1

1                IN THE UNITED STATES DISTRICT COURT
2                    FOR THE DISTRICT OF COLORADO
3     Case No. 14-mj-01077-BNB
4     _____
5     UNITED STATES OF AMERICA,
6          Plaintiff,
7     vs.
8     RICKY GARRISON,
9          Defendant.
10    _____
11         Proceedings before MICHAEL E. HEGARTY, United
12    States Magistrate Judge, United States District Court for
13    the District of Colorado, commencing at 10:57 a.m., June 4,
14    2014, in the United States Courthouse, Denver, Colorado.
15    _____
16         WHEREUPON, THE ELECTRONICALLY RECORDED PROCEEDINGS
17    ARE HEREIN TYPOGRAPHICALLY TRANSCRIBED...
18    _____
19                            APPEARANCES
20         ZACHARY PHILLIPS, Assistant United States
21    Attorney, appearing for the government.
22         ROBERT PEPIN, Assistant Federal Public Defender,
23    appearing for the defendant.
24    _____
25            PRELIMINARY/DETENTION HEARING - CORRECTED

                   AVERY/WOODS REPORTING SERVICE, INC.
              455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
                     303-825-6119      FAX 303-893-8305

2

1         P R O C E E D I N G S
2             (Whereupon, the within electronically recorded
3    proceedings are herein transcribed, pursuant to order of
4    counsel.)
5             THE COURT: Case No. 14-mj-01077, United States of
6    America versus Ricky Garrison.
7             MR. PHILLIPS: Good morning, Your Honor. Zachary
8    Phillips on behalf of the United States.
9             MR. PEPIN: Robert Pepin appearing for Mr.
10   Garrison, and he's present in custody, Your Honor.
11            THE COURT: Thank you, Mr. Pepin.
12            I guess we're here solely on the issue of
13   detention, is that correct?
14            MR. PHILLIPS: Yes, Your Honor. I was talking to
15   defense counsel earlier, and I needed a couple of more days
16   prior -- for the preliminary hearing, and in anticipation of
17   that, that will probably become unnecessary.
18            THE COURT: Okay. So where are we, then? I'm
19   sorry.
20            MR. PEPIN: Detention hearing, Your Honor.
21            THE COURT: Right. I'm ready. You guys ready?
22            MR. PHILLIPS: Certainly, Your Honor.
23            THE COURT: Okay. I take it you're asking for
24   detention and you're challenging?
25            MR. PEPIN: Correct.

1          MR. PHILLIPS: Yes.

2          THE COURT: All right.  Very good.

3          Do you want to put on any evidence?

4          MR. PHILLIPS: I'm not going to put on any
5   evidence, Your Honor, I would just ask the Court take
6   judicial notice of the Presentence Report and the file in
7   front of the Court.  I would point out to the Court the
8   defendant's criminal history and the fact that he's here
9   looking at two felon in possession of a firearm charges, as
10  well as the ammunition, and he's got two prior gun charges
11  or arrests, one in 2009 and 2001.  The 2009 was a
12  conviction.

13         He's also got prior drug charges in 2006 and 2011.
14  He's got assaults in 2010 and 2011. In addition, he has an
15  arrest for intimidating witness, a 2010 charge, showing his
16  danger to the community.

17         I would also note that in the Presentence Report
18  the defendant notes he's been shot at least twice,
19  recognizing that, you know, Ronald Reagan has been shot;
20  however, the vast majority of people that get shot in this
21  country it's due to some sort of activity that people should
22  not be involved in, it shows a danger to the community.

23         In addition, the defendant has what I counted was
24  three -- at least three probation violations, one of them as
25  recent as January of this year.  Two failures to appear.

4

1    I'd also note to the Court that the defendant's
2    drug charge in 2011 lists as dismissed.  It's my
3    understanding that that is in fact correct; however, I can
4    also tell the Court that it's my understanding that that
5    charge was dismissed, as one of the witnesses in the case,
6    a material witness for the government -- or for the state
7    charges was murdered prior to trial, and at this point
8    there's been at least enough probable cause to order the
9    defendant to supply his DNA as part of that investigation,
10   so obviously he is a suspect, or at least being considered
11   in that case.
12              THE COURT:  Who'd you receive that information
13   from?
14              MR. PHILLIPS:  That's from the Aurora Police
15   Department.
16              As such, Your Honor, we would ask the defendant be
17   detained, as he shows a flight risk, as well as an extreme
18   danger to the community.
19              THE COURT:  Thank you.
20              Mr. Pepin?
21              Oh, by the way, could you put on the -- the
22   factual basis for the current charge, please.
23              MR. PHILLIPS:  Yes, Your Honor.  In the current
24   charge, the defendant was staying at A residence, and I did
25   forget to note one thing thanks to the Court.  While he was

1    staying there in a basement bedroom, which was his bedroom,
2    according to the person who owns or rents the home said that
3    that was all of his property and that he stayed there on a
4    regular basis, and that was his room that he was allowed to
5    live in.  During a search warrant that was executed at that
6    house, a firearm was found underneath the bed in which the
7    defendant and his girlfriend were sleeping, as well as
8    another firearm in a box in a closet, both of which were
9    loaded.
10             THE COURT: Okay.  Thank you.
11             Mr. Pepin?
12             MR. PEPIN: Thank you, Your Honor.
13             I am guessing that most of the people who have
14   been victims of gunshots in the United States of America who
15   -- whose having been shot didn't result in charges against
16   themselves, because they were considered aggressors, would
17   be shocked to learn that to be shot means that you somehow
18   are a bad person, and I frankly am astonished and
19   entertained, to no small degree, by Mr. Phillips, a very
20   experienced prosecutor, for making a statement like that in
21   open court.  I guess I'd encourage him to go out and make a
22   statement like that in public before the press and see what
23   happens.  And if David Lane was standing here, it's probably
24   what would happen is it would be in public.
25             THE COURT: Maybe David Lane would ask him to step

1  outside the courtroom.
2  MR. PEPIN: I saw that, Your Honor, and I don't
3  know if he would, and I think I'd put my money on Mr.
4  Phillips, as much as I like David, in any event. I think he
5  played hockey too long to be a victim of just getting
6  slapped around.
7  And I'm not meaning to come across as chippy, but,
8  you know, that -- that really, keeping with the hockey
9  theme, that really was an astounding thing to say.
10  Especially, I think, when we go about breaking down a couple
11  of things involved with this Pretrial Services Report. And
12  actually, before I get to that, let me -- let me add the
13  following: I understand that there has been this
14  investigation that involved -- or involves someone
15  apparently being killed, and someone who may have been a
16  witness in an offense -- or to an offense that perhaps
17  involved Mr. Garrison, but apparently investigators have --
18  and I think it's a natural thing if there's a case ongoing
19  and someone involved in that. I don't know who this person
20  was or to what degree she was a pivotal witness, or what the
21  circumstances of her dying were, you haven't been presented
22  with any of that and, frankly, him being labeled a danger to
23  the community because of that circumstance when --
24  apparently this happened a year-and-a-half ago, two years'
25  ago.

1                THE COURT: Three.

2                MR. PEPIN: Three -- three years' ago.

3                THE COURT: Well, two-and-a-half, you're right.

4                MR. PEPIN: And investigation, I'm assuming, has

5     gone on and on, and there hasn't been any charge coming

6     against Mr. Garrison.  It's frustrating that that's being

7     brought up in way as -- as a possible reason why he should

8     not be given bond.

9                You know, I -- and the fact that there was enough

10    probable cause to get a warrant so that he can get his -- so

11    that he could be ordered to give a DNA sample is

12    interesting, but the threshold with regard to something like

13    that is not particularly high, and I haven't seen the

14    allegations or the search warrant, and I guess we could take

15    a look at that to see just how viable a potential culprit he

16    is in terms of that particular investigation.  My guess is

17    if they really had probable cause to arrest him, he'd be

18    arrested.

19                THE COURT: Right.

20                MR. PEPIN: And so all of that in terms of just the

21    peripheral background that has been thrown out here.

22                Now, if I can get to the Pretrial Services Report.

23    I -- there are a couple of things I need to proffer, and I

24    want to do that just to sort of get to them so I don't

25    forget to mention them.  They include -- you know, there's

1   a reference on page 6 at the top with regard to a public
2   indecency conviction.  Let me just tell you, that had to do
3   with urinating in public, and, you know, no sort of exposure
4   or anything like that.
5           The indication here is a plea of nolo contendere
6   with a sentence to 12 months' credit for time served.  It
7   seems sort of odd to me and suggested there were -- that he
8   was in custody for a year or something down in Georgia, and
9   I've tried to clear that up, because I'm told that is not
10  what happened.  We were able only to get something online,
11  we've got the regular court records on order.  The stuff
12  online makes the same reference, I'm assuming the probation
13  department got that information online, but my understanding
14  is -- and if you -- looking at the -- at the -- just this
15  basic docket sheet that we have, my understanding from Mr.
16  Garrison is that he spent a night in jail, bonded out, was
17  not living in Georgia, came back to Colorado, hired a
18  lawyer, whose name is reflected in the -- in the docket
19  sheet, a man named -- I'll see it here in a second.  A man
20  named Andrew Fiddes, F-I-D-D-E-S.  I've just gotten a
21  release today so that we can try and get whatever
22  information we have, and that -- that the plea was actually
23  entered long distance and the matter was resolved with 40
24  hours of community service and fines being paid, and court
25  costs.  So, you know, to what degree -- I guess there's a

1    suggestion by him supposing to have been in jail for 12
2    months that he's a worse guy, I guess.
3            Let me also add something we were able to clear up
4    on page 9, the top entry having to do with Denver Case No.
5    13-1497.  The reference is that -- in the right-hand column
6    -- to a request for a warrant for -- and a complaint for
7    revocation of probation with a sentence to 90 days jail and
8    90 days ankle bracelet.  Let me --
9            MR. PHILLIPS: That -- is that sentence suspended?
10           MR. PEPIN: So the jail sentence was suspended.
11   And we took a look at the court record with regard to that,
12   I've got it if you'd like to see it, and I informed Mr.
13   Phillips that I received this, but it says 90 days ankle
14   bracelet, and in reality what happened was that the judge
15   gave him 90 days ankle bracelet, said if you do what you're
16   supposed to do for 30 days, then we'll take the ankle
17   bracelet off.  The documents that we received from the court
18   yesterday indicate that that's exactly what happened, he
19   complied with the terms and conditions, they removed the
20   ankle bracelet, which is why he didn't have it when he was
21   arrested at the time that that particular instance -- that
22   this -- this matter took place that got -- that we're in
23   front of the Court for now.
24           So, the allegation is that because of failures to
25   appear, two of them, and there are a number of these things,

1  obviously, but actually -- in fact, what I'd like to do is
2  go -- just run through the assessment of nonappearance and
3  the assessment of danger.  One of the ticks with regard to
4  that for both of those areas of assessment have to do with
5  reporting daily marijuana use, having a Medical Marijuana
6  Card since 2008 for leg pain, how that really fits into
7  these particular assessments, and I'm not sure, Medical
8  Marijuana Cards have been legal in Colorado since at least
9  19 -- 2008, and if he's been following the law in using
10 that, then he just simply has.  And I don't see how that
11 fits one way or the other into this other information.

12             He does, over the course of his life, have two
13 failures to appear.  One of them we also got also records
14 on, that had to do with this matter on page 9, the Denver
15 Police Department case involving registration of a fictious
16 plate.  You can see -- and the court record that we got
17 bears this out.  He failed to appear on 5-13, and then he
18 went in and the warrant was cancelled on 5-23.  There's no
19 indication he was arrested on that.  He basically realized
20 that he had missed court, made a mistake, and went in and
21 turned himself in on it, paid the $100 fine that he needed
22 to, pled guilty.  That, actually, was held off for some
23 time, pled guilty and was eventually assessed fines and
24 costs.

25             The other one was some time ago, and I don't even

1   remember how long ago it was, but in any event, he's got --
2   he's had a number of contacts, many of them traffic, many of
3   them minor, and he appears to have appeared in court most of
4   the time.  And when I say "most of the time," all of the
5   time but for those two instances, one of which he realized
6   the mistake and took care of himself.
7            He has had three bench warrants for violation of
8   probation.  They -- he has taken care of all of those.
9   They've had to do with a variety of -- I mean, with
10  different issues that needed to be addressed, and he has, I
11  think the most recent one that I just made reference to
12  before is the most telling, and that has to do with -- in
13  fact, two things.  One, that he failed to appear and then
14  went in on his own, and secondly that he complied with the
15  court's order so that he got off the ankle bracelet order --
16  over -- or, excuse me, early so that he could be -- because
17  he complied as he was supposed to.
18           He -- well, I think that basically -- I mean, he
19  has a minor conviction for a drug abuse matter.  He's had
20  other -- a number -- and most of the things that we see here
21  are minor things indeed.  And if you'd just give me one
22  second, Your Honor.
23           (Pause) I'm looking to the reference -- for the
24  references to the assaults that counsel made reference to
25  and the intimidating of a witness.  Intimidating a witness

1    is referred to, and what he -- what Mr. Phillips said was
2    that he was arrested for intimidating a witness, that's on
3    page 7, it's the entry 10-18-2010.  You know, I'm sorry, but
4    acquitted still means something to me, and he was found not
5    guilty of that, whatever the circumstance, and that should
6    not be even brought up.
7             What we have here is -- the assault that I see has
8    to do with assault and battery, simple misdemeanor,
9    disposition unknown.  I don't know what that is, but it
10   certainly doesn't indicate that there's a conviction with
11   regard to that, he may have been suspected of it.  Maybe he
12   was convicted, maybe he wasn't, but I don't think that fits
13   into the pot, and I think those were the primary things that
14   I wanted to point out with regard to his record and the
15   like.
16            Mr. -- Mr. Garrison has a place to stay.  He
17   hadn't worked for the last month but is willing to get out
18   there and work, he's willing to be on an ankle bracelet.
19   He'd be staying with Shanna, S-H-A-N-N-A, Waterson
20   (phonetic), at 10340 East 13th Avenue in Aurora, and he --
21   they have -- he has seen her, they've been in a relationship
22   off and on since about 2010, and an important thing with
23   regard to failure to appear issue here is that Ms. Waterson
24   has a son who's ten years old, he's in the fourth grade.
25   Mr. Garrison has embraced that boy as his own, and has cared

```
 1        for and taken care of him, and what I mean by that is -- it
 2        is -- he and Ms. Waterson have had some issues between the
 3        two of them in the recent past, but that hasn't affected the
 4        relationship with her son, and he has been involved with
 5        that young man, and what Ms. Waterson told me yesterday was
 6        that that is a close relationship and she doesn't see that
 7        changing, and they both would welcome him into -- into her
 8        home.
 9                  I'd also add that she is employed and she works as
10        a legal assistant in town, and, in fact, that's where she
11        was yesterday when I -- when I reached her.
12                  On balance, Your Honor, our positions is this:  We
13        understand that there is -- that there has been -- there was
14        a search warrant conducted and that some guns were found.
15        I haven't seen the discovery, I don't know what the --
16        whether or not this is something that really bears a strong
17        possibility of conviction.   From what I read in the
18        Complaint, apparently there's a bed -- a gun under a bed,
19        between mattresses on the bed that is alleged that Mr.
20        Garrison was staying at, or sleeping on, and another gun in
21        a box.  I have seen no description as to where the box was
22        found, if it was even in that bedroom.  I don't know.  I'm
23        thinking that if it were in that bedroom it'd be in neon
24        lights, but, you know, who knows?
25                  And I'm eager to see what the discovery is going
```

14

1     to bring us, but, right now it looks like we have a place
2     for this man to stay, he has got ties to this community in
3     the form of Ms. Waterson and her son, and he is -- his
4     record is, I think, for however it's glossed, is nowhere as
5     near as bad or dangerous to the community as has been
6     described, and we'd ask that you'd allow him to be released
7     on the -- on an ankle bracelet, that is, electronic
8     monitoring.
9                 THE COURT: Well, let me -- let me pose this to
10    you. Doesn't the record appear to reflect someone who just
11    has to have a gun at all times? The four felonies he's
12    faced all involve guns. Three. Two convictions, the
13    current charge, the one where he wasn't convicted of a gun
14    charge, carrying a concealed gun and a felony possession of
15    gun were dismissed because he pleaded guilty to assaulting
16    a police officer. So doesn't it appear that this is just a
17    person who, for whatever reason, is in a culture or a place
18    in his life where he's got to have a gun?
19                MR. PEPIN: I don't know if it says that or not.
20    It says that he appears to have had contact with guns in the
21    past, yes, it says that, but I don't know what --
22                THE COURT: Well, the very recent past.
23                MR. PEPIN: -- that says prospectively.
24                Well, and -- well, 2009, yeah. I --
25                THE COURT: No, within the last 30 days.

1               MR. PEPIN: Oh, you mean assuming he's guilty of
2      this?
3               THE COURT: Well, not assuming.  I mean, there was
4      -- is there probable cause?  I don't think -- there was an
5      Indictment here, right?
6               MR. PEPIN: Well, no, there isn't yet, and that's
7      why we're -- apparently there's going to be one tomorrow,
8      although --
9               THE COURT: Oh, there's just a Complaint?
10              MR. PEPIN: -- I don't think they're allowed to say
11     so out loud --
12              THE COURT: Okay.
13              MR. PEPIN: -- because they can't presuppose that
14     they can actually get to the jury to indict a ham sandwich,
15     but...
16              THE COURT: Understood.  Okay.  Thank you very much
17     for your argument.
18              MR. PEPIN: Thanks.
19              THE COURT: Anything further, Mr. Phillips?  Do you
20     want to retract any of those gunshot statements?
21              MR. PHILLIPS: No, since Mr. Lane's not here today.
22     Thank you, Your Honor.
23              THE COURT: Mr. Pepin is a good substitute for Mr.
24     Lane, I know them both.
25              All right.  Well, Mr. Garrison, it does seem like

1   to me -- I don't know about the risk of flight, I think on
2   the whole with being from Michigan, it looks like, and not
3   having been in Colorado very long, I think a year or so, I'm
4   not sure.  Not having ever had any employment reported in
5   Colorado, although you do have a child you're calling your
6   own.
7               MR. PHILLIPS: Your Honor, can I just say -- and
8   I'm sorry to interrupt, but I think he's been here seven
9   years.
10              THE COURT: For seven years, okay.
11              The record was -- I didn't see that in the record.
12              MR. PHILLIPS: Well, I'm sorry I didn't say it.
13              THE COURT: You think it's -- is it seven, Mr.
14  Pepin?
15              MR. PEPIN: That's my understanding it's seven.
16              MR. PHILLIPS: I think that's correct, Your Honor.
17              THE COURT: Okay.  Well, still -- I mean, for
18  goodness sake, seven years with no reportable employment is
19  an issue for me.  I don't know how one supports themselves
20  without making any money, but I guess he would have more
21  connections to the community than I thought.  It does say
22  that he lived in Aurora for six years and a total of seven
23  in Colorado.
24              I just see it as a risk.  I see it as Mr. Garrison
25  believes he needs to have a gun, and I believe on this

17

1   record if I released him he would have a gun, and that's
2   dangerous, for obvious reasons, so the order will be
3   custody.
4              Anything further?
5              MR. PHILLIPS: What time on Friday, Your Honor?  I
6   would request something in the afternoon if at all possible.
7              THE CLERK: (Inaudible - not at microphone).
8              THE COURT: Oh, he just -- he requested afternoon
9   if at all possible.
10             THE CLERK: (Inaudible - not at microphone).
11             THE COURT: Yeah, that -- Judge --
12             MR. PHILLIPS: And I do understand the Court's
13  going to be very busy that day, and --
14             THE COURT: I think Judge Tafoya is going to take
15  Friday afternoon, actually, so we'll shoot for 2.  I mean,
16  we'll get you in, it will happen in the afternoon.
17             MR. PHILLIPS: Great.
18             MR. PEPIN: Two o'clock, then, is what we'll shoot
19  for?
20             THE COURT: Yes, so to speak.
21             MR. PHILLIPS: That's it.
22             THE COURT: Okay, that will be all.  Mr.
23  Garrison's remanded to the custody of the U.S. Marshal.
24
25             (Whereupon, the within hearing was then in

```
                                                                  18
1      conclusion at 11:21 a.m. on June 4, 2014.)
2
3              I   certify  that   the  foregoing  is   a   correct
4      transcript, to the best of my knowledge and belief, from the
5      record of proceedings in the above-entitled matter.
6
7         /s/ Bonnie Nikolas                        June 14, 2014
8          Signature of Transcriber                      Date
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

AVERY/WOODS REPORTING SERVICE, INC.
455 SHERMAN STREET, SUITE 250, DENVER, CO  80203
303-825-6119        FAX 303-893-8305