IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 14-cr-00231-WJM-01

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1. **RICKY GARRISON**,
2. JAMES TILLMON,
3. CHRISTOPHER MARTINEZ,
4. FRANCISCO AGUILAR,
5. SIMEON RAMIREZ,
6. CHRISTOPHER VIGIL,
7. TRAVIS EDWARDS,
8. DONDRAI FISHER,
9. ARCHIE POOLE,
10. LUIS RAMIREZ,
11. MELVIN TURNER,
12. SHAWN BEARDSLEY,
13. SIDNEY TAYLOR,
14. GREGORY WILLIAMS,
15. ROBERT PAINTER, and
16. LATOYA WIMBUSH,
          Defendants.

---

**DEFENDANTS' MOTION FOR SPECIFIC DISCOVERY**

---

The defendant, Ricky Garrison, by and through counsel, James A. Castle and Mitchell

Baker, and the remaining codefendants hereby move for discovery as set forth below.

## I. INTRODUCTION

In this investigation, the government submitted several applications to intercept

communications on thirteen separate telephones. Each application references a "target

organization." The "target organization," in reality consisted of nothing more than an amorphous group of individuals. The affidavits themselves and the discovery provided demonstrate that the so-called "organization" had no discernable structure or common purpose. The applications claimed both implicitly and explicitly that the interceptions sought were in furtherance of an investigation of large-scale drug distribution and/or the Gangster Disciples street gang. The discovery provided, the indictments obtained, and the pleas entered to date all establish that there was never a meaningful investigation into large-scale drug dealing or the Gangster Disciples Street gang. In reality this was nothing more than an investigation of one alleged Gangster Disciple, Ricky Garrison, who law enforcement knew to be a small time street level drug dealer. Law enforcement did, however, believe Garrison was involved in the murder of an Aurora confidential informant and attempted to use Title III to investigate a state crime that is not one of the enumerated predicate offenses that could serve as a basis for a federal wiretap.

According to the government, this investigation began as an Aurora Police investigation at least as early as January 2013. In December of 2012 CHS-1 allegedly came forward and provided information about alleged drug trafficking activities of defendant Francisco Ramirez. The government described CHS-1 as, "an associate of both Francisco Ramirez and Ricky Garrison." Upon information CHS-1 was intimately familiar with defendant/target Francisco Ramirez because she was in fact his live in girlfriend.

The affidavits acknowledged that Francisco Ramirez was previously well known to law enforcement and that his phone was tapped in August of 2012 pursuant to a state

court order out of Denver in an investigation dubbed "Red Dawn". This disclosure, like the above description of CHS-1, was incomplete and misleading. The affidavits failed to disclose that the state court interception of Mr. Ramirez was terminated once it was determined Francisco Ramirez was buying from the state court targets rather than supplying them and the investigating agents in Red Dawn had no interest in using a wiretap to work down from him. Mr. Ramirez was not even charged in Red Dawn.

Discovery provided reflects that on January 2, 2013 agents investigated an alleged attempted robbery of a drug dealer. The police reports provided indicate that Aurora detectives were attempting surveillance on an unrelated matter when they came upon two vehicles, which they started following. They subsequently had one of the vehicles pulled over. The driver of the vehicle was Francisco Ramirez. Two guns were found in the vehicle along with masks, bandanas and black gloves. Mr. Ramirez claimed ownership of the guns and was charged in Arapahoe District Court with being a felon in possession of a weapon.

The report by Investigator Gullicksrud, who was also the affiant on several of the wiretap applications, stated that he received a call from DEA agent Joel White, approximately thirty minutes after Mr. Ramirez's arrest. Agent White related that a source of information had just called to tell him that police had stopped Mr. Ramirez on his way to commit a home invasion robbery of a known drug dealer.   Apparently Investigator Gullicksrud met with this source of information that implicated Mr. Garrison who she knew only as "G". This source, who clearly is CHS-1, indicated that Mr. Ramirez and Garrison were planning again to try to commit the robbery on January 4,

2013. Surveillance was established and purportedly saw Garrison and Mr. Ramirez meet but no robbery occurred.

On January 19, 2013 the Aurora confidential source was murdered. On January 29, 2013 Garrison was interrogated as part of the homicide investigation. Though the investigation of Garrison undoubtedly continued, the government has not provided any reports covering any investigation between the dates of January 29, 2013 through May 15, 2013.

On May 16, 2013 Francisco Ramirez was again arrested and charged with possession of cocaine in state court. He was found to be in possession of .32 grams of cocaine. Discovery provided incudes the Affidavit of Probable Cause for Mr. Ramirez's arrest. Aurora Police Officer Hitchings affirmed that she was in plain clothes working with Investigator Gullicksrud when she observed Ramirez driving. She knew he did not have a valid driver's license so she had uniformed officer's pull him over on traffic violations.  Interestingly Investigator Gullicksrud's affidavit in the Title III case affirmed that he was conducting surveillance at Garrison's apartment and observed Mr. Ramirez leave the apartment. He followed Mr. Ramirez and saw him engage in what he believed was a drug transaction in a parking lot. Uniformed Aurora officers then stopped Mr. Ramirez.

The May 16 Ramirez arrest is significant in three respects. First, the defense has been given no reports, logs or other information concerning this surveillance or discovery pertaining to any investigation that was occurring in May of 2013. Second the varied descriptions of the event as reflected in Investigator Gullicksrud's sworn affidavit

for the wiretap and Hitchings' sworn affidavit for the arrest illustrate the concept of parallel construction (see section D infra). Finally the amount of cocaine seized from Francisco Ramirez demonstrated that he was either a user or an extremely low level dealer and that the police involved in this investigation were aware of this fact.

The affidavits and the discovery reference two confidential informants, CHS-2 and CHS-3 who made or attempted to make purchases of miniscule amounts of heroin in Denver Civic Center Park in the summer of 2013. Allegedly the sellers of the heroin were members of the Gangster Disciples. There is nothing in the affidavits or discovery that indicate that the drug dealing in Civic Center Park had anything to do with any of the individuals targeted in Garrison's case. At the end of July 2013, CHS-1 became a paid informant who also received law enforcement assistance purportedly pertaining to a traffic matter. Additionally in the summer of 2013, CHS-4, who claimed to have bought drugs from Garrison on multiple occasions, was enlisted as a confidential source in connection with the Garrison investigation.

CHS-1 was able to introduce an undercover officer to Francisco Ramirez. On August 14, 2013 the undercover officer bought one half ounce of cocaine from Mr. Ramirez.  On August 20, 2013 the undercover officer again made a purchase form Mr. Ramirez. On this occasion, surveillance was established and the officer actually obtained the cocaine from a runner for Mr. Ramirez's source and Mr. Ramirez. The source was determined to be Jesus Molina-Villareal based upon information provided by CHS-1. In September 2013 law enforcement obtained a tracker for the vehicle driven by Mr. Molina-Villareal's courier and for Mr. Ramirez's car. CHS-1 was also able to

advise officers that Mr. Molina-Villareal had obtained a new vehicle including the make, model, color and plate number. Based upon surveillance of Mr. Molina-Villareal and his courier, law enforcement was able to arrest a customer of Mr. Molina-Villareal. This customer was able to perform several consensually recorded phone calls with Mr. Molina-Villareal and conduct several controlled buys with Mr. Molina-Villareal commencing October 15, 2013.

In September of 2013, CHS-1 advised law enforcement that Garrison moved. Surveillance was established and the police watched Garrison move into his new residence. This information was obtained from a surveillance report. No report of any meeting or communication with CHS-1 was provided. On October 10, 2014 CHS-4 placed a consensually recorded telephone call to Garrison in which CHS-4 inquired about obtaining a sixteenth of an ounce of cocaine for $150.00.

On October 23, 2013 the first wiretap was approved on a phone belonging to Francisco Ramirez. Prior to October 23, 2013 law enforcement had a confidential source, CHS-1, living with the target of the tap, seemingly keeping officers abreast of Mr. Ramirez's dealings; they had an undercover officer introduced by CHS-1 buying directly from Mr. Ramirez the target of the tap; they had a confidential source buying directly from Mr. Ramirez's source; and, importantly, they had strong evidence from their own investigation and from Operation Red Dawn that Mr. Ramirez was a low level dealer. They also had a confidential source directly in contact with Garrison. They had no information that Mr. Ramirez was connected with the Gangster Disciples, in fact they believed he was a member of Duke Surenos. They knew with certainty that neither Mr.

Ramirez nor Mr. Garrison was in any position to be a significant source of supply to any street gang. In short, the government's use of traditional or normal investigative techniques was going extremely well with respect to their investigation of Mr. Ramirez's low level drug dealing, his source of supply's drug dealing and Garrison's low level drug dealing. Strong cases had been developed without the use of Title III. It is not surprising that the government was able to make strong cases almost at will because the following agencies were participating in the investigation: the Aurora Police Department, the Metro Gang Task Force (which is comprised of the Denver Division of the FBI, U.S. Immigration and Customs Enforcement's, Homeland Security Investigations, Adams County Sheriff's Office, Arapahoe County Sheriff's Office, Aurora Police Department, Colorado State Patrol, Commerce City Police Department, Colorado National Guard Counter Drug Unit, Denver District Attorney's Office, Denver Police Department, Jefferson County Sheriff's Office, the High Intensity Drug Trafficking Areas Program (HIDTA), the Lakewood Police Department, Douglas County Sheriff's Office and the Thornton Police Department. Agencies with the  assistance of the Westminster Police Department; the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF); and the U.S. Marshals Service), the Rocky Mountain Safe Streets Task Force (which is comprised of the FBI, the Federal Protective Service, the Denver Police Department, the Lakewood Police Department, the Colorado State Patrol, the Jefferson County Sherriff's Office, ICE and the DEA).  The government was devoting an enormous amount of resources to the investigation separate and apart from any wiretap.  These other resources were met with success. Starting with the first tap on October 23, 2013

the government proceeded for the next seven months from each tap successively without ever pausing to evaluate or apply normal investigative techniques to the material that they had collected. In total 13 phones were tapped and 9 separate applications were submitted.  Throughout this process the government selected and presented facts to the issuing judge that was misleading and materially incomplete. The material was misleading as to necessity and as to the true purpose of the investigation.

The items sought herein are relevant to a showing that the affidavits contain materially false statements or omissions, that the applications were not full and complete statements, to establish that the wiretaps did not meet the necessity requirements of Title III or the requirement that the targets of the interception be properly described, and that the crimes being investigated are among the enumerated crimes set forth as predicates in Title III. Therefore, the information described with some specificity below should reasonably be considered favorable to the defense in the context of a motion to suppress evidence obtained pursuant to the Title III interceptions.

The government portrayed their need for the wiretaps as a critical tool in an investigation of major drug traffickers and/or the Gangster Disciples Street gang. In fact, because there was no real "organization" being targeted, the government could not consistently describe even their own concept of the "organization".

## II. LAW

Defendants Ricky Garrison, James Tillmon, Christopher Martinez, Francisco Aguilar, Simeon Ramirez, Christopher Vigil, Travis Edwards, Dondrai Fisher, Archie Poole, Luis Ramirez, Melvin Turner, Shawn Beardsley, Sidney Taylor, Gregory

Williams, Robert Painter, and Latoya Wimbush ("the defendants"), pursuant to Fed. Rule Crim. P. 16, *Kyles v. Whitley*, 514 U.S. 419, 437 (1995), *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and other authorities cited herein move this Court for an order directing the government to make inquiry as required by *Kyles* and to disclose all of the information described below. This motion seeks discovery of specific information necessary for effective preparation of pretrial motions as well as trial.

**A. The Government's Obligation to Disclose Evidence Favorable to the Accused**

1. Disclosure obligations

The defense has set forth the law regarding disclosure obligations in the concurrently filed Motion for Discovery concerning Confidential Sources, which is incorporated by reference herein.

**B. Evidence Which Would Support A Defense Motion Is Exculpatory Within The Meaning Of *Brady*.**

The failure to provide material evidence, whether at trial or on a pretrial motion, violates due process if there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. *U.S. v. Gamez-Orduno*, 235 F.3d 453, 461 (9th Cir. 2000). Judge Nottingham expressly held that withholding information that could be the basis of a motion to suppress violates the Defendant's rights as much as if trial evidence were suppressed. (Transcript, November 19, 2003, page 21, lines 5-10, attached).

9

In the traditional Fourth Amendment search context, individuals in a position to have standing to challenge the validity of the warrant necessarily have sufficient relation to the area searched that they would possess information required in a *Franks* challenge.  In the wiretap context, individuals whose conversations are overheard may have little or no connection with the primary target of the intercepted communications. In order to have any meaningful opportunity to make the attack on the wiretap as is specifically authorized by Title III, all defendants must have full and complete information provided by the government to fully assess the validity of the affidavits. The government claims in its affidavits and application for the wiretaps to have a need for the wiretaps and the defense merely wishes to meaningfully contest that assertion. The right of the defense to challenge the wiretaps and seek to suppress evidence derived from the wiretaps is specifically set forth in Title III which includes its own exclusionary rule. 18 U.S.C. §2515.

Two federal district courts have incorporated this standard into their local rules regarding discovery in criminal cases:

> Exculpatory information is information that is material and favorable to the accused and includes, but is not necessarily limited to, information that tends to:
>
>  (2) cast doubt on the admissibility of evidence that the government anticipates using in its case-in-chief, that might be subject to a motion to suppress or exclude, which would, if allowed, be appealable pursuant to 18 U.S.C. § 373

*Local Rules of the United States District Court for the District of Massachusetts*, rule 116.2; *United States District Court for the Western District of Pennsylvania*, local

criminal rules of court W.D. Pa. LCRR 16 (2015).  cited in *United States v. Scott*, 2013 U.S. Dist. LEXIS 84851 (D. Mass. June 17, 2013); *United States v. Turner*, 2012 U.S. Dist. LEXIS 32482 (W.D. Pa. Mar. 12, 2012).

In other contexts the Courts have ruled that they have the inherent authority to order disclosure of materials which would support a motion to suppress evidence or to support a habeas corpus petition. In *Harris v. Nelson*, 349 U.S. 286, 298, 300 (1969) the issue was "whether state prisoners who have commenced habeas corpus proceedings in a federal district court may, in proper circumstances, utilize the instrument of interrogatories for discovery purposes." *Harris*, 349 U.S at 288. In recognizing there to be "no higher duty of a court, under our constitutional system, than the careful processing and adjudication of petitions for writs of habeas corpus," and "that a habeas corpus proceeding must not be allowed to founder in a 'procedural morass,'" the Court concluded that, in appropriate circumstances, a district court had inherent authority "to use or authorize the use of suitable discovery procedures, including interrogatories, reasonably fashioned to elicit facts necessary to help the court to 'dispose of the matter as law and justice require.'" *Id*. at 290, 292- 1086-87 (quoting 28 U.S.C. § 2243).

The Court thus held that in federal habeas corpus proceedings, "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." *Id*. at 300.

Following the *Harris* decision, the federal courts implemented the Rules Governing § 2254 and 2255 Cases in order to bring lower court's inherent authority within the procedural rules. See *Bracy v. Gramley*, 520 U.S. 899, 909 (1997). In *Bracy*, the petitioner had made specific allegations that that the judge who presided over his trial had an interest in his conviction to deflect suspicion that the judge was taking bribes in other cases, and that this interest violated the fair-trial guarantee of the Due Process Clause. 520 U.S. at 901. He sought discovery of (1) the sealed transcript of the judge's corruption trial; (2) reasonable access to the prosecution's materials in the judge's case; (3) the opportunity to depose persons associated with the judge; and (4) a chance to search the judge' rulings for a pattern of pro-prosecution bias. *Id.* at 902.  In deciding the case, the Supreme Court of the United States reiterated its holding in *Harris* and held further that the petitioner had showed "good cause" to justify discovery on his claims. *Id*. at 908-09 (citing *Harris*, supra at 300).

In *United States v. Nobles*, 422 U.S. 225, 45 L. Ed. 2d 141, 95 S. Ct. 2160 (1975), which approved exercise of a District Court's inherent authority to order the disclosure of certain witness statements, the Court felt it necessary to make sure that such exercise did not conflict with Federal Rule of Criminal Procedure 16. The material requested herein is not specifically addressed by Federal Rule of Criminal Procedure 16 and as a result an order under the Court's inherent authority would not conflict with the rule. As to the disclosures not mandated by Rule 16, the court has inherent authority to enforce its specific discovery order.  *United States v. Grace*, 526 F.3d 499, 516 (9th Cir. Mont. 2008)

Other courts also have held that disclosure in the grand jury context is permissible outside the dictates of Rule 6(e). See, e.g., *In re Hastings*, 735 F.2d at 1267-68; *In re Grand Jury Proceedings, Miller Brewing Co.,* 687 F.2d 1079, 1088 (7th Cir. 1982) (stating, in dictum, that a court may have discretion to disclose grand jury records when there is an extraordinary and compelling need to do so in the interests of justice), vacated in part, 717 F.2d 1136 (7th Cir. 1983); *In re Special February, 1975 Grand Jury*, 662 F.2d 1232, 1235-36 (7th Cir. 1981), aff'd sub nom. *United States v. Baggot*, 463 U.S. 476, 77 L. Ed. 2d 785, 103 S. Ct. 3164 (1983) (stating, in dictum, that a court "in rare situations may have some discretion" to order disclosure in circumstances not covered by Rule 6(e)); see also *In re Grand Jury Proceedings*, 800 F.2d 1293, 1303 (4th Cir. 1986) (holding that the district court did not abuse its discretion by allowing disclosure of grand jury material to the government for a civil suit).

This Court has already found in this case and others that it has the inherent authority to issue orders requiring disclosures by a party. Order Regarding Joint Defense Agreement Disclosures (Doc. # 100); See also *United States v. Brown*, 2013 U.S. Dist. LEXIS 62333, 2-3 (D. Colo. May 1, 2013); *United States v. Reed*, 2013 U.S. Dist. LEXIS 25647 (D. Colo. Feb. 25, 2013).

### C.  The Odd Nature of What is Favorable to the Defense in the Context of a Title III Challenge

Though perhaps counterintuitive, evidence that would be inculpatory at trial is in fact favorable to an accused in the context of a motion attacking the validity of a wiretap. In order to obtain authorization to conduct a Title III interception, the government must

convince a district court judge that normal investigative procedures have been tried, or at least considered, and that they are unlikely to succeed. 18 U.S.C §§ 2518 (1) (c) and (2)(c). This is commonly referred to as "necessity." The necessity requirement was added to Title III by Congress "to assure that wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Kahn*, 415 U.S. 143, 153 n.12 (1974) (citing S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112) In other words, mandating that a "full and complete statement" regarding necessity be provided in the warrant application is designed "both to underscore the desirability of using less intrusive procedures and to provide courts with some indication of whether any efforts were made to avoid needless invasion of privacy." *United States v. Lilla*, 699 F.2d 99, 104 (2d Cir. 1983).

A showing that the government could have achieved its goals without resorting to a wiretap can be the basis for suppression. *United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997). In order to make such a showing, the defense must establish that the government had information that, through normal investigation, would have achieved its goals. The more evidence the government possessed or had access to concerning the targets and stated objectives of the investigation, the less likely the need for Title III interception. Therefore, inculpatory evidence possessed by the government prior to the Title III application is actually favorable to the accused in challenging necessity.

> 1. <u>Challenges to whether the affidavit sets forth a full and complete statement regarding necessity</u>

Challenges involving Title III interceptions arise in two separate forms. The first analysis is on whether the affidavit sets forth a full and complete statement as to necessity.  18 U.S.C. §2518 (1) (c) requires that an application contain:

>  (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;

Accordingly, for the interception to be lawful the reviewing court must conclude pursuant to 18 U.S.C. §2518 (3) (c), that:  "Normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous"

### 2.   Veracity/Franks Challenges

The second issue involving Title III applications is whether there are material omissions or false statements in the affidavit. This issue, by its very nature, is not capable of being resolved simply by reviewing contents of the affidavits. A defendant may challenge a facially sufficient affidavit on the grounds that the police knowingly or recklessly included false information or omitted material information. See *United States v. Kennedy*, 131 F.3d 1371 (10th Cir. 1997) (recognizing that analysis set forth in *Franks v. Delaware*, 438 U.S. 154 (1978), extends to omissions).[1]  In the wiretap

---

[1] The U.S. Supreme has never ruled that the *Franks v. Delaware*, supra, limitations are applicable in a wiretap context.  *Franks* was focused on whether the judicially created exclusionary rule should apply to veracity challenges to an affidavit for search warrant.  Challenges to interceptions pursuant to Title III are both statutory and constitutional in nature.  Title III places the obligation to comply with its mandates on the government and provides the remedy of suppression, not as a constitutionally required prophylactic, but as a statutory imperative. As such the defense argues that the limitations discussed in *Franks* do not apply to wiretaps.  The defense does, however, concede that current 10th Circuit law applies *Franks* to intercepted communications.

context, false statements or omissions have significance as to the necessity analysis, as well as the probable cause analysis. See *United States v. Ippolito*, 774 F.2d 1482 (9th Cir. 1985) (suppressing evidence where material false statements influenced necessity determination); *United States v. Simpson*, 813 F.2d 1462 (9th Cir. 1987) (affidavit for wiretap, when corrected for misstatements and omissions, failed to establish necessity).

## D. <u>Specific challenges to a Title III application and intercepted communications</u>

Under Title III of the Omnibus Crime Control and Safe Streets Act of 1968 ("the Act"), the grounds upon which suppression are codified in 18 U.S.C. § 2518(10)(a), namely, the communication was unlawfully intercepted [subparagraph (i)]; the order of authorization or approval under which it was intercepted is insufficient on its face [subparagraph (ii)]; and, the interception was not made in conformity with the order of authorization or approval [subparagraph (iii)].

In 1974, the U.S. Supreme Court in *United States v. Giordano*, 416 U.S. 505, 527 (1974). carved out the following standard for suppression where statutory violations result in "unlawfully intercepted" communications under subparagraph (i):

> [W]e think Congress intended to require suppression where there is failure to satisfy any of those statutory requirements that directly and substantially implement the congressional intention to limit the use of intercept procedures to those situations clearly calling for the employment of this extraordinary investigative device.

*Giordano* found that violations within subparagraph (i) dealt with the Act's statutory provisions but also included constitutional violations as well, for example lack

of probable cause, while subparagraphs (ii) and (iii) reached purely statutory defaults without constitutional overtones. *Id*.

A wiretap order may not be sustained without strict adherence to the statutory requirements. *United States v. Castillo-Garcia*, 117 F.3d 1179, 1185 (10th Cir. 1997), cert. den., 522 U. S. 962 (1997); *United States v. Small*, 229 F. Supp.2d 1166, 1177 (D. Colo. 2002).

### 1. Necessity in regards to investigative techniques

Necessity challenges focus on § 2518(10)(a)(i). In assessing why the requested material is reasonably favorable to the defendants, the defendants ask the Court to remain cognizant of the basic difference between an affirmative showing of necessity and the existence of probable cause. 18 U.S.C. §2518(1)(b) requires "a full and complete statement of the facts and circumstances *relied upon by the applicant* [emph. added] with respect to probable cause. 18 U.S.C. §2518(1)(c) addresses necessity and requires a "full and complete statement as to whether or not other investigative techniques have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous." The different wording of these two sections explicitly recognizes the fundamental difference between the nature of probable cause and the nature of necessity.

Once the affiant provides sufficient information to establish probable cause, additional evidence is superfluous. Consequently, the statute provides that the affiant need only provide the court with those facts "relied upon by the applicant" to establish

probable cause. Failure to include facts will generally tend to reduce the likelihood that probable cause will be established and it is therefore in the applicant's interest to include more information rather than less.

Necessity, on the other hand, requires a showing that normal techniques will not be successful. Omissions concerning the availability or success of traditional techniques are more likely to lead the court to a finding of necessity and it is, therefore, in the interest of the applicant to provide as little information as possible. Consequently, rather than allowing the affiant to include only those facts being relied upon by the applicant to establish necessity, 18 U.S.C. §2518(1)(c) explicitly requires the applicant to include all information for the court to make an independent determination of necessity and does not qualify the requirement with, "relied upon by the applicant." The material requested herein largely pertains to omissions and is uniquely in the control of the government.

2.    Challenges to the "organizational" component

A challenge focusing on the organizational component of an Article III application has its roots in the Fourth Amendment, namely, the lack of particularity in describing the persons to be searched.  Such a challenge focuses on one of the core protections that the wiretap statute and Fourth Amendment hold sacrosanct, which is to restrict the government's intrusion into citizens' private telephone conversations only upon a showing of particularity.

It is well established that the government's use of electronic surveillance is subject to the demands of the Fourth Amendment. *Berger v. New York*, 388 U.S. 41, 51

(1967); see also *Katz v. United States*, 389 U.S. 347 (1967). The Fourth Amendment requires that warrants "particularly describe[e] the place to be searched, and the person or things to be seized." U.S. Const. amend IV.   Because electronic eavesdropping invariably involves a "broad" intrusion on privacy, it must be "carefully circumscribed." *Berger v. New York*, 388 U.S. at 56, 58. Consequently, the need for "particularly describing the place to be searched, and the . . . things to be seized" is viewed as "especially great in the case of eavesdropping." *Id.* at 56. A wiretap authorization that fails to meet this need, "as with general warrants,…leaves too much to the discretion of the officer executing the order." *Id.* at 59. Unlike probable cause, the particularity requirements under Title III are more stringent than the requirements under the Fourth Amendment and are set forth in the statute. See, e.g., *United States v. Gaines*, 639 F.3d 423, 430-31 (8th Cir. 2011).

It is beyond question that the protections of the Fourth Amendment apply to court orders authorizing electronic surveillance, specifically the collection of data, voice and messaging via telephones. *Katz v. United States*, 389 U. S. 347, 353-359, 88 S. Ct. 507, 19 L. Ed. 2d 576 (1967); see also *Riley v. California,* 573 US _ (2014), 134 S. Ct. 2473, 2494-95, 189 L. Ed. 2d 430 (U.S. 2014) ("Modern cell phones are not just another technological convenience. With all they contain and all they may reveal, they hold for many Americans 'he privacies of life'.")

Applications and resultant orders for electronic surveillance are overbroad and violate the Fourth Amendment's requirement of particularity when they are directed at

an amorphous and undefined criminal "organization" that is inadequately described, defined, or explained in the wiretap applications and orders, where the evidence demonstrates that the affiant recklessly or intentionally included false information or omitted material information from the application or whether there is in insufficient connection between the individuals to be targeted and the organization which is targeted.

The over breadth analysis begins with a discussion of the statutory purposes and constitutional underpinnings of Title III. When it enacted Title III, Congress clearly articulated its legislative intent:

> Because of the complexity in the area of wiretapping and electronic surveillance, the committee believes that a comprehensive and in-depth analysis of Title III would be appropriate in order to make explicit congressional intent in this area.

S. Rep. No. 90-1097, at 88 (1968), as reprinted in 1968 U.S.C.C.A.N. 2112, 2177.

The legislative history articulates two purposes behind the enactment of Title III: protection of constitutional rights delineated by the Supreme Court in *Katz v. United States,* supra, and combating organized crime. As the Senate Report explained:

> Title III is essentially a combination of S. 675, the Federal Wire Interception Act, introduced by Senator McClellan on January 25, 1967, and S. 2050, the Electronic Surveillance Control Act of 1967, introduced by Senator Hruska on June 29, 1967. Subsequent to the introduction of S. 675, the U. S. Supreme Court handed down the decision in Berger v. New York, 388 U.S. 41 (1967), which declared unconstitutional the New York State statute authorizing electronic eavesdropping (bugging) by law-

enforcement officers in investigating certain types of crimes. The Court held that the New York statute, on its face, failed to meet certain constitutional standards. In the course of the opinion, the Court delineated the constitutional criteria that electronic surveillance legislation should contain. Title III was drafted to meet these standards and to conform with *Katz v. United States*, 389 U.S. 347 (1967).

Senate Report, at 66, 1968 U.S.C.C.A.N. at 2153 (parenthetical in original).

Congress thus recognized that the requirements of 28 U.S.C. § 2518(1)(d) "are intended to meet the test of the Constitution that electronic surveillance techniques be used only under the most precise and discriminate circumstances, which fully comply with the requirements of particularity." Senate Report, at 102, 1968 U.S.C.C.A.N. at 2191 (citing Berger v. New York, 388 U.S. 41, 58-60 (1967). and *Katz v. United States*, 389 U.S. at 355-56).

In *Berger*, supra the Court held that the Fourth Amendment's particularity requirement was paramount in wiretaps and emphasized the paramount importance of the Fourth Amendment's particularity requirement and that "few threats to liberty exist which are greater than that posed by the use of eavesdropping devices." *Berger*, 388 U.S. at 63; see also *United States v. Valley*, 729 F.2d 1243, 1268 (10th Cir. 1983) (en banc). Title III thus attempts to codify the Fourth Amendment's particularity requirement.

The notion of targeting an "organization," such as the purported "Gangster Disciples," is rooted in the statute's principal purpose of combating organized crime. The Senate Report stressed this purpose:

> The major purpose of Title III is to combat organized crime. … We have always had forms of organized crime and corruption. But there has grown up in our society today highly organized, structured and formalized groups of criminal cartels, whose existence transcends the crime known yesterday. … These hard-core groups have become more than just loose associations of criminals. They have developed into corporations of corruption, indeed, quasi-governments within our society, presenting a unique challenge to the demonstration of justice. … Organized crime has also an almost monopolistic control over the illegal importation, distribution and sale of narcotics. … Organized crime has not limited itself to criminal endeavors. It has large spheres of legitimate business and union activity undermining our basic economic mores and institutions.

Senate Report, at 70-71, 1968 U.S.S.C.A.N. at 2157-58.

Using a wiretap to target organized crime, such as a drug-trafficking or other criminal enterprise, requires the existence of a bona fide criminal organization. A criminal organization is just that — it is organized and defined by its structure. Indeed, as Congress recognized in enacting Title III, the criminal organizations that Congress intended to target through electronic surveillance have a structure beyond "just a loose association of criminals." Senate Report, at 70, 1968 U.S.C.C.A.N. at 2157. Such organizations by definition must have a structural hierarchy with leaders at the top, s at the bottom, and lieutenants in the middle. In addition, if a bona fide criminal organization does exist it is axiomatic that the target organization be connected to the actual purpose of the requested intercepts and the individuals being targeted.

When the government targets tenuously connected individuals under the guise that they constitute or are part of an "organization" and applies and obtains Title III intercepts such a seizure is in violation of the principles articulated in *United States v.*

*Donovan*, 429 U.S. 413 (1977). There, the Supreme Court considered the government's assertion that Title III requires the wiretap application to "identify only the principal target of the investigation," such that an individual "is not a principal target even if the government has probable cause to believe that the individual is engaged in the criminal activity under investigation." *Id.* at 424. Rejecting the government's argument, the Court held that "a wiretap application must name an individual if the government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone." *Id.* at 428. Permitting the government to surreptitiously conduct electronic surveillance by throwing a blanket around a nebulous group of individuals, based upon the unsupported guise that they are part of an organization, would relieve the government of its obligation to establish probable cause with particularity against the person to be seized.

In *United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997), the court held, inter alia, that a wiretap application's necessity showing was particularized adequately as to only one of its targets. *Id.* at 1196. The court stated that "nothing in [the application's] language [was] in any way particularized to" one of the targets; for instance its description of physical surveillance "relie[d] on wholly conclusory language which would apply to every member of every suspected drug conspiracy." *Id.* at 1194. The Tenth Circuit thus held that the two applications authorizing wiretaps against the particular individual target were inadequate from a necessity standpoint, and the information derived from the interception of that target telephone was properly suppressed. *Id.* at 1196.

The target of a wiretap may be a criminal organization as a whole, rather than an individual. See *United States v. Crumpton*, 54 F. Supp. 2d 986, 1007 (D. Colo. 1999); *United States v. Barrios*, 994 F. Supp. 1257, 1263 (D. Colo. 1998); see also *United States v. Zapata,* 540 F.3d 1165 (10th Cir. 2008). However, as stated above using a wiretap to target organized crime requires the existence of a bona fide criminal organization.

A central focus of this discovery motion and an eventual wiretap challenge will be on what evidence the government possessed that there was a bonafide organization that existed. If the organization was the Gangster Disciples then the individuals targeted for interception must be part of such organization. If instead the organization is the group of individuals targeted then there must be something more formal than a loose association of criminals in order to fall within the ambit of Title III.

### 3.   Subterfuge challenges

Title III permits the use of wiretaps in the investigation of dozens of specifically enumerated federal criminal offenses. 18 U.S.C. § 2516(1). The list of predicate offenses, however, is limited. State offenses, such as murder, can be the subject of a wiretap authorized under Title III but only if the application is made by a state prosecutor before a state court judge.  18 U.S.C. § 2516(1).

Although the investigation of a predicate crime is a necessary requirement for securing an electronic surveillance order, courts have permitted the use of wiretaps in

the prosecution of crimes not specifically listed in Title III. This is specifically provided for in the statutory text:

> When an investigative or law enforcement officer, while engaged in intercepting wire, oral, or electronic communications in the manner authorized herein, intercepts wire, oral, or electronic communications relating to offenses other than those specified in the order of authorization or approval, the contents thereof, and evidence derived therefrom, may be disclosed or used as [otherwise] provided.

18 U.S.C. § 2517(5).

This provision has been described as, in essence, a plain-view exception to the predicate offense requirement allowing the government to present evidence of other crimes discovered while investigating an authorized offense. *United States v. Rajaratnam*, 2010 U.S. Dist. LEXIS 143175, at *9-10 (calling this statutory provision a "plain-view exception" (citing *United States v. Masciarelli*, 558 F.2d 1064, 1067 (2d Cir. 1977); 18 U.S.C. § 2517(5))).

Congress itself thought that certain restrictions on "plain view" evidence were appropriate by providing that any "plain view" evidence obtained during a wiretap investigation, if it is to be used at trial, must be brought to the a judge's attention "as soon as practicable." See 18 U.S.C. § 2517(5). Congress further believed that this subsequent application should establish the following:

> [i] that the original order was lawfully obtained, [ii] that [the original order] was sought in good faith and not as a subterfuge search, and [iii] that the [otherwise intercepted] communication was in fact incidentally intercepted during the course of a lawfully executed order.

S. Rep. No. 90-1097 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2189.

Courts have held that Title III applications must be "sought in good faith and not as a subterfuge search, . . .." *United States v. Marion,* 535 F.2d 697, 700 (2d Cir. 1976) (quoting S. Rep. No. 90-1097, at 12 (1968), reprinted in 1968 U.S.C.C.A.N. 2112, 2189); *see also United States v. Rajaratnam*, 2010 U.S. Dist. LEXIS 143175 at *6 (S.D.N.Y. Nov. 24, 2010). All circuits that have weighed in on the issue all require that a Title III application must not be a subterfuge to conduct a search for a different crime. See *United States v. McKinnon,* 721 F.2d 19 (1st Cir. Mass. 1983) (wiretap application); *United States v. Vento*, 533 F.2d 838 (3d Cir. Pa. 1976) (wiretap application); *United States v. Johnson*, 696 F.2d 115 (D.C. Cir. 1982) (wiretap application).

With respect to the applications in this case, as will be explained below, the defense is seeking discovery to determine whether the wiretap applications in this case were a subterfuge to obtain phone calls in order to investigate a state homicide investigation.

### E.  Timing of the Government's Discovery Obligation

As a general matter, "[s]ome limitation on disclosure delay is necessary to protect the principles articulated in *Brady v. Maryland*." *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009). Indeed, "[i]t would eviscerate the purpose of the Brady rule and encourage gamesmanship were we to allow the government to postpone disclosures to the last minute, during trial." *United States v. Burke*, 571 F.3d at 1054. The court in Burke further recognized that:

> Where the district court concludes that the government was dilatory in its compliance with Brady, to the prejudice of the defendant, the district court has discretion to determine an appropriate remedy, whether it be exclusion of the witness, limitations on the scope of permitted testimony, instructions to the jury, or even mistrial.

571 F.3d at 1054.  See also *United States v. Pollack*, 534 F.2d 964 (D.C.Cir. 1976) ("Disclosure by the government must be made at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case"); *United States v. Lujan*, 530 F. Supp. 2d 1224, 1257 (D.N.M. 2008) (requiring that the government must "disclose to Defendants any Brady material that is also subject to Rule 16 as soon as it becomes aware of the existence of such material").

The United States Attorney for the District of Colorado has had a discovery policy in place since October 22, 2010 titled, "Office Policies and Procedures Regarding Discovery in Criminal Prosecutions." (hereinafter the "Policy"). The Policy requires among other things:

1. "All exculpatory information known to or in the possession of the prosecution team, regardless of whether the information is memorialized, should be disclosed to the defendant reasonably promptly after its discovery."  § II (B) (1).

2. "Impeachment information relating to government witnesses who will testify at a preliminary/detention hearing, motion to suppress, or other pre-trial hearing should be disclosed sufficiently in advance of the hearing to allow the hearing to proceed efficiently." § II (B) (3) (b) (2) (a).

3. "Impeachment information should be disclosed 'at a reasonable time before trial to allow the trial to proceed efficiently.'" § II (B) (3) (b) (2) (b).

4. "Absent unusual circumstances such as potential serious threats to witness safety, national security, or an ongoing criminal investigation, AUSAs should produce reports of testifying witness interviews and witness statements to the defense prior to the hearing or trial. Interview reports of testifying witnesses should be produced sufficiently in advance of the witness's testimony to permit defense counsel to make effective use of the information." § II (D).

The discovery requested herein will require time to review, digest, investigate and present in a motion to suppress. The defense requests a minimum of sixty days between the date the discovery, if ordered, is produced and the date motions attacking the various Title III applications are due. The Court's current order states, "All suppression motions, including wiretap suppression motions (four corners and non-four corners), shall be filed 60 days after the hearing on discovery issues." See Amended Order Resetting Trial Date and Related Deadlines, (Doc # 517). The Court indicated in that order that, "This [60 day] date is set with the understanding the Government will require time to assemble and provide any additional discovery ordered by the Court and the defense will need sufficient time to review the additional discovery prior to the filing of any wiretap motions."

The undersigned respectfully suggests that the 60 day time period the Court selected should begin to run from receipt of the discovery as the defense needs to not only review the material but conduct necessary investigations into the material and then

incorporate such material and any resulting investigation into the wiretap suppression motion.

III.    **SPECIFIC MATERIALS REQUESTED AND THE BASIS FOR EACH SUCH REQUEST**[2]

    **A. GANGSTER DISCIPLES INFORMATION**

The government, throughout each Title III application stressed the significant role of the Gangster Disciples in the criminal conduct being investigated. The problem demonstrated by the discovery, indictments and pleas in this case is that there was, in reality, no Gangster Disciples investigation.

There were numerous Title III applications for thirteen target telephones and for each application they define the "Target Organization" is identified as either the "Gangster Disciples Drug Trafficking Organization" or the "Gangster Disciples Street Gang".

The significance of the role of the Gangster Disciples was also emphasized throughout the affidavits. For example "Gangster Disciples" is mentioned approximately 46 times in the first affidavit. (1:13-wt-00006-WYD *SEALED* Document 1-1).  Seven individuals were identified as targets in the first affidavit. Specifically, Paragraph 7 of the affidavit asserted that there was probable cause to believe that these seven individuals were members or associates of the Gangster Disciples.

Within the four corners of the affidavit the only individual identified as a Gangster Disciple was Ricky Garrison. Within the four corners of the affidavit the only gang

---

[2] Examples provided for the items requested are illustrative rather than exhaustive.

affiliation ascribed for any of the remaining six individuals was as to Francisco Ramirez, the user of the target phone. Mr. Ramirez was described as a Duke Sureno, not a Gangster Disciple. The discovery provided also failed to establish any Gangster Disciples association other than as to Garrison for any of the seven individuals targeted. The four corners of the affidavit demonstrated that Ricky Garrison, the lone alleged Gangster Disciple, had no contact with any of the named targeted individuals other than Francisco Ramirez, the alleged Duke Sureno.

That same affidavit, beginning on page 18, contained a section entitled "CURRENT INVESTIGATION OF THE GANGSTER DISCIPLES" followed by paragraphs numbered 40-70. A review of those thirty paragraphs reveals an investigation of low-level drug dealing that has nothing whatsoever to do with the Gangster Disciples and could not by any definition be considered a "Gangster Disciples investigation."

Though the orders and affidavits continued to stress the significance of the Gangster Disciples, the connection between the Gangster Disciples and the actual investigation that occurred became even more tenuous as the investigation continued and more information became known to the investigators. An FBI Agent involved in the investigation testified under oath that the government learned in late October or early November that, "the gang really distanced themselves from Ricky or Ricky distanced himself from the gang. We're not exactly clear on what happened, but it was at that point when the gang stuff for him really stopped." (Grand Jury Transcript, 6/3/2014, pp. 92-3). Thus by the second application dated November 15, 2013 the investigators were

aware that there was no longer any meaningful connection between their "Target Organization" and Garrison, if there ever was one.

The discovery, subsequent affidavits, and the indictments did not demonstrate that the investigation focused in any significant way on any Gangster Disciple members other than Ricky Garrison. When a Grand Juror inquired as to whether Garrison was the only Gangster Disciple member involved, the FBI agent responded that James Tillmon was a Gangster Disciple and that she believed, without identifying anyone that a few others "have affiliations". (Grand Jury Transcript, 6/3/2014, p. 93).

Contrary to the assertions in the applications the investigation was never an investigation of the Gangster Disciples, it was an investigation of Ricky Garrison. Rather than belaboring this point further the defendants draw the court's attention to the Grand Jury exhibits that are attached as sealed attachment A and incorporated by reference (The attachment is sealed as it is a grand jury exhibit). The following information concerning the Gangster Disciples is specifically requested and must be provided because it is favorable to the defense:

> A-1   Any and all information in possession of any of the investigating agencies, in whatever form, concerning any aspect of the Gangster Disciples in the Denver Metropolitan Area from January, 2012 through June, 2014.

The affidavits and orders identify the Gangster Disciples as the target of each of the numerous Title III applications. The purpose of the applications was to unveil the inner workings of the "Gangster Disciples Drug Trafficking Organization>: Very few specifics were provided within the four corners of the affidavits or in discovery with respect to the gang, its hierarchy, its members. As the primary target being investigated

it was incumbent upon the government to provide the issuing judge with a full and complete statement as to necessity as to this important target. If the government had additional information concerning the Gangster Disciples, such information would be helpful to the defense in arguing that the government did not make a full and complete statement to the issuing judge. If the government had infiltrated this gang, had informants providing information on the organization or had conducted surveillance and other traditional investigative techniques on the organization such has not been described in the Title III applications. If there is no other information possessed by law enforcement with respect to the Gangster Disciples, the lack of such information would be helpful to the defense in arguing the lack of necessity since it would be indicative of the government failing to pursue normal investigative techniques as to its primary target.

The wiretap applications indicate that the Gangster Disciples had been investigated in 2012, which would be the year before this investigation began. The applications state:

> On March 20, 2012, the Metro Gang Task Force (MGTF), a multi-jurisdictional task force consisting of local, state and federal law enforcement partners began investigating Gangster Disciple members in the Denver metropolitan area. Through the use of various techniques, investigators were able to identify the criminal activities and drug source(s) of supply for Gangster Disciple members. As a result of the investigation, approximately 788 grams of cocaine and $110,000.00 US currency were seized.   Thus far, MGTF investigators have not discovered any links between this current investigation and the aforementioned Gangster Disciple investigation conducted in 2012.

Based on this information it appears that the affiant in this case accessed the information from the 2012 Gangster Disciple investigation and such information is exculpatory as it contradicts the statements that a wiretap is necessary to infiltrate the

Gangster Disciple Drug Trafficking organization, that Garrison is a part of such and that any of the named targets are part or ore associates of that organization. The defense needs access to this information so it can contest necessity and the organizational component of the Title III applications.

> A-2   All information in the possession of any of the investigating agencies indicating any of the named targets was or was not a member of the Gangster Disciples.

In light of the repeated references to the investigation focusing on the Gangster Disciples and the testimony of the agent before the Grand Jury, this information is helpful to the defense in formulating a *Franks* type challenge; in asserting that the government failed to identify the target of the interception with the required specificity; and in asserting that investigation of the Gangster Disciples was used as a subterfuge to investigate Ricky Garrison for state offenses that did not fall within the list of predicate offenses enumerated in Title III. The statement above that the government could not find any "links between this current investigation and the aforementioned Gangster Disciple investigation conducted in 2012," would clearly indicate the government conducted searches to determine connections between the targets in this case with what they knew about the Gangster Disciples based on their investigation the year before.[3]

> A-3   All records, reports, charts, or materials prepared by law enforcement setting forth the goals of the investigation and/or the structure of the organization being targeted.

---

[3] Although this motion's focus is on obtaining discovery necessary to challenge the wiretaps, this evidence is also exculpatory to the defense as it squarely contradicts the allegation in Count One of a conspiracy.

In light of the repeated references to the investigation focusing on the Gangster Disciples and the testimony of the agent before the Grand Jury, this information is helpful to the defense in formulating a *Franks* type challenge; in asserting that the government failed to identify the target of the interception with the required specificity; and in asserting that investigation of the Gangster Disciples was used as s subterfuge to investigate Ricky Garrison for state offenses that did not fall within the list of predicate offenses enumerated in Title III.

   A-4  The identification of Informants used by any of the investigating agencies that have infiltrated or provided useful information about the Gangster Disciples Area from January, 2012 through June, 2014.

The government has not referenced any informants used during the relevant time period to infiltrate the Gangster Disciples.  Presumably some were used during the 2012 investigation of this same group.[4] The use of informants is a recognized normal investigative technique. See *Castillo Garcia*, supra. Failure to discuss the use of existing informants to the primary target of the wiretap would be helpful to the defense in asserting that the government failed to provide the issuing court with a full and complete statement of normal investigative techniques as required. If there in fact were no informants, failure to use informants or consider their use as to the primary target would be helpful to the defense in challenging necessity.

   A-5  All Title III interceptions targeting or intercepting members of the Gangster Disciples Between in the Denver Metro area.

---

[4] The Aurora Police Department 2012 Annual Report on Gang Activity indicates that the Metro Gang Task Force had worked cases involving the gangster Disciples.

18 U.S.C. § 2518 (1)(e) requires a full and complete statement of prior applications involving any of the same persons specified in the current application. This demand pertains to instances in which the Gangster Disciples were themselves named as a target or where the individuals that comprise or are members of the Gangster Disciples were subject to interception. The Gangster Disciples were designated by the government as the primary target of the investigation that was the basis for the numerous wiretap applications in this case. The Gangster Disciples is not a legal entity but is rather comprised of members. As such the interception of those members is an interception of the Gangster Disciples and must be disclosed. Evidence of prior interceptions is helpful to the defense in arguing lack of compliance with 18 U.S.C. § 2518 (1)(e) and to establish that the government did not access existing data before resorting to further wiretaps.

### B. HOMICIDE AND ROBBERY INVESTIGATIONS

CHS-1 provided information also about Ramirez and Garrison's alleged involvement in a robbery of Jesus Molina-Villareal on January 2, 2013. The investigative reports indicate that Metro Gang Task Force (MGTF) Investigator Gulliksrud and another officer along with officers from APD's Direct Action Response Team (the SWAT team) stopped Ramirez on that date, purportedly for a stop sign violation and Ramirez was subsequently arrested for a weapons violation. The reports indicate thirty minutes after the stop MGTF Investigator Gulliksrud was contacted by a DEA Task Force Officer Joel White. Off. White informed Gulliksrud that he had a source of information who had informed him that Ramirez had just been stopped by the

police while on his way to commit a home invasion robbery of a **known drug dealer**. CHS-1 later identified the known drug dealer as a person named "Vato" whose actual name is Jesus Molina-Villareal.  No reports have yet been provided as to what DEA or MGTF knew about Molina-Villareal or how he had become known to them as a drug dealer.

It is somewhat clear from the affidavits that the narcotics investigation into Mr. Ramirez and Garrison found its impetus in the government's belief that Garrison murdered an informant.[5]  CHS-1 began providing information in early January, 2013 concerning her boyfriend, Francisco Ramirez, and Garrison yet discovery reveals the narcotics investigation did not begin until May, 2013, four months into the homicide investigation (the homicide occurred on January 19, 2013).  Detectives from Aurora Police Department cross-pollinated both the homicide and narcotics investigations.

Murky allegations about the alleged homicide have been liberally applied to all of the Title III applications, the grand jury testimony, in Garrison's bond hearing (Doc. # 196), press releases, plea agreements of co-defendants and as reasons why confidential informants couldn't be used instead of using wiretaps.  CHS-1 told the police, along with her information that Garrison was a narcotics distributor, that Garrison had confessed to her that he had ordered the murder while he was out of town.

The defense at this stage is investigating whether the wiretaps were a subterfuge for an investigation into the state homicide, an offense which is not an enumerated

---

[5] No charges have been filed concerning that allegation despite an intense investigation.  DNA was taken from Garrison which does not match DNA at the scene.  Garrison denied any involvement in the murder.

offense in Title III for a federal investigation.   The defense requests the following information be produced:

> B-1- All materials identifying Molina-Villareal as a known drug dealer.

The applications state that interceptions are needed to identify the sources of supply for Ramirez who they indicate is Molina-Villareal.  These materials are needed as they would demonstrate that the investigators already possessed information concerning Molina-Villareal's drug dealing and it would provide information concerning investigative leads that were not pursued.  It appears from the affidavits that the DEA possessed a fund of information concerning Molina-Villareal's activities.

> B-2- All materials concerning the APD homicide investigation that were shared with any of the investigators working on the narcotics investigation.

In order to demonstrate that the federal wiretaps were a subterfuge the defense needs to be provided with the materials that demonstrate such and the government is in sole possession of these materials.  This information would also be exculpatory as it would likely demonstrate the falsity of CHS-1 statements that Garrison confessed to her and that he was out of town at the time of the murder.  Materials that show someone else killed the victim or that exculpate Garrison for that murder are also exculpatory in this case as they dispute the veracity of the most important informant, CS-1, who provided the vast majority of information which formed the basis of the wiretaps and would also directly dispute the notion that informants could not be used as they would be in danger of Garrison.  In addition, if any consideration is being given by the government to relying on any allegation of the homicide in any future hearings, trial or

sentencing as either relevant conduct, FRE 404(b) evidence, impeachment, motive and bias evidence concerning testifying witnesses, etc. the defense has to be in a position to confront such evidence or argue against its admission.

### C. **RED DAWN INFORMATION**

The affidavits acknowledge that Francisco Ramirez, the user of Target Telephone 1, was also a target in the August 2012 wiretaps in Operation Red Dawn, an operation separate and distinct from the 2012 investigation of the Gangster Disciples. In fact, Mr. Ramirez's phone was a target phone in one of the Red Dawn taps.  As noted above, taps on Mr. Ramirez's phone were terminated once it was determined that Mr. Ramirez was lower on the distribution chain than the initially identified targets of the state investigation. In other words, he was determined not to be a significant target even at the state court level and was not charged as part of Red Dawn. The affidavits in Garrison's case make no reference to the fact that Mr. Ramirez was deemed too insignificant to keep tapping in the state case nor does it disclose what those taps revealed in terms of determining any source of narcotics for Mr. Ramirez. In addition, the affidavits are silent as to whether the Red Dawn tap confirmed or contradicted the statements of CHS-1 or what other investigative techniques used in that case revealed concerning potential witnesses, phone records, etc.

The first and all subsequent Gangster Disciples affidavits advised the court that investigators in the Gangster Disciples investigation had contacted the lead agent from Red Dawn as well as the prosecutor, "and will actively pursue any additional investigative leads which may result as the prosecution of Operation Red Dawn

proceeds." (1:13-wt-00006-WYD *SEALED* Document 1-1, para. 168) The affidavits also assert that the agents in Red Dawn did not become aware of the targets or named interceptees of the first Gangster Disciples affidavit, including specifically Jesus Molina-Villareal.

A review of the limited amount of information available from the Red Dawn investigation reveals that Francisco Ramirez was in regular contact and was being supplied by an individual called Jesus Molina who appears to be the Jesus Molina-Villareal identified in the affidavits in this case. The Red Dawn material also indicated that Mr. Ramirez was in contact with an individual called Gabby who was a runner for Jesus Molina. The Gangster Disciples affidavits set forth that Jesus Molina-Villareal was a source for Ramirez. It also stated Molina-Villareal had a drug runner named Javier Segura-Cisneros who, according to the affidavit, was known as Gabby.  Data from the Red Dawn investigation did in fact identify Molina (Jesus Molina-Villareal) and Gabby (Javier Segura-Cisneros) as Mr. Ramirez's sources contrary to the assertions of the agents in the Gangster Disciples affidavits. A review of the Red Dawn data would have revealed this connection as well as a number of other phone numbers that appear in the Red Dawn data for the Ramirez phone and in the Gangster Disciples Data for the Ramirez phone.

Though Red Dawn investigators were not interested in working down the chain from Mr. Ramirez, Gangster Disciple investigators, according the affidavits, were interested in learning about Ramirez's customers. This information was readily available from the Red Dawn tap on Ramirez's phone. Furthermore the individuals Ramirez was

dealing with in Red Dawn were all potentially usable as confidential informants just as CHS-5, Molina Villareal's customer was used.

The inescapable conclusion is that either the investigators in this investigation did not, as they stated in the affidavits, access the Red Dawn investigative material or they intentionally or recklessly omitted such information from their affidavits.

The following information concerning the Red Dawn investigation is specifically requested and must be provided because it is favorable to the defense:

> C-1    All Communications and records of communications between the Gangster Disciples investigators and the Red Dawn investigators.

If such communications exist they will contain favorable information to the defense, because as noted above, there was information available from the Red Dawn investigation that was useful to the Gangster Disciples investigators. Such information was not disclosed in the Gangster Disciples affidavits and as such is helpful to the defense in a *Franks* showing as well as the defense argument that a full and complete statement was not provided to the court. In the alternative, the lack of communication is also helpful to the defense for the *Franks* showing since the Gangster Disciples affidavits assert that contacts were made, nothing bore fruit and is also helpful for challenging necessity. Whatever the information contains it will either support a challenge that the affidavits were not complete and were misleading or will show that normal known investigative leads were not followed.

> C-2    All information or data and obtained by Gangster Disciples investigators from the Red Dawn investigation.

The basis of this request is similar to that set forth in B-1.

> C-3    All analysis performed in the Gagster Disciple investigation of records and data obtained through the Red Dawn investigation.

The basis of this request is similar to that set forth in B-1.

> C-4    All information, records, reports, data, and analysis from the Red Dawn investigation.

The limited information that the defense has obtained from the Red Dawn investigation has proven to be helpful to the defense with respect to the issue of *Franks* type challenges, necessity challenges and full and complete statement challenges. There is every reason to believe that there is additional favorable information available in the Red Dawn Materials for which the defense has not been able to gain access. As the investigators from Red Dawn were working cooperatively with the agents in this case, the information in their possession is in the possession of the government. See *Kyles*, supra. Furthermore it is the defense's understanding that numerous defendants in Red Dawn pled guilty and that at least some debriefed.

Since Francisco Ramirez was too small a fish to be of interest to the Red Dawn investigators it is unlikely that the Red Dawn defendants were interrogated about Ramirez in any significant detail though several clearly knew and had dealt with him. If these individuals were not interviewed about Ramirez this would support a finding that necessity has not been established.

## D.  CONFIDENTIAL SOURCES

Discovery disclosed that approximately twelve confidential or anonymous sources were used in this investigation. The initial affidavit referenced five confidential human sources.

### 1.   D-1: CHS-1

The wiretap affidavits in this case do not explicitly state when this investigation actually began. Investigator Gullicksrud, the affiant on the first affidavit, indicated that his participation in the investigation began in January 2013 and the affidavit and discovery provided describe his activities as early as January 2, 2013. CHS-1, according to the affidavit, came forward in December 2012 to provide information about the drug trafficking activities of Francisco Ramirez. No reason is given for CHS-1 coming forward. The absence of a reason being offered for CHS-1 coming forward to assist police in their investigation of Francisco Ramirez is particularly suspicious in light of the fact that CHS-1, upon information and belief, was the girlfriend of Mr. Ramirez and resided with him.

On January 2, 2013 Investigator Gullicksrud was involved in a traffic stop of Francisco Ramirez in which guns, masks, bandanas and gloves were recovered from Mr. Ramirez's vehicle.  Mr. Ramirez claimed the guns were his. Investigator Gullicksrud related in discovery that shortly after the stop, he was contacted by DEA task force agent Joel White who advised that a "source of information" had contacted White and advised him that Francisco Ramirez had just been stopped by police on his way to commit a home invasion robbery of a known drug dealer. Discovery further reveals that Investigator Gullicksrud met with this "source of information" on January 2, 2013. Discovery and the affidavits reveal that Investigator Gullicksrud also met with CHS-1 on January 2, 2013 and based upon the description of the respective conversations, it is

apparent that CHS-1 and the source of information are one and the same. This raises the obvious question as to why Mr. Ramirez's girlfriend happened to be a source of information for the DEA and when that arrangement began.

According to Investigator Gullicksrud, CHS-1 provided information implicating Garrison in the January 19, 2013 homicide of an Aurora confidential informant. Investigator Gullicksrud also maintains that CHS-1 continued to frequently, voluntarily provide information after January 2013 until July 31, 2013 when she became a paid confidential informant for the Metro Gang Task Force and received assistance with a traffic citation. There is nothing in the discovery reflecting any investigation occurring between the end of January 2013 and late July 2013 except for the May arrest of Mr. Ramirez on the three-tenths of a gram cocaine charge. There was also no explanation as to why the status of CHS-1 changed from voluntarily cooperating to becoming a paid informant for MGTF. However, there is some indication in the discovery provided that CHS-1 was struggling financially during the time in which CHS-1 acted as an informant. In September of 2013 CHS-1 formally became an informant for the FBI. No explanation is provided for this change of status either.

Discovery and the affidavits establish that prior to the first tap in October of 2013 CHS-1 had regularly provided information to law enforcement including details of Mr. Ramirez's sources, customers, and travel plans. CHS-1 also provided information about Garrison's alleged drug dealing and his move to a new residence. No information is generally provided by law enforcement as to the source of CHS-1's knowledge.

Additionally, CHS-1 introduced an undercover officer who was able to buy cocaine directly from Mr. Ramirez and a courier for Molina-Villareal, Mr. Ramirez's source.

In addition to not sharing with the issuing judges the fact that CHS-1 was an embedded informant, living with and intimately involved with Francisco Ramirez, other important pieces of information were not disclosed in the affidavits.[6] For example, law enforcement was aware that CHS-1 had filed multiple domestic violence complaints against Mr. Ramirez, a fact certainly relevant to her potential bias and motive.  Based upon the recorded calls from Red Dawn there was good reason to believe that CHS-1 was either using drugs or participating in Mr. Ramirez's cocaine business. Investigators in Red Dawn describe how she "whined" upon hearing that Mr. Ramirez had thrown an eighth of an ounce of cocaine out of the window while he believed police were following him in August 2012. In December of 2012 Investigator Gullicksrud arranged to have CHS-1 stopped for driving under suspension.  No reason is given for this action.

The following information concerning the CHS-1 is specifically requested and must be provided because it is favorable to the defense:

> D-1.1 All information in the possession of any law enforcement  agency involved in this investigation including the DEA that bears on  the reliability of CHS-1

Information such as filing charges against Mr. Ramirez, drug usage, whether payment is conditioned on an arrest, and violation of a confidential source agreement

---

[6] The defense has determined the identities of this and other informants based on a review of disclosures which were intended to cloak the identity of the informants but which inadvertently revealed their identities.  In discussions with AUSA Phillips the defense has agreed at this juncture to continue to identify the informants by their alphanumeric designations.

are a few examples of matters that would bear on the credibility of the informant.  It is improper to withhold from the issuing court information that bears on the informant's reliability.  *Illinois v. Gates*, 462 U.S. 213, 230 (1983).  This information is helpful to a *Franks* type challenge and a challenge as to a full and complete statement of necessity.

> D-1.2  Records of all communications including but not limited to interviews, notes, reports, and recordings between CHS-1 and any law enforcement agency involved in this investigation including the DEA and the actual communications.

Communications made between the end of January 2013 and July 2013 would be helpful to the defense because they provide information about the investigation which is not disclosed in discovery.  This information is helpful to the challenge to whether a full and complete statement was provided and would provide substantive evidence that could be used in such a challenge.  If there were no communications made between the end of January 2013 and July 2013, this information is helpful in the necessity challenge.  This information will also be helpful in that it is likely to disclose whether or not information obtained from CHS-1 and included in the affidavits was based on her knowledge or otherwise reliable.

> D-1.3  Records of and information obtained as a result of follow up by law enforcement on information provided by CHS-1

The basis of this request is similar to C-1.2

> D-1.4   Records setting forth the basis to subpoena the records on which CHS-1's phone appears

CHS-1's telephone was in contact with numerous individuals whose telephone records were subpoenaed. No information is contained in discovery identifying why

these records were subpoenaed though presumably they were connected with the drug trafficking investigation. The defense needs all records setting forth the basis to subpoena the records on which CHS-1's phone appears.

This information is helpful to the defense because it will be used to show that law enforcement had reason to believe that CHS-1 was herself involved in drug trafficking or that she had knowledge of drug traffickers not set forth in the affidavits.

2.      **D-2: CHS-2 and CHS-3**

CHS-2 and CHS-3 did controlled buys of heroin in Denver Civic Center Park. They appear to have nothing whatsoever to do with this investigation other than to serve as a red herring used to attempt to justify naming the Gangster Disciples as the "Target Organization".

D-2.1  All information connecting CHS-2 and CHS-3 to this investigation or any of the named individual targets in this investigation

This information is helpful to the defense because if it exists it is useful in challenging whether a full and complete statement was made as to necessity. If it does not exist it is helpful to a *Franks* type showing, that the target was not sufficiently identified and that the Gangster Disciples were identified as a target as a subterfuge to investigate Garrison for an offense not covered by Title III.

3.      **D-3:  CHS-4**

CHS-4 allegedly bought cocaine from Garrison on numerous occasions over a period of time.  According to the first affidavit, CHS-4 entered into a confidential human

source agreement with MGTF on August 7, 2013. On October 10, 2013 investigators had CHS-4 place a consensually recorded phone call to Garrison inquiring about acquiring a sixteenth of an ounce of cocaine for $150.00. On October 23, 2015 Investigator Gullicksrud stood before Senior Judge Ebel and presented an affidavit affirming that CHS-4 had not spoken to agents since mid-August of 2013 and there was no reason to believe he would ever contact them again.

> D-3.1 Records of all communications including but not limited to interviews between CHS-4 and any law enforcement agency involved in this investigation and the actual communications.

Obviously, the information provided by the affiant in the first affidavit concerning contact with CHS-4 was false.  Records of communications and the communications themselves will be helpful to the defense in providing substantive evidence in support of a *Franks* type challenge. The records will also be helpful to the defense in challenging necessity. In addition to the falsehood, the records will confirm that alleged transactions between Garrison and CHS-4 were for small amounts of cocaine contradicting the implication of the affidavit that Garrison was supplying the Gangster Disciples street gang with drugs. Finally, at trial any and all evidence demonstrating the falsity of statements the lead agent made in an affidavit would be impeachment evidence.

### 4.    D-5:  CHS-5

CHS-5 was able to buy drugs directly from Mr. Molina-Villareal, Mr. Ramirez's source. On October 13, 2013 CHS-5, at Investigator Gullicksrud's request conducted a consensually recorded phone call with Mr. Molina-Villareal. On October 15, 2013 CHS-5

conducted a controlled buy with Mr. Molina-Villareal. On October 22, 2013 CHS-5 conducted another controlled buy with Mr. Molina-Villareal under the supervision of Investigator Gullicksrud. On October 23, 2015 Officer Gullicksrud stood before Senior Judge Ebel and presented an affidavit affirming that did not mention CHS-5 or advise the court that agents had an informant that could buy directly from Mr. Molina Villareal.

D-5.1  Records of CHS-5's statements and cooperation

These records would support a challenge under *Franks*, a to the fullness and completeness of the affidavit and would provide impeachment evidence for trial.

### E.    PARALLEL CONSTRUCTION

Parallel construction is a means by which law enforcement agents have been trained to recreate investigative trails so as to conceal from defense counsel, the courts, and even the prosecutor the true source of investigative leads. *See, e.g.*, *Lewis v. United States*, 2014 U.S. Dist. LEXIS 151821 at * 180 (D.D.C. Oct. 20, 2014); John Shiffman and Kristina Cooke, *Exclusive: U.S. Directs Agents To Cover Up Program Used To Investigate Americans,* REUTERS, August 5, 2013, *available at* http://www.reuters.com/article/2013/08/05/us-deasodidUSBRE97409R20130805.   The idea is to draft two documents addressing the exact same event; one document which is sanitized of information concerning investigative leads and information the government considers sensitive which is released for litigation consumption and a second document which details fully and completely all information concerning the event which is accessible only to law enforcement and sometimes the prosecutors. The two

documents are not necessarily congruent and may diverge or be inconsistent in important areas. The concept of parallel construction, as opposed to redaction and court review, has the effect of insulating government requests for non-disclosure from oversight by the courts or the efforts by litigants to demonstrate need for disclosure.

The process of parallel construction is kept secret to protect sources and investigative methods, and has been utilized in domestic wiretap cases. *Id.* Senior DEA officials have been quoted as stating: "Parallel construction is a law enforcement technique we use every day...It's decades old, a bedrock concept." *Id.* If defendants don't know how an investigation began or was conducted or if there are dual reports about the same transaction, they cannot know what sources were used or what materials to request.  Frequently prosecutors are not even told of the true source of the information.

In light of the Government's acknowledgment of the regular use of parallel construction, and its training of agents to use the technique, the defense is requesting information pertaining to the methods by which the investigation of Garrison began and was subsequently conducted, including any sources or databases used during its investigation of Garrison.

The defense does not make this request out of mere suspicion. In the example provided in the Introduction section pertaining to the May 16, 2013 arrest of Mr. Ramirez (see page 47 above), it is clear that parallel reconstruction was utilized in this case. Reports provided in this case demonstrate that Mr. Ramirez was stopped as a result of surveillance that was being conducted in regard to this narcotics investigation. In

Ramirez's state court discovery there were reports about the exact same incident but there was no reference whatsoever to the surveillance, only that he had been stopped for a traffic violation. The end result is that the construction of the report for federal purposes demonstrated Ramirez was stopped as a part of the federal investigation whereas the construction of the report for state purposes indicated he was stopped due to a routine state traffic violation. The use of parallel construction had the direct result, if not accompanied by intent, of insulating the court and counsel from ascertaining the legality of the stop. Therefore, in this case, there is absolute evidence that parallel construction techniques were used to sanitize investigative reports. There are several instances in the discovery that raise similar concerns that the entire well of information about a particular event is not being provided.

There is a debate as to whether parallel construction is illegal with its proponents arguing that probable cause, independent of the true concealed source of the lead, must only be found. However that argument is inapplicable in statutory Title III proceedings wherein the suppression hearing requires the court to analyze whether a full and complete statement has been provided in regard to the issue of necessity or under *Franks* whether their has been a material omission. The crux of necessity rests on law enforcement being forthcoming about its available sources of information. The use of parallel construction by law enforcement officers, including Investigator Gullicksrud who directed this investigation, is also indicative of veracity and is discoverable as impeaching information.

E-1   It is requested that the prosecution make inquiry of each law enforcement agency involved in this investigation and specifically

determine the extent to which the technique of parallel construction was employed and to provide the defense with the true source of all information that gave rise to  any relevant information in this case.

### F. PEN REGISTER AND TRAP AND TRACE MATERIALS

Large scale drug investigations are conducted in a different fashion today than they were at the time Title III, which is part of the Omnibus Crime Control and Safe Streets Act of 1968, was enacted by Congress nearly forty years ago. The evolution of law enforcement techniques is a direct result of the enormous advancement in the ability to deal with huge volumes of data.

Computers were virtually nonexistent in 1968; now, police cars routinely have them along with instantaneous access to databases throughout the country and world. As a result of the strides made in technology, the government now maintains huge databases. The use of these databases now plays a major role in most large drug investigations. The databases are routinely used in conjunction with the normal investigative techniques described in *Castillo-Garcia*, 117 F.3d at 1186.

Pen registers and trap and traces are recognized as normal investigative techniques that must be used, or at least considered, prior to obtaining a wiretap. *Id*. at 1187. Pen registers and trap and trace devices are considered normal investigative techniques because the data obtained from them can provide the government with significant information that could obviate the need for a wiretap. Normally the government enters the phone numbers obtained from pen registers and trap and traces into various databases. The databases are capable of providing significant information to the government, including but not limited to the location from which a cell phone is

being used, the location of the participants in the call, travel information of the participants in the call if the participants moved during the call, the length of the call, the frequency with which numbers are called and the relationships between various phone numbers. Telephone numbers are normally also indexed in Narcotics and Dangerous Drugs Information System ("NADDIS") which, as set forth more fully below, contains information on users of the phone and cross references to addresses and other investigations.

In this case the government obtained authorization for a large number of pen registers, trap and traces and GPS information. However it appears from the discovery that little or no analysis was performed on this data and that the information was obtained immediately before seeking a wiretap. The timing and depth of the investigative efforts relating to Pen Registers, Trap and Traces and GPS information must be further examined to analyze their impact on the necessity requirement.

F-1    The results of any Penlink, NADDIS or other analysis performed on all such raw data.

For reasons of analyzing the issue of necessity and the fullness and completeness of the applications, as discussed above, the defense needs disclosure of this analysis.

## G. ADMINISTRATIVE SUBPOENAS PERTAINING TO TOLL RECORDS AND THE INFORMATION OBTAINED THEREFROM

The statements and arguments set forth in Section D above pertaining to pen registers are equally applicable to the use of administrative subpoenas. The defendants

specifically incorporate the language of Section D above. Generally, wiretap affidavits contain a section that references the analysis performed on toll records. This analysis focuses on establishing probable cause for the tap. The analysis consists of referencing that the toll records were obtained, usually, but not always, within two to three weeks of a wiretap application being submitted to the court, and establishes contacts between the target phone and other phone numbers associated with drug trafficking.

*Castillo-Garcia,* explains that pen register analysis and, implicitly, toll record analysis has become a traditional investigative technique and that the requirement that traditional investigative techniques be addressed is not merely to establish probable cause but specifically to establish necessity. *Castillo-Garcia*, 117 F.3d at 1187-88. Pen register analysis and presumably toll analysis are considered to be normal investigative techniques because they actually can provide information that will enable the investigation to be successful without resorting to a wiretap.

There is no indication in the discovery that this important investigative prerequisite was completed in a timely fashion. Frequently, discovery includes reports that at least summarize the call analysis. No such reports have been provided. Even from the affidavits themselves, it is apparent that law enforcement was in such a hurry to obtain wiretaps that investigators failed to take advantage of the information available to them through the normal investigative technique of pen registers and toll records.

> G-1  The results of any Penlink, NADDIS or other analysis performed on all such raw data.

**H. MATERIAL OBTAINED OR AVAILABLE PRIOR TO THE ISSUANCE OF THE LAST TITLE III ORDER FROM THE GOVERNMENT AND PRIVATE DATABASES**

In *Castillo-Garcia* the court stated that, "[t]o obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap." *Castillo-Garcia*, 117 F.3d at 1187. The court, citing *United States v. Mesa Rincon*, 911 F.3d 1433, 1444 (10th Cir 1990), set out a list of traditional investigative techniques that included the following: standard visual and aural surveillance; questioning of witnesses and participants, including the use of grand jury subpoenas; search warrants; the use of undercover agents and informants; and the use of pen registers and trap and trace devices. *Id.* With the exception of pen registers and trap and trace devices, which were added by the *Castillo-Garcia* court over a quarter of a century ago, this list of normal techniques had its origin in the legislative history to Title III which occurred almost a half century ago. S. Rep. No. 1097, 90th Cong., 2d Sess. 101 (1968).

This list of "normal" or "traditional" techniques was not intended by the court to be exhaustive or static.  Whether other normal investigative techniques must also be explored before turning to wiretaps will depend on the unique circumstances of each investigation.  For example, it will often be the case that the government must consider first the less intrusive technique of reviewing available public, private, or governmental records pertaining to the suspects under investigation to see if the requisite information needed to prosecute may be obtained in that way."  *Castillo-Garcia*, 117 F.3d at 1188.

The four investigative techniques gleaned from the legislative history described the way sophisticated investigations were conducted nearly a half-century ago. However, as touched on above, with the use of computers, investigative techniques have changed dramatically. In fact, the use of public, private, and governmental records, particularly in the form of intricate, and expansive databases and sophisticated programs available to search them, constitutes a much more normal and productive technique in today's investigations than the trash runs described in the affidavits.[7]

From the information provided thus far, it is not always possible to determine which of the databases described below were used in this investigation; however, it is clear that databases were employed.   The following databases or types of databases are normally used in the investigation of large drug conspiracies:

H-1. Narcotics and Dangerous Drugs Information System ("NADDIS").

The DEA website describes NADDIS as follows: "A centralized automated file of summaries of reports on subjects of interest to DEA, consisting of over 5.9 million subjects on individuals, businesses, vessels, aircraft and selected airfields identified through the DEA investigative reporting system, and related investigative records." *See* http://www.dea.gov/foiainaddis.html. One of the stated purposes of NADDIS is to obtain intelligence information for prospective investigations. Furthermore, the DEA Agents Manual specifically states that all names appearing on records of toll calls made by a suspected violator should be indexed in NADDIS.

---

[7] It is anticipated that the government will, in good faith, have to concede this fact. If not, the defense is prepared to establish at a hearing on this motion that the use of computerized databases has become a normal investigative technique in the investigation of large drug conspiracies.

Because this is a MGTF Investigation and DEA was consulted, it is reasonable to assume that NADDIS indexing occurred throughout the investigation. Specifically, data consisting of names, addresses and telephone numbers would routinely be inputted into NADDIS, both for future evaluations and for learning about prior references to the subject being indexed. NADDIS information in the discovery is largely redacted.

H-2. Financial Crimes Enforcement Network ("FinCEN").

FinCEN is a network of databases and financial records maintained by the U.S. federal government. Run by the Treasury Department, FinCEN maintains records on suspect financial transactions. Banks, casinos, brokerage firms and money transmitters all must file reports with FinCEN on cash transactions over $10,000. FinCEN shares information with investigators from dozens of agencies, including the Bureau of Alcohol, Tobacco, and Firearms; the DEA; the Federal Bureau of Investigation ("FBI"); the U.S. Secret Service; the Internal Revenue Service; the Customs Service; and the U.S. Postal Inspection Service. Agents can use names, addresses, and/or Social Security numbers to help identify possible subjects in the FinCEN database. Neither the affidavits nor discovery mention use of FinCEN, though a government press release mentioned below details the important role of money in this investigation.

H-3. National Crime Information Center ("NCIC").

The FBI maintains the NCIC database. NCIC is a computerized index of criminal justice information, such as criminal record histories, fugitives, stolen properties or missing persons. It is accessible to federal, state, and local law enforcement and other criminal justice agencies. The purpose of maintaining the NCIC system is to provide

ready access to a criminal justice agency and for prompt disclosure of information in the system from other criminal justice agencies about crimes and criminals.

H-4.   Treasury   Enforcement   Communication   System   ("TECS"),   or   any replacement   for TECS.

TECS is a Department of the Treasury system managed by U.S. Customs. It was designed to provide controlled access to a large database of information about suspects and to interface with other law enforcement systems. Information-sharing applications permit on-line entry and maintenance of subject records and provide access to other data sources, including NCIC. TECS applications allow subject queries and reviews of linkage relationships between subjects and other types of records. Primary query history information is available for person and vehicle subjects. *See* Investigators' Guide to Sources of Information (Other Written Prod., 04/01/97, GAO/OSI-97-2).

H-5. FBI Electronic Surveillance Indices ("Elsur").

Elsur is maintained by the FBI and covers individuals: who have been the targets of direct electronic surveillance coverage in a court order; whose communications have been monitored/intercepted by electronic surveillance installation; and who own, lease, or license premises subjected to electronic surveillance coverage conducted pursuant to court order. One of the specific uses of Elsur is to enable the government to certify whether a person for whom court-ordered authority is being sought for electronic coverage has ever been so covered in the past. Elsur was used in preparation of the section of the affidavits pertaining to "Prior Applications."  The applications confirm that ELSUR was utilized but the exact results of such analyses have not been disclosed.

H-6. El Paso Intelligence Center ("EPIC").

EPIC is described in the DEA Agents Manual as a full-service tactical intelligence operation. EPIC uses many of the databases described above, as well as other databases. In addition to providing for watches on individuals and vehicles, EPIC is used for tactical analytical support. Specifically, the DEA Agents Manual describes the analytical capabilities of EPIC. Two are relevant to the defendants' Title III challenge:

> H-6.1. Database Review. This is designed to obtain information on incompletely identified persons and vehicles. It is also used to develop the relationship among individuals and subjects. Generally, a brief synopsis of the findings accompanied by database printouts is provided.

> H-6.2. Organizational Profiles. EPIC is said to be able to produce full-scale organizational profiles derived from in-depth research of multi-agency databases. These reports are prepared in connection with international movement of drugs.

Prior to the commencement of a wiretap, agents will normally submit data to analysts. In addition to EPIC, analysis can occur in-house or can be sent to other facilities, including those in Washington. The affidavits in this case are completely silent with respect to any analysis of information obtained from any databases.

H-7. Gang Databases

There are a large number of Federal, state and local gang related databases used by law enforcement in combating gangs.  One example is the National Gang Intelligence Center which integrates gang intelligence from across federal, state, and local law enforcement on the growth, migration, criminal activity, and association of

gangs that pose a threat to the United States.  It supports law enforcement by sharing information and by providing strategic/tactical analysis of intelligence.

H-8. The Colorado Bureau of Investigation.

The Colorado Bureau of Investigation maintains a database for tracking gangs and gang members both within the state and among the various states pursuant to C.R.S. § 24-33.5-412.

H-9.  Versadex.

The Aurora Police Department uses Versadex as its records management system for flagging records.  A flag record, also referred to as a "gang flag" identifies the criminal street gang name associated with a gang member and provides an automatic notification in Versadex any time the member is involved in a reported incident in Aurora.

H-10. Public Records

Numerous public records are available via on-line search engines or specialized databases. Many federal agencies use a fee-based service such as Choicepoint to research a subject's public records such as associated addresses, telephone numbers, credit headers, real property ownership, persons with whom they have shared addresses, civil litigation records and/or criminal records. General references are made in the affidavits to the use of public and private databases. There is little or no additional indication in the affidavits of how these databases may have been used or what was learned from their use. These databases frequently provide information about potential locations where drugs can be stored and where drug proceeds are either stored or

invested. Information obtained from such databases is frequently used in conjunction with other traditional investigative techniques such as surveillance.

The information enumerated below is favorable to the accused because: (i) it is inconsistent with the representations made by the government in the affidavits and is *Giglio* material; (ii) it is also favorable to potential arguments the defense can raise to make the *Franks* type showing; and (iii) it is relevant and favorable to the defense with respect to the issue of whether a full and complete statement of the prior applications was provided pursuant to 18 U.S.C. §§ 2518(1)(c) and (e):

> H-10.1 All information contained on Elsur or other databases relied upon by the government that reflects any of the named interceptees, addresses or phone numbers in the applications in this case were involved in any prior Title III interceptions. The term "involved as used herein is not limited to actual targets or named interceptees, but includes all individuals, phone numbers and addresses actually intercepted during the course of the prior wiretaps.

> H-10.2 All information in any of the above-described databases pertaining to any members of the alleged Gangster Disciple Drug Trafficking Organization and any sources of controlled substances for such organization that existed prior to the final Title III application in this case.

> H-10.3 All analysis of database information done in-house or by other analysts in Denver, Washington or elsewhere. This would include the raw data and the product of the analysis, including, but not limited to, written reports, synopses, and relationship charts.

> H-10.4 Unredacted discovery which shows, among other things, the existence of NADDIS information in the indexing section.

> H-10.5 All queries referenced in the section of the affidavits  "Use of Administrative Subpoenas, Colorado Department of Motor Vehicles (DMV) and Criminal History Checks", specifically paragraph 167 and the similar paragraph in all remaining affidavits.

Respectfully submitted,


s/James A. Castle

James A. Castle
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
f: (303) 329-5500



s/Mitchell Baker

Mitchell Baker
1543 Champa Street, Suite 400
Denver, CO  80202
(303) 592 - 7353
mitchbaker@estreet.com

## CERTIFICATE OF SERVICE


I hereby certify that on this 9th day of October, 2015, I electronically filed the foregoing
**DEFENDANT GARRISON'S MOTION FOR SPECIFIC DISCOVERY** using the CM/ECF system
which will send notification of such filing to all counsel of record in this case.



s/James A. Castle

James A. Castle