IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No.  1:16-cv-02106

DANIELLE MARKS

    Plaintiff,

v.

JAMES COMEY, Director, Federal Bureau of Investigation

    Defendant.

---

**COMPLAINT AND JURY DEMAND**

---

Plaintiff Danielle Marks for her Complaint states:

## INTRODUCTION

This is a sex discrimination and retaliation suit brought by a former female special agent of the United States Federal Bureau of Investigation ("FBI") who was discriminated against, harassed, and ultimately constructively discharged from her employment in violation of federal law.  Plaintiff was retaliated against after she made a formal complaint to FBI management and the EEO about the harassing and discriminatory behavior of numerous male FBI special agents and management.  Plaintiff asserts claims against the FBI of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*. ("Title VII") and of retaliation against her for having engaged in protected activity by objecting to her harassment by the FBI, also in violation of Title VII, 42 U.S.C. § 2000e-3(a).

Exhibit 1

## PARTIES

1. Plaintiff Danielle Marks is a resident of the State of Colorado.

2. Defendant United States Federal Bureau of Investigation is a federal agency.

3. The United States Federal Bureau of Investigation's principal office is J. Edgar Hoover Building, 935 Pennsylvania Avenue, N.W., Washington D.C., 20535.

## JURISDICTION AND VENUE

4. This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1367, and specifically under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq*.

5. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because the employment practices and other conduct alleged to be unlawful were committed in the District of Colorado.

6. At all relevant times, Defendant Federal Bureau of Investigation was covered by the definitions of "employer" set forth in 42 U.S.C. § 2000e(b) of Title VII.

7. All procedural prerequisites for the filing of this suit have been met. Plaintiff filed a federal EEO complaint on November 12, 2014.

## SPECIFIC ALLEGATIONS

8. Defendant United States Federal Bureau of Investigation ("FBI") is a federal agency.

9. Danielle Marks began working as a special agent for the FBI on April 7, 2010.

10. Ms. Marks was originally assigned to the Baltimore Division as an agent on the Safe Streets Task Force, investigating drugs and violent gangs.

11. Ms. Marks had an overwhelmingly positive experience at the Baltimore Division and she received performance appraisal ratings of "Successful," and "Excellent."

Exhibit 1

12. Ms. Marks was transferred to the Denver Division in January 2013, and she was assigned to the Metro Gang Task Force ("MGTF").

13. Even before Ms. Marks arrived in Denver, Denver Assistant Special Agent in Charge ("ASAC") Mike Rankin told Ms. Marks's former supervisor in Baltimore that the environment in the MGTF was "tough," and asked if Ms. Marks had the skillset to handle such an environment.  Ms. Marks's supervisor reiterated to ASAC Rankin that Ms. Marks was an excellent agent and that she got along well with all of the male agents in Baltimore.  Ms. Marks was the only female agent on the Baltimore task force.

14. There were six FBI Special Agents assigned to the MGTF, along with Task Force Officers ("TFOs") from various police departments in the Denver metro area. Although the MGTF is supposed to be an FBI-led task force, it is in fact partially led by the Aurora Police Department.

15. There was one Lieutenant from the Aurora Police Department and two Sergeants assigned to the MGTF from the Aurora Police Department and the Denver Police Department.  These police officers shared the supervisory role for all day-to-day matters.

16. Supervisory Special Agent ("SSA") Todd Wilcox and ASAC Mike Rankin were the FBI agents who oversaw operations at the Denver MGTF.

17. Ms. Marks's first and only Performance Appraisal Rating at the MGTF was "Successful."  She was told that she could not be given a higher rating because she had only been on the MGTF for a short period of time.

Exhibit 1

18. In September 2014, Ms. Marks received a monetary award for her efforts in gang investigation.

19. During Ms. Marks's tenure at the MGTF, she experienced a hostile work environment replete with inappropriate sexual comments.

20. In Spring 2013, Special Agent ("SA") Sara Aerts brought a cake into the office that was decorated as a penis. She put the cake in the workroom and asked, "who's the biggest dick on the task force? I know, Dave See." SA Aerts then placed the cake on TFO See's desk.

21. When TFO See, who was an officer with the Jefferson County Sheriff's Department, looked at the cake, he was visibly offended and angry.

22. Beginning in September 2013, Ms. Marks told Supervisory Special Agent ("SSA") Wilcox that Special Agents Sanin, Tobar, and Alexander, all of whom were male:

- refused to assist her with surveillance on her case, even though it was the only open case in the office;
- were never at work, particularly on the weekends;
- behaved inappropriately and made repeated sexual comments around Ms. Marks and other female employees;
- treated the Task Force Officers poorly;
- responded to Ms. Marks in a negative manner; and
- routinely made negative comments to the Task Force Officers about Ms. Marks's casework.

23. On more than 20 occasions, Special Agents Sanin, Tobar, and Alexander failed to attend their scheduled surveillance shifts for Ms. Marks's wiretap case. On at least 7

Exhibit 1

occasions, Ms. Marks asked SSA Wilcox where the agents were. On each occasion, SSA Wilcox would say that he would check in with them, and then he would reply that they were "unavailable." He never provided any more detail on their whereabouts.

24. Furthermore, on one occasion, SSA Wilcox mandated that Agent Tobar help Ms. Marks with a 15-day wiretap report. SA Tobar was a senior agent and had many years of experience writing wiretap reports. Nonetheless, the report that he wrote was so poor that Ms. Marks had to rewrite it hours before it was due.

25. Each time Ms. Marks complained to SSA Wilcox from September 2013 through September 2014 about these issues, he assured her that he would speak with Agents Sanin, Tobar and Alexander.

26. However, despite these assurances, the agents' behavior became worse.

27. In May 2014, SA Tobar and SA Donnie Peterson were having a discussion about Special Agent Aerts possibly transferring to a different FBI office or leaving the FBI so that she could be closer to her boyfriend in Idaho. SA Tobar stated, "good, I hope she quits, she can stay home in the kitchen."

28. SA Tobar frequently made derogatory comments about women and their inability to effectively act as FBI agents.

29. Numerous times during Ms. Marks's employment, Agents Sanin, Tobar, and Alexander invited Ms. Marks's partner, TFO Cooper, a male, to lunch. Each time, they asked if Ms. Marks was coming, and when TFO Cooper responded that she was, they said "nevermind," and that they would instead go somewhere else.

Exhibit 1

30. Ms. Marks was also excluded from operations plans that Agents Sanin, Tobar, and Alexander devised. They instead included male agents in the plan who were not even present in the office on the day the plan was to be implemented.

31. In June 2014, TFO Cooper told Ms. Marks that SA Tobar was having a conversation with SA Aerts and said, "come on Sara, show me your tits."

32. TFO Cooper, also told Ms. Marks that he heard male special agents make numerous derogatory comments about women, oftentimes stating that women should not be special agents.

33. A number of male task force officers told Ms. Marks that their police departments would surely terminate male employees if they acted the way the male FBI special agents acted.

34. In October 2014, TFO Roberts, a female, shared with Ms. Marks that Ms. Roberts overheard SA Henry Sanin, a male, say to SA Aerts, "let me lick your pussy."

35. Ms. Marks urged SA Roberts to report this offensive behavior.

36. Throughout Ms. Marks's time as a Special Agent on the MGTF, male special agents made inappropriate comments and then looked at Ms. Marks or Special Agent Aerts and said, "I wonder how many zeroes will be at the end of that lawsuit check."

37. After a few months, male special agents made inappropriate comments and then said "uh oh, add another zero." All of the other male FBI special agents would laugh at this comment.

38. On one occasion, Ms. Marks was told that SSA Wilcox and Agents Sanin, Tobar, and Alexander were discussing assignments when one of the agents said, "give it to Marks, she'll fuck it up."

Exhibit 1

39. On numerous occasions, when TFO Cooper and Ms. Marks were scheduled to meet with confidential sources or to conduct a gun or drug buy, Agents Tobar, Alexander, and Sanin would arrive at the scene unscheduled. When TFO Cooper confronted them and told them that they were compromising the integrity of the investigation, they said that they thought he "needed an extra set of eyes." Agents Sanin, Tobar, and Alexander never did this when two male agents were meeting with informants or conducting a buy.

40. Furthermore, from September 2013 through her constructive discharge in October 2014, Supervisory Special Agent Wilcox and the other male special agents frequently made jokes about Special Agent Donnie Peterson and Assistant United States Attorney ("AUSA,") and Chief of the Organized Crime Drug Enforcement Task Forces for the state of Colorado ("OCDETF"), Susan "Zeke" Knox.

41. SA Peterson worked on several cases successfully with AUSA Knox and it was clear that they had a positive working relationship. Because of this, when Ms. Marks and other agents had to work with AUSA Knox, they often asked SA Peterson for advice.

42. Special Agent Peterson became the brunt of frequent sexually inappropriate comments about his relationship with AUSA Knox. For instance, other male special agents:

- said that Special Agent Peterson and AUSA Knox were having an affair;
- frequently said "get Donnie to call Zeke, he's doing her,";
- whenever someone asked where Special Agent Peterson was, SSA Wilcox would say, "making Zeke's trailer shake";

Exhibit 1

- if Special Agent Peterson were busy, other male special agents would say that he was "laying the pipe to Zeke."

43. To Ms. Marks's knowledge, SA Peterson was not having an affair with AUSA Knox.

44. However, ASAC Rankin was allegedly having an inappropriate relationship with his married subordinate. On one occasion in April 2013, ASAC Rankin and his subordinate openly stayed together in a hotel room for a work conference.

45. ASAC Rankin also assisted her in applying for her current position of Secretary to the Special Agent in Charge Ravanelle.

46. Despite numerous complaints from employees about this relationship, the behavior was not only tolerated but encouraged at the Denver Field Office.

47. During this same time, Special Agent Alexander showed everyone in the office a picture of a female FBI agent wearing high heels and a ballistic vest. He said that she looked ridiculous and that she was an embarrassment to the FBI.

48. He then placed the picture on his desk. He only removed the picture when the next scheduled inspection was due.

49. In mid-July 2014, Special Agent Tobar announced that he had requested a transfer to a different squad. On July 29, 2014, ASAC Rankin and SSA Wilcox stated that no one would be allowed to transfer out of MGTF and if anyone tried to "backdoor" him, the consequences would be grave.

50. SSA Wilcox said that ASAC Rankin can be a "vindictive son of a bitch," and that he would surely follow through with his threats.

51. Ms. Marks had numerous conversations with SA Aerts, a female, throughout her tenure in Denver about how women were not treated equally in the MGTF.

Exhibit 1

52. In summer 2014, Lieutenant Torpin stated to Ms. Marks and SA Aerts after leaving SSA Wilcox's office, "I don't think they like working with women."

53. Ms. Marks and other female agents were routinely excluded from MGTF operations plans, particularly as part of the rescue team. Special Agents Tobar, Sanin, and Alexander made numerous comments stating that only male agents should be part of the rescue team and that it should be "left up to the boys."

54. Furthermore, Special Agent Marks was the only agent besides Special Agents Peterson and Aerts (both female), who had active investigations during Ms. Marks's tenure.

55. In contrast, Special Agents Tobar, Sanin, and Alexander had not opened a case at any point during Ms. Marks's tenure. When employees commented on their lack of work, they claimed that they were busy doing proffers from their old case (which had closed in April 2013).

56. On August 13, 2014, SSA Wilcox participated in a high level chief's meeting between Aurora Police Department and the FBI. SSA Wilcox, ASAC Rankin, SAC Ravanelle, and the Aurora Chief of Police were present. Following the meeting, SSA Wilcox told Ms. Marks that task force officers from the Aurora Police Department had told FBI management that male special agents were refusing to help task force officers and Ms. Marks with her cases.

57. After the meeting, Task Force Officer Torpin told Ms. Marks that during the squad meeting, SSA Wilcox defended the male special agents for not supporting others and for failing to come to work.

Exhibit 1

58. During this meeting, it was confirmed that Special Agents Tobar, Sanin, and Alexander were not coming to the office when they were scheduled to, particularly on the weekends. Lt. Torpin provided detailed key card reports showing that the agents' individual door codes were not being entered and were not on the log report.

59. Despite proof of this misconduct, SSA Wilcox said that the agents must have had reasons for not being in the office when they were scheduled to. However, when pressed further on the issue, SSA Wilcox did not have any explanation for the agents' whereabouts.

60. SSA Wilcox also told others at the squad meeting that Ms. Marks was mistreated because the male special agents did not like her.

61. Lt. Torpin told Ms. Marks that if she continued to be targeted by the male special agents and SSA Wilcox, he and other task force officers were willing to speak to Special Agent in Charge ("SAC") Ravanelle to defend her, because they felt as though Ms. Marks was one of the hardest working agents at MGTF.

62. After a year of enduring constant inappropriate comments and poor treatment, the environment at the MGTF became so hostile and intolerable that it began to affect Ms. Marks's mental health.

63. As a result, Ms. Marks tendered her resignation to the FBI on September 15, 2014.

64. On September 16, 2014, Special Agent Sanin approached Ms. Marks and asked her to reconsider her resignation, as the MGTF is "not the real FBI." Ms. Marks told him that ASAC Rankin wanted to speak with her about her resignation. At this time, SA Sanin warned Ms. Marks not to say anything negative about SSA Wilcox, Special

Exhibit 1

Agent Tobar, or Special Agent Alexander to ASAC Rankin because they were all close friends and it would likely get back to them.

65. Special Agent Sanin also said that ASAC Rankin always protects SSA Wilcox and that he does not like Lt. Torpin.

66. For fear of retaliation, Ms. Marks elected not to tell SSA Wilcox or ASAC Rankin the reasons for her resignation until her exit interview on September 30, 2014, her last day of employment.

67. On September 29th, SA Aerts asked Ms. Marks if she was going to tell SAC Ravanelle everything. When Ms. Marks said that she was, SA Aerts warned her that Ms. Marks better plan on leaving, because if she did not, there would be severe consequences. SA Aerts also said that this was the reason she had not complained about the inappropriate sexual comments and hostile environment.

68. During her exit interview with SAC Tom Ravenelle, Ms. Marks spoke at length about the inappropriate sexual comments, negative attitude, lack of support, and failure to address her complaints that she experienced during her employment in the Metro Gang Task Force. Ms. Marks gave SAC Ravenelle direct quotes and explicit detail about the environment within the MGTF.

69. SAC Ravenelle told Ms. Marks that he did not wish to lose a good agent and he initially offered to transfer her to a different squad or to the New York field office. When Ms. Marks declined both options and stated that she wanted to stay at MGTF and that the offending agents should instead be transferred, SAC Ravanelle said that it was unrealistic to transfer the offending agents out of the MGTF before he had an opportunity to investigate the issues. SAC Ravanelle then asked Ms. Marks if she

Exhibit 1

would be willing to take a leave of absence, but noted that she would first have to use her own annual leave.

70. Ms. Marks said that she would agree to take her annual leave and a leave of absence only if it was clear that she would return to the MGTF and that she could seek outside employment after her administrative leave was exhausted.

71. Ms. Marks explained to SAC Ravenelle that she would need approval for outside employment prior to October 13, 2014, as she had tentatively accepted a part-time position as a speech pathologist (her profession prior to joining the FBI).

72. SAC Ravenelle assured Ms. Marks that he would get her an answer quickly.

73. During Ms. Marks's exit interview, SAC Ravenelle asked Ms. Marks multiple times if he could invite ASAC Rankin into the room.

74. Ms. Marks explained to SAC Ravenelle that ASAC Rankin was aware of the hostile environment at MGTF, and that he had not taken any action to resolve the issues. In fact, it was common knowledge that ASAC Rankin was close friends with the offending agents, as was SSA Wilcox.

75. Nonetheless, SAC Ravanelle invited ASAC Rankin into the room and briefed him on what Ms. Marks had just shared. He then put ASAC Rankin in charge of the "investigation."

76. On October 1, 2014, TFO Roberts, a female, told Ms. Marks that she was happy that Ms. Marks reported the incidents of sexual harassment and inappropriate behavior to SAC Ravanelle.

77. On October 2, 2014, Ms. Marks complained to both the FBI's Office of Professional Relations and a Denver EEO counselor.

Exhibit 1

78. An EEO investigation was initiated in early October 2014.

79. Shortly thereafter, Ms. Marks was informed that SSA Wilcox publicly announced to the MGTF TFOs and the agents that Ms. Marks had filed an EEO complaint.

80. By October 8, 2014, SAC Ravanelle had not contacted Ms. Marks about her employment status. As such, Ms. Marks sent him an email inquiring about approval to seek outside employment during her leave without pay.

81. SAC Ravanelle responded that she would likely be approved for outside employment, but she had to fill out another form and it could take some time to receive approval. He then reiterated that ASAC Rankin was in charge of her investigation.

82. Ms. Marks knew that ASAC Rankin would not appropriately investigate her complaints.

83. As expected, ASAC Rankin never interviewed Ms. Marks, the sergeants and lieutenants at MGTF, or any of the task force officers who witnessed the pervasive sexual harassment and misconduct.

84. In fact, ASAC Rankin only interviewed the special agents who had engaged in the sexual harassment and discrimination. In ASAC Rankin's interview with the EEO counselor, he stated that he did not interview anyone else because he thought that the agents were being truthful and that further investigation was not necessary.

85. ASAC Rankin then determined that Ms. Marks's allegations were unfounded.

86. As a result of ASAC Rankin's incomplete investigation and SAC Ravanelle's inability to approve Ms. Marks's outside employment request, along with the pervasive hostile work environment that Ms. Marks was forced to endure throughout

Exhibit 1

her tenure at MGTF, she felt that her only option was to resign from the FBI in October 2014.

87. In October 2014, SSA Wilcox received an "Outstanding" in his performance review.

88. Ms. Marks filed a formal complaint with the FBI's Office of Equal Employment Opportunity Affairs on November 12, 2014.

89. After Ms. Marks filed her EEO complaint, she was informed that ASAC Rankin blamed Lt. Torpin from the Aurora Police Department for influencing Ms. Marks to file the complaint. He insisted that Lt. Torpin be removed from the MGTF. Consequently, Lt. Torpin was removed from the MGTF and transferred back to the Aurora Police Department.

90. Furthermore, Special Agent Tobar also blamed TFOs Cooper and Johnson, and Lt. Torpin for influencing Ms. Marks to file an EEO complaint. Agent Tobar proceeded to call these officers "backstabbers" to everyone at MGTF.

91. In November 2014, MGTF employee Jennifer Oftelie told Ms. Marks that Special Agents Sanin, Tobar, and Alexander were acting "as usual," because they were told by FBI management that Ms. Marks's EEO complaint had been dropped.

92. Ms. Oftelie noted that Agents Sanin, Tobar, and Alexander were not coming to work and were refusing to do work while they were in the office. They were also making inappropriate comments.

93. Agent Alexander also told Ms. Oftelie after Lt. Torpin was removed from the MGTF that they "were going after Torpin, [Ms. Oftelie] was just collateral damage."

Exhibit 1

94. In November 2014, Ms. Marks received a call and an email from Ms. Oftelie inviting her and Lt. Torpin to a luncheon at a restaurant in Denver so that they could give them plaques that the Task Force had made for them.

95. Ms. Oftelie then told Ms. Marks that analyst Frank Fredericks told Ms. Oftelie that he overheard Agents Sanin, Tobar, and Alexander state that they were going to attend the luncheon to make Ms. Marks and Lt. Torpin "feel awkward."

96. Agents Sanin, Tobar, and Alexander did indeed attend the luncheon and failed to say anything to Ms. Marks or Lt. Torpin. Several of the other task force officers were upset that the agents had attended the luncheon and thought that it was disrespectful. Two of the task force officers were so offended by the agents' presence that they left the luncheon and apologized to Ms. Marks for the situation.

97. Agents Sanin, Tobar, and Alexander were the only FBI personnel to attend the luncheon.

98. In January 2015, TFO Scott Cooper told Ms. Marks that Agent Sanin and the other special agents were informed that Ms. Marks had submitted a formal complaint to the EEOC. Agent Sanin told Officer Cooper in a sarcastic tone, "well, looks like I will be getting some days off."

99. Ms. Marks was also told that soon after she resigned, Agent Tobar said, "I don't get why she's suing, all the stuff I said wasn't to her anyway."

**STATEMENT OF CLAIMS**

**FIRST CLAIM FOR RELIEF**
(Sex Discrimination in violation of Title VII of the Civil Rights Act of 1964, as amended)

95. The foregoing allegations are realleged and incorporated herein by reference.

Exhibit 1

96. The Federal Bureau of Investigation subjected Plaintiff to different terms and conditions of her employment based on her sex in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-16, including by: subjecting her to sufficiently severe or pervasive harassment based on her sex so as to alter the conditions and terms of her employment; condoning or tolerating such harassment; subjecting her to less favorable terms and conditions of employment including, but not limited to, harassing her, discriminating against her in job assignments, refusing to support her cases, and forcing her to resign by making her work environment intolerable.

97. The FBI was motivated to discriminate against Plaintiff, in part, by its attitudes about women acting as special agents.

98. The FBI's actions toward Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

99. The FBI's conduct discriminated against Plaintiff on the basis of her sex in violation of Title VII.

100. As a direct and proximate result of the FBI's actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

**SECOND CLAIM FOR RELIEF**

(Retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended)

101. The foregoing allegations are realleged and incorporated herein by reference.

Exhibit 1

102. Plaintiff participated in statutorily protected activity by opposing practices targeted at her that were unlawful under Title VII, including discrimination and harassment based on sex.

103. As a result of Plaintiff's protected opposition to discrimination and harassment, the FBI retaliated against her by subjecting her to different terms and conditions of employment as described in this Complaint, including refusing to support her cases, constructively discharging her, and telling special agents that Ms. Marks had filed a formal EEO complaint.

104. The FBI's actions taken against Plaintiff were done knowingly and intentionally or with reckless disregard of her rights.

105. The FBI's conduct violated 42 U.S.C. § 2000e-3(a) of Title VII, as applicable to the federal government.

106. As a direct and proximate result of FBI actions, Plaintiff has suffered damages, including lost wages and benefits, diminished reputation and other pecuniary losses, and emotional pain and suffering, mental anguish, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

WHEREFORE, Plaintiff Danielle Marks respectfully requests that this Court enter judgment in her favor and against Defendant and order the following relief as allowed by law:

A. Compensatory damages, including but not limited to those for emotional distress, inconvenience, mental anguish, and loss of enjoyment of life;

B. Back pay and benefits;

C. Reinstatement or front pay and benefits;

Exhibit 1

      D.      Injunctive and/or declaratory relief;

      E.      Attorney fees and costs of the action, including expert witness fees, as appropriate;

      F.      Pre-judgment and post-judgment interest at the highest lawful rate; and

      G.      Such further relief as justice allows.

Respectfully submitted August 18, 2016.

                    By:    SWEENEY & BECHTOLD, LLC

                            s/Charlotte N. Sweeney
                            650 S. Cherry St., Ste. 610
                            Denver, CO 80246
                            Telephone: (303) 865-3773
                            Fax: (303) 865-3738
                            E-mail: cnsweeney@sweeneybechtold.com

                            s/Kaitlyn M. Wright
                            650 S. Cherry St., Ste. 610
                            Denver, CO 80246
                            Telephone: (303) 865-3773
                            Fax: (303) 865-3738
                            E-mail: kmwright@sweeneybechtold.com

                            ATTORNEYS FOR PLAINTIFF

Plaintiff's Address:
25657 White Aspen Circle
Menifee, CA 92584

# Exhibit 1

# CERTIFICATION OF GOOD STANDING

I hereby certify that I am a member in good standing of the bar of this Court.

By: SWEENEY & BECHTOLD, LLC

s/Charlotte N. Sweeney
650 S. Cherry St., Ste. 610
Denver, CO 80246
Telephone: (303) 865-3773
Fax: (303) 865-3738
E-mail: cnsweeney@sweeneybechtold.com

s/Kaitlyn M. Wright
650 S. Cherry St., Ste. 610
Denver, CO 80246
Telephone: (303) 865-3773
Fax: (303) 865-3738
E-mail: kmwright@sweeneybechtold.com

ATTORNEYS FOR PLAINTIFF

Exhibit 1