**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge William J. Martínez**

Criminal Case No. 14-cr-231-WJM

UNITED STATES OF AMERICA,

      Plaintiff,

v.

1.    **RICKY GARRISON,**

      Defendant.

---

## ORDER DENYING MOTION TO SUPPRESS WIRETAP EVIDENCE

---

Before the Court is Defendant Ricky Garrison's Motion to Suppress Wiretap Evidence and for Specific Wiretap Discovery.  (ECF No. 939.)  For the reasons explained below, the motion is denied.

## I.  BACKGROUND

Between October 2013 and May 2014, Garrison was a named interceptee in a succession of thirteen wiretap authorization orders obtained by the Government.  These orders were variously issued by Senior Circuit Judge David M. Ebel (wiretaps 1, 3, 4, 5, 8, and 9), Chief District Judge Marcia S. Krieger (wiretap 10), and Senior District Judge Wiley Y. Daniel (wiretaps 2, 6, 7, 11, 12, and 13).  Based at least in part on what the Government learned through these wiretaps, the Government has charged Garrison with fifty-three counts of drug and weapons offenses, and one count of enabling interstate prostitution.

Defendant only specifically challenges the first wiretap order, which he refers to

as "TT1" (short for "Target Telephone One," as the tapped phone eventually became

known).  (ECF No. 939 at 4.)  Garrison argues that "TT1 was subsequently used as the

basis to obtain [the] second wiretap order" and the Government "continued this process

with the remaining orders."  (*Id.*)  Thus, Garrison's motion addresses TT1 "as the

genesis of all wiretap evidence[;] however," he says, "the arguments averred in this

motion apply to TT1–TT13 and [he seeks] suppression as to all wiretap evidence

obtained in TT1–TT13."  (*Id.*)

## II.  WIRETAP ANALYSIS

### A.     Standard of Review

Federal investigatory wiretaps are governed by Title III of the Omnibus Crime

Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–22.  Wiretap authorization

orders are presumed proper and the defendant bears the burden of overcoming this

presumption.  *United States v. Mitchell*, 274 F.3d 1307, 1310 (10th Cir. 2001).  Thus,

the defendant must present a *prima facie* showing that the Government failed to satisfy

the requirements of 18 U.S.C. § 2518, which governs wiretap authorizations.  *United*

*States v. Borrayo-Gutierrez*, 119 F. Supp. 2d 1168, 1170 (D. Colo. 2000).

The judge to whom the application for a wiretap is submitted has considerable

discretion to grant or deny the application.  *United States v. Carrillo*, 123 F. Supp. 2d

1223, 1231 (D. Colo. 2000).  A district court nonetheless examines *de novo* whether the

Government submitted to the issuing judge a full and complete statement of the

relevant facts justifying the wiretap.  *United States v. Ramirez-Encarnacion*, 291 F.3d

1219, 1222 n.1 (10th Cir. 2002).  But the district court reviews the issuing judge's

conclusion that the wiretaps were necessary only for abuse of discretion.  *Id.*

As to the latter question (necessity), the Court may only look to "the information before the issuing judge" when he or she decided to issue the wiretap.  *United States v. Oregon-Cortez*, 244 F. Supp. 2d 1167, 1172 (D. Colo. 2003).  Such information includes the wiretap application itself and its supporting materials, other wiretap orders presented to the issuing judge, and any other testimonial or documentary evidence introduced in the *in camera* proceedings before the issuing judge.  *Id.*

**B.    Identity of Likely Interceptees & Probable Cause**

The affidavit in support of TT1 ("TT1 Affidavit") states that the Metro Gang Task Force (a Denver-area federal/state/local law enforcement partnership) had been investigating an "increasingly violent" street gang known as the Gangster Disciples, which was suspected of orchestrating drug distribution, robbery, homicide, and other offenses.  (TT1 Affidavit ¶¶ 2–3, 5, 7a, 19, 25.)  The application for TT1 ("TT1 Application") therefore names "known members and/or associates of" the Gangster Disciples as the "target organization."  (TT1 Application ¶ 2.)  The purpose of the wiretap was to gather

> admissible evidence of: (1) the nature, extent, and methods of operation of the manufacture, importation, possession with intent to distribute, and distribution of controlled substances; (2) the identities and roles of accomplices, aiders and abettors, co-conspirators, and participants in the illegal activities; (3) the existence and location of records; (4) the locations and vehicles used in furtherance of the criminal activities; (5) the distribution and transfer of money by those involved in the offenses; and (6) the location and disposition of the proceeds from the criminal activities[.]

(*Id.* ¶ 4(b).)

3

The investigators' specific goal with TT1 was to tap a telephone used by Francisco Ramirez, who was believed to be "a source of cocaine and methamphetamine supply to suspected Gangster Disciple Ricky Garrison." (*Id.* ¶ 6(a).)[1] The Affidavit elsewhere also refers to Garrison as a "suspected" Gangster Disciple. (*Id.* ¶¶ 20, 38, 130.)

Garrison bases his first suppression argument on this characterization of him as a suspected Gangster Disciple. Garrison claims that TT1 fails the statutory requirement that wiretap applications provide a "full and complete statement" because the Government claimed that it was investigating the Gangster Disciples but the TT1 Affidavit says nothing in support of the assertion that Garrison is a "suspected" Gangster Disciple. (ECF No. 939 ¶¶ 13–25, 28–30.)

The difficulty with Garrison's argument is that the statute governing the content of a wiretap application, 18 U.S.C. § 2518, contains four separate "full and complete statement" requirements,[2] and Garrison does not specify which one is at issue. At one point, Garrison indirectly references § 2518(1)(c)'s requirement to provide a full and complete statement of traditional investigative techniques that have failed or that are

---

[1] Throughout the various wiretap applications at issue, the Government spells the last names of individuals in all capital letters. Thus, in the just-quoted passage, "Garrison" is actually spelled in all-capitals. Because this tends to be distracting, the Court's quotations from the affidavits will present these names with normal capitalization.

[2] *See* 18 U.S.C. § 2518(1)(b) ("a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued"), (1)(c) ("a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous"), (1)(e) ("a full and complete statement of the facts concerning all [relevant] previous applications"), (11)(a)(ii) ("a full and complete statement as to why such specification [of the communications facility from which communications will be intercepted] is not practical").

unlikely to succeed or are too dangerous to try.  (*See* ECF No. 939 ¶ 25.)  However, Garrison later asserts a separate challenge (under a separate heading) explicitly invoking § 2518(1)(c).  (*Id.* ¶¶ 26–33; *see also* Part II.C, *infra*.)  Thus, it appears that Garrison believes that some other "full and complete statement" requirement is at issue in his first argument.

At another point in this argument, Garrison invokes *United States v. Donovan*, 429 U.S. 413 (1977), for its analysis of § 2518(1)(b)(iv).  (ECF No. 939 ¶ 30.)  That portion of the statute requires "a full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued, including . . . the identity of the person, if known, committing the offense and whose communications are to be intercepted."  In *Donovan*, the Supreme Court rejected the argument that this identification requirement only extends to the "principal targets" of an investigation.  429 U.S. at 426.  Rather, it means essentially what it says: "a wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone."  *Id.* at 428.[3]  Drawing on this language, Garrison argues that "[p]ermitting the government to surreptitiously conduct electronic surveillance by throwing a blanket around a nebulous group of individuals, based upon the unsupported guise that they are part of an organization, would relieve the government of its obligation to establish probable cause with particularity against the person [whose communications will be intercepted]."  (ECF No. 939 ¶ 30.)

---

[3] The failure to do so can nonetheless be harmless error.  *See id.* at 435–36.

5

This argument may have merit in the abstract, but it is inapplicable to this case because the Government did not "throw[] a blanket around a nebulous group of individuals."  Rather, it named seven specific individuals (including Garrison) whom the Government believed to be involved in the drug offenses principally under investigation and whose communications would likely be intercepted if a wiretap order issued.  (*See* TT1 Affidavit ¶ 6.)  Thus, to the extent Garrison actually intended to make a § 2518(1)(b)(iv) challenge, the Court holds that the Government did not fail to provide the identity of the persons, if known, committing the offense and whose communications would be intercepted.

What Garrison ultimately appears to be arguing is that there must be some legal significance to the Government's definition of the "target organization" as "known members and/or associates of" the Gangster Disciples.  This is all the more salient for Garrison because he believes that the Government knew at least as of the second wiretap that Garrison was no longer affiliated with the Gangster Disciples.  (*See* ECF No. 939 ¶ 21.)[4]

The "target organization" designation *might* have significance when discussing the "necessity" requirement for wiretap authorizations (*see* Part II.C.2, below), but that is separate from the requirement to identify individuals whose communications would be intercepted.  The Government's task in that regard was to establish "tripartite probable cause: the person's identity, his criminal activity, and his use of the telephones to be tapped or the facilities to be bugged."  1 Hon. James G. Carr *et al.*, *Law of*

---

[4] Garrison's allegation in this regard, if true, would need to be raised in a "sub-facial" challenge to the wiretap, which Garrison has not made.  (*See* Part III, *infra*.)

6

*Electronic Surveillance* § 4:37 (Aug. 2016 update) (footnotes omitted).  Under the circumstances of this case, none of these three elements necessarily turns on whether Garrison was an active Gangster Disciple or an "associate" of the Gangster Disciples. As to the first element, the Government certainly knew Garrison's identity.  As to the second element, the Government includes numerous allegations regarding the extent of Garrison's suspected drug distribution activities (TT1 Affidavit ¶¶ 30–39) as well as other crimes (*id.* ¶¶ 20–29).

The third element, "use of the telephones to be tapped," is satisfied by the likelihood that an individual's communications will be intercepted on the telephone to be tapped; it does not require that the person actually place or receive calls on that telephone.  *See Donovan*, 429 U.S. at 424–25.  The Government met that burden as well, presenting evidence that Garrison had made dozens of calls to Ramirez's phone (Target Telephone One) and that there was reason to believe that Ramirez was both a supplier and a distributor for Garrison.  (TT1 Affidavit ¶¶ 6(a), 83.)  Thus, the Government satisfied the necessary "tripartite probable cause" as to Garrison.  *See United States v. Armendariz*, 922 F.2d 602, 608 (10th Cir. 1990) ("We review the district court's finding of probable cause for a wiretap under the same standard used for a search warrant, to determine whether the facts and circumstances within the officer's knowledge based on reasonably trustworthy information are sufficient to warrant a person of reasonable caution to believe that an offense has [been] or is being committed." (citation omitted)).

Although the Government certainly named "known members and/or associates of" the Gangster Disciples as the "target organization," it did not seek a wiretap as to

7

the organization writ large.[5]  It sought a wiretap as to one specific phone (Ramirez's),

and then named seven specific individuals (including Garrison) whose communications

would likely be intercepted through that phone.  (TT1 Affidavit ¶ 6.)  Each of those

individuals was suspected of being part of a drug distribution network connected to

Garrison.  (*Id.*)  Garrison's "full and complete statement" challenge under

§ 2518(1)(b)(iv), to the extent he actually intended to make one, therefore fails.

**C.      Necessity**

Garrison also challenges the wiretap as unnecessary and therefore invalid.

(ECF No. 939 ¶¶ 26–51.)

        1.      Legal Standard

This challenge derives from 18 U.S.C. § 2518(1)(c), which, as noted above,

requires the Government to submit "a full and complete statement as to whether or not

other investigative procedures have been tried and failed or why they reasonably appear

to be unlikely to succeed if tried or to be too dangerous."  Closely connected is

§ 2518(3)(c), which directs that the judge reviewing a wiretap application may not

approve it unless he or she is satisfied that "normal investigative procedures have been

tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too

dangerous."

These two provisions combined are often called the "necessity requirement"

because their purpose "is to ensure that the relatively intrusive device of wiretapping is

_____

        [5] Indeed, it is not clear that any such wiretap could issue.  Although *United States v. Crumpton*, 54 F. Supp. 2d 986, 1007 (D. Colo. 1999), says that "the target of a wiretap may be a drug organization as a whole, rather than an individual," this remark refers to § 2518's "necessity" requirement, discussed in the following subsection.

8

not resorted to in situations where traditional investigative techniques would suffice to expose the crime." *United States v. Verdin-Garcia*, 516 F.3d 884, 889–90 (10th Cir. 2008) (internal quotation marks omitted). Traditional investigative techniques generally include: (1) visual and aural surveillance; (2) questioning and interrogation of witnesses or participants (including the use of grand juries and the grant of immunity if necessary); (3) search warrants; (4) undercover agents or informants; and (5) pen registers and trap-and-trace devices. *Id.* at 890; *Ramirez-Encarnacion*, 291 F.3d at 1222 n.2.

The necessity requirement is not to be treated hypertechnically and does not mandate exhaustion of all possibilities. *Verdin-Garcia*, 516 F.3d at 890. The Government is expected to act "in a common sense fashion," and "[t]he overall burden" to establish necessity "is not great." *Id.* (internal quotation marks omitted). This Court reviews the warrant-issuing judge's necessity conclusion only for abuse of discretion. *Ramirez-Encarnacion*, 291 F.3d at 1222 n.1.

2. Necessity and the "Target Organization"

Taking a different approach to the arguments previously raised, Garrison claims that the Government failed to establish his connection to the Gangster Disciples and therefore was required to state the investigative techniques used against him personally, rather than techniques used to investigate the Gangster Disciples and their associates generally. (ECF No. 939 ¶¶ 31–33.) Because the Government said nothing about investigative techniques used against Garrison personally, he argues that the Government *per se* failed the necessity requirement. (*Id.*) Resolving this argument requires some discussion of what the "target organization doctrine" (for lack of a better

9

term) truly entails.

The apparent genesis of the target organization doctrine is *United States v. Castillo-Garcia*, 117 F.3d 1179 (10th Cir. 1997), *overruled on other grounds by Ramirez-Encarnacion*, 291 F.3d at 1222 n.1.[6]  *Castillo-Garcia* contains the following sentence that has since become more significant than the court may have foreseen: "To obtain an electronic surveillance order, the government must explain fully in its application what investigative techniques have been tried against the target of the wiretap.  18 U.S.C. §§ 2518(1)(c), 2518(3)(c) (1994)."  117 F.3d at 1187.  The final six words of the sentence—"against the target of the wiretap"—are not part of § 2518(1)(c) or § 2518(3)(c), nor does § 2518 ever use the word "target."  Moreover, the quoted sentence appears in a portion of the opinion discussing the *types* of investigative techniques that the Government must consider, not the *targets* of those techniques. *See id.  Castillo-Garcia* nonetheless went on to repeat the need for necessity as tailored to the target of the wiretap, although this time in a condemnation of boilerplate: "[G]eneralities, or statements in the conclusory language of the statute, are insufficient to support a wiretap application.  The statements must be factual in nature and they must specifically relate to the individuals targeted by the wiretap."  117 F.3d at 1188.

The following year, Judge Lewis T. Babcock of this District was confronted with the question naturally flowing from *Castillo-Garcia*'s language: "Who or what is a 'target' of a wiretap?"  *United States v. Barrios*, 994 F. Supp. 1257, 1262 (D. Colo. 1998). Judge Babcock was forced to answer this question because he was presented with a

_____

[6] *Ramirez-Encarnacion* only overruled *Castillo-Garcia*'s holding that necessity determinations were reviewed *de novo*, as opposed to for abuse of discretion.  *See id.*

10

wiretap suppression motion arguing that "target" means any person who has been named as a likely interceptee under § 2518(1)(b)(iv) (the provision discussed in Part II.B, above).  *Id.*  In other words, the movants believed that the Government fails its burden under § 2518 unless it makes a necessity showing as to each likely interceptee.

Judge Babcock rejected this argument largely on account of *United States v. Killingsworth*, 117 F.3d 1159 (10th Cir. 1997), a wiretapping decision issued by the Tenth Circuit on the same day as *Castillo-Garcia*.[7]  *Killingsworth* established the legal standard applicable to wiretaps by quoting certain paragraphs from *Castillo-Garcia*, including the paragraph containing the "target of the wiretap" phrase.  117 F.3d at 1163. *Killingsworth* then went on to agree with the district court that the order authorizing the wiretap "adequately complied with [the necessity requirement] because the wiretap application detailed that normal investigative techniques had been attempted with regard to [a drug distribution ring known as] the Bustos Organization and it explained why those techniques had been unsuccessful."  *Id.* at 1164.  Judge Babcock naturally inferred from this conclusion that "target" is not congruous with individuals named as likely interceptees under § 2518(1)(b)(iv), but rather can refer to "individuals as well as criminal organizations."  *Barrios*, 994 F. Supp. at 1257; *see also Crumpton*, 54 F. Supp. 2d at 1007 (drawing on *Killingsworth* and *Barrios* for the proposition that "the target of a wiretap may be a drug organization as a whole, rather than an individual").

Garrison's necessity attack extends the reasoning of *Castillo-Garcia*, *Killingsworth*, and *Barrios* to what he believes are its logical implications.  In Garrison's

---

[7] *Castillo-Garcia* and *Killingsworth* were heard by different panels save for one shared member—Judge Ebel—who wrote both decisions.

view: (1) *Castillo-Garcia* establishes a presumption that the necessity inquiry requires a showing of necessity as to each likely interceptee named under § 2518(1)(b)(iv); (2) *Killingsworth* and *Barrios* create an exception to the rule when the target of the investigation is an organization (*i.e.*, the target organization doctrine); therefore (3) to take advantage of the target organization doctrine (thus overcoming the need to establish necessity as to each likely interceptee), the Government must somehow establish in the affidavit that the likely interceptee is a member of the target organization.  Because the Government supposedly failed to do so in his case, Garrison argues that necessity was never properly established as to him, thus requiring suppression.

    In the Court's view, Garrison fails to show that suppression is required for two reasons, one relatively straightforward, and the other less so.  The first (straightforward) reason assumes that Garrison's logic is sound.  Under that assumption, the Court notes that the TT1 Affidavit alleges Garrison's participation with a "documented" Gangster Disciple member in an attempted robbery of another drug dealer.  (TT1 Affidavit ¶ 27.) This allegation was sufficient, particularly under an abuse of discretion standard, for Judge Ebel to conclude that Garrison was at least an "associate" of the Gangster Disciples, and therefore a member of the target organization.  Thus, no showing of necessity specific to Garrison was required.  This basis alone suffices to reject Garrison's argument.

    The second, more complicated reason can be summarized as follows: § 2518 does not require the Government to establish a connection between the investigative methods it tried (or not) and the persons whose communications will likely be

intercepted.  Practically speaking, a connection will usually exist, but the necessity requirement does not turn on it.  And because there is no need to link the necessity inquiry to the persons whose communications will likely be intercepted, there is no need for a "target organization doctrine" as an exception to the supposed presumption that investigative efforts will be directed at individuals.

Obviously this conclusion conflicts with *Castillo-Garcia*, and so this Court cannot adopt it as a holding.  The Court's reasoning nonetheless deserves explanation, if only for future consideration by the Tenth Circuit.

As already noted, § 2518 does not use the word "target," nor does it express any concept equivalent to *Castillo-Garcia*'s "target of the wiretap."  117 F.3d at 1187.  One might presume that the "target" should be one of the individuals listed as a likely interceptee under § 2518(1)(b)(iv), but such an interpretation is somewhat undermined by § 2518's other requirements.  In particular, § 2518(1)(e) requires the Government to describe previous wiretap applications "involving any of the [likely interceptees]," but the necessity requirement, § 2518(1)(c), contains no such language referring back to the list of likely interceptees.  The lack of such a reference, in light of its presence in § 2518(1)(e), suggests an intentional statutory drafting decision.

Moreover, as Judge Babcock understood in *Barrios*, "target of the wiretap" must be something potentially distinct from the list of likely interceptees under § 2518(1)(b)(iv) because *Killingsworth* approved of investigative efforts attempted against "the Bustos Organization" *qua* organization, yet nothing in § 2518 would permit the Government to satisfy its obligation to list likely interceptees simply by naming "the

Bustos Organization." *Barrios*, 994 F. Supp. at 1257.

The undersigned would take this reasoning even further. Consider a crime boss who only issues orders to his subordinates orally and in person, precisely because many other forms of communication can be intercepted by Government officials armed with a wiretap order. Nonetheless, the boss's subordinates discuss their orders amongst themselves via telephone, and the Government wishes to intercept those conversations. If "target of the wiretap" is congruent with likely interceptees, then § 2518 would *not* require the Government to consider any traditional investigative techniques against the boss himself because he is *not* a likely interceptee—even though he is definitely the "target" of the Government's investigation in a functional or colloquial sense. Such a result seems almost certainly at odds with the purposes of the necessity requirement. To prevent this result, targets and likely interceptees must be potentially distinct categories.

This reasoning emphasizes that "target of the wiretap" is not a statutorily grounded concept—there is no place in § 2518 where it neatly fits. And if anything can be considered a "target of the wiretap" under § 2518, it would seem to refer most directly to the telephone line to be bugged. Of course it is nonsense to speak of traditional investigative techniques tried against a telephone line.

At the same time, *Castillo-Garcia* is probably correct that the requirement to list investigative techniques tried or considered must have a sensible referent— investigative techniques tried or considered against what? There are several reasons to believe that the proper referent is the *crime under investigation*, not the persons who might have committed the crime.

14

To begin, Title III authorizes judges to grant wiretap applications through "an order authorizing or approving the interception of wire or oral communications by [law enforcement agencies] having responsibility for the investigation of *the offense as to which the application is made*, when such interception may provide or has provided evidence of [specified offenses]."  18 U.S.C. § 2516(1), (2), (3) (emphasis added). Consistent with this view is § 2518(1)(b)'s list of information that must be a part of the Government's "full and complete statement of the facts and circumstances relied upon by the applicant, to justify his belief that an order should be issued."  The first-listed topic to be included is "details as to *the particular offense* that has been, is being, or is about to be committed," followed by "a particular description of the nature and location of the facilities from which or the place where the communication is to be intercepted," then "a particular description of the type of communications sought to be intercepted," and finally "the identity of the person, *if known*, committing the offense and whose communications are to be intercepted."  18 U.S.C. § 2518(1)(b)(i)–(iv) (emphasis added).  All of this suggests that the "target" of a wiretap, if anything, is the offense under investigation.

This interpretation is further supported, albeit by implication, in the Supreme Court's *Donovan* case, discussed in Part II.B, above.  The Government there contended that § 2518(1)(b)(iv)'s "identity of the person, if known" requirement only applies to the "principal target" of an investigation, meaning the person who "operates the target telephone to place or receive calls."  *Donovan*, 429 U.S. at 424–26.  The Supreme Court rejected this argument for various reasons, including that "the legislative materials apparently contain no use of the term 'principal target' or any discussion of a

15

different treatment based on the telephone from which a suspect speaks." *Id.* at 428. Accordingly, § 2518(1)(b)(iv) requires the Government to identify every likely interceptee for whom "the Government has probable cause to believe [is] engaged in *the criminal activity under investigation*." *Id.* (emphasis added). *Donovan* thus implies that analysis of "targets" is misguided to the extent that term refers to specific individuals. The real question is the crime at issue and the likely interceptees participating in that crime.

Also consider a situation in which the Government has reason to believe that three distinct street gangs are now collaborating in a certain criminal enterprise. Under *Castillo-Garcia*, *Killingsworth*, and *Barrios*, it appears legitimate for the Government to name all three as targets, or perhaps all three combined as a single target. At that point, however, it would seem far simpler to acknowledge that the Government is "targeting" the crime that brings the three gangs together, not the gangs themselves.

With utmost respect to the Tenth Circuit in *Castillo-Garcia* and *Killingsworth*, the idea of a specified target person or organization against whom traditional investigative techniques must be tried or considered creates certain problems. As noted, nothing in § 2518, *Castillo-Garcia*, or *Killingsworth* requires the "target" to be the same as a person listed as a likely interceptee. *Barrios*, 994 F. Supp. at 1257. How, then, does the Government identify the target against whom it must consider traditional investigative techniques? One might assume that, practically speaking, the target would almost always also be a likely interceptee. The "target of the wiretap" principle nonetheless leaves open the possibility that a reviewing court could find that the Government misunderstood the target against whom it should have directed

16

investigative techniques.

Extending this problem, consider the following hypothetical variation on the facts described in *Killingsworth*. The Government learns from a confidential informant about a drug distribution ring called "the Bustos Organization," directs traditional investigative techniques at persons believed to be involved in the Bustos Organization, and then successfully applies for a wiretap authorization naming the Bustos Organization as the "target organization." Through the wiretaps, the Government learns the following. First, those whose communications were intercepted never speak of a "Bustos Organization," nor do they use any other organizational moniker. Second, numerous persons believed to be involved in the organization actually appear to have nothing to do with drug distribution activities. Third, many other persons never suspected of being a part of the organization seem to have a prominent role, and none of them has the surname Bustos.

Having named the Bustos Organization as the "target organization," any later necessity challenge to the wiretap should, under *Killingsworth*, focus on the investigative techniques tried against the Bustos Organization. Given the findings of the wiretap, should the wiretap evidence be suppressed because the organizational target turned out not to exist in any manner contemplated by the Government before the wiretap?

It would seem that the answer should be "no" as long as the Government's allegations in support of its wiretap application had been made in good faith. But no good faith exception is needed if the baseline assumption is that the Government was targeting the crime of conspiracy to distribute drugs, and that the precise contours of

17

the conspiracy (*i.e.*, the makeup or designation of the "target organization") have no obligatory relevance to the necessity inquiry.

The Bustos Organization hypothetical illustrates a further point.  Sometimes a criminal organization has a name by which it is known both on the outside and the inside.  Street gangs often fall into this category.  But oftentimes the name given to a criminal organization is something invented by law enforcement as a shorthand way of referring to those believed to be involved in a criminal conspiracy.  Thus, the conspiracy is the real target, not necessarily any organization that the conspirators consider themselves to be a part of.  At that point, the naming of a target organization in a wiretap application becomes essentially a form of wordplay.  Indeed, as this case illustrates, the wordplay can extend even to an organization with a publicly recognized name ("Gangster Disciples") simply by tacking on "and/or associates" to the target organization's definition.  "Associates" is broad enough to encompass essentially any person acquainted with a Gangster Disciple.  If the target organization doctrine is so easily manipulated through word choice, there is strong reason to suspect that the doctrine is not grounded in the purposes Title III's necessity requirement.

Under the foregoing reasoning—which, again, this Court cannot adopt as a holding in light of *Castillo-Garcia*—the Government in this case had no obligation under § 2518(1)(c) to connect Garrison to the Gangster Disciples in order to avoid trying or considering investigative efforts directed at him specifically.  If this Court were free to do so, it would reject Garrison's necessity argument on this basis alone.

3.    Necessity and "CHS-1"

Garrison has a second necessity challenge, this one focused on the Government's use of a confidential informant known as "CHS-1."  The Government currently describes CHS-1 as someone who "had a close social relationship with Francisco Ramirez."  (ECF No. 1024 at 21.)  CHS-1 became a part of the Government's investigation in early January 2013.  (TT1 Affidavit ¶ 130.)  At the time of the TT1 Affidavit, about ten months later, CHS-1:

- "[was] continu[ing] to provide accurate information related to Francisco Ramirez'[s] involvement in a conspiracy to obtain and distribute illegal narcotics with Ricky Garrison";

- "[had] provided information regarding Francisco Ramirez'[s] drug supply"; and

- "[had] assisted in the drug trafficking portion of this investigation by agreeing to introduce UCE-1 [an undercover agent] to Francisco Ramirez by phone."

(TT1 Affidavit ¶¶ 132, 133.)  The Affidavit continues, however, that

> CHS-1 either does not know or is unable to introduce UCE-1 (or any other agent of law enforcement) to other people who are known to be involved with this drug organization at any level.  Although CHS-1 continues to provide information of use to this investigation, your affiant does not believe CHS-1 is capable of providing assistance that will enable investigators to achieve the overall goals of this investigation.

(*Id.* ¶ 133.)

Garrison argues that this explanation is fundamentally conclusory, and did not give Judge Ebel sufficient information to find that traditional investigative techniques were not working.  (ECF No. 939 ¶¶ 34-35.)  "As such," Garrison says, "the [wiretap] application affirmatively states that traditional [investigative] techniques could have led to the successful infiltration of the entire enterprise."  (*Id.* ¶ 36.)

Although the TT1 application does *not* "affirmatively state[]" that traditional investigative techniques would be enough, the Court understands Garrison to be arguing that the TT1 Affidavit implicitly demonstrates that CHS-1 could have been relied upon to uncover the entire conspiracy under investigation.  Given that Garrison does not challenge the Government's claims that other traditional investigative techniques had limited success (including traditional visual surveillance, GPS tracking, confidential informants other than CHS-1, an undercover agent, administrative subpoenas, and many other techniques), Garrison appears to be claiming that CHS-1 alone was enough to develop all the evidence the Government needed.

The above-quoted explanation of CHS-1's limited ongoing utility certainly could have included more detail, but the TT1 Affidavit as a whole provided enough allegations for Judge Ebel to conclude, in his discretion, that traditional investigative techniques had reached their reasonable limits.  The goal of the investigation was to gather evidence regarding drug offenses and related crimes committed by the Gangster Disciples or their associates, including persons "yet unknown and unidentified."  (TT1 Affidavit ¶¶ 5–6, 7a; *see also* TT1 Application ¶ 4(b).)  This is a legitimate use of wiretaps in appropriate circumstances.  *See United States v. Newman*, 733 F.2d 1395, 1399 (10th Cir. 1984).  CHS-1 assisted the Government in achieving part of that goal

20

without wiretaps, and had done so for about ten months.  That length of time was enough for the Government to form a credible opinion regarding CHS-1's ongoing usefulness.  *See also United States v. Carrillo*, 123 F. Supp. 2d 1223, 1235 (D. Colo. 2000) ("the mere attainment of some degree of success during law enforcement's use of traditional investigative methods does not alone serve to extinguish the need for a wiretap" (internal quotation marks omitted)).

Moreover, CHS-1's inability specifically to introduce UCE-1 to other individuals involved in the drug conspiracy is not surprising given that Ramirez himself began to suspect that UCE-1 was working with the police.  (TT1 Affidavit ¶ 141.)  Given that circumstance, it is reasonable to suppose that CHS-1 him/herself would have become an object of suspicion if he/she then began introducing UCE-1 to others.  Indeed, even if Ramirez had never become suspicious of UCE-1, it is nonetheless reasonable to suppose that CHS-1 would start to seem suspicious if he/she serially introduced UCE-1 to more and more drug associates.  Accordingly, Judge Ebel did not abuse his discretion in concluding that the TT1 Affidavit satisfied the necessity requirement.

### III.  *FRANKS* CHALLENGE & DISCOVERY REQUESTS

Most wiretap challenges are "facial" challenges, arguing that the information before the judge that issued the wiretap was not sufficient to justify the wiretap.  *See United States v. Oregon-Cortez*, 244 F. Supp. 2d 1167, 1171 (D. Colo. 2003).  The Court has rejected all of Garrison's facial challenges.

Garrison also alleges that the Government withheld information it should have included in the TT1 Affidavit.  (ECF 939 ¶¶ 21, 40–50, 54.)  A defendant who wishes a reviewing court to consider evidence *outside* what the issuing court considered (*i.e.*, a

"sub-facial" or "non-four corners" argument) must bring a *Franks* challenge, named for *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant may be entitled to a preliminary evidentiary hearing to challenge the truthfulness of statements in an affidavit sworn out in support of a warrant. *Id.* at 155–56. *Franks* applies to wiretap warrants, *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999), and can be used to challenge both the constitutional requirement of probable cause and the stricter statutory requirements found in Title III, *United States v. Merton*, 274 F. Supp. 2d 1156, 1166 (D. Colo. 2003). To obtain a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155–56; *see also United States v. Owens*, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit."). *Franks* similarly applies to material omissions. *Merton*, 274 F. Supp. 2d at 1166.

Despite making allegations based on evidence outside the wiretap affidavits, Garrison insists that he is not currently bringing a *Franks* challenge. (ECF No. 1032 at 7–9.) Rather, he is seeking discovery from the Government that might assist him in bringing a *Franks* challenge. (*Id.*) In that light, however, all discovery requests are moot for the following reasons.

On July 17, 2015, this Court stated that "wiretap suppression motions (four corners and non-four corners)" were due "60 days after the hearing on [motions for discovery]." (ECF No. 517 ¶ 5.) The Court resolved motions for discovery on the papers, without a court hearing, on December 3, 2015. (ECF No. 706.) *See also*

22

*United States v. Garrison*, 147 F. Supp. 3d 1173 (D. Colo. 2015).  Thus, motions to suppress wiretap evidence, whether facial challenges or *Franks* challenges, were due by February 1, 2016.  (*See* ECF No. 836.)  Nonetheless, in light of Garrison receiving new counsel around that time, the Court reopened the window to file a wiretap suppression motion, and set a new deadline of May 5, 2016.  (ECF No. 898 at 1–2.)  Garrison filed his current suppression motion on that deadline, but, as noted, he has disavowed any interpretation of the motion as a *Franks* challenge.  Accordingly, he has forfeited his opportunity to file a *Franks* challenge, and the Court therefore denies as moot any discovery requests in support of that potential *Franks* challenge.[8]

## IV.  CONCLUSION

For the reasons set forth above, Defendant Garrison's Motion to Suppress Wiretap Evidence and for Specific Wiretap Discovery (ECF No. 939) is DENIED.

Dated this 2nd day of September, 2016.

BY THE COURT:

William J. Martínez
United States District Judge

---

[8] The Government has in any event agreed to supply some of the discovery information Garrison requests.  (*See* ECF No. 1004 at 39.)  The Government of course is free to do so, and must do so to the extent the information qualifies as *Brady* or *Giglio* information, or falls under any other category of mandatory disclosure.  But, to the extent not already voluntarily produced, the Court will not require the Government to provide any discovery for the purpose of assisting Garrison in preparing a *Franks* motion.