1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLORADO

3     Criminal Action No. 14-cr-0231-WJM-1

4     UNITED STATES OF AMERICA,

5     Plaintiff,

6     vs.

7     RICKY GARRISON,

8     Defendant.

9     ------------------------------------------------------------

10         REPORTER'S TRANSCRIPT EXCLUDING JURY VOIR DIRE
                    (Jury Trial - Day 1)
11                      VOLUME II
      ------------------------------------------------------------

12

13         Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

14    Judge, United States District Court for the District of

15    Colorado, on the 21st day of February, 2017, in Courtroom

16    A801, United States Courthouse, Denver, Colorado.

17

                           APPEARANCES
18
           ZACHARY H. PHILLIPS and CELESTE B. RANGEL, Assistant
19    U.S. Attorney, 1801 California Street, Suite 1600, Denver,
      Colorado 80202, appearing for the plaintiff.
20
           MILLER M. LEONARD, Miller Leonard, P.C. 14143 Denver
21    West Parkway, Suite 100, Golden, Colorado 80401 and
           SEAN M. McDERMOTT, McDermott Stuart & Ward, LLP, One
22    Sherman Place, 140 East 19th Avenue, Suite 300, Denver,
      Colorado 80203, appearing for the defendant.
23

24              MARY J. GEORGE, FCRR, CRR, RMR
             901 19th Street, Denver, Colorado 80294
25         Proceedings Reported by Mechanical Stenography
              Transcription Produced via Computer

P R O C E E D I N G S

(This transcript does not include jury voir dire)

*       *       *       *       *

THE COURT:  All right.  We are now ready for the opening statement of the Government.  Ms. Rangel.

MS. RANGEL:  Thank you, Your Honor.

COURTROOM DEPUTY:  Ms. Rangel, do the jurors need to see anything on the monitor?

MS. RANGEL:  No.  Thank you.

Cocaine.  Crack cocaine.  Methamphetamine.  Guns. Women as prostitutes.  What sounds like something straight from a movie are actually the tools of the trade for Ricky Garrison, the defendant in this case.  He made a living selling drugs and using women as prostitutes.  People were means to an end for him.

Between June 1st, 2013, and June 4th, 2014, the defendant conspired with several individuals to buy and sell cocaine, crack cocaine, and methamphetamine.  He used his cell phone to communicate with these individuals and to arrange the purchase and sale of those drugs.

He would buy drugs from individuals who sold larger quantities than him and he would then either sell the cocaine or methamphetamine or he would create crack cocaine, which he then sold.  Day in, day out, he was buying and selling drugs.

 1          Unbeknownst to the defendant, however, his actions

 2     were not entirely secret.  He was part of a larger

 3     investigation that had began early in 2013.  Law

 4     enforcement was watching his movements.  They were

 5     surreptitiously following him when he went to buy and sell

 6     drugs from individuals.  They were surreptitiously watching

 7     his home and the homes of his associates.  They observed

 8     that his home and the home of one of his drug suppliers

 9     were in close proximity to schools.

10          But law enforcement was not solely just watching

11     him, they were also listening to him.  The defendant's

12     phone and several of his associates' phones were

13     wire-tapped.  Calls and text messages detailing the

14     purchase and sale of drugs were being recorded.  Though

15     they tried to use code, such as soft or hard, nine or

16     teener, or the M game, it's clear that they are discussing

17     drugs.  You won't have to just take my word for what those

18     calls say, you're going to hear those calls.

19          And you're also going to hear from some of the

20     individuals involved in the purchase and sale of drugs.

21     They will be exactly what you expect from someone who is

22     involved in buying and selling drugs.  They are drug

23     dealers.  Some of them are drug addicts.  Some of them are

24     convicted felons.  They are testifying because of a plea

25     agreement with the Government.

1      You should consider all of that when you listen to

2   them testify.  Consider why they are testifying, what they

3   have to say, and consider all of that with all of the

4   evidence that you're going to hear this week.

5      Part of the evidence that you will hear is a trip

6   that the defendant took from Denver to Oklahoma City,

7   Oklahoma, with a woman named Heather Quintanilla.  This

8   trip was for prostitution.  And Heather Quintanilla had

9   posted an ad for her services on an on-line website called

10  backpage.com.

11      At the request of the Denver task force, the

12  Oklahoma City vice unit assisted and arranged to meet Ms.

13  Quintanilla at a nearby hotel.  When the undercover

14  detective arrived at that hotel, he noticed the defendant

15  sitting in the parking lot paying close attention to him as

16  he approached the hotel room.  And once he was there, this

17  undercover detective gave Ms. Quintanilla some money and

18  ultimately arrested her for prostitution.  The defendant

19  left the hotel once the police made their presence known.

20      On May 23d, 2014, law enforcement here in Denver

21  went to the residence where the defendant was living at the

22  time and executed a search warrant.  The defendant was in

23  the basement with Ms. Quintanilla.  In the basement bedroom

24  where he was living, law enforcement found two firearms,

25  one in his bedroom closet and one under the mattress of his

1    bed.

2         They also found in that bedroom closet items

3    commonly associated with drug distribution.  They found two

4    scales commonly used to weigh drugs in order to make sure

5    that the right amount is being bought or sold; they found

6    empty capsules in which drugs could be put so they could be

7    consumed in capsule form; and they also found supplements

8    that are commonly used to cut cocaine which results in a

9    greater amount to be sold, which results in a greater

10   profit.

11        The defendant had no legitimate job, he had no

12   legitimate income, and yet he had thousands of dollars in

13   his bank account.  He had thousands of dollars in his bank

14   account from using people as currency.  He sold drugs, he

15   prostituted women, and after you hear all of the evidence,

16   we will return to you and ask that you find him guilty as

17   charged.  Thank you.

18             THE COURT:  Thank you, Ms. Rangel.

19             Is the defendant going to give an opening

20   statement now?

21             MR. LEONARD:  Yes, Your Honor.  Give me a moment

22   to get set up.

23             THE COURT:  Sure.

24             COURTROOM DEPUTY:  Do you need the Elmo?

25             MR. LEONARD:  No.  Good afternoon, ladies and

1    gentlemen.  My name is Miller Leonard.  I represent Mr.

2    Ricky Garrison.  Mr. Garrison is the defendant in this

3    case.  That means that the Government has the burden.  They

4    bear the burden of proving the charges they've brought

5    against Mr. Garrison.  They bear the burden of proving what

6    they have charged beyond a reasonable doubt.

7         Each and every element that they allege, they must

8    prove beyond a reasonable doubt.  And if they do not, the

9    law instructs you, and your oath requires you, to find him

10   not guilty.

11        Now, I want you to remember this as the evidence

12   proceeds.  I want you to keep asking that question:  Is the

13   Government proving what they allege and are they proving it

14   beyond a reasonable doubt?

15        There's one piece of evidence, or lack thereof,

16   that's going to be with us this entire case.  This is a

17   drug case, they say.  And yet you will see no drugs

18   introduced at this trial.  No drugs will be introduced, no

19   laboratory tests showing that there are drugs.  No drugs

20   were seized from Mr. Garrison.  No drugs were seized from

21   his vehicles.  No drugs were seized from his home.

22        This, even though the Government, as they just

23   told you, spent over a year investigating Mr. Garrison,

24   using wiretaps, snitching, confidential informants,

25   surveillance, closed circuit TV.  You're going to hear the

1    Government say over and over again, We watched what we

2    say -- what we say is alleged drug deal and we never

3    stopped it.  Not once, not twice, but well over 15 times.

4          The conspiracy, the Government says, begins June

5    1st, 2013.  It lasts approximately 368 days, if my math is

6    decent, and ends, according to the Government, on June 4th.

7          The evidence is going to be clear to you there was

8    no conspiracy.  And let's talk about that for a second.

9    368 days.  During that time, the Government will charge 15

10   discrete drug deals.  15 out of 368.  The Government will

11   tell you that they had thousands of phone calls, 10s of

12   thousands of phone calls that they intercepted.  I expect

13   them to introduce no less -- or no more than 60 to 65.

14         The phone calls:  Pay attention to them and ask

15   yourself the question:  Is it showing a conspiracy?  Is it

16   showing an agreement, and is it showing interdependence?

17   And what you're going to here is a bunch of guys who have

18   totally different ideas about what they are doing.  Each of

19   them has their own idea.  They are acting independently.

20   There is no interdependence.

21         And that's crucial because the Government has to

22   prove interdependence beyond a reasonable doubt.  They have

23   to show you that there was some common mutually agreed upon

24   plan.

25         And here's what you're going to hear from the

1    codefendants who all have deals to testify.  Greg Williams:

2    He's going to testify he was a small use amount -- user

3    amount of drugs.  He didn't have a purpose with Mr.

4    Garrison.  His purpose, he's going to tell you, was to use

5    drugs.

6         Sidney Taylor, again, he's a use guy.  Small user.

7    His purpose is to use drugs.  He has no shared purpose with

8    Mr. Garrison.

9         What I mean by that is there is no evidence that

10   Mr. Williams or Mr. Taylor cared one bit what Mr. Garrison

11   was doing.  It didn't matter to them.  They were using

12   drugs.  That's what we believe their testimony is going to

13   be.

14        Simeon Ramirez.  He is a supplier, the Government

15   alleges.  Simeon Ramirez has no shared purpose with Mr.

16   Garrison.  He gets paid in cash up-front.  He's not relying

17   upon Mr. Garrison, according to the Government's theory, to

18   make sales in order to gain a profit.  He could not care

19   less what happens once he has sold those alleged drugs.  As

20   far as he's concerned, you can throw them up in the air

21   because he has cash in hand.

22        Robert Painter.  Mr. Painter's another guy,

23   long-time user of drugs.  That's all he's doing is buying

24   drugs.  He didn't care what Ricky Garrison is doing.  Even

25   under the Government's theory he doesn't care.  There's no

1      shared purpose.

2            Francisco Aguilar.  Well, he sells drugs is what

3      he is going to say, but not on credit.  According to Mr.

4      Aguilar, his purpose in selling drugs is so he could pay

5      child support.

6            Let me tell you, Mr. Garrison has no interest

7      whatsoever in Mr. Aguilar's children and paying child

8      support.  They don't share a common purpose.

9            And Mr. Vigil, he's the last person, the

10     Government's going to say, who's going to appear in court

11     here, that he sold drugs out of his house, and the reason

12     that he sold drugs was to support his habit.  He used,

13     according to his own testimony, all sorts of different

14     drugs, and that's the reason that he was selling them.

15     And, again, there's no shared mutual agreement between Mr.

16     Garrison and Mr. Vigil.

17           The evidence is also going to show something

18     really interesting about all these people who have

19     incentives and deals.  Their stories change.  They don't

20     change just a little, the evidence is going to show that

21     they change a lot.  And the closer they get to this trial

22     and their appearance in this courtroom, the evidence shows

23     that their testimony becomes worse and worse for Mr.

24     Garrison.  Many of them because they have yet to be

25     sentenced and they want to make sure that they get their

1    deal.

2              The Government also has to prove certain amounts

3    of drugs.  As I think broadly -- I'm not going to go into

4    each amount that they have to prove -- but the jury

5    instructions will tell you about that, and the Government

6    is going to ask you to trust the testimony of these

7    cooperating codefendants and trust the phone calls as to

8    make a determination as to what amount of drugs they allege

9    was being transacted.

10             Folks, none of you will trust any of these folks

11   if they handed you something and said it's a drug in X

12   quantity, you will be okay, and take it.  And they don't

13   have any weights because they didn't seize any drugs.  And

14   it was their burden to go and get what they say happened.

15   It's their burden to prove it.

16             When you heard the statement of the case, one of

17   the charges, and a series of charges that the Court read

18   you about, was phone counts, using a telephone in the

19   commission of a drug crime.  Those phone counts are going

20   to relate back to what the Government says is a conspiracy.

21             There's no conspiracy, there are no phone counts.

22   There are no weights, we can't have a phone count.  And it

23   is their burden to prove it and prove it beyond a

24   reasonable doubt.

25             There's a charge, it's Count 48, knowing -- or use

1    and possession of a firearm in furtherance of a drug crime.

2    Lawyers call it the 924(c) charge because of the statute

3    that it's listed on.  Let's talk about that 924(c) charge,

4    that gun that they say was used during the drug crime.

5    Ricky Garrison is arrested on May 23d of 2014.  He is

6    arrested at 6:00 a.m.  There are no phone calls whatsoever

7    that will be introduced that are going to show that Mr.

8    Garrison was in what they would say is an alleged drug

9    deal.  The last drug deal that they charge independently is

10   going to occur in March.

11         Mr. Garrison doesn't have a gun on him, it's not

12   in a holster, it's not in his hands, it's not in his back

13   pocket.  He's not threatening anybody with a drug -- or a

14   gun.  Simply put, folks, there is no drug deal going on and

15   the evidence is abundantly clear on that.

16         And when they arrive at this house approximately

17   one year after their investigation has begun, and what they

18   have just said is hours and hours of surveillance and phone

19   taps, what do they find in the house?  No drugs.  None.

20   And there are no drugs in this car.  And there's no drugs

21   on his person.  There's no drugs anywhere.

22         It's a gun they say that he owns, but it's not his

23   house.  Actually, there are two guns.  It's not his house.

24   And no fingerprints on those firearms that link Mr.

25   Garrison to them.  There's no DNA that links him to the

1    firearms.

2         Now, the prostitution count, traveling with

3    somebody to engage in prostitution, it sounds salacious.

4    And according to the Government, their evidence is going to

5    be that their detective, or their agent, sees Mr. Garrison

6    outside of a motel where a prostitution deal is going to go

7    down.  But they don't arrest Mr. Garrison.  They don't stop

8    him.  They don't detain him.  According to their evidence,

9    he drives off.

10        And, crucially, there's no evidence on how Ms.

11   Quintanilla gets there.  None.  She was a grown woman,

12   she's an adult, she makes all the deals herself, it's her

13   pictures, she talks to the detective, she tells the

14   detective where to go, she tells the detective the price.

15   If they think she's a victim, you would have thought they

16   would have stepped in and arrested Mr. Garrison that day.

17        The Government's going to ask you to trust their

18   evidence.  They're going to ask you to trust their evidence

19   beyond a reasonable doubt, to take a man's liberty from

20   him.

21        We have in place in this country that standard

22   because we do not allow anyone to have their liberty taken

23   from them unless the Government can prove what they say and

24   prove it beyond a reasonable doubt.  And in all the time of

25   our Government's history and before, we know one thing:  If

Direct - Gullicksrud

1    you, ladies and gentlemen, don't hold them to their burden,

2    then it's all gone.  It's all lost.  Nobody gets their

3    liberty taken unless there's proof beyond a reasonable

4    doubt.

5           And at the end of this case, I'm going to stand up

6    and I'm going to ask you what I'm asking you to do right

7    now:  Find Mr. Garrison not guilty because there's no proof

8    beyond a reasonable doubt as to each and every element that

9    the Government has alleged.

10          Thank you very much for your time.  Thank you,

11   Your Honor.

12          THE COURT:  All right.  Thank you, Mr. Leonard.

13          All right.  We will begin with the Government's

14   case in chief.  The Government may call its first witness.

15          MR. PHILLIPS:  Thank you, Your Honor.  Government

16   calls Special Agent Brad Gullicksrud.

17        BRAD GULLICKSRUD, GOVERNMENT'S WITNESS, SWORN

18          COURTROOM DEPUTY:  Please state your full name for

19   the record and spell your first and last name.

20          THE WITNESS:  Bradley John Gullicksrud.  It's

21   B-r-a-d-l-e-y, and Gullicksrud, G-u-l-l-i-c-k-s-r-u-d.

22                      DIRECT EXAMINATION

23   BY MR. PHILLIPS:

24   Q.   And how are you employed?

25   A.   I'm a special agent with the FBI, currently assigned

Direct - Gullicksrud

1    to Boston.

2    Q.    And how long have you been a special agent with the

3    FBI?

4    A.    Since November 2d, 2014.

5    Q.    And as your assignment in Boston with the FBI, what is

6    your assignment?

7    A.    Currently assigned to a gang squad.

8    Q.    And do you -- taking you back to your time with --

9    prior to becoming an FBI agent, where were you employed?

10   A.    I was applied at the City of Aurora Police Department

11   since June of 2005.

12   Q.    If you would, please describe to the jury some of your

13   training and experience both as a city of Aurora police

14   officer as well as with the FBI.

15   A.    I started my career, as I said, with the Aurora Police

16   Department in June of 2005.  I went through approximately a

17   six-month training academy and an additional 14-week field

18   training program where I rode with a senior officer.

19          I worked as a patrol officer from -- until

20   December 2009.  At that point, I promoted to the vice and

21   narcotics unit.  While at the vice and narcotics unit, I

22   received a number of training courses.  Again, I trained

23   with a senior narcotics investigator.  I had some

24   undercover training.  I also did basic and advanced drug

25   investigative training and drug recognition and testing.

Direct - Gullicksrud

1      In, I believe, it was June 2013 I joined the Metro

2   Gang Task Force, it's an FBI-led task force.  It's

3   comprised of a number of local agencies that work together

4   to investigate drug -- do drug investigations in the Denver

5   metro area.

6   Q.   Now, I want to take you back to prior to joining Metro

7   Gang Task Force, early in the year of 2013, did you start

8   an investigation into a group that was of interest to

9   you?

10  A.   I did.

11  Q.   And if you could briefly describe to the jury what you

12  were investigating and then how that led to further

13  development as you got transferred to the Metro Gang Task

14  Force.

15  A.   I received information that Mr. Ricky Garrison and

16  another individual named Francisco Ramirez were working

17  together to distribute drugs, namely, cocaine --

18          MR. LEONARD:  Objection, Your Honor.  Hearsay.

19          MR. PHILLIPS:  Your Honor, it's not being offered

20  for the truth of the matter but why this officer did what

21  he was doing.  And we will present evidence of the crime as

22  time goes on.

23          THE COURT:  Okay.  I'm going to overrule for now.

24  I'll let some limited questioning on this subject, but set

25  the background for where you're going.

Direct - Gullicksrud

1    BY MR. PHILLIPS:

2    Q.    Now you had mentioned you had started to focus on

3    Francisco Ramirez and Ricky Garrison.   What did you do as

4    you started this investigation?

5    A.    The first thing, just like any investigation, we try

6    to conduct a number of interviews, get as much information

7    as we can about the individuals, where they live, who

8    they -- where they work.

9             From there, we'll typically conduct surveillance

10   just to see -- try to corroborate what we have been told

11   during interviews.

12            From there, as the investigation progresses, we

13   try to develop confidential sources.   We'll do things --

14   you know, maybe they could make phone calls for us or even

15   buy drugs for us.

16            And then if the investigation continues to

17   progress, we may use other techniques such as GPS tracking,

18   phone -- analyze phones, and eventually we may even work up

19   to conducting wiretaps.

20   Q.    Now, you mentioned GPS tracking.   If you could

21   describe to the jury what a GPS tracking is.

22   A.    Well, there's two types.   We conduct GPS tracking of

23   vehicles.   We have ways to be able to track vehicles.   And

24   we also have ways to work with the phone companies to get

25   what are called phone pings so it could track GPS of cell

Direct - Gullicksrud

1    phones.

2    Q.    And you mentioned analyze phones.   What does that

3    mean?

4    A.    Typically what we will do is request phone records and

5    what we'll do is we'll review the records to see if they

6    are contacting any other known people that we know are

7    conducting criminal activity, just to see who they are

8    working with or contacting.

9    Q.    And you mentioned that sometimes you may eventually

10   lead up to a wiretap.   What is that?

11   A.    A wiretap is where we actually listen in to -- in

12   realtime, person's phone calls, incoming, outgoing.   And we

13   also get to -- or we can also review text messages in

14   realtime.

15   Q.    And in your training and experience, have you had the

16   opportunity to work on multiple cases involving wiretaps,

17   both as a local task force officer, as well as an FBI

18   agent?

19   A.    I have.

20   Q.    And if you could describe to the jury what is

21   necessary in order to develop a case to the point where a

22   wiretap is necessary.

23   A.    Well, first, No. 1 we have to identify a device or a

24   phone number as being used for criminal activity.   That

25   could be done in a number of ways.   If we do a controlled

Direct - Gullicksrud

1    purchase or something like that where we call the phone

2    number, we can show that that device has been used for

3    criminal activity.

4              But beyond that, we also have to show necessity.

5    We have to show that other means have been tried and we

6    either had limited success or no success at all, or would

7    be too dangerous or wouldn't have any benefits -- or, you

8    know, if we did try them.  So once we've -- it's called

9    exhaustion, once we have shown that to -- we need wiretaps

10   to progress the case.

11   Q.   And in order to be granted a wiretap, what are you --

12   you mentioned some of the things you have to show or do.

13   How do you present that to a judge?

14   A.   We complete an affidavit and describing all the things

15   I just mentioned:  How the phone's being used for criminal

16   activity and all the things we have tried up to that

17   point.

18   Q.   Now, you had mentioned a little bit earlier the use of

19   confidential informants or confidential sources.  Did you

20   attempt to use those in this investigation?

21   A.   We did.

22   Q.   And just to be clear, you mentioned a Francisco

23   Ramirez as well as Ricky Garrison.  Ultimately when

24   these -- when this case came to an end, were there two

25   separate conspiracies charged?

Direct - Gullicksrud

1    A.    There were.

2    Q.    And you mentioned that you did develop and were able

3    to use confidential sources.  If you could describe to the

4    jury how that came about and what benefit that was to you

5    in your investigation.

6    A.    Well, we had a number of confidential sources.  Some

7    of them actually did make controlled purchases of drugs,

8    meaning they called a target and then actually went and

9    purchased the drugs under our supervision, and brought the

10   drug directly back to us.  And some other confidential

11   sources we had just made recorded phone calls -- not a

12   wiretap, but just recorded phone calls into certain

13   targets.

14   Q.    And as your investigation progressed, in October,

15   specifically October 23d of 2013, did you, in fact, apply

16   for and were you granted a wiretap?

17   A.    Yes.

18   Q.    And was that for telephone No. 720-297-7752?

19   A.    It was.

20   Q.    And you've mentioned that you had to lay that out to a

21   judge.  Did you, in fact, present that to Senior Federal

22   Circuit Court Judge David Ebel for authorization?

23   A.    Yes.

24   Q.    And did he grant you permission to wiretap that

25   phone?

Direct - Gullicksrud

1   A.   He did.

2   Q.   And just to make it a bit easier, is it common to, in

3   this type of investigation, refer to as -- a phone as a

4   target telephone and in this case it would be target

5   telephone 1?

6   A.   It is.

7   Q.   If you could describe to the jury what target

8   telephone 1, or who had target telephone 1, was using

9   target telephone 1?

10   A.   Target telephone 1 was being used by Francisco

11   Ramirez.  He was also known as Pancho.

12   Q.   Out of curiosity, was the phone registered in his

13   name?

14   A.   It was not.

15   Q.   In your training and experience, is that anything of

16   importance to you?

17   A.   It is.  Quite often --

18        MR. LEONARD:  Your Honor, I object.  This is 702

19   testimony, which has been excluded by the Court.

20        THE COURT:  Mr. Phillips.

21        MR. PHILLIPS:  I got to be honest, I'm confused as

22   to what he thinks has been excluded.  We're simply laying

23   the groundwork for the investigation and how it progressed.

24        THE COURT:  Counsel, please approach.

25        (Discussion at side bar)

Direct - Gullicksrud

1        THE COURT:  What 702 ruling are we talking about?

2        MR. LEONARD:  His expert testimony was to

3   testimony about matters that were not common or known based

4   on his training and experience.  They're outside the scope

5   of 701.  And the Court made a ruling on 702 and excluded

6   it.

7        THE COURT:  I made a 702 ruling, but I don't

8   remember making a ruling of -- in such a sweeping generic

9   form.  Can you --

10        MR. LEONARD:  My position is -- the defense

11   position is he's getting into 702 testimony.

12        THE COURT:  This is expert testimony?

13        MR. LEONARD:  Yes.

14        THE COURT:  Your --

15        MR. PHILLIPS:  Your Honor, I think the officer can

16   clearly testify as to his training and experience in

17   whether a phone -- it's common for a defendant to list a

18   phone in a different name.  Just to save time later we're

19   also going to have him testify as to slang terms that he's

20   aware of and so forth.  That's not expert testimony, that's

21   simply his experience as a trained investigative officer.

22        THE COURT:  Well, I agree.  I'm going to overrule

23   the objection.  I think this is 701 testimony.  It's within

24   the experience and knowledge and understanding of this --

25   of this witness and doesn't require technical or

Direct - Gullicksrud

1  specialized knowledge or training.  This is based on his

2  experience as a police officer and Metro Gang Task Force

3  officer.  Overruled.

4         (Side bar concluded)

5         THE COURT:  All right, the objection's overruled.

6  Mr. Phillips.

7         MR. PHILLIPS:  Thank you.

8  BY MR. PHILLIPS:

9  Q.   I believe my last question to you was in your training

10  and experience, was it of importance to you that this phone

11  wasn't in Francisco's name?

12  A.   It was, quite -- or typically drug distributors will

13  not register phones in their own names and that's to thwart

14  the efforts of law enforcement.  They don't want the phones

15  they're using for criminal activity to be tied to them in

16  any way.

17  Q.   And how many phone wiretap investigations have you

18  been involved in?  How many different phones have you seen

19  tapped?  Or do you know?

20  A.   I don't know.  I would say -- I mean definitely four

21  investigations, and just multiple lines on each of those

22  investigations.

23  Q.   And you mentioned earlier that you analyzed phones, in

24  your training and experience on those analyzed phones,

25  typically come back during drug investigations registered

Direct - Gullicksrud

1   to the people that have them?

2   A.   They do not.

3   Q.   Fair so say, though, sometimes it does?

4   A.   Occasionally.

5   Q.   Now, as this investigation -- or as you got up on

6   target telephone 1, if you could describe to the jury what

7   is happening in your investigation as this is taking place

8   in order to facilitate your investigation.

9   A.   So we're listening to the phone calls, and in using

10   the phone calls we're trying to identify sources of supply,

11   customers, and other co-conspirators.

12         Typically what will happen is, you know, there

13   will be conversations about a drug deal that's about to

14   occur, or it might even be the next day.  And when we know

15   these deals ahead of time, we'll dispatch surveillance out

16   to watch these deals occur.

17   Q.   If you think you're going to see a drug deal, why

18   don't you rush in and arrest everyone?

19   A.   The reason we can't do that, if we jumped on them

20   right away and arrest on the first deal, they're going to

21   quit using those phones and they're going to go

22   underground.  They're not going to -- they may shut down

23   their operations for a while.  So that's why we -- we allow

24   those deals to occur so we could get the full scope of the

25   organization.

Direct - Gullicksrud

1    We just don't want one dealer.  The goal of the

2    investigation is to get as many people involved in the

3    organization as possible.

4    Q.   Now as the investigation progressed and you were using

5    these techniques, did, ultimately, you apply for and were

6    you granted a target telephone No. 2?

7    A.   Yes.

8    Q.   And was that telephone No. 720-690-2310?

9    A.   It was.

10   Q.   And was that authorized on November 13 -- or, I'm

11   sorry, November 15th, 2013, by Senior Federal District

12   Court Judge Wiley Daniel?

13   A.   It was.

14   Q.   And if you could, tell the grand -- I keep saying

15   grand jury -- tell the jury -- I see Your Honor's smiling

16   because he's seen me do it -- tell the jury whose phone

17   that was.

18        MR. LEONARD:  Objection, Your Honor.  There's no

19   foundation.

20        THE COURT:  Overruled.

21        THE WITNESS:  That phone belonged to Ricky

22   Garrison.

23   BY MR. PHILLIPS:

24   Q.   And, again, was that phone registered in Ricky

25   Garrison's name?

1    A.    It was not.

2    Q.    Okay.  And you see Ricky Garrison here in the

3    courtroom today?

4    A.    I do.

5    Q.    If you could, please point to him and tell us what

6    he's wearing.

7    A.    He's seated at the defendant's table in a blue shirt,

8    wearing glasses.

9              MR. PHILLIPS:  Your Honor, subject to

10   cross-examination, ask identification of the defendant.

11             THE COURT:  The record will reflect the

12   identification of the defendant.

13   BY MR. PHILLIPS:

14   Q.    And as part of your investigation, you'd mentioned

15   earlier that when you started investigation, you start

16   looking at people, where they live, who they associate

17   with, and that sort of thing.

18             During the summer and in the fall of 2013, were

19   you able to determine where Ricky Garrison was living?

20   A.    Yes.

21   Q.    And where was that?

22   A.    It was at 10340 East 13th Avenue in Aurora,

23   Colorado.

24   Q.    Now, knowing that he lived at that residence, did you

25   do anything that assisted you in surveilling that

Direct - Gullicksrud

1   residence?

2   A.    We did.

3   Q.    What was that?

4   A.    We installed a covert camera on the public roadway so

5   that we could watch the house with closed circuit

6   television, basically a surveillance camera that was put up

7   outside his house.

8   Q.    And when that camera's up, how are you able to observe

9   it or what takes place or -- and that sort of thing so the

10  jury knows?

11  A.    So it's a camera that we can actually observe from the

12  office, not only can we observe it but we can manipulate

13  it.  By "manipulate" I mean we can move the camera, pan it

14  back and forth, and zoom in and out.

15  Q.    Now, kind of taking you back, you mentioned the word

16  "manipulate."  Is that something that's recording all the

17  time or a record that you keep?

18  A.    It is.

19  Q.    Okay.  I want to take you back to when you first

20  started testifying about the target telephones.  If you

21  could describe to the jury what type of machinery is used

22  and how those recordings are processed or kept and that

23  sort of thing.

24  A.    So when the order is signed by the judge, that order

25  is submitted to the phone company that is the provider for

Direct - Gullicksrud

1    the phone.  The phone company then coordinates with the FBI

2    technicians and allows the calls to be intercepted by the

3    FBI technicians.  And the system they use to intercept the

4    calls is called Voice Box.  And what Voice Box is -- it

5    takes the calls in, allows us --

6              MR. LEONARD:  Your Honor, object -- or renew my

7    702 objection as to him -- as to this witness talking about

8    Voice Boxes.  It's technical matters, it is under 702, it

9    is not 701.

10              THE COURT:  Overruled.  You may complete your

11   answer.

12              THE WITNESS:  So as I was saying, Voice Box, it

13   brings the calls in and allows us to hear them in realtime

14   and also see the text messages.  What else the Voice Box

15   does is it organizes the calls and actually creates a copy

16   or recording of all the calls that come in.

17   BY MR. PHILLIPS:

18   Q.   And that copy or recording, how many does it make?

19   A.   It makes two copies.

20   Q.   And when you're up on a wiretap, is there specific

21   order from the judge as to what is to take place with those

22   copies?

23   A.   Yes.  Generally -- the orders are generally for 30

24   days.  At the end of the 30 days, if the line is not

25   renewed, the phone company is told to stop sending the

Direct - Gullicksrud

1    calls and immediately the FBI technicians stop recording,

2    and it is then sealed, and they are encrypted so that they

3    can't be manipulated or changed in any way.

4    Q.   And do you, in fact -- or have you as part of this

5    investigation, did you do anything specific with any of

6    those sealed disks?

7    A.   Yes.  So we pick up the disks then and take them to

8    the judge that signed the order and they seal that.  One --

9    one copy of the call stays with the judge and another copy

10   goes into FBI evidence.

11   Q.   And the copy that stays with the judge, do you know

12   how long it stays with the judge?

13   A.   I do not, but I believe it's indefinitely.

14   Q.   Okay.  Now as you are -- taking you back to listening

15   to target telephone No. 2, using your investigative

16   techniques as you were furthering this investigation, what

17   was your goal in this investigation?

18   A.   Again, as I stated before, wanted to identify as many

19   sources of supply, customers, and co-conspirators that Mr.

20   Garrison was working with.

21   Q.   And as the investigation progressed, did you, in fact,

22   listen to and intercept calls with Mr. Ricky Garrison and

23   others?

24   A.   We did.

25   Q.   And in front of you, I'm hoping, or at least over to

Direct - Gullicksrud

1    the side, is going to be an exhibit book.  There's going to

2    be a Government's exhibit book as well as a transcript

3    book.

4              COURTROOM DEPUTY:  Which volume of the

5    Government's?

6              MR. PHILLIPS:  We can go ahead and start with

7    Government No. 1, volume 1.

8    BY MR. PHILLIPS:

9    Q.    Kind of taking you back, when you're up on a wiretap,

10   and the many wiretaps that you've listened to, is there any

11   specific orders as to what you can listen to and what you

12   are not allowed to listen to and how that works?

13   A.    Yes, there are rules.  We can't just listen to any

14   call we want to.  So, for instance, a certain call -- if

15   it's not pertinent, if he's just calling, you know, his

16   mother just to talk, then we're not going to listen to that

17   call.  We would turn it off after we realized it wasn't

18   pertinent.

19             And another example where we wouldn't listen to

20   calls, say, if it's with his -- an attorney, those would be

21   marked as privileged.  And, again, we would not listen to

22   those and we would seal those.

23   Q.    And does the judge give you specific orders as to what

24   that is and what you can and can't listen to?

25   A.    He does.

Direct - Gullicksrud

1    Q.    Okay.   Now, taking you back to target telephone No. 1,

2    you've mentioned that this Voice Box allows you to listen

3    to that.   Were you one of the main officers, main

4    investigators, in this -- kind of throws me off -- you're a

5    special agent, now but used to be investigator, correct?

6    A.    Correct.

7    Q.    Were you one of the main agents in this case?

8    A.    Yes.

9    Q.    And as a main agent in this case, what were some of

10   your duties and responsibilities?

11   A.    Main duty was to review the calls.   We were -- and we

12   would review the calls in realtime as much as we could, but

13   we don't work 24 hours a day, so if we came in, we would --

14   first thing we would do is review the calls that were

15   marked pertinent from the night before, whenever we were

16   gone.

17   Q.    Okay.   And I'm going to ask you to look, whether it's

18   easier in looking at the transcripts or at the exhibits --

19   have you had an opportunity to look at all the exhibits in

20   this case?

21   A.    Yes.

22   Q.    At least all the exhibits that the Government's

23   offering?

24   A.    Yes.

25   Q.    And have you had an opportunity to review all the

Direct - Gullicksrud

1    transcripts?

2    A.    Yes.

3    Q.    And are those fair and accurate representations as to

4    intercepted phone calls during the course of this

5    investigation?

6    A.    They are.

7    Q.    And if you could -- looking at Government Exhibit

8    No. 1, if you could tell the grand -- or tell the jury what

9    that call involved and who was involved with it.

10          THE COURT:  Let's -- let's do -- before we start

11   going into the exhibits, let's take our afternoon break.

12   We're going to take a slightly longer one than usual,

13   ladies and gentlemen of the jury, because Ms. Hansen is

14   going to introduce you to your new home-away-from-home in

15   the jury deliberation room.  She has to give you your entry

16   cards, your jury code of conduct, and she's going to give

17   you some other instructions for your time with us here in

18   the court.  So let's say we will be in recess until 3:30.

19          (Recess taken 3:10 p.m.)

20          (Outside the presence of the jury at 3:35 p.m.)

21          THE Court:  We're going to chat about a couple of

22   things before we bring in the jury.  Did you folks make any

23   progress on the limiting instructions during the lunch

24   hour?

25          MR. PHILLIPS:  No, Your Honor.  We've made other

Direct - Gullicksrud

1    progressions, but not on the limiting instruction.

2              THE COURT:  Okay.  Well, first let me ask you, Mr.

3    Phillips, what is the Government limiting instruction you

4    were referring to this morning?  We can't find it.

5              MR. PHILLIPS:  Your Honor, I apologize, I went

6    back and looked through Mr. Cisneros's trial and found that

7    it was a 404(b) limiting instruction and not a limiting

8    instruction as far as statements.

9              THE COURT:  Okay.

10             MR. PHILLIPS:  So I did not have one, although I

11   was confused when speaking with Mr. Leonard about that.

12             THE COURT:  All right.  So the Government is --

13   does not have its own separate limiting instruction that

14   the Government wishes for me to read at any point during

15   the trial?

16             MR. PHILLIPS:  We don't have one at this time,

17   Your Honor.  We can probably develop one tonight, but at

18   this time we do not have one.  We tried to find it during

19   the lunch hour and was unsuccessful.

20             THE COURT:  All right.  Well, again, I'm trying to

21   see if I can get you folks to agree.  We looked at -- you

22   referenced us, Mr. Leonard, to some filing in the 600s and

23   that wasn't there.  I think what you were talking about

24   is --

25             MR. LEONARD:  YOUR Honor, the filing --

Direct - Gullicksrud

1      THE COURT:  -- 1209 or 1241.

2      MR. LEONARD:  -- filing in the 600s was as to the

3  404 motion.

4      THE COURT:  I thought we were talking about a

5  limiting instruction that you wanted me to read during the

6  trial, before evidence of the nature that you were

7  concerned about came in before the jury.

8      MR. LEONARD:  That's correct, Your Honor.

9      THE COURT:  Okay.  Brian, which one is the

10  defendant's?  1209 or 1241?

11      THE LAW CLERK:  1241, instruction A.

12      THE COURT:  Okay.  Is that the limiting

13  instruction you're talking about?

14      MR. LEONARD:  Yes, Your Honor.

15      THE COURT:  All right.  Okay.  And then 1209 was

16  the Government's objection?

17      THE LAW CLERK:  Correct.

18      THE COURT:  So do you recall, Mr. Phillips, that

19  you objected to his limiting instruction?

20      MR. PHILLIPS:  I do, Your Honor.  And --

21      THE COURT:  Okay.  That's at -- somehow your

22  objection got filed before the actual instruction, which

23  further confuses the matter.  But I think we've sorted that

24  out.

25      So I have a defendant's limiting instruction,

Direct - Gullicksrud

1    Government's objection to it.  Now, what's your best guess,

2    both of you, as to when we might need to read a limiting

3    instruction to a witness?

4              MR. PHILLIPS:  At the earliest, tomorrow.

5              THE COURT:  Okay.  Tomorrow morning, tomorrow

6    afternoon?

7              MR. PHILLIPS:  Tomorrow morning, just to be safe.

8              THE COURT:  Okay.  So, well, then we need to

9    have --

10             MR. LEONARD:  I --

11             THE COURT:  -- it ready to go.

12             MR. LEONARD:  The defense is in disagreement.

13   There's going -- my understanding is there's going to be a

14   30-minute phone call, which is currently Exhibit 106, call

15   No. 1152.  This is the call with Mr. Bhatia Fox.  And

16   currently, as the Court's *James* order reads, it is subject

17   to admission and perhaps could be subject to the

18   co-conspirator exception to the hearsay rule if the

19   Government makes a motion.

20             THE COURT:  So you think it's coming in this

21   afternoon.

22             MR. LEONARD:  Yeah, certainly the defense is going

23   to be making an objection and asking that the --

24             THE COURT:  Well, can we move it around -- move

25   things around so you don't go into it until tomorrow

Direct - Gullicksrud

1   morning?  Because we don't have a limiting instruction to

2   go and -- and I think that the defendant does deserve to

3   have me read the limiting instruction before that testimony

4   is taken.

5            MR. PHILLIPS:  Your Honor, I think we can move

6   that around; however, the Court's order for the *James*

7   hearing was that Mr. Fox's statement wouldn't come in as

8   part of -- as evidence unless the Government laid

9   foundation that he was an unindicted co-conspirator, and we

10  are going to present that evidence as we progress towards

11  that.  So it will be our position that a limiting

12  instruction will not be necessary for that instruction;

13  however, we can kind of move that around so that the Court

14  this evening has the ability to look at that, as well as

15  myself and defense counsel.

16           THE COURT:  All right.  Okay.  So you -- so we

17  don't know whether you're close or far apart on the

18  limiting instruction because you didn't talk about it.

19           MR. PHILLIPS:  Your Honor, I believe we're close

20  in the sense --

21           THE COURT:  What I'm trying to do is -- because if

22  you're close, I don't want to be spending our time back in

23  chambers tonight -- I have another big order in a case that

24  I've got to get out tomorrow morning.  If you're going to

25  be working it out, I don't want to be taking the time to do

Direct - Gullicksrud

1   it myself with my law clerk.

2           MR. PHILLIPS:  I think the biggest thing we need

3   to simply do with this instruction proposed by defense

4   counsel is make it clear that the statement by the other

5   person is simply to give context, but the defendant's

6   statements are evidence.

7           THE COURT:  Are you agreeable to that?

8           MR. LEONARD:  Yes, Your Honor, subject to our

9   objections, which we will, of course, make.

10          THE COURT:  All right.  Well, then, what I --

11  okay.  So it sounds like we have an agreement, at least as

12  to that aspect of it.  So we're putting aside the

13  Government's limiting instruction because I think you're

14  telling me you don't have -- at least for now you don't

15  have another separate one.

16          MR. PHILLIPS:  And we can work off of this one and

17  I'm sure that -- well, I'm hopeful that we could make this

18  one work.

19          THE COURT:  Okay.  So let's do this, I'm going to

20  instruct counsel to stick around here tonight until you

21  hammer out an agreement on this limiting instruction and

22  have it ready for us tomorrow morning, have copies made for

23  Ms. Hansen and my law clerk and me, and we will get on the

24  record that there's an agreement or get me as close as you

25  can to your agreement and tell me what still separates you.

Direct - Gullicksrud

1    I'll make a ruling and then we'll have the instruction and

2    then we'll read it before -- what's the name of the witness

3    again?

4              MR. PHILLIPS:  It -- well, I think the witness --

5              THE COURT:  It will be through Agent --

6    Gullicksrud?

7              THE WITNESS:  Right.

8              MR. PHILLIPS:  Again, I don't think, actually, the

9    piece of evidence that we're presenting through Mr. --

10   Special Agent Gullicksrud would be subject to that limiting

11   instruction, but I did think some of the later phone calls,

12   given the Court's ruling that the other speakers' words are

13   only to give context, that would be the proper place and

14   time to give it.

15             THE COURT:  I think Mr. Leonard's taking the

16   position that it would be covered by it; he is requesting a

17   limiting instruction.

18             MR. LEONARD:  That's correct, Your Honor.

19             THE COURT:  Okay.  So let's not go into that -- so

20   that testimony will not be gone into today.  I will

21   instruct you to stick around and get -- and hammer out an

22   agreed-upon instruction that you will give us in the

23   morning, and then at the earliest point that either one of

24   you wants me to give the instruction -- because I don't see

25   a huge downside to giving it at an earlier spot, I will

Direct - Gullicksrud

1    give it, and then it will be contained in the final

2    instructions.  All right?

3         Okay.  Let's bring in the jury.

4         MR. PHILLIPS:  Your Honor, can we have -- I have

5    one other matter to raise, because it deals with a standing

6    objection on the hearsay for the phone calls.  And my

7    understanding is the Government's about to get into the

8    phone calls.  We would like to make our standing

9    objection --

10        THE COURT:  I think we talked about this at the

11   final trial preparation conference.  Go ahead and make your

12   standing objection.

13        MR. LEONARD:  Your Honor, the Government -- or the

14   Government -- my goodness, the defense objects to any and

15   all phone calls that are being sought to be admitted as

16   hearsay and under 801.

17        THE COURT:  All right.  Can I get the Government's

18   response?

19        MR. PHILLIPS:  And, Your Honor, in this case, as

20   the Court is aware, a lengthy and complex 8 -- or *James*

21   hearing, or at least *James* filings were done, in that we

22   laid out what we believed the conspiracy and what would be

23   shown in court.  The Court made numerous findings regarding

24   all of the phone calls that are being used here or during

25   this trial.

1      There is one phone call that the Court made

2   subject to us laying more of a foundation and we will do

3   that with this witness as time goes by, but we're going to

4   offer them as 801(d)(2) -- part of the conspiracy and we

5   will lay that foundation throughout the trial for the

6   conspiracy.

7      THE COURT:  All right.  Your standing objection is

8   overruled and it will continue to be overruled.  There's no

9   need for you to preserve it again and again with each phone

10  call.  It's a standing objection.  And the basis for my

11  overruling IT is the *James* order and my analysis and

12  discussion in that order.

13     MR. LEONARD:  Thank you, Your Honor.

14     THE COURT:  All right.  Let's bring in the jury.

15     (Jury was present at 3:45 p.m.)

16     THE COURT:  Ladies and gentlemen, I know we went

17  longer than I thought and we weren't out here doing

18  crossword puzzles, we were dealing with a number of legal

19  issues that have to be discussed and decided outside your

20  presence; that's just how these things go.  You don't need

21  to be concerned about why that is.  And it will happen

22  periodically during the trial, so -- but please rest

23  assured, if we're taking longer than I have committed to

24  you, it's because we're dealing with those kind of matters

25  out here that need to be discussed outside your presence.

Direct - Gullicksrud

1    All right.  Mr. Phillips, you may continue your

2    direct examination.

3    MR. PHILLIPS:  Thank you.

4    BY MR. PHILLIPS:

5    Q.   Special Agent Gullicksrud, I believe I was starting to

6    talk to you about the intercepted conversations that were

7    captured during this investigation.  Have you had a chance

8    to review those?

9    A.   I have.

10   Q.   And have you had a chance to review the transcripts

11   that go along with those as well?

12   A.   I have.

13   Q.   And during the course of the investigation, as you

14   began intercepting people and intercepting voices, what

15   were some of the actions you took in order to try to

16   identify different individuals?

17   A.   Well, again, we look at the subscriber info on the

18   phone.  As I've already discussed, a lot of times people

19   didn't put the phone in their name, but -- so in addition

20   to that, we go out and conduct surveillance when we knew

21   Mr. Garrison would be meeting with certain individuals.

22   Q.   Okay.  And if you saw him meet with a certain

23   individual, what were some of the techniques or abilities

24   in order to identify those people that he was meeting

25   with?

Direct - Gullicksrud

1    A.   Well, quite often we have an idea of who it was,

2    either from a license plate or something like that, so we

3    get a photograph from the Department of Motor Vehicle, then

4    people on surveillance would use those photos to compare to

5    the person they saw and be able to make a positive

6    identification that way.

7    Q.   Okay.  And as the investigation progressed, and after

8    the take-down, have you had the opportunity to review any

9    of these phone calls with individuals that were involved in

10   the phone calls?

11   A.   Yes.

12   Q.   And did that also assist you in identifying voices and

13   so forth?

14   A.   It did.

15   Q.   Now, I want to talk to you specifically about some of

16   the exhibits.  Government Exhibit No. 1, what is that?

17   A.   This is a transcript from a call that was intercepted

18   on November 16th, 2013.

19   Q.   And just to be clear, you're looking at the

20   transcript.  The actual piece of evidence is the

21   intercepted phone call; is that correct?

22   A.   Correct.

23   Q.   Okay.  And on that November 16th, 2013 phone call,

24   about what time was that intercepted?

25   A.   It was intercepted at 1815 hours, so 6:15 p.m.

Direct - Gullicksrud

1    Q.    And who's involved in that phone call?

2    A.    This call involves Mr. Ricky Garrison and an

3    individual named Gregory Williams.

4    Q.    And looking at Government Exhibit No. 2, if you could

5    describe to the jury what that intercepted communication

6    is.

7    A.    This is a phone call between Mr. Garrison and Greg

8    Williams where they are arranging to meet with each other

9    to conduct a drug transaction.

10   Q.    Now, is the Government Exhibit No. 2 a phone call --

11   you referred to as phone calls -- a phone call or text?

12   A.    It is a phone call, so it's audio.

13   Q.    Let me make sure that I'm . . .

14          Now, as the month progressed, did you intercept

15   other people -- or other intercepted phone calls?

16   A.    We did.

17   Q.    And looking specifically at Government Exhibit No. 3,

18   what is that?

19   A.    Exhibit No. 3 is a phone call that was intercepted on

20   November 22d, 2013, and it's a phone call between Mr. Ricky

21   Garrison and Simon Ramirez.

22   Q.    And approximately what time was that?

23   A.    It was at 10:26 p.m. -- or, I'm sorry, a.m.

24   Q.    Okay.  And looking at Government Exhibit No. 4, what

25   is that?

Direct - Gullicksrud

1    A.    Exhibit 4 is another intercepted phone call between

2    Ricky Garrison and Simon Ramirez.   The date of this call is

3    November 22d, 2013, and the start time of that call is

4    1344, or 1:44 p.m.

5    Q.    Okay.  Now, you mentioned that you were starting this

6    investigation, you were looking at and trying to identify

7    people.   As this investigation was progressing, who did you

8    or what did you suspect of Greg Williams?

9    A.    Greg Williams was looked to be a customer of both

10   powder cocaine and crack cocaine.

11   Q.    Of whom?

12   A.    Of -- Mr. Williams was buying powder cocaine and crack

13   cocaine from Mr. Ricky Garrison.

14   Q.    And who was Simeon, or Simon, Ramirez?

15   A.    Simon Ramirez was identified as a cocaine source of

16   supply used by Ricky Garrison.

17   Q.    Okay.  And I want you to go back to and look at

18   Government Exhibit No. 2 again, if you would.   And

19   specifically look at the transcript and the identification

20   of that interception and see if you can tell what kind of

21   interception that was.

22   A.    This is a text message sent from Greg Williams to Mr.

23   Ricky Garrison.

24   Q.    Okay.  And earlier you said that that was a phone

25   call.   What's your -- what you're looking at, Government

Direct - Gullicksrud

1    Exhibit 2, are you sure which it is now?

2    A.    Exhibit No. 2 is a text message.

3          MR. PHILLIPS:  And in order to make it easy as we

4    kind of go along at this time, the Government would move to

5    admit Government Exhibits 1 through 4.

6          THE COURT:  All right.  Subject to the standing

7    objection, Government Exhibits 1 through 4 are admitted

8    into evidence and may be published to the jury.

9        (Government's Exhibit 1, 2, 3, and 4 received)

10         MR. PHILLIPS:  We will wait to publish those until

11   later, Your Honor.  Thank you.

12         THE COURT:  All right.

13   BY MR. PHILLIPS:

14   Q.    I want you to now look at Government Exhibits 5, 6 and

15   7, and see if you recognize those.

16   A.    I do.

17   Q.    And what are those?

18   A.    These are disks.  The CDs contain the recordings from

19   that pole -- the surveillance camera I discussed earlier

20   that was placed outside of Mr. Garrison's residence at

21   10340 East 13th Avenue.

22   Q.    And had you had an opportunity to review that

23   surveillance video as well as the still frames made from?

24   A.    I have.

25   Q.    And do they accurately depict what was seen and

Direct - Gullicksrud

1    observed on the date and the time that those pictures were

2    taken?

3    A.    They do.

4          MR. PHILLIPS:   At this time, we would move to

5    admit Government Exhibits 5, 6, and 7 but wait to publish.

6          THE COURT:   All right.   Similar to the standing

7    objection, Exhibits 5 through 7 of the Government are

8    admitted into evidence.

9       (Government's Exhibits 5, 6, and 7 received)

10   BY MR. PHILLIPS:

11   Q.    Moving on to Government Exhibit No. 8, what is

12   that?

13   A.    Exhibit No. 8 is another recorded phone call.   This

14   call is between Mr. Ricky Garrison and Sidney Taylor.   The

15   call was intercepted on November 23d, 2013, at 1932 hours,

16   so 7:32 p.m.

17   Q.    And I'm going to kind of throw you off here now --

18   well, let's go ahead and move to admit Government Exhibit

19   No. 8 at this time and publish later.

20         THE COURT:   All right.

21   BY MR. PHILLIPS:

22   Q.    And throw you off now, moving --

23         THE COURT:   Hold on, hold on.

24         MR. PHILLIPS:   Oh.

25         THE COURT:   Let me -- got to get it on the record.

Direct - Gullicksrud

1   Let me make my ruling here.   Subject to the standing
2   objection, Government's Exhibit 8 is admitted into
3   evidence.
4           (Government's Exhibit 8 received)
5               THE COURT:   Go ahead.
6               MR. PHILLIPS:   Thank you, Your Honor.
7   BY MR. PHILLIPS:
8   Q.   Moving on, to kind of throw you off and jumble you
9   around here, going to Exhibit No. 98, what is that?
10   A.   No. 98 is another intercepted phone call.   This call
11   is between Mr. Ricky Garrison and Robert Painter.   The call
12   was intercepted on November 29th, 2013, at 1319 hours, so
13   1:19 p.m.
14   Q.   And you mentioned Robert Painter.   As this
15   investigation was ongoing, why would you intercept phone
16   calls from Mr. Painter to Mr. Garrison?
17   A.   Mr. Painter was determined to be a drug customer of
18   Mr. Garrison.   He was purchasing methamphetamine and crack
19   cocaine -- or cocaine.
20   Q.   Moving on to Government Exhibit No. 99, what is
21   that?
22   A.   No. 9 is a recorded phone call between Mr. Ricky
23   Garrison and Christopher Vigil.   This call was intercepted
24   on November 29th, 2013, at 1657 hours, so 4:57 p.m.
25               THE COURT:   Agent, you said No. 9.   Do you mean --

Direct - Gullicksrud

1    did you mean to say 99?

2            MR. PHILLIPS:  And, Your Honor, I was going to

3    correct him.  He clearly -- I must not have enunciated

4    well.  99.

5            THE WITNESS:  I'm sorry, my apologies.

6            No. 99 is a phone -- recorded phone call between

7    Ricky Garrison and Simon Ramirez.  The call was intercepted

8    on November 29th, 2013, at 1:21 p.m.

9    BY MR. PHILLIPS:

10   Q.   And Government Exhibit No. 100.

11   A.   That is a phone call between Ricky Garrison and Robert

12   Painter again.  Again, the date is November 29th, 2013, the

13   time is 1656 p.m., so 4:56 p.m.

14           MR. PHILLIPS:  And given the fact that we've

15   talked about Government Exhibit No. 9, the Government would

16   now move to admit, but publish later, Exhibits No. 98, 99,

17   100, and No. 9.

18           THE COURT:  Okay.  Government Exhibits 98, 99,

19   100, and 9 are admitted into evidence.

20       (Government's Exhibits 98, 99, 100, and 9 received)

21   BY MR. PHILLIPS:

22   Q.   Now, you mentioned Christopher Vigil.  Do you recall

23   where Mr. Vigil lived during the course of this drug --

24   charged drug conspiracy?

25   A.   I do.  Mr. Vigil lived at 3515 Franklin Street in

Direct - Gullicksrud

1   Denver.

2   Q.   Okay.   Moving on to Government Exhibit No. 101.   What

3   is that?

4   A.   Exhibit 101 is a recorded phone call between Ricky

5   Garrison and Greg Williams.   This call was intercepted on

6   November 29th, 2013, at 1710, so 5:10 p.m.

7   Q.   And Government Exhibit No. 102.

8   A.   This is a recorded phone call between Ricky Garrison

9   and Gregory Williams.   The date is November 29th, 2013, at

10  1752, so 5:52 p.m.

11  Q.   And Government Exhibit No. 103.

12  A.   This is a text message between Christopher Vigil and

13  Ricky Garrison.   The intercept date is November 29th, 2013,

14  at 1714 hours, so 5:14 p.m.

15  Q.   And Government Exhibit No. 104.

16  A.   This is a intercepted phone call between Ricky

17  Garrison and Christopher Vigil.   The intercept date is

18  November 29th, 2013, at 1736 hours, so 5:36 p.m.

19       MR. PHILLIPS:   Government would move to admit, but

20  publish later, Government's Exhibit 101 to 104.

21       THE COURT:   All right.   Government Exhibits 101,

22  102, 103, 104 admitted into evidence.

23       (Government's Exhibits 101, 102, 103, and 104

24  received)

25  BY MR. PHILLIPS:

Direct - Gullicksrud

1    Q.    Now I'm kind of switching you back to the earlier part

2    of the exhibit book.  If you would please look at

3    Government Exhibit No. 10 and see if you can identify that.

4    A.    Yes.   Exhibit No. 10 is a recorded phone call between

5    Mr. Ricky Garrison and James Tillmon.   The intercept date

6    was November 29th, 2013, at 1845 hours, so 6:45 p.m.

7    Q.    And during the course of the investigation, as you

8    started to intercept James Tillmon, what were you looking

9    for or what were you trying to investigate as far as who

10   James Tillmon was?

11   A.    We determined that James Tillmon was not only a drug

12   customer, but I would classify -- or I would describe him

13   as a friend -- close friend and associate of Mr. Garrison.

14   So he wasn't just a customer for use, they were -- they

15   worked with each other.

16   Q.    Okay.   And we've started to talk about a number of

17   individuals in this case and trying to lay it out.   Have

18   you had an opportunity to look at Government Exhibit

19   No. 124?

20   A.    Yes.

21   Q.    And would that assist you in describing to the jury

22   what you were doing during the course of this investigation

23   and why you were looking at different people?

24   A.    Yes.

25               MR. PHILLIPS:   Your Honor, at this time we would

Direct - Gullicksrud

1    ask to publish Government's Exhibit No. 124 for

2    demonstrative purposes only.

3            THE COURT:  All right.  Any objection to the

4    exhibit being used as a demonstrative exhibit without it

5    being admitted into evidence?

6            MR. LEONARD:  No, Your Honor.

7            THE COURT:  There being no objection, the Exhibit

8    124 may be published to the jury.

9    BY MR. PHILLIPS:

10   Q.   Now, if you could describe to the jury what they're

11   looking at here and how this assists you in describing what

12   was taking place or what your investigation was doing, and

13   who some of these people are.

14   A.   Well, as you can see, Mr. Garrison is in the center --

15           MR. LEONARD:  Your Honor, I object.  That question

16   calls for a narrative answer.

17           THE COURT:  Let me read it.  It was pretty broad.

18   Let's break it down a little bit, Mr. Phillips.

19   BY MR. PHILLIPS:

20   Q.   We just talked about James Tillmon.  If you would

21   identify James Tillmon and how he's associated with your

22   investigation.

23   A.   Again, like I said, James Tillman is a close

24   associate.  He worked with Mr. Garrison to obtain drugs

25   that he later resold, specifically, cocaine.

Direct - Gullicksrud

1    Q.   And somebody we talked about earlier was Sidney

2    Taylor.   And you've mentioned during the course of the

3    investigation that you listened to some phone calls that

4    are pertinent and not other phone calls that aren't.   Why

5    were you listening to phone calls from Sidney Taylor --

6    between Sidney Taylor and Ricky Garrison?

7    A.   Because Mr. Sidney Taylor was purchasing crack cocaine

8    and powder cocaine from Mr. Garrison.

9    Q.   And is he depicted there and identified by name and

10   date of birth?

11   A.   He is.   He's directly below Mr. Garrison.

12   Q.   Okay.   And you'd also mentioned somebody named

13   Christopher Vigil.   Why did you intercept his calls and

14   continue to investigate him as opposed to finding the

15   non --

16   A.   Christopher Vigil's identified as an alternative

17   source of cocaine supply --

18           MR. LEONARD:   Your Honor, object.   The witness'

19   testifying about facts that aren't in evidence.   There's no

20   foundation.   He's assuming facts that aren't in evidence

21   yet.

22           THE COURT:   Yeah, I'm going to sustain that.   I

23   think you need to rephrase.

24   BY MR. PHILLIPS:

25   Q.   I'll move on in the sense of:   Did you intercept other

Direct - Gullicksrud

1    people that were of interest in your investigation that are

2    not depicted in this photograph?

3    A.   We did.

4    Q.   In a conspiracy, in your training and experience, do

5    you charge everybody or is everybody always charged or are

6    there some charged people and some charged not?

7    A.   There are some people that are not charged.

8    Q.   Okay.  Moving on -- you can take that down -- moving

9    on to Government's Exhibit No. 11, what is that?

10   A.   It appears it is a CD of call No. 1517 on target

11   telephone 2, and that is the phone number that was

12   identified as being used by Mr. Garrison.

13   Q.   Okay.  And do you know what date and time that was

14   intercepted and who was involved in that conversation?

15         THE COURT:  Did you want this demonstrative back

16   on?

17         MR. PHILLIPS:  No.

18   BY MR. PHILLIPS:

19   Q.   Looking at the transcript may be of assistance.

20   A.   Okay.  Oh, ah.  This is a intercepted phone call

21   between Mr. Garrison and Christopher Vigil, the intercept

22   date is November 29th, 2013, at 1848 hours, so 6:48 p.m.

23   Q.   And have you had an opportunity to review Government's

24   Exhibit No. 13?  And that's not a transcript.  Sending you

25   back and forth between the books, aren't I?

206

Direct - Gullicksrud

1    A.    I have.   Again, this is another discontinued footage

2    from the surveillance camera outside Mr. Garrison's

3    residence.

4    Q.    And does it fairly and accurately represent what was

5    taking place or what was depicted at the date and time that

6    it was captured?

7    A.    It does.

8         MR. PHILLIPS:   At this time, the Government would

9    move to admit Government's Exhibit 10, 11, and 13.

10        THE COURT:   All right.   Subject to the standing

11   objection, Exhibits 10, 11, and 13 are admitted into

12   evidence.

13        (Government's Exhibits 10, 11, and 13 received)

14   BY MR. PHILLIPS:

15   Q.    Going back to the transcripts and the recorded phone

16   calls, if would you look at Government Exhibit No. 14 and

17   describe to the jury what that is.

18   A.    Exhibit No. 14 is a recorded phone call between Mr.

19   Ricky Garrison and Francisco Aguilar.   The call was

20   intercepted on December 6th, 2013 at 9:38 a.m.

21   Q.    And Government Exhibit No. 15.

22   A.    This is a text message that occurred between Mr.

23   Garrison and Francisco Aguilar.   The text message came

24   across on December 6th, 2013, at 1723 hours, so 5:23 p.m.

25   Q.    And Government Exhibit 16.

Direct - Gullicksrud

1    A.    Exhibit 16 is another text message between Mr. Aguilar

2    and Ricky Garrison.   The intercept date was December 7th,

3    2013, at 11:33 a.m.

4    Q.    And Government Exhibit 17.

5    A.    This is -- again, is a text message between Mr.

6    Garrison and Mr. Aguilar.   The intercept date is December

7    7th, 2013, at 2:57 p.m.

8    Q.    And Government Exhibit 18.

9    A.    This is another text message between Mr. Garrison and

10   Mr. Aguilar.   Intercept date is December 7th, 2013, time is

11   2:57 p.m.

12           MR. PHILLIPS:   Government would move to admit, and

13   publish later, Government Exhibits 14 through 18.

14           THE COURT:   All right.   Subject to the standing

15   objection, Government Exhibits 14 through 18 are admitted.

16         (Government's Exhibits 14, 15, 16, 17, and 18

17   received)

18   BY MR. PHILLIPS:

19   Q.    I want to talk to you about this investigation.   You

20   mentioned earlier to the jury that wire intercept is

21   limited to 30 days.   Did you, in fact, apply for and were

22   granted an extension on target telephone No. 2?

23   A.    We did.

24   Q.    And was that on December 13th of 2013, with Senior

25   Circuit Judge David Ebel?

Direct - Gullicksrud

1    A.    It was.

2    Q.    And was that for telephone No. 720-505-1613?

3    A.    That was not the renewal.  That was the --

4    Q.    Did I throw you off?  If you would correct me to the

5    correct number.

6    A.    The phone number ending in 2310 was the renewal for

7    target telephone 2; the phone number ending in 1613 was for

8    target telephone No. 3, which was determined also to be

9    used by Mr. Garrison.

10   Q.    And, in fact, target telephone No. 2 is 720-690-2310.

11   A.    Yes.

12   Q.    Thank you for correcting me.  And, again, just for the

13   jury's knowledge, who possessed target telephone No. 2

14   during the course of your investigation?

15   A.    Mr. Ricky Garrison.

16   Q.    And as a result of the judge's order to intercept

17   target telephone No. 2, did you, in fact, continue to

18   intercept target telephone No. 2?

19   A.    We did.

20   Q.    Looking at Government Exhibit No. 19, if you would

21   tell the jury what that is.

22   A.    Exhibit No. 19 is a recorded phone call between Mr.

23   Ricky Garrison and Robert Painter.  The call took place on

24   January 5th, 2014 at 11:38 a.m.

25   Q.    And Government Exhibit No. 20.

Direct - Gullicksrud

1   A.   This is a recorded -- recorded phone conversation

2   between Ricky Garrison and Christopher Martinez.  This call

3   took place on January 5th, 2014, at 11:42 a.m.

4   Q.   Now, I'm not sure if we talked about Mr. Martinez yet,

5   but during the course of your investigation, was Mr.

6   Martinez -- did he become a target of your investigation?

7   A.   He did.

8   Q.   Okay.  And Government Exhibit No. 21.

9   A.   Exhibit No. 21 is a recorded conversation between Mr.

10  Garrison and Robert Painter.  This call took place on

11  January 5th, 2014, at 11:43 a.m.

12  Q.   And Government Exhibit No. 22.

13  A.   Exhibit No. 22 is a text message between Mr. Garrison

14  and Christopher Martinez.  This text message took place on

15  January 5th, 2014, at 1807 hours, so 6:07 p.m.

16  Q.   And Government Exhibit No. 23.

17  A.   Exhibit 23 is a phone conversation between Mr.

18  Garrison and Christopher Martinez.  This call took place on

19  January 5th, 2014 at 1825 hours, so 6:25 p.m.

20  Q.   And later that same evening, Government Exhibit

21  No. 24.

22  A.   This is a recorded conversation between Mr. Garrison

23  and Robert Painter.  The call took place on January 5th,

24  2014, at 1959 hours, so 7:59 p.m.

25  Q.   And Government Exhibit No. 25.

Direct - Gullicksrud

1    A.    This is another recorded conversation between Mr.

2    Garrison and Robert Painter.  This conversation took place

3    on January 5th, 2014, at 2046 hours, so 8:46 p.m.

4    Q.    And Government Exhibit No. 26.

5    A.    This is a recorded conversation between Ricky Garrison

6    and Christopher Martinez.  This call took place on January

7    5th, 2014, at 2047 hours, so 8:47 p.m.

8    Q.    Government Exhibit No. 27.

9    A.    This is a recorded phone conversation between Mr.

10   Garrison and Robert Painter.  This call took place on

11   January 5th, 2014, at 2049, so it will be 9:49 p.m.

12   Q.    And Government Exhibit 28.

13   A.    This is a recorded conversation between Mr. Garrison

14   and Robert Painter.  The call took place on January 5th,

15   2014, at 2135 hours, so 9:35 p.m.

16   Q.    And Government Exhibit No. 29.

17   A.    This is the phone conversation between Mr. Garrison

18   and Robert Painter.  This conversation occurred on January

19   5th, 2014, at 2151 hours, so 9:51 p.m.

20   Q.    And Government Exhibit No. 30.

21   A.    This is a recorded conversation between Mr. Garrison

22   and Robert Painter.  This conversation occurred on January

23   5th, 2014, at 2158 hours, so 9:58 p.m.

24          MR. PHILLIPS:  Government would move to admit, but

25   publish later, Government's Exhibits No. 19 through 30.

Direct - Gullicksrud

1           THE COURT:  Subject to the standing objection,

2    Exhibits 19 through 30 are admitted.

3        (Government's Exhibits 19, 20, 21, 22, 23, 24, 25, 26,

4    27, 28, 29, and 30 received)

5    BY MR. PHILLIPS:

6    Q.   Now, I want to draw your attention to a few days later

7    in the investigation, and on -- specifically on January 9th

8    of 2014.  Were you still intercepting Ricky Garrison's

9    telephone on that day?

10   A.   Yes.

11   Q.   And did you intercept phone calls that were of

12   interest to you and of assistance in your investigation?

13   A.   Yes.

14   Q.   And looking at Government's Exhibit No. 31, what was

15   that?

16   A.   This is a recorded phone conversation between Ricky

17   Garrison and Francisco Ramirez.  As you stated, the call

18   occurred on January 9th, 2014, at 1:08 p.m.

19   Q.   And Government Exhibit No. 32.

20   A.   This is a recorded conversation between Ricky Garrison

21   and Francisco Aguilar.  This conversation occurred on

22   January 9th, 2014, at 1615 hours, so 4:15 p.m.

23   Q.   And I believe that may be the first time we've heard

24   Mr. Aguilar's name.  And correct me if I'm wrong, but was

25   that somebody that became of interest to you during the

Direct - Gullicksrud

1   course of this investigation?

2   A.   He was.

3   Q.   And was he a target of the investigation?

4   A.   He was.

5   Q.   And was he depicted on Government Exhibit 124, as you

6   saw it earlier?

7   A.   He was.

8   Q.   Moving on to Government Exhibit No. 33, what is

9   that?

10  A.   This is a recorded conversation between Ricky Garrison

11  and Francisco Aguilar.  The conversation occurred on

12  January 9th, 2014, at 1622 hours, so 4:22 p.m.

13  Q.   And Government Exhibit No. 34.

14  A.   This is a text message that took place between

15  Francisco Aguilar and Ricky Garrison.  Text message came in

16  at January -- on January 9th, 2014, at 1653 hours, so 4:53

17  p.m.

18  Q.   And Government Exhibit No. 35.

19  A.   This is another phone conversation that was recorded

20  between Ricky Garrison and Francisco Aguilar.  The date of

21  that call was January 9th, 2014, at 1702 hours, so 5:02

22  p.m.

23  Q.   And Government Exhibit No. 36.

24  A.   This is a recorded phone conversation between Ricky

25  Garrison and Francisco Aguilar.  The call occurred on

Direct - Gullicksrud

1   January 9th, 2014, at 1745 hours, so 5:45 p.m.

2            MR. PHILLIPS:  At this time, the Government moves

3   to admit, and publish later, Government's Exhibits 31

4   through 36.

5            MR. LEONARD:  Your Honor --

6            THE COURT:  Mr. Leonard.

7            MR. LEONARD:  I know I have a standing objection.

8   There's -- Exhibit 31, there's a discrepancy that indicates

9   Francisco Ramirez at the top of what this transcript is

10  about and then indicates Francisco Aguilar.

11           THE COURT:  Where are you reading from?

12           MR. LEONARD:  I'm reading on the transcript

13  portion of Exhibit 31.

14           THE COURT:  One second.  Let me get there.

15           MR. PHILLIPS:  And I believe my witness can

16  probably clarify that, Your Honor.

17           THE COURT:  I don't have anything in my notebook

18  on this -- on 31, but anyway, what did you say, Mr.

19  Phillips?

20           MR. PHILLIPS:  I believe that the witness can

21  clarify that.  It looks like it's a typo.

22           THE COURT:  Okay.

23  BY MR. PHILLIPS:

24  Q.   Special Agent Gullicksrud, looking at Government

25  Exhibit 31, do you see the discrepancy that defense counsel

Direct - Gullicksrud

1   has raised?

2   A.   I do.  At the top of the page, the name listed is

3   Francisco Ramirez, but everything else in the call is Mr.

4   Francisco Aguilar.

5   Q.   And just so we're clear, during the course of this

6   investigation, were there two different Franciscos?

7   A.   There were.

8   Q.   And in this particular phone call, who were the

9   speakers and who were -- was captured on the phone?

10  A.   In Exhibit 31, the speakers are Ricky Garrison and

11  Francisco Aguilar.

12  Q.   Okay.  And just so we're clear, during the

13  interceptive -- and --

14          THE COURT:  Well, I -- Mr. Phillips, let's make

15  sure we cover the -- there was, in addition to the standing

16  objection, the specific objection Mr. Leonard made to

17  Exhibit 36 that I haven't ruled on yet.

18          Based on the witness' testimony, I'm going to

19  overrule that objection.  So then I go to your -- you've

20  moved for the admission of 31 through 36?

21          MR. PHILLIPS:  Yes, please, Your Honor.

22          THE COURT:  You're going to publish later?

23          MR. PHILLIPS:  Publish later.

24          THE COURT:  Okay.  Also subject to this standing

25  objection, Exhibit 31 through 36 is admitted into

Direct - Gullicksrud

1    evidence -- or are admitted into evidence.

2         (Government's Exhibits 31, 32, 33, 34, 35, and 36

3    received)

4    BY MR. PHILLIPS:

5    Q.    Now, we've been going through some phone calls and

6    intercepts of them and so forth.  If you could, describe to

7    the jury what is taking place, or what you and your

8    teammates are doing, or your fellow investigating officers

9    are doing during specific intercepts of some of the calls.

10   Do you have different teams doing different things?

11   A.    Right.  I've often heard wiretaps referred to as

12   almost like the pre-crime unit, like we know when a crime's

13   going to occur before it occurs because we intercept the

14   calls.  The calls are used to set up the drug deals, so we

15   know from the phone calls when these deals are going to

16   occur and, ideally, where they are going to occur.  So when

17   we intercept these calls, we anticipate drug deals to

18   occur.  We go to those areas before the suspects even get

19   to those areas so we can set up surveillance and observe

20   what's going on with these drug deals.

21   Q.    And what are the officers on there doing out there on

22   surveillance when they're out there?

23   A.    Basically just observing.  A lot of times they will be

24   taking videos and taking notes -- or, I mean, taking

25   pictures, basically just detailing what they see, license

Direct - Gullicksrud

1    plates of vehicles, people's descriptions, basically

2    anything -- any type of information that could help our

3    investigation.

4    Q.   And during the course of this investigation, did, in

5    fact, officers take a bunch of photographs, a bunch of

6    videos, a bunch of tag numbers, that sort of thing?

7    A.   They did.

8    Q.   And look at Government Exhibit No. 37, is that -- or

9    what is that?

10   A.   Exhibit 37 is a CD.  It contains surveillance video

11   from a Shell gas station on January 9th, 2014.

12   Q.   And was that part of the investigation and did it

13   fairly depict what was taking place on that particular

14   day?

15   A.   It does.

16        MR. PHILLIPS:  Move to admit, and publish later,

17   Government Exhibit 37.

18        MR. LEONARD:  Your Honor, defense objects.  He is

19   not qualified under 803.6 to make admission of a Shell

20   video gas station, nor does he -- has he laid the requisite

21   foundation that the device that was purported to be

22   recording and gathering the photographs was in proper

23   working order.

24        THE COURT:  Mr. Phillips.

25        MR. PHILLIPS:  Maybe I could clarify further as to

Voir Dire - Gulllicksrud

1    what this evidence depicts.

2            THE COURT:  Okay.

3    BY MR. PHILLIPS:

4    Q.   Was this evidence taken by the Shell equipment or by

5    police officers?

6    A.   No, this was video taken by an agent that was on

7    surveillance, so his own personal -- or not personal, but

8    the recorder that he used.

9    Q.   And so it's not special equipment or anything of that

10   nature?

11   A.   No.

12           THE COURT:  All right --

13           MR. LEONARD:  Your Honor, may I voir dire the

14   witness briefly?

15           THE COURT:  All right.  You may.

16                   VOIR DIRE EXAMINATION

17   BY MR. LEONARD:

18   Q.   Agent Gullicksrud, you indicated that the video was

19   taken by an agent.  Was it you who took that video?

20   A.   It was not.

21   Q.   Did you personally set up this videorecording

22   device?

23   A.   I did not.

24           MR. LEONARD:  All right.  I -- Your Honor, the

25   defense objects to this witness is not qualified to lay a

Direct - Gullicksrud

1    foundation as to the workings of the device that's

2    capturing the recording.

3            THE COURT:  Do you have another witness that you

4    can get this --

5            MR. PHILLIPS:  Sergeant Dan Johnson is scheduled

6    to testify.  Yes, Your Honor.

7            THE COURT:  Let's do it through him.  The

8    objection's sustained.

9            MR. PHILLIPS:  Thank you.

10                   DIRECT EXAMINATION (Continued)

11   BY MR. PHILLIPS:

12   Q.   Now during the course of this investigation, did you,

13   in fact, intercept -- apply for and intercept numerous

14   phones as part of this investigation?

15   A.   Yes.

16   Q.   And if you could describe to the jury why you would

17   intercept numerous phones as opposed to just one person.

18   A.   Again, like I said, we want to get the full scope of

19   the organization, so as we identify other sources of drug

20   supply, we would like to listen to their phone to find out

21   who they're working with additionally.

22           We want to be able to flush out the organization

23   completely, see how they all work with each other and,

24   again, get the full scope of the criminal organization.

25   Q.   Now I want to take you back to December 30th of 2013.

Direct - Gullicksrud

1    Did you apply for and were you granted the intercept for a

2    telephone on that day?

3    A.    Yes.

4    Q.    Was that telephone 720-525-0850?

5    A.    It was.

6    Q.    And was that approved by the Honorable David Ebel?

7    A.    It was.

8    Q.    And who possessed or who was using 720-525-0850?

9    A.    That phone was being used by James Tillmon.

10   Q.    And was this the very first time that you'd seen James

11   Tillmon, or how did you come to develop and want to

12   intercept James Tillmon's phone call -- or phone?

13   A.    We knew of Mr. Tillmon because we conducted

14   surveillance of Mr. Garrison and had intercepted calls

15   between Mr. Garrison and Tillmon, so we conducted

16   surveillance on a day we knew they met up with each other

17   and identified him that way.

18   Q.    Okay.  And Government Exhibit No. 38, if you could

19   identify that.

20   A.    This is a recorded phone call between Mr. James

21   Tillmon and Greg LNU.  The L-N-U just means last name

22   unknown.  He wasn't identified.  The only way we knew him

23   was by the name Greg.

24          This call took place on January 28th, 2014 at

25   11:31 a.m.

Direct - Gullicksrud

1   Q.   A -- and Government Exhibit No. 39.

2   A.   This is another recorded phone conversation between

3   Mr. Tillmon and Greg -- Greg.  This call occurred on

4   January 28th, 2014 at 1346 hours, so 1:46 p.m.

5   Q.   And Government Exhibit No. 40.

6   A.   This is another phone call between Mr. Tillmon and

7   Greg.  This call occurred on January 28th, 2014, at 1417

8   hours, so 2:17 p.m.

9   Q.   And Government Exhibit No. 41.

10   A.   This is another phone conversation between Mr. Tillmon

11   and Greg.  This call occurred on January 28th, 2014, at

12   1436 hours, so 2:36 p.m.

13   Q.   And if you would, please look at Government Exhibit 42

14   and see if you can identify that.

15   A.   Sorry.  Is there another book?

16   Q.   Oh.  There may be, yes.

17   A.   Exhibit 42 is a CD containing, again, surveillance

18   camera footage from Mr. Garrison's residence.  This footage

19   was taken on January 28th, 2014.

20   Q.   And does it fairly and accurately portray what was

21   taking place on that particular date and time?

22   A.   It does.

23        MR. PHILLIPS:  Move to admit Government's Exhibit

24   No. 38 through 42.

25        THE COURT:  All right.  Subject to the standing

Direct - Gullicksrud

1    objection, Exhibits 38 through 42 are admitted into

2    evidence.

3        (Government's Exhibits 38, 39, 40, 41, and 42

4    received)

5    BY MR. PHILLIPS:

6    Q.   Now, I want to talk to you about target telephone 5.

7    Did you intercept what was referred to as a target

8    telephone No. 5?

9    A.   Yes.

10   Q.   And who was the user of that target telephone?

11   A.   The user of that telephone was Simon Ramirez.

12   Q.   And what about target telephone No. 6; who was the

13   user of that phone call -- or that phone or what took place

14   with that particular phone?

15   A.   The user of that phone was Francisco Aguilar.

16   Q.   And was that phone successful or did you intercept a

17   bunch from that, or what took place with that phone?

18   A.   No, when we put -- tried to intercept the calls, the

19   phone had had -- Mr. Aguilar discontinued using the

20   phone.

21   Q.   And going back to target telephone No. 5, you've had a

22   chance to review the evidence and the exhibits that the

23   Government is going to be presenting during the course of

24   this trial.  Are any phones interception of target

25   telephone 5 being presented at trial?

Direct - Gullicksrud

1   A.   No.

2   Q.   How about target telephone No. 7, who was the user of

3   that target telephone?

4   A.   The user of target telephone No. 7 was Christopher

5   Martinez.

6   Q.   And, again, speaking about Christopher Martinez and

7   target telephone No. 7, were any of the intercepted calls

8   from that particular telephone being presented in this

9   trial here today?

10  A.   Yes.

11  Q.   Do you recall the phone number for that particular

12  phone?

13  A.   I don't recall that number.  Sorry.

14  Q.   Now I want to take you to February 24th of 2014.  Did

15  Judge Ebel, in fact, grant you another extension for target

16  telephone No. 2?

17  A.   He did.

18  Q.   And if you would refresh the jury whose target

19  telephone that was.

20  A.   Target telephone 2 belonged to Ricky Garrison.

21  Q.   And did he also order you to intercept target

22  telephone 8?

23  A.   Yes.

24  Q.   And was that phone number 719-354-8298?

25  A.   Yes.

Direct - Gullicksrud

1    Q.   And who did that phone belong to?

2    A.   That phone also belonged to Ricky Garrison.

3    Q.   Okay.  Now, you talked earlier about target telephone

4    2 being Ricky Garrison's, but not registered in his name or

5    subscribed in his name.  Who was the subscriber of target

6    telephone 8?

7    A.   I don't recall.

8    Q.   Do you recall whether he had that in his name?

9    A.   I recall that it was not in his name.

10   Q.   Is it possible that it could have been?

11   A.   It could have been.

12   Q.   And did you also -- on that same day, were you ordered

13   to intercept target telephone No. 9?

14   A.   Yes.

15   Q.   And was that 720-434-5073?

16   A.   Yes.

17   Q.   And who was that -- who was the user of that phone?

18   A.   The user of that phone was Corinna Henderson.

19   Q.   And having reviewed the evidence that's being

20   presented in this trial, are any of the phone calls from

21   target telephone 9 being used during the course of this

22   trial?

23   A.   No.

24   Q.   Moving to Government Exhibit No. 43, if you would look

25   at that.

Direct - Gullicksrud

1    A.    Exhibit No. 43 is a recorded phone call between Ricky

2    Garrison and Sidney Taylor.  The call took place on

3    February 26th, 2014 at 1749 hours, so 5:49 p.m.

4            MR. PHILLIPS:  Move to admit, publish later,

5    Government's Exhibit 43.

6            THE COURT:  Exhibit 43 is admitted into evidence.

7        (Government's Exhibit 43 received)

8    BY MR. PHILLIPS:

9    Q.    Moving ahead to March 2d, was there any intercepted

10   phone calls on that particular day that are of interest to

11   you?

12   A.    Yes.

13   Q.    Looking at Government Exhibit 45.  If you would,

14   please, identify that.

15   A.    This is a recorded phone call between Ricky Garrison

16   and Robert Painter.  Again, the phone call occurred on

17   March 2d, 2014, at 1450 hours, so 2:50 p.m.

18   Q.    Okay.  And Government Exhibit No. 46.

19   A.    This is a recorded phone call between Ricky Garrison

20   and Robert Painter.  Again, the call occurred on March 2d,

21   2014, at 1454 hours, so 2:54 p.m.

22           MR. PHILLIPS:  Move to admit, and publish later,

23   Government Exhibits 45 and 46.

24           THE COURT:  Exhibits 45 and 46 are admitted.

25       (Government's Exhibits 45 and 46 received)

Direct - Gullicksrud

1    BY MR. PHILLIPS:

2    Q.    Okay.  On that same day, looking at Government Exhibit

3    107, was there an intercepted call?

4    A.    There was.  There was an intercepted call between

5    Ricky Garrison and Simon Ramirez.  Again, the call's

6    intercepted the same day at 1500 hours, so 3:00 p.m.

7              MR. PHILLIPS:  Government moves to admit

8    Government Exhibit No. 107, publish later.

9              THE COURT:  Exhibit 107 is admitted into evidence.

10             (Government's Exhibit 107 received)

11   BY MR. PHILLIPS:

12   Q.    Also on March 2d of 2014, if you would, please look at

13   Government Exhibit No. 47.

14   A.    This is a recorded phone conversation between Ricky

15   Garrison and Travis Edwards.  Again, the call occurred on

16   March 2d, 2014, at 1543 hours, so 3:43 p.m.

17   Q.    And Government Exhibit No. 48.

18   A.    This is another recorded conversation between Ricky

19   Garrison and Travis Edwards.  This call was recorded at

20   1545 hours, so 3:45 p.m.

21   Q.    And Government Exhibit 49.

22   A.    I believe this is a text message, but it's a message

23   between Ricky Garrison and Travis Edwards.  It occurred at

24   March -- on March 2d, 2014, at 3:50 p.m.

25   Q.    And you noted that that was, in fact, a text message?

Direct - Gullicksrud

1    A.    Yeah.   It does say recorded telephone communication,

2    but it is a text message.

3    Q.    And Government Exhibit No. 50.

4    A.    It's a recorded phone conversation between Ricky

5    Garrison and Travis Edwards on the same date at 1550 hours,

6    so 3:50 p.m.

7    Q.    And if you would, please, look at Government Exhibit

8    No. 51.   Have you had an opportunity to review that?

9    A.    I have.   Again, it's surveillance camera footage from

10   outside Mr. Garrison's residence from March 2d, 2014.

11   Q.    And does it fairly and accurately depict what was

12   taking place on that date and time at that residence?

13   A.    It does.

14          MR. PHILLIPS:   Government moves to admit

15   Government's Exhibits 47 through 51.

16          THE COURT:   Subject to the standing objection,

17   Exhibits 47 through 51 are admitted.

18       (Government's Exhibits 47, 48, 49, 50, and 51

19   received)

20   BY MR. PHILLIPS:

21   Q.    Now let's talk about more phones that you intercepted.

22   Did you receive an order on March 21st, 2014, from District

23   Court Judge Marcia Krieger to intercept phone No.

24   720-477-8714?

25   A.    Yes.

Direct - Gullicksrud

1    Q.    Whose phone was that?

2    A.    I believe I know who it is.  I just -- I don't want to

3    misstate.  Can you tell me what target telephone that is?

4    Q.    Well, you would say that.  Yes, I can.  One moment.

5          Target telephone 10.

6    A.    Target telephone 10 belonged to Francisco Aguilar.

7    Q.    And during the course of this investigation, did you

8    notice anything unique about the recording times of

9    Francisco Aguilar's telephone?

10   A.    We did.

11   Q.    And what was that?

12   A.    Some -- it's like any system, there's -- there can be

13   problems with any technical device.  We noted that when the

14   calls were coming in, the times are off by, I believe it

15   was, like two hours, but they were consistently off.  So

16   for the first few days before we could get the problem

17   corrected, we had to note the times of the calls, but they

18   actually were versus what the system told us they were.

19   Q.    And did you note that and correct it?

20   A.    We did.

21   Q.    Taking you to Government Exhibit No. 59, do you

22   recognize that?

23   A.    I do.

24   Q.    And what is that?

25   A.    This is a recorded conversation between Francisco

Direct - Gullicksrud

1    Aguilar and Ricky Garrison.  The call occurred on

2    March 25th, 2014, at 1932 hours, so 7:32 p.m.

3    Q.   And is that the corrected time?

4    A.   The corrected time was -- the corrected time was

5    actually 1832 hours, so 6:32 p.m.

6    Q.   And Government Exhibit No. 60.

7    A.   This is another recorded conversation between

8    Francisco Aguilar and Ricky Garrison.  It's on the same

9    date.  The actual time is 2015 hours, so 8:15 p.m.  The

10   system read it as 2115, so two hours later.

11   Q.   And Government Exhibit No. 61.

12   A.   This is a recorded text message between Francisco

13   Aguilar and Ricky Garrison.  It's on the same date.  The

14   corrected time is 2045 hours, so 8:45 p.m.

15   Q.   And Government Exhibit 62.

16   A.   This is another text message between Francisco Aguilar

17   and an unknown male on the same date at -- let me see the

18   corrected time -- start time is 2146 hours, so 9:46 p.m.

19   And I believe this one is the correct time.

20   Q.   Okay.

21   A.   Yes.

22   Q.   And Government Exhibit No. 63.

23   A.   This is another text message between Ricky Garrison

24   and Francisco Aguilar, same date.  Time is 2332 hours, so

25   11:32 p.m.

Direct - Gullicksrud

1    Q.    One moment.

2    A.    Oh, I'm sorry, there -- let me see here.  There is a

3    corrected time on that call.  The corrected time is 2232

4    hours.

5    Q.    And Government Exhibit No. 64.

6    A.    64 is another text message between Francisco Aguilar

7    and Ricky Garrison.  Start time is 1308 hours, so 1:08 p.m.

8    Q.    And is there a corrected time?

9    A.    I do not see a corrected time on this one.

10   Q.    Thank you.  Government Exhibit No. 65.

11   A.    65 is another text message between Francisco Aguilar

12   and Ricky Garrison.  Again, this day of this text message

13   is March 26th, 2014, the corrected time is 1213 hours, so

14   12:13 p.m.

15   Q.    And Government Exhibit No. 66.

16   A.    66 is a recorded telephone conversation between

17   Francisco Aguilar and Ricky Garrison.  This phone

18   conversation occurred on March 26th, 2014.  This time is

19   corrected, the time is 1437 hours, so 2:37 p.m.

20   Q.    And Government Exhibit No. 67.

21   A.    This is a recorded conversation -- phone conversation

22   between Francisco Aguilar and Ricky Garrison, the date of

23   this call is March 26th, 2014.  The corrected time is 1729

24   hours, so 5:29 p.m.

25   Q.    And Government Exhibit No. 68.

Direct - Gullicksrud

1    A.    This is a recorded telephone conversation between

2    Francisco Aguilar and Ricky Garrison.   The date of the call

3    is March 26th, 2014.   The corrected time is 1808 hours, so

4    6:08 p.m.

5    Q.    And Government Exhibit No. 69.

6    A.    This is a text message between Francisco Aguilar and

7    Ricky Garrison.   The date of the text message is

8    March 26th, 2014.   Corrected time is 6:21 p.m.

9              MR. PHILLIPS:   At this time, the Government would

10   move to admit, but publish later, Government Exhibits 59

11   through 69.

12             THE COURT:   Subject to the standing objection,

13   Exhibits 59 through 69 are admitted.

14        (Government's Exhibits 59, 60, 61, 62, 63, 64, 65, 66,

15   67, 68, and 69 received)

16   BY MR. PHILLIPS:

17   Q.    Now, you just went through -- and I want to draw your

18   attention back to the March 25th of 2014 a number of phone

19   calls between Ricky Garrison and Francisco Aguilar.   Do you

20   recall that night?

21   A.    I do.

22   Q.    And what -- what were you and other law enforcement

23   doing, or what is your plan that particular evening?

24   A.    That particular evening, well, we intercepted calls

25   between Francisco Aguilar and Ricky Garrison that indicated

Direct - Gullicksrud

1    that Mr. Garrison's going to be traveling to Mr. Aguilar's

2    residence at -- I believe it was 3100 South Colorado

3    Boulevard to purchase 4 ounces of cocaine.

4    Q.    And based on those phone calls, were you and your

5    other investigators planning to do anything particular?

6    A.    We were.  On this particular deal, we had made a

7    decision that once Mr. Garrison purchased the drugs, we

8    were going to stop -- stop him -- conduct a traffic stop to

9    recover the drugs after the deal.

10   Q.    And as that particular night progressed, did anything

11   unusual happen that made you change that plan?

12   A.    It did.  Everything was going according to plan.  Mr.

13   Aguilar was at his house and Mr. Garrison had made it clear

14   he was en route to the house, because they were exchanging

15   text messages back and forth, basically saying he was on

16   the way.

17         While we were conducting surveillance, other calls

18   are still coming into Mr. Aguilar's phone, and a number was

19   read off over our radio system, it was just an unrelated

20   phone number, but it was a friend of Mr. Aguilar's.  Some

21   person unrelated to the case had a scanner and she text

22   message that phone -- Mr. Aguilar -- or a friend of that --

23   that friend of Mr. Aguilar and just said Francisco or Ricky

24   need to be careful, there's a sting, or something to that

25   effect.

Direct - Gullicksrud

1    Mr. Aguilar didn't know what was going on, but we

2    assumed, or thought that obviously Mr. Aguilar would tell

3    Ricky what had happened --

4         MR. LEONARD:  Your Honor, I object.  This is

5    hearsay --

6         THE COURT:  Sustained.

7         MR. LEONARD:  -- he's testifying --

8         THE COURT:  Sustained.

9         MR. PHILLIPS:  Your Honor, it's not being offered

10   for the truth of the matter, but why the officers did or

11   did not do what they did that particular night, and Mr.

12   Aguilar will be testifying later.

13        THE COURT:  Well, then probably it's better to get

14   it through him, but I'm going to sustain it for now.

15   BY MR. PHILLIPS:

16   Q.   You as law enforcement, as you began -- and you were

17   intercepting Mr. Aguilar's phone?

18   A.   Correct.

19   Q.   And you had mentioned that there started to be some

20   weird interceptions on the phone.  What were those and why

21   did you either do or not do what you did based on those

22   interceptions?

23        MR. LEONARD:  Your Honor, given objection.  What

24   were those?  That's hearsay.

25        THE COURT:  I think it's better if you just ask

Direct - Gullicksrud

1   him what he did based on the statements he heard.

2   BY MR. PHILLIPS:

3   Q.   Now, you mentioned that you and other law enforcement

4   officers were out and the plan was to do a traffic stop

5   after your suspected drug deal with Mr. Garrison.  As the

6   night progressed, were there interceptions from individuals

7   you were not familiar with that made you do something

8   different?

9   A.   There were.

10  Q.   And if you could briefly describe to the jury what --

11  why your plans changed that particular evening.

12  A.   Based on those text messages, we didn't feel it made

13  sense to stop Mr. Garrison after he met up with Mr.

14  Aguilar.  Based on those text messages we thought it likely

15  that he didn't purchase the drugs.

16  Q.   Now, I want to speak to you about somebody named

17  Latoya Winbush.  Are you familiar with her?

18  A.   I am.

19  Q.   And how are you familiar with her?

20  A.   She was a friend of Mr. Garrison's.  She was also a

21  drug customer of Mr. Garrison, crack cocaine customer.

22            MR. LEONARD:  Your Honor, I object and move to

23  strike.  That's hearsay.  There's no foundation as to who

24  Ms. Winbush is.

25            THE COURT:  This is his understanding of who she

1    is.   Overruled.

2    BY MR. PHILLIPS:

3    Q.    And looking again at Government's Exhibit No. 124, if

4    you could, point her out and the relationship and for that

5    demonstrative Wiest of evidence?

6    A.    Again, she's directly below Mr. Garrison, next --

7    between Sidney Taylor and Robert Painter.

8    Q.    Taking you back to early on in the investigation, I'm

9    going to ask you to look at Government Exhibit No. 105.

10   A.    Now --

11   Q.    I guess before we go there, I'm going to take you back

12   to -- I'm going to clarify.   Government Exhibit No. 69.

13   Can you go back to 69, please.   And is 69 a phone call or a

14   text?

15   A.    This is a text message.

16   Q.    Are you sure?

17   A.    It's not -- so it's --

18         MR. LEONARD:   Your Honor, first of all, I object.

19   The witness answered the question.

20         THE COURT:   Well, it's a proper follow-up.

21   Overruled.   Go ahead.

22         THE WITNESS:   Again, I believe this is a typo.

23   It's listed as a text message on top; however, if you look

24   at it, there's an answer to the response, so it couldn't be

25   a text message, so it's an audible phone call.

Direct - Gullicksrud

1   BY MR. PHILLIPS:

2   Q.   And so 69, just so we're clear, is an audible phone

3   call, and it's something that will be played later and it

4   will be able to be heard?

5   A.   Correct.

6   Q.   Now, if you would take you to Government Exhibit No.

7   105.

8   A.   Exhibit 105 is a recorded phone conversation between

9   Ricky Garrison and Latoya Winbush.  This conversation took

10  place on November 16th, 2013 at 2013 hours, so it will be

11  8:13 p.m.

12          MR. PHILLIPS:  If I may have one moment, Your

13  Honor.

14          THE COURT:  You may.

15          MR. PHILLIPS:  And, Your Honor, if I may have one

16  moment to speak with Mr. Leonard.

17          THE COURT:  Sure.

18          MR. PHILLIPS:  Thank you for the time, Your Honor.

19          At this time, the Government would move to admit,

20  as well as publish, Government Exhibit No. 105.

21          THE COURT:  All right.  Subject to the standing

22  objection, Exhibit 105 is admitted into evidence and may be

23  published to the jury.

24      (Government's Exhibit 105 received)

25          MR. PHILLIPS:  And, Your Honor, we have prepared

Direct - Gullicksrud

1    and have available transcripts for the jury.  We'd ask that

2    they be allowed to be distributed to the jurors and allowed

3    to look at Government Exhibit No. 105 transcript.

4              THE COURT:  The transcript of 105 only.

5              MR. PHILLIPS:  They're in a book for all of the

6    phone calls, but we would ask them to turn only to each

7    phone call as it's played, and in this particular one, it

8    will be 105.

9              THE COURT:  Okay.  Any objection?

10             MR. LEONARD:  Your Honor, we object.  The phone

11   calls are in the English language, the jury understands the

12   English language, they're intelligible and not in need of

13   aid and assistance of a transcription to tell them what

14   they're listening to.

15             THE COURT:  Why do we need a transcript if we have

16   the recorded call?

17             MR. PHILLIPS:  Your Honor, because many of these

18   phone calls contain slang or words that are used as hidden

19   words.  In addition, they're not always extremely audible.

20   It's been my experience in all of the trials I've done here

21   that transcripts would be provided so that the phone calls

22   don't have to be played repeatedly over and over again so

23   that oftentimes the human mind tracks better with a

24   transcript which has been provided and clarified as opposed

25   to, you know, "Your Honor, can we play that again, Your

Direct - Gullicksrud

 1    Honor, can we play that again."

 2            THE COURT:  All right.  Okay.  Objection's

 3    overruled.  The jury may be provided with a transcript of

 4    105.  But if the notebook does contain transcripts of

 5    documents that have yet to be admitted into evidence, then,

 6    ladies and gentlemen, I'm instructing you that you should

 7    turn only to the transcript of the exhibit that we're

 8    dealing with through the witness.

 9            MR. PHILLIPS:  And, Your Honor, that very lengthy,

10    and I'm sure boring presentation that I have to go through,

11    all of what is in the book, but, again, we would ask them

12    to turn only to the one phone call at a time.

13            THE COURT:  Okay.

14            MS. SUMMER WALL:  And they have tabs which will be

15    published to the jury so you can flip through the tabs.

16            MR. PHILLIPS:  I thought that Your Honor had a

17    transcript book, but I have now been told you may not.

18    Would you like one?

19            THE COURT:  I mentioned that before I don't have

20    any transcripts.

21            MR. PHILLIPS:  I apologize, Your Honor.  If I may

22    approached your courtroom deputy.

23            COURTROOM DEPUTY:  Actually, Your Honor, they gave

24    it to me this morning and I told them to take it back until

25    we needed it.

Direct - Gullicksrud

1          THE COURT:  Oh, okay.  So what do I do with the

2     nontranscript binder?

3          MR. PHILLIPS:  We make -- everything we make, we

4     make something for you, so I'm sure you can keep that one.

5          THE COURT:  All right.  All right.

6          MR. PHILLIPS:  If you would, please, publish for

7     the jury.

8          (Phone call played)

9          MR. PHILLIPS:  And, Your Honor, I do note that the

10    hour is late, but not to the time that the Court normally

11    goes; however, given the conversation we had prior to the

12    jury coming in, I believe this would be a good place to

13    break so that we can address the Court's concerns.

14         THE COURT:  Okay.  I think that's an excellent

15    idea.

16         All right.  Ladies and gentlemen of the jury,

17    we're going to recess for the evening.  Every lunch and

18    every end of the day you're going to hear me repeat this

19    and you're going to get tired of me saying this, but I've

20    got to say it.

21         Please do not discuss this case, any of the facts,

22    testimony, individuals involved, with anyone else, and

23    please do not do any independent research into the facts or

24    law or issues of this case.  We are going to start tomorrow

25    and every day after tomorrow at 8:45.  All right?  So I ask

Direct - Gullicksrud

1    that you be in the jury deliberation room by 8:35.  And

2    usually if jurors are late for my trials, which is usually

3    day No. 2 because they're still figuring out where they're

4    going to park, how they're going to take public transport,

5    and all that, so give yourself extra time tomorrow morning

6    so you figure out how long it takes you to be in that room

7    by 8:35.

8         If we don't get to you exactly at 8:45, it's

9    because I'm still dealing with legal issues with the

10   lawyers that we need to discuss outside your presence.

11        All right.  We will be in recess until 8:45

12   tomorrow morning.

13       (Proceedings concluded at 4:54 p.m.)

14

15                            **INDEX**

16   <u>Item</u>                                              <u>PAGE</u>

17                     OPENING STATEMENTS

18   By Ms. Rangel                                      155

19   By Mr. Leonard                                     158

20                    GOVERNMENT'S WITNESSES

21       **BRADLEY GULLICKSRUD**
         Direct Examination by Mr. Phillips          166
22       Voir Dire Examination by Mr. Leonard         217
         Direct Examination by Mr. Phillips          218
23

24

25

Direct - Gullicksrud

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 1 | 197 | 197 | | |
| 2 | 197 | 197 | | |
| 3 | 197 | 197 | | |
| 4 | 197 | 197 | | |
| 5 | 198 | 198 | | |
| 6 | 198 | 198 | | |
| 7 | 198 | 198 | | |
| 8 | 198 | 198 | | |
| 9 | 200 | 200 | | |
| 10 | 206 | 206 | | |
| 11 | 206 | 206 | | |
| 13 | 206 | 206 | | |
| 14 | 207 | 207 | | |
| 15 | 207 | 207 | | |
| 16 | 207 | 207 | | |
| 17 | 207 | 207 | | |
| 18 | 207 | 207 | | |
| 19 | 210 | 211 | | |
| 20 | 210 | 211 | | |
| 21 | 210 | 211 | | |
| 22 | 210 | 211 | | |
| 23 | 210 | 211 | | |
| 24 | 210 | 211 | | |

Direct - Gullicksrud

1                        GOVERNMENT'S EXHIBITS

2    EXHIBITS:         Offered    Received   Refused    Stipulated

3    25                210        211

4    26                210        211

5    27                210        211

6    28                210        211

7    29                210        211

8    30                210        211

9    31                213        215

10   32                213        215

11   33                213        215

12   34                213        215

13   35                213        215

14   36                213        215

15   37                216                   218

16   38                220        221

17   39                220        221

18   40                220        221

19   41                220        221

20   42                220        221

21   43                224        224

22   45                224        224

23   46                224        224

24   47                226        226

25   48                226        226

242

Direct - Gullicksrud

1              GOVERNMENT'S EXHIBITS

2    EXHIBITS:        Offered    Received   Refused    Stipulated

3    49               226        226

4    50               226        226

5    51               226        226

6    59               230        230

7    60               230        230

8    61               230        230

9    62               230        230

10   63               230        230

11   64               230        230

12   65               230        230

13   66               230        230

14   67               230        230

15   68               230        230

16   69               230        230

17   98               200        200

18   99               200        200

19   100              200        200

20   101              201        201

21   102              201        201

22   103              201        201

23   104              201        201

24   105              235        235

25   107              225        225

243

Direct - Gullicksrud

1               *       *       *       *       *

2                    REPORTER'S CERTIFICATE

3

4        I certify that the foregoing is a correct transcript

5   from the record of proceedings in the above-entitled

6   matter.

7        Dated at Denver, Colorado, this 5th day of May, 2017.

8

9

10

11

12                    MARY J. GEORGE, FCRR, CRR, RMR