1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLORADO
2

3   Criminal Action No. 14-cr-0231-WJM-1

4   UNITED STATES OF AMERICA,

5   Plaintiff,

6   vs.

7   RICKY GARRISON,

8   Defendant.

   ------------------------------------------------------------
9

10               REPORTER'S TRANSCRIPT
             (Jury Trial - Day 3)
11                VOLUME IV

   ------------------------------------------------------------
12      Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 8:54 a.m., on the 23d day of

15   February, 2017, in Courtroom A801, United States

16   Courthouse, Denver, Colorado.

17

18                   APPEARANCES

19      ZACHARY H. PHILLIPS and CELESTE B. RANGEL, Assistant
   U.S. Attorney, 1801 California Street, Suite 1600, Denver,
20   Colorado 80202, appearing for the plaintiff.

21      MILLER M. LEONARD, Miller Leonard, P.C. 14143 Denver
   West Parkway, Suite 100, Golden, Colorado 80401 and
22      SEAN M. McDERMOTT, McDermott Stuart & Ward, LLP, One
   Sherman Place, 140 East 19th Avenue, Suite 300, Denver,
23   Colorado 80203, appearing for the defendant.

24            MARY J. GEORGE, FCRR, CRR, RMR
         901 19th Street, Denver, Colorado 80294
25       Proceedings Reported by Mechanical Stenography
         Transcription Produced via Computer

P R O C E E D I N G S

1   P R O C E E D I N G S

2        (Call to order of the court outside the presence of

3   the jury at 8:54 a.m.)

4        THE COURT:  All right.  I wanted to talk with the

5   lawyers about -- back again to -- I seem to be obsessed

6   about it because I don't know if we can't seem to get to an

7   end point on this, this limiting instruction.  We had -- we

8   finally got you guys to agree on it, thought we had an

9   agreement as to -- that one of you would tell me when you

10   wanted it read; still hasn't happened.

11        I'm sort of, as I read it, wondering shouldn't we

12   have read it already.  And it's also -- really, what you

13   filed is incomplete because it doesn't list out all the

14   different witnesses or individuals as to which it's going

15   to apply.  So when are we going to wrap up all the loose

16   ends and get this decided -- decide how we're going to

17   handle this?

18        MR. PHILLIPS:  Your Honor, I believe that limiting

19   instruction is only going to be two phone calls that will

20   be coming in through Josh Mohlman.  And I've already made

21   sure to note in my direct and so forth to ask the Court to

22   read that when we get to those phone calls at the

23   appropriate time.

24        All the other phone calls have been admitted under

25   the *James*, under 801(d)(2)(E), and as such, both sides, the

1   parties' conversation are something that the jury can

2   consider.  But these two phone calls that are upcoming I've

3   made sure to note that we would be asking for those.

4           THE COURT:  All right.  Mr. Leonard, are you in

5   agreement?

6           MR. LEONARD:  Subject to the objection --

7           THE COURT:  Subject to your standing objection,

8   right.

9           MR. LEONARD:  My understanding is that that is

10  correct, that there were two phone calls, 82 and 83 on the

11  *James*, I believe --

12          MR. PHILLIPS:  I didn't get those --

13          MR. LEONARD:  They're late phone calls that occur

14  late May.  That's my understanding, that those are the only

15  two phone calls that would have been pursuant to the

16  Court's rulings subject to the limiting instruction.

17          THE COURT:  Okay.  All right.  So we're going to

18  need to do this -- is it going to be two separate limiting

19  instructions right at two different times?

20          MR. PHILLIPS:  I do believe it has to be read

21  before each of the two phone calls, so they're essentially

22  back to back or close to back to back.

23          THE COURT:  Okay.

24          MR. PHILLIPS:  I would have to check my notes,

25  but . . .

1          THE COURT:  All right.  So who's going to be the

2     wordsmith to finalize this and get the names of the

3     speakers that should be referenced in the limiting

4     instruction?

5          MR. PHILLIPS:  We have that on computer, and we'll

6     make sure that we do that during one of the breaks.

7          THE COURT:  Okay.  Just either hand it to

8     Ms. Hansen, e-mail it to my chambers, and then that way I

9     will just have it, a document, that I can read to the

10    jurors at the appropriate time.

11         MR. PHILLIPS:  Absolutely.

12         THE COURT:  Okay.  Anything further on that,

13    Mr. Leonard --

14         MR. LEONARD:  Nothing further on that.

15         THE COURT:  Anything further we need to discuss

16    before we bring in the jury?

17         MR. PHILLIPS:  Just for the Court's knowledge --

18    and we have spoken with the marshals about that -- after we

19    finish with this witness, the next witness also is an

20    in-custody, so when we take that break, we will be able to

21    take a break and do both the shuffles at the same time.

22         THE COURT:  Okay.  And are you going to have the

23    next witness' lawyer in the wing -- he's here already?

24         MR. PHILLIPS:  He's already here.

25         THE COURT:  So we don't have that delay from

1    yesterday.  All right.

2              MS. RANGEL:  And I apologize, Your Honor.  I have

3    a matter that I need to bring up with regard to Mr. Ramirez

4    before cross-examination.

5              THE COURT:  Okay.

6              MS. RANGEL:  Yesterday I inquired of him about his

7    felony convictions, and it's my understanding that he has a

8    pending case out of New Mexico for illegal reentry into the

9    United States.

10             THE COURT:  Right.

11             MS. RANGEL:  It's my understanding that he has not

12   pled guilty to that.  There was some confusion when we --

13             THE COURT:  That's what I heard him say, that he's

14   not pled to that.

15             MS. RANGEL:  I think he's pretty clear on that.

16             THE COURT:  Still in custody, although hasn't

17   pled.

18             MS. RANGEL:  Correct.  And it's my understanding

19   that cross-examination is going to inquire of him about his

20   return to the United States, which I think implicates his

21   Fifth Amendment rights, and I would ask that he be advised

22   of his Fifth Amendment rights and whether he decides to

23   invoke those when he is asked those questions.

24             THE COURT:  Do you agree with that, Mr. Leonard?

25             MR. LEONARD:  I do.

1          THE COURT:  Huh?

2          MR. LEONARD:  I agree with that.

3          THE COURT:  Okay.  So before you -- before you get

4     into that, if -- are you going to go into that on

5     cross-examination?

6          MR. LEONARD:  I am.

7          THE COURT:  Okay.  Let me think how we can do

8     that.  Why don't you just say something like, Judge, this

9     would probably be an appropriate time for the Court to

10    instruct the witness on his Fifth Amendment rights or

11    something like that.  I don't know that we need to take a

12    side bar to -- for you to tell me that you're going to do

13    that.  I think with this discussion I know that that's

14    coming and I'll do it.

15         MS. RANGEL:  And --

16         THE COURT:  Is that agreeable to you?

17         MS. RANGEL:  That is agreeable to me.  Thank you.

18    Ms. Wayne is here.  I don't know if she needs to speak to

19    Mr. Ramirez specifically about this, because that's not

20    something that we talked about -- I did talk to Ms. Wayne

21    about that yesterday, but I don't know if Mr. Ramirez is

22    fully understanding what we're saying right now as he sits

23    there on the witness stand.

24         THE COURT:  Okay.

25         MS. RANGEL:  So I don't know if he needs to talk

1    to Ms. Wayne for a few minutes about that.

2              THE COURT:  All right.  Well, let me ask you, Mr.

3    Ramirez, do you understand what we're talking about?

4              THE WITNESS:  Yes.

5              THE COURT:  Huh?

6              THE WITNESS:  Yes.

7              THE COURT:  You do?  Okay.  So the Fifth Amendment

8    allows you to tell us, to tell me, tell the Court, that you

9    are not going to answer questions that might incriminate

10   you.  In other words, that may implicate your guilt in

11   another pending prosecution; specifically the unlawful

12   reentry one that you have going on in New Mexico.

13             And if that's -- if that's your choice, then Mr.

14   Leonard will not be allowed to ask any questions.

15             Ms. Wayne, do you wish to speak to your client at

16   this time?

17             MS. WAYNE:  If I may, Judge, just for the

18   record.

19             THE COURT:  Why don't you come towards the mike.

20             MS. WAYNE:  Just for the record, I am not his

21   attorney on the pending matter in New Mexico.  I have

22   spoken to his federal defender.  So I have not gone over

23   each and every question that he should be responding to,

24   obviously.  You can appoint me for that purpose as to this

25   case, I guess, but I just want to let you know that that

1    has not been the focus of my advice with him, because it's

2    coming up this morning, frankly.

3              THE COURT:   Okay.  Well, I don't think I need to

4    do that, appoint you for this purpose, because I have an

5    understanding from Mr. Leonard, I think I do, that if I

6    read -- if I advise the witness of his rights and he elects

7    to stand on those Fifth Amendment rights, that he's not

8    going to press the matter such that you would then be

9    advising your client not to answer.  See what I'm saying?

10   If I were to appoint you.

11             MS. WAYNE:   Just --

12             THE COURT:   In other words, I don't think we're

13   going to get to the point where I advise -- I advise and

14   Mr. Leonard asks a question, your client says, I would

15   invoke my Fifth Amendment right not to answer that

16   question.  You're not going to push it beyond that, right?

17             MR. LEONARD:   To --

18             THE COURT:   Because if you are, then I do have to

19   appoint Ms. Wayne, and she will have to be standing over

20   here and making objections.

21             MS. WAYNE:   And I'll be honest, because I think

22   this is probably what I'm anticipating from you, is that

23   there was somewhat of an opening of the door yesterday in

24   terms of --

25             MR. LEONARD:   Right.

1          MS. WAYNE:  -- his own -- and I'm sitting back

2     there wondering what was going on, but, you know, he was

3     very open about the fact that he left and came back and now

4     he's incarcerated.  And I have a little bit of information

5     as to the extent of why he came back and it probably would

6     be a surprise to the defense and to the Government, but --

7     so it's a little bit more complicated, Judge.

8          And I'm happy to approach and give you a proffer

9     ex -- outside the presence of both the parties, frankly, so

10    that you know what I'm talking about here.

11         THE COURT:  Proffer regarding --

12         MS. WAYNE:  What he would say about coming back

13    because he did say he came back.  I mean, obviously he's

14    back.  He's in New Mexico, and he's incarcerated.

15         THE COURT:  I don't know that I could take a

16    proffer from you and not allow the lawyer for the

17    defendant, at least, to be present for this.  I mean,

18    that's --

19         MS. WAYNE:  Yeah.

20         THE COURT:  So, okay.  Well, then, if you think

21    you are going to pursue it, then what I'm going to do is

22    appoint Ms. Wayne for purposes of the examination of this

23    trial as attorney for Mr. Ramirez and probably, then, since

24    we're going to go into direct examination, let's do this.

25    You'll be at the lectern, Ms. Wayne.  I would like you to

1    sit where Mr. Leonard is sitting now, and when you believe

2    it appropriate to make an objection, then you're going to

3    have to pipe up and do it.

4              MR. LEONARD:   Your Honor, just so the Court's

5    aware, the defense position is just as Ms. Wayne stated,

6    the door was opened, he spoke, he waived his Fifth

7    Amendment right.   I have a right to ask him, I have a right

8    to pursue why he's here, what he's going to ask for, down

9    in the federal district -- I don't know which federal

10   district it is, but if it's New Mexico, what sort of

11   benefit he's going to ask those prosecutors for that

12   testimony.   I think that's all --

13             THE COURT:   You're saying that you believe this

14   witness made a knowing and voluntary waiver of his Fifth

15   Amendment rights yesterday?

16             MR. LEONARD:   He answered unequivocally --

17             THE COURT:   I'm asking you --

18             MR. LEONARD:   I do.

19             THE COURT:   Is it your position he made a knowing

20   and voluntary waiver of his Fifth Amendment rights?

21             MR. LEONARD:   It is.   I don't see --

22             THE COURT:   I don't -- I mean, there may be an

23   argument that the topic had been gone into, if you want to

24   use the metaphor of opening the door, to some extent, but I

25   don't believe there was a knowing and voluntary waiver of a

1    constitutional right.  You can't just sort of -- in my

2    mind, and I think the cases support me, you can't just sort

3    of accidentally waive a constitutional right.  You have to

4    be -- that's the whole purpose of why I was going to advise

5    him of his rights again.  But -- hold on.

6              MR. LEONARD:  Sure.

7              THE COURT:  I think Ms. Rangel wants to pipe in on

8    this.

9              MS. RANGEL:  Your Honor, I think one important

10   aspect of this is the element of the charge of illegal

11   reentry, which this Court is well aware of, is that he

12   illegally returned to the country without taking the steps

13   to obtain legal United States authorization for that.  So

14   just the fact that he returned and is physically present is

15   not in and of itself necessarily incriminating because,

16   frankly, no one has inquired, and that's where I think the

17   incrimination part comes in, as to whether or not he did so

18   illegally.  And I think that's exactly what

19   cross-examination is going to get into.

20             So I don't think that he waived anything by virtue

21   of saying, I was removed and returned to the United States.

22   Because no one knows --

23             THE COURT:  That's right.  I mean, the element of

24   the crime includes the failure to obtain lawful approval

25   to -- I mean, it could be through -- hypothetically,

1    theoretically, not likely that it happened, but he could

2    have, in the interim, married an American citizen and come

3    back into the country.

4            So, anyway, I'm appointing you, Ms. Wayne, for

5    purposes of -- to represent Mr. Ramirez for purposes of the

6    remainder of his testimony at this trial.  And I will allow

7    you to interject objections as you see fit.

8            But I still am asking you, before you go into it,

9    Mr. Leonard, to let me know.  I'm going to give the witness

10   the Fifth Amendment advisement and we'll go from there.

11           MS. WAYNE:  And, Judge, just for purposes of

12   logistics, because -- I apologize, I would have put a suit

13   on, I actually have the flu -- so I don't want to be --

14           THE COURT:  I think you look perfect.  Don't worry

15   about how you look.

16           MS. WAYNE:  But I'm also -- I don't feel very good

17   so I'm wondering -- what I've done in the past, Judge, was,

18   when this has occurred, I've actually sat next to the

19   marshals because I'm not -- I don't want to identify with

20   this table or, frankly -- or either, but --

21           THE COURT:  I was just thinking of the mike so

22   that the jurors can hear you.  If you're sitting back in

23   the corner -- you can do that if that's your preference,

24   but you're going to have to talk loud.  You have to

25   project, all right?

 1              MS. WAYNE:  I promise.

 2              THE COURT:  I want the jurors to hear you.  The

 3     court reporter has to hear what you're saying.  You can't

 4     just be a wallflower back there.

 5              MS. WAYNE:  I promise, Judge.

 6              COURTROOM DEPUTY:  Do you want me to move the

 7     microphone over there?

 8              THE COURT:  Oh, that's right, we have a microphone

 9     over there.  The wonders of technology.  Why don't you hand

10     the mike to Ms. Wayne.

11              MR. LEONARD:  I have one more issue on this

12     matter, Your Honor.

13              THE COURT:  Sure.

14              MR. LEONARD:  The -- yesterday I had requested

15     access to Mr. Ramirez's judgment.  And the basis for

16     requesting access to that judgment was so that I could look

17     over whatever conditions of reporting to probation that

18     he -- were given him, if any -- I don't know because we

19     don't have any idea -- if he would return to the United

20     States.  The Government responded by saying that he'd been

21     convicted, so it wasn't necessary.  And we kind of left it

22     at that.

23              THE COURT:  Okay.

24              MR. LEONARD:  I would renew my request to have

25     access to Mr. Ramirez's judgment so that I can look and see

1    if -- what conditions, if any, were given to him about

2    reporting to probation upon returning to the United States

3    because, in the defense's position, if that was a

4    condition, and if he failed to do that, that shows an

5    inability to follow the Court's order, and it's 608(b),

6    goes to his trustworthiness, and it should be considered by

7    the jury.

8         THE COURT:  All right.  First of all, let me ask

9    Ms. Wayne:  As Mr. Ramirez's attorney, would you have an

10   objection -- did you hear the --

11        MS. WAYNE:  Uhm-hum, I did.

12        THE COURT:  What's your position on that?  Why

13   don't you turn the mike toward you.

14        MS. WAYNE:  Judge, I think that I'm in a -- I'm --

15   I would advise Mr. Ramirez to invoke his Fifth as to any

16   aspect of the question.  I think that the inferences or

17   anything about it goes into the pending matter.

18        THE COURT:  But specifically what we're talking

19   about is the defense in this case has requested, yesterday,

20   a copy of your client's judgment in this case.  Correct,

21   Mr. Leonard?

22        MR. LEONARD:  Yes, Your Honor.  That's correct.

23        THE COURT:  In order to see if there's anything in

24   that judgment that either precluded his reentry into the

25   United States, required the -- his communication with the

1    probation officer upon his entry to the United States, and

2    that's specifically, so -- so the question would be to you

3    is:  Do you have an objection to a copy of your client's

4    judgment, which I'm assuming we're doing all this because

5    it was sealed and that it's not --

6            MR. LEONARD:  That's correct, Your Honor.  I tried

7    to access it.  I can get the order stating that he was

8    sentenced to time served, but then everything else is

9    restricted.  I thought I got it, but I mistakenly got Louis

10   Ramirez, because I just didn't pay attention to the last --

11   first names.  I can't get it.

12           THE COURT:  Okay.  So what's your position about

13   the defendant seeing a copy of the judgment?

14           MS. WAYNE:  I would object, Judge.  I think it's

15   sealed for a reason, and we would continue to object.  We

16   think the sealing's appropriate.

17           THE COURT:  Well, I don't know if it's sealed for

18   this reason.  What's the Government's position?

19           MS. RANGEL:  Your Honor --

20           THE COURT:  Can we -- go ahead.  Give me your

21   position.

22           MS. RANGEL:  I think my issue with it is separate

23   from it being sealed or not, but, rather, it's improper

24   cross-examination under 608(b).  The fact that the Court

25   ordered him, if he were to return to the United States, to

1    report to the probation officer and he didn't, is not an

2    act of deceitfulness.  If he says on cross-examination, I

3    always follow the Court's orders, I always do what the

4    Court tells me, then I think that's proper fodder to say,

5    Well, on this specific instance the Court ordered you to do

6    this and you didn't; or if he were to say, I did contact

7    them, and that turns out to be not true, then that becomes

8    deceitful, but just not following a court order I don't

9    think is a specific instance of untruthfulness.

10            THE COURT:  Well --

11            MR. LEONARD:  Well, I --

12            THE COURT:  I think folks would differ on that,

13    but I think what it comes down to -- the reason I'm going

14    to -- I'm going to deny your request, Mr. Leonard -- is

15    that -- correct me if I'm wrong, and I can pull up my Rules

16    of Evidence, but 608 does not permit you, as the

17    cross-examiner, to prove up the matter by extrinsic

18    evidence.

19            In other words, you get to say -- you get to ask

20    him, Did you do X?  And if he says, No, I didn't, you're

21    stuck with that answer.  You can't prove it up -- you can't

22    prove the falsity of that statement by extrinsic evidence.

23            And since you're not agreeing with me right away,

24    let's take a look at it.

25            MR. LEONARD:  I have to look at the rule.

1    MS. RANGEL:  Actually, Your Honor, that's under

2    609.  Just to point the Court --

3    MR. LEONARD:  I believe, Your Honor, if I say, Do

4    you always follow the Court's rules, and he says yes, I'm

5    stuck with the answer.  And then if there's a judgment that

6    indicates that you ordered him to comply -- to -- to check

7    in with probation, when -- if he comes back, I ask you to

8    take judicial notice of document X, we publish it, and we

9    talk about what he was told to do.

10    THE COURT:  Okay.  First of all, Ms. Rangel, I

11    think you're wrong and I'm right.

12    MS. RANGEL:  Yes.  Sorry.

13    THE COURT:  608 --

14    MS. RANGEL:  It is 608.

15    THE COURT:  608(b) says, Except for criminal

16    conviction under 609, extrinsic evidence is not admissible

17    to prove specific instances of a witness' conduct in order

18    to attack or support the witness.

19    Okay.  So what you're -- I see your point.  You

20    don't even know enough to know what to ask.

21    MR. LEONARD:  I don't.

22    THE COURT:  Okay.  So can we get a stipulation on

23    this point -- without having to use the document, get a

24    stipulation that the judgment required this or did not

25    require this?  And then Mr. Leonard can ask the question

 1    and then he is stuck with it -- with the witness' answer?

 2              MS. RANGEL:   I still stand by my previous

 3    position.   I don't think that someone's failure to follow a

 4    court order is necessarily an act of untruthfulness.   I

 5    don't see how -- that, to me, is improper character

 6    evidence to say -- it would be no different -- let me put

 7    it this way:   It would be no different than if he said, You

 8    were ticketed for driving without a driver's license; isn't

 9    that true?   That's not an act of deceitfulness; this is

10    breaking the law, that is not following the law, but that

11    has nothing to do with telling a lie or being untruthful.

12              No different than if this Court -- this Court

13    tells him, Make sure that you pay attention and only cross

14    the street when that white walking man is on the sign, and

15    he doesn't do that.   That's not an act of dishonesty.   And

16    so what he's getting into is a specific bad act, not a

17    specific bad act of untruthfulness.

18              THE COURT:   What about that, 608 is really solely

19    limited to truthfulness.

20              MR. LEONARD:   Flip the script on the prosecutor,

21    it's reverse 404(b), and I need to know if I need to give

22    them notice of it, but I think if he's going to come up

23    there and just state, I didn't -- I don't know what he's

24    going to say, but if he says, Look, I always follow the

25    Court's rules --

1          THE COURT:  Okay, but Ms. Rangel's point -- I

2    think it's a good one -- is this whole inquiry will not be

3    an inquiry leading to evidence that would let the jury

4    conclude that this witness is truthful or not truthful --

5    being truthful or not being truthful.  I just -- I just

6    don't think it is.  And if it's not 608, then it's 404, and

7    it's not admissible unless you're trying to get it in for a

8    reason other than to show a prior bad act.

9          MR. LEONARD:  I think in -- my co-counsel's

10   correct, it also comes in under *Davis v. Alaska*.   The

11   Government's holding something over this individual's head.

12   If he fails to follow through with his promises that he

13   made in his proffer and plea agreement, they can revoke,

14   recharge and, you know, basically slam the door on him.  So

15   I think along with *Davis v. Alaska*, frankly you get down to

16   the issue of fundamental fairness under the constitution

17   and the fact that my client has a right to have a fair

18   trial.  And it is simply unfair if somebody would knowingly

19   lie on the stand and -- and there's nothing that the

20   defense could do about it.

21          THE COURT:  So -- but lie about what?

22          MR. LEONARD:  Well, I mean, that's the problem.

23   I'm -- it's a hypothetical that if he says he followed your

24   orders, and you gave him an order to do something

25   different.  I don't even know if you gave him the order,

476

 1     though.   I haven't seen it.

 2             THE COURT:   Let me look at -- one second.   Let me

 3     look at this judgment.

 4             So you specifically want to know whether the

 5     judgment required him not to reenter the United States

 6     and/or if he did, whether he was required to report to the

 7     United States probation office upon his reentry?   It --

 8             MR. LEONARD:   Yes.

 9             THE COURT:   Is that -- is that what you want to

10     know, if his judgment says --

11             MR. LEONARD:   Correct.   And just -- I -- most

12     judgments that I've seen, that's a condition, but I don't

13     know if it is on this one.

14             THE COURT:   One second.

15             All right.   My judicial assistant and Ms. Hansen

16     and I have looked at it, and 1136 the judgment of Simeon

17     Ramirez is not restricted, it's not sealed, it should be

18     available to you.   And the items that you are inquiring

19     about is -- are included in the judgment.   So I'm

20     sustaining your objection to not having it.   And I'm

21     allowing Ms. Hansen to give you a copy of the judgment.

22             MR. LEONARD:   Okay.   Thank you.   Could I further

23     make my record as to the ability to ask the questions that

24     we were speaking about?

25             THE COURT:   Make a record about the questions?

1          MR. LEONARD:  Well, I guess we'll get it first.

2     Can we have -- we need some time to look at it, if that's

3     all right.  I know we're wasting time with the jury, but --

4          THE COURT:  How long is your cross-examination

5     going to go?

6          MR. LEONARD:  I -- honestly, my cross-examination

7     right now of Mr. Ramirez is going to be all of 10 minutes,

8     if that.  It's in and out.  I don't plan on asking him very

9     many questions at all.

10         THE COURT:  All right.  Let's do this.  Let's take

11    a 10-minute recess.  You can look at the judgment.  Ms.

12    Hansen, why don't you advise the jurors, apologize to them

13    on behalf of all of us, tell them that we're dealing with

14    some complicated legal matters, and we should be back to

15    them in about 10, 15 minutes.

16         (Recess at 9:23 a.m. to 9:47 a.m.)

17         THE COURT:  I have given this matter additional

18    thought and this is what we're going to do.  You now have

19    the judgment, you now know that the two things you, Mr.

20    Leonard, were thinking that this -- that the defendant was

21    subject to, in fact he was subject to; he's not to return

22    to the United States and were he to return to the United

23    States, he was to report to the probation office within 72

24    hours.

25              Because -- if he were to have a revocation hearing

1    here and I were to find that he had violated his conditions

2    of supervised release, he would be subject to a period of

3    incarceration.  Because of that, in my view, the Fifth

4    Amendment has to apply to this defendant for purposes of

5    violations of his judgment and also for purposes of the

6    indictment that he is subject to in New Mexico.

7         So I think the best move we should proceed is you

8    go ahead and ask your questions.  Ms. Wayne will make her

9    objections based on the Fifth Amendment.  I'm going to

10   sustain those objections, and we won't go into it.

11        What I will let you do, because he's not a

12   defendant, but he is a witness, that I will allow you,

13   should you wish -- and I don't want to tell you how to put

14   on your case -- but if you want to make the judgment an

15   exhibit, I will allow it in, and you can make whatever

16   arguments you want to make.  There's not going to be any

17   testimony from the -- Mr. Ramirez on it, so you can't make

18   any reference to that, but you can make whatever reference

19   you want to make at closing, to the judgment, and whatever

20   you want to -- whatever you think you can do for your

21   client from that document, but that's -- that's as far as

22   I'm going to let you go on this with Mr. Ramirez.

23        MR. LEONARD:  All right.  Thank you, Your Honor.

24   I have one procedural question.

25        THE COURT:  Yeah.

1           MR. LEONARD:  If he invokes, do -- am I allowed to

2    continue asking questions and he will just continue

3    invoking?  I've seen it done that way.  I've also had

4    judges say, He invokes and says he's going to invoke on any

5    other questions on this subject matter, so, counsel, you're

6    done there.

7           THE COURT:  I think we can do sort of a hybrid.

8    He will -- on advice of counsel, he will invoke on the

9    first time and then you can ask something like, Are -- is

10   it your intention to invoke the Fifth Amendment on any

11   other questions I ask you about, and sort of describe the

12   matter generally.  If he says yes, I don't want you running

13   through 10 questions soliciting the Fifth Amendment.

14          MR. LEONARD:  Thank you.

15          THE COURT:  All right.  Okay.  Anything else

16   before we bring in the -- our very patient jury?

17          MS. RANGEL:  Nothing from the Government.

18          THE COURT:  Okay.  For the defendant?

19          MR. LEONARD:  No.  Thank you, Your Honor.

20          THE COURT:  All right.  Ms. Wayne, are you --

21          MS. WAYNE:  Nothing further, Your Honor.  Thank

22   you.

23          THE COURT:  Okay.  Let's bring in the jury.

24          (Proceedings were held in the presence of the jury at

25   9:51 a.m.)

1          THE COURT:  Welcome back, ladies and gentlemen of

2     the jury, to day three of our jury trial.  You folks are

3     very, very patient.  I really appreciate it.  I apologize

4     for the delay, but you will remember the morning of the

5     first day of the trial, I told you that at times the trial

6     would, from your perspective, appear to be moving slowly,

7     but we are dealing with very important things here and,

8     remember, I asked you to always consider the importance of

9     what we're doing here, and we're not -- this is not, you

10    know, a car-accident case, this is someone's liberty's at

11    stake, and so we want to make sure we do it right.  And

12    there are just matters that we needed to discuss, the

13    lawyers and I, outside your presence.

14          Just so that you're not totally confused about

15    everything that's going on here, you may see a young lady

16    behind the witness here.  That's Ms. Wayne; that's the

17    witness' attorney.  And I have appointed her to represent

18    Mr. Ramirez for purposes of what remains of his

19    examination -- his cross-examination and redirect

20    examination for this trial.  He's entitled to do that and I

21    have appointed her to do that, and so you may hear her make

22    some objections.

23          The same instructions I gave you about objections

24    for the lawyers, the Government, and the defendant apply to

25    her.  You're not to infer or draw any conclusions just

Cross - Ramirez

1    based on her objections and not -- not base any views of

2    the client -- of the witness, rather, and the witness's

3    believability, credibility, anything along the lines, just

4    based solely on an objection, because that's her duty and

5    obligation as an attorney to interject objections on behalf

6    of her client when she believes it appropriate to do so.

7    All right.

8                Cross-examination by the defendant.

9           MR. LEONARD:   Thank you, Your Honor.

10                         CROSS-EXAMINATION

11   BY MR. LEONARD:

12   Q.   Good morning, Mr. Ramirez.   How are you?

13   A.   Good.

14   Q.   I want to go back to Exhibit 103.   Do you recall that?

15   That was the phone call between yourself and Mr. Garrison

16   where you talked about the catalytic converter.

17   A.   Yes.

18   Q.   Do you recall that phone call?

19   A.   Yes.

20   Q.   Tell me if I'm wrong, but it appeared to me that you

21   and Mr. Garrison were friendly with one another.

22   A.   Yes.

23           THE COURT:   So, Mr. Ramirez, you need to either

24   move your seat up or pull the microphone.   You're talking

25   very slow -- softly this morning, so please speak up and

482

Cross - Ramirez

1    into the mike.

2              THE WITNESS:  Okay.

3              THE COURT:  All right.

4    BY MR. LEONARD:

5    Q.   All right.  So just -- I'll repeat my question just so

6    the jury can hear.

7              You and Mr. Garrison were friendly with one

8    another; isn't that true?

9    A.   Yes.

10   Q.   And during that conversation, you were talking about a

11   catalytic converter, correct?

12   A.   Yes.

13   Q.   And that's because you're a mechanic by trade; isn't

14   that right?

15   A.   Yes.

16   Q.   And he was asking your advice about the catalytic

17   converter, wasn't he?

18   A.   Yes.

19   Q.   And that's from a car that he had purchased from you,

20   correct?

21   A.   Yes.

22   Q.   Because you also sold cars as part of your business,

23   right?

24   A.   Yes.

25   Q.   Now, I want to turn to your plea agreement.  You did

Cross - Ramirez

1    not plead guilty in this case to the charge of conspiracy,

2    did you?

3    A.    No.

4    Q.    You did, however, enter into a cooperation agreement;

5    isn't that correct?

6    A.    Yes.

7    Q.    And as part of that cooperation agreement, all

8    remaining charges against you were dismissed; isn't that

9    right?

10   A.    Yes.

11   Q.    And you testified yesterday that you faced up to 20

12   years on the charge that you pled guilty to; isn't that

13   right?

14   A.    Yes.

15   Q.    But in exchange for your cooperation, you got much

16   less than 20 years, didn't you?

17   A.    Yes.

18   Q.    In fact, the sentence you received was time served;

19   isn't that right?

20   A.    Yes.

21          MR. LEONARD:  Can you bring up Exhibit 114.

22          And we're going to go through the Bates-stamp 36,

23   and that's the last portion, the last paragraph.

24   BY MR. LEONARD:

25   Q.    All right.  So, Mr. Ramirez, before you is what's been

Cross - Ramirez

1    previously admitted as Government's Exhibit 114.  Are you

2    able to see that?

3    A.   Yes.

4    Q.   And this is a portion of your plea agreement,

5    correct?

6    A.   Yes.

7    Q.   And specifically, we're looking at a portion of this

8    plea agreement that's under the title encaptioned Statement

9    of Facts; isn't that right?

10   A.   Yes.

11   Q.   And what this portion indicates is that the total drug

12   quantity for which he, meaning you, is accountable is less

13   than 50 grams of a mixture, or substance, containing a

14   detectable amount of cocaine.  That's what it says,

15   correct?

16   A.   Correct.

17   Q.   That's the amount of drugs you said you were

18   responsible for, correct?

19   A.   Yes.

20   Q.   Now, I want to take you back just a little bit.  You

21   were arrested on June 6th, 2014, correct?

22   A.   Yes.

23   Q.   Do you recall that the investigators came in and they

24   asked you if you wanted to talk, didn't they?

25   A.   I didn't talk to the investigators at first.

485

Cross - Ramirez

1   Q.   That's right.  That's what I'm getting at.  You moved

2   ahead.  I appreciate that.  They asked you if you wanted to

3   talk and you said, Probably not at this time.

4           That's what you said, right?

5   A.   Yes.

6   Q.   You didn't talk to the Government until you got

7   something for talking to them, didn't you?

8   A.   No.

9   Q.   And by talking to the Government, you got a deal;

10  isn't that correct?

11  A.   Yes.

12  Q.   All right.

13          MR. LEONARD:  Your Honor, we're now getting to the

14  portion of my examination which was subject to the lengthy

15  conversations we had with the Court.

16          THE COURT:  Right.  I think given the developments

17  since that initial conversation, because the witness is now

18  represented by counsel, I'll allow her to make her

19  objections, and I won't give any instruction myself to

20  the --

21          MR. LEONARD:  All right.

22          THE COURT:  -- to the witness.

23          MR. LEONARD:  I just wanted to make sure that

24  counsel was aware of where I was --

25          THE COURT:  Okay.

Cross - Ramirez

1          MR. LEONARD:  Preliminarily, the defense would ask

2     that document 1136 be taken as judicial notice by the Court

3     and entered as an exhibit.  It will be Defense Exhibit 8 --

4     B, I'm sorry -- D.  Oh, I can't hear.  D as in dog, Your

5     Honor.

6          THE COURT:  Okay.  Exhibit D.  Is there any

7     objection?

8          MS. RANGEL:  No objection.

9          THE COURT:  All right.  There being no objection,

10    Defense Exhibit D is admitted into evidence.

11       (Defendant's Exhibit D received)

12          THE COURT:  Now, just -- we're -- so we make a

13    clear record, probably at lunchtime it would be good for

14    you to get with Ms. Hansen, get a label on it, and get it

15    into the exhibit binder and all that.

16          MR. LEONARD:  Thank you, Your Honor.

17          THE COURT:  All right.  Does the Government have a

18    copy of the document?

19          MS. RANGEL:  I do.  I don't know if the witness

20    does.

21          THE COURT:  Okay.

22          MS. RANGEL:  Thank you.

23          THE COURT:  Deb, can we print out another copy --

24          COURTROOM DEPUTY:  I have an extra.

25    BY MR. LEONARD:

Cross - Ramirez

1  Q.   All right.  Mr. Ramirez, as a result of the conviction

2  in this case, you were deported or removed from the United

3  States; isn't that correct?

4          MS. WAYNE:   Your Honor, at this time we would

5  object, and on the advice of counsel, Mr. Ramirez would

6  take the Fifth Amendment -- invoke his Fifth Amendment.

7          THE COURT:   All right.

8  BY MR. LEONARD:

9  Q.   Mr. Ramirez, first you were removed from the United

10 States physically against your will; isn't that correct?

11         MS. WAYNE:   Again, we would object and invoke the

12 Fifth Amendment.

13 BY MR. LEONARD:

14 Q.   You reentered the United States without having first

15 obtained consent or -- of the Attorney General; isn't that

16 correct?

17         MS. WAYNE:   We would object and invoke the Fifth

18 Amendment.

19 BY MR. LEONARD:

20 Q.   You also entered the United States without having

21 obtained the consent or permission of the Secretary of the

22 Department of Homeland Security.

23         MS. WAYNE:   Objection.  Invoke the Fifth

24 Amendment.

25 BY MR. LEONARD:

Cross - Ramirez

1    Q.   Mr. Ramirez, you are not a natural-born citizen, are

2    you?

3            MS. WAYNE:  Objection.  Fifth Amendment.

4    BY MR. LEONARD:

5    Q.   You are not a naturalized U.S. citizen, are you?

6            MS. WAYNE:  Objection.  Fifth Amendment.

7    BY MR. LEONARD:

8    Q.   Mr. Ramirez, you're aware that the Court gave you an

9    order that if you are deported, you shall not thereafter

10   reenter the United States illegally?

11           MS. WAYNE:  Objection.  Fifth Amendment.

12   BY MR. LEONARD:

13   Q.   And you're aware that if you reenter -- the Court

14   ordered you that if you reenter the United States legally,

15   the Court ordered you to report to the nearest United

16   States probation office within 72 hours of your return?

17           MS. WAYNE:  Objection.  Fifth Amendment.

18           MR. LEONARD:  Thank you, Your Honor.  One second.

19   I'll consult with counsel.

20           THE COURT:  Sure.  You may.

21           MR. LEONARD:  The defense has no further questions

22   for this witness.  Thank you.

23           THE COURT:  Thank you, Mr. Leonard.

24           Redirect.

25           MS. RANGEL:  Thank you, Your Honor.

Redirect - Ramirez

1              REDIRECT EXAMINATION

2    BY MS. RANGEL:

3    Q.   Mr. Ramirez, I just have a few clarifying questions

4    for you.

5              MS. RANGEL:   And if we could display Exhibit 114

6    on the screen, please.

7    BY MS. RANGEL:

8    Q.   Do you see that on the screen in front of you, Mr.

9    Ramirez?

10   A.   Yes.

11             MS. RANGEL:   And if we could please just expand

12   that paragraph at the bottom underneath Agreement.   Thank

13   you.

14   BY MS. RANGEL:

15   Q.   Now, Mr. Ramirez, this is the charge that you pled

16   guilty to in this case, right?

17   A.   Yes.

18   Q.   And that's the part of the plea agreement that you

19   reached with the Government?

20   A.   Yes.

21   Q.   This charge relates to the actions that you took on

22   November 22d, 2013; isn't that accurate?

23   A.   Yes.

24   Q.   And if you could just remind us from yesterday, did we

25   listen to a call between you and Mr. Garrison on that date?

Redirect - Ramirez

1    A.    Yes.

2    Q.    And if you could just remind us, because I think you

3    listened -- we listened to a few calls with you -- was that

4    the call where you were at his home and he was directing

5    you to place the drugs in his car and ultimately placed it

6    in the garage?

7    A.    Yes.

8    Q.    How much drugs did you deliver to Mr. Garrison's home

9    at that time?

10   A.    One --

11          MR. LEONARD:   Your Honor, that's been asked and

12   answered.   He answered that question on direct and it's

13   beyond the scope of any of my cross-examination.

14          THE COURT:   Why are you going back over this?

15          MS. RANGEL:   Because -- and I can perhaps ask a

16   better, more pointed question.   He was asked on

17   cross-examination about the amount of weight that he

18   stipulated to, that it was less than 50 grams.   That's

19   really what I'm getting at.

20          THE COURT:   All right.   I'll allow it for that.

21   Let's keep it close to that because otherwise I think it

22   was a good objection.

23          MS. RANGEL:   Okay.   And I'm sorry, I was just

24   trying to get us all back.   I'll get us there faster.

25          THE COURT:   Okay.

Redirect - Ramirez

1    BY MS. RANGEL:

2    Q.   Mr. Ramirez, at the time that you delivered the drugs

3    to Mr. Garrison -- I'm sorry -- you said it was 1 ounce?

4    A.   Yes.

5    Q.   How many grams are in 1 ounce?

6    A.   28.

7    Q.   And so in -- as part of your stipulation to the amount

8    of cocaine, fair to say 28 grams is less than 50?

9    A.   Yes.

10   Q.   And when you were asked of -- by defense counsel about

11   that plea and that stipulated weight, when you had

12   initially met with the Government and the agents, you

13   described drug deals with Mr. Garrison that were greater

14   than 50 grams; is that fair?

15           MR. LEONARD:   Objection, Your Honor.   That's been

16   asked and answered on direct; it's beyond the scope of

17   cross-examination.

18           THE COURT:   All right.   I'll sustain it.   I must

19   agree.   You went through that and Mr. Leonard didn't go

20   through -- go over this during his cross.

21           MS. RANGEL:   Okay.

22   BY MS. RANGEL:

23   Q.   So let's talk about what he crossed you about,

24   specifically.

25           MS. RANGEL:   If we could display Exhibit 115,

Redirect - Ramirez

1    please.

2    BY MS. RANGEL:

3    Q.    Do you have that in front of you?

4    A.    Yes.

5    Q.    And this is part of your proffer agreement, correct?

6    A.    Yes.

7    Q.    And at the time that you made this proffer, you had

8    not yet been sentenced; is that fair to say?

9                 MR. LEONARD:  Your Honor, I object.

10               THE WITNESS:  Yes.

11               MR. LEONARD:  This is beyond the scope of cross.

12               THE COURT:  Hold on.  What?

13               MR. LEONARD:  This is beyond the scope of my

14   cross, and it's been covered in direct examination.

15               THE COURT:  I'm going to allow it.  It's not

16   wholly outside your cross-examination.

17               MS. RANGEL:  I'm sorry, can I have one moment?

18               THE COURT:  Yeah.

19               MS. RANGEL:  And if we could, please, expand just

20   that last paragraph on Exhibit 115.  It's the first page of

21   115.

22   BY MS. RANGEL:

23   Q.    And, Mr. Ramirez, when you read over that paragraph,

24   do you remember reading that paragraph when you were

25   initially provided this proffer letter when you sat down

Redirect - Ramirez

1    with the Government?

2    A.    Yes.

3    Q.    And so at the time, on November 9th, 2014, when you

4    disclosed amounts greater than 50 grams, you had not yet

5    been sentenced by this Court; is that fair to say?

6              MR. LEONARD:   Objection, Your Honor; that assumes

7    facts not in evidence.

8              THE COURT:   Overruled.

9              THE WITNESS:   Yes.

10   BY MS. RANGEL:

11   Q.    And so this paragraph explicitly tells you that part

12   of the agreement between you and the Government is that the

13   Government agrees that it will not use information provided

14   by you, as part of your sitting down and being interviewed,

15   against you; is that fair?

16   A.    Yes.

17   Q.    That's what that paragraph says?

18   A.    Yes.

19   Q.    So at the time that you reached an agreement with the

20   Government, you agreed to cooperate, right?

21   A.    Yes.

22   Q.    And defense counsel talked to you about that.   Is it

23   fair to say that if you had decided you wouldn't cooperate,

24   you don't know what plea, if any, would have been extended

25   to you; is that fair to say?

494
Redirect - Ramirez

1    A.    Yes.

2    Q.    And when you were sentenced by this Court, you were

3    sentenced on October 13th, 2016; do you remember that

4    date?

5    A.    Yes.

6    Q.    Do you remember the date that you were initially

7    arrested in this case?

8    A.    It was on June the 6th of 2014.

9    Q.    So when you received credit for time served, how much

10   credit did you receive by this Court?

11   A.    Approximately it was 28 months.

12   Q.    And prior to your arrest on June 6th, 2014, had you

13   ever spent that long of a period of time in custody?

14   A.    No.

15             MS. RANGEL:  I have no further questions.

16             THE COURT:  All right.  May this witness be

17   excused?

18             MS. RANGEL:  Please, Your Honor.

19             THE COURT:  For the defendant?

20             MR. LEONARD:  Yes, Your Honor.

21             THE COURT:  All right.  Ladies and gentlemen of

22   the jury, just like yesterday, a very quick five-minute

23   hiatus and we will be back with you as soon as we can.

24        (Jury left the proceeding at 10:10 a.m.)

25             THE COURT:  Thank you, Ms. Wayne, so much, for

1    your assistance this morning.

2         MS. WAYNE:  You're welcome.

3       (Pause)

4         THE COURT:  All right, folks, we might as well use

5    this time productively.  Let me raise something with the

6    Government that I was going to wait for our lunch break.

7    We might as well do it now since we're waiting for our next

8    witness.

9         Back in chambers, we were thinking about and

10   preparing our Rule 29 ruling.  And one of the difficulties

11   we're having, Mr. Phillips and Ms. Rangel, is it's sort of

12   a mechanical one, but it's still important.  How do we

13   connect -- how, in your mind, are you connecting counts on

14   the telephonic charges to different telephone calls on a

15   particular day?

16        Let me give you an example, Counts 22 through 26

17   are five separate telephone calls on January 5th, 2014.

18   But the indictment in the counts, themselves, don't

19   reference a particular phone call by a particular time.  So

20   how -- you know, how do we make a ruling on whether the

21   Government has theoretically, hypothetically, met its

22   burden on Count 24?  We've got five different phone calls

23   on the same day.

24        MR. PHILLIPS:  Your Honor, I think the answer to

25   that is kind of two-fold.  One is I think there's ample

1    evidence that on each day that there were phone calls.  As

2    the Court mentioned, there are five charged phone counts on

3    that particular day, and the jury heard five calls, or if

4    they heard nine calls, they could find that each of those

5    nine phone calls, We believe unanimously that each one of

6    those -- or one of those five met the requirement, was part

7    of the drug transaction.

8         Two, during closing, one thing that we're going to

9    be doing is laying out how those phone calls interact with

10   the grand jury indictment that was found, the date and time

11   of the call, which is how we presented to the grand jury.

12        Just for the Court's knowledge, how it was

13   presented the first time, they were specifically asked --

14   the officer testifying was, okay, charged Count No. 7, call

15   No. 22, and then the second grand jury it was reconfirmed.

16   They were given the same superseding indictment, they were

17   given the first grand jury's transcript and then the

18   testifying agent matched up the previous charge, the

19   previous phone call and the date and time, so it was a

20   specific phone call that proved it.

21        THE COURT:  Right.  We're assuming that each

22   specific call has its own referenced count, but I think

23   what we're lacking and what would really be helpful, very,

24   very helpful, is if someone in your office could give us

25   just a document listing that says Count 24 is referencing

1    the phone call made at 2:32 p.m. on the 5th of June -- or

2    January, something like that.  So that we know what --

3    because right now, there's no -- there's no connecting of

4    the dots for purposes of a Rule 29 ruling, for example, for

5    me to -- I would have to -- let's say I find that the

6    Government has met its burden of establishing -- of putting

7    on enough evidence from which a reasonable juror could

8    conclude beyond a reasonable doubt that Count 24 has

9    been -- has been proven.  But I don't know which phone call

10   Count 24 is.

11           So that -- I mean, something as simple as just

12   maybe two columns that says Count 42 refers to this, Count

13   11 refers to that, that would be very helpful.

14           MR. PHILLIPS:  And, Your Honor, we can prepare

15   that for the Court.  Also for the Court's knowledge --

16   we'll certainly prepare that.  One of the things that's on

17   our exhibit list in the comments information is although it

18   doesn't -- the -- like if it looks at -- if the Court looks

19   at Exhibit No. 1 and Exhibit No. 2, in the comment

20   sections, it says:  Telephone calls and then Counts 2

21   through 5.  But we can also match up for the Court the

22   specific count by count as opposed to 2 through 5.

23           Does that make sense?

24           THE COURT:  Which comment section?

25           MR. PHILLIPS:  On our proposed -- or not proposed,

1    but on our exhibit list --

2            THE COURT:  Oh, on your exhibit list.

3            MR. PHILLIPS:  It's document No. 1238.

4            THE COURT:  1238 is your exhibit list.

5            MR. PHILLIPS:  If you look, like Exhibit No. 1, it

6    says call No. 129 on target telephone No. 2.

7            THE COURT:  Right.

8            MR. PHILLIPS:  The description, if you go all the

9    way over to the far right column, 11-16-2013, telephone

10   call, and then Counts 2 through 5.  And although those are

11   grouped --

12           THE COURT:  That's just telling us that Mr.

13   Williams, for example, is testifying about count -- calls

14   that comprised -- or are the foundation for Exhibits 2

15   through 5.

16           MR. PHILLIPS:  Right.  And what those --

17           THE COURT:  But it doesn't break it down to the

18   next level of which one is count -- which phone call is

19   Count 2, which phone call is Count 3, et cetera.

20           MR. PHILLIPS:  And we will break that down for the

21   Court.

22           THE COURT:  If you could do that, you know,

23   ideally if someone could prepare that over the lunch hour

24   and give us a document to that at the end of the lunch

25   hour, that would be great.

Direct - Aguilar

1          MR. PHILLIPS:  I can tell you that it's almost

2    completely done because it was part of our closing, so we

3    will be able to produce that document for the Court.

4          THE COURT:  Okay.  Excellent.  All right.

5          Let's bring in the jury.

6       (Jury was present at 10:20 a.m.)

7          THE COURT:  All right.  The Government may call

8    its next witness.

9          MR. PHILLIPS:  Thank you, Your Honor.  The

10   Government would call Francisco Aguilar.

11         COURTROOM DEPUTY:  Please stand and raise your

12   right hand, sir.

13      FRANCISCO AGUILAR, GOVERNMENT'S WITNESS, SWORN

14         COURTROOM DEPUTY:  Please state your full name for

15   the record and spell your first and last name.

16         THE WITNESS:  Francisco Aguilar.

17   F-r-a-n-c-i-s-c-o, A-g-u-i-l-a-r.

18         COURTROOM DEPUTY:  And if you'll scoot your chair

19   up a little bit and -- you can pull up that mike.  Thank

20   you.

21         THE COURT:  Mr. Phillips.

22         MR. PHILLIPS:  Thank you, Your Honor.

23                      DIRECT EXAMINATION

24   BY MR. PHILLIPS:

25   Q.   Mr. Aguilar, I see that you appear to be dressed in

500

Direct - Aguilar

1    detention center clothing; is that correct?

2    A.    Yes.

3    Q.    Safe to say that you're currently incarcerated or in

4    custody?

5    A.    Yes.

6    Q.    And what are you in custody for?

7    A.    For possession with intention to distribute.

8         MR. LEONARD:  Your Honor, just if I may, I would

9    like to reaffirm my 404(b) objection for the reasons stated

10   previously on the record and ask that that be incorporated

11   herein, and ask for a standing objection.

12        THE COURT:  All right.  Your request for a

13   standing objection is granted, and you have made your

14   objection including the references to your prior

15   objections.  For the record, those are all now part of the

16   record and your objection is overruled.

17        All right.  Please proceed, counsel.

18        MR. PHILLIPS:  Thank you.

19   BY MR. PHILLIPS:

20   Q.    Now, you mentioned that you are in custody.  Is that

21   part of this case that you're here to testify on today?

22   A.    Yes.

23   Q.    And as part of the case that you're here to testify on

24   today, have you pled guilty?

25   A.    Yes.

501

Direct - Aguilar

1    Q.    And I'm going to ask you, if you could -- and you'll

2    be handed an exhibit book in a moment -- to take a look at

3    Government Exhibit No. 110.

4    A.    Okay.

5    Q.    Do you recognize that document?

6    A.    Yes.

7    Q.    And what is that?

8    A.    It is my plea agreement.

9    Q.    And is everything that's part of your plea agreement

10   outlined in that plea agreement?

11   A.    Yes.  Yeah.

12   Q.    And when you were originally charged in this case,

13   what were you charged with?

14   A.    It was -- it was a conspiracy, with distribution.

15   Q.    Conspiracy to distribute cocaine?

16   A.    Yes.

17   Q.    And do you recall what the possible penalties for that

18   charge was?

19   A.    It -- there was different penalties.  Some ranged from

20   10 to 15 years, to 10 to 20 years, five to 10.

21   Q.    I was going to say, does five to 20 years sound

22   familiar?

23   A.    Five to 20, yes.

24   Q.    And the five is a mandatory five, meaning the bottom.

25   A.    Yes.

Direct - Aguilar

1    Q.    And then you had a number of phone calls or use of

2    electronic communications?

3    A.    Yes.

4    Q.    And those were up to four years?

5    A.    Yes.

6    Q.    And then you had some distribution charges that were

7    from zero to 20 years?

8    A.    Yes.

9    Q.    And ultimately when you pled guilty, what did you

10   plead guilty to?

11   A.    Possession with intent to distribute.

12   Q.    So that makes your possible sentence zero to 20

13   years?

14   A.    Yes.

15   Q.    And have you been sentenced yet?

16   A.    Yes, I have.

17   Q.    And what was that sentence?

18   A.    30 months.

19   Q.    And are you currently serving that sentence?

20   A.    Yes.

21   Q.    And did you also -- I'll ask you to look at Government

22   Exhibit No. 111.

23   A.    Okay.

24   Q.    And in Government Exhibit No. 111, is that a letter

25   you signed agreeing to cooperate with the Government?

503

Direct - Aguilar

1    A.    Yes.

2    Q.    And when you signed that letter, did you have an

3    attorney?

4    A.    Yes, I did.

5    Q.    And did you meet with law enforcement?

6    A.    Yes.

7    Q.    And when you met with law enforcement, were you

8    completely truthful?

9    A.    Yes.

10   Q.    The first time?

11   A.    No.  Not the first time.

12   Q.    Okay.  And that's what I kind of want to get into.

13   With Government's Exhibit -- well, I'll get back to it.

14          As this case was progressing, did there come a

15   time -- and you probably didn't know a case was

16   progressing, but at the time, were you at work and you were

17   contacted by police officers?

18   A.    Yes.

19   Q.    These two gentlemen here?

20   A.    Yes.

21   Q.    And when they contacted you, did they talk about your

22   drug dealing?

23   A.    Yes.

24   Q.    And did you share some of your drug dealing

25   information with them?

504

Direct - Aguilar

1    A.    Limited --

2    Q.    When you say --

3    A.    -- amount.

4    Q.    I'm sorry, I cut you off.

5    A.    A little bit of it, yeah.

6    Q.    Okay.  And that little bit you shared with them, was

7    it truthful?

8    A.    No.

9    Q.    What was -- what did you share with them?

10   A.    I just -- that I -- you know, I was peddling a few

11   grams.

12   Q.    Okay.  And when you shared with them that you were

13   peddling a few grams, what do you mean by peddling?

14   A.    Selling a few grams.

15   Q.    Cocaine?

16   A.    Yes.

17   Q.    At that time, were you peddling or selling a few

18   grams?

19   A.    Yes and no.

20   Q.    Okay.  And what do you mean by that?

21   A.    I was selling some grams and a little more.

22   Q.    Okay.  And when they confronted you about specific

23   instances and asked you about amounts, such as four, what

24   did you tell them?

25   A.    At that -- at that time, 4 grams.

Direct - Aguilar

1    Q.    Okay.  And did those officers confront you about their

2    belief that it was 4 ounces?

3    A.    Yes.

4    Q.    Okay.  And later when you signed your proffer

5    agreement and you sat down with law enforcement, what did

6    you tell law enforcement about the -- when you were

7    confronted about an ounce?

8    A.    That it was ounces.

9    Q.    The first time you sat down with law enforcement or

10   the second?

11   A.    The second time.

12   Q.    Okay.  When you first sat down with law enforcement --

13   I want to go back to Government's Exhibit No. 111.  That

14   was back on May 26th of 2016.  Did you say that you were

15   selling ounces or grams at that time?

16   A.    At that particular time --

17              THE COURT:  It might be easier for the jury if you

18   move that up a little bit.

19              THE WITNESS:  At this particular time --

20   BY MR. PHILLIPS:

21   Q.    Well, let's go back to your plea agreement.  On your

22   plea agreement, prior to actually coming into court,

23   holding your hand up and swearing to the judge --

24   A.    Yeah.

25   Q.    -- that what was truthful in your plea agreement, had

506

Direct - Aguilar

1    you told law enforcement that you were selling ounces or

2    had you told law enforcement you were selling grams?

3    A.    Ounces.

4    Q.    Before your plea agreement or after your plea

5    agreement?

6    A.    It was -- well, before my plea agreement I was selling

7    grams.

8    Q.    That's what you told law enforcement.

9    A.    Yeah.

10   Q.    But then on the day that you actually pled guilty --

11   and I'll ask you to turn to page -- and we'll highlight it

12   for you, you can look at either the screen or the actual

13   paperwork, page 7 and then on to page 8, and specifically

14   paragraph on page 8 that says:  The facts specific related

15   to -- no, I'm sorry, let's go back.

16         MR. PHILLIPS:  Let's go back to page 7 and

17   highlight the bottom paragraph.

18   BY MR. PHILLIPS:

19   Q.    That starts to outline some of the facts in the case

20   that you swore to the judge were truthful, correct?

21   A.    Correct.

22   Q.    And in that, you said that you had sold 56 grams of

23   cocaine to Ricky Garrison; then another time, 252 grams of

24   cocaine; and then as it goes over to the next page, 3.5

25   grams of cocaine --

Direct - Aguilar

1    A.    Yes.

2    Q.    -- and then 112 grams of cocaine.

3          Prior to swearing to the judge that that was true,

4    you had not told law enforcement that it was ounces, you'd

5    told them small grams, correct?

6    A.    Correct.

7    Q.    And what I mean by that is if -- if you'd said -- if

8    they'd said to you, Were you selling 4 ounces, your

9    response to them was, No, I was selling 4 grams.

10   A.    Correct.

11   Q.    Now, after you actually came into court and swore to

12   the judge, did you sit down with law enforcement and

13   correct what you had previously told them?

14   A.    Yes, I did.

15   Q.    Okay.  But that came after your plea.

16   A.    Yes.  Yes.

17   Q.    And this plea that you entered into -- or at least the

18   notice of disposition -- was very close to a time when you

19   were scheduled for trial; is that correct?

20   A.    Correct.

21   Q.    And just so the jury's clear, at the time you swore to

22   the judge in your plea agreement, was what you were

23   swearing to what you believed to be true?

24   A.    Yes.

25   Q.    Now, I want to take you back to the summer of 2013 and

Direct - Aguilar

1   into 2014.  What were you doing and where were you living

2   during that time?

3   A.   I was -- I was working as an electrician.  I was

4   living off of Federal Boulevard.

5   Q.   And while you were living and working as an

6   electrician, did you know a person named Simeon Ramirez, or

7   Simon Ramirez?

8   A.   Yes.

9   Q.   How did you know him?

10  A.   He's an ex-brother-in-law.

11  Q.   So he's a relative of yours?

12  A.   Yes.

13  Q.   And through your dealing with Simon Ramirez -- he goes

14  by Simon; is that correct?

15  A.   Yes.

16  Q.   As you were dealing with Simon Ramirez, did there come

17  a time that you started working with Simon or assisting

18  Simon in selling drugs to somebody named Ricky Garrison?

19  A.   Yes.

20  Q.   And are you familiar with Ricky Garrison?

21  A.   Yes.

22  Q.   And, I'm sorry, you were starting to look, so I'll go

23  ahead and ask:  Do you see that person in the courtroom

24  today and can you point to him and tell us what he's

25  wearing?

509

Direct - Aguilar

1   A.   A button-up shirt and some khakis.

2          MR. PHILLIPS:  Your Honor, I would ask the record

3   reflect identification of the defendant at this time

4   subject to cross-examination.

5          THE COURT:  The record will so reflect.

6   BY MR. PHILLIPS:

7   Q.   Now, when you were working with Simon Ramirez and

8   selling cocaine, about how many customers did you guys

9   have?

10  A.   Four.

11  Q.   Okay.  If you would, describe to the jury how you

12  first came to be involved in selling cocaine to Ricky

13  Garrison along with Simon Ramirez.

14  A.   Just started selling grams to him.

15  Q.   Okay.  And -- and when about was that?

16  A.   Well, the first time I met him was about November.

17  Q.   November of 2013?

18  A.   Yes.

19  Q.   So the late summer, early fall, or even late fall, of

20  2013?

21  A.   Yes.  Yeah.

22  Q.   Certainly after June of 2013?

23  A.   Yes.

24  Q.   Okay.  Now, you mentioned that you were selling grams.

25  Who was actually originally doing the deals with Ricky

510
Direct - Aguilar

1   Garrison?

2   A.   Simon.

3   Q.   Okay.

4   A.   Ramirez.

5   Q.   I'm sorry?

6   A.   Ramirez.

7   Q.   And eventually Simon Ramirez kind of brought you into

8   it?

9   A.   Yes.

10  Q.   And how many deals did you and Simon Ramirez do with

11  Ricky Garrison?

12  A.   I -- it was -- like I said, it was grams, so it --

13  I -- I'm -- several.   I don't know how many exactly, you

14  know.

15  Q.   And who was in charge of the cocaine at the time when

16  you were --

17  A.   Simon.

18  Q.   Okay.   And so you did several deals with Simon and

19  Ricky Garrison.   Did there come a time that you started,

20  yourself, dealing with Ricky Garrison?

21  A.   Yes.

22  Q.   If you could, describe to the jury how that came about

23  and why.

24  A.   Basically Simon was -- he was hard to get ahold of

25  sometimes, so we just met and communicated ourselves.

Direct - Aguilar

1    Q.    And you had a source of cocaine that you could get

2    cocaine from and then get it to Ricky Garrison?

3    A.    Yes.

4    Q.    And if you could, just describe briefly to the jury

5    what a typical drug deal with Ricky Garrison was like, or

6    how it took place.

7    A.    Just a quick -- just quick, he'd call, come over, or I

8    would go over.  We would meet real quick and that was it.

9    Q.    So one would call the other, say what they needed, and

10   get it delivered?

11   A.    Yes.

12   Q.    Okay.  I'm going to take you to some specific phone

13   calls and instances of conduct between you and Ricky

14   Garrison.  And I'd like you to look at Government Exhibit

15   No. 14, if you would, please.

16          And we're going to be going over a number of phone

17   calls today, and I'm going to ask you:  Have you had an

18   opportunity to review a number of CDs that contained phone

19   calls?

20   A.    Yes.

21   Q.    And those CDs and those phone calls, did you do

22   anything specific after listening to them and confirming

23   that they were, in fact, you and Ricky Garrison?

24   A.    Yeah, I signed them.

25   Q.    Put your initials on them?

Direct - Aguilar

1    A.    Initial.

2    Q.    At this time, I'll ask you -- we're going to give you

3    a book that has a transcript as well.

4            MR. PHILLIPS:    And I would ask the jury to turn to

5    Government Exhibit 14.

6    BY MR. PHILLIPS:

7    Q.    It's a telephone call between you and Ricky Garrison

8    that took place on December 6th, 2013, at approximately

9    9:38 a.m.

10            MR. PHILLIPS:    At this time I'd ask to publish.

11   And please publish Government Exhibit 14.

12           (Phone call played)

13   BY MR. PHILLIPS:

14   Q.    Do you recognize the voices in that phone call?

15   A.    Yes.

16   Q.    And who are those?

17   A.    Ricky Garrison and myself.

18   Q.    Okay.    And when you say, Um, I'm going to take an

19   order here today.    So home boy just called me, what did you

20   mean by that?

21   A.    Was just going to pick up some cocaine.

22   Q.    Okay.    And when Mr. Garrison said to you, Shit, shit,

23   uh, I had to go -- go another route, but I could still, uh,

24   use like two, what did you understand that to mean?

25   A.    Two ounces.

Direct - Aguilar

1    Q.    Two ounces of cocaine?

2    A.    Yes.

3    Q.    And when you were dealing with Ricky Garrison, just so

4    we're clear, were you selling powder cocaine or base

5    cocaine or both?

6    A.    Powder.

7    Q.    Also during that call, there's a mention of another

8    phone by Mr. Garrison.  What did that mean to you?

9    A.    I believe he had a new phone.

10   Q.    And during your time that you were dealing with

11   Mr. Garrison, did he always have the same phone number or

12   did he change phones?

13   A.    Changed phones.

14          MR. PHILLIPS:  Ask you now -- and ask the

15   jurors to turn to Government Exhibit 15.

16          I would ask to publish the text for Government 15.

17   BY MR. PHILLIPS:

18   Q.    Was that a text that you're familiar with?

19   A.    Yes.

20   Q.    And what did that text mean to you?

21   A.    Everything was ready, but we just got busy -- got a

22   little busy, so we didn't have time to do it at that

23   particular time.

24   Q.    And when you say, Everything's ready, what do you

25   mean?

514

Direct - Aguilar

1    A.   I already had the 2 ounces.

2    Q.   Of cocaine?

3    A.   Yes.

4    Q.   Ask you to look at Government Exhibit 16.

5         MR. PHILLIPS:  And the jurors as well.

6    BY MR. PHILLIPS:

7    Q.   What does "all gravy" mean?

8    A.   That it's done.  I have them pretty much in my

9    possession.

10   Q.   Okay.  And available and ready to sell?

11   A.   Yes.

12   Q.   Okay.  Ask you now to look at Government Exhibit 17.

13        What were you telling Ricky Garrison there, that

14   text?

15   A.   That I was on my way.

16   Q.   And what were you on your way to do?

17   A.   To deliver the 2 ounces.

18   Q.   And Government Exhibit No. 18.

19        And did Mr. Garrison confirm with you his

20   readiness?

21   A.   Yes.

22   Q.   And how did he do that?

23   A.   He text, yes.

24   Q.   And on that day, did you, in fact, go to Ricky

25   Garrison's house?

Direct - Aguilar

1    A.    Yes.

2    Q.    And did you deliver the 2 ounces of cocaine?

3    A.    Yes.

4          THE COURT:  Mr. Phillips, why don't we take our

5    morning break at this time.

6          MR. PHILLIPS:  That would be a perfect place.

7          THE COURT:  All right.  Great.  Ladies and

8    gentlemen of the jury, we will be in recess for 15 minutes.

9        (Recess at 10:41 a.m. to 11:04 a.m.)

10         THE COURT:  Mr. Aguilar, I remind you that you

11   remain under oath.

12         THE WITNESS:  Yes.

13         THE COURT:  All right.  Mr. Phillips, you may

14   resume your direct examination.

15         MR. PHILLIPS:  Thank you, Your Honor.

16   BY MR. PHILLIPS:

17   Q.    Mr. Aguilar, we were just talking about a -- December

18   16th of 2013 when you sold 2 ounces of cocaine to Ricky

19   Garrison.  How much were you charging Ricky Garrison for

20   cocaine at that time?

21   A.    $900 an ounce.

22   Q.    $900 per ounce?

23   A.    Yes.

24   Q.    Okay.  And did you continue to sell cocaine to Ricky

25   Garrison through the end of 2013 and into 2014?

Direct - Aguilar

1    A.    Yes.

2    Q.    Okay.  I want to take you now to January 9th of 2014,

3    and go through a number of calls with you regarding another

4    cocaine deal.

5          Looking at Government Exhibit No. 31, and the

6    transcript of Government Exhibit 31.

7          MR. PHILLIPS:  Please publish to the jury.

8          (Phone call played)

9    BY MR. PHILLIPS:

10   Q.    And, again, was that you and Ricky Garrison?

11   A.    Yes.

12   Q.    Okay.  And when you said, Well, they're here, what

13   were you referring to?

14   A.    The cocaine.

15   Q.    The people you get it from, or the actual cocaine?

16   A.    The people.

17   Q.    Okay.  And when you said, I just got to see it myself,

18   what did you mean by that?

19   A.    I had to see it to see if it's good or not.

20   Q.    Okay.  And when you would get cocaine, you would look

21   at it, check it out and so forth to make sure it was

22   better --

23   A.    Yes.

24   Q.    -- or good?

25          And what was the plan, based on listening to that

Direct - Aguilar

1    call?  What was your plan for the rest of the evening or

2    day?

3    A.    Just maybe meet up later.

4    Q.    Okay.  And on January 9th, at approximately 4:15 p.m.,

5    did you have another conversation with Ricky Garrison --

6    and it's probably hard for you to remember, but I'll ask

7    you to look at Government Exhibit 32.

8    A.    Okay.

9          MR. PHILLIPS:  Please publish Government 32.

10          THE WITNESS:  Yes.

11      (Phone call played)

12    BY MR. PHILLIPS:

13    Q.    During that conversation, when you were having it, and

14    you mentioned that it was real soft, what were you

15    referring to?

16    A.    That it was good.

17    Q.    And what was good?

18    A.    The cocaine.

19    Q.    And about five minutes later, Government Exhibit

20    No. 33, transcripts, please.

21          MR. PHILLIPS:  Please publish 33.

22      (Phone call played)

23    BY MR. PHILLIPS:

24    Q.    And during that conversation, Mr. Garrison said to

25    you, Shit just bring me uh, a nine, what did that mean to

Direct - Aguilar

1    you?

2    A.    Nine ounces.

3    Q.    And, again, going back to when they spoke to the

4    officers, if they had asked you about a nine, what would

5    you have told them originally prior to pleading guilty?

6    A.    Nine grams.

7    Q.    And why were you telling the officers 9 grams as

8    opposed to 9 ounces?

9    A.    Well, I was trying not to incriminate myself more.

10   Q.    And then in this call, when he starts to ask you about

11   being soft, you say, Oh, no.  Nah.  Hey I'm just in -- when

12   I opened it, it broke, what were you referring to there?

13   A.    The quality of the drugs.

14   Q.    And based on that, how -- how good a quality were

15   these drugs that you were getting?

16   A.    They were pretty good.

17          MR. PHILLIPS:  And I'd ask the jurors to now move

18   to Government Exhibit No. 34 in your transcript book.

19   BY MR. PHILLIPS:

20   Q.    Was that a text --

21   A.    Yes.

22   Q.    -- regarding this deal?

23   A.    Yes.

24   Q.    You guys getting ready to meet?

25   A.    Yes.

Direct - Aguilar

1    Q.    Okay.

2    A.    That I was on my way.

3    Q.    And at approximately 5:02 p.m. on January 9th,

4    Government Exhibit No. 35.

5          MR. PHILLIPS:   And please publish Government 35.

6          (Phone call played)

7    BY MR. PHILLIPS:

8    Q.    Now, when you told Mr. Garrison in that phone call,

9    Just be ready, so that way I, just hurry up, why was that

10   important to you?

11   A.    I don't like waiting.

12   Q.    Do you like hanging around the drug deals or --

13   A.    No.

14         MR. PHILLIPS:   And ask the transcript No. 36, and

15   please publish 36.

16         (Phone call played)

17   BY MR. PHILLIPS:

18   Q.    And based on that phone call, where were you that day?

19   A.    Down the street from Garrison's house.

20   Q.    And do you recall where Ricky Garrison lived at that

21   time?

22   A.    Yeah.

23   Q.    Where was that?

24   A.    I think it was like 13th and Havana or something like

25   that.

520

Direct - Aguilar

1   Q.   Okay.   And you have been to his house a number of

2   times?

3   A.   A -- a handful of times, yes.

4   Q.   Okay.   And based on these phone conversations, what

5   actually took place at Ricky Garrison's home that day?

6   A.   I sold him the 9 ounces.

7   Q.   Of cocaine?

8   A.   Yes.

9   Q.   I want to take -- draw your attention now to

10  Government Exhibit 59.   If you could, please turn to your

11  transcripts.

12          And this is a call from March 25th, 2014, at about

13  6:32 p.m.

14          MR. PHILLIPS:   And please publish 59.

15      (Phone call played)

16  BY MR. PHILLIPS:

17  Q.   Again, was that you and Mr. Ricky Garrison?

18  A.   Yes.

19  Q.   And in that phone call, when you say to Ricky

20  Garrison, Just four dude, that's all I got left, what were

21  you referring to there?

22  A.   4 ounces.

23  Q.   And when he said to you, I'll probably come get half

24  of that today, what did that mean to you?

25  A.   Two ounces.

Direct - Aguilar

1    Q.   And when you said, It's fucking bomb, what is that

2    describing?

3    A.   It was good dope.

4    Q.   And, again, just so we're clear, we're talking about 2

5    ounces of cocaine?

6    A.   Yes.

7    Q.   And later that same day, about 8:15 p.m., Government

8    Exhibit No. 60, please, in the transcripts.

9         MR. PHILLIPS:  Please publish 60.

10        (Phone call played)

11   BY MR. PHILLIPS:

12   Q.   Now, in that call when Mr. Garrison tells you, I'll

13   probably come to get a few after you get out of work

14   tomorrow, what did that mean to you?

15   A.   That he would come and see me to get a couple ounces

16   of . . .

17   Q.   And on March 25th at about 8:45 p.m. --

18        MR. PHILLIPS:  Ask the jurors to turn to their

19   Government Exhibit No. 61 in their transcript books.

20   BY MR. PHILLIPS:

21   Q.   Did you receive a text from Ricky Garrison on that

22   night?

23   A.   Yes.

24   Q.   And is that the text?

25   A.   Yes.

Direct - Aguilar

1    Q.   If you could, describe to the grand jury what that

2    text meant to you.

3    A.   It's a dietary supplement.

4    Q.   And this text says, You got your magic cut or do I

5    need to bring mine?  What is cut?

6    A.   It's -- it's just something to put into the coke to

7    either -- make more.

8    Q.   Okay.  And if you could, describe to the jury what --

9    why you would do that.

10   A.   To make more.  To make more to -- make it more

11   weight.

12   Q.   So you could take an ounce and make it an

13   ounce-and-a-half, and you could sell more?

14   A.   Yes.

15   Q.   And do you recall what you used as a cut?

16   A.   I just usually use inositol.

17   Q.   And I think you mentioned earlier, what is inositol?

18   Did I say that right?

19   A.   It's a vitamin supplement.

20   Q.   And after him asking you if you have your magic cut,

21   did you respond with a text?

22   A.   Yes.

23   Q.   And is that depicted in Government Exhibit 62?

24   A.   Yes.

25   Q.   And so you -- what were you letting him know?

523

Direct - Aguilar

1    A.   Yes, I had some.

2    Q.   So he didn't have to bring any?

3    A.   No.

4    Q.   And later that same evening, Government Exhibit No.

5    63 in the transcripts, at approximately 11:30 p.m., did you

6    send another text?

7    A.   Yes.

8    Q.   And that -- what did that text mean?

9    A.   Just if he was going to come so I could go to sleep.

10   Q.   Getting late at night?

11   A.   Yes.

12   Q.   And during this time, did you have a job outside of

13   selling cocaine?

14   A.   Yes.

15   Q.   And, again, what was that?

16   A.   Electrician.

17   Q.   Okay.  And on March 26th, at about 12:08 a.m., was

18   there another conversation -- or, I'm sorry, text message?

19   A.   Yes.

20   Q.   And what is that text message?

21   A.   The time to meet if you wanted to meet at that time.

22   Q.   Okay.  And did you agree then to meet later in the day

23   after 5:00?

24   A.   Yes.

25   Q.   And is that depicted in Government Exhibit No. 65,

Direct - Aguilar

1    text message?

2    A.    Yes.

3    Q.    And what was that -- what were you letting Mr.

4    Garrison know regarding that?

5    A.    Well, my buddy wouldn't be able to meet me until

6    about 5:00.

7    Q.    And did you have an actual conversation with Ricky

8    Garrison on that date about 2:37 p.m.?  I ask you to look

9    at Government Exhibit No. 66.

10            MR. PHILLIPS:  And ask the jurors to turn to

11    Government Exhibit 66 in the transcript book.

12    BY MR. PHILLIPS:

13    Q.    And taking you back, actually, to Government Exhibit

14    65, was that text from you or was that from Mr. Garrison to

15    you letting you know his plans?

16    A.    That is -- that's his --

17    Q.    Him letting you?

18    A.    -- his message to me, yeah.

19            MR. PHILLIPS:  Again if you would, please publish

20    Government Exhibit 66.

21            (Phone call played)

22    BY MR. PHILLIPS:

23    Q.    And in that call when Mr. Garrison said to you, I'm

24    probably going to do all of that, whatever you got left,

25    what does that mean to you?

Direct - Aguilar

1    A.   The 4 ounces that I had.

2    Q.   Okay.  And that's when you responded with, Okay, the

3    four?

4    A.   Yes.

5    Q.   And when you say 4 ounces again, just for the record

6    that was 4 ounces of cocaine?

7    A.   Yes.

8    Q.   Take you to later that night.

9         MR. PHILLIPS:  And the grand -- or the jurors,

10   please turn to Government Exhibit 67.

11   BY MR. PHILLIPS:

12   Q.   At approximately 6:29 did you have another

13   conversation with Ricky Garrison?

14   A.   Yes.

15        MR. PHILLIPS:  Please publish Government Exhibit

16   69 -- or, I'm sorry, 67.

17        (Phone call played)

18   BY MR. PHILLIPS:

19   Q.   Based on that phone call, what was the plan?

20   A.   To meet up.

21   Q.   In order to do what?

22   A.   The transaction.

23   Q.   And was Mr. Garrison coming to your house this

24   particular night?

25   A.   Yes.

Direct - Aguilar

1    Q.   And where did you live?

2    A.   On Federal and Dartmouth.

3    Q.   Do you remember the exact address?

4    A.   3100 South Federal.

5    Q.   And at approximately 6:08 p.m., approximately two

6    minutes later, did you have another conversation with

7    Mr. Garrison?

8    A.   Yes.

9            MR. PHILLIPS:  Ask the jurors to look at

10   transcript No. 68.  And please publish 68.

11       (Phone call played)

12   BY MR. PHILLIPS:

13   Q.   Mr. Garrison is about two minutes away?

14   A.   Yes.

15   Q.   And looking at Government Exhibit 69 and transcript

16   69, did he actually call you as he arrived?

17   A.   Yes.

18            Mr. PHILLIPS:   Please publish Government Exhibit

19   69.

20       (Phone call played)

21   BY MR. PHILLIPS:

22   Q.   And did Mr. Garrison arrive at your house that

23   evening?

24   A.   Yes.

25   Q.   And what did you believe the plan was as far as the

Direct - Aguilar

1    cocaine deal that night?

2    A.    For him to take the 4 ounces.

3    Q.    Okay.  Now, I want to take you back to your plea

4    agreement -- well, let me ask you this:  How many cocaine

5    deals did you do with Mr. Garrison?

6    A.    I can't put a number on it.  We made a --

7    Q.    Pretty busy together?

8    A.    Fairly.  Not much, but, yeah, fairly busy.

9    Q.    Okay.  Now, would you have an estimate as to how

10   many -- or how much cocaine you sold Mr. Garrison between

11   June of 2013 and June of 2014?

12   A.    I got to say, like, 20 ounces.

13   Q.    Okay.  About 20 ounces?

14   A.    Yes.

15   Q.    Okay.  Now, I want to take you back to your plea

16   agreement.  One of the things that you agreed to, and stood

17   up in front of the judge and swore was true in your plea

18   agreement, was that on that particular night, March 26th,

19   2014, that you sold Ricky Garrison 4 ounces of cocaine.

20   Correct?

21   A.    Yeah, that's what I -- that's what I said --

22   Q.    And when you said that and you swore in front of the

23   judge, did you believe that to be true?

24   A.    At the time, I did, but when I thought about it and I

25   remembered that phone call and the day and everything . . .

Direct - Aguilar

1    Q.   And later, in preparation for this trial, you met with

2    law enforcement, these officers over here, and went over

3    those phone calls, correct?

4    A.   Correct.

5    Q.   And during that time, it was brought up that something

6    unusual happened that evening during that drug transaction.

7    A.   Yes.

8    Q.   And do you recall that night and what unusual thing

9    happened?

10   A.   Yes, I received a text message from a friend of mine

11   saying that we were being investigated -- well, that we

12   were about to get caught.

13   Q.   Okay.  And what -- how did that text message make its

14   way to you or how would -- how was that communicated to

15   you?

16   A.   That -- at first it was a text message and then he

17   called me and told me that -- it was a friend of mine that

18   told me that they received -- that he had received a text

19   message saying that we were going to be tooken down is what

20   he said.  And that's what the text message said.

21   Q.   And was that unusual?

22   A.   Very unusual.

23   Q.   Have you ever had that happen before?

24   A.   No.

25   Q.   And based on that memory, what did you tell the

Direct - Aguilar

1  officers as far as correcting your plea agreement and what

2  you had sworn to the judge regarding the amount that night?

3  A.   Well, we said -- well, I had said 4 ounces, but in all

4  reality, he only took 4 grams that day.

5  Q.   And why did he only take 4 grams?

6  A.   Because he didn't have money.

7  Q.   Okay.  And if he -- when you were dealing with Ricky

8  Garrison, would you give him cocaine without him paying for

9  it or did he always have to pay for it?

10  A.   No, he'd always have to pay for it.

11  Q.   Okay.  And so if he showed up with enough for 4 grams,

12  you'd give 4 grams?

13  A.   Yes.

14  Q.   Okay.  And on that particular night, it was the

15  unusual texts that reminded you that that was the weird

16  night --

17  A.   Yes.

18  Q.   And in your plea agreement, by saying that you sold 4

19  ounces, was that a benefit or a drawback to you as far as

20  your sentencing?

21  A.   That was a drawback, actually.  I -- I figured -- I

22  mean, I -- I'm over here basically saying I'm selling more

23  drugs than I wasn't.

24  Q.   And why are you clarifying that today for the jury?

25  A.   Because I want to be -- it's the truth.  That's what I

530

Cross - Aguilar

1    wanted them to hear.

2    Q.    Now, I want to talk to you a bit about your prior

3    history.  You have a prior drug felony in the past; is that

4    correct?

5    A.    Yes.

6    Q.    And was that from 1997?

7    A.    Yes.

8    Q.    Do you recall what you pled guilty to?

9    A.    I think it was a possession and a -- intent to

10   distribute as well.

11   Q.    Okay.  And do you recall what your sentence was?

12   A.    It was a three-year probation.

13            MR. PHILLIPS:  If I may I have one moment, Your

14   Honor.

15            THE COURT:  You may.

16            MR. PHILLIPS:  Thank you.  Nothing further, Your

17   Honor.

18            THE COURT:  All right.  Cross-examination.

19            MR. LEONARD:  Thank you, Your Honor.

20                 CROSS-EXAMINATION

21   BY MR. LEONARD:

22   Q.    Good morning, Mr. Aguilar.  How are you?

23   A.    I'm good.  Thank you.

24   Q.    I'll start off by talking about the last thing that

25   you spoke with the prosecutor.  You indicated you had a

Cross - Aguilar

1   1997 felony drug conviction; is that correct?

2   A.   Correct.

3   Q.   And your -- you had been advised then that because of

4   that prior felony drug conviction, the Government, if they

5   sought to, could have enhanced any conviction in this case

6   up to a 20-year mandatory minimum, correct?

7   A.   Correct.

8   Q.   But you struck a cooperation agreement with the

9   Government; isn't that correct?

10  A.   Correct.

11  Q.   And in exchange for that cooperation agreement, they

12  allowed you to plead guilty to a distribution count of less

13  than 500 grams of a controlled substance; isn't that right?

14  A.   Correct.

15  Q.   So to be clear, you didn't plead guilty to the

16  conspiracy charge.

17  A.   Correct.

18  Q.   And no 851 enhancement making you subject to a 20-year

19  mandatory minimum was filed as a result, right?

20  A.   That's correct.

21  Q.   And as a result of your plea agreement, the Government

22  has agreed -- they did dismiss all remaining counts at

23  sentencing, correct?

24  A.   Correct.

25  Q.   Now, we talked about your plea agreement, and that is

532

Cross - Aguilar

1    Exhibit 110, I believe.

2              Can you pull 110 up and go to page 9, paragraph E.

3              Do you have that before you, Mr. Aguilar?

4    A.   Yes.

5    Q.   All right.  Paragraph E says the advisory guideline

6    range resulting from these calculations is 37 to 46 months.

7    That was after your deal, the anticipated range of

8    sentence, correct?

9    A.   That's correct.

10   Q.   You ended up getting 30 months; isn't that right?

11   A.   Yes.

12   Q.   Thank you.  Now I want to talk to you about the

13   March 27th, 2014, interview.  You recall that date and that

14   interview, don't you?

15   A.   Yes.

16   Q.   And that's when you spoke with these two, now special

17   agent and investigator, correct?

18   A.   Correct.

19   Q.   You were contacted at your job site, correct?

20   A.   Correct.

21   Q.   Now, I believe that you just testified that you were

22   not truthful with those investigator -- the investigator

23   and special agent; is that correct?

24   A.   Yes.

25   Q.   Have you been charged with lying to a federal law

Cross - Aguilar

1   enforcement officer?

2   A.   No.

3   Q.   Have you been charged with obstructing justice?

4   A.   No.

5   Q.   During the March 27th interview, you told the agents

6   that you would, quote, occasionally purchase 1 or 2 ounces

7   of cocaine, but you have the ability to stretch it into 9

8   ounces, correct?

9   A.   Correct.

10  Q.   And by stretch it, you meant that you would add a

11  nondrug substance -- by that nondrug, I mean a nonillegal

12  drug -- to increase the volume, right?

13  A.   Yes.

14  Q.   And you just testified on direct that Exhibit 62,

15  which was a text, was you indicating you had your own

16  cutting agent, correct?

17  A.   Correct.

18  Q.   Now, on the March 27th interview, you told the agents

19  you could only recall of two occasions when you purchased

20  ounce quantities of cocaine, correct?

21  A.   Yes.

22  Q.   During the March 27th interview, the agents were

23  specifically wanting to know about the March 26th incident,

24  weren't they?

25  A.   Yes.

534

Cross - Aguilar

1  Q.   And they asked you about that, correct?

2  A.   That's correct.

3  Q.   And you told the investigators you didn't sell Mr.

4  Garrison 4 ounces of cocaine, correct?

5  A.   That's correct.

6  Q.   You told them at that time it was approximately 4

7  grams, correct?

8  A.   Yes.

9  Q.   That -- the agents -- they just simply didn't believe

10 you, did they?

11 A.   No.

12 Q.   They pushed you on that, didn't they?

13 A.   Yes.

14 Q.   And you kept saying no, it was 4 grams, right?

15 A.   Correct.

16 Q.   And then you said, in fact, it was $120, correct?

17 A.   Yes.

18 Q.   And to be clear, then, it was your impression at that

19 time that even though you had tried to tell the Government

20 a lesser amount than they wanted to hear, they wouldn't

21 believe you?

22 A.   No, they didn't believe me.

23 Q.   Now, the March 27th interview, you told the

24 investigators the reason that you sold these alleged drugs,

25 correct?

535

Cross - Aguilar

1    A.    Yes.

2    Q.    And you told the agents that the reason that you were

3    selling the alleged drugs was to make money for child

4    support you owe, right?

5    A.    Yes.

6    Q.    You also told the Government in your March 27th

7    interview of 2014, that you'd never sold marijuana to

8    anyone, correct?

9    A.    Say again.

10   Q.    You told the Government in the March 27th interview

11   that you'd never sold marijuana to anyone; isn't that

12   right?

13   A.    Yeah.   Yeah.   That's correct.

14   Q.    And after the March 27th interview, did the Government

15   agents arrest you?

16   A.    Three months later.

17   Q.    Right, three months later.   But -- so on the 27th,

18   they didn't arrest you, did they?

19   A.    No.

20   Q.    And on every day up until the three months later you

21   got arrested, you were walking around in the community,

22   correct?

23   A.    Correct.

24   Q.    Able to call people, correct?

25   A.    Correct.

Cross - Aguilar

1    Q.    And the next time you come in to talk to the

2    Government is after you have been charged; isn't that

3    right?

4    A.    Yes.

5    Q.    And this is on May 26th, 2016, correct?

6    A.    Correct.

7    Q.    You signed a document, which is -- it's often called a

8    proffer agreement; do you recall that?

9    A.    Yes.

10   Q.    And that document is Exhibit No. 111; isn't that

11   correct?

12             MR. LEONARD:   Pull Exhibit 111 up.

13             THE WITNESS:   Oh.

14             COURTROOM DEPUTY:   Here it is.

15             THE WITNESS:   That -- yes.

16   BY MR. LEONARD:

17   Q.    All right.   Now, you reviewed this document, didn't

18   you, with your attorney?

19   A.    Yes, I did.

20   Q.    And you had plenty of time to go over and understand

21   the document, didn't you?

22   A.    Yes.

23   Q.    And then after you reviewed the document, you signed

24   it, right?

25   A.    Yes.

Cross - Aguilar

1    Q.    Your attorney signed it, correct?

2    A.    Correct.

3    Q.    A representative of the United States Government

4    signed it, correct?

5    A.    Correct.

6    Q.    Go to page 2.

7          MR. LEONARD:    And blow up paragraph . . .

8    BY MR. LEONARD:

9    Q.    All right.  Do you have page 2 in front of you now

10   with the highlighted section?

11   A.    Yes.

12   Q.    All right.  You would agree with me it says the

13   proffer and any subsequent testimony must be absolutely

14   truthful.  That's what it says, correct?

15   A.    Correct.

16   Q.    The statements given in the proffer and testimony may

17   be used against you in any future prosecution for giving a

18   false statement, correct?

19   A.    Correct.

20   Q.    Or perjury, correct?

21   A.    Correct.

22   Q.    You admitted to giving a false statement in the

23   proffer, correct?

24   A.    Yes.

25   Q.    Have you been charged with perjury?

538

Cross - Aguilar

1    A.   No.

2    Q.   Have you been charged with giving a false statement?

3    A.   No.

4    Q.   Now, you indicated in your May 26th proffer statement

5    to the Government that the largest amount of cocaine you

6    ever sold Mr. Garrison was 1 to one-and-a-half ounces,

7    correct?

8    A.   Correct.

9    Q.   The rest of the time you indicated that you sold

10   Mr. Garrison gram-type qualities -- quantities of cocaine,

11   correct?

12   A.   Yes.

13   Q.   And in the May 26th proffer, you again told the

14   Government that you often, quote, cut the cocaine with

15   inositol to increase the amounts, correct?

16   A.   Yes.

17   Q.   And you told the Government during your May 26th,

18   2016, meeting that you would then, after cutting the

19   cocaine, distribute the cocaine, correct?

20   A.   Correct.

21   Q.   During your May 26th meeting with the Government, they

22   played you a series of phone calls.  Do you recall that?

23   A.   Yes.

24   Q.   They played you one phone call on January -- which is

25   purported to have happened on January 9th, 2014, and they

Cross - Aguilar

1    were asking you about Mr. Garrison asking for 9.  Do you

2    remember that?

3    A.   Yes.

4    Q.   You confirmed that at that time, during the proffer,

5    that Mr. Garrison was asking for 9 ounces of cocaine,

6    correct?

7    A.   Yes.

8    Q.   But then you say he -- you only sold Mr. Garrison 2

9    ounces of cocaine, correct?

10   A.   That's correct.

11   Q.   And you said you only sold him 2 ounces instead of 9

12   because he didn't have enough money for the 9 ounces,

13   correct?

14   A.   That's correct.

15   Q.   The Government played you another phone call, this was

16   from May 26th -- or May 26th, 2016, call No. 263, where

17   they asked about Mr. Garrison asking for 4, correct?

18   A.   Yes.

19   Q.   And during that interview, you said 4 of them referred

20   to 4 grams instead of 4 ounces, correct?

21   A.   Yes.

22   Q.   The Government played for you call 36 during the May

23   26th interview and wanted to know what -- what was said

24   {sic} by 4, and you said 4 grams instead of ounces,

25   correct?

540

Cross - Aguilar

1    A.    Correct.

2    Q.    And then in call No. 1807, which was played for you,

3    the Government wanted to know what the, Could you still use

4    2 meant, correct?

5    A.    Yes.

6    Q.    And you said that Mr. Garrison was referencing

7    marijuana; isn't that right?

8    A.    Correct.

9    Q.    Now, you again meet with the Government.  This occurs

10   on February 17, 2017, correct?

11   A.    Yes.

12   Q.    During this meeting, you tell the Government that you

13   sold Mr. Garrison 3.5 gram quantities of cocaine on

14   approximately 16 occasions, correct?

15   A.    That's correct.

16   Q.    And you tell the Government that you sold Mr. Garrison

17   ounce-level quantities on approximately nine occasions;

18   isn't that right?

19   A.    Yes.

20   Q.    You told them that the alleged 9-ounce sale on January

21   9th, 2014, that didn't happen, right?

22   A.    No.  No.

23   Q.    You -- and then you are now claiming it was 2 ounces,

24   weren't you?

25   A.    That's correct.

541

Cross - Aguilar

1    Q.   On the March 26th, in the -- in the March 26th, 2014,

2    date, you now tell the Government that this is 4 grams

3    rather than 4 ounces, correct?

4    A.   Yes.

5    Q.   And the Government went over this a little bit.  You

6    had said in your plea agreement that it was 4 ounces,

7    correct?

8    A.   Correct.

9    Q.   That plea agreement was signed by you, wasn't it?

10   A.   Yes.

11   Q.   It was reviewed by you, wasn't it?

12   A.   Yes.

13   Q.   It was signed by your attorney, wasn't it?

14   A.   Yes.

15   Q.   It was signed by an agent of the Government, wasn't

16   it?

17   A.   Yes.

18   Q.   You attested under oath that it was 4 ounces, didn't

19   you?

20   A.   Yes.

21   Q.   Now, Government -- the Government's exhibit -- has

22   admitted Exhibit 110, which was your plea agreement, do you

23   recall that?

24   A.   Yes.

25   Q.   I didn't see an addendum to that plea agreement where

Cross - Aguilar

1   you informed the Court that you had misspoke under oath

2   about the quantity.

3   A.   Yes.

4   Q.   You told the Government in your two -- February 17th,

5   2017, interview that you used a cutting agent, correct?

6   A.   Correct.

7   Q.   And, again, you said that by a cutting agent, you mean

8   a substance used to increase the volume of the alleged

9   cocaine you were selling, correct?

10  A.   Yes.

11  Q.   But you didn't go into specifics about how much

12  cutting agent you used per gram, did you?

13  A.   No.

14  Q.   They didn't even ask you, did they?

15  A.   No.

16  Q.   You didn't say how much cutting agent you used per

17  ounce, did you?

18  A.   No.

19  Q.   And they didn't ask you, did they?

20  A.   No.

21  Q.   During the May 26th proffer, you told the Government

22  you didn't trust Mr. Garrison; is that correct?

23  A.   Yes.

24  Q.   And because you didn't trust the -- Mr. Garrison, you

25  told the Government you always made him pay the full

Cross - Aguilar

1    amount, correct?

2    A.    Correct.

3    Q.    And you just testified to that on direct examination.

4    He always paid the full amount; isn't that right?

5    A.    Correct.

6    Q.    And you told the Government that on February 17th,

7    2017, that Mr. Garrison always paid in cash, correct?

8    A.    Correct.

9    Q.    And on the February 17th, 2017, interview, you

10   specifically said you did not provide any of the alleged

11   drugs to Mr. Garrison on credit, correct?

12   A.    Correct.

13   Q.    Mr. Garrison was the buyer and you were the seller;

14   that's what was going on, right?

15   A.    Yes.

16   Q.    I want to talk about the total amounts.  Your

17   March 27th, 2014, interview, you told the Government that

18   the total amount of alleged cocaine you sold to

19   Mr. Garrison was 1 ounce, correct?

20   A.    Yes.

21   Q.    On May 26th, 2016, during your first proffered

22   interview with the Government, you told them that the total

23   amount of alleged cocaine you sold was 4 1/2 to 5 ounces;

24   is that correct?

25   A.    That is correct.

544
Cross - Aguilar

1    Q.    And on February 17th, 2017, with your second meeting

2    with the Government subject to that proffer letter where

3    you were telling -- you were telling everybody you were

4    going to tell the truth, and it has to be truthful

5    testimony, you increased the amount of alleged cocaine sold

6    to 22 to 23 ounces, correct?

7    A.    Correct.

8    Q.    And now under oath during direct exam you were asked

9    about how much cocaine you sold, and you said 20 ounces,

10   correct?

11   A.    Correct.

12   Q.    You would agree with me that one is different than

13   five.

14   A.    Yes.

15   Q.    Five is different than 22 to 23.

16   A.    Yes.

17   Q.    And 22 to 23 is different than 20.

18   A.    Yes.

19   Q.    And you would agree with me that, in fact, every time

20   you talked to the Government, the amount of total cocaine

21   you say you sold, it changes.

22   A.    You could say that.

23               MR. LEONARD:  One second, please.

24               No further questions.  Thank you.

25               THE COURT:  All right.  Redirect.

Redirect - Aguilar

1         MR. PHILLIPS:  Thank you, Your Honor.

2                  REDIRECT EXAMINATION

3    BY MR. PHILLIPS:

4    Q.   Do you know every day and every time that you sold

5    cocaine to Ricky Garrison?

6    A.   I do not.

7    Q.   Why is that?

8    A.   It's been like four years.

9    Q.   And given that, can you say an exact, precise amount

10   of cocaine that you sold Ricky Garrison?

11   A.   No, it's basically just rough.

12   Q.   Did you keep meticulous records as to each day and

13   time and amount?

14   A.   Oh, no.

15   Q.   Why is that?

16   A.   That's -- that's a no-no.  You don't keep a ledger.

17   Q.   Kind of dangerous if these men come knocking.

18   A.   Yeah.  Al Capone.  You learn off that.

19   Q.   Just so the jury's clear, what is your best estimate

20   as to how much cocaine, between June of 2013 and June of

21   2014, you sold Ricky Garrison?

22   A.   It's -- that's -- that's a rough estimate.  Like I

23   said, like 20.  Like it could be -- like the defense said,

24   it could be 22, 23.  I don't know.  I'm saying 20 because

25   it's been so long.

Redirect - Aguilar

1    Q.    But you did numerous cocaine deals with him?

2    A.    Yes.

3    Q.    And when Mr. Leonard was cross-examining you, he

4    talked about you swearing under oath to the judge about his

5    buying 4 ounces on that, I believe it was, March date in

6    your plea agreement.  At that time, did you believe that to

7    be true?

8    A.    At that time, yes.

9    Q.    Okay.  And having reviewed the history of this case

10   and so forth, is that true -- or what you believe to be

11   true different now today?

12   A.    Yes.

13   Q.    And as I think we covered, in fact, you said that it

14   was less cocaine, even though you pled guilty to a higher

15   amount of cocaine.

16   A.    Yes.

17   Q.    And you've done that in front of this judge that

18   sentenced you?

19   A.    Yes.

20   Q.    And you swore to him that you were telling the truth

21   at that time.

22   A.    Yes.

23   Q.    And were you telling the truth to the best of your

24   knowledge at that time?

25   A.    At the time, yes.

547

Redirect - Aguilar

1    Q.   And, again, why did you make it smaller today?

2    A.   I just wanted to tell the truth.

3    Q.   And when you were sentenced and defense counsel talked

4    about the guideline range of 37 to something, and

5    ultimately you received a 30-month sentence, who sentenced

6    you?

7    A.   The judge.

8    Q.   And he could have sentenced you anywhere from zero to

9    20 years as part of your plea; is that correct?

10   A.   That's correct.

11   Q.   And it was this judge and this judge alone that

12   decides that sentence?

13   A.   Yes.

14            MR. PHILLIPS:  Nothing further.  Thank you, Your

15   Honor.

16            THE COURT:  All right.  Thank you.  May this

17   witness be excused, Mr. Phillips?

18            MR. PHILLIPS:  Yes.

19            THE COURT:  For the defendant?

20            MR. LEONARD:  Yes, Your Honor.  Thank you.

21            THE COURT:  All right.  Mr. Aguilar, you're

22   excused and you may step -- oh, hold on, one minute.

23            We're going to do our little five-minute routine

24   again.  Ladies and gentlemen, we will be in recess for five

25   minutes.

1       (Jury left the proceedings at 11:53 a.m.)

2           THE COURT:  Who do we have next, Mr. Phillips or

3   Ms. Rangel?

4           MS. RANGEL:  Detective Alonzo Rivera.  So -- he's

5   at -- from Oklahoma City.

6           THE COURT:  Oh, he's by telephone?

7           MS. RANGEL:  No, he's here.  And, Your Honor,

8   we're pressing right up against the lunch break.  I don't

9   anticipate his testimony will be terribly long, I think

10  either on direct or cross.  He has a flight out today at

11  3:20.

12          THE COURT:  Okay.

13          MS. RANGEL:  I don't know if the Court's inclined

14  to let us go a little bit longer and take a later lunch

15  break to accommodate that.

16          THE COURT:  We can do that.  We can do that.

17          MS. RANGEL:  Thank you.

18          THE COURT:  What about Mr. Turner?  Are you going

19  to call him?

20          MS. RANGEL:  Oh, no.  No.

21          THE COURT:  Okay.  So I'm just looking at your

22  witness list and you've jumped over a couple of people.

23          MS. RANGEL:  I can tell the Court we will call

24  Detective Rivera and then Mr. Natha, he's the Red Roof Inn

25  representative.  Kenneth -- I don't know how to pronounce

 1    his last name -- LeCesne, he's from T-Mobile; Dan Johnson;

 2    and, if we have time, Detective Wehr.

 3              MR. LEONARD:  I think that's fine.  I don't expect

 4    very many questions of Sergeant Johnson, Detective Wehr.

 5    The T-Mobile representative and the Red Roof

 6    representative, those are 803(6) --

 7              THE COURT:  So that's your plan for the day.

 8              MS. RANGEL:  Yes.

 9              The COURT:  And then Investigator Mohlman tomorrow

10    morning.

11              MS. RANGEL:  And we do also have, Mr. Phillips is

12    reminding me, Christopher Vigil.

13              THE COURT:  Right.  Okay.  Yeah.  I would say --

14    so give me your -- let's see.  For Detective Rivera, you

15    have an hour-and-a-half.  And it's going to be pretty long,

16    if it's going to take an hour-and-a-half to have these

17    folks to wait until 1:30 to start their lunch.

18              MS. RANGEL:  I definitely would not want to do

19    that.  I think he could possibly be a half hour total.

20    Maybe --

21              MR. LEONARD:  Yeah, I think the biggest issue we

22    have with Detective Rivera is an evidentiary issue that we

23    are going to run into.

24              THE COURT:  Which means it will take longer than

25    half an hour to deal with him.

1          MS. RANGEL:  Well, and I think just as an offer of

2     proof, this is the detective that's going to talk about

3     meeting up with Ms. Quintanilla in the hotel.

4          THE COURT:  Okay.

5          MS. RANGEL:  And I have instructed him to not tell

6     me what she told him absent if it led him to take some

7     actions, such as meeting her at the hotel and the like.

8     But I'm not going to have him say, And then what she agreed

9     to do, and all of that, which I think is Mr. Leonard's

10    concern.

11         THE COURT:  Is that what your -- are you folks

12    here on hearsay issues?

13         MR. LEONARD:  A hearsay issue, a *Crawford* Sixth

14    Amendment confrontation issue, and this is --

15         THE COURT:  Okay.  And how so in your view?

16         MR. LEONARD:  Well,  Mr. -- sorry -- Detective

17    Rivera is going to be testifying as to what actions he's

18    taking based off this conversation.  And I don't know what

19    portion they want to get of those conversations.  We

20    haven't talked that far, but him saying what he did, we

21    have a right to confront the witness that is against --

22    I -- it's an end run of *Crawford* and the hearsay rules is

23    the defense's position.

24         THE COURT:  What's your response?

25         MS. RANGEL:  That they will have the opportunity

1    to cross-examine the witness as to the actions that he

2    took.  That's not a *Crawford* issue.  He's not going to say,

3    She told me that we would do the following sexual acts for

4    this amount of money, which I think arguably then perhaps

5    is a *Crawford* issue, but he's available for

6    cross-examination --

7              THE COURT:  He's going to be talking about what he

8    did, what he's observed.

9              MS. RANGEL:  Correct.

10             THE COURT:  All right.  I think if that's what

11   we're talking about, then I don't see there being a Sixth

12   Amendment issue.  All right.  Obviously if he says, Ms.

13   Quintanilla told me that the defendant brought her --

14   brought me -- or brought her here to Oklahoma to prostitute

15   herself, that's a different issue.

16             MS. RANGEL:  And he's absolutely not going to say

17   that.

18             THE COURT:  All right.  Well, let's try to -- I

19   think I'll go to about 12:40, but beyond that, I know the

20   jurors start to get antsy, they're not going to be

21   listening, and so if we could do another 40 minutes, then

22   I'll accommodate you and the detective's flight schedule.

23             MS. RANGEL:  Thank you, Your Honor.

24             THE COURT:  All right.  Let's bring in the jury.

25             (In open court in the presence of the jury at 11:58

1    a.m.)

2           THE COURT:  Ladies and gentlemen of the jury, just

3    a little heads-up.  Our next witness has a flight to catch

4    later this afternoon, mid-afternoon, back to Oklahoma City,

5    and so we're going to try to get him done, and -- which

6    means we're going to take our lunch break a little bit

7    later than we have been the last couple of days, but I told

8    counsel that I would try to accommodate his schedule.

9           So the Government may call its next witness.

10          MS. RANGEL:  Thank you, Your Honor.  The

11   Government calls Detective Alonzo Rivera.

12          Your Honor, I apologize.  The witness stepped

13   outside of the building briefly but he's currently coming

14   up the elevator.  Sorry.

15          THE COURT:  Bad timing on his part.

16          MS. RANGEL:  Yes, it was.

17          THE COURT:  Well, we'll all just hold tight.

18          MS. RANGEL:  Thank you, Your Honor.  I apologize.

19          THE COURT:  Has Ms. Wall gone after him?

20          MS. RANGEL:  She was texting him.

21          THE COURT:  Okay.

22          MS. RANGEL:  Would you like me to check?

23          THE COURT:  I think they're coming in now.

24          MS. RANGEL:  Great.  I apologize about that, Your

25   Honor.

Direct - Rivera

1      COURTROOM DEPUTY:  Right here, sir.  Just face me
2  and raise your right hand.
3      ALONZO RIVERA, GOVERNMENT'S WITNESS, SWORN
4      COURTROOM DEPUTY:  Please be seated.  State your
5  full name for the record and spell your first and last
6  name.
7      THE WITNESS:  Alonzo Rivera.  First name is
8  A-l-o-n-z-o.  Last name is R-i-v-e-r-a.
9      THE COURT:  Ms. Rangel.
10      MS. RANGEL:  Thank you, Your Honor.
11                  DIRECT EXAMINATION
12  BY MS. RANGEL:
13  Q.   Good afternoon.
14  A.   Good afternoon.
15  Q.   How are you currently employed?
16  A.   I'm a detective with the Oklahoma City Police
17  Department.
18  Q.   How long have you been in law enforcement?
19  A.   13 years.
20  Q.   Can you give us some idea of what you do as a
21  detective for the Oklahoma City Police Department.
22  A.   Yes, ma'am.  I am assigned to the Oklahoma City vice
23  unit.  We conduct prostitution investigations, human
24  trafficking investigations, illegal gambling
25  investigations, also assist the narcotics investigations.

Direct - Rivera

1    I speak Spanish so I get used quite a bit translating

2    during the different investigations.

3    Q.   How long have you been in the vice unit?

4    A.   3 1/2 years.

5    Q.   Do you participate in undercover investigations as

6    well?

7    A.   Yes, ma'am, I do.

8    Q.   Do you act as an undercover officer?

9    A.   Yes, ma'am, I do.

10   Q.   How long have you been doing that?

11   A.   Four years.

12   Q.   I want to direct your attention to March 17th, 2014.

13   A.   Uhm-hum.

14   Q.   Were you on duty on that date?

15   A.   Yes, ma'am, I was.

16   Q.   And were you part of the vice unit at that time?

17   A.   Yes, I was.

18   Q.   On that particular date, what were you doing?

19   A.   On that particular day, we -- I believe it was a

20   Monday, if I'm not mistaken -- we -- we had been assigned a

21   case over the weekend and got called in.  We were on -- we

22   were unable to -- to move forward with this investigation

23   during the weekend due to the people we were investigating,

24   they weren't getting in contact back with us.  So on

25   Monday, we picked up where we left off.

Direct - Rivera

1        COURTROOM DEPUTY:  Can you scoot up a little bit?

2    I think some of the jurors look like they're straining to

3    hear you.

4        THE WITNESS:  Yes, ma'am.

5        So approximately about 1300 hours on that day, I

6    made a phone call to a prostitution ad posted on

7    backpage.com.

8    BY MS. RANGEL:

9    Q.   If I may just interrupt you briefly here.

10   A.   Yes, ma'am.

11   Q.   I'm going to break that down with you.  So was that --

12       MR. LEONARD:  Your Honor, I want to object to his

13   commenting on an ad that's not in evidence, number one;

14   and, two, referencing it as a, quote, prostitution ad.

15   There's no evidence whatsoever of what he's even speaking

16   about.  Assumes facts not in evidence.

17       THE COURT:  Well, I think there's something to

18   that.  But I think Ms. Rangel is going to untangle that a

19   little bit, but maybe when she does that, it will be

20   clearer.  If you still have an objection, you can raise it

21   at that time.

22       Go ahead.

23       MS. RANGEL:  Thank you, Your Honor.

24   BY MS. RANGEL:

25   Q.   Now, this investigation that, it sounds like, began on

Direct - Rivera

1    the weekend and was continued into March 17th, 2014, was

2    that an investigation that originated in Oklahoma City or

3    did it originate in another jurisdiction that you were

4    assisting?

5    A.    It originated in another jurisdiction that we were

6    assisting.

7    Q.    And what was that other jurisdiction?

8    A.    Aurora, Colorado.

9    Q.    Had they -- and "they" being people from Aurora,

10   Colorado -- reached out to your vice unit for this

11   assistance?

12   A.    Yes, ma'am.

13   Q.    And when you talk about, I believe you mentioned,

14   backpage.com --

15   A.    Uhm-hum.

16   Q.    -- what is that?

17   A.    It's an online website where people can post ads in

18   reference to things they are selling.  Also it has

19   different -- different areas within the website where

20   people post massage parlor ads, things of that nature,

21   escorts, which -- which is:  You're paying for time and

22   companionship.

23         And us as a vice unit know that girls that are

24   working as prostitutes use that website to -- to

25   commercialize their business.

557

Direct - Rivera

1    Q.    And when you talk about backpage.com, is that a

2    website that you've become familiar with over your time in

3    the vice unit, which I think you said was four to five

4    years?

5    A.    Yes, ma'am.

6    Q.    Thank you.  And is that still an active website?

7    A.    The website is active; as of a couple of months ago

8    the escort and massage parlors section of it has been

9    censored.

10   Q.    When you look at the backpage.com website for this

11   investigation -- and, if I may, I'm going to have you look

12   at Government's Exhibits 53 and 54, which I think are in

13   the first binder.

14   A.    53 and 54?

15   Q.    Yes.

16   A.    Okay.  Yes, ma'am.  Exhibit 53 appears to be an online

17   prostitution escort ad posted on the escort section of

18   backpage.com.

19   Q.    What about 54?  Do you recognize 54?

20   A.    Yes, ma'am, I do.  It appears to be another

21   prostitution escort ad posted on backpage.com.

22   Q.    When you look at Government's Exhibits 53 and 54, were

23   those advertisements that you looked at as part of the

24   investigation that you're testifying about today?

25   A.    Yes, ma'am.

558

Direct - Rivera

1    Q.   You recognize those as what you saw on that date?

2    A.   Yes, ma'am.

3    Q.   And specifically is there a particular -- well,

4    actually, let me rephrase that.

5         Is there a photograph of a particular person

6    contained within that advertisement?

7    A.   Yes, ma'am.

8    Q.   Is it a woman?

9    A.   Yes, ma'am.

10   Q.   Is that consistent with the information you received

11   from law enforcement in Aurora, Colorado?

12   A.   Yes, ma'am.

13   Q.   Were you provided with any other individuals'

14   information, identifying information, that was part of this

15   investigation?

16   A.   Yes, ma'am.

17   Q.   And do you recall that person's information?

18   A.   Yes, ma'am.

19   Q.   What was that person's information?

20   A.   It was a male with the last name of Garrison, and the

21   first name of Kamil is what we were given at that time.

22   Q.   And could you spell that for the court reporter

23   possibly.

24   A.   Garrison is G-a-r-r-i-s-o-n.  Kamil is K-a-m-i-l.

25   Middle initial R.

Direct - Rivera

1    Q.    Were you provided with a photograph of --

2    A.    Yes, ma'am.

3    Q.      -- the person Garrison?

4    A.    Yes, ma'am.

5    Q.    And is that a male or a female?

6    A.    Male.

7    Q.    And so you were provided a photograph of Mr.

8    Garrison?

9    A.    Yes, ma'am.

10   Q.    With that information that's contained in Government's

11   53 and 54, did you contact anyone on March 17th, 2014?

12   A.    Yes, ma'am.

13   Q.    And was that contact number contained within 53 and

14   54?

15   A.    Yes, ma'am.

16   Q.    Was it a phone number?

17   A.    Yes, it was.

18   Q.    So when you contact that person, how did you contact

19   that person?

20   A.    We called the number listed on the ad.

21   Q.    When you called that person, did anyone answer?

22   A.    Yes, ma'am, a female that goes by the name Michelle.

23   Q.    She told you her name was Michelle?

24   A.    Yes, ma'am.

25   Q.    And did you ultimately arrange to meet this woman?

Direct - Rivera

1    A.    Yes, ma'am.

2    Q.    Now, understanding that you arranged to meet her, was

3    it one phone call or was there multiple phone calls?

4    A.    There were several phone calls.  Approximately three.

5    The initial one to set up an appointment to meet up, a

6    secondary one to -- which was a couple of hours later to --

7    to affirm and to find out the location where we were going

8    to meet up, and -- actually, there were four, and then one

9    that I received from Michelle looking for verification if I

10   was still on my way to meet with her.  And then the one

11   when I arrived, letting her know that I was in the area.

12   Q.    And where were you meeting up with this woman?

13   A.    Initially I was told to go to the area of I-40 and

14   South Meridian Avenue, which is interstate I-40 and South

15   Meridian.

16   Q.    And that's in Oklahoma City?

17   A.    Yes, ma'am.

18   Q.    What's at that area?

19   A.    It's a hotel district.  Several hotels run north and

20   south, some run east and west.  It's just depending on

21   where you are in that intersection.

22   Q.    Did you ultimately go to a specific location to meet

23   up with this woman?

24   A.    Yes, ma'am.  I went to the Red Roof Inn located at 309

25   South Meridian Avenue.

Direct - Rivera

1   Q.   And did you go to a particular room at the Red Roof

2   Inn?

3   A.   Yes, ma'am.

4   Q.   Do you recall the number of that room?

5   A.   I believe it was 226.

6   Q.   When you went to room 226, did you observe anyone

7   before you arrived at that room?  Did you observe anyone

8   that caught your attention?

9   A.   Yes, ma'am.  I received instructions from the young

10  lady who went by Michelle, and she told me to park on the

11  west side, which was the back part of the hotel area, next

12  to a red Chevy SS pickup truck.  So I followed the

13  directions.  And upon arrival I found the -- the particular

14  vehicle that she had identified, and I parked about two or

15  three spaces north of that space, facing east.  And there

16  was a -- there was a silver Porsche SUV parked about two or

17  three spaces north of me.  And inside the vehicle was a

18  gentleman, a black male, who was sitting in the seat and

19  looked like he was a -- either looking at an iPad or an

20  iPhone, a big phone, a tablet of some sort.

21  Q.   Did you have the opportunity to observe that male for

22  any sort of, I guess, significant period of time at that

23  point in time?

24  A.   Yes, ma'am.  Whenever I arrived, I called the same

25  number I had been calling to try to get back into contact

Direct - Rivera

1    with the young lady who identified herself as Michelle, to

2    let her know I was at the hotel.

3         Initially when I called, she didn't answer, it

4    went to voice mail, so I left a voice mail.  So I sat there

5    for a couple of minutes.  That gave me a time to look

6    around.  A lot of times in these kind of investigations, we

7    know that girls that are working as -- as prostitutes or

8    escorts have somebody with them as security or somebody

9    who's in charge of whatever business they're conducting to

10   collect the money or just as protection, usually known as a

11   pimp or a panderer.

12        So us knowing this kind of information, we usually

13   look for somebody acting as a lookout or as a security or

14   something to that effect.  And I noticed the individual

15   sitting in the SUV that was just north of me, two spaces

16   away, he -- he -- he kind of kept looking over at my car.

17   And -- and then a little bit afterwards I got -- received a

18   call from Michelle, from the same phone number.  Excuse me.

19   Q.   And there's some water there in case you need it.

20   A.   Thank you.  Allergies.  I apologize.  I don't know

21   what -- something got in my throat at the hotel here.

22   Let's see here.

23   Q.   I think if you just depress that -- there you go.

24   A.   So once I received the call back from the young lady,

25   she told me she was in room 226.  I proceeded to exit my

563

Direct - Rivera

1    vehicle and, as I did, the individual that was sitting in

2    the silver SUV, which had Colorado plates on it, kept

3    looking over at me, more often -- more often than not --

4    and kind of like he was checking me out, checking out what

5    I looked like and what I was doing.

6           As I made my way around the corner in front of my

7    vehicle, room 226 is upstairs on the east side of the

8    hotel, and once I went upstairs, I lost sight of the

9    individual.

10   Q.   Now, when you observed this man -- and you said it was

11   a Porsche SUV?

12   A.   Yes, ma'am.

13   Q.   When you observed this man, did you recognize him in

14   the context of this investigation?

15   A.   Yes, ma'am.

16   Q.   And how is it that you were able to recognize him?

17   A.   The information that was given to us over the weekend

18   when we got called in, we were presented with names and

19   photos, and we knew that we needed to be on a high level of

20   awareness, which we usually are in these kind of

21   investigations.  Officer safety is -- is of utmost

22   importance.

23           MR. LEONARD:  Your Honor, I object.  There's

24   absolutely no foundation for a fear of safety or concern.

25           THE COURT:  Overruled.  You may complete your

Direct - Rivera

1    answer, Detective, if you had any --

2            THE WITNESS:  Thank you, Your Honor.

3            We were advised that the individual, with

4    information we were presented with over the weekend, could

5    possibly be violent --

6            MR. LEONARD:  Objection, Your Honor.  There's no

7    foundation.  We have a motion before the Court on matters

8    like this.  It's been ruled on.  It touches on it.  Move to

9    strike the answer.

10           THE COURT:  Okay.  I'm going to sustain the

11   objection.  Why don't you rephrase, Ms. Rangel.  Maybe you

12   can guide your witness as to what you're looking for and

13   not -- what we're not here to look for.

14           MS. RANGEL:  Yes, Your Honor.

15           MR. LEONARD:  Your Honor before -- I think the

16   jury needs to be instructed by the Court to disregard that

17   answer in its entirety as it was improper.

18           THE COURT:  One second, let me read the answer.

19           THE WITNESS:  In these kinds of investigations --

20           THE COURT:  Oh, hold on, hold on.

21           All right, I sustain the objection.  And I will

22   instruct the jury to disregard that last response.

23           So, Ms. Rangel, I think if you focused your

24   witness in as to what exactly we're looking for here and

25   what we should stay away from, then I think we will be

Direct - Rivera

1    okay.

2              MS. RANGEL:   Okay.   Thank you, Your Honor.

3    BY MS. RANGEL:

4    Q.   Let me rephrase that question to you, okay?

5    A.   Okay.

6    Q.   When you saw this man in the Porsche SUV in the

7    parking lot --

8    A.   Yes, ma'am.

9    Q.   -- you recognized him.

10   A.   Yes, ma'am.

11   Q.   And you recognized him in the context of this

12   investigation.

13   A.   Yes, ma'am.

14   Q.   So focusing you specifically on your ability to use

15   your eyes and visually recognize him, was that because you

16   had been provided a photograph of this person?

17   A.   Yes, ma'am.

18   Q.   And that was from the law enforcement in Aurora,

19   Colorado?

20   A.   Yes, ma'am.

21   Q.   Do you see that person present in the courtroom today?

22   A.   Yes, ma'am, I do.

23   Q.   Can you please point him out by where he's seated and

24   an article of clothing that he's wearing.

25   A.   He's the gentleman sitting on the other side of the

Direct - Rivera

1    gentleman in the suit here.  He's wearing a collared shirt,

2    white, with -- it looks like blue -- blue or dark-colored

3    squares, wearing glasses, faded haircut.

4    Q.    Thank you for that detailed description.

5    A.    Yes, ma'am.

6          MS. RANGEL:  If the record could reflect he has

7    identified the defendant subject to cross-examination.

8          THE COURT:  The record will so reflect.

9    BY MS. RANGEL:

10   Q.    You noticed that the defendant was paying particular

11   attention to you.

12   A.    Yes, ma'am.

13   Q.    So when you went up to room 226 -- and, actually, I'm

14   sorry, before we get there, in the binder in front of you,

15   can you please look at Government's Exhibit 57.

16         THE COURT:  Are you going to move to admit the two

17   mentioned before?

18         MS. RANGEL:  I am not.

19         THE COURT:  You are not.

20         MS. RANGEL:  Thank you, though, Your Honor.

21         THE COURT:  Okay.

22         THE WITNESS:  Okay.  Exhibit 57 --

23   BY MS. RANGEL:

24   Q.    Do you recognize what's contained in Government's

25   Exhibit 57?

567

Direct - Rivera

1    A.   Yes, ma'am, I do.

2    Q.   And is that a depiction of that vehicle in the parking

3    lot at that time?

4    A.   I believe I'm -- Exhibit 57 is a -- is a receipt.

5    Q.   Oh, I apologize.  Did I write down the wrong number?

6    58.

7    A.   Yes, ma'am.  Exhibit --

8         THE COURT:  I think he just -- 56 -- you may be

9    looking at the wrong tab, Detective.

10        THE WITNESS:  Oh.

11        THE COURT:  56 is the receipt and 57 is the

12   photograph.

13        THE WITNESS:  I apologize.

14   BY MS. RANGEL:

15   Q.   That's okay.  You're keeping me -- keeping me on my

16   toes here.

17   A.   Yes, ma'am.  Exhibit 57 is a photograph of the silver

18   Porsche SUV.

19   Q.   And is that a fair and accurate representation of the

20   vehicle that you saw on March 17th, 2014?

21   A.   Yes, ma'am.

22        MS. RANGEL:  Your Honor, at this time I'd move to

23   admit Government's Exhibit 57.

24        THE COURT:  Any objection?

25        MR. LEONARD:  No.

568

Direct - Rivera

1          THE COURT:  All right.  There being no objection,

2    Exhibit 57 is admitted into evidence, may be published to

3    the jury.

4          (Government's Exhibit 57 received)

5          MS. RANGEL:  Thank you.  If we could go ahead and

6    publish 57.  And just so it's clear, that picture is a

7    little, perhaps, blurry.

8    BY MS. RANGEL:

9    Q.   Did you take that photograph?

10   A.   No, ma'am.

11   Q.   Was that taken by a fellow officer doing

12   surveillance?

13   A.   Yes, ma'am.

14   Q.   Now -- thank you.  When you arrived at room 226, who

15   was present in that room?

16   A.   A young lady by the name of -- last name of

17   Quintanilla, first name is Heather.

18   Q.   And could you spell that last name for the court

19   reporter, please.

20   A.   Yes, ma'am.  It's Q-u-i-n-t-a-n-i-l-l-a.  Quintanilla.

21   Q.   And was that the same woman depicted in Government's

22   53 and 54?

23   A.   Yes, ma'am.

24   Q.   Were you able to confirm that that was also the same

25   woman you had been speaking to on the phone?

Direct - Rivera

1    A.    Yes, ma'am.

2    Q.    Was anyone else present in the room?

3    A.    No, ma'am.

4    Q.    When you entered the room, did you engage Ms.

5    Quintanilla in kind of general conversation?

6    A.    Yes, ma'am.

7    Q.    And I don't want you to go into the specifics of what

8    she told you; we're going to focus specifically on what you

9    said to her.

10   A.    Okay.

11   Q.    Did you talk to her about anything sexual in nature?

12   A.    Yes, I did.

13   Q.    And specifically what did you say to her?

14   A.    After our general conversation, I asked her if -- the

15   time I was paying for, if I was going to be able to hit it

16   from the back.

17   Q.    And what did you mean by that?

18   A.    Sexual intercourse from behind.

19   Q.    Based on your conversation with Ms. Quintanilla, did

20   you do anything with regard to money?

21   A.    Yes, ma'am.

22   Q.    What did you do?

23   A.    For an hour of the young lady's time it was going to

24   be $250.  Due to not having any change, I paid -- I -- I

25   removed $260 out of my wallet and placed it on a -- on

Direct - Rivera

1   the -- kind of like a counter inside the hotel room.

2   Q.   Did you see Ms. Quintanilla do anything with regard to

3   that money?

4   A.   Yes, ma'am.  She grabbed the money and put it inside a

5   black purse.

6   Q.   Once Ms. Quintanilla took that money, what happened?

7   A.   We continued to -- after -- after she took the money,

8   we continued to engage in conversation, which is more

9   sexual in nature at that --

10          MR. LEONARD:  Objection, Your Honor.  That's

11  hearsay.  It goes to the confrontation of the Sixth

12  Amendment issue.  He's describing the conversation, not

13  what he was doing or what he was saying, and I would move

14  to strike that and have the jury instructed to disregard.

15          THE COURT:  All right.  I'm going to sustain the

16  objection.  The jury's instructed to disregard the

17  response.  We'll strike that response.

18          I think if we rephrase the question, we can stay

19  away from the issues --

20  BY MS. RANGEL:

21  Q.   And understanding, Detective Rivera, that you were not

22  telling me what Ms. Quintanilla said just now, let's talk

23  about what happened.

24  A.   Okay.

25  Q.   Was she ultimately taken into custody after she took

Direct - Rivera

1    the money?

2    A.   Yes, ma'am.

3    Q.   And how did that happen?

4    A.   A -- a take-down team who also works as a surveillance

5    team, prior to me entering the room, goes into the room

6    with my assistance, once I'm in the room I allow them in,

7    and they assist in taking the young lady into custody.

8    Q.   What was she taken into custody for?

9    A.   Offering to engage in an act of prostitution.

10   Q.   Is that a crime in the state of Oklahoma?

11   A.   Yes, ma'am.

12   Q.   I'm going to direct you to Government's Exhibit 55.   I

13   think you're -- if you just go -- oh, yeah.   I think it's a

14   couple back.

15   A.   Yeah, Exhibit 55 is a picture of Heather

16   Quintanilla.

17   Q.   And is that a fair and accurate photograph of how she

18   appeared on March 17th, 2014?

19   A.   Yes, ma'am.

20        MS. RANGEL:   Your Honor, at this time I'd move to

21   admit Government's 55.

22        THE COURT:   Any objection?

23        MR. LEONARD:   No objection.

24        THE COURT:   There being no objection, Exhibit 55

25   is admitted into evidence and may be published to the jury.

Direct - Rivera

1        MS. RANGEL:  Thank you.

2        (Government's Exhibit 55 received)

3    BY MS. RANGEL:

4    Q.   Now, you indicated that Ms. Quintanilla had a black

5    purse.

6    A.   Yes, ma'am.

7    Q.   Was that purse searched after she was arrested?

8    A.   Yes, it was.

9    Q.   Can you just generally describe what was located

10   inside of her purse.

11   A.    Condoms, jewelry, personal hygiene.  The money that I

12   initially put on the counter inside the hotel room.

13   Q.   And was there any sort of documentation in her purse

14   regarding that hotel room?

15   A.   Yes, there was.

16   Q.   And I believe we've already looked at it.  I think

17   it's Government's Exhibit 56.

18   A.   Yes, ma'am.

19   Q.   Do you recognize Government's 56?

20   A.   Yes, ma'am.

21   Q.    Is that a fair and accurate representation of the

22   paperwork found in Ms. Quintanilla's purse?

23   A.   Yes, ma'am.

24   Q.   With regard to what was in her purse, was there also

25   anything associated with backpage.com that was found inside

573

Cross - Rivera

1   of her purse?

2   A.   There were prepaid phone cards.  As far as it being

3   connected to that page, I don't recall any -- anything in

4   her purse actually addressing backpage.

5   Q.   Did any law enforcement officer have any contact with

6   the defendant in that parking lot where you had observed

7   him?

8   A.   No, ma'am.  Nobody made contact with the individual in

9   the parking lot.

10          MS. RANGEL:   I have no further questions.

11          THE COURT:   Cross-examination.

12          MR. LEONARD:   One second, please, Your Honor.

13                        CROSS-EXAMINATION

14   BY MR. LEONARD:

15   Q.   Detective, how are you?

16   A.   Good, sir.  How are you?

17   Q.   I'm well.  Thank you very much.

18          Detective, to make it clear, you didn't arrest Mr.

19   Garrison on March 17th, 2014, correct?

20   A.   Correct, sir.  We did not.

21   Q.   No member of your investigative team arrested Mr.

22   Garrison; is that correct?

23   A.   Say that again.

24   Q.   Sure.  No member of your investigative team arrested

25   Mr. Garrison on March 17th, 2014.

574

Redirect - Rivera

1    A.    No, sir.

2    Q.    I want to talk about items that you got off of Ms.

3    Quintanilla.  You were also able to get a driver's license

4    off her, weren't you?

5    A.    Yes, sir.

6          MR. LEONARD:  Thank you.  No further questions.

7          THE COURT:  Redirect?

8          MS. RANGEL:  Just briefly.

9                      REDIRECT EXAMINATION

10   BY MS. RANGEL:

11   Q.    Did you ever see Ms. Quintanilla associated with a

12   vehicle in the parking lot?

13         MR. LEONARD:  Objection, Your Honor.  It's beyond

14   the scope of cross.

15         MS. RANGEL:  Your Honor, the implication of the

16   last question was that she has a driver's license, and we

17   know from defense counsel's opening that he's going to

18   claim that she got her there herself.

19         THE COURT:  You're right.  I agree with Ms.

20   Rangel.  Overruled.

21   BY MS. RANGEL:

22   Q.    Do you need me to re-ask it?

23   A.    No, ma'am.  She -- we did not observe her in the

24   vehicle any time.

25   Q.    And specifically any vehicle, not just the Porsche

575

1    SUV; any vehicle in the parking lot?

2    A.    Not any vehicle.

3              MS. RANGEL:   Thank you.

4              THE COURT:   May this witness be excused?

5              MS. RANGEL:   Please, Your Honor.

6              THE COURT:   All right.   For the defendant?

7              MR. LEONARD:   Yes.   Thank you, Your Honor.

8              THE COURT:   All right, Detective, thank you very

9    much for your testimony.   You're excused.   You may step

10   down.   Safe flight back to Oklahoma.

11             THE WITNESS:   Thank you, Your Honor.

12             MS. RANGEL:   Thank you for accommodating him.

13             THE COURT:   Sure.   Just hold tight one second.

14             Ladies and gentlemen of the jury, we're going to

15   take our lunch break now.   I remind you please do not

16   discuss this case with anyone, don't do any independent

17   research into the facts, the law, or the individuals

18   involved in this case.

19             We will be in lunch recess until 1:45.

20        (Recess at 12:32 p.m.)

21                       AFTERNOON SESSION

22        (In open court out of the presence of the jury at 1:52

23   p.m.)

24             THE COURT:   Mr. Phillips, do you have that

25   statement for us?

1          MR. PHILLIPS:  I do not have it completely done.

2     I did bring my computer.  I believe myself and Mr. Mohlman

3     and Ms. Rangel can complete it during our afternoon break.

4     I'm quite certain that we won't get through all of our

5     witnesses today, but I will have it completed.  I know

6     we're up to Government Exhibit 40; is that correct?  32.

7     And once we figured out how to do it, it will be moving

8     very quickly.  We just didn't want to be late for court.

9          THE COURT:  Okay.  So -- all right, I think the

10    latest I want it is when we break here at the end of the

11    day.

12         MR. PHILLIPS:  Oh, absolutely.

13         THE COURT:  Yeah.  So if you can get it done by

14    the afternoon break, or give it to us at the afternoon

15    break, that would be great.

16         MR. PHILLIPS:  We will absolutely work on it

17    during that break.

18         THE COURT:  Okay.  All right.  Let's bring in the

19    jury.

20        (Jury was present at 1:54 p.m.)

21         THE COURT:  The Government may call its next

22    witness.

23         MS. RANGEL:  Thank you, Your Honor.  The

24    Government calls Kenneth LeCesne to the stand.

25         COURTROOM DEPUTY:  Right here.  If you would face

577

1    me and raise your right hand, sir.

2             KENNETH LeCESNE, GOVERNMENT'S WITNESS, SWORN

3             COURTROOM DEPUTY:  Please be seated.

4             THE WITNESS:  Thank you.

5             COURTROOM DEPUTY:  Please state your full name for

6    the record and spell your first and last name.

7             THE WITNESS:  Kenneth LeCesne.  That's

8    K-e-n-n-e-t-h.  L-e capital C-e-s-n-e.

9             THE COURT:  Go ahead.

10            MS. RANGEL:  Thank you, Your Honor.

11                        DIRECT EXAMINATION

12   BY MS. RANGEL:

13   Q.   Good afternoon, sir.

14   A.   Good afternoon, ma'am.

15   Q.   Are you currently employed?

16   A.   Yes, ma'am.

17   Q.   Where do you work?

18   A.   I work for T-Mobile Metro PCS Cellular Telephone

19   Company located in Richmond, Texas.

20   Q.   What do you do for -- can we call them T-Mobile for

21   simplicity sake?

22   A.   Yes.  My official title is records custodian slash

23   testifier.  Basically when I'm assigned to a specific case,

24   I usually travel and I authenticate and explain the records

25   as they apply to that specific case.

578

1    Q.   And when we talk about records, are we talking about

2    records that are made and created by T-Mobile?

3    A.   Yes, ma'am.

4    Q.   Can you just kind of generally explain to the jurors,

5    if you will, when you talk about -- it sounds like your job

6    is to travel nationwide and testify.

7    A.   Yes, ma'am.

8    Q.   And when you're talking about records -- and in

9    relation to T-Mobile, what kind of records are we talking

10   about?

11   A.   T-Mobile keeps several different types of records.

12   They keep call detail records, which are phone logs of

13   historical phone calls that are made at the time a T-Mobile

14   customer either makes a call or receives a call.

15        They keep subscriber records.  Subscriber records

16   are the records that are actually created at the time a

17   customer goes into a T-Mobile store and purchases a phone

18   and/or the T-Mobile service.

19        And then they also keep other records also, pings

20   or actually records that are kept at realtime, and that is

21   something that's -- that's when the phone company -- when

22   the proper documents come into the phone company, request

23   that a phone actually be located by the company, the

24   company will actually ping that phone or call that phone

25   and send that information to the requesting law enforcement

579

1    agency, or U.S. Attorney's Office, depending on how often

2    they want it and the dates that they want it for.

3    Q.   So you are talking about pings?

4    A.   Yes, ma'am.

5    Q.   What's a ping?

6    A.   A ping is when the phone company actually calls the

7    phone, and that's for realtime location of the hand-held

8    device, itself.   That information is -- can be requested

9    for certain time periods.   The pings can occur usually

10   every 15 minutes for a length of time, and then that

11   information is sent to the requesting agency when the

12   proper documents come in the company in the form of a

13   search warrant or a court order.

14   Q.   Now, when you talk about T-Mobile contacting a

15   particular cell phone, does the person who is physically

16   holding that cell phone when T-Mobile calls it, do they

17   know that T-Mobile is calling it?

18   A.   Not on pings.   The pings are done automatically by the

19   company.   That depends on what the court order actually

20   requests.   If the court order requests that the person be

21   notified, then they will -- they will -- they will show

22   that; but if they request that they not be notified, then

23   they can do it without the customer knowing that the phone

24   is actually being utilized.

25   Q.   So correct me if I'm wrong, Mr. LeCesne, but it sounds

580

1    like what you're saying is that T-Mobile kind of keeps

2    these records of these pings and, depending on what the

3    court order tells T-Mobile to do with it, they then will do

4    that, send out that information, et cetera.

5    A.    To the requester, yes, ma'am.

6    Q.    Okay.  With regard to why you are here today, were

7    you -- were you provided with certain numbers so that you

8    knew why you were here today?

9    A.    Yes, ma'am.

10   Q.    Okay.  If you could please turn to Government's

11   Exhibit 12.  I believe that's in the first binder.

12   A.    Yes, ma'am.

13   Q.    And do you recognize a phone number on Government's

14   Exhibit 12 that's part of why you are here today?

15   A.    Yes, ma'am.

16   Q.    Could you tell us what that number is.

17   A.    That number is 720-505-1613.

18   Q.    And when you look at Government's Exhibit 12, do you

19   recognize what's contained there?

20   A.    Yes, ma'am.

21   Q.    What -- is that an example of a ping?

22   A.    That is an example of a specific ping, yes, ma'am.

23   Q.    And more specifically, is that an example of a

24   business record that's kept in the regular course of

25   business by T-Mobile?

581

1    A.   Yes, ma'am.

2             MS. RANGEL:   Your Honor, at this time I would move

3    to admit Government's Exhibit 12.

4             THE COURT:   I have to find it amidst all these

5    binders here.

6             MS. RANGEL:   Oh, I apologize.

7             THE COURT:   That's all right.   Let me take a look

8    at it.   This is No. 12?

9             MS. RANGEL:   Yes.

10            THE COURT:   Is there any objection?

11            MR. McDERMOTT:   Your Honor, my -- my only

12   objection is I believe that the technology calls for

13   specialized knowledge, and I -- and so my objection is

14   under 702.

15            THE COURT:   Ms. Rangel, is this what we are

16   talking about?

17            MS. RANGEL:   Yes.   And, Your Honor, if I may?

18            THE COURT:   Yeah.

19            MS. RANGEL:   I'm moving to admit it pursuant to

20   803(6) and the witness has testified that Government's

21   Exhibit 12 is an example of a record that is kept in the

22   regular course of T-Mobile's business.

23            THE COURT:   Okay, the objection's overruled.

24   Government's Exhibit 12 is admitted into evidence and may

25   be published to the jury.

582

1              MS. RANGEL:  Thank you.

2              MR. McDERMOTT:  And, Your Honor, just so my

3    record's clear, my -- my 702 objection is based on the

4    underlying science involved with the pings and not whether

5    it's a business record or not.

6              THE COURT:  I understand.  Ms. Rangel's

7    articulated another ground by which I can admit this based

8    on hearsay exception, and I disagree that this is

9    information that requires specialized education or training

10   such as 702 would be the only way that this would come in.

11   So your objection's overruled.  Exhibit 12 is admitted and

12   may be published to the jury.

13        (Government's Exhibit 12 received)

14             MS. RANGEL:  Thank you, Your Honor.

15             If we could just expand the white portion of it,

16   please.  Thank you.

17   BY MS. RANGEL:

18   Q.   Now, Mr. LeCesne, when we look at Government's

19   Exhibit 12 and this ping, is it fair to say that cell phone

20   pinging can occur very frequently or not very frequently?

21   A.   It depends on the court order that comes into the

22   company.  The court order or the search warrant that comes

23   into the company requesting the ping has to give a certain

24   specific date and a certain specific time period on how

25   often they -- the specific phone is actually called by the

1    company or pinged.

2    Q.    And so in your experience with T-Mobile, and the times

3    you've testified to pings, can you give the jury an idea of

4    the quickest or most frequent amount of time you've seen

5    pings and perhaps the furthest apart you've seen pings?

6    A.    The ones that I have personally actually done pings

7    were usually every 15 minutes.  Now, it could be longer, it

8    could be shorter, but the ones that I have personally

9    actually did the pings with were 15 minutes.  That's

10   usually what it is, every 15 minutes.

11   Q.    So what we're looking at right now in Government's

12   Exhibit 12 is just one ping.

13   A.    That's correct.

14   Q.    And so this is one example of T-Mobile contacting that

15   720 number.

16   A.    That's correct.

17   Q.    And the -- can you tell the jury what additional

18   information is provided in this record.

19   A.    It actually has the date.  The date was on 11-29 of

20   2013.  It has the time of 7:35 and 15 seconds p.m.  That

21   time is in Pacific time.  It has the latitude, which is the

22   positive decimal number; and it has the longitude, which is

23   the negative decimal number.  And --

24   Q.    And the -- I apologize, I did not mean to interrupt

25   you.

584

1          Mr. LeCesne, these screens are actually -- you can

2     write on them with your finger or -- I don't know if

3     there's a little stylus up there, if that would aid you in

4     explaining that to the jury.

5     A.   Okay.   I don't see the stylus.

6     Q.   I think Ms. Hansen is getting it for you.

7     A.   No problem.

8          MS. RANGEL:   Thank you, Ms. Hansen.

9          COURTROOM DEPUTY:   Here you go, sir.

10         THE WITNESS:   Thank you, ma'am.

11    BY MS. RANGEL:

12    Q.   And, I'm sorry, I did not mean to cut you off.

13    A.   No problem.   I'll just go back.   The request is for

14    the location of the phone ending in 1613.   That's a

15    T-Mobile phone number.

16         THE COURT:   Can we blow this up any more?   This is

17    really small font.

18         MS. RANGEL:   Is that better, Your Honor?

19         THE COURT:   Yeah.

20         THE WITNESS:   This is the phone number.   I'll put

21    a mark by it.   It's the number ending in 1613.   The date is

22    next, 11-29 of 2013.   The time this was requested was at

23    7:35 and 15 seconds p.m.   That is Pacific Standard Time,

24    and the result of where that particular hand-held device of

25    that phone was, the latitude, is the -- is right here.

585

1   That is the positive number; and the longitude is the

2   negative number.  And that gives the exact location of

3   where the hand-held device is.

4          At the very end you will see uncertainty, and then

5   a colon, and six meters.  What that means is that phone was

6   within six meters of that exact location at that specific

7   time that that ping was made.

8   BY MS. RANGEL:

9   Q.   And, Mr. LeCesne, when we look at that information,

10  does that say who is using that phone at that time?

11  A.   That information is not on this particular document.

12  Q.   Does it just say that that particular device is

13  pinging off of a tower at that location?

14  A.   Yes.  That is the exact location of the phone, itself.

15  Yes, ma'am.

16  Q.   It does not say who's actually using that device.

17  A.   No.  I can't tell you from this who's using the

18  phone.

19  Q.   And it doesn't tell you what they were doing.

20  A.   No.

21  Q.   If we could next go to Government's Exhibit 44,

22  please.  And I think -- Mr. LeCesne, I think that's in that

23  same binder.  Oh, I apologize.  It's going to be in the

24  second binder.

25  A.   I'm sorry.

1   Q.   I'm sorry.

2   A.   Thank you, ma'am.  Yes, ma'am.

3   Q.   And do you recognize what is in Government's Exhibit

4   44?

5   A.   Yes, ma'am.  This is the location for a different

6   T-Mobile phone number.  That number is 719-354-8298.  This

7   particular ping was done on 3-1 of 2014.

8   Q.   And, Mr. LeCesne --

9   A.   Yes.

10  Q.   -- if I could have you just pause for one moment.

11  A.   Yes.

12  Q.   Is Exhibit 44 also an example of a business record

13  that is kept by T-Mobile in the regular course of business?

14  A.   Yes, ma'am.

15          MS. RANGEL:  Your Honor, at this time I would move

16  to admit Government's Exhibit 44.

17          THE COURT:  Any objection?

18          MR. McDERMOTT:  Same objection with respect to the

19  underlying technology, Your Honor, and 702.

20          THE COURT:  All right.  Overruled.  Exhibit 14 is

21  admitted into evidence, may be published to the jury.

22          MS. RANGEL:  Thank you.

23          COURTROOM DEPUTY:  Exhibit 44, Your Honor?

24          MS. RANGEL:  Yes.

25          THE COURT:  What did I say?  14?  Sorry.  44.

587

1          (Government's Exhibit 44 received)

2               MS. RANGEL:  I heard 44, if that helps.

3               THE COURT:  I messed up.  All right.  44.

4               MS. RANGEL:  And if we could, then, publish that

5     for the jury.

6     BY MS. RANGEL:

7     Q.    And, Mr. LeCesne, before we go to that same part --

8     that same last line --

9     A.    Yes, ma'am.

10    Q.    This top portion of it -- and particularly I'm going

11    to direct you to -- I'm drawing on the screen, kind of a

12    really messy bracket right there that says, This message

13    has been archived.

14    A.    Yes, ma'am.

15    Q.    Any of that -- those three lines there, does that

16    pertain to location information of the ping?

17    A.    No, ma'am.  That -- that is something that the company

18    uses when they archive a record for a certain period of

19    time.  The actual location is going to be on the bottom

20    line.

21    Q.    And before we get there, just briefly, this portion up

22    here, is that information of who sent it, to whom they sent

23    it, and when?

24    A.    That's correct.

25               MS. RANGEL:  Okay.  Now, if we could perhaps blow

588

1    up just that bottom sentence.  Thank you.  If we could zoom

2    out just a little bit to the very end of it.  Perfect.

3    Thank you.  Oh, nope.  That's perfect, thank you.

4    BY MS. RANGEL:

5    Q.    Okay.  So, Mr. LeCesne, if you could just explain to

6    us what we're looking at on Government's Exhibit 44 on that

7    last line.

8    A.    Okay, I'll be going from left to right.  The location

9    of the hand-held device, the number is 719-354-8298.  This

10   particular ping occurred on 3-1 of 2014.  The time is

11   1:06:51 p.m., that's Pacific time.  And the result is the

12   latitude was 39.66028 and the longitude was negative

13   105024555, with an uncertainty of within four meters.  That

14   particular device was within four meters of that exact

15   location.

16   Q.    And similarly to what we talked about with

17   Government's Exhibit 12, does that tell us who is utilizing

18   that device at that time?

19   A.    No, ma'am.

20   Q.    And does it tell us what that person is doing?

21   A.    No, ma'am.

22   Q.    It simply tells us where that device is at that time.

23   A.    That's correct.

24          MS. RANGEL:  I have no further questions.

25          THE COURT:  Cross-examination?

1              MR. McDERMOTT:  No questions, Your Honor.

2              THE COURT:  All right.  May this witness be

3       excused, Ms. Rangel?

4              MS. RANGEL:  Yes, please.

5              THE COURT:  For the defendant?

6              MR. McDERMOTT:  Yes, Your Honor.

7              THE COURT:  All right, sir, thank you very much

8       for your testimony.

9              THE WITNESS:  Thank you, sir.

10             THE COURT:  You are excused.  You may step down.

11             All right.  The Government may call its next

12      witness.

13             MS. RANGEL:  Thank you.  The Government next calls

14      Mr. Tushar Natha.

15             COURTROOM DEPUTY:  Just stand there and raise your

16      right hand, please.

17             TUSHAR NATHA, GOVERNMENT'S WITNESS, SWORN

18             COURTROOM DEPUTY:  Please be seated.  State your

19      full name for the record and spell your first and last

20      name.

21             THE WITNESS:  Tushar Natha.  T-u-s-h-a-r, last

22      name N-a-t-h-a.

23             THE COURT:  Ms. Rangel.

24             MS. RANGEL:  Thank you, Your Honor.

25                       DIRECT EXAMINATION

Direct - Natha

1    BY MS. RANGEL:

2    Q.   Good afternoon, sir.

3    A.   Good afternoon.

4    Q.   Are you currently employed?

5    A.   Yes.

6    Q.   What do you do?

7    A.   Employed at Red Roof Inn.  I'm a managing member.

8    Q.   And what does that mean to be a managing member of Red

9    Roof Inn?

10   A.   Overlook the hotel.

11   Q.   And specifically one hotel or more than one hotel?

12   A.   More than one hotel.

13   Q.   Where are the hotels that you overlook?  Where are

14   they located?

15   A.   On -- in Oklahoma City.

16   Q.   How many hotels do you manage?

17   A.   Three.

18   Q.   Three?

19   A.   Yes.

20   Q.   How long have you been a manager for Red Roof Inn?

21   A.   Since 2008.

22   Q.   And have you -- well, let me ask it this way:  As the

23   manager of Red Roof Inn, generally what do you do?

24   A.   I make sure everything's the way it's supposed to

25   be.

591
Direct - Natha

1    Q.   And what does that mean?

2    A.   Make sure the work is done, keep an eye on the manager

3    at the front desk, housekeeping --

4    Q.   Do you do any sort of bookkeeping for Red Roof Inn?

5    A.   Yes.  Yes, we do -- I do write checks.

6    Q.   And do you have the opportunity to review records that

7    are kept by the company?

8    A.   Yes.

9    Q.   Do you -- in your experience with Red Roof Inn, do you

10   ever look at receipts?

11   A.   Yes.

12   Q.   How are receipts generated by Red Roof Inn?

13   A.   From the PMS system.

14   Q.   What does that mean?

15   A.   From the computer.

16   Q.   So if a guest comes to a Red Roof Inn motel, do they

17   receive a receipt as part of that transaction?

18   A.   Yes.

19   Q.   And does Red Roof Inn then retain a copy of that

20   receipt?

21   A.   Yes.

22   Q.   What does the receipt contain information-wise?

23   A.   I have a copy if you want.

24   Q.   If you could just kind of generally tell us what is

25   generally on a generic receipt.

Direct - Natha

1    A.   Name, their address, room charge, and a form of

2    payment.

3    Q.   I'm going to have you take a look at -- it's going to

4    be in the second binder -- Government's Exhibit 56.

5    A.   Okay.  Yes.

6    Q.   Do you recognize Government's Exhibit 56?

7    A.   Yes, I do.

8    Q.   Is that a photograph of a document that you recognize?

9    A.   Yes.

10   Q.   Do you recognize the information on that document as

11   part of your job as a manager of Red Roof Inn?

12   A.   Yes.

13   Q.   And is that document, the contents of that document,

14   is that kept by Red Roof Inn in the regular course of

15   business?

16   A.   Yes, it is.

17             MS. RANGEL:  At this time, I'd move to admit

18   Government's Exhibit 56.

19             THE COURT:  Any objection?

20             MR. LEONARD:  Yeah, I object.  Exhibit 56 is a

21   photocopy.  It's not a complete and accurate representation

22   of the purported receipt, and does not qualify under

23   803(6).

24             THE COURT:  How is it incomplete?

25             MR. LEONARD:  There's the section on the bottom

Direct - Natha

1   that is cut off.  I can't read it.  I have no idea what it

2   says on that.

3           THE COURT:  Do we know what's on the bottom there,

4   Ms. Rangel?

5           THE WITNESS:  I have a copy if you want to look at

6   it.

7           MS. RANGEL:  If I may take a look at his copy.  I

8   have not seen his copy.

9           THE COURT:  Okay.  Go ahead.

10          MS. RANGEL:  Thank you.

11          THE COURT:  Why don't you let Mr. Leonard look at

12  it, too.

13          MR. LEONARD:  Sorry, Your Honor.  We are trying to

14  compare -- it's --

15          THE COURT:  That's all right.  Do what you've got

16  to do.

17          MS. RANGEL:  Your Honor, if I may -- and I don't

18  think I'm going to run afoul of anything here -- what this

19  witness has given me is -- and correct me if I'm wrong --

20  it's a printout from the Red Roof Inn system, as opposed to

21  the photocopy that was taken of a receipt that was found in

22  a purse.  And so Mr. Leonard has informed me that he would

23  prefer the copy that the witness just brought, which I'm

24  amenable to.

25          If the Court will allow us to swap out Exhibit 56,

Direct - Natha

1    we'll replace it in the binders, and use this copy.  It's

2    the same information; it's in a different format.

3         THE COURT:  Since you've already examined this

4    witness on what is now 56, instead of swapping it out,

5    let's just make it a new exhibit.

6         MS. RANGEL:  Okay.  Would it be acceptable to the

7    Court if I made it 56-A?

8         THE COURT:  Sure.

9         MS. RANGEL:  Okay.  Thank you, Your Honor.  And if

10   I -- I'll use the ELMO, if that's acceptable, and we'll get

11   it into electronic format as well.

12        THE COURT:  Okay.  How can we make -- why don't

13   you hand it to Ms. Hansen.

14        Deb, can you real quick make some copies?

15        MS. RANGEL:  And, so, while Ms. Hansen's doing

16   that, at this point in time, I would still move to admit

17   Government's Exhibit 56.

18        THE COURT:  Well, I --

19        MS. RANGEL:  And I'm sorry if we need her in here,

20   I can --

21        THE COURT:  No, no.  So 56-A is not the same as

22   56.

23        MS. RANGEL:  They are not the same.  They are the

24   same business records in that they both come from Red Roof

25   Inn and they both contain the -- they contain the same

Direct - Natha

1    information on the same transaction.  What he has provided

2    is a very detailed invoice of -- this is specifically for

3    this room, these are the taxes, all of that, whereas

4    this -- what is contained in 56 is an -- the actual receipt

5    that was tendered at the time of the transaction.

6            THE COURT:  Okay.  So you're not going to try to

7    get 56 in anymore, it will just be 56-A?

8            MS. RANGEL:  I would move to admit both of them.

9            THE COURT:  Okay.  Oh, both.

10           MS. RANGEL:  And, Your Honor, Detective Rivera,

11   who testified before the break, looked at Government's

12   Exhibit 56 and recognized that document as part of that

13   transaction as well.

14           THE COURT:  Yeah.  But my concern is that I think

15   Mr. Leonard has a point that there's obviously text that

16   was cut off and is not included in the receipt.  I don't

17   know if it's material or immaterial to any of the issues

18   here.

19           So what we're going to do -- I think the better

20   thing to do is I'm going to sustain the objection to 56 and

21   I'm going to go -- let me ask, is there an objection to

22   56-A?

23           MR. LEONARD:  Sorry, I thought there was a flash.

24           MS. RANGEL:  Yeah, the light bulb went out.

25           MR. LEONARD:  No, Your Honor.  I believe that the

596

Direct - Natha

1    witness has laid a sufficient foundation under 803(6) for

2    the copy that I have received.

3            THE COURT:  All right.  So 56 is refused; 56-A is

4    admitted into evidence.  And you can publish it to the jury

5    via the ELMO.  And then sometime today before you leave,

6    let's get an exhibit sticker on this one and then Ms.

7    Hansen can put it in the official exhibit binder.

8            MS. RANGEL:  Okay.  Thank you, Your Honor.

9        (Government's Exhibit 56-A received)

10           MS. RANGEL:  And if I may, I understand the

11   Court's ruling on Government's Exhibit 56.  I'm just

12   wondering if I can inquire of Mr. Natha as to that bottom

13   portion to see if he knows; and if he does not know, I'll

14   move on.

15           THE COURT:  Well, what's so important about

16   getting them both in if they both have the same

17   information?  Why would we spend time trying to get 56 in

18   if we have 56-A in?

19           MS. RANGEL:  Your Honor, 56 was the receipt that

20   was recovered from Ms. Quintanilla's purse and it contains

21   a license plate --

22           MR. LEONARD:  Your Honor, can I object, there

23   needs to be a side bar, I think, because --

24           THE COURT:  Yeah, let's not go into the contents

25   of an exhibit that's not in evidence.  Would counsel

597

Direct - Natha

1   approach.

2        (Discussion at side bar)

3            THE COURT:  Okay.

4            MS. RANGEL:  So, Your Honor, it's really just to

5   follow up.  Detective Rivera's already testified that this

6   is the receipt that he observed in Ms. Quintanilla's purse.

7   The only other difference I think in terms of it is that 56

8   contains the license plate number that's been handwritten

9   on.  The issue that Mr. Leonard has raised is at the very

10  bottom of 56, there's a stamp that's been cut off.  I think

11  Mr. -- I believe -- I think Mr. Natha will be able to

12  testify what that is because there's a corresponding stamp

13  that is visible in 56.  And I think in terms of

14  admissibility of this pursuant to 803(6), I think that the

15  sufficient foundation has been made, and I think the

16  objection that the stamp has been cut off goes to weight

17  and not admissibility of 56.

18           THE COURT:  Mr. Leonard.

19           MR. LEONARD:  Well, Exhibit 56 has handwriting on

20  it.  The business records custodian indicated that the

21  exhibits are generated by the computer.  There's something

22  that's cut off.  I can't tell the Court what is cut off;

23  what else is on there; and it is not a complete and

24  accurate business record.  And the purse -- the reason they

25  want to use it is to get information to link my client to

Direct - Natha

1    the vehicle.  And a business record can also be testimonial

2    in its aspect under both Cumming and the Supreme Court

3    talked about that with laboratory tests, and that's what

4    they're trying to do here as well, but it's not a complete

5    business record anyway.  They have a complete business

6    record which they can see all of.

7            THE COURT:  Okay.  Looking at it now, I'm more

8    concerned about this handwriting next to the -- I mean,

9    there's no foundation laid that it's -- well, let me say it

10   a different way.  The record is the receipt.  We don't know

11   who -- unless this witness wrote down this -- would this

12   witness testify that he circled the words "license plate"

13   and wrote in those words?

14           MS. RANGEL:  No, he's not the person who conducted

15   that transaction.

16           THE COURT:  Okay.  Then we don't know who put it

17   in.  I mean, you know, it can be done a year later by

18   someone in your office, so I think that's the more

19   important concern I have, especially given what you're

20   trying to use this for, so I'm going to sustain the -- I'm

21   going to continue to sustain the objection on 56.  We're

22   done.  You can -- I think based on your objection you've

23   made an offer of proof of what you are trying to do with

24   this, but it's going to stay out.

25           MS. RANGEL:  Just so it's clear, it's not the

Direct - Natha

1    defendant's license plate.  The argument would have come

2    from it's a very close number to the license plate, but

3    that's not his license plate.

4              THE COURT:  Well, you --

5              MS. RANGEL:  No, just so it's clear.

6              THE COURT:  It's even more confusing.  Okay.  I

7    think we're spending too much time on this exhibit.

8              MS. RANGEL:  Got it.

9              THE COURT:  It's out.

10          (End of discussion at side bar)

11             THE COURT:  My rulings remain the same; 56-A is

12   admitted, 56 is refused.

13   BY MS. RANGEL:

14   Q.   I publish 56-A for you via the ELMO.  Mr. Natha, this

15   is the receipt that you brought with you?

16   A.   Yes.

17   Q.   Is this a document that you printed from the Red Roof

18   Inn system?

19   A.   Yes.

20   Q.   And I'm sorry, if you could sit up a little bit so the

21   microphone could catch you.

22   A.   Okay.

23   Q.   So when we look at what's on the screen right now for

24   the jury on 56-A, if you could just walk us through briefly

25   what this business record contains.

Direct - Natha

1    A.    Okay.   It has the guest -- the name of the guest,

2    address, room number, rate, and total, and the method of

3    payment.

4              MS. RANGEL:   Thank you.   I have no further

5    questions for this witness.

6              THE COURT:   All right.   Cross-examination.

7              MR. LEONARD:   Defense has no questions.   Thank

8    you.

9              THE COURT:   All right.   May this witness be

10   excused?

11             MS. RANGEL:   Please, Your Honor.

12             THE COURT:   All right.   For the defendant?

13             MR. LEONARD:   Yes, Your Honor.

14             THE COURT:   All right, sir.   Thank you for your

15   testimony.   You're excused and you may step down.

16             The Government may call its next witness.

17             MR. PHILLIPS:   The Government would call Sergeant

18   Dan Johnson.

19             THE COURT:   All right.

20             DANIEL JOHNSON, GOVERNMENT'S WITNESS, SWORN

21             THE COURT:   Ms. Hansen, do you want to ask him

22   about --

23             COURTROOM DEPUTY:   I'm sorry.   Please state your

24   full name for the record and spell your first and last

25   name.

Direct - Natha

1        THE WITNESS:  Daniel Johnson.  D-a-n-i-e-l.

2   Johnson, J-o-h-n-s-o-n.

3                    DIRECT EXAMINATION

4   BY MR. PHILLIPS:

5   Q.   How are you employed?

6   A.   I'm a sergeant with the Aurora Police Department.

7   Q.   If you could, tell the jury some of your training and

8   background as a police officer.

9   A.   Oh, boy.  I'm kind of old so I've been around a while.

10  I was hired back in 1984 with the Adams County Sheriff's

11  Department.  Went to a small academy there.  In '85, I

12  moved to the Englewood Police Department, worked nine years

13  there.  So I went to the CLETA Academy -- at that time it

14  was a state-run academy -- for 15 weeks, probably.

15       I went to South Metro Drug Task Force in 1988, so

16  I went to a couple different schools there, marijuana

17  school.  We called it a two-week baby narc school the DEA

18  put on.

19       In '95, I went to the Aurora Police Department,

20  went through another academy.  And I have had several

21  assignments in Aurora.  Made sergeant.  Worked in the Metro

22  Gang Task Force until 2015, and now I am in internal

23  affairs.

24  Q.   I was just going to ask where you are, in internal

25  affairs?

Direct - Natha

1    A.    Yes.

2    Q.    And I'm going to take you back to the year 2013, 2014.

3    Where were you assigned then?

4    A.    I was a sergeant with the Metro Gang Task Force.

5    Q.    As a sergeant with the Metro Gang Task Force -- how

6    long had you been with Metro Gang Task Force?

7    A.    I was sent there in 2006, so I did another stint back

8    in narcotics, sergeant for a year in the middle of that, so

9    total time at Metro Gang I probably spent about

10   nine-and-a-half years.

11   Q.    And as a sergeant with Metro Gang Task Force, what

12   were your duties and responsibilities?

13   A.    I did scheduling, surveillance, I worked in the wire

14   room at times.  Scheduled for the wire room and the

15   surveillance team.  Basically all around every day.

16   Q.    Okay.  And back in 2013 and into 2014, were you at

17   Metro Gang and were you assisting in an investigation into

18   a person named Ricky Garrison and others?

19   A.    I was.

20   Q.    And do you know and do you recognize Ricky Garrison?

21   A.    I do.

22   Q.    And if you could, please point to him and tell us what

23   he's wearing.

24   A.    I believe it's a blue -- light-colored shirt, second

25   on the right-hand side.

Direct - Natha

1          MR. PHILLIPS:  Your Honor, at this time we'd ask

2     the record reflect identification of the defendant subject

3     to cross-examination.

4          THE COURT:  The record will so reflect.

5     BY MR. PHILLIPS:

6     Q.   Now, during the course of that investigation, did you

7     have an opportunity to participate in different

8     surveillances?

9     A.   I did.

10    Q.   And if you could describe for the jury what you're

11    doing when you're out on surveillance and how generally

12    things are conducted.

13    A.   Well, there's many different kinds of surveillance;

14    kind of what the case agents need to have happen that day.

15    Some days we just need to go out and take photographs of

16    cars or houses or other things.  Some days there's specific

17    missions; we need to, like, ID someone, which we do after a

18    traffic stop, we could do it through photos, you know,

19    license plates, and then compare the photos we have to the

20    driver's license.

21          There's many different missions with surveillance.

22    We may follow someone around for several hours, see where

23    they're going, what they're doing, who they're meeting.  So

24    there's just a -- whatever the case agents need to have

25    happen in their case, they ask surveillance to go do it,

604

Direct - Natha

1    and we try to take care of it.

2    Q.   Now I want to take you to a specific date involving

3    this case.  Were you working January 9th of 2014?

4    A.   I was.

5    Q.   And did you have the opportunity to go to an area

6    around -- or start surveillance around Ricky Garrison's

7    residence?

8    A.   We did.

9    Q.   And do you recall his residence, his address?

10   A.   It was 10340 East 13th Avenue.

11   Q.   And why were you out there that particular day?

12   A.   The phones indicated he was negotiating for a drug

13   deal, thought someone was either going to bring him some

14   drugs or he was going to go pick it up, so we try to get

15   out there before that happens.

16         Some days we're out there before they even get

17   done on the phone, but that's going to happen, we like to

18   see who's showing up or where he's going to get drugs.

19   Q.   And on that particular day, at about 5:00 p.m., were

20   you and others out there doing surveillance?

21   A.   Yes.

22   Q.   And if you would, tell the jury what you -- what you

23   observed and what took place that was of interest to you as

24   an investigator, as a sergeant at Metro Gang.

25   A.   Well, we were doing surveillance.  And there is a wire

Direct - Natha

1    up -- the wire room mainly notifying us of kind of what's

2    happening on the phones.  And they let us know that someone

3    was coming over to bring 9 ounces, so we were watching for

4    that to happen.

5    Q.    Okay.  And as the night went on, did you, in fact,

6    start to identify or at least see a vehicle that was of

7    interest to you?

8    A.    I -- we did.  It was a white Tahoe that showed up at

9    his house after the phone call had come to say, I'll be

10   there in a few minutes.

11   Q.    Okay.  And if you could, describe to the grand -- not

12   the grand jury, the jurors -- what you observed when that

13   telephone call came in.

14   A.    The driver of the Tahoe got out of the vehicle and

15   went into the house and just stayed for a very few minutes

16   and exited again and got back in the Tahoe and drove

17   away.

18   Q.    And when the Tahoe drove away, did you stay watching

19   the house or did you, in fact, follow the Tahoe?

20   A.    We followed the Tahoe.

21   Q.    And if you could, describe to the jury where it went

22   and what you observed.

23   A.    We observed it to go to the Shell gas station at

24   Potomac and 6th Avenue in Aurora.

25   Q.    And you mentioned earlier that while you were out

Direct - Natha

1   there on surveillance, that officers were taking

2   photographs sometimes, videos, and that sort of thing.   Was

3   a video taken that particular day at the Shell gas station?

4   A.   I believe so.

5   Q.   And was that video representative of the person that

6   was being observed by you and other officers?

7   A.   Yes.

8           MR. PHILLIPS:   I'm going to -- at this time, Your

9   Honor, we move to admit and publish Government's

10   Exhibit 37.

11          THE COURT:   Just a second.   Okay.   Is this a

12   transcript of a video?   What is it?

13          MR. PHILLIPS:   No, it's a -- it's the video -- the

14   Shell station video taken by the officers.

15          THE COURT:   Okay.   Well, first let me ask:   Is

16   there an objection?

17          MR. McDERMOTT:   There's no objection, Your Honor.

18          THE COURT:   All right.   That makes it easy.   There

19   being no objection, Exhibit 37 is admitted and may be

20   published to the jury.

21       (Government Exhibit 37 received)

22       (Video played)

23   BY MR. PHILLIPS:

24   Q.   What did you do after this person was done pumping

25   gas?

Cross - Johnson

1    A.    Continued to follow it.

2    Q.    And where did it eventually go to?

3    A.    Eventually it ended up at 3100 West -- no, 3100 South

4    Federal.

5    Q.    And is that in Denver, Colorado?

6    A.    I believe it is, yes.

7          MR. PHILLIPS:  Nothing further.  Thank you, Your

8    Honor.

9          THE COURT:  All right.  Cross-examination.

10                      CROSS-EXAMINATION

11   BY MR. McDERMOTT:

12   Q.    Good afternoon, Officer.

13   A.    Good afternoon.

14   Q.    I just have a few questions about this January 9th

15   surveillance.  What we see -- saw there was Mr. Aguilar

16   after he left Mr. Garrison's house, right?

17   A.    Correct.

18   Q.    And you were doing surveillance in anticipation of

19   Mr. Aguilar going to Mr. Garrison's house.

20   A.    Correct.

21   Q.    And Mr. Aguilar was permitted to go to Mr. Garrison's

22   house; he was not intercepted before he got there.

23   A.    Yes.

24   Q.    And you heard information on a phone call, but on

25   January 9th, nothing was seized.

608

Redirect - Johnson

1    A.    Correct.

2    Q.    No arrest was made.

3    A.    Right.

4    Q.    There's no physical evidence to corroborate what the

5    amount -- alleged amount that Mr. Aguilar brought over

6    there was.

7    A.    Yes.

8    Q.    No way to test whether there was a cutting agent.

9    A.    Yes.

10   Q.    No way to test how much cutting agent could have been

11   used on the alleged transaction.

12   A.    Correct.

13   Q.    And no way to verify the actual amount on January 9th.

14   A.    Correct.

15         MR. McDERMOTT:   Those are my questions.   Thank

16   you.

17         THE COURT:   All right.   Redirect?

18              REDIRECT EXAMINATION

19   BY MR. PHILLIPS:

20   Q.    Why didn't you rush in to Ricky Garrison's house?

21   A.    The investigation wasn't done yet.   I mean, we were in

22   the middle of it.

23   Q.    Okay.   When you say you were in the middle of it, as a

24   sergeant, supervisor, out at Metro Gang Task Force, what's

25   the importance of an investigation?   When you say you're in

609

Redirect - Johnson

1   the middle of it, what are the goals of that investigation?

2   A.   The goal is to get the entire organization, not just a

3   single person.  Metro Gang was founded on long-term

4   investigations, you know, we start with a certain someone

5   and to be general, and try to wrap up the entire

6   organization, not just one person.

7   Q.   And with your training and experience over many years,

8   as you mentioned, you're old, if you make an arrest on a

9   certain individual, what tends to happen to an

10  investigation?

11  A.   Well, definitely slow down or stop.  People tend to

12  throw their phones away, you know, get new phones, they

13  move, change cars; lots of things that basically hinder the

14  investigation.

15          MR. PHILLIPS:  Thank you.  Nothing further, Your

16  Honor.

17          THE COURT:  All right.  May this witness be

18  excused, Mr. Phillips?

19          MR. PHILLIPS:  He may.

20          THE COURT:  All right.  For the defendant?  Hold

21  on one second, Mr. Johnson.

22          MR. McDERMOTT:  Yes, Your Honor.

23          THE COURT:  Okay, Sergeant, you're excused.  You

24  may step down.

25          THE WITNESS:  Sorry.

Direct - Wehr

1      MR. PHILLIPS:  He's a high energy guy, Your

2  Honor.

3      THE COURT:  He's anxious to get out of here.  All

4  right.  The Government may call its next witness.

5      MS. RANGEL:  Thank you.  The Government calls

6  Roger Wehr to the stand.

7      THE COURT:  Okay.

8      COURTROOM DEPUTY:  Face me and raise your right

9  hand.

10      ROGER J. WEHR, GOVERNMENT'S WITNESS, SWORN

11      COURTROOM DEPUTY:  Please be seated.  State your

12  full name for the record and spell your first and last

13  name.

14      THE WITNESS:  My name is Roger J. Wehr.  First

15  name is spelled R-o-g-e-r, last name's W-e-h-r.

16      THE COURT:  Ms. Rangel.

17      MS. RANGEL:  Thank you.

18                DIRECT EXAMINATION

19  BY MS. RANGEL:

20  Q.   Good afternoon, sir.

21  A.   Good afternoon.

22  Q.   How are you currently employed?

23  A.   I'm a Denver police officer, assigned to the Metro

24  Gang Task Force.

25  Q.   How long have you been in law enforcement?

611

Direct - Wehr

1    A.    Almost 32-and-a-half years.

2    Q.    What is your current rank?

3    A.    Detective.

4    Q.    How long have you been a detective?

5    A.    24 years.

6    Q.    So I think we could focus in on just that.  Can you

7    tell us what you do as a detective with the Denver Police

8    Department assigned to the Metro Gang Task Force.

9    A.    I assist with ongoing investigations involving gang

10   members, narcotics transfer -- or transactions,

11   surveillance, writing reports, and so forth.

12   Q.    Let's talk about surveillance.  Were you involved with

13   surveillance in an investigation of an individual named

14   Ricky Garrison?

15   A.    Yes, I was.

16   Q.    When did you become involved in that investigation?

17   A.    As soon as they started -- I can't remember the exact

18   date, but from the day they started the case, I was

19   involved in the investigation and the surveillance on that

20   case.

21   Q.    Is it fair to say that would have been in 2013?

22   A.    Yes.

23   Q.    And did you conduct surveillance in that investigation

24   between June 2013 and June 2014?

25   A.    Yes.

Direct - Wehr

1    Q.   Let's talk a little bit about surveillance.   When

2    doing surveillance, what is kind of your main goal, if you

3    will?

4    A.   To see the meets.   After what we call listening post

5    passes on information to us, we go to certain locations,

6    and our job is to document the meets, whether they're

7    between individuals, whether they're at different residence

8    or locations.   Not only write up the surveillance reports

9    but also do any kind of video or photographs.

10   Q.   Is it important when doing surveillance that you not

11   be discovered by the person you're surveilling?

12   A.   Yes.

13   Q.   And so what steps are taken to make sure that you are

14   not discovered?

15   A.   Well, we use undercover vehicles, what we call soft

16   cars.   They're like everyday cars.   Some of us have beards,

17   some of us wear shorts, regular everyday clothes to blend

18   in with the everyday people.

19   Q.   Shorts are probably dependent upon the season?

20   A.   Yes, in some cases.

21   Q.   So when you're doing surveillance, approximately how

22   many people would be doing surveillance with you at that

23   time?

24   A.   Well, depends on how many are available that day.   We

25   are not allowed to be out without less than two, but

Direct - Wehr

1    normally we have three to seven people, just depending on

2    how many people are available.

3    Q.   And when you're doing surveillance with these people,

4    are you able to communicate with them and vice versa?

5    A.   Yes.

6    Q.   And how do you do that?

7    A.   Either through cell phones, radio communications, text

8    messaging, that way.

9    Q.   Do you and your fellow officers out on surveillance

10   with you, do you have any sort of video cameras, regular

11   cameras, that sort of thing, to document what you're doing?

12   A.   Yes, there's individuals that are assigned those

13   tasks.  They are -- they're good with the video and also

14   good with the cameras, so they'll take care of that.

15   Q.   And when you did surveillance in this investigation,

16   were you focused exclusively on Mr. Garrison or were you

17   focused on other targets?

18   A.   Both -- both.  I mean, we had Mr. Garrison, and as the

19   case develops we develop other suspects that we follow.

20   Can be anyone from distributor -- or people who distribute

21   the form, or people that are sources -- what we call source

22   of supply.

23   Q.   So just kind of depends, it sounds like, on the day?

24   A.   Exactly.

25   Q.   Does it also depend on the calls that are being

614

Direct - Wehr

1    intercepted?

2    A.    Yes.

3    Q.    I want to talk to you about a few specific instances

4    that you did in this case.  And the reason why I want to

5    focus on a few is, is it fair to say, Detective Wehr, that

6    you did a lot of surveillance in this case?

7    A.    Yes.

8    Q.    So let's talk about November 16th, 2013.

9    A.    Okay.

10   Q.    Were you doing surveillance as part of this

11   investigation on that date?

12   A.    Yes, I was.

13   Q.    And I want to talk to you specifically about midday,

14   and where you were midday on November 16th, 2013.

15   A.     Myself and the other surveillance officers, we were in

16   the 1100 block of Xenia.  We were directed there by the

17   listening post, that they received a call that there might

18   be an indication that an exchange might take place there.

19   Q.    And specifically were you looking for any individual

20   in particular?

21   A.    Yes, we are.

22   Q.    And who was that?

23   A.    Mr. Garrison.

24   Q.    Do you see Mr. Garrison present in the courtroom

25   today?

Direct - Wehr

1    A.   Yes, I do.

2    Q.   Could you please point him out by where he's seated

3    and what he's wearing.

4    A.   He's sitting in the table to my right, the second

5    party back.  He has a light-colored shirt on, glasses,

6    African-American male.

7              MS. RANGEL:  Your Honor, if the record could

8    reflect that he's identified the defendant subject to

9    cross-examination.

10              THE COURT:  The record will so reflect.

11   BY MS. RANGEL:

12   Q.   Now, as part of your involvement in this

13   investigation, and specifically when you went out to do

14   surveillance of Mr. Garrison or other people who might be

15   meeting or interacting with Mr. Garrison, had you

16   previously met Mr. Garrison?

17   A.   No.

18   Q.   So how did you know who you were looking for?

19   A.   Through photos, previous -- well, in this day it would

20   be previous surveillances, but when we first started,

21   through DMV photos.  We gather that information and we

22   follow them and we go from there.

23   Q.   So going back to November 16th, 2013, I think you said

24   you were at the location of 11th and Xenia; is that

25   right --

616

Direct - Wehr

1   A.   1100 block of Xenia.

2   Q.   And what city is that?

3   A.   The City and County of Denver.

4   Q.   In Colorado?

5   A.   Yes, ma'am.

6   Q.   And where -- if you could just kind of orient the

7   jury, where did you set up?  What sort of vehicle were you

8   in?  What was your plan?

9   A.   I was in a F-150 pickup that day.  We had just arrived

10  in the area.  And as we drove into the area, my sergeant at

11  the time, Joe Unser, observed Mr. Garrison's car parked in

12  the block as I just came into that area and saw the same

13  car.

14  Q.   And specifically what car was that?

15  A.   It was a gray Dodge Charger.

16  Q.   So when you saw that gray Dodge Charger, where did you

17  go?

18  A.   I parked in the -- looking northbound in about 10th

19  and Xenia, and I had the view up the street.

20  Q.   Now, did you have a clear view or were you using

21  binoculars or something like that to assist you?

22  A.   That day, I can't recall whether it was -- it was

23  pretty clear, sunny day, I know that.  I don't know -- I

24  always have my binoculars there with me, but I can't

25  remember if I used them that that day.

Direct - Wehr

1    Q.    While you were doing surveillance at that time, was

2    there another vehicle that you were looking out for?

3    A.    We were looking for an individual who was coming out

4    of the house, and one of the other surveillance officers

5    had advised he saw the individual come out of the house, we

6    believed it was 1176 Xenia.  And at that time, there was a

7    party that was sitting in a light -- I believe it was a

8    blue Jeep Liberty across the street.  And just as he had

9    aired that, Mr. Garrison was leaving, and I observed that

10   party sitting in that -- that vehicle.

11   Q.    Now, where was Mr. Garrison leaving from when you

12   observed him at that time?

13   A.    That -- that part of 1100 Xenia, right across the

14   street.  It would have been the same area of 1176 Xenia.

15   Q.    Where did you see Mr. Garrison go?

16   A.    He went up the street, I pulled up the street behind

17   him, and then he turned onto East 12th and was leaving the

18   area.

19   Q.    What vehicle was he driving?

20   A.    The gray Dodge Charger.

21   Q.    Did you notice anything that stood out to you about

22   the way that he was driving?

23   A.    Yes.  He was driving extremely slow.

24   Q.    Why did that stand out to you?

25   A.    It appeared he was looking in his rearview mirrors

Direct - Wehr

1    for, you know, what we call countersurveillance.  They were

2    doing countersurveillance.  He was looking for us.  So at

3    that time, I radioed everyone that it appeared he was

4    checking for anyone following him and we terminated

5    surveillance at that time.

6    Q.   Can you explain what countersurveillance is?

7    A.   It's -- sometimes it's individuals that are working

8    with the parties we're watching that are watching us or

9    he's checking -- or he's looking for surveillance in the

10   windows or in -- out the windows or in their mirrors for us

11   to be following to see the same cars on a regular basis.

12   Q.   So at that point in time, surveillance was terminated

13   on that Charger?

14   A.   Yes, ma'am.

15   Q.   Did you at that point in time make any observations

16   about that Jeep Liberty you had seen previously?

17   A.   There was an individual that matched the description

18   sitting in there that the officer -- the other surveillance

19   officer had aired earlier, and he had appeared to be

20   looking down at his lap as I drove by.

21   Q.   And when you saw he matched a description, what

22   description was that?

23   A.   I believe it was a gray hooded sweatshirt and brown

24   pants.  But all I could see was the sweatshirt because he

25   was sitting in the car.

619

Direct - Wehr

1    Q.    And was there some sort of indication that he was

2    associated with Mr. Garrison at that time?

3    A.    It was just, you know, experience and instinct.  I

4    really couldn't say.  I didn't see them meet, I just saw

5    that person that fit the description that came out of 1176

6    Xenia.

7    Q.    Would that Jeep Liberty come up again later on in the

8    investigation?

9    A.    Not that I remember.

10   Q.    Not that you were involved with?

11   A.    No.

12   Q.    Okay.  Did you do further surveillance on this case

13   later on November 16th, 2013?

14   A.    Yes, I did.

15   Q.    And where did you do surveillance later on November

16   16th, 2013?

17   A.    The listening post sent us up to 52nd and Wadsworth to

18   cover -- they had received a call indicating there was

19   going to be another meet at 7771 West 52nd, which is behind

20   a Home Depot up there at Wadsworth and 52nd, so we

21   responded to that area.

22   Q.    When we talk about Wadsworth and 52nd, what city is

23   that?

24   A.    I believe that's Arvada.

25   Q.    Colorado.

620
Direct - Wehr

1   A.   Yes, ma'am.

2   Q.   And when you were doing surveillance up there, did you

3   notice any particular vehicle around 7:32 p.m.?

4   A.   Yes, I did.

5   Q.   What vehicle did you notice?

6   A.   It was Mr. Garrison's gray Dodge Charger.

7   Q.   That same vehicle that you saw earlier in the day?

8   A.   Yes, ma'am.

9   Q.   Who was driving that Charger?

10  A.   I -- it was Mr. Garrison.

11  Q.   Was he alone at that time, could you tell?

12  A.   As I recall, he was alone.

13  Q.   Where was that Charger when you saw it at that time?

14  A.   It was in the parking lot of -- it was on the south

15  side of the apartment complex at 7771 West 52nd, parked in

16  the parking lot, and there was no spots to park so it was

17  kind of parked out by itself.

18  Q.   And when you say "the parking lot," was it the parking

19  lot associated with that apartment complex?

20  A.   Yes, ma'am.

21  Q.   Did you observe anyone approach Mr. Garrison's

22  vehicle?

23  A.   I observed an individual.  I couldn't tell you whether

24  it was a male or female, or the clothing.  It was just too

25  dark.  I couldn't see it.  I couldn't see the person.

Direct - Wehr

1    Q.    Okay.  And where did you see that person come from?

2    A.    The building.

3    Q.    The apartment complex?

4    A.    Yes, ma'am.

5    Q.    Where did you see that person go?

6    A.    Over to Mr. Garrison's car.

7    Q.    Were you still in that same truck?

8    A.    Yes, ma'am.

9    Q.    Could you tell -- when that person approached that

10   gray Dodge Charger, could you see what happened at that

11   point in time?

12   A.    I saw that person go up to the passenger side of

13   that -- of Mr. Garrison's car, but I couldn't tell if that

14   person got in.

15   Q.    How long was that person at that vehicle?

16   A.    Just a -- probably just a minute or -- maybe two or

17   three minutes.  One of the other investigators, Kelly

18   Draper, actually walked up, he got out on foot on

19   surveillance and he walked up and verified that there was

20   two parties now inside Mr. Garrison's car.

21   Q.    What did you see Mr. Garrison's vehicle do after that

22   person was inside of it?

23   A.    Eventually I saw the car leave westbound on -- or,

24   excuse me, eastbound on 52nd, and leave.

25   Q.    Do you recall what time that was?

Direct - Wehr

1   A.   It was about -- I want to say it was 7:36 or so,

2   approximately, that evening.

3   Q.   I want to direct your attention now just about a

4   couple of weeks later, November 29th, 2013.

5   A.   Yes.

6   Q.   Were you doing surveillance on that date?

7   A.   Yes, I was.

8   Q.   On that date, where were you doing surveillance?

9   A.   Listening post had sent us up to 35th and Franklin.

10  Q.   And where is that?  What city is that?

11  A.   That's in the City and County of Denver, Colorado.

12  Q.   Okay.  Were you sent to a specific address at that

13  time?

14  A.   Yes.

15  Q.   What was that address?

16  A.   3515 Franklin Street.

17  Q.   And what was at that address?

18  A.   I believe a person by the name of Christopher Vigil

19  was supposed to meet with Mr. Garrison there.

20  Q.   Okay.  And do you recall what time of day that was?

21  A.   That was -- I want to -- I would have to look at my

22  notes for sure, but it was about -- later in the afternoon,

23  like about 4:40 something, around there, approximately.

24  Q.   Had you been doing surveillance earlier that day on

25  November 29th, 2013?

Direct - Wehr

1   A.   Yes.

2   Q.   And was that at that same location or a different

3   location?

4   A.   We actually went there earlier in the day expecting a

5   meet, but it never happened.  And then about a half hour

6   later we was sent back over there by the listening post and

7   set back up.

8   Q.   And was Christopher Vigil's residence at 3515 Franklin

9   Street the only location that you did surveillance on on

10  November 29th, 2013?

11  A.   I don't -- I'm sure we did others, but I can't recall

12  which ones.

13  Q.   Had you ever done surveillance at an -- 2331 West

14  Hampden Avenue?

15  A.   Yes.

16  Q.   What's at that location?

17  A.   That was an auto body shop.

18  Q.   Do you --

19  A.   And that -- sorry.

20  Q.   No, I'm sorry.  I cut you off.

21  A.   That was Mr. Ramirez's shop, I believe.  I went down

22  there to check for a vehicle.

23  Q.   When we talk about 2331 West Hampden Avenue, where is

24  that located, city-wise?

25  A.   Oh, I believe that's Sheridan, Colorado.

624

Direct - Wehr

1    Q.   So let's talk about your surveillance at 3515 Franklin

2    Street.

3    A.   Okay.

4    Q.   Mr. Vigil's residence.  Are you familiar with that

5    particular residence and that particular neighborhood?

6    A.   Yes.

7    Q.   And how is it that you're familiar with it?

8    A.   Well, earlier in the day, we had been sent out there.

9    And I went by, verified the address, actually got a car --

10   license plate number and radioed it back into the listening

11   post.

12   Q.   Are you aware if there is any sort of school near Mr.

13   Vigil's residence?

14   A.   I -- yes, I believe there's one right up the street on

15   Franklin Street.

16   Q.   Do you know the name of that school?

17   A.   No, I do not.

18   Q.   Why do you think that there's a school up the street?

19   A.   I used to work that precinct car when I was a

20   patrolman, and there's a -- it's a big tan building.  I

21   think it's in the 35- or 3600 block, right?

22   Q.   And how far is that from Mr. Vigil's residence?

23              MR. McDERMOTT:  Objection, Your Honor.  This is

24   speculation.

25              THE COURT:  I think this is something that he's

1    established why he's familiar with that block.  I think he

2    can make an estimate based on his knowledge of the block.

3    Overruled.

4           Go ahead.

5           THE WITNESS:  It's probably within a block, maybe,

6    of Mr. Vigil's address.

7    BY MS. RANGEL:

8    Q.   Now, when you were doing surveillance at Mr. Vigil's

9    residence on November 29th, 2013, you indicated you were

10   there, you left, and you came back.

11   A.   Right.

12   Q.   Where did you park when you returned the second time?

13   A.   When I returned the second time, I established

14   surveillance on 35th, facing eastbound, just past Humboldt.

15   So between Humboldt and Franklin on the south side facing

16   east, and so I could see the alley.

17   Q.   And the alley is where in relation to Mr. Vigil's

18   residence?

19   A.   It's to the west of his.

20   Q.   And so does the alley face his front door or his back

21   door?

22   A.   His back door.

23   Q.   Is there any sort of structure associated with

24   Mr. Vigil's residence off of the alley?

25   A.   A garage.

626

Direct - Wehr

1    Q.   Is it a detached garage or an attached garage?

2    A.   That I don't know.

3    Q.   But you know that it's associated with his

4    residence?

5    A.   Yes, I do.

6    Q.   So when you parked in the alley, could you see that

7    garage?

8    A.    I parked on the street so I could see the garage and

9    so, yeah, you look right -- it was just kind of like

10   catty-corner to me right there.  It was the second garage

11   in.

12   Q.   Second garage in from the street?

13   A.   Yes, from 35th.

14   Q.   After you parked on that street, did you notice anyone

15   in particular?

16   A.   Not until I -- not until Mr. Garrison showed up.

17   Q.   And so tell me about that.  When did Mr. Garrison

18   arrive?

19   A.   About 10 minutes -- I think it was about 10 minutes

20   after I established surveillance.  It was about 5:40, I

21   believe.  Now that I think about it, it was about 5:29,

22   give or take, that I established my surveillance along with

23   my sergeant.  Then I observed the blue Porsche Cayenne that

24   was being driven by Mr. Garrison approach the alley from

25   35th and Franklin.  It turned northbound in the alley and

627

Direct - Wehr

 1    parked right next to the garage.

 2              As Mr. Garrison was getting out of the driver's

 3    side, walking around the rear of the car to the garage

 4    door, the garage door opened and I observed a Hispanic male

 5    standing in the garage.  The garage itself was light -- lit

 6    up so you could see who was there.

 7              They had a conversation.  I could see them talking

 8    and so forth.  And then they went on into the garage out of

 9    my sight and I couldn't tell you what happened then.

10    Q.   So at that point in time, was it just the two

11    individuals that you observed?

12    A.   Yes.

13    Q.   And so you could not tell -- at that point in time you

14    didn't have a positive identification on the person meeting

15    with Mr. Garrison?

16    A.   No, I did not.

17    Q.   You just observed that he was a Hispanic male?

18    A.   Yes.

19    Q.   And when they went into the garage and out of your

20    sight, how long were they out of your sight?

21    A.   Just maybe a minute or two.  It was a very short

22    time.

23    Q.   And what did you observe after that?

24    A.   Then I observed -- I got my binoculars sitting next to

25    me and I was looking into the garage.  I observed Mr.

Direct - Wehr

1    Garrison walk out, walk back to the driver's side of his

2    vehicle, get in it.  At the same time, the Hispanic male,

3    who then I could see through my binoculars grabbed the top

4    of the garage door and was kind of hanging on it, and

5    talking to Mr. Garrison through the passenger side window.

6    They had a brief conversation.  Then Mr. Garrison drove off

7    northbound in the alley.

8             The other party who was eventually identified as

9    Christopher Vigil, closed the garage door.  Then Mr.

10   Garrison left -- excuse me -- left the area.  We terminated

11   our surveillance at that time.

12   Q.   So you indicated that you were able to positively

13   identify the Hispanic male as Christopher Vigil?

14   A.   Yes.

15   Q.   How did you make that identification?

16   A.   After using my binoculars and being -- getting a clear

17   shot of his face, and I received a text message with a

18   Colorado Department of Motor Vehicle photo of Mr. Vigil,

19   and I matched the two of them.  It was definitely the guy

20   that I saw in the picture.

21   Q.   When Mr. Garrison left Christopher Vigil's residence

22   on that date, why was surveillance terminated?

23   A.   That I don't remember why.

24   Q.   Did you make that decision or did someone else make

25   that decision?

629

Direct - Wehr

1    A.   The sergeant.

2    Q.   Okay.  I want to talk to you about December 7th, 2013.

3    A.   Yes.

4    Q.   Were you doing surveillance on that date?

5    A.   Yes, we were.

6    Q.   Where were you at that time?

7    A.   We were out at Mr. Garrison's house.

8    Q.   And what residence was Mr. Garrison living at on

9    December 7th, 2013?

10   A.   East 13th Avenue.  I believe it was 10340 East 13th

11   Avenue.

12   Q.   10340?

13   A.   Yes.

14   Q.   Is that anywhere near Havana?

15   A.   Yes.

16   Q.   Can -- can you describe how close that residence is to

17   Havana?

18   A.   It's about a half a block west.

19   Q.   Off of 13th?

20   A.   Yes.

21   Q.   And were you at his residence -- what time of day were

22   you there?

23   A.   It was during the day.  It was about 3:40 in the

24   afternoon.

25   Q.   Could you tell if Mr. Garrison was inside of the

Direct - Wehr

1   residence at the time that you were there doing

2   surveillance?

3   A.   I actually didn't have an eye on the location at the

4   time.  I believe the LP had that -- listening post had it

5   with the camera.

6   Q.   So where were you at that time?

7   A.   I was parked in front of the school, which is just to

8   the west of 13th and Del Mar Circle or Del Mar Parkway.

9   Q.   And if you could just orient us to that location in

10   relation to Mr. Garrison's residence.

11   A.   It's -- it's about a half a block west on 13th.  The

12   school is right across Del Mar Parkway, and then -- then

13   you go across there to the east and there's his

14   residence.

15   Q.   Could you see Mr. Garrison's residence when you were

16   parked in the parking lot of the school?

17   A.   Not when I was in the parking lot, no; but when I

18   parked out in front, when there was other cars there and

19   blended in, yes.

20   Q.   So why were you parked in the parking lot of the

21   school on that date?

22   A.   Just waiting, because we had other surveillance

23   officers out there and I didn't have the eye, the primary

24   eye, so I was going to help with the takeaway.

25   Q.   When you say "help with the takeaway," what does that

Direct - Wehr

1    mean?

2    A.    Well, when the party who we were watching would show

3    up, whether it be Mr. Garrison or somebody we expect to

4    meet them, once the meet happened, then we take the car

5    that left away from that location and follow them.

6    Q.    And continue to conduct surveillance at that time?

7    A.    Yes.

8    Q.    So the parking lot of the school that you were in,

9    what is that school?

10   A.    It's Aurora -- I believe it's Aurora college -- Aurora

11   West Preparatory College Academy.

12   Q.    Sounds like a charter school?

13   A.    I believe so.

14   Q.    Okay.  Have you ever, when doing surveillance at

15   Mr. Garrison's house, parked in that school parking lot

16   before?

17   A.    Yes.

18   Q.    Is it fair to say you've done it on a few occasions?

19   A.    Yes.

20   Q.    Have you ever noticed any sort of children or school-

21   aged persons being at the school at that time?

22   A.    Yes.

23   Q.    All right.  Let's talk about your surveillance on

24   December 7th, 2013.  Did you notice a particular vehicle

25   arrive -- or was a particular vehicle noticed to arrive at

632

Direct - Wehr

1    Mr. Garrison's residence that afternoon?

2    A.    Yeah, it was a Chevy Tahoe.

3    Q.    Do you remember the color of that Tahoe?

4    A.    It was white.

5    Q.    Do you know who was driving that white Chevy Tahoe?

6    A.    The description was a Hispanic male wearing a white

7    baseball cap, a black vest over a white long-sleeved shirt,

8    and blue jeans.

9    Q.    And what did you do while you were conducting

10   surveillance at that time?

11   A.    I -- at that time, while the car was there, I was just

12   in the area ready to leave with that vehicle as it left.

13   Q.    So that was going to be your role with that vehicle?

14   A.    Yes.

15   Q.    Did that vehicle remain at Mr. Garrison's house at

16   that time?

17   A.    A short maybe two or three minutes, maybe four at the

18   most.

19   Q.    Then what happened?

20   A.    The party exited, got back into that vehicle, and then

21   left the area.

22   Q.    Did you follow it?

23   A.    Yes, we did.

24   Q.    Where did you follow it to?

25   A.    We followed it around the metro area to a restaurant

Direct - Wehr

1    up at 4957 Colorado Boulevard; it's called the El Toro

2    Restaurant.

3    Q.    What did you do at that location?

4    A.    I followed the driver.  And the driver had a passenger

5    inside, and at that point I was able to get a good eye and

6    identify the driver.  He was up against the pool table.  He

7    was up standing around the -- a pool table.

8    Q.    And who did you identify that individual as?

9    A.    Later when I got back to the car, the listening post

10   sent me a photo of the registered owner of that vehicle,

11   the white Tahoe, and it was an individual by the name of

12   Francisco Aguilar.

13   Q.    Let's talk about February 26th, 2014.  Were you doing

14   surveillance on that date?

15   A.    Yes.

16   Q.    Where were you?

17   A.    Trying to remember which ones they are.  Oh, 3100 --

18   3100 South Federal Boulevard.

19   Q.    And where is that?

20   A.    That's in the City and County of Denver.

21   Q.    Colorado?

22   A.    Yes, ma'am.

23   Q.    Is there a residence there that you were focused on?

24   A.    Yeah, it was an apartment building.  It's an apartment

25   building, number G.

Direct - Wehr

1    Q.    And where did you position yourself in relation to

2    apartment G?

3    A.    Well, on that day, I was parked actually on Dartmouth

4    at Federal.  I -- I found an open parking spot and I sat

5    myself there, and I could see the west side of the

6    buildings, and so that's where I positioned myself.

7    Q.    Did you see anyone of interest arrive while you were

8    doing surveillance at that location?

9    A.    Yes, I did.

10   Q.    Who arrived?

11   A.    Mr. Garrison.

12   Q.    And how did he get there?

13   A.    In his light blue Porsche Cayenne.  Cayenne.

14   Q.    Where did you see Mr. Garrison go at that time?

15   A.    He parked on the west side of the building, so the

16   building -- it would be right against Federal and

17   Dartmouth, and he parked up against the wall and sat there

18   for a moment.

19   Q.    Did he remain in his vehicle that whole time?

20   A.    No.

21   Q.    Could you see what he was doing inside of his vehicle?

22   A.    Looked like he was using his cell phone.

23   Q.    And when you say "using his cell phone," what was

24   he -- could you tell what he was doing?

25   A.    I couldn't tell if he was calling or if he was

635

Direct - Wehr

1    texting, but it looked like he had something in his hand

2    and he was using the . . .

3    Q.   After Mr. Garrison arrived at that location, did

4    anyone else of interest to you arrive?

5    A.   Yes.

6    Q.   And tell me about that.  Who -- who did you see

7    arrive?

8    A.   Mr. Aguilar.  He drove -- the white Chevy Tahoe

9    arrived.  It actually parked facing the apartment house, so

10   it was facing east.  And he got out and went up on in.

11   Q.   He went into the apartment?

12   A.   Yes.

13   Q.   Did you see Mr. Garrison leave his vehicle at that

14   time?

15   A.   No.  I -- to be honest with you, I was focusing in on

16   the other cars coming in, and I didn't see him leave his

17   car or know when he went up or not.

18   Q.   Okay.  What did you do at that point in time?

19   A.   I maintained surveillance and then a short time later

20   observed Mr. Garrison leave that apartment G building and

21   walk back to his car.

22   Q.   So if I'm understanding you correctly, you didn't see

23   him get out of his vehicle, but you did see him out of his

24   vehicle getting back into his vehicle?

25   A.   Yes, ma'am.

636

Direct - Wehr

1   Q.   Okay.  And where did Mr. Garrison go in his vehicle at

2   that time?

3   A.   He returned to his vehicle and then left eastbound on

4   Dartmouth out of the apartment complex.  And surveillance

5   maintained on him at that time.  Two other detectives went

6   up to the address and went up on the third floor, because

7   that's where we had verified that Mr. Garrison had gone,

8   and they verified there was only two apartments up there,

9   325 and 326.

10  Q.   Did you follow Mr. Garrison once he left that

11  location?

12  A.   Yes, I did.

13  Q.   Where did you follow him to?

14  A.   To another location down at Englewood in the 3100

15  block.  It was an apartment house.  The 3100 block of south

16  Delaware.

17  Q.   And what did you see him do there?

18  A.   He went up to a -- an apartment that was -- I don't

19  remember if it was the second or third floor, but he went

20  up, and it was in the corner unit, and by the time we got

21  around, we set up surveillance then.

22  Q.   How long was he inside of that other apartment?

23  A.   I don't -- I don't think it was very long.  I can't

24  remember exactly how long, but it wasn't very long.

25  Q.   Did he ultimately leave that location?

637

Direct - Wehr

1    A.   Yes, he did.

2    Q.   Did you continue to follow him?

3    A.   No, we ended surveillance at that time then.

4    Q.   Let's move forward to March 26th, 2014.

5         THE COURT:   How about before we move to another

6    surveillance, let's take our afternoon break.

7         MS. RANGEL:   Okay.   Thank you, Your Honor.

8         THE COURT:   All right.   Ladies and gentlemen of

9    the jury, we will be in recess for 15 minutes.

10        (Jury left the proceeding at 3:10 p.m.)

11        THE COURT:   Detective, since you're in the middle

12   of your testimony, I direct you not to speak with any of

13   the lawyers during the break.

14        THE WITNESS:   Yes, sir.

15        (Recess at 3:10 p.m.)

16        (Proceedings resumed outside the presence of the jury

17   at 3:26 p.m.)

18        THE COURT:   So, Mr. Phillips, you're going to be

19   handing us our table now?

20        MR. PHILLIPS:   No, I wish I was, your Honor.

21        THE COURT:   No, you've got to stop making promises

22   to the judge that you can't --

23        MR. PHILLIPS:   I said I would do my absolute best,

24   and I can promise you I did.

25        THE COURT:   Okay.   All right.   Well, let me just

Direct - Wehr

1    say this:  You're not leaving this courtroom this evening

2    until we have that.  Okay?

3          MR. PHILLIPS:  I can say one thing, and I totally

4    get that, and I would absolutely give that to the Court.

5    The problem we're having is, for whatever reason, it's not

6    letting me access my N drive.  I may possibly have to leave

7    in order to access that and mail it back to myself and do

8    it.

9          I can tell you that between what I've done on my

10   computer and what these two agents just did by hand, we

11   have it done, but I can't get to it because our computer

12   system is --

13         THE COURT:  So what you're telling me is you have

14   to go back to your office in order to complete this?

15         MR. PHILLIPS:  Yes, Your Honor.  Although right

16   now what I have is one of our paralegals is -- has all my

17   passwords -- please don't tell our IT people or Washington

18   D.C. or anything of that nature --

19         THE COURT:  We won't --

20         MR. PHILLIPS:  -- and is attempting to work

21   through that system to see if she could get to it in order

22   to type it in.

23         THE COURT:  Okay, let's do this:  When you leave

24   here tonight, you will go back to your office, and you

25   won't leave your office to go home until you finish it and

Direct - Wehr

1    you've e-mailed it to our chamber's e-mail.

2              MR. PHILLIPS:  Now that's a promise I can make.

3              THE COURT:  Okay.  All right.  Then Mr. Hawkins

4    will have it when he comes in tomorrow morning.

5              MR. PHILLIPS:  I can absolutely make that promise,

6    Your Honor.

7              THE COURT:  We're going to hold you to that.

8    Okay.

9              All right, let's bring in the jury.

10             MS. RANGEL:  Your Honor --

11             THE COURT:  Yes, ma'am.

12             MS. RANGEL:  I am also done with Detective Wehr.

13   Our next witness is going to be Christopher Vigil.

14             THE COURT:  Okay.

15             MS. RANGEL:  He is in a somewhat similar situation

16   as Mr. Ramirez this morning in the sense that there may be

17   things on cross-examination that he will assert his Fifth

18   Amendment right to.  I don't know that for sure --

19             THE COURT:  Is his lawyer going to be here?

20             MS. RANGEL:  His lawyer is currently in the

21   hallway talking to him about what he wants to do, but -- so

22   because we don't know that yet, would it be possible to

23   just take a very, very brief -- we just need to step out

24   and talk to his attorney and see what he wants to do and

25   what he doesn't want to do and then we can call him.  If

Direct - Wehr

1   that makes sense.

2        THE COURT:  Yeah.  Would you -- so are you saying

3   that we should excuse the jury like we have been doing for

4   five minutes or can we leave them sitting there while you

5   go outside and talk?

6        MS. RANGEL:  My preference would be to leave them

7   sitting there because I do think it will be that brief.

8        THE COURT:  Okay.

9        MS. RANGEL:  Mr. Navarro has been talking to him

10   now for several minutes and he will continue to talk to

11   him, so I think it will be a brief -- Mr. Leonard and Mr.

12   Phillips could step outside, This is what he plans on

13   doing, and come back in.

14        THE COURT:  All right.  Let's do that.

15        MS. RANGEL:  Thank you.

16        THE COURT:  Let's bring in the jury.

17     (Jury was present at 3:29 p.m.)

18        THE COURT:  Detective, I remind you that you

19   remain under oath.

20        THE WITNESS:  Yes, sir.

21        THE COURT:  All right.  Ms. Rangel, you may

22   continue your direct examination.

23        MS. RANGEL:  Thank you, Your Honor.

24   BY MS. RANGEL:

25   Q.   Detective Wehr, right before the break, I think I

641
Direct - Wehr

1    asked you about March 26th, 2014.

2    A.    Yes, you did.

3    Q.    Okay.  Thank you.  Were you doing surveillance on that

4    date?

5    A.    Yes, I was.

6    Q.    Where were you doing surveillance on that date?

7    A.    Again, I was assigned to 3100 South Federal Boulevard

8    in the apartment house there, apartment number -- or

9    building number G.

10   Q.    What time were you there?

11   A.    It was late afternoon.  Approximately, I think I got

12   there about -- in the 5:45 to 6:00 range.

13   Q.    And specifically at that location, where were you

14   positioned?

15   A.    I was actually on the east side of the building, which

16   would have been the time before I was on the west side, the

17   month before, but this time I was on the east side of the

18   building.

19   Q.    What were you specifically looking at when you were

20   doing surveillance at this time?

21   A.    This time I was actually there to assist and I was

22   watching for either the white Chevy Tahoe to show up or

23   Mr. Garrison's car.

24   Q.    And specifically which vehicle of Mr. Garrison's at

25   that time?

Direct - Wehr

1    A.    That was the light blue Porsche.

2    Q.    The SUV?

3    A.    Yes, ma'am.

4    Q.    Was there some sort of briefing or plan that was

5    discussed before doing surveillance at that location?

6    A.    There was a -- yeah, we were setting up -- from what

7    we understood and what we were told from the LP, that

8    was -- Mr. Garrison was going over to Mr. Aguilar's

9    possibly to pick up product --

10   Q.    And so --

11   A.    -- drugs.

12   Q.    Oh, I apologize.

13   A.    That's all right.  Drugs.

14   Q.    And so the location that you were at, I think you said

15   it was 3100 South Federal?

16   A.    Yes.

17   Q.    That was Mr. Aguilar's residence.

18   A.    Yes, ma'am.

19   Q.    Was there a plan in what you thought was going to

20   occur?  If it appeared as if that had, in fact, occurred,

21   was there a plan as to what was going to happen at that

22   time?

23   A.    Yes, at that point we were going to allow Mr. Garrison

24   to leave, and then we would do a traffic stop on him to see

25   if there was any kind of drugs in the car.

643

Direct - Wehr

1    Q.   So what was your particular role during this time

2    period?

3    A.   I was positioning myself so that I could see any cars

4    coming in.  Most of the time the Tahoe would come in off of

5    Dartmouth on the west -- east side of the building and then

6    drive around and come back.  And that's the same way that

7    the month earlier when I was there Mr. Garrison had come

8    in, off of Dartmouth, and went around the building and then

9    parked in the west side of the building.

10            So I was positioned to where, from past

11   experience, where they would enter and come in and go

12   around the building.

13   Q.   And what did you observe while you were at that

14   location?

15   A.   Well, at first I -- I observed the Tahoe -- the white

16   Tahoe being driven by Mr. Aguilar, arrive, go around, and

17   then park on the west side of the building.

18   Q.   Do you recall approximately what time it was that you

19   saw Mr. Aguilar arrive?

20   A.   I want to say it was about 6:00 that night.

21   Q.   And what happened after Mr. Aguilar arrived and

22   parked?

23   A.   He went up into his apartment and then about 10

24   minutes later, approximately 10 minutes later, Mr. Garrison

25   showed up.

644
Direct - Wehr

1    Q.    And when you say that Mr. Garrison showed up, what did

2    he arrive in?

3    A.    In the light blue Porsche Cayenne.

4    Q.    Was he alone or was he with someone else at that time?

5    A.    I believe there was a male party with him.

6    Q.    Was he driving that vehicle?

7    A.    Yes, ma'am.

8    Q.    What did you observe him do when he drove that vehicle

9    in -- that was a really poorly-framed question.  Let me

10   rephrase that.

11         When you saw Mr. Garrison arrive in his Porsche

12   Cayenne, where did you see him go?

13   A.    He went around -- he went past me and around the south

14   of the building and back over towards the west side and

15   park.

16   Q.    Did he park close or far away from Mr. Aguilar's

17   vehicle?  Do you remember?

18   A.    I don't remember.

19   Q.    What did you see him do once he parked?

20   A.    He went up into the -- you take the stairs up into the

21   building and there's different apartments up in there; each

22   floor has a different entrance.  And he went up to the

23   third floor.

24   Q.    And is this the same third floor that you indicated

25   before?  There's only two apartments there?

645

Direct - Wehr

1   A.   Yes, ma'am.

2   Q.   You said earlier that when Mr. Garrison arrived, he

3   was with another male.  What did that male do when Mr.

4   Garrison went up into the apartment?

5   A.   Stayed in the vehicle.

6   Q.   Did you see Mr. Garrison go into any apartment in

7   particular?

8   A.   No, ma'am, I did not.

9   Q.   Do you know how long he was inside of whatever

10  location he went into?

11  A.   Between approximately eight to 10 minutes.

12  Q.   Did you see him leave then?

13  A.   Yes.

14  Q.   Where did he go?

15  A.   Both him and Mr. Aguilar left together.  They got in

16  their respective vehicles and they left the parking lot.

17  Mr. Garrison left eastbound on Dartmouth Avenue and drove

18  all the way to Santa Fe, and then left the area.

19  Q.   Did you follow either Mr. Aguilar or Mr. Garrison?

20  A.   Mr. Garrison.

21  Q.   Did you do a traffic stop on him as the plan was to --

22  A.   No, ma'am.

23  Q.   Why not?

24  A.   During our surveillance, we were told that there was a

25  compromise --

Direct - Wehr

1        MR. McDERMOTT:  Objection.  Hearsay, Your Honor.

2        THE COURT:  Ms. Rangel?

3        MS. RANGEL:  Yes, Your Honor.  The specific

4   question was why he did not do a traffic stop.  And so he's

5   explaining the information that he was told caused him to

6   not do a traffic stop.  So it's really for the effect on

7   the listener.

8        THE COURT:  I'm going to overrule the objection.

9   It's not being introduced for the truth -- it's not your

10  intent to have this witness testify that that is, in fact,

11  true --

12        MS. RANGEL:  That is correct.

13        THE COURT:  -- right?  All right, overruled.

14  BY MS. RANGEL:

15  Q.   So why did you not do a traffic stop with Mr. Garrison

16  at that time?

17  A.   We were advised over the radio that there was a

18  compromise.  Somebody overheard radio communications and

19  had relayed that information to Mr. Aguilar.  And we didn't

20  know if an exchange had happened.  And for not only officer

21  safety as well as, you know, public safety, we decided it

22  was best not to make the traffic stop at that time.

23        It was better to let -- knowing that these

24  individuals knew that we might have been involved in

25  watching them and overhearing what -- their conversations,

Direct - Wehr

1    that they -- there might be a problem, so we thought it was

2    best to let him go at that time.

3                MS. RANGEL:  Your Honor, may I have one moment?

4                THE COURT:  You may.

5                MS. RANGEL:  I have no further questions for this

6    witness.

7                THE COURT:  Cross-examination.

8                MR. McDERMOTT:  Your Honor, the defense doesn't

9    have any questions for Detective Wehr.  He's free to go

10   from our perspective.

11               THE COURT:  I have a question for the detective.

12               THE WITNESS:  Yes, Your Honor.

13               THE COURT:  From your best estimate, how far was

14   the Aurora West Preparatory College Academy from Mr.

15   Garrison's residence on East 13th Avenue?

16               THE WITNESS:  I would say about a half a block.

17               THE COURT:  And in feet?  What are we talking

18   about?

19               THE WITNESS:  Maybe 5- to 700 feet.

20               THE COURT:  All right.  I'll allow further

21   questions from counsel based on the Court's question.

22               MS. RANGEL:  I don't have any questions for this

23   witness.

24               THE COURT:  All right.  Defendants -- defendant?

25               MR. McDERMOTT:  No questions, Your Honor.

648

1          THE COURT:  All right.  May this witness be

2     excused?

3          MS. RANGEL:  Yes, please.

4          THE COURT:  For the defendant?

5          MR. McDERMOTT:  Yes.

6          THE COURT:  All right.  Detective, thank you so

7     much for your testimony.  You're excused and you may step

8     down.

9          THE WITNESS:  Thank you, Your Honor.

10         THE COURT:  The Government may call its next

11    witness.

12         MS. RANGEL:  Thank you, Your Honor.  May we just

13    have one moment with Mr. Leonard?

14         THE COURT:  Yes.  Absolutely.

15         MS. RANGEL:  Thank you.

16         THE COURT:  Members of the jury, just hold tight

17    for a couple of minutes there; the lawyers are going to be

18    talking out in the hallway about a matter that needs to be

19    outside of your presence.

20       (Pause)

21         THE COURT:  All right, Mr. Phillips, what are we

22    doing?

23         MR. PHILLIPS:  The Government would call

24    Christopher Vigil.

25         THE COURT:  All right.

649

Direct - Vigil

 1          COURTROOM DEPUTY:  Right here, sir.

 2       CHRISTOPHER VIGIL, GOVERNMENT'S WITNESS, SWORN

 3          COURTROOM DEPUTY:  Please be seated.  Move your

 4   chair all the way up and you can put your elbows right on

 5   there.

 6          Please state your full name for the record and

 7   spell your first and last name.

 8          THE WITNESS:  Christopher Alexander Vigil.

 9   C-h-r-i-s-t-o-p-h-e-r, V-i-g-i-l.

10          MR. PHILLIPS:  If I may, Your Honor.

11          THE COURT:  You may, Mr. Phillips.

12                     DIRECT EXAMINATION

13   BY MR. PHILLIPS:

14   Q.   Mr. Vigil, I see you're here in regular clothes today.

15   Are you out of custody, in custody, or kind of halfway in

16   between?

17   A.   Halfway in between.  I am in a halfway house.

18   Q.   And what is a halfway house, for the --

19   A.   It is a location set for -- I should say people being

20   released from prison or just to be supervised as

21   necessary.

22   Q.   Okay.  And how long have you been in the halfway

23   house?

24   A.   About two weeks now.

25   Q.   Okay.  And prior to -- excuse me, prior to being in

Direct - Vigil

1   the halfway house, where were you living?

2   A.   I was living -- I had a home off of -- with my mother.

3   I was staying with my mother.   I was on pretrial release.

4   Q.   Okay.   And are you here as a result of a case you have

5   been charged in?

6   A.   Yes, I am.

7   Q.   And if you would, describe to the jury what you were

8   originally charged with.

9   A.   For all of the charges -- I'm not exactly sure all of

10  them in order, but there was a conspiracy, there was a

11  possession of controlled substance, and I believe

12  distribution of a controlled substance as well.

13  Q.   Okay.   And have you pled guilty in that case?

14  A.   Yes, I have.

15  Q.   And have you been sentenced?

16  A.   No, I have not.

17  Q.   So you're awaiting sentencing?

18  A.   Yes.

19  Q.   And was your plea a plea agreement along with the

20  Government?

21  A.   It was the dismissal of, I believe, conspiracy and

22  distribution, but I am -- I did plead guilty to possession

23  of less than 500 grams of controlled substance with a

24  mixture of a cocaine base.

25  Q.   Now, I want you to, if you would, direct your

651

Direct - Vigil

1    attention to Government Exhibit No. 120.  And you'll get a

2    copy of it there in just a minute.

3              Do you recognize that document?

4    A.   Yes, I do.

5    Q.   What is that document?

6    A.   It is the plea agreement which I pled to.

7    Q.   And does that outline all the terms and conditions of

8    the plea agreement?

9    A.   Yes, it does.

10   Q.   And you mentioned that you pled guilty to possession

11   with intent to distribute less than 500 grams.  Fair to

12   say --

13             THE COURT:  Mr. Phillips, do you want the jury to

14   be looking at this exhibit?

15             MR. PHILLIPS:  Your Honor, I don't think it's

16   necessary.

17             THE COURT:  Okay.  Just wanted --

18             MR. PHILLIPS:  It --

19             THE COURT:  I just want to point out to you again,

20   you may recall from your last trial, so that screen back

21   there, that's what the jury sees, so if there's nothing up

22   there, then you know they're not seeing anything.

23             MR. PHILLIPS:  Thank you, Your Honor.

24             THE COURT:  All right.

25             MR. PHILLIPS:  And this has been admitted.

Direct - Vigil

1    THE COURT:  Right.  I understand.

2    BY MR. PHILLIPS:

3    Q.   Maximum penalty, what's the possible penalties that

4    you're looking at?  Are you familiar?

5    A.   No, I am not.

6    Q.   Now we'll look at it.  Turning your attention to

7    page 7 of your plea agreement --

8    MR. PHILLIPS:  And I'd ask the jurors be allowed

9    to see Plaintiff's 7, document No. 120.  And if you could

10   bring up the Section 3, statutory penalties.

11   BY MR. PHILLIPS:

12   Q.   Fair to say that when you go to sentencing, you're

13   looking at any type of sentence between zero and 20 years

14   in prison?

15   A.   Yes.

16   Q.   And who decides your ultimate sentence?

17   A.   I believe Judge Martinez.

18   Q.   And when you were originally charged, you mentioned

19   you were charged with a conspiracy.  Do you recall that

20   that charge carries a mandatory minimum of five years up to

21   20 years?

22   A.   Yes, I do.

23   Q.   And just drawing your attention to Government Exhibit

24   No. 121, do you recognize that document?

25   A.   Which one again?  I'm sorry.

653

Direct - Vigil

1    Q.    121.

2    A.    Yes, I do.

3    Q.    And what is that document?

4    A.    The agreement that I had to be -- with you and discuss

5    testifying.

6    Q.    Okay.  And what was the agreement you had with the

7    Government as far as what you were going to testify to?

8    A.    I believe it was just dismissal of the conspiracy and

9    a few other charges and pleading to the distribution

10   charge.

11   Q.    Correct.  And what were you to do in return?

12   A.    I am not -- I don't recall.  Again, I'm not sure; is

13   it testify?  Is that what it is, to testify?

14   Q.    That's a bad question.

15   A.    Yeah.

16   Q.    Let me take you back to November 12th, 2015, when you

17   pled guilty.  Did you know who was going to go to trial or

18   who wouldn't go to trial in this case?

19   A.    No, I did not.

20   Q.    But was it your understanding that if anybody did go

21   to trial and you were called to testify, you would have to

22   testify?

23   A.    Yes, I do.

24   Q.    What would be the requirement of that testimony?  What

25   would you be required to do as far as sitting in that

654

Direct - Vigil

1    stand?

2    A.    Tell the truth.

3    Q.    Now, I kind of want to go back now.  You're awaiting

4    sentence; clearly out of custody.  Were you in custody for

5    a time?

6    A.    Yes.  For a month at the -- Jefferson County, I

7    believe.

8    Q.    Okay.  And eventually you were released on bond?

9    A.    Yes, I was.

10   Q.    And you were living with your mother for some time,

11   correct?

12   A.    Yes.

13   Q.    Now you're in a halfway house.  Why are you currently

14   in a halfway house?

15   A.    Because I used a controlled substance, cocaine, and I

16   violated the bond agreements where that was the

17   recommendation place for me to be.

18   Q.    Fair to say that on December 20 -- well, let me ask

19   you this:  One of your conditions of your release, was it

20   to not use any illegal narcotics?

21   A.    That's correct.

22   Q.    And cocaine would be one of those?

23   A.    Correct.

24   Q.    On December 21st of 2014, did you -- were you required

25   to submit a urinalysis?

655

Direct - Vigil

1    A.    Yes, I was.

2    Q.    And did you submit that urinalysis?

3    A.    Yes, I did.

4    Q.    And were you confronted by your probation officer as

5    to a positive test for that urinalysis?

6    A.    Yes, I was.

7    Q.    And was that on January 14th of 2015?

8    A.    Yes.

9    Q.    And when your probation officer told you that you had

10   tested positive for cocaine, were you truthful with him and

11   admit to it?

12   A.    No, I was afraid, and I made the stupid mistake by

13   lying to him, trying to weasel my way out of it.

14   Q.    Okay.  And were you confronted again on February 11th,

15   2015, about that?

16   A.    Yes, I was.

17   Q.    And did you lie again?

18   A.    Yes, I did.

19   Q.    And let me ask you this:  Have you used cocaine in the

20   past?

21   A.    Yes, I have.

22   Q.    Would you -- fair to say that you've had a cocaine

23   problem in the past?

24   A.    Yes, I do have a cocaine problem, yes.

25   Q.    And boy, you did a good job correcting me.  Do you

656

Direct - Vigil

1   still struggle with that problem?

2   A.   Yes, I do.

3   Q.   On March 19th of 2015, did you do another urinalysis?

4   A.   Yes.

5   Q.   Were you confronted on that same day by your probation

6   officer as to its positive test?

7   A.   Yes, I was.

8   Q.   And on that date, did you admit to it?

9   A.   I don't believe I did.  I believe I lied again.

10   Q.   All right.  And did you continue to deny that and lie

11   on March 20th, 2015?

12   A.   Yes.

13   Q.   And ultimately on March 22d, 2015, did you ultimately

14   admit that you had used cocaine?

15   A.   Yes, I did.

16   Q.   On May 4th of 2016 -- I'm sorry -- May 11th, 2016, did

17   you submit a urinalysis on that day?

18   A.   Yes.

19   Q.   And were you confronted about your positive test for

20   cocaine?

21   A.   Yes, I was.

22   Q.   Did you tell the truth or did you deny it?

23   A.   At first I believe I denied.

24   Q.   Okay.  And did you continue to deny on May 16th of

25   2016?

657

Direct - Vigil

1    A.   Yes, I did.

2    Q.   And on December 28th of 2016, did you submit another

3    urinalysis test as positive?

4    A.   Yes, I did.

5    Q.   And were you confronted on January 7th of 2017?

6    A.   Yes.

7    Q.   And what did you tell your probation officer -- or did

8    you tell the truth or did you deny?

9    A.   It was a denial, but it also led to me telling the

10   truth.

11   Q.   Okay.  And did you actually, on January 18th of 2017,

12   call your probation officer and leave a message admitting

13   to that use?

14   A.   Yes, I did.

15   Q.   So the times that you had tested positive and denied,

16   it's fair to say that you were lying to your probation

17   officer on those dates?

18   A.   Yes.

19   Q.   And on February 3d of 2017, did you supply a test on

20   that day?

21   A.   Yes, I did.

22   Q.   And on February 14th, did your probation officer

23   challenge you about that positive test?

24   A.   Yes, he did, and I admitted to the -- being dirty.

25   Q.   Now, you mentioned earlier that when you originally

Direct - Vigil

1    were on bond you were living with your mother.  Did you

2    live with your wife and kids as well?

3    A.    Yes, I did, wife and two children.

4    Q.    Okay.  Ultimately, what has been the sanction?  What

5    has probation done in order to assist you, yet also hold

6    you accountable, for those cocaine tests over the last

7    couple of years?

8    A.    For the last couple of years, I have been in different

9    treatments trying to find the right treatment based on the

10   Independent House Northside and just recently I was placed

11   in the halfway house for additional sanction and

12   treatment.

13   Q.    Now, I want to take you back to this investigation

14   that has you here to testify.  Back in 2013, about midyear,

15   did you know a person named Ricky Garrison?

16   A.    Yes, I did.

17   Q.    And would that be fair to say that you've known him

18   since approximately May of 2009?

19   A.    Yes.

20   Q.    How did you originally meet Mr. Garrison?

21   A.    He had a cousin that I was told his cousin's name was

22   Kay-how [phonetic].  Never did get a real Government name,

23   but that was his nickname he went by, and he introduced me

24   to Ricky and I was a supplier to --

25              MR. LEONARD:  Your Honor, I object and would ask

Direct - Vigil

1   to approach.

2           MR. PHILLIPS:  Your Honor, I think that I can lead

3   him out of here.

4           THE COURT:  Do you still want to approach?

5           MR. LEONARD:  This goes into our 404(b) issue and

6   I would ask that the witness be instructed to stop

7   answering so that the Government attorney can now direct

8   him out of where we're headed, so that we don't get into a

9   problem.

10          THE COURT:  All right.  I think that's a fair

11  resolution.  So, Mr. Vigil, let's -- let's forget that last

12  question and Mr. Phillips is going to rephrase it and

13  ask -- and I direct you to answer that question only.

14          THE WITNESS:  Okay.

15          THE COURT:  Nothing more than that.

16          THE WITNESS:  All right.

17          THE COURT:  Okay.

18  BY MR. PHILLIPS:

19  Q.   Now you have known Ricky Garrison since 2009, but I

20  want to take you now to June of 2013.  In June of 2013, did

21  you have a relationship with Ricky Garrison?

22  A.   Yes, I did.

23  Q.   And what was that relationship?

24  A.   I was his supplier for cocaine.

25  Q.   And do you see Ricky Garrison here in the courtroom

Direct - Vigil

1    today?

2    A.    Yes, I do.

3    Q.    If you could, please point to him and tell us what

4    he's wearing.

5    A.    He's wearing a -- I believe it's white with a

6    checkered shirt and glasses there.

7              MR. PHILLIPS:   Your Honor, at this time we'd ask

8    the record reflect identification of the defendant, subject

9    to cross-examination.

10              THE COURT:   The record will so reflect.

11   BY MR. PHILLIPS:

12   Q.    Okay.   Now, you mentioned that you were selling

13   cocaine to Ricky Garrison.   Approximately what's -- what

14   amounts were you selling to Ricky Garrison?

15   A.    One to 2 ounces at a time.

16   Q.    And how often were you selling Ricky Garrison 1 to 2

17   ounces at a time?

18   A.    He was very sporadic to where it could be twice a day

19   or once a week.

20   Q.    And what were you doing with the money that you got

21   from Ricky Garrison selling him cocaine?

22   A.    Ultimately I was using the money to fund my own habit

23   of cocaine and other drug use.

24   Q.    Now, taking you back to -- now actually I want to take

25   you ahead to November 29th of 2013.   Were you still selling

Direct - Vigil

1    cocaine to Ricky Garrison?

2    A.    Yes.

3    Q.    And when you were selling to Ricky Garrison, cocaine,

4    were you selling powder cocaine, base cocaine, or both?

5    A.    Both.

6    Q.    Now, I'd ask you to look at Government Exhibit No. 9.

7             MR. PHILLIPS:    Ask the jurors to be able to turn

8    in the transcript to Government Exhibit No. 9.

9             COURTROOM DEPUTY:    Do you want him to have the

10   transcript as well?

11            MR. PHILLIPS:    I would ask he see both at this

12   time.

13   BY MR. PHILLIPS:

14   Q.    Now looking at Government Exhibit 9, the actual disk

15   in there, what is that?

16   A.    It is an audio recording that -- between me and Ricky

17   Garrison for a drug deal.

18   Q.    And is there anything unique about that disk as a

19   result of your actions on it?

20   A.    I confirmed that it was me and Ricky on the disk.

21   Q.    And did you do that with a number of exhibits and

22   items?

23   A.    Yes, I did.

24   Q.    And how did you confirm that it was you, or put it on

25   there?    What did you mark?

Direct - Vigil

1   A.   I heard it for myself, to where I actually initialed

2   it after hearing them.

3   Q.   And did you initial all those disks to confirm it?

4   A.   Yes, I did.

5        MR. PHILLIPS:   Now, I'm going to ask, now that

6   we're all turned to Government Exhibit No. 9, to please

7   publish Government Exhibit 9.

8        (Phone call played)

9   BY MR. PHILLIPS:

10  Q.   And who are the two people on that call?

11  A.   Myself and Ricky Garrison.

12  Q.   And when you -- I'm sorry, when Mr. Garrison said to

13  you, Shit I need two, what was he referring to?

14  A.   Two ounces of cocaine.

15  Q.   And based on that phone call, did you have 2 ounces of

16  cocaine available to sell him?

17  A.   Yes, I did.

18  Q.   And later that day, did, in fact, a drug deal between

19  you and Ricky Garrison take place?

20  A.   Yes, it did.

21  Q.   And did you deliver 2 ounces of cocaine to him?

22  A.   He came to me to where he was delivering --

23  Q.   And, I'm sorry, I was talking about delivering by

24  hand, but thank you for clarifying.

25  A.   Yes, he was.

663

Direct - Vigil

1    Q.    Did he come to your house and get it?

2    A.    Yes, he did.

3    Q.    When he came to get it, how much were you charging him

4    per ounce for cocaine?

5    A.    I believe at the time it was $1100 an ounce.

6    Q.    Now did you continue to sell Ricky Garrison drugs, as

7    you mentioned, kind of sporadically through time?

8    A.    Yes, I did.

9    Q.    I would ask the jurors to turn to Exhibit No. 103 and

10   ask you to turn to 103 as well.

11          On November 29th, 2013, about 5:14 p.m., do you

12   recall where you were at that evening?

13   A.    Can you repeat the question?  I'm sorry.

14   Q.    On November 29th, 2013, at about 5:14 p.m., do you

15   recall where you were that evening?

16   A.    Yes, I was at home in my garage.

17   Q.    Okay.  If you could, describe to the jurors how your

18   house and your garage are situated.

19   A.    The house is separated from the garage.  It's an older

20   house, over a hundred years old, so you get to the back

21   door; about 50 feet from the door, the garage is there, and

22   the door to the alleyway.

23   Q.    And when you say "the door to the alleyway," is that

24   the garage door?

25   A.    Yes, it is.

Direct - Vigil

1    MR. PHILLIPS:  At this time, Your Honor, I --

2    well, it's been admitted, so I would just simply ask to

3    publish 103.

4    BY MR. PHILLIPS:

5    Q.   And what were you letting Mr. Garrison know through

6    that communication?

7    A.   He was coming to meet me, so I told him I was in the

8    garage, and I directed him to get to the alley where I was

9    at.

10   Q.   Okay.  Ask you to turn to 104.

11    MR. PHILLIPS:  Please publish 104.

12    (Phone call played)

13   BY MR. PHILLIPS:

14   Q.   And on that evening, do you recall selling Ricky

15   Garrison cocaine?

16   A.   Yes, I do.

17   Q.   Do you recall how much?

18   A.   I do not.

19   Q.   What was your typical amount of sales to Ricky

20   Garrison?

21   A.   One or 2 ounces.

22   Q.   What's the largest amount of cocaine you sold at one

23   time to Ricky Garrison?

24   A.   Two ounces.

25   Q.   And what was the smallest?

665

Direct - Vigil

1    A.   One ounce.

2    Q.   Now, I want to take you now to Government Exhibit

3    No. 11.

4         On November 29th, 2013, at about 6:48 p.m., did

5    you have another conversation with Mr. Garrison?

6    A.   Yes, I did.

7         MR. PHILLIPS:   Please publish Government

8    Exhibit 11.

9         THE WITNESS:   I did.

10       (Phone call played)

11   BY MR. PHILLIPS:

12   Q.   Okay.  During that conversation when Ricky Garrison

13   said to you, You got one more down there, what was he

14   referring to?

15   A.   One more ounce of cocaine.

16   Q.   And then as the conversation went on, he asked you,

17   You got -- you got that stuff for me, can you weigh it and

18   tell me how much it is?  What was he referring to then?

19   A.   I don't know the name of the substance, but it was a

20   white powder substance that he would use himself to cut the

21   cocaine for a higher profit.

22   Q.   And if you would, describe to the jurors what you mean

23   by "cut the cocaine for a higher profit."

24   A.   Take a percentage of the original cocaine out and you

25   add another substance to it to where now instead of just

Direct - Vigil

1    having 28 grams of cocaine, you have 35 grams of cocaine

2    that you can sell for a higher profit.

3    Q.   And did you, in fact, sell Ricky Garrison an ounce of

4    cocaine that night?

5    A.   Yes, I did.

6              MR. PHILLIPS:   If I may have one moment, Your

7    Honor.

8              THE COURT:   You may.

9              MR. PHILLIPS:   May we approach, Your Honor?

10             THE COURT:   Yes.

11        (Side bar conference held)

12             MR. PHILLIPS:   Your Honor, this witness has made

13   two statements about Ricky Garrison and prostitution; one

14   was back in 2012 that Ricky Garrison had told him about

15   that.   I am not going to get into that.   He made a second

16   statement which I may direct him, to be safe, so it doesn't

17   go into the first one, that during the course of conspiracy

18   Ricky Garrison told him he had some sort of prostitution

19   connection to Detroit, that that's about the information he

20   knows.

21             MR. LEONARD:   Your Honor, I object.   That's 404(b)

22   information.   It's a prior uncharged bad act.   It is

23   specifically -- the statement, if it would come in saying

24   Detroit is a specifically discrete act, and that which is

25   charged, the Government, if they wanted to use that, needed

667

Direct - Vigil

1    to give us notice.

2             The purpose, I would believe, for the Government

3    trying to get that into evidence is to establish a common

4    scheme, motive, plan, intent, lack of mistake.  We asked

5    for notice.  They replied they would give us 60 days notice

6    and they didn't.  And so it -- it should be excluded.

7             THE COURT:  Well, why are you trying to get into

8    statements about what alleged prostitution activities he

9    conducted in Michigan before the conspiracy --

10            MR. PHILLIPS:  Actually, how this witness would

11   testify is he says, I know it's out of state, I think it's

12   Detroit, but I'm not sure.

13            THE COURT:  I have to agree with Mr. Leonard on

14   this.  It's outside the charged periods of time, June 2013

15   through June of 2014.  I think it is 404(b) evidence.  And

16   you have not given notice of it to the defendants; is that

17   correct?

18            MR. PHILLIPS:  That's right.

19            THE COURT:  All right.  So I'll sustain it.

20        (End of discussion at side bar)

21            THE COURT:  All right.  Next question.

22   BY MR. PHILLIPS:

23   Q.   Now, did there come a time that you stopped selling

24   cocaine to Ricky Garrison?

25   A.   Yes.

668

Direct - Vigil

1    Q.    And what -- what was the catalyst for that?

2    A.    I -- my home was raided by the North Metro Denver

3    Police Task Force, I believe it was January 1st, 2014.   At

4    that moment I had ceased all drug sales.

5    Q.    Would -- was it January 1st or could it have been

6    January 5th?

7    A.    January 5th, yes, correct, you're right.

8    Q.    And as a result of that search warrant and that raid,

9    did -- was there actually about six ounces of cocaine

10   recovered?

11   A.    Yes, there was.

12            MR. LEONARD:   Objection, Your Honor.   Move to

13   strike.   That's not evidence that's been admitted into this

14   courtroom.   It's not on any of the exhibit lists.   And we

15   simply don't have any notice of that.

16            MR. PHILLIPS:   Your Honor, I can rephrase that.

17            THE COURT:   All right.   Let's -- I'm going to

18   sustain that objection, but ask you to rephrase.

19   BY MR. PHILLIPS:

20   Q.    As a result of that raid, were you ultimately

21   arrested?

22   A.    Yes, I was.

23   Q.    And were you charged in a state court?

24   A.    Yes, I was.

25   Q.    Ultimately, June of 2014, did the Feds come and

Direct - Vigil

1    contact you?

2    A.    Yes, they did.

3    Q.    And were you charged as a result of that contact by

4    the federal government for your actions in this

5    conspiracy?

6    A.    Yes, I was.

7    Q.    And as a result of that charge, did, in fact, you

8    plead guilty to this particular case in exchange for having

9    the Denver case -- or the other case dismissed?

10   A.    Yes.

11          MR. PHILLIPS:    If I may have one moment, Your

12   Honor.

13          THE COURT:    You may.

14   BY MR. PHILLIPS:

15   Q.    Now, just so we're clear, the original February 14th,

16   2017, positive urinalysis for cocaine, did you initially

17   deny that to your probation officer, or lie about it?

18   A.    Yes.

19   Q.    And then you admitted to it?

20   A.    Yes.

21   Q.    And during the time of these drug deals when Ricky

22   Garrison would come to your home, where were you living?

23   A.    On 35th and Franklin, north Denver -- northeast

24   Denver.

25   Q.    Did you have an exact address?

Cross - Vigil

1    A.    3515 Franklin Street, Denver, Colorado 80205.

2    Q.    And is there a school near that address?

3    A.    Yes, there is.

4    Q.    And what is that school?

5    A.    Wyatt Edison Elementary.

6              MR. PHILLIPS:   Nothing further.   Thank you, Your

7    Honor.

8              THE COURT:   Cross-examination.

9              MR. LEONARD:   Yes, thank you.

10                        CROSS-EXAMINATION

11   BY MR. LEONARD:

12   Q.    Good afternoon, Mr. Vigil.   How are you doing?

13   A.    I'm doing good.   How are you?

14   Q.    I'm doing well.   Thank you.

15              I want to talk to you a little bit about your

16   motivation to allegedly sell drugs.   You detailed to the

17   Government that you have a substantial drug habit; is that

18   correct?

19   A.    Yes.

20   Q.    And if I understood your testimony correctly, the

21   reason that you allegedly were selling cocaine was to

22   support your own drug habit; is that correct?

23   A.    Yes.

24   Q.    So you're testifying that Mr. Garrison would pay you

25   cash, correct?

Cross - Vigil

1    A.    Yes.

2    Q.    You were the seller, correct?

3    A.    Yes.

4    Q.    And Mr. Garrison was the buyer, correct?

5    A.    Yes.

6    Q.    You testified that you were arrested on January 5th,

7    2014, correct?

8    A.    Yes.

9    Q.    And your home was searched, correct?

10   A.    Yes, it was.

11   Q.    You also testified about cutting agents; is that

12   correct?  That a cutting agent increases the volume of the

13   alleged cocaine, correct?

14   A.    Correct.

15   Q.    But that would mean that if you had an ounce of

16   something with cutting agents in it, a portion would be the

17   alleged drugs and a portion the cutting agent, correct?

18   A.    Correct.

19   Q.    And the way you would determine how much is an actual

20   illegal substance as opposed to the cutting agent is some

21   sort of lab test, correct?

22   A.    I believe so, yes.

23   Q.    Okay.  You entered into a cooperation agreement with

24   the Government, and you are clear about that, correct?

25   A.    Correct.

Cross - Vigil

1  Q.   And in exchange for a plea of guilty, the Government

2  agreed to dismiss all the charges except for the one you

3  pled guilty to at sentencing; isn't that right?

4  A.   Correct.

5  Q.   And included in the dismissal of charges will be the

6  conspiracy charge; that's Count 1, correct?

7  A.   Correct.

8  Q.   And the conspiracy charge carries a maximum sentence

9  of 20 years, correct?

10 A.   I believe so.

11 Q.   But as opposed to the charge that you pled guilty to,

12 it carries a mandatory minimum of five years sentence,

13 correct?

14 A.   Correct.

15 Q.   And so by your plea agreement, you have avoided a

16 mandatory sentence, correct?

17 A.   Yes.

18 Q.   In addition -- now your deal states that the only

19 party that gets to decide if you fully cooperate is the

20 Government, correct?

21 A.   Yes.

22 Q.   You have to satisfy the Government, right?

23 A.   Correct.

24 Q.   Your deal calls for the Government to ask for a

25 reduction in the sentence called for by the sentencing

673

Cross - Vigil

1    guidelines; isn't that correct?

2    A.    I believe so, yes.

3    Q.    And currently the sentencing guideline range of

4    punishment in your case, since there's no mandatory

5    minimum, is 27 to 33 months; correct?

6    A.    Correct.

7    Q.    Now, that's what the sentencing guidelines call for,

8    but you're going to come into court and ask for probation,

9    aren't you?

10   A.    I have not yet spoken with my lawyer on -- prior to

11   coming into court.

12   Q.    You certainly don't want to be sentenced to 27 to 33

13   months, do you?

14   A.    No, I do not.

15   Q.    And you want to do everything in your power to avoid a

16   prison sentence, don't you?

17   A.    All possibilities, yes.

18   Q.    Your plea agreement requires you to furnish to the

19   Government all documents and other material that may be

20   relevant to the investigation that are in your control or

21   possession, correct?

22   A.    Correct.

23   Q.    Now, your home gets raided in January, but then the

24   Feds come around and arrest you on May 6th of 2014; isn't

25   that correct?

674

Cross - Vigil

1    A.    I believe it was June.

2    Q.    I'm sorry, June.  But five to six months after the

3    January raid, correct?

4    A.    Correct.

5    Q.    And when you were initially arrested, you did not give

6    a statement to the Government, did you?

7    A.    In the January arrest?

8    Q.    No, I'm sorry, I should have rephrased that better.

9    When you were arrested by the federal government, you

10   didn't give a statement, did you?

11   A.    No.

12   Q.    You invoked your rights to remain silent, correct?

13   A.    Correct.

14   Q.    You didn't talk to the Government until you had a

15   lawyer who could negotiate a proffer plea agreement with

16   you, correct?

17   A.    Correct.

18   Q.    And by proffer plea agreement, I mean a cooperation

19   agreement for a better deal, right?

20   A.    Right.

21   Q.    You did go and meet with the Government; isn't that

22   correct?

23   A.    Yes.

24   Q.    And you gave an interview where you promised to be

25   truthful; isn't that right?

675

Cross - Vigil

1    A.    Yes.

2    Q.    And this is on April 3d, 2015, the first time,

3    correct?

4    A.    Not exact sure of the date, but I believe so.

5    Q.    Sometime in April 2015?

6    A.    Correct.

7    Q.    They played some phone calls for you; is that your

8    recollection?

9    A.    Yes.

10   Q.    One of the phone calls they played for you, they asked

11   you to identify some voices, and you said that the two

12   voices were your wife's and Mr. Garrison, correct?

13   A.    Correct.

14   Q.    And you indicated to the Government that your wife

15   would sometimes answer the phone calls and take orders or

16   help conduct the alleged drug transactions, correct?

17   A.    Yes, she would have the meeting.

18   Q.    She was participating in what you're stating is your

19   scheme to distribute cocaine, right?

20   A.    Yes.

21   Q.    And she was using a phone, wasn't she?

22   A.    Yes.

23   Q.    And she was never, however, charged with using a

24   telephone device or communications device in the commission

25   of a drug crime, was she?

676

Cross - Vigil

1    A.    No.

2    Q.    You made no mention of James Tillmon in your proffer

3    session, did you?

4    A.    No.

5    Q.    Now in the April meeting interview, you did tell the

6    Government that you never talked about or dealt with guns,

7    correct?

8    A.    Correct.

9    Q.    And you said that specifically because your wife has a

10   gun, correct?

11   A.    Yes, she had a legal firearm.

12   Q.    That was in the home, right?

13   A.    Yes, it was.

14   Q.    She was never charged with using or carrying a firearm

15   in relation to a drug crime, was she?

16   A.    No, she was not.

17   Q.    You weren't charged with that, were you?

18   A.    No, I was not.

19   Q.    But that gun's in your house, right?

20   A.    Correct.

21   Q.    And just like your wife had access to it, you had

22   access to it, correct?

23   A.    Correct.

24   Q.    You stated in your first proffer session in April that

25   the last time you saw Mr. Garrison was in November of 2013.

Cross - Vigil

1   That's what you said, right?

2   A.   Correct.

3   Q.   Now, you went -- you were questioned in some detail by

4   the Government about statements you made to your pretrial

5   release officer, correct?

6   A.   Yes.

7   Q.   And you would agree with me that one of the conditions

8   of your pretrial release is that you cannot possess, use,

9   or obtain a controlled substance without a prescription.

10  A.   That's correct.

11  Q.   And you're admitting now that you used cocaine

12  multiple times while on pretrial release, correct?

13  A.   Correct.

14  Q.   And you're also admitting that multiple times you lied

15  to your pretrial officer, correct?

16  A.   That is correct.

17  Q.   And you went from being in your home to a halfway

18  house because of that, is that what I understand?

19  A.   That is correct.

20  Q.   You didn't get charged with a crime for lying to your

21  pretrial officer?

22  A.   No, I did not.

23  Q.   The Government didn't bring forth charges that you

24  were in violation of your pretrial release?

25  A.   No, they did not.

678

                    Redirect - Vigil

1            MR. LEONARD:  I have no further questions.

2            THE COURT:  Redirect?

3            MR. PHILLIPS:  If we may have one moment, Your

4    Honor.

5            THE COURT:  Yes.

6                    REDIRECT EXAMINATION

7    BY MR. PHILLIPS:

8    Q.   Are you familiar with what the status is as far as

9    your pretrial release, whether you're going to be facing a

10   revocation or not?

11   A.   I do not.  I'm not aware of it.

12   Q.   Okay.  And that's up to your probation officer?

13   A.   Yes, it is.

14   Q.   Now you were asked a number of questions about your

15   wife and possibly being charged or anything.  Just so it's

16   clear to the jury, did you ever have any discussions

17   whatsoever with me, these agents, or anybody else from the

18   Government regarding potential charges against your wife or

19   not against your wife, or any agreements whatsoever?

20   A.   No, I did not.

21   Q.   Now you were asked -- or you were told that you needed

22   to satisfy the Government.  When you have met with the

23   Government, what is the one thing that is repeatedly

24   stressed to you?

25   A.   To tell the truth.

679

Redirect - Vigil

1   Q.   And when you swore up here today to tell the truth,

2   have you done that?

3   A.   Yes, I have.

4   Q.   Would you do anything you possibly could to get out of

5   prison or release --

6   A.   Yes, I would.

7   Q.   Would you lie on the stand?

8   A.   No, I would not.

9   Q.   Now, you mentioned that you were selling drugs, but

10  you were also using cocaine.

11  A.   Correct.

12  Q.   What would happen if, say, you took, oh, 3 grams of

13  cocaine and put in an ounce of cut and tried to sell that?

14  Would people buy that?

15  A.   No.

16  Q.   Why is that?

17  A.   The purity would not be there and it would cause

18  possibly serious consequences.

19  Q.   And in your experience in both the selling cocaine and

20  using cocaine, is there sometimes cut in the cocaine?

21  A.   Generally there is, yes.

22  Q.   Okay.  And is it necessary to balance that?

23  A.   Yes.

24  Q.   Okay.  And the cocaine that you were using, but also

25  selling to Ricky Garrison, would it get you high?

1  A.   Yes, it would.

2         MR. PHILLIPS:   Nothing further.   Thank you, Your

3  Honor.

4         THE COURT:   All right.   I have a couple of

5  questions for this witness.

6         The name of the school near your home is Wyatt

7  Elementary?

8         THE WITNESS:   Wyatt Edison Elementary.

9         THE COURT:   Wyatt Edison?

10        THE WITNESS:   Yes.

11        THE COURT:   Okay.   Wyatt Edison.   How far is Wyatt

12 Edison Elementary School from 3515 Franklin Street?

13        THE WITNESS:   It is the -- directly on the corner

14 of 36th and Franklin Street.

15        THE COURT:   Okay.   How far is that from 3515

16 Franklin?

17        THE WITNESS:   One block.   I'm not sure of the

18 measurements.

19        THE COURT:   One block away?

20        THE WITNESS:   Yes.

21        THE COURT:   And in your best estimate, how many

22 feet would that be?

23        THE WITNESS:   From what I recall from my original

24 discovery, 1,000 feet, less than 1,000 feet.

25        MR. LEONARD:   Your Honor, I object to his answer.

681

1    He stated that from what he recalls from his original

2    discovery.  He's not testifying to his knowledge.  I would

3    move --

4              THE COURT:  Right.  I agree.  Sustained.

5              I don't want you to give me a distance based on

6    anything you've read in your file or anything.  I want you

7    to tell me from -- as -- from your personal observation,

8    your best guess based on the fact that you lived there, how

9    far in feet the school was from your home.

10             THE WITNESS:  I'd say 500 feet.

11             THE COURT:  500 feet.  Okay.

12             I'll allow questions from counsel based on the

13   Court's questions of this witness, if there are any.

14             MR. PHILLIPS:  Nothing for the Government.  Thank

15   you, Your Honor.

16             THE COURT:  For the defendant?

17                        EXAMINATION

18   BY MR. LEONARD:

19   Q.   I heard you, Mr. Vigil, say that your -- you were

20   estimating the distance; is that correct?

21   A.   Correct.

22   Q.   Have you taken a device and tried to measure the

23   distance, like a tape measure?

24   A.   No, I did not.

25   Q.   Are you certified in judging distances?

1    A.    No, I'm not.

2    Q.    In fact, you could be wrong, correct?

3    A.    Correct.

4    Q.    It could be over 1,000 feet, couldn't it?

5    A.    Yes, it could.

6              MR. LEONARD:  Thank you.

7              THE COURT:  All right.  May this witness be

8    excused from the Government?

9              MR. PHILLIPS:  Yes, Your Honor.

10             THE COURT:  All right.  From the defendant?

11             MR. LEONARD:  Yes, Your Honor.

12             THE COURT:  Okay.  Mr. Vigil, thank you for your

13   testimony.  You may -- you're excused.  You may step down.

14             Would counsel approach, please.

15        (Side bar conference held)

16             THE COURT:  So am I correct that -- am I correct

17   that Investigator Mohlman -- she comes after me, too.  Even

18   I can't escape that.

19             MR. PHILLIPS:  You don't have a little sign up

20   here that says, "Speak loudly and clearly and no one gets

21   hurt."

22             MS. RANGEL:  She's clearly a smart woman; come on

23   now.

24             THE COURT:  She takes the place of that sign.

25             Investigator Mohlman is your last witness?

1            MR. PHILLIPS:  That's correct.

2            THE COURT:  I'm not going to absolutely hold you

3    to it, but are you planning on any of these witnesses

4    testifying?

5            MR. LEONARD:  I don't believe we're going to have

6    any witnesses.

7            THE COURT:  Okay.  So then you'll -- then the

8    testimonial part will be done tomorrow.  All right.

9            I have, after the investigator -- so what I think

10   I'm going to do, especially because you have an assignment

11   from me --

12           MR. PHILLIPS:  Yes, I do.

13           THE COURT:  -- is I'm going to recess right now

14   today.  The weather's not so great and we've got some folks

15   that live pretty far away; Tabernash and some other

16   places.

17           MR. LEONARD:  And it's supposed to be bad out;

18   that's what I've been told.

19           MR. PHILLIPS:  I've been told it's pretty white

20   out.

21           THE COURT:  So two hours and two hours.  Are we

22   still looking at four hours for Mr. Mohlman?

23           MR. PHILLIPS:  I would say roughly an

24   hour-and-a-half to two for the Government.

25           THE COURT:  Okay, how about for the defendant?

1            MR. LEONARD:  I -- that's a good question.

2            THE COURT:  I'm asking this just because I want to

3    know when I have to be ready for a Rule 29 --

4            MR. LEONARD:  Yeah, so the best estimate -- I

5    apologize, I wanted to address this -- they're taking

6    Investigator Mohlman basically through the same series of

7    questions as Agent Gullicksrud, but more voluminous because

8    he's the case agent.  And I don't know how long I took with

9    Gullicksrud, but maybe an hour-and-a-half.

10           THE COURT:  So we might be most of the morning.

11           MR. LEONARD:  I think that's fair --

12           MR. PHILLIPS:  I think that's a good --

13           THE COURT:  Estimate.  All right, good.  Thank

14   you.

15        (End of discussion at side bar)

16           THE COURT:  All right, ladies and gentlemen of the

17   jury, you're going to be happy with what I'm going to say.

18   We're going to recess now for the day.  It's not the best

19   weather out there and a couple of you live pretty far away.

20   Ms. Amick-Sullivan --

21           THE JUROR:  I'm staying here.

22           THE COURT:  You are?

23           THE JUROR:  Yeah.

24           THE COURT:  So we're going to recess for today.

25   And like the prior days, we're going to start up again

1    tomorrow morning at 8:45.  I keep telling you that, but you

2    never come out here at 8:45.  The lawyers and I will start

3    at 8:45 and as soon as we're done with whatever we need to

4    do, we'll come for you.  But since we may get to you at

5    8:45, I ask that you be here by 8:35.

6           Again, don't discuss this case with anyone and

7    don't do any independent research into the facts, the law,

8    or the persons involved in this case.  We'll be in recess

9    until 8:45 tomorrow morning.

10          (Jury left the proceeding at 4:26 p.m.)

11          THE COURT:  So, Mr. Phillips, you better not show

12   your face here tomorrow morning if you haven't gotten that

13   to us.

14          MR. PHILLIPS:  I won't, Your Honor.  I promise

15   to -- well, I'll be in the office much later than just

16   doing that tonight.

17          THE COURT:  Okay.

18          MR. PHILLIPS:  With that said --

19          THE COURT:  Well, everybody sit down.

20          MR. PHILLIPS:  With that said, just trying to get

21   a road map for tomorrow as far as like when we'll address

22   jury instructions, closings, and that sort of thing and

23   what the Court anticipates doing.

24          THE COURT:  All right.  Assuming that we spend

25   most of the morning with Investigator Mohlman, then I think

686

1     what we're looking at is taking a lunch, maybe an early

2     lunch, and coming back, and I'll take Rule 29 arguments,

3     I'll make a ruling.

4          I told defense counsel I wasn't going to hold them

5     to the representation that they're not going to have

6     witnesses, but assuming that that continues to be their

7     plan, then we will -- we'll take a break and we'll do --

8     definitely do charging conference tomorrow afternoon, both

9     the jury instructions, verdict forms, get all that set up.

10         I'm thinking -- here's the concern I have:  If the

11    testimony is going to end by, let's say, late morning, we

12    have so much to do in terms of the Rule 29, the Rule -- the

13    charging conference, then for me to hold them here for

14    several hours while we're dealing with that and then bring

15    them back for closing I think makes no sense.

16         So I'm thinking -- this is what I'm thinking, but

17    don't hold me to this, but I'm thinking that we'll let them

18    go when we're done.  I'll ask the defendants on the

19    record -- the defendant's counsel on the record if there

20    are witnesses.  Assuming you say no, then since there's no

21    evidence for the defendant, then there will be no rebuttal,

22    the testimonial part of the case will be done.

23         I think then I'll just release them for the day

24    and then that leaves us the afternoon to deal with the Rule

25    29s, the charging conferences -- charging conference and

1    any amendments or revisions to the instructions and verdict

2    forms, and then we'll come back Monday morning for closing

3    arguments, for me reading the instructions first, that's my

4    practice.  I'll read the instructions first, we'll do

5    closing arguments, and then they will begin their

6    deliberations.  All right?

7            MR. PHILLIPS:  I believe that makes very good

8    sense, Your Honor.

9            THE COURT:  Yeah, I just don't want -- you know,

10   the Rule 29 -- because of the -- how many counts we have

11   here and how many counts I'm going to have to cover in a

12   ruling, and I don't know right now how complicated the

13   charging conference will be.  They literally could be

14   waiting two or three hours while we plow through it, so I

15   don't want to do that to them.

16           MR. PHILLIPS:  I agree, Your Honor.  And one of

17   the things I have noted and will make sure of this tomorrow

18   is that we have dismissed a couple of counts, and make sure

19   that those aren't in there for the jury.  So it's going to

20   be a lengthy dot-the-I-and-cross-the-T sort of period.

21           THE COURT:  If you could include with what you

22   e-mail to us this evening, if you are going to be

23   dismissing counts, send that over to us.

24           MR. PHILLIPS:  I'm sorry, we're not dismissing any

25   at this point; it's the two that we dismissed prior.  And

1    one of the things that went through my head yesterday

2    afternoon, for whatever reason, was, like, did we make sure

3    that we took that count out of the jury instruction part of

4    the indictment?

5            THE COURT:  Oh.

6            MR. PHILLIPS:  And so I have that note.  And so we

7    may have to make that little change and that sort of thing.

8            THE COURT:  All right.  So two counts -- I thought

9    we just dismissed 47.  Was there another one?

10           MR. PHILLIPS:  We did the one phone count right at

11   the beginning of the trial.

12           THE COURT:  Ah.  Remind me what that was.

13           MR. PHILLIPS:  I would if I could.

14           MR. LEONARD:  That's Count 35, I believe.

15           THE COURT:  35?

16           MR. LEONARD:  I think so.

17           THE COURT:  So we don't have to be dealing with it

18   on the 29 or the instructions and the verdict form, then,

19   you know, your verdict form's obviously going to have to

20   reflect those two counts being out.  And if you're going to

21   not -- if you're going to dismiss any other ones, obviously

22   those will have to be out.

23           MR. PHILLIPS:  Yeah.  We're not dismissing any

24   others --

25           THE COURT:  So those are your two.  Okay.  And --

1           MR. PHILLIPS:  The only question I have --

2           THE COURT:  And while I'm thinking of this, Mr.

3    Leonard, are you -- I'm not going to hold you to this, but

4    just so Mr. Hawkins and I can sort of be planning for this,

5    do you anticipate there being any counts that you would not

6    be moving against on the 29?

7           MR. LEONARD:  No.  But I certainly am going to

8    focus on some rather than others.

9           THE COURT:  Okay.  Let me do this as a favor to my

10   law clerk and I:  If you are planning on not moving against

11   one or more counts, in other words, you're conceding that

12   the Government's met its burden at least to get it to the

13   jury on those counts, if you would shoot us an e-mail this

14   evening on that as well, and then we know we don't have to

15   deal with that.  But, you know, it's -- you know, it's

16   entirely up to you.  If you want to move against all the

17   counts, that's your right.

18          MR. LEONARD:  I'll discuss with Mr. McDermott and

19   we'll come to a decision.

20          THE COURT:  Okay.  Very good.  Go ahead --

21          MR. PHILLIPS:  If I may have one moment.

22          THE COURT:  Yeah.

23          MR. LEONARD:  Oh, Mr. Junker is released from

24   his --

25          THE COURT:  One second.  All right.  Before we

1   move on, anything else?  Ms. Hansen has informed me that

2   her minutes and also our realtime Bridge does not reflect

3   the dismissal of any Count 35 at the beginning of the

4   trial.  So make -- that's why -- I'm not totally losing my

5   mind, I was having difficulty recalling it.  But then the

6   question is back in my mind how does Mr. Leonard know about

7   a rule -- a Count 35 dismissal?

8            MR. LEONARD:  I -- I know it's not reflected --

9   went through the minutes -- but I know he dismissed it, and

10  I can tell you why Count 35 sticks in my head so well.

11  It's out of order in terms of dates in the indictment, and

12  when I did my outline -- at the time I was doing my

13  outline, I thought I'd gone crazy and missed the count so I

14  spent time on it, so that's why I know it's 35 --

15           THE COURT:  Let's do this.  I didn't catch it, Ms.

16  Hansen didn't catch it, so why don't you -- the Government

17  just move to dismiss Count 35 again now and then today's

18  minutes can reflect it, assuming that --

19           MR. PHILLIPS:  Your Honor, the Government moves to

20  dismiss Count 35.

21           THE COURT:  All right.  I assume there's no

22  objection.

23           MR. LEONARD:  We do not object.

24           THE COURT:  Okay.  The record will reflect that

25  Count 35 is dismissed.  All right.

1          Mr. Phillips, you had some other matters you

2   wanted to raise.

3          MR. PHILLIPS:  Your Honor, I just spoke to

4   Mr. Leonard.  They had the probation officer, Seth Junker,

5   under subpoena.  We've discussed that.  They do not believe

6   they need him anymore, and we are willing to release him

7   from his subpoena.  He had e-mailed us earlier asking to

8   let us know if he wasn't needed because I believe he's off

9   the next few days and wanted to be available to do what he

10  wanted.  It's my understanding the defense is releasing him

11  from his subpoena.

12         MR. LEONARD:  He is released, Your Honor.

13         THE COURT:  Okay.  All right.  Officer Junker will

14  be released from his subpoena, and we'll notify him.  When

15  I go back I'll ask my judicial assistant to inform -- call

16  him and let him know.

17         Anything else that you think we should deal with

18  today?

19         MR. PHILLIPS:  Thank you, Your Honor.

20         THE COURT:  Mr. Leonard, anything further?

21         MR. LEONARD:  No.  Thank you.  Appreciate it.

22         THE COURT:  All right.  We will be in recess until

23  8:45 tomorrow morning.

24     (Proceedings concluded at 4:35 p.m.)

25

692

1                              **INDEX**

2    <u>Item</u>                                                    <u>PAGE</u>

3                      GOVERNMENT'S WITNESSES

4        **SIMEON RAMIREZ**
         Cross-examination by Mr. Leonard                481
5        Redirect Examination by Ms. Rangel              489

6        **FRANCISCO AGUILAR**
         Direct Examination by Mr. Phillips              499
7        Cross-examination by Mr. Leonard                530
         Redirect Examination by Mr. Phillips            545
8
         **ALONZO RIVERA**
9        Direct Examination by Ms. Rangel                553
         Cross-examination by Mr. Leonard                573
10       Redirect Examination by Ms. Rangel              574

11       **KENNET LeCESNE**
         Direct Examination by Ms. Rangel                577
12
         **TUSHAR NATHA**
13       Direct Examination by Ms. Rangel                589

14       **DAN JOHNSON**
         Direct Examination by Mr. Phillips              601
15       Cross-examination by Mr. McDermott              607
         Redirect Examination by Mr. Phillips            608
16
         **ROGER WEHR**
17       Direct Examination by Ms. Rangel                610

18       **CHRISTOPHER VIGIL**
         Direct Examination by Mr. Phillips              649
19       Cross-examination by Mr. Leonard                670
         Redirect Examination by Mr. Phillips            678
20       Examination by Mr. Leonard                      681

21

22

23                    GOVERNMENT'S EXHIBITS

24   EXHIBITS:        <u>Offered</u>   <u>Received</u>  <u>Refused</u>   <u>Stipulated</u>

25   12               581        581

693

GOVERNMENT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| 37 | 606 | 606 | | |
| 44 | 586 | 586 | | |
| 55 | 571 | 571 | | |
| 56 | 592 | | 595 | |
| 56-A | 594 | 596 | | |
| 57 | 567 | 568 | | |

DEFENDANT'S EXHIBITS

| EXHIBITS: | Offered | Received | Refused | Stipulated |
|-----------|---------|----------|---------|------------|
| D | 486 | 486 | | |

                    *       *       *       *       *

REPORTER'S CERTIFICATE

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Dated at Denver, Colorado, this 8th day of May, 2017.

_Mary J. George_

Mary J. George, FCRR, CRR, RMR