1           IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLORADO
2
    Criminal Action No. 14-cr-0231-WJM-1
3
    UNITED STATES OF AMERICA,
4
        Plaintiff,
5
    vs.
6
    RICKY GARRISON,
7
        Defendant.
8
    ------------------------------------------------------------
9
                  REPORTER'S TRANSCRIPT
10                 (Jury Trial - Day 3)
                      VOLUME IV
11  ------------------------------------------------------------

12      Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 8:52 a.m., on the 24th day of

15  February, 2017, in Courtroom A801, United States

16  Courthouse, Denver, Colorado.

17
                      APPEARANCES
18
        ZACHARY H. PHILLIPS and CELESTE B. RANGEL, Assistant
19  U.S. Attorney, 1801 California Street, Suite 1600, Denver,
    Colorado 80202, appearing for the plaintiff.
20
        MILLER M. LEONARD, Miller Leonard, P.C. 14143 Denver
21  West Parkway, Suite 100, Golden, Colorado 80401 and
        SEAN M. McDERMOTT, McDermott Stuart & Ward, LLP, One
22  Sherman Place, 140 East 19th Avenue, Suite 300, Denver,
    Colorado 80203, appearing for the defendant.
23

24              MARY J. GEORGE, FCRR, CRR, RMR
            901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

P R O C E E D I N G S

1

2          (In open court outside the presence of the jury at

3     8:52 a.m.)

4          THE COURT:  We have a couple matters to deal with

5     before we bring in the jury.  One is I started talking

6     about this yesterday and the more I think about it, I think

7     the more it makes sense, if the parties agree.  Obviously

8     the normal procedure would be after the Government rests, I

9     would ask that the defendant has a motion, folks would tell

10    me that you do, we'd excuse the jury, we'd have the

11    argument, I'd have a ruling.

12         We know from what you told my law clerk yesterday,

13    Mr. Leonard, and I believe you -- I assume you told the

14    Government -- you're not going to move against some or all

15    of the distribution counts.

16         MR. LEONARD:  That's correct.  We're not moving

17    any of the distribution counts.

18         THE COURT:  All right.  So for sure the case is

19    going to the jury, it's just a matter of depending on the

20    ruling, on the Rule 29 ruling going to the jury, on which

21    counts.  But for sure on the distribution counts.

22         MR. LEONARD:  Your Honor --

23         THE COURT:  Then --

24         MR. LEONARD:  I'm sorry, I may have forgotten to

25    tell the Government last night.  I thought I did, but my

1    apologies.  I meant to.

2              MR. PHILLIPS:  We have been a bit busy and we

3    understand.

4              THE COURT:  That's good.  I love how you guys work

5    well together.  Again, you should hold a CLE for civil

6    litigators and teach them how the hell to cooperate and

7    conduct a trial.  I would love it.

8              Okay.  You broke my train of thought.

9              All right.  Yeah.  On the 29.  So the jury will be

10   sitting out there, they wait for the argument, I would

11   rule.  We know we're going to -- the case is going to the

12   jury on at least some of the counts.  We'd come back to you

13   folks.  You'd -- if it -- you're still with your plan from

14   yesterday, you will get up and say that there's no -- We

15   have no witnesses.  You would rest.  And then I'd have to

16   excuse the jury again for us to have a renewal of the 29,

17   more argument, more ruling, and then -- and then keep them

18   excused while we're doing the charging conference.  All of

19   which I think makes no sense.

20             So if the parties agree, what I'd like to do is

21   get a stipulation that the Government will rest; Mr.

22   Leonard, I'll ask you, does the defendant have a motion

23   under Rule 29?  You'll say yes, and then I'll say, Do the

24   parties stipulate that we can defer argument on the motion

25   until the time to renew the motion has come up?

1           And then if you say yes, we can have it all at one

2      time.  I can then tell -- then I'll ask -- you'll -- then

3      I'll ask you to put on your -- call your first witness,

4      right?  And then you'll say you have no witnesses.  And you

5      will -- and the defendant rests.

6           And then I'll warn the jury that their services

7      for today are done.  I'll let them go home and then in the

8      afternoon we can deal with the 29, the argument, the

9      ruling, the charging conferences, the jury instructions,

10     and the verdict forms.  How does that sound to the

11     Government?

12          MR. PHILLIPS:  The Government agrees and has no

13     objection to that.

14          THE COURT:  Okay.  Mr. Leonard.

15          MR. LEONARD:  The defense agrees.  That makes

16     perfect sense and we stipulate.

17          THE COURT:  Okay.  Excellent.  Let me turn to

18     something that I totally forgot about in that case until

19     Mr. Hawkins reminded me of it -- it's great to have

20     excellent law clerks -- you folks asked for a forfeiture

21     bifurcation.

22          MR. PHILLIPS:  Your Honor, and going back --

23          THE COURT:  Bifurcated trial on a forfeiture

24     count.

25          MR. PHILLIPS:  Yes.  And going back to the final

1   pretrial conference, it's my understanding the defendant

2   had admitted that and didn't -- no longer wanted that

3   challenge to the forfeiture.  It may be done at that point,

4   I don't know, but that was something we discussed.  And

5   we've all put out of our mind until your law clerk reminded

6   us that morning.  So all of those instructions and so forth

7   I think are moot and nothing to worry about.

8           THE COURT:  So did you stipulate to the forfeiture

9   at the final trial prep -- I'm losing my memory quicker on

10  that job than I thought I was.

11          MR. LEONARD:  I can't -- honestly can't recall,

12  but we're not contesting it, so it's not an issue.

13          THE COURT:  Okay.  So then let's get that process

14  straight in our minds.  The original plan based on what --

15  you can sit down, Mr. Leonard.

16          Based on what we read from your proposed

17  instructions, it read to us, Mr. Phillips, like you wanted

18  to handle this like a felon-in-possession bifurcation, and

19  then for purposes of that trial, if there were a conviction

20  on Count 1 on conspiracy, I think that's when you then were

21  going to request that we bring the jury back to be

22  instructed and for them to deliberate on forfeiture.  Is

23  that correct?

24          MR. PHILLIPS:  That was the request.  And actually

25  what originally was going to take place is that same sort

1    of thing, but Glenn Campbell was going to be here, who's

2    one of the forfeiture attorneys.

3            THE COURT:  Okay.

4            MR. PHILLIPS:  But -- all right.

5            THE COURT:  So there's -- so what I'm getting at

6    is it was going to be contingent on a guilty plea on

7    conspiracy; is that correct?

8            MR. PHILLIPS:  To be honest, I'm not sure because

9    I didn't review it at length because our forfeiture people

10   prepared that for us, to be honest, and I think Laura Herd

11   was the one who had submitted it and so forth.

12           THE COURT:  So the bottom line is that there's a

13   stipulation of forfeiture that doesn't matter which count

14   there's -- I'm assuming you're stipulating contingent on a

15   guilty plea on at least one count.  You're not stipulating

16   to the forfeiture if there's an acquittal on all counts.

17           MR. LEONARD:  That's correct, Your Honor.  And our

18   stipulation is contingent upon, I don't think that would

19   happen, that the Government wouldn't make any reference

20   that we stipulate to that -- I can't imagine they would,

21   but --

22           THE COURT:  All right.  But what I'm getting at is

23   your stipulation is contingent on at least a guilty verdict

24   on one count; is that correct?

25           MR. LEONARD:  That's correct, Your Honor.

1              THE COURT:  Okay.  All right.  So -- so then

2      assuming that there is a guilty -- a verdict of guilty on

3      at least one count, then let's get that straight on the

4      record.  There's a stipulation by the defendant that he

5      stipulates to the forfeiture allegation in the indictment,

6      correct?

7              MR. LEONARD:  Yes.  That's correct, Your Honor.

8              THE COURT:  And is there a stipulation as to the

9      amount of the forfeiture?

10             MR. LEONARD:  I thought it was something like

11     $5,500, but --

12             MR. PHILLIPS:  That's roughly what it was.

13             THE COURT:  So it has to do with a bank account or

14     something.

15             MR. LEONARD:  That's my understanding.

16             THE COURT:  So it's the forfeiture of the funds in

17     the bank account.

18             MR. LEONARD:  Correct.  Whatever was pled by

19     the -- I know the Government pled out the issue, and

20     Mr. Campbell had submitted it, and we're not going to be

21     contesting that if there's a guilty verdict.

22             THE COURT:  Okay.  So then probably the best way

23     to do that, Deb, is in the minutes, after there's a

24     verdict, if there's a verdict of guilty on at least one

25     count, we'll enter a finding of forfeiture in favor of the

1    Government and against the defendant per the forfeiture

2    allegation in the indictment.

3          And then maybe you can make a note of letting the

4    probation officer know that he or she, in terms of whether

5    they're preparing the report, they know they don't have to

6    spend a lot of time on the amount of the forfeiture and all

7    that because it has been stipulated to and it will be

8    included in the judgment.

9          COURTROOM DEPUTY:  Yes, Your Honor.

10          THE COURT:  Okay.  Do we have to discuss that any

11    further or are we all done with that issue?

12          MR. PHILLIPS:  It makes sense to me.  Thank you,

13    Your Honor.

14          MR. LEONARD:  No, I think we made a sufficient

15    record, Your Honor.

16          THE COURT:  Okay.  Good.  We got your chart --

17    your table, Mr. Phillips.  So that's why you felt safe

18    showing your face here this morning, and I didn't chase you

19    out of here.  And thank you for that.  That will help our

20    29 discussions go a lot more smoothly.

21          All right, anything else we have to cover before

22    we bring in the jury?

23          MR. PHILLIPS:  No.  Thank you, Your Honor.

24          THE COURT:  All right.  For the defendant?

25          MR. LEONARD:  Nothing, Your Honor.

1          THE COURT:  All right.  Let's bring in the jury.

2              (In open court in the presence of the jury at

3      9:02 a.m.)

4          THE COURT:  Welcome back, ladies and gentlemen of

5      the jury, to day four of our jury trial.

6          The Government may call its next witness.

7          MR. PHILLIPS:  Thank you, Your Honor.  The

8      Government would call Investigator Josh Mohlman.

9          JOSHUA MOHLMAN, GOVERNMENT'S WITNESS, SWORN

10          COURTROOM DEPUTY:  Please state your full name for

11      the record and spell your first and last name.

12          THE WITNESS:  Josh Mohlman.  J-o-s-h-u-a,

13      M-o-h-l-m-a-n.

14          MR. LEONARD:  Your Honor, the defendant would

15      reassert its 404(b) objection, incorporate the basis --

16      for, as we already stated previously on the record, the

17      basis for that objection, and request a standing objection

18      for that witness.

19          THE COURT:  All right.  Your objection's noted.

20      Your request for a standing objection is granted and your

21      objection's overruled.

22          Mr. Phillips.

23          MR. PHILLIPS:  Thank you, Your Honor.

24                        DIRECT EXAMINATION

25      BY MR. PHILLIPS:

Direct - Mohlman

1    Q.    Investigator Mohlman, if you could, please tell the

2    jury some of your training and experience as a police

3    officer.

4    A.    As a police officer, I've been employed at the Aurora

5    Police Department for approximately 10 years.  Prior to

6    that, I was a deputy sheriff in Lincoln, Nebraska, for

7    seven years, so I've been a police officer for about 17

8    years.

9          Some of that time -- a lot of that time, actually,

10   in Nebraska for a year-and-a-half I was assigned as a

11   narcotics investigator with the local task force.  In

12   Aurora, I've been assigned as a narcotics investigator and

13   also at the Metro Gang Task Force.  As part of that, I've

14   had the opportunity to attend several different trainings,

15   including the -- it's been mentioned before, the DEA basic

16   narcotics investigator's school, which is a two-week

17   school, as well as other specialized narcotics training,

18   including informant handling, drug ID and symptomatology,

19   undercover training, and other various drug-related

20   trainings, all motorcycle gang training, gang -- other gang

21   training as well.

22   Q.    And how are you presently -- what's your present

23   assignment?

24   A.    I'm currently assigned to the Metro Gang Task Force.

25   Q.    And how long have you been with the Metro Gang Task

704

Direct - Mohlman

1   Force?

2   A.    A little over five years.

3   Q.    And fair to say that you were one of the main case

4   agents in the investigation that you're here to testify

5   about here today?

6   A.    I was.

7   Q.    And as part of that investigation, was there a number

8   of target telephones or wire intercepts in the

9   investigation?

10  A.    Yes, there was.

11  Q.    And have you had the opportunity to look at what is a

12  stipulated exhibit, Government Exhibit No. 125, which the

13  parties stipulate under Rule 1006, is that a summary of all

14  of the target telephones?

15  A.    Yes.

16  Q.    And the dates and times that they were signed and who

17  was actually using the phone at the time?

18  A.    Yes.

19        MR. PHILLIPS:   Your Honor, at this time the

20  Government would move to admit, and the parties stipulate

21  to, Government Exhibit 125.

22        THE COURT:   Okay.  My exhibit list ends at 124.

23        MR. PHILLIPS:   Your Honor, that was the one that

24  we prepared this morning.  I apologize if the Court didn't

25  get a copy.

Direct - Mohlman

1          THE COURT:  Well, let me just check my binder --

2     all my binders here.  Let's see.  I do have a copy of 125.

3     All right.

4          Given the stipulation of the parties, Exhibit 125

5     is admitted into evidence.

6       (Government's Exhibit 125 received)

7     BY MR. PHILLIPS:

8     Q.   Thank you.

9          Now, as the leader -- one of the main case agents

10    in this investigation, what were some of your duties and

11    responsibilities?

12    A.   I was part of an investigative team, and as one of the

13    lead case agents, we were responsible for -- as was

14    previously said, we worked in the wire room, we listened to

15    intercepted telephone calls, we reviewed those calls.  We

16    were responsible for sending out the surveillance teams,

17    the supervision of those teams, and what roles needed to be

18    accomplished.

19         As one of the case agents, it was my

20    responsibility to basically lead the direction of the

21    investigation.  I was part of the decision-making as far as

22    who we targeted, how we targeted them.  It was my decision

23    whether or not we were to stop cars, whether we were to

24    seize drugs, arrest people.

25         My decisions led to search warrants, and that type

Direct - Mohlman

1    of thing, or applications for search warrants.  And just

2    the overall direction of the investigation.

3    Q.   And during that time, are you working with the United

4    States Attorney's Office as well?

5    A.   Yes.

6    Q.   And as part of that, yesterday you heard some

7    testimony regarding choices whether, like Christopher

8    Vigil's wife being charged or not.  Do you assist in

9    deciding or focusing who will be charged and where and

10   when?

11   A.   Yes.  We work closely with the U.S. Attorney's Office

12   and we -- and we do make determinations ourselves as far as

13   who will be charged in the investigation.

14   Q.   And what goes into that decision-making process, or

15   what are some of the considerations that are taken?

16   A.   There can be many considerations whether or not a

17   person is charged.  The things that we considered was:  A,

18   how much did we see them?  How much surveillance did we

19   have?  Did we have a positive identification?  Are we

20   confident in our probable cause?  You know, also criminal

21   histories play into --

22            MR. LEONARD:  Your Honor, I object to him

23   discussing the charging decision based on criminal history.

24   That evidence -- is not evidence that has been submitted to

25   this jury, it's improper 404(b) testimony, and further --

Direct - Mohlman

1    well, the officer is not an Assistant United States

2    Attorney and he is not the person who ultimately makes the

3    charging decision.

4              THE COURT:   I think he is just talking about what

5    he personally knows and has experience doing, so it's

6    overruled.

7    BY MR. PHILLIPS:

8    Q.    Go ahead.

9    A.    We consider the criminal histories of the individual,

10   the -- their active participation in the investigation, and

11   also the impact in the community that it would have by

12   charging these people, arresting them.

13   Q.    And does everybody -- all your investigations get

14   charged in federal court or do some people get charged in

15   state court or in other conspiracy charges or individual

16   charges?

17   A.    Yes.

18   Q.    And --

19   A.    In this case, yes.  If there's multiple investigations

20   going on, sometimes wiretaps or different investigations

21   cross paths, so someone may be charged in a different

22   investigation.  We do -- if it's appropriate, we file

23   charges in the state court.  In fact, we did do that on

24   some defendants in this case.

25   Q.    Now, I want to take you to November 22d of 2013, in

Direct - Mohlman

1   the early afternoon.  Was there activity and phone calls

2   taking place that day when there was an interest of you as

3   one of the main case agents in this case?

4   A.    Yes.

5   Q.    And were there a number of phone calls already

6   published and played for the jury that you heard and

7   understood?

8   A.    Yes.

9   Q.    And were those calls where Simeon Ramirez was trying

10  to deliver cocaine to Ricky Garrison by first attempting to

11  put the cocaine in the trunk of the Impala and then later

12  left it in the garage?

13  A.    Yes.

14  Q.    Do you recall that testimony and those phone calls?

15  A.    I do.

16  Q.    And on that date and time, what were you monitoring or

17  what were you doing at the Metro Gang Task Force office?

18  A.    I was monitoring target telephone 2, which was a

19  telephone used by Ricky Garrison.  And we also had at the

20  time a CCTV camera up in the area of Ricky Garrison's

21  residence, where we could kind of see the street and the

22  driveway, the side of the residence.  And so we were

23  intercepting calls and I'm also monitoring the CCTV at the

24  same time.

25  Q.    Now, yesterday -- I'm not sure if this got covered

Direct - Mohlman

1    earlier, but yesterday there was some reference to a

2    listening post.  What is that or what is that a reference

3    to?

4    A.   A listening post is -- is a basically a big room at

5    our office which is set up with multiple computers where

6    it's a line that comes in from the FBI headquarters where

7    we monitor the telephones.  We monitor them on computers,

8    with the software.  I think it was previously said, it's

9    Voicebox, and then -- so we're monitoring these calls.

10           We also have televisions and other computers where

11   we're monitoring other things such as GPS pings and closed

12   circuit television on big screen TVs.

13   Q.   And is that essentially where you were on this day?

14   A.   Yes.

15   Q.   Now, on that particular day, you mentioned that you

16   were watching CCTV.  Was that aimed at or near 10340 East

17   13th Avenue in Aurora?

18   A.   Yes.

19   Q.   And that's Colorado?

20   A.   Correct.

21   Q.   And whose address was that?

22   A.   At the time, it was Ricky Garrison, who lived with a

23   female at that -- at that residence.

24   Q.   And speaking of Ricky Garrison, are you familiar with

25   him and do you recognize him?

Direct - Mohlman

1    A.   Yes.

2    Q.   And do you see him here in the courtroom today?

3    A.   Yes.

4    Q.   If you could please point to him and tell us what he's

5    wearing.

6    A.   He's seated in the defense table in a light-colored

7    checkered shirt and eyeglasses.

8         MR. PHILLIPS:  Your Honor, at this time we'd ask

9    the record reflect identification of the defendant, subject

10   to cross-examination.

11        THE COURT:  The record will so reflect.

12   BY MR. PHILLIPS:

13   Q.   Now, you mentioned you were watching CCTV on that

14   particular day when Mr. Ramirez was talking on the phone

15   and wandering around the car and then back into the garage.

16   Have you had an opportunity to look at Government's

17   Exhibits 5, 6, and 7?

18   A.   I have seen those, yes.

19   Q.   And what are those?

20   A.   They are still-photo captured images from the CCTV

21   that was recording at that time during the intercepted

22   call.

23        MR. PHILLIPS:  At this time, ask to publish

24   previously admitted Government Exhibit No. 5.

25        (Video played)

Direct - Mohlman

1    BY MR. PHILLIPS:

2    Q.   Now, if you would -- and do you have a stylus up

3    there?

4    A.   I don't think -- I don't think so.

5    Q.   I have one back here.  May I approach?

6            If you could, using that stylus, describe to the

7    jury what they're viewing here.

8    A.   This right here, basically 10340 East 13th Avenue, the

9    residence, is right here.  The driveway was kind of off to

10   the side of the residence, and then there's a garage back

11   here in this area.

12           And so you're -- you're observing the driveway,

13   the street directly in front of the residence, and this

14   here was one of Ricky Garrison's car -- cars, his silver

15   Impala.

16   Q.   And was that a car you were familiar with as part of

17   this investigation?

18   A.   Yes.

19           MR. PHILLIPS:  And if you would, go ahead and play

20   that video.

21       (Video played)

22   BY MR. PHILLIPS:

23   Q.   Now that kind of jumps, correct?

24   A.   It does.  In realtime, the CCTV is recording in

25   multiple frames per second, but as it's recorded onto the

Direct - Mohlman

1    drive, it's an incredible amount of data, and when it

2    records, it's set to record -- I believe it's 15 frames per

3    second, so what you're seeing are 15 -- or 15 frames per

4    minute -- so what you're seeing is every 15 seconds another

5    frame.  So that's why it will be jumpy.

6    Q.   And in that video -- and it obviously jumps back to

7    the beginning or something -- did a vehicle arrive that was

8    of interest to you?

9    A.   Yes.

10            MR. PHILLIPS:  And if we could please publish

11   Government Exhibit 6.

12   BY MR. PHILLIPS:

13   Q.   If you could, describe to the jury what they're

14   looking at here and what was of interest to you as one of

15   the main case agents.

16   A.   It's kind of difficult to see.  For me, it was on --

17   on the big screen, it was easier to see, but you see the --

18   a male standing there in back of the black sport utility

19   vehicle, that male was ultimately identified as Simeon

20   Ramirez.  And I believe -- I know he was on the cellular

21   phone.  He has his arm -- hand up to his ear; he was on the

22   cell phone at that time.

23   Q.   And when you were watching this in realtime, how was

24   it -- you talked about how the download doesn't quite work

25   right and so forth.  What were you able to see and

713

Direct - Mohlman

1  observe?

2  A.   I was able to see that -- and this is at the same time

3  that we're intercepting a lengthy telephone call between

4  Mr. Ramirez and Mr. Garrison, so as he's talking to Mr.

5  Garrison on the phone and they're discussing about walking

6  around the car, going into the garage, I'm watching the

7  same thing on television.

8          MR. PHILLIPS:   And if you would, please, publish

9  Government Exhibit 7.

10  BY MR. PHILLIPS:

11  Q.   And what is taking place there?

12  A.   I believe this was actually after he had walked around

13  the car and walked into the garage.   I believe this is as

14  he is leaving.

15  Q.   And after he left, what did you do as one of the case

16  agents in this investigation, or what did you instruct to

17  have happen?

18  A.   I continued from the listening post to monitor and

19  advised the surveillance investigators.   They followed Mr.

20  Ramirez after that transaction.

21  Q.   And you mentioned that ultimately Mr. --

22          THE COURT:   Mr. Phillips, let me just interject a

23  question, just so I understand this image more clearly.

24          It's -- the closed circuit television's coming

25  from a stationary camera, a pole camera?

714

Direct - Mohlman

1         THE WITNESS:  Correct, yes.  It was a pole camera.

2         THE COURT:  All right.  And because I noticed it

3    doesn't -- you can't see the actual residence from that

4    angle.  So it's nothing that you from the listening post

5    could adjust, you couldn't move the camera anyway?

6         THE WITNESS:  We can pan and move the camera, but

7    we have limitations.  And -- and a lot of times those

8    limitations are based on where they can put the pole

9    camera, because they put it on a telephone pole or an

10   electrical pole, so we don't always get the optimal angles

11   that we would desire because it's based on where telephone

12   poles are.  So that was the best place that we could put

13   the camera, or the tech agents determined they could put

14   the camera, and then we could see what we could see.

15        And our limitations were that we couldn't pan it

16   enough to see the front of the residence.

17        THE COURT:  Okay.  Thank you.  Sorry to interrupt.

18        MR. PHILLIPS:  No, thank you, Your Honor.

19   BY MR. PHILLIPS:

20   Q.   Okay.  Now I'm going to take you to November 29th,

21   2013.  If you would, please look at the previously admitted

22   Government Exhibit No. 10, which took place at

23   approximately 6:45 p.m.

24        And I'd ask you to have -- the transcript book

25   will probably be the most assistance to you.  In looking at

Direct - Mohlman

1    that, what is previously admitted Government Exhibit

2    No. 10?

3    A.    It is an intercepted telephone call between Ricky

4    Garrison and James Tillmon.

5          MR. PHILLIPS:  I'd ask the jurors now please turn

6    in their transcript books to Government Exhibit No. 10.

7    BY MR. PHILLIPS:

8    Q.    And who were the two people that were intercepted in

9    Government Exhibit 10?

10   A.    Ricky Garrison and James Tillmon.

11         MR. PHILLIPS:  Please publish Government

12   Exhibit 10.

13         (Phone call played)

14   BY MR. PHILLIPS:

15   Q.    Now, when that conversation was taking place, was that

16   of importance to you?

17   A.    Yes.

18   Q.    And based on that conversation, what actions did you

19   start to do or what things did you start to do as a result

20   of that?

21   A.    At the time, we didn't have -- I was in the listening

22   post, but we didn't have investigators out on surveillance,

23   so I started to take other steps to confirm that this

24   transaction took place.  There were subsequent phone calls

25   where a meeting was arranged between Tillmon and Garrison

Direct - Mohlman

1    at Garrison's residence, so I watched this closed circuit

2    TV to observe when Tillmon arrived at Garrison's residence.

3              I also monitored GPS pings from Ricky Garrison's

4    phone to track his locations.

5    Q.    Now, during the course of this investigation,

6    particularly on November 29th of 2013, were you familiar

7    with the vehicle that James Tillmon was driving?

8    A.    I was.

9    Q.    And what kind of vehicle was that?

10   A.    At the time, he was driving a rented Dodge Charger.

11   Q.    And had you seen that rented Dodge Charger, as well as

12   others, during the course of this investigation?

13   A.    Yes.  That seemed to be a popular thing was to rent

14   Dodge Chargers.

15   Q.    And was there anything distinctive about the Dodge

16   Chargers that you were seeing, specifically James Tillmon's

17   as well?

18   A.    At that time -- I'm fairly familiar with cars and at

19   that time in 2013, it was one of the first years where the

20   Dodge Chargers had the taillights that went all the way

21   across the trunk, and it was very distinctive taillights.

22   Q.    Now, you'd mentioned that you were watching the CCTV

23   and James Tillmon arriving and then you mentioned GPS

24   pings.  And I believe there was some testimony yesterday

25   about GPS pings.  I'd ask you to look at Government Exhibit

717

Direct - Mohlman

1   No. 12.  And it's up on the screen --

2   A.   Oh, okay.

3   Q.   -- if it will help you.

4        Are you familiar with this type of ping.

5   A.   I am.

6   Q.   And if you would, describe to the jury how pings

7   worked as far as your end of the information.

8   A.   Well, as the -- as the end user, the pings -- we

9   requested the pings, the most minimal amount of time

10  possible.  So what I'm trying to say is that we requested

11  we get pings on the cell phone --

12       MR. LEONARD:  Your Honor, okay, I'm going to

13  object to him describing pings.  To my recollection, there

14  are two exhibits on the GPS evidence that have been

15  admitted into court.  I think he can comment on those.  As

16  to everything else, I don't believe the Government's laid

17  any foundation for this witness to testify as to those

18  alleged pings, and I would move that he be prohibited from

19  talking about that.  He's just not qualified to talk about

20  it under 702 or 701.

21       THE COURT:  All right.  The question was:  Was he

22  familiar with this type of ping?  I think that's an

23  appropriate question and I think it's a foundational

24  question, and I think this witness can answer.  But the

25  other part of your objection I think has some merit, so I'm

Direct - Mohlman

1   assuming Mr. Phillips is going to keep these questions to

2   the pings that are in evidence as opposed to pings that are

3   not in evidence.

4   BY MR. PHILLIPS:

5   Q.    And you were asked what you do on your end when you

6   receive pings and so forth.

7   A.    We receive the pings, get the information, and then we

8   utilize that information to conduct surveillance or our

9   investigation.

10  Q.    And is this a common tool that you use as an

11  investigator with Metro Gang Task Force?

12  A.    Yes.

13  Q.    And specifically going to Government Exhibit No. 12,

14  based -- did you receive that ping that night?

15  A.    I did.

16  Q.    And based on that, what did you do?

17  A.    I documented the -- or I noted the ping and that

18  was -- it was in relation to the intercepted telephone

19  calls that we were receiving, and I was able to -- by the

20  time the ping and the time of the intercepted phone calls

21  between Christopher Vigil and Ricky Garrison, I was able to

22  basically match those up and confirm that Ricky Garrison's

23  telephone was located in the area of Vigil's residence.

24  Q.    And just to be clear, telephone number 720-505-1613 on

25  November 29th of 2013 at about 7:35 p.m., whose telephone

Direct - Mohlman

1    were you enter -- or were you pinging at that time?

2    A.   That was target telephone 3, which was Ricky

3    Garrison's telephone.

4    Q.   Now in here -- and it was testified to yesterday --

5    there's latitude and longitude numbers.  When you receive

6    the ping, what do you do as far as those latitude and

7    longitude numbers?

8    A.   Occasionally the latitude and longitude comments, it's

9    a hyper link or, basically I can just click on it, Google

10   Maps loads it up, and then it shows a point on the map of

11   that latitude and longitude.  If it wasn't a hyperlink --

12   and I don't believe that this was -- I take those GPS

13   coordinates, I plug them into Google Maps and it shows me a

14   point on the Google Maps of latitude and longitude.

15   Q.   And on November 29th, 2013, at 8:35 local time,

16   although this is obviously Pacific time this came in,

17   within six meters, where was the phone that Ricky Garrison

18   was using?

19   A.   It was, I believe --

20         MR. LEONARD:  Your Honor, I object.  He's

21   testified that he's relying on Google Maps, which isn't his

22   own knowledge; that's hearsay.  The accuracy of Google Maps

23   has not been introduced into this court.  There's been no

24   *Daubert* foundation made under Google, or there's actually

25   no acceptance of Google Maps as being generally relied upon

Direct - Mohlman

1    as accurate.

2            THE COURT:  Mr. Phillips.

3            MR. PHILLIPS:  Your Honor, Google Maps is nothing

4    more than a map now in today's technology.  In the past,

5    officers maybe asked to look at an Atlas mapping area or a

6    map, a paper map, and point out locations.  Google Maps is

7    used every day by numerous -- about everybody in our

8    society.  It's a common tool, it's not specific knowledge.

9    And it goes to weight, not admissibility, as to whether

10   it's reliable or not.

11           It clearly is a common tool in everyday use and

12   doesn't require expert testimony.

13           THE COURT:  I agree with Mr. Phillips.  It's

14   overruled.

15           But the jury's free to consider what weight to

16   attribute to the use of Google -- of a commercial product

17   such as Google Maps.  Go ahead.

18   BY MR. PHILLIPS:

19   Q.   And I believe the last thing I asked you, on November

20   29th of 2013, at 8:35 local time, target telephone No. 3,

21   where was it located?

22   A.   Within approximately six meters of 3531 Franklin

23   Street in Denver, Colorado.

24   Q.   And just as we requested, who lived at 35 -- and I

25   missed the last --

721

Direct - Mohlman

1    A.    It was actually the -- the address, as it was

2    displayed, was 3531 Franklin.  Mr. Vigil lived at 3515

3    Franklin, just a couple doors down.

4    Q.    Now, looking at Government Exhibit No. 13, what is

5    that?

6              THE COURT:  I don't think he has anything on his

7    screen.

8              MR. PHILLIPS:  I'll ask you to go ahead and

9    publish previously admitted Government Exhibit No. 13.

10             This was -- this is a recording.

11   BY MR. PHILLIPS:

12   Q.    And go ahead and describe what the jury's going to see

13   in a minute.  We'll republish.

14   A.    This was a CCTV video.  This is -- obviously was very

15   dark out at night, but you can see this is the same CCTV in

16   front of Ricky Garrison's residence at 10340 East 13th and

17   you can see the vehicle stopped in front of the residence

18   on the street.

19   Q.    And when you see that vehicle stopped, was there

20   anything distinct about that vehicle, in your experience,

21   having been investigating this case?

22   A.    There again, yes.  The surveillance of James Tillmon

23   and the intercepted telephone calls, it was James Tillmon

24   that was arriving at Garrison's residence.

25   Q.    And was that based on those distinct taillights?

722

Direct - Mohlman

1    A.    Yes.

2              MR. PHILLIPS:   If you would, publish again.

3          (Video played)

4    BY MR. PHILLIPS:

5    Q.    Now, speaking of Ricky Garrison's residence at that

6    time, have you had the opportunity to go out and do

7    anything specific as far as 10340 East 13th Avenue and

8    Aurora West Prep Academy?

9    A.    Yes.

10   Q.    If you could, describe to the jury what those two

11   addresses are and how they're situated.

12   A.    So 10340 East 13th Avenue is approximately mid-block

13   on the south side in between Havana Street and Del Mar

14   Parkway in Aurora; and then on the -- what would be the

15   southwest corner of Del Mar Parkway and 13th Avenue is the

16   Aurora West Preparatory Academy.

17   Q.    And is that an active public school?

18   A.    Yes.

19   Q.    Now, please tell the jury, if you would, did you have

20   any opportunity to make any measurements out there?

21   A.    I did.

22   Q.    And if you would, please describe to the jury how you

23   did that.

24   A.    Myself and another Aurora police officer, we went out

25   to that location -- I believe it was on February 15th --

Direct - Mohlman

1    and specifically the officer I went with was a traffic

2    officer, and we utilized the -- a speed and measurement

3    device to basically shoot distances.  We stood in the

4    driveway of 10340 East 13th Avenue.  We shot a distance to

5    a straight -- straight to a crosswalk box at 13th and

6    Del Mar, and then we shot distances to the school.

7    Q.    When you say "shot," what do you mean by that?

8    A.    Measured.  We used the device to basically -- it's a

9    laser device that includes measurements as well as speed.

10   It's primarily used for speed enforcement, but it also

11   provides the distance between two objects or from where

12   you're standing to an object.  And so we took those

13   measurements using that device.

14   Q.    And what was the distance between those two addresses?

15         MR. LEONARD:  Your Honor, I object.  This agent

16   has not made a sufficient foundation for a LIDAR,

17   L-I-D-A-R, device so a rather long objection, so I

18   apologize.  One, this officer has not given the Court any

19   indication that he's trained in the use of LIDAR.  Two, the

20   LIDAR device requires specific tests to be performed before

21   and after.  Self-test before and a self-test after.  He

22   hasn't testified to that foundation.

23         Among the self-tests, you do are display tests, a

24   scope alignment test, and adult-to-distance test.

25         In addition, in order for a LIDAR device to be

Direct - Mohlman

1   admitted into evidence in court you have to make the 803(6)

2   certificate of compliance that it's in good and working

3   order.  He's made no 803(6) certificate of compliance

4   foundation.

5           And my last objection is this is *Daubert* 702

6   testimony.  The LIDAR device has not been accepted as

7   generally accepted in the scientific community and the

8   prosecution has made no 702 *Daubert* foundation.

9           THE COURT:  Mr. Phillips.

10          MR. PHILLIPS:  If I may ask some more of this

11  witness.

12          THE COURT:  Sure.  And I think especially the

13  foundational questions about the device and the experience

14  by the traffic cop or this witness.  I think it would be

15  appropriate, because I think those aspects of the

16  objection, in particular, have merit.

17  BY MR. PHILLIPS:

18  Q.   Now, Investigator Mohlman, you mentioned that you were

19  a police officer in Nebraska.

20  A.   Yes.

21  Q.   Deputy sheriff, correct?

22  A.   Yes.

23  Q.   When you were a deputy sheriff in Nebraska, did you

24  have any training in LIDAR devices?

25  A.   At that time -- it's been several years ago -- but

Direct - Mohlman

1  yes, I was trained and certified in the use of LIDAR

2  devices.

3  Q.   And what was that training and experience you received

4  in the use of LIDAR devices?

5  A.   It was in-house as well as, I believe, an external

6  training class.  And you had to be certified in using those

7  devices.

8          As part of the certification in LIDAR, as well as

9  any speed measurement device, we're also trained and we

10  have to pass a test as far as measuring visually, visually

11  estimated distances.

12  Q.   And did you pass those tests and were you able to do

13  that?

14  A.   I wrote speeding tickets.

15  Q.   And essentially that's what it is?

16  A.   Yes.

17  Q.   And as part of that training and experience, when you

18  were out there shooting these distances, to use your term,

19  was that experience that you were using in order to confirm

20  the accuracy of the tool?

21  A.   Yes.  I was using the -- yeah, my visual estimation as

22  well as I was working closely with the traffic officer who

23  was trained and certified as part of his job as a traffic

24  officer to use that --

25          MR. LEONARD:  Your Honor, I object.  That is

Direct - Mohlman

1    hearsay.  He can't testify as to what this officer is

2    trained in unless he happens to be the training officer and

3    has written the certificate of his compliance with the

4    LIDAR testing.  He doesn't know what that person knows.

5           THE COURT:  All right.  How is it you're aware of

6    the traffic -- of the -- of this traffic officer's

7    training?

8           THE WITNESS:  Because of his assignment, I'm aware

9    that all traffic officers are trained and certified in

10   laser devices.

11          THE COURT:  All right.  That objection's

12   overruled.  I think we still need some more foundation in

13   terms of this particular device working properly on this

14   particular day.

15   BY MR. PHILLIPS:

16   Q.   And on this particular day, and on this particular

17   device -- and did you supply this information as far as the

18   certification for this LIDAR device as part of the

19   discovery in this case?

20   A.   The date of last calibration I did for -- provide to

21   U.S. Attorney's Office.

22   Q.   And on this particular day, what do you know about the

23   tool as far as its accuracy and ability to measure

24   distances?

25   A.   I believed it to be completely accurate.  I -- it

Direct - Mohlman

1    seemed to be functioning fine.

2         MR. LEONARD:  Your Honor, again, I object.  I

3    would ask permission to voir dire the witness as to the

4    certificate of compliance.

5         THE COURT:  You may -- well, you are saying

6    803(6).  I don't know if you're referencing the right --

7         MR. LEONARD:  I think they're trying to get the

8    certificate of compliance in under the business record

9    exception, but maybe I'm wrong.

10        THE COURT:  I don't think he's -- I don't think he

11   was trying to get any certificate in.  You're talking about

12   a certificate that's required under 803(6), and as far as

13   I'm concerned, the Rule -- the Rule 803 doesn't talk about

14   the requisite certificate -- give me one second.  It's just

15   a plain business record exception, but you're -- you're

16   stating that you believe that there needs to be an

17   exhibit -- a document that needs to get qualified under

18   803(6).

19        MR. LEONARD:  Or he needs to be testifying -- or

20   by "he," I apologize, the investigator needs to testify

21   that he was the individual who certified the LIDAR device

22   or that he is the person -- he knows how the -- that the

23   business record is made.  My understanding from his

24   testimony is -- and maybe I'm wrong -- that he didn't

25   certify the device, somebody else in this department

728

 1    certifies the device.

 2             THE COURT:  I'll let you voir dire the witness.

 3                   VOIR DIRE EXAMINATION

 4    BY MR. LEONARD:

 5    Q.   Investigator, did you certify the LIDAR device?

 6    A.   I did not.

 7    Q.   Who did?

 8    A.   I'm -- I don't -- I don't want to speculate.  I don't

 9    know.

10    Q.   You personally weren't involved in the certification

11    of the device, were you?

12    A.    Correct.

13             MR. LEONARD:  Thank you, Your Honor.  He can't

14    make a foundation of the LIDAR device in the defense's

15    position -- the LIDAR device because they don't know how it

16    was certified.  This witness isn't competent in the legal

17    term to make the predicate foundation, and it should be

18    stricken.

19             THE COURT:  Mr. Phillips?

20             MR. PHILLIPS:  And, Your Honor, I think we're --

21    there's two parts to this.  One is the LIDAR device as it's

22    used for radar, as far as speeds of vehicles and so forth.

23    The other part of it is that it's a simple laser measuring

24    device.  Those are devices that are used every day.

25    They're essentially today's tape measure.  And I can ask

1    this officer about having used that device -- or not that

2    device, but similar devices in measurements.  They're used

3    every day by carpenters, by golfers, by hunters.  I don't

4    know what else.

5           THE COURT:  Well, you raise a good point.  To what

6    extent, Mr. Leonard, were you citing from cases that speak

7    to the foundational requisites for LIDAR evidence when the

8    issue is not the measurement of distance, but the

9    measurement of speed for purposes of traffic infraction

10   prosecutions?

11          MR. LEONARD:  First of all, Your Honor, the LIDAR

12   for speed and LIDAR for distance are the same thing.

13   LIDAR --

14          THE COURT:  Well --

15          MR. LEONARD:  -- speed --

16          THE COURT:  You have a case that they're the same

17   thing?  That -- for purposes of --

18          MR. LEONARD:  I'm --

19          THE COURT:  We can't talk at the same time.

20          MR. LEONARD:  I'm sorry.

21          THE COURT:  Okay.  If you're citing to me cases

22   that talk about the foundational prerequisites to admit

23   evidence of -- through a LIDAR device for purposes of

24   prosecuting traffic infractions, I think that -- that is --

25   makes those cases distinguishable from a use of LIDAR for

1    what effectively is an electronic ruler.

2              MR. LEONARD:  And --

3              THE COURT:  Go ahead.

4              MR. LEONARD:  So, Your Honor, that's part of the

5    *Daubert* objection.  The LIDAR device measures distance

6    using a formula.  And it does that with a vehicle and it

7    can also do it on a stationary object.

8              And the best -- first of all, I'm not aware of a

9    Tenth Circuit case on LIDAR admissibility.  I am aware of

10   no Colorado Supreme Court case on LIDAR admissibility.  I

11   am aware of a First Judicial District case on LIDAR

12   admissibility that applies in general to the municipal

13   courts in the First Judicial District.

14             But the best, I think, article I have found that

15   talks about generally the cases nationwide in LIDAR is a

16   2011 Texas Law Review article that goes in and cites the

17   various courts that have looked at LIDAR and attempted to

18   make those foundations and the predicates.  And --

19             THE COURT:  In the context of traffic

20   prosecutions.

21             MR. LEONARD:  Yes.  But the device, Your Honor,

22   didn't -- and this is part of the *Daubert* objection -- the

23   device works off of a formula:  Speed of light times time

24   of flight divided by two, you start --

25             THE COURT:  It seems to me like a formula for

1    calculating velocity.

2             MR. LEONARD:  But it's looking at distance.  And

3    you -- that's why you have to first test it stationary; you

4    get done with your shift, you test it again.  But they

5    haven't made that predicate foundation.  And then you have

6    to have the certificate of compliance for the device to

7    work.

8             THE COURT:  Mr. Phillips?

9             MR. PHILLIPS:  Your Honor, this is not a *Daubert*

10   issue.  *Daubert* goes to complex, novel, new science.  This

11   is essentially today's tape measure.  I'm sure that there's

12   no *Daubert* cases on tape measure if you go back 20 or 25

13   years or whatever it was.  I'm sure there's no *Daubert*

14   cases on the wheel.  Instead of people stretching out the

15   tape measure, with the wheel you see the people walk down

16   the side of the road measuring, and now it has simply

17   progressed to a laser measurement device that this

18   officer's not only trained in, but even if he wasn't

19   trained in, is -- you know, the simple golfer knows that

20   these devices are helpful because it helps them get on the

21   green.

22            This is not complex things that will ever have a

23   *Daubert* case on because it's not *Daubert* type science, it's

24   not DNA, it's not things of that nature.  This is an

25   everyday tool that's used by people in every types of

1    things, and this officer can certainly testify what he

2    observed, what he -- and he's actually better trained in

3    the sense that for distances -- what he observed the device

4    do, did it match up with his training and experience as far

5    as distances, and did it appear to be working?  And what

6    the distance was.

7             THE COURT:  All right.  Let me just ask the

8    investigator a couple of questions of my own.

9             So just so we're clear, the -- you were

10   accompanied on this date that we're talking about by a

11   traffic officer who, as part of their training, it is your

12   understanding that training consists in part of being

13   trained on this device.

14            THE WITNESS:  Yes, Your Honor.

15            THE COURT:  And I think you spoke to this already

16   a few minutes ago, but we've had a lot of back-and-forth

17   since then, but -- so I'm clear in my mind and the record

18   is clear, what procedures does the task force use or

19   undertake to ensure that from a measurement, a linear

20   measurement perspective, this device is accurate?

21            THE WITNESS:  In my experience, Your Honor, this

22   is actually -- in five years at the task force, this is the

23   first time that this has came up.  And I consider -- the

24   first thought that came into my mind was I -- using a

25   surveying wheel, which I've used many times.  And I

1    actually thought the laser device would be much more

2    accurate, and that's why I called the traffic officer to

3    assist me with taking those measurements.  And that's --

4    that's why I did it.  And --

5         THE COURT:  Well, I'm not specifically asking

6    about the device being tested for accuracy for a linear

7    measurement, but what is the standard procedure, from

8    either the task force or the jurisdictions that have

9    officers on task force, use to make sure that these devices

10   are functioning properly for traffic enforcement purposes?

11        THE WITNESS:  As far as I know in the -- like I

12   said, my five years' experience, this is the first time

13   that it's come up.

14        THE COURT:  Well, okay.  Maybe I didn't ask an

15   artful question.  Are these devices tested for purposes of

16   traffic enforcement?

17        THE WITNESS:  Yes.

18        THE COURT:  Okay.  How frequently are they tested

19   for accuracy?

20        THE WITNESS:  It is my understanding that they're

21   tested before and after each shift.

22        THE COURT:  All right.  Is there any -- do you

23   have any reason to believe that this device on this day had

24   not been tested after the prior shift?

25        THE WITNESS:  No.  And, in fact, if I can expand,

734

1    the officer --

2           THE COURT:  Go ahead.

3           THE WITNESS:  The officer told me that he had gone

4    to the shop's facility before he met me, he was just

5    starting his shift.  And I understand that they're

6    basically -- where they do check the calibration -- they

7    don't calibrate the device, they just check the

8    calibration -- those signs are at the central shops, and so

9    I believe that he was checking the calibration before he

10   came to me.

11          THE COURT:  All right.  Okay.  Your objection's

12   overruled.

13          You may proceed --

14          MR. LEONARD:  Your Honor, may I make just my

15   record complete?

16          THE COURT:  I think you've made a hell of a

17   record.  I don't know what more you want to add.

18          MR. LEONARD:  Well, I want to add -- you asked for

19   a case, and the best case I'm aware of is *State v. Assaye*,

20   216 P.3d 1227, it's Hawaii Supreme Court 2009.  It's a

21   pretty comprehensive case on LIDAR.

22          THE COURT:  But, again, is it a case on the use of

23   LIDAR to prove someone's guilt in a traffic prosecution?

24          MR. LEONARD:  Yes, but it talks about the -- how

25   the LIDAR unit is tested and what the investigator was

Direct - Mohlman

1    indicating that he believed because somebody had told him,

2    when they go out and test, and he's talking about the

3    signs, they're at a specific distance.  The sign isn't

4    moving.  They shoot it to make sure it comes up at 50 feet,

5    100 feet, 150 feet.  There's been no direct testimony that

6    that's happened.

7              After the shift, the officer comes back, he does

8    that again.  That's -- that's how they calibrate it on that

9    day.

10             But in addition, there has to be a certificate of

11   compliance, which was 803(6) objection, which there's been

12   no testimony for.  That's my record.

13             THE COURT:  All right.  You made your record.

14   Overruled.

15             You may proceed with your examination, Mr.

16   Phillips.

17                   DIRECT EXAMINATION (Continued)

18   BY MR. PHILLIPS:

19   Q.   Now if you would, describe again for the jury what

20   measurements you took on that particular day.

21   A.   We took a measurement from 10340 East 13th Avenue to a

22   crosswalk box at 13th Avenue --

23   Q.   And I'm going to kind of challenge you here.  Just so

24   it's clear, I'm going to ask you if you could use the

25   screen to describe where those two places are located.

736

Direct - Mohlman

1    A.    All right.  I'm not an artist but I'll try.  Is it --

2    is it ready?

3    Q.    I believe it is.

4    A.    Okay.  So looking westbound, this is 13th Avenue right

5    here, this is the driveway to 10340 East 13th Avenue.  We

6    stood in the middle of the driveway, and out here is a

7    crosswalk box on the traffic signal pole, so we measured a

8    distance between the middle of the driveway, straight to

9    that crosswalk box.  And that gave us a distance to start

10   with.

11        On this corner, which is the southwest corner, is

12   the Aurora Preparatory College, and we -- from this point,

13   so we get this measurement from the driveway, the crosswalk

14   box, and we cross to the crosswalk box and then we measure

15   another distance.

16        And first off, we measure to the corner of the

17   building, which is basically directly across the street

18   from the crosswalk box, which was the -- would be the

19   northeast corner of the building.  So we measure that

20   distance.

21        And so when we added the -- when I added the

22   distance here and the distance to the corner of the

23   building, it was approximately -- it was, I believe, 738.2

24   feet.

25        Also took another measurement while we were

Direct - Mohlman

1   standing there.  There was a set of doors with kids coming

2   out on this east side, so we took another measurement and

3   we measured to that point there.  So we added up the

4   distance from the driveway to the crosswalk box and then to

5   the doors, and that was a distance, I believe, of 867.2

6   feet.

7   Q.   862.6?

8   A.   That could be.  I would have to look at my report to

9   refresh my memory, as far as the actual distance.

10  Q.   Would it assist you to look at your report?

11  A.   Yes.

12  Q.   If your report said 862.6 feet, would that be the

13  correct --

14  A.   I believe that.

15  Q.   Okay.  Now, you had mentioned that you actually had

16  been trained in this in the past.  From your training and

17  experience, did this tool appear to be working and

18  accurate?

19  A.   Yes.

20  Q.   Okay.  And so you had one distance.  The longest

21  distance was less than 1,000 feet, and I believe it was

22  862.6 to the front doors where the people would come and

23  go?

24  A.   It was a set of doors where people were coming and

25  going.  I'm not sure if those were the main doors of the

Direct - Mohlman

1    school, I haven't walked around the school.  But as we were

2    standing at the crosswalk box there were people coming in

3    and out and that's why I obtained that measurement.

4    Q.    Thank you.  Now, speaking of measurements and so

5    forth, did you also have the opportunity to go to 3515

6    Franklin Street in Denver, Colorado?

7    A.    Yes.

8    Q.    Was that the address of Christopher Vigil during the

9    course of this investigation?

10   A.    Yes.

11   Q.    And was there -- or is there an active public school

12   near that address?

13   A.    Yes.

14   Q.    And what is that public school?

15   A.    It's Wyatt Academy.  I believe it's a K through 12

16   charter school at 3620 Franklin Street.

17   Q.    If you would, please describe to the jury what you can

18   as far as taking measurements between those two addresses.

19          MR. LEONARD:  Your Honor, may I incorporate my

20   previous lengthy objection?

21          THE COURT:  Your very lengthy objection.  Yes.

22   And I'm not trying to denigrate the objection --

23          MR. LEONARD:  It was long, I understand.

24          THE COURT:  That's all right.  It was a -- you

25   have to do what you have to do for your client.  And you

Direct - Mohlman

1    can incorporate it and it's overruled.

2    BY MR. PHILLIPS:

3    Q.   If you would, please describe to the jury -- and let's

4    go ahead -- since we've seen that you can be somewhat of an

5    artist, go ahead and use the screen as you describe what

6    measurements you took that particular day.

7    A.   Okay.   Okay.   So the house here at the bottom of the

8    screen is the 3515 Franklin Street.   Again, we stood in the

9    driveway of 3515 Franklin Street.   This is Franklin here,

10   and this is 36th.   And there's a stop sign here on the

11   northwest corner of 36th and Franklin.

12          So from the middle of the driveway, we shot a

13   distance straight to that stop sign, and then we walked and

14   stood by that stop sign, and then -- actually the building

15   isn't completely square, it was kind of cut off in the

16   corner here, but directly from that stop sign straight

17   across to the front doors of that -- of Wyatt Academy.

18   Q.   And what was the distance between 3515 Franklin Street

19   and the front doors of Wyatt Academy?

20   A.   The total distance was, I believe, 518 feet.

21   Q.   And, again, based on your training and experience, did

22   the device appear to be working that day?

23   A.   Yes.

24   Q.   Now, I want to take you to January 28th.   Was there a

25   series of calls that day that interested you as one of the

Direct - Mohlman

1    lead investigators in this case?

2    A.   Yes.

3    Q.   And at that time, whose phone were you up on and

4    listening to?

5    A.   It was target telephone 4, which was a telephone

6    utilized by James Tillmon.

7         MR. PHILLIPS:   And if you would -- if we could

8    please publish Government Exhibit No. 124.

9    BY MR. PHILLIPS:

10   Q.   If you would identify for the jury who James Tillmon

11   is as we talk about him.

12   A.   Directly to the right of Ricky Garrison.

13   Q.   And during the course of this investigation, did you

14   come to recognize the relationship or at least the

15   familiarity between Ricky Garrison and James Tillmon?

16   A.   Yes.

17   Q.   Did they have frequent contact?

18   A.   Yes.

19   Q.   Thank you.

20        MR. PHILLIPS:   At this time, Government would ask

21   to go ahead and publish previously admitted Government

22   Exhibit No. 38.

23        Ask the jurors to please turn your transcripts

24   to 38.

25   BY MR. PHILLIPS:

Direct - Mohlman

1    Q.   And on this day, were you actively investigating this

2    case and listening to these calls?

3    A.   Yes.

4         MR. PHILLIPS:   Publish 38, please.

5         (Phone call played)

6    BY MR. PHILLIPS:

7    Q.   Now, who was that on that particular conversation?

8    A.   That was James Tillmon and the individual that we were

9    unable to identify, but from intercepted calls we

10   identified him as Greg.

11        MR. PHILLIPS:   Ask you -- the jurors, to now turn

12   to Government Exhibit No. 39.

13        And please publish Government 39.

14        (Phone call played)

15        And ask the jurors to now turn to Government

16   Exhibit No. 40 in their transcript book.

17        And please publish Government Exhibit No. 40.

18        (Phone call played)

19        THE COURT:   I would hate to be the person to

20   transcribe that phone call.

21        MR. PHILLIPS:   It takes a while, I'm sure.

22        THE COURT:   Go ahead.

23   BY MR. PHILLIPS:

24   Q.   Now as one of the investigators, main agents on this

25   case, as you were listening to one of these phone calls,

742

Direct - Mohlman

1   what were you suspecting and what did you do as a result of

2   that?

3   A.   We were suspecting that there was going to be a drug

4   transaction between James Tillmon and Greg, last name

5   unknown, who we had not positively identified, and that

6   Ricky Garrison was going to be involved in this

7   transaction.

8   Q.   And based on that, what action did you take?

9   A.   We sent surveillance -- I was in the listening post --

10  we sent surveillance to the area of 13th and Havana where

11  they observed Ricky Garrison -- or, I'm sorry, where they

12  observed James Tillmon arrive at Ricky Garrison's

13  residence.

14          At the same time I'm in the listening post

15  watching the closed circuit television at the address and

16  observed Tillmon arrive and leave.

17  Q.   And during the course of this investigation, did you

18  become familiar with how James Tillmon looked and his

19  posture and his height and weight and that sort of thing?

20  A.   Correct.

21  Q.   And as well as his facial features?

22  A.   Yes.

23  Q.   Was he somebody that you regularly saw or observed

24  either through the surveillance or CCTV?

25  A.   Or photographs captured by surveillance.  Yes.  I was

743

Direct - Mohlman

1    very familiar with Tillmon.

2           MR. PHILLIPS:  I'd ask to now publish Government

3    Exhibit No. 42 --

4    BY MR. PHILLIPS:

5    Q.    And before we publish it, what is the jury about to

6    see here?

7    A.    I believe this is closed circuit television from 10340

8    East 13th Avenue.  And it's a video of a green Ford

9    Explorer arriving, of which Tillmon was a back-seat

10   passenger.  And I believe he goes into the residence and

11   then comes back out and leaves.

12          MR. PHILLIPS:  And if you would, go ahead and

13   publish 42.

14      (Video played)

15   BY MR. PHILLIPS:

16   Q.    Now, as this video -- or was taking place, were you

17   monitoring and use -- manipulating the camera in some way

18   in order to catch different information?

19   A.    Correct.

20   Q.    And early on in this, it became focused in on the tag

21   number of that vehicle, correct?

22   A.    Correct.

23   Q.    Anything of importance that you missed as you were

24   getting the tag number?

25   A.    I believe it missed him getting out of the car.

Direct - Mohlman

1    Q.   Going inside?

2    A.   Right.

3    Q.   And as those people came back out and came to the

4    vehicle, were you able to identify anybody that you were

5    familiar with?

6    A.   Yes.  It was hard to see in this, there again, because

7    it jumps frames, but the person in the black-and-white hat

8    and black-and-white jacket, if you're able to see that,

9    that was James Tillmon.

10   Q.   And was that the person that, towards the end of the

11   video, came out and was on the right side of the vehicle

12   and went around and got in the back left?

13   A.   Correct.

14        MR. PHILLIPS:  And if you would, just go ahead and

15   play that again so we're clear.

16        (Video played)

17   BY MR. PHILLIPS:

18   Q.   Now, after you observed that and this time was going

19   by, was there another phone call that was of importance to

20   you?

21        MR. PHILLIPS:  And I point the jurors to

22   Government Exhibit 41 in their transcript books, please.

23        THE WITNESS:  Yes.

24   BY MR. PHILLIPS:

25   Q.   And, again, what were you monitoring and doing and

Direct - Mohlman

1   also dictating as being the main case agent as far as this

2   taking place?

3   A.   I was monitoring James Tillmon's phone and his

4   communications with Greg -- Greg, who I monitored them as

5   they -- their communications as they met for a drug

6   transaction.

7            MR. PHILLIPS:   Ask to publish, if you would,

8   Government Exhibit 41.

9        (Phone call played)

10  BY MR. PHILLIPS:

11  Q.   And from the listening post, were you dictating

12  anything or assisting the surveillance units at all?

13  A.   Correct.   I was radioing -- as surveillance was

14  actively following Tillmon, I was radioing what was being

15  said on the telephone as far as the meeting place and

16  whatnot.

17  Q.   And what -- what took place?

18  A.   There was a drug deal that took place between James

19  Tillmon and Greg.

20  Q.   Let's talk a bit about March 1st, 2014.   And does this

21  date involve another one of these previously admitted pings

22  that we talked about?

23  A.   It does.

24  Q.   Okay.   Why is it important you have the ping

25  information as an investigator in this case?

746

Direct - Mohlman

1    A.   At times it can either show us a location of where

2    someone is so we can acquire them with our physical

3    surveillance, and also when we do not have physical

4    surveillance available, we can use those pings to determine

5    the location of our suspects.

6    Q.   And on that particular day, who were your suspects and

7    what were you looking for or wondering what was happening?

8    A.   Basically from a series of intercepted phone calls, we

9    had information that Ricky Garrison would be conducting a

10   drug transaction with Francisco Aguilar, and there were

11   other parties involved who were, we believe, drug customers

12   that were getting drugs from Ricky Garrison.

13   Q.   And if you would, please look at --

14        MR. PHILLIPS:   And let's publish Government

15   Exhibit No. 44.

16   BY MR. PHILLIPS:

17   Q.   Now, whose phone number does that ping coordinate

18   with?

19   A.   That's telephone number 719-354-8298, which was target

20   telephone 8, a telephone utilized by Ricky Garrison.

21   Q.   And you've mentioned that you anticipated a drug deal

22   between Ricky Garrison and Francisco Aguilar.

23   A.   Correct.

24   Q.   And what did that ping tell you as far as where Ricky

25   Garrison's phone was at the time that you anticipated that

Direct - Mohlman

1    drug deal?

2    A.    There again, we utilized the intercepted calls,

3    matched them up with the appropriate times with the phone

4    pings and we found that at 2:07 p.m. on March 1st, Ricky

5    Garrison's -- or his telephone's located in the area of

6    3100 South Federal Boulevard in Denver, Colorado.

7    Q.    And who lived at 3100 South Federal Boulevard?

8    A.    Francisco Aguilar.

9    Q.    And you said it was in the area.  Would that be within

10   four meters of that area?

11   A.    Correct.

12   Q.    Taking you to March 2d of 2014, did you intercept a

13   number of calls between Ricky Garrison, Robert Painter and

14   Travis Edwards?

15   A.    Yes.

16        MR. PHILLIPS:  Looking at Government Exhibit 124,

17   if you would please publish.

18   BY MR. PHILLIPS:

19   Q.    If you could, please identify Travis Edwards for the

20   jury.

21   A.    Travis Edwards is up here, upper left photo.

22   Q.    Thank you.

23        MR. PHILLIPS:  And I'd ask the jurors to please

24   turn in your transcript books to Government Exhibit No. 47.

25        Please publish Government 47.

Direct - Mohlman

1           (Phone call played)

2    BY MR. PHILLIPS:

3    Q.   As one of the investigators working on this case, what

4    did you do or what actions were being taken as you heard

5    this phone call?

6    A.   We set up physical surveillance, investigators did, as

7    well as I was in the listening post on this day and was

8    listening to the intercepted communications, and observing

9    the CCTV at Ricky Garrison's residence.

10   Q.   And during this time -- and I believe the jury's heard

11   it -- was Robert Painter also intercepted?

12   A.   Yes.   He was involved in this transaction.

13           MR. PHILLIPS:   Ask the jurors to now look at

14   Government Exhibit No. 48 -- I'm sorry -- yes, 48.

15           If you would, please publish 48.

16           (Phone call played)

17   BY MR. PHILLIPS:

18   Q.   And after that phone call, was a text intercepted on

19   Ricky Garrison's telephone?

20   A.   Yes.

21           MR. PHILLIPS:   Please publish Government

22   Exhibit 49.

23   BY MR. PHILLIPS:

24   Q.   Now, based on the previous call one, and this text,

25   what did that mean to you as an investigator in this

749

Direct - Mohlman

1    case?

2    A.    This was -- to me, it meant it was a confirmation of

3    the price:  Thousand?  Right.  A question.

4           MR. PHILLIPS:  And if you would please turn in

5    your transcript books to Government Exhibit No. 50.

6           And please publish Government 50.

7       (Phone call played)

8    BY MR. PHILLIPS:

9    Q.    And I believe you mentioned earlier, as a result of

10   these calls, as well as Robert Painter, you were monitoring

11   the CCTV on that particular TV -- or day?

12   A.    Correct.

13   Q.    And have you had a chance to review Government Exhibit

14   No. 51?

15   A.    I have.

16          MR. PHILLIPS:  If you would, please publish

17   Government Exhibit 51.

18      (Video played)

19   BY MR. PHILLIPS:

20   Q.    During the course of this investigation, were you

21   familiar with Travis Edwards?

22   A.    I was.

23   Q.    And while we're at it, just briefly if you would, is

24   there a -- you mentioned earlier that you were familiar

25   with this vehicle, the Impala.

750
Direct - Mohlman

1    A.    Correct.

2    Q.    Is there another vehicle in that picture that you're

3    familiar with from this investigation?

4    A.    Yes.  Next to the Impala is a silver Porsche Cayenne,

5    which was a vehicle owned and driven by Ricky Garrison.

6    Q.    And if you would, describe to the grand -- to the jury

7    what was taking place that was of interest to you as an

8    investigator as you watched this CCTV that particular day.

9    A.    This was -- and as I said, we had physical

10   surveillance out there as -- so in the frame we were only

11   able to capture Robert Painter's vehicle -- that white SUV

12   was Robert Painter's -- and then Travis Edwards had arrived

13   in a black Lincoln Continental that was actually out of the

14   frame -- it was parked a little bit further east here, I --

15   I'm sorry, it was west on 13th Avenue.  And Ricky Garrison

16   had come from the residence and got into Edwards' vehicle

17   and then went back to the residence.

18          Ricky Garrison and Painter came out of the

19   residence, and what you saw, the two individuals at the

20   end, Painter was getting into the vehicle, and that was

21   Garrison standing with him on the -- at the driver's side.

22   Q.    And you mentioned that Edwards' vehicle is further --

23   west down the road.  Was that something surveillance

24   observed?

25   A.    It was.  Yes, Edwards' vehicle.

751
Direct - Mohlman

1    Q.   I'm sorry.

2    A.   No, that might have been what you said.  But yes,

3    surveillance observed that vehicle.

4    Q.   And I think you talked about it earlier, but -- were

5    there limitations as to how much you could manipulate this

6    CCTV and capture everything?

7    A.   Correct.

8    Q.   Now, shifting gears a bit, during the course of this

9    investigation --

10         THE COURT:  Mr. Phillips, before you shift gears,

11   this will probably be a good time for our morning break.

12         MR. PHILLIPS:  Certainly.  It's perfect.

13         THE COURT:  Okay.  All right.  Members of the

14   jury, we will be in recess for 15 minutes.

15         (Recess 10:17 a.m.)

16         (Outside the presence of the jury at 10:39 a.m.)

17         THE COURT:  I have one question.  Mr. McDermott,

18   this is for you, because I believe you were the one who

19   provided the objections to the Government's verdict form.

20         You had an objection to the -- call them special

21   interrogatory questions in the conspiracy count verdict

22   form, and you said that it violated a lien, but you didn't

23   give us a -- an alternative form of -- verdict form for

24   that count that you want us to consider.

25         MR. McDERMOTT:  I didn't, and we had addressed it,

Direct - Mohlman

1    I believe, at the pretrial conference, Your Honor.  I will

2    tell you --

3              THE COURT:  All these things in the pretrial

4    conference I can't remember.

5              MR. McDERMOTT:  We did address it, and I --

6              THE COURT:  You told me that you weren't going to

7    give me a verdict form on -- for the conspiracy count?

8              MR. McDERMOTT:  Correct.  And --

9              THE COURT:  And why not?

10             MR. McDERMOTT:  Well, why don't I let Mr. Leonard

11   answer that portion of it.  But before he does, let me tell

12   you -- I told Ms. Rangel at the break, I didn't tell Mr.

13   Phillips because he's in the middle of an examination, I've

14   gone through everything.  What I did do is I -- and the

15   Court doesn't have this yet, but I put together a draft of

16   what I refer to as a bridge instruction that also puts a

17   lesser-included offense with respect to Count 1, and it's

18   with respect to the quantities alleged.  And I believe that

19   with that bridge instruction, everything would track, and

20   that verdict form probably would make sense if the

21   instructions read that way.

22             THE COURT:  Well, when were you planning on giving

23   us this bridge instruction?

24             MR. McDERMOTT:  I wanted to give it to you before

25   the instruction conference for certain.

753

Direct - Mohlman

1        THE COURT:  Well, I mean, my law clerk and I are

2   going to be finalizing the Court's set of instructions and

3   verdict forms during the lunch break, all right?  So, you

4   know, you need to give it to us at the beginning of the

5   lunch break at the latest so that we can consider it.

6        MR. McDERMOTT:  Okay.

7        THE COURT:  You can -- obviously at the charging

8   conference you will be able to make your record and make

9   your oral objection and state orally what you prefer, but

10   it's some -- it would do you much -- put you in a much

11   better stead if you had actually something in writing that

12   you want us to be looking at.

13        MR. McDERMOTT:  And, Your Honor, we did -- we

14   addressed this at the pretrial conference, and I even

15   did -- the Court gave me leave to refile the objections and

16   I did --

17        THE COURT:  That's true.  I remember -- I do

18   remember that.

19        MR. McDERMOTT:  Correct.  And in that, I did

20   articulate a reason why we weren't going to, I guess for

21   lack of a better term, fix the verdict form.  And then Mr.

22   Leonard and I were discussing it as the trial has gone on

23   and I asked him, I said, Well, I know -- we addressed it at

24   the pretrial conference, but it probably makes sense for me

25   to craft something just in case you did come in, as you

Direct - Mohlman

1    just did today.  And so I have been working on that and

2    that's why I came up with the bridge.

3               Mr. Leonard has -- I would have e-mailed it this

4    morning, but Mr. Leonard hasn't even had a chance to review

5    it yet.  So if I can get that to you as soon as we're done

6    here, I will do so --

7               THE COURT:  Get it to us at the beginning of the

8    lunch break so we can look at it.

9               MR. McDERMOTT:  I brought a drive with me today so

10   I could make sure everybody had an editable form of it, so

11   I will get that to you in the next --

12              THE COURT:  All right.  Yeah, because obviously

13   you need to give a copy to the Government so that they can

14   prepare an objection to it if they see so fit.

15              Mr. Leonard.

16              MR. LEONARD:  I wanted to address the question as

17   to the verdict form.  The defense position is that the

18   verdict form submitted by the Government, while the special

19   transportation does not comport with *Alleyne v. United*

20   *States* because there's no language finding the amounts as

21   an element beyond a reasonable doubt, which is the holding

22   of *Alleyne*, it's pretty clear in *Alleyne* --

23              THE COURT:  Correct, it could enhance the

24   sentence.  So -- but -- so what is your suggested language

25   that would comply with *Alleyne*?

Direct - Mohlman

1          MR. LEONARD:  Well, my suggested language is that

2     all the amounts have to be specific elements, they have to

3     be said -- found -- you must find beyond a reasonable

4     doubt, however, whatever the amount you're seeking.

5          THE COURT:  So, okay.  So that each individual

6     interrogatory asking for the weight -- or the amount,

7     rather, that the jury finds attributable to the

8     defendant -- you want to insert language that you're

9     finding that this amount is attributable to the -- I forget

10    the exact language -- to the defendant beyond a reasonable

11    doubt?  Is that what you're saying, that the burden is not

12    repeated in each --

13         MR. LEONARD:  That's correct.  And I frankly --

14    the defense's position would be that this shouldn't be done

15    by special interrogatory; it has to be in the jury

16    instruction, itself, as a discrete element, because that's

17    what Justice Thomas in *Alleyne* was talking about.

18         THE COURT:  Was that -- and did you include that

19    in your disputed instructions?

20         MR. LEONARD:  I believe we've put it in our

21    objection, because what we think the Government has

22    submitted is a nonmandatory minimum instruction, which

23    we -- we're okay with.

24         THE COURT:  Okay.  All right.  So you -- you say

25    you've included it in your objection to the Government's

756

Direct - Mohlman

1   instruction on the conspiracy count.

2          MR. LEONARD:  Yes, sir.  Yes, Your Honor.

3          THE COURT:  All right.  But -- so I think I

4   comprehend orally, in the narrative form, that you've made

5   your point, what you're driving at.  I'll just say again,

6   it's just better for you if you could have -- give us an

7   alternative verdict form for us to be looking at and us

8   making a decision as to -- between the verdict forms or

9   melding them together in some synthesis of the two.

10         MR. LEONARD:  And just -- just so the Court

11  understands, the defense position would be that -- because

12  I raised this with Mr. Phillips, I didn't hide the ball

13  to -- I thought that the instruction was not -- did not

14  comport with *Alleyne* --

15         THE COURT:  Well, your objection is in the record.

16  It's perfectly clear that you're objecting to the

17  Government's proposed verdict form on Count 1 as not

18  sufficiently meeting the requisites of *Alleyne*.

19         MR. LEONARD:  And --

20         THE COURT:  That's -- that's established.

21         MR. LEONARD:  And my understanding was the

22  Government said that it -- they thought it did, and that

23  was -- so that was my understanding.

24         THE COURT:  Okay.  I don't know why I'm being so

25  unclear today.  All I'm saying is your objection is very

Direct - Mohlman

1    clear.  I'm just asking you what -- what language are you

2    proposing that, in the defendant's view, does comport with

3    *Alleyne*?  That's what we need from you.

4              MR. LEONARD:  Okay.  And --

5              THE COURT:  All right.  Sometime at the beginning

6    of the lunch break.

7              MR. LEONARD:  All right.  We'll -- and I'll talk

8    to the Government directly about it as well.

9              THE COURT:  All right.

10             Mr. Phillips, did you have something -- you're

11   just getting up to resume your examination?

12             MR. PHILLIPS:  Actually I'm getting up to bring up

13   an issue, and myself and Mr. Leonard's desire to never

14   practice civil law.  While the Court was gone, we have

15   discussed, and it's my understanding, the defense

16   stipulates to Government Exhibits 71 through 98, which will

17   be part of the testimony this afternoon.

18             THE COURT:  71 through 9 -- there's a stipulation,

19   Mr. Leonard?

20             MR. LEONARD:  That's correct, Your Honor.

21             THE COURT:  All right.  Do you want to just -- I

22   mean, we don't have to have the jury in here for you to

23   move them in, and we can admit them.  We'll just make it

24   smoother.

25             MR. PHILLIPS:  I would move to admit and we'll

758

Direct - Mohlman

1    publish as we go.

2              THE COURT:  Okay.  So given the stipulation of the

3    parties, the Government's Exhibits 71 through 98 are

4    admitted into evidence and may be published to the jury at

5    the appropriate time.

6         (Government's Exhibits 71, 72, 73, 74, 75, 76, 77, 78,

7    79, 80, 81, 82, 83, 84, 85, 86, 87, 88, 89, 90, 91, 92, 93,

8    94, 95, 96, 97, and 98 received)

9              THE COURT:  Anything else -- oh, I had something.

10   Investigator, how would you prefer that I refer to you in

11   front of the jury?

12             THE WITNESS:  Investigator will be fine, sir.

13             THE COURT:  Okay.  All right.  Anything else

14   before we bring in the jury?

15             MR. PHILLIPS:  No.  Thank you, Your Honor.

16             THE COURT:  All right.  Let's bring in the jury.

17        (In the presence of the jury at 10:48 a.m.)

18             THE COURT:  Thank you for your patience, members

19   of the jury.  We all appreciate it.

20             Investigator, you -- I remind you you remain under

21   oath.

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Okay.  Mr. Phillips, you may resume

24   your direct examination.

25             MR. PHILLIPS:  Thank you, Your Honor.

759

Direct - Mohlman

1    BY MR. PHILLIPS:

2    Q.    During the course of this investigation, did there

3    come a time, or did you start to discover information that

4    made you suspect that there was possible prostitution or

5    pimping being taken place by Ricky Garrison?

6    A.    Yes.

7    Q.    And was that outside of the state of Colorado?

8    A.    Inside and also outside of the state of Colorado.

9    Q.    And as a result of that information, what are some of

10   the actions that you took?

11   A.    We were utilizing -- or intercepting calls on target

12   telephone 8, which were -- there were a lot of

13   prostitution-related calls on that phone.

14          MR. LEONARD:  Your Honor, I object.  Those phone

15   calls aren't in evidence and I would move to strike any

16   reference to them.

17          THE COURT:  I think that this is a foundational

18   question.  Overruled.

19          Go ahead.

20   BY MR. PHILLIPS:

21   Q.    So go ahead.

22   A.    We were intercepting calls on target telephones which

23   indicated prostitution.  And we were also, as we were

24   intercepting those calls and learning the different

25   locations that they were traveling to, I was querying that

760

Direct - Mohlman

1    website, backpage.com, to locate any ads for prostitution

2    associated with our target telephone numbers and our

3    suspects.

4    Q.    And you mentioned target telephone No. 8; was that a

5    telephone used and possessed by Ricky Garrison?

6    A.    It was.

7    Q.    And was that telephone number 719-354-8298?

8    A.    Yes.

9    Q.    And as you were researching, you mentioned backpage,

10   is that something that was being part or being used as part

11   of this?

12   A.    Correct.  We had -- we had heard that on interceptions

13   related, there was talk about backpage.com.  And at the

14   time, it was very common place for prostitutes to post

15   their services.

16   Q.    Now, looking at Government Exhibit No. 52, see if you

17   recognize that.

18   A.    I'm sorry, different book.  Okay.

19   Q.    Do you recognize that?

20   A.    Yes, I do recognize this document.

21   Q.    And is that something that you discovered or found by

22   doing some sort of action?

23   A.    Yes.

24   Q.    And what did you do in order to discover that?

25   A.    I searched backpage.com.  There again, other

Direct - Mohlman

1    interceptions had indicated that they were traveling to

2    Ohio --

3            MR. LEONARD:  Your Honor, I object.  He's now

4    using the term "traveling."  He's getting into a discrete

5    element.  I'd move to strike.  There's been no foundation

6    of traveling.

7            THE COURT:  Let's rephrase.

8    BY MR. PHILLIPS:

9    Q.    That particular document, did you use a computer in

10   order to find that?

11   A.    I did.

12   Q.    And what is backpage.com?

13   A.    Backpage.com is a -- I think it would be best

14   described as a classified advertisement site where people

15   can post things on there for sale, but there's also -- you

16   can post social elements as well as adult services,

17   escorts, that type of thing.

18   Q.    And while you were looking at backpage.com as part of

19   this investigation, were you focused on a phone number

20   719-354-8298?

21   A.    Yes.

22   Q.    And on March 21st, 2014, did you find an advertisement

23   on backpage.com that was of interest to you?

24   A.    Yes.

25   Q.    And is that depicted, an accurate copy, on

Direct - Mohlman

1    Government's Exhibit No. 52?

2    A.    Yes.

3           MR. PHILLIPS:   Your Honor, at this time we'd ask

4    to admit Government Exhibit 52 and publish for the jury.

5           THE COURT:   Any objection?

6           MR. LEONARD:   Objection.   Insufficient foundation.

7           THE COURT:   Overruled.   Objection -- the

8    Exhibit 52 is admitted into evidence and may be published

9    to the jury.

10          (Government's Exhibit 52 received)

11   BY MR. PHILLIPS:

12   Q.    Now, looking at Government Exhibit 52, if you could

13   describe to the jury as one of the investigators in this

14   case, what was of interest to you or of importance as far

15   as that?

16   A.    The interest is the telephone number, which is listed

17   on the -- on the ad, which was target telephone 8.   The

18   name used was interesting:   Heather.   And then also the

19   photographs that were posted.

20   Q.    And do you recognize the person in that photograph?

21   A.    I do.

22   Q.    And who is that?

23   A.    That's Heather Quintanilla.

24   Q.    And if you could make it smaller.   If you go up top

25   and highlight this area.

763

Direct - Mohlman

1        And where was that backpage.com advertisement

2   being displayed as far as location?

3   A.   In Ohio.  And this is the way that I searched it was

4   by backpage.com, and then I searched Ohio dating and Ohio

5   women seeking men.

6   Q.   And why did you focus on Ohio?

7   A.   Because we had intercepted communications which

8   indicated Ricky Garrison and Heather Quintanilla were going

9   to Ohio.

10       MR. LEONARD:  Objection, Your Honor.  That's not

11   in evidence.  Would move to strike; it's hearsay.

12       THE COURT:  Mr. Phillips?

13       MR. PHILLIPS:  Your Honor, it's not being offered

14   for the truth of the matter, but why this officer actually

15   searched Ohio as opposed to Florida or Nevada or somewhere

16   else.

17       MR. LEONARD:  So it is hearsay, then, and I would

18   move to strike and -- and have the jury instructed that

19   it's not evidence that they can consider in their

20   deliberations.

21       THE COURT:  I don't believe that it's being used

22   for the truth of the matter; it's being introduced as to

23   why this witness then took the actions he took.  Overruled.

24   BY MR. PHILLIPS:

25   Q.   Now, I'm going to ask you to look at Government

Direct - Mohlman

1    Exhibit No. 53 and see if you recognize it.

2    A.   Yes.

3    Q.   And is that another posting that you, yourself, found

4    on backpage.com?

5    A.   Yes.

6    Q.   And does that fairly and accurately describe or

7    show -- I guess not show, but it showed what you found on

8    March 15th of 2014, on backpage.com?

9    A.   Yes.

10           MR. PHILLIPS:   Government would move to admit and

11   then publish Government Exhibit 53.

12           THE COURT:   Any objection?

13           MR. LEONARD:   Objection.   Insufficient

14   foundation.

15           THE COURT:   Overruled.   Exhibit 53 is admitted

16   into evidence and may be published to the jury.

17       (Government's Exhibit 53 received)

18           MR. PHILLIPS:   If you would, publish page 1.

19   BY MR. PHILLIPS:

20   Q.   Now looking at page 1 of Government Exhibit 53, what,

21   if anything, was of interest to you as far as that?

22   A.   There again, the telephone number, which was target

23   telephone 8, that was the most significant thing on the

24   posting.   The photographs weren't as clear, but it was the

25   telephone number and name, again, and photographs.

Direct - Mohlman

1          Mr. PHILLIPS:  Okay.  And make that smaller.  And

2     if you would highlight the top.

3     BY MR. PHILLIPS:

4     Q.   And on March 15th of 2014, where was that backpage.com

5     located, as far as your search nationwide?

6     A.   And I should clarify, if I could, that when I searched

7     it, the only way I knew how to search it is you have to

8     search it regionally.  You can't do a nationwide search.

9     You have to pick Oklahoma, Ohio -- in this case I picked

10    Oklahoma and I searched Oklahoma, and this is one of the

11    results I received.

12    Q.   Okay.  If you would just briefly go to page 2 of

13    Government 53.  And page 3 of Government 53.  Thank you.

14         And did you find any other backpage.com in

15    Oklahoma that was of interest to you?

16    A.   Yes.  There was another posting.

17    Q.   And I'm going to ask you to look at Government Exhibit

18    54 and see if you recognize that.

19    A.   Yes.

20    Q.   And is that a posting that you personally found and

21    located on March 15th of 2014 on backpage.com?

22    A.   Yes.

23         MR. PHILLIPS:  Government would move to admit and

24    publish Government Exhibit No. 54.

25         THE COURT:  Any objection?

Direct - Mohlman

1           MR. LEONARD:  Object to foundation.  Also object

2      to hearsay if the officer's going to testify about what's

3      contained in the document.

4           THE COURT:  Overruled.  Exhibit 54 may be -- or is

5      admitted and may be published to the jury.

6         (Government's Exhibit 54 received)

7           MR. PHILLIPS:  And would you, please, publish 53.

8      And if you would just highlight the area, where it came

9      from.

10     BY MR. PHILLIPS:

11     Q.   And, again, when you were searching, where did this

12     backpage.com appear as far as nationwide?

13     A.   Oklahoma.  Specifically Oklahoma City, Oklahoma.

14          MR. PHILLIPS:  If you would, please show page 2.

15     And page 3.  Thank you.

16     BY MR. PHILLIPS:

17     Q.   Now, you'd shown -- upon discovering these, what, if

18     anything, did you do as a result of discovering these

19     backpage.coms?

20     A.   The investigative decision was made to contact

21     authorities in Oklahoma City, Oklahoma, and see if we could

22     coordinate some type of prostitution arrest or sting

23     operation with the authorities in Oklahoma.

24     Q.   And did you at some point speak with the officer that

25     testified earlier, and some of his cohorts, regarding that

Direct - Mohlman

1    information?

2    A.    Yes.   I believe I first spoke with a lieutenant in his

3    vice unit, and eventually did speak to Detective Rivera.

4    Q.    And did you supply them with the backpage.coms that

5    you had discovered?

6    A.    Yes.

7    Q.    And did you supply them with anything additional as

8    far as the people you suspected?

9    A.    Yes, I did provide them with suspect descriptions,

10   vehicle information, and that type of thing.

11   Q.    And did you describe -- supply like a driver's license

12   photograph of anyone in particular?

13   A.    Yes, I do believe I also supplied photographs to the

14   detectives.

15   Q.    Now, after -- as a result of supplying that

16   information, did you receive any information from them that

17   was of interest to you?

18   A.    Yes.   I received feedback, I believe I first spoke

19   with the Oklahoma City authorities on a Saturday and they

20   were unable to do it, but they were able to set up a sting

21   on the following Monday.   And they contacted me and told me

22   that their -- they had made a successful arrest.

23   Q.    And after that, did you search backpage.com any --

24   additionally?

25   A.    Yes.

Direct - Mohlman

1    Q.    And I draw your attention to Government's Exhibit

2    No. 58.  And do you recognize Government Exhibit No. 58?

3    A.    I do.

4    Q.    What is that?

5    A.    Another backpage ad -- advertisement from Wichita,

6    Kansas.

7    Q.    And is that a backpage.com ad that you personally

8    discovered and found on March 21st of 2014?

9    A.    Yes.

10        MR. PHILLIPS:  Your Honor, at this time Government

11   would move to admit Government Exhibit No. 58 and publish.

12        THE COURT:  Any objection?

13        MR. LEONARD:  Object as to foundation.  Hearsay,

14   if the officer's going to comment on the proposed exhibit.

15        THE COURT:  Overruled.  Exhibit 58 is admitted

16   into evidence and may be published to the jury.

17      (Government's Exhibit 58 received)

18        MR. PHILLIPS:  Thank you.  And if you would,

19   page 2.  And page 3.  Thank you.

20        And if you would, please publish previously

21   admitted Government Exhibit No. 57.

22   BY MR. PHILLIPS:

23   Q.    Looking at Government No. 57, although a bit blurry,

24   does that vehicle look a bit familiar to you or in any way

25   similar to a vehicle that you're familiar with?

Direct - Mohlman

1   A.   Yes.  I can't identify the license plate, but it's

2   very similar.  I recognize the vehicle.

3   Q.   And what -- how do you recognize that vehicle?

4   A.   It's -- it appears like Ricky Garrison's light blue

5   Porsche Cayenne.

6   Q.   Now, let's talk a little bit about that Porsche

7   Cayenne.  During the course of the investigation -- and,

8   actually, I believe earlier you said the vehicle was light

9   silver and you just said light blue.  What color was this

10   vehicle?

11   A.   It -- well, depending on the lighting, it was kind of

12   a pearl color, so depending on the lighting, it looked

13   either light blue or silver.

14   Q.   Now, during the course of this investigation, did you

15   see Ricky Garrison driving different vehicles?

16   A.   Yes.

17   Q.   And originally if you could describe what type of

18   vehicles he was driving or how -- what type of ownership

19   and so forth they were.

20   A.   Originally early on in the investigation we observed

21   him driving that silver Chevrolet Impala, which was in the

22   driveway.  And I believe that car broke down or something

23   happened to it.  And so then he was -- for a period of

24   time, he had rental cars; specifically, I remember a silver

25   Dodge Charger.

Direct - Mohlman

1        And by the time we were intercepting his phone in

2   mid-November, it was in, probably, about November 22d that

3   he had purchased that Porsche Cayenne.  And then he pretty

4   much used that vehicle exclusively up until the end of our

5   investigation.

6   Q.   And just to be clear, were you watching Ricky Garrison

7   from June of 2013 until that mid-November when the vehicle

8   came about?

9   A.   Not daily, but sporadically we were conducting

10  surveillance during that time.

11  Q.   And prior to November of 2013, had he ever had the

12  Porsche Cayenne?

13  A.   No.

14  Q.   Now, I want to shift gears now and go to November --

15  or, I'm sorry, March 27th of 2014.  A couple of days prior

16  to that, during the course of your investigation, had

17  anything unusual happened?

18  A.   Yes.  On March 26th, 2014, was the deal with Francisco

19  Aguilar where I had specific knowledge of that because I

20  was the one who asked for a telephone number over the

21  radio, and that telephone number was intercepted by another

22  person who made some phone calls.  And it eventually got

23  back to Francisco Aguilar.  And we were, in my mind, burned

24  that he had basically found out that he was being looked at

25  by law enforcement, so I do remember that specifically.

Direct - Mohlman

1    Q.    And I believe the jury's heard this, but as lead

2    investigator, dictating the investigation, what was your

3    plan for March 26th of 2014?

4    A.    March 26th, 2014, our plan was to interdict Ricky

5    Garrison after he met with Francisco Aguilar.

6    Q.    And I believe you just said that you thought you had

7    been burned.  What does that mean?

8    A.    Basically, you know, we'd been found out or the gig is

9    up -- jig, gig.  That just -- we had been burned and they

10   know -- they know what we're doing, they know that we're

11   listening, they know that we're looking at them and that

12   things are going to change, fall apart.  That's our fear.

13   Q.    And safe to say that you called off the plan to pull

14   Ricky Garrison over --

15   A.    On that day, yeah, after -- yes, after we learned that

16   the telephone call was placed, we discontinued our

17   surveillance.

18   Q.    And on the next day, March 27th of 2014, what did you

19   and Special Agent Gullicksrud do as a result of that

20   previous belief, burned, from the night before?

21   A.    We made the decision to contact Francisco Aguilar.

22   Q.    And if you could, describe to the jury how that took

23   place.

24   A.    We were able to locate it through an Internet search.

25   I was able to learn that he was working for an electrical

Direct - Mohlman

1    contractor in downtown Denver, and so we drove to his job

2    site and asked his boss if we could talk to him.  And his

3    boss produced him.  And it was towards the end of the day,

4    so we drove him to his home and spoke with him for about

5    10, 15 minutes in a park before we took him home.

6    Q.   And during that conversation, was he forthcoming in

7    your belief?

8    A.   No.

9    Q.   Okay.  Now, as a result -- on that day, did you arrest

10   Francisco Aguilar?

11   A.   No.

12   Q.   Why not?

13   A.   Because we were not -- we were actually hoping to gain

14   his assistance and see if he could help us further our

15   investigation.  We were not complete -- the investigation

16   was not complete.  We were still up on other target

17   telephones and we were still investigating many people in

18   the investigation.  We were not ready to arrest or indict

19   or charge anyone for fear of discovery or other people

20   finding out, because we were still in the middle of our

21   investigation.

22   Q.   Now, you mentioned you weren't ready to arrest,

23   indict, or charge anyone.  In an investigation like this,

24   how difficult or complex is it in order to indict and then

25   arrest people?

Direct - Mohlman

1    A.   As a group, it's extremely difficult.  In this -- in

2    this case, we had over 20 charged individuals and so trying

3    to indict the case before a grand jury, and then the arrest

4    warrants, and then the take-down day, we try to arrest them

5    as a group as much as possible on the same day, on the same

6    morning, so that people don't flee.  Even if they would

7    learn about the arrest of their cohorts, they would

8    potentially flee.  That's our concern.  And so it's -- we

9    try to organize it the best way possible.

10   Q.   Now, you'd mentioned that in this case there are a

11   number of people.  As part of this investigation, was there

12   a whole nother group of people that were also targets of

13   this investigation and charged eventually?

14   A.   Yes.

15   Q.   Okay.  Now, as you continued to investigate and try to

16   expand and identify the different people in the group, in

17   May of 2014, were you intercepting any phones?

18   A.   Yes.

19   Q.   And whose phone were you intercepting?

20   A.   Specifically in May one of the telephones we were

21   intercepting was target telephone 13, which was a phone

22   utilized by Ricky Garrison.

23   Q.   Now, was that target telephone number 305-407-5925?

24   A.   That sounds correct.

25   Q.   And as you were intercepting that phone and trying to

774
Direct - Mohlman

1    continue your investigation, did you intercept any calls

2    that were of concern to you as one of the lead case agents

3    in this investigation?

4    A.    Yes.  At that time, and also prior to that a little

5    bit, we were getting indications that Ricky Garrison had

6    planned to move out of state and, in fact, move back to

7    Michigan.

8    Q.    And speaking of which, did there come a time in March

9    of 2014 that you discovered that Ricky Garrison, the

10   defendant, had moved out of 10340 East 13th Avenue?

11   A.    Yes.  And in early March, he was telling people that

12   he was moving out and, in fact, we observed a U-Haul truck

13   in front of the residence and he moved out.

14   Q.    And after he had moved out, was he in Denver a bunch

15   or had he been gone for a bit?

16   A.    No, he -- during that time, he -- the U-Haul's in

17   early March, and then he leaves and comes back.  He's in a

18   hotel for a period of time.  But from -- from March 5th

19   when he moved out -- I believe it was March 5th -- 6th, he

20   was staying at the Monaco address.  We had done

21   surveillance there and seen him there.

22   Q.    Okay.  When you say the Monaco address is that 1250

23   South Monaco Parkway?

24   A.    Correct.

25   Q.    Unit 61 in Denver, Colorado?

Direct - Mohlman

1   A.   Yes.

2   Q.   Now, you'd mentioned you started to intercept some

3   phone calls that were concerning to you about the potential

4   of Ricky Garrison moving out of state.   I'm going to draw

5   your attention to Government Exhibit No. 108.   Have you had

6   an opportunity to review that telephone call?

7   A.   I have.

8   Q.   Okay.   Is that a telephone call from May 16th of 2014

9   at approximately 1:10 p.m. between Ricky Garrison and an

10  unknown male?

11  A.   May 16th sounds correct.

12       MR. PHILLIPS:   Okay.   And, Your Honor, at this

13  time, the Government would move to publish 108; however,

14  prior to doing so, we would ask the Court to read the

15  limiting instruction.

16       THE COURT:   All right.   108 is not yet admitted,

17  right?   You are moving for its admission?

18       MR. PHILLIPS:   Moving to admit 108.

19       THE COURT:   Let's deal with that first.   Is there

20  an objection?

21       MR. LEONARD:   Yes, Your Honor.   The objection is

22  that the phone call's hearsay.   I'd also incorporate our

23  objections made in our *James* motion and filed.

24       THE COURT:   All right.   That objection's noted as

25  well as your incorporated arguments.   And you're requesting

Direct - Mohlman

1    that it be a standing objection as to this witness?

2         MR. LEONARD:  Yes, Your Honor.  I think there may

3    be another exhibit that will fall under this potential

4    category, and we'd ask for -- the same objection apply to

5    it.

6         THE COURT:  All right.  Your request that it be

7    treated as a standing objection is granted; and the

8    objection's overruled.

9         Exhibit 108 is admitted into evidence.

10        (Government's Exhibit 108 received)

11        THE COURT:  And before we publish to the jury,

12   okay, can counsel approach, please.

13        (Side bar at bench)

14        THE COURT:  All right.  The limiting instruction

15   that you folks gave us, and it makes -- it makes sense in

16   this context to read it except these two words, because

17   we're not listing anybody, so --

18        MR. PHILLIPS:  Okay.

19        THE COURT:  Can I just read it without --

20        MR. PHILLIPS:  Yeah.

21        THE COURT:  -- those two words?

22        MR. PHILLIPS:  I have no objection to that.

23        MR. LEONARD:  Yes.  My understanding is we put

24   those words in because that would go back to the jury later

25   in the instruction packet, so we'd have the exhibits listed

Direct - Mohlman

1   below.

2            THE COURT:  We have the -- we'd have the speakers.

3            MR. LEONARD:  I'm sorry, speakers, yes, I

4   apologize.

5            THE COURT:  Okay.

6            MR. PHILLIPS:  I think that makes sense to read it

7   without those two words and then submit it with the two

8   words.

9            MR. LEONARD:  Yeah, I would agree.

10            THE COURT:  Okay.  And then -- so I'm going to

11   need from one of you a final limiting instruction with

12   these two words and with the names of the individuals

13   below.

14            MR. LEONARD:  I think they're -- they're

15   unknown --

16            MR. PHILLIPS:  We have them.  We worked together

17   to do it, but I know Ms. Rangel has that on her computer.

18            THE COURT:  Okay.  All right.  Thank you.

19        (End of discussion at side bar)

20            THE COURT:  Before we publish this phone call to

21   you, ladies and gentlemen of the jury, I'm going to read a

22   limiting instruction.  And you're going to get a form of

23   this limiting instruction with you in the final set of

24   instructions that you will be reading and considering while

25   you deliberate your verdict.  Okay.

778

Direct - Mohlman

1    The limiting instruction is as follows:  Certain

2    statements have been admitted to you to give context to

3    statements made by the defendant.  The purpose of the other

4    speaker's statement is to help explain the defendant's

5    statements.  The statements of the other speakers are not

6    evidence or proof of any facts.  Thus, you may not consider

7    the portion of the other speaker's statement as proof of

8    any matter asserted.  However, you may consider the

9    defendant's statements as proof of the matter asserted.

10    Like I said, you'll get this in your final set, so

11    you will be able to consider it at that time.  All right.

12    Mr. Phillips.

13    MR. PHILLIPS:  I'd ask to please publish -- first,

14    I'd ask the jurors to please turn their notebooks to the

15    transcripts to Government Exhibit No. 108.

16    And please publish Government's Exhibit 108.

17    (Phone call played)

18    BY MR. PHILLIPS:

19    Q.   Now you mentioned earlier that you're becoming

20    concerned based on intercepted calls that Ricky Garrison

21    may be planning to move.  Did this phone call also draw you

22    some concern?

23    A.   Yes.

24    Q.   If you could, describe to the jury why that was.

25    A.   Just because in the call he talked about the

779

Direct - Mohlman

1   back-and-forth thing and talked about how he didn't want to

2   be carrying the straps on the highway.

3   Q.   And what is a strap?

4   A.   A slang term for a firearm, gun.

5   Q.   And during the course of this intercept, as well as

6   others, did anything else draw your attention or cause you

7   concern as the main investigator?

8   A.   Yes.  We -- we had intercepted multiple communications

9   indicating that he was shutting down his operations in

10  Colorado and moving out of state.

11  Q.   And did these phone calls make any concern as to the

12  possibility of him possessing firearms?

13  A.   Yes, absolutely.

14  Q.   Now, I turn your attention to Government Exhibit

15  No. 109.  Have you had an opportunity to review that

16  intercepted telephone conversation?

17  A.   I have.

18  Q.   And is that a intercepted conversation between Ricky

19  Garrison and an unknown male from May 20th of 2014?

20  A.   Yes.

21       MR. PHILLIPS:  At this time, Your Honor, the

22  Government would move to admit Government Exhibit No. 109;

23  however, prior to publishing, we would ask for the limiting

24  instruction.

25       THE COURT:  All right.  Any objection to 109?

780

Direct - Mohlman

1      MR. LEONARD:  The continuing objection, please,

2  Your Honor.

3      THE COURT:  All right.  Your request for a

4  continuing objection for the reasons you've previously

5  stated on the record is granted, and your objection's

6  overruled.  Exhibit 109 is admitted into evidence and may

7  be published to the jury after I read this limiting

8  instruction.

9      Okay, ladies and gentlemen of the jury, I'll read

10  you again the same limiting instruction.  You'll get this

11  in your final set.  Certain statements have been admitted

12  to you to give context to statements made by the defendant.

13  The purpose of the other speaker's statements is to help

14  explain the statements -- the defendant's statements.  The

15  statements of the other speakers are not evidence or proof

16  of any facts.  Thus, you may not consider the portions of

17  the other speaker's statements as proof of the matter

18  asserted; however, you may consider the defendant's

19  statements as proof of the matter asserted.

20      All right.  Mr. Phillips.

21      (Government's Exhibit 109 received)

22      MR. PHILLIPS:  I would ask the jurors to please

23  turn to transcript No. 109.

24      And please publish 109.

25      (Phone call played)

Direct - Mohlman

1    BY MR. PHILLIPS:

2    Q.   Now, in May, as you started to intercept these calls

3    and had concern about Ricky Garrison leaving the state, did

4    you and other officers start preparing anything in

5    anticipation of doing something prior to his leaving?

6    A.   Yes.  I began drafting a search warrant for the

7    residence on Monaco.

8    Q.   And on May 22d of 2014, did you receive a search

9    warrant for a 1250 South Monaco Parkway, Unit 61, in

10   Denver, Colorado?

11   A.   I did.

12   Q.   And was that signed and approved by a federal

13   magistrate judge?

14   A.   Judge Boland, yes.

15   Q.   Now, as you were preparing to execute this search

16   warrant, as the lead investigator in this case, what were

17   you anticipating to find as part of that search warrant?

18   A.   The primary thing, the telephone calls dealing with

19   the guns, we expected to find firearms inside of the

20   residence.

21   Q.   And did you anticipate finding large amounts of

22   drugs?

23   A.   Not at the time.  We hadn't intercepted a lot of calls

24   dealing with drugs.  We believed we may find a small amount

25   of drugs; we were not expecting a large quantity.

Direct - Mohlman

1    Q.    And why was that?

2    A.    There again, from our intercepted calls, lack of drug

3    deals, and -- at the time, the sources of supply that we

4    knew of had either -- there were some problems with the

5    normal sources of supply that we knew, and also the fact

6    that he was planning to move out of state and made the

7    comment on -- that he was shutting down his operations in

8    Colorado.

9    Q.    And take you to May 23d of 2014.  Did, in fact, that

10   search warrant get executed?

11   A.    It did.

12   Q.    And were you part of the team that went and executed

13   and searched the residence and so forth?

14   A.    Correct, yes.

15   Q.    And approximately what time of the day did -- was that

16   search warrant executed?

17   A.    6:00 a.m.

18   Q.    And why do you -- why did you do it so early?

19   A.    Federal search warrants, we typically serve them

20   during daylight hours, 6:00 a.m. being approximately

21   daylight, and that's the earliest that we can serve it.

22   It's a common time.  We try to keep -- catch people while

23   they're hopefully sleeping so that there's no surprises for

24   the SWAT officers or whoever's executing the warrant.

25   Q.    And on May 23d of 2014, if you could, please describe

Direct - Mohlman

1    to the jury what you found at 1250 South Monaco Parkway,

2    Unit 61.  What was the house -- how it was designed and so

3    forth?

4    A.   It was, I believe, part of a four-plex.  It would -- I

5    would describe it as a condo, single level.  You walk

6    thorough the front door and there's a living room.  Off to

7    the left a very small apartment-sized kitchen.  There was a

8    washer and dryer right by the kitchen.  And then from the

9    living room, you can walk straight back into a single

10   bedroom, and then on either side of that, there was a small

11   bathroom.  And then there was -- if you go in the front

12   door and off to the right, there was a small, very small

13   set of stairs that led down to a basement bedroom.

14        It was -- it appeared to be a nonconforming

15   bedroom.  The staircase was very small; almost like a

16   cellar, but there was a window down there and a closet and

17   a single bed, mattress, down there in that basement.

18   Q.   And when this search warrant was executed, who was

19   located in the home?

20   A.   Ricky Garrison and Heather Quintanilla.

21   Q.   And where were they located?

22   A.   They were located in that basement area.

23        MR. PHILLIPS:  I'd ask to publish Government

24   Exhibit No. 83, please.  It's been stipulated to.

25        THE COURT:  One second.  Is it in already?

Direct - Mohlman

1          COURTROOM DEPUTY:  Yes.  With the group 71 through
2     98.
3          THE COURT:  Oh, that's right.  So it's in your
4     group --
5          MR. PHILLIPS:  Yes.
6          THE COURT:  It's already in evidence.
7          MR. PHILLIPS:  Yes.
8          THE COURT:  All right.  You can go ahead and
9     publish it.
10         MR. PHILLIPS:  Thank you.
11         If you would go ahead and publish 83.
12    BY MR. PHILLIPS:
13    Q.   If you would, please describe to the jury what they're
14    looking at there.
15    A.   This was the kitchen counter inside of the residence.
16    And depicted in the photograph there's a wood box here with
17    a bunch of gift cards, and then just miscellaneous mail and
18    things.  There's a couple pieces of mail that are kind of
19    separated out here.  That one is, I believe, addressed to
20    Shawna Waterson; the other one, Ricky Garrison at the 10340
21    East 13th Avenue address.
22         MR. PHILLIPS:  And if you would, please publish
23    stipulated exhibit -- Government Exhibit 84.  And could you
24    highlight the address for each of those two, one at a time,
25    please.

785

Direct - Mohlman

1    BY MR. PHILLIPS:

2    Q.    Now you mentioned mail that you found on the kitchen

3    counter.  Just to be clear, that was upstairs?

4    A.    It was.

5    Q.    Okay.  And why was this of particular interest to

6    you?

7    A.    Because it showed indicia as to who was staying at the

8    residence, and it was mail for Ricky Garrison.

9    Q.    And is that address Ricky Garrison's previous

10   address?

11   A.    Yes.

12   Q.    And if you would, please, highlight where that mail

13   came from.

14         And to chase, as this morning progressed,

15   eventually become of interest to you?

16   A.    Yes.

17   Q.    Thank you.  And you'd mentioned the other person,

18   Shawna Waterson.  I'm not sure her name came up at all.

19   Who was Shawna Waterson?

20   A.    Shawna Waterson was the female girlfriend of Ricky

21   Garrison.  She owned the home at 10340 East 13th Avenue.

22   She lived there.  I believe she had, I believe, just one

23   young son.  And Ricky Garrison lived with her for, I think

24   several -- several years.

25         MR. PHILLIPS:  Now, I'd ask to please publish

Direct - Mohlman

1    stipulated exhibit Government Exhibit 82.

2    BY MR. PHILLIPS

3    Q.    Now, you mentioned the staircase.  If you would,

4    please describe to the jury what they're looking at there.

5    A.    This is, as I said before, the very small staircase

6    that is almost like a cellar, but it led down to that --

7    that basement room.  Very tight quarters.

8             MR. PHILLIPS:  And ask to publish stipulated

9    Exhibit No. 92.

10   BY MR. PHILLIPS:

11   Q.    If you would describe to the jury what they're looking

12   at there.

13   A.    This was a box that was found inside the closet in the

14   basement.  And the box contains some things that were of

15   interest to us.  I would describe them as drug

16   paraphernalia items used in the preparation and

17   distribution of drugs.

18             MR. PHILLIPS:  And please publish stipulated

19   Exhibit 93.

20   BY MR. PHILLIPS:

21   Q.    And if you could describe to the jury what they're

22   looking at there.

23   A.    These are just items that were contained within the

24   box.  These are items that they were taken out of the box

25   and set out so that each -- each item could be photographed

Direct - Mohlman

1    and seen.

2    Q.    And specifically what is this item?

3    A.    That is a bottle labeled Inositol Powder.

4    Q.    And we've heard that described some, but what is your

5    knowledge as far as one of the uses of inositol?

6    A.    Actually, I don't know what its legitimate use is for,

7    but I know it as a cocaine cutting agent; not only in this

8    investigation, I've seen it in several other

9    investigations.  It's a common cutting agent for cocaine.

10   Q.    And what about these two items?

11   A.    Digital scales, which are commonly used to weigh

12   drugs.

13            MR. PHILLIPS:  Ask to please publish Government

14   Exhibit 89, which has been stipulated to.

15   BY MR. PHILLIPS:

16   Q.    If you could, describe to the jurors what they're

17   looking at there.

18   A.    This was another box that was inside the closet and

19   there's some speakers and stereo equipment inside there,

20   but I'm not sure if you can see it in the photograph, but

21   another firearm was located inside of this box.

22   Q.    And where was this box located, to be certain?

23   A.    Inside the closet in the basement area of the house on

24   Monaco.

25   Q.    And is that the area where Mr. Garrison was contacted

788

Direct - Mohlman

1   at the search warrant?

2   A.   Yes.

3        MR. PHILLIPS:   Please publish stipulated

4   exhibit Government Exhibit 90.

5   BY MR. PHILLIPS:

6   Q.   If you would, describe to the jurors what they're

7   looking at there.

8   A.   This is a photograph of the firearm that was located

9   in that box with the stereo equipment.   One of the

10  investigators is holding it.

11       MR. PHILLIPS:   And please publish Government

12  Exhibit 91.

13  BY MR. PHILLIPS:

14  Q.   And what are the jurors looking at there?

15  A.   Another photograph of that same firearm.   Here the

16  investigator is just showing that the firearm was loaded

17  with a magazine and live ammunition.

18       MR. PHILLIPS:   And if you would, please, publish

19  stipulated exhibit Government Exhibit 94.

20  BY MR. PHILLIPS:

21  Q.   If you would, describe to the jurors what they're

22  looking at there.

23  A.   It's a black plastic case.   Could be used for a lot of

24  purposes, but, I mean, this one's actually labeled as

25  Single Pistol Case, so it's a pistol case.

789
Direct - Mohlman

1    Q.    And just to be clear, that doesn't go to any specific

2    type firearm, it's a general?

3    A.    Yes.  Yes.  Just very general case.

4    Q.    And where was that located?

5    A.    It was also located inside of the closet at 1250, in

6    the basement at 1250 South Monaco.

7              MR. PHILLIPS:  Please publish Government

8    Exhibit 95.

9    BY MR. PHILLIPS:

10   Q.    And what are the jurors looking at there?

11   A.    Upon opening the case, we found four firearm

12   magazines.  They were found to fit the branded 9-millimeter

13   pistol that you previously saw.  And two of the magazines

14   are loaded with ammunition.

15   Q.    Now, let's talk about the bed area where Mr. Garrison

16   was located when the search warrant was executed.  What was

17   found in the nightstand that was of importance to you?

18   A.    There was a wallet inside of the nightstand that had

19   either a Colorado identification card, it was a government

20   ID card, Colorado identification card or driver license for

21   Ricky Garrison.

22             MR. PHILLIPS:  And please publish Government

23   Exhibit No. 88.

24   BY MR. PHILLIPS:

25   Q.    And do you recognize the person depicted in that

790
Direct - Mohlman

1    photograph?

2    A.    I do.

3    Q.    And who is that?

4    A.    It's the defendant, Ricky Garrison.

5    Q.    And if you would, please highlight the -- or expand

6    the name.

7         And was there anything else -- thank you -- that

8    was located in the drawer next to the bed that was

9    important to you?

10   A.    Yes.  More -- another item of indicia, there was an

11   orange pill bottle, prescription bottle, with the typed out

12   name of Ricky Garrison.

13   Q.    And was that next to the bed in the basement?

14   A.    Yes.

15   Q.    Now, when you do a search like this, how thorough do

16   officers search?

17   A.    We try to be very, very thorough.  We typically don't

18   tear out drywall and that type of thing unless we have some

19   indication that things are being that well hidden, but we

20   fairly -- very thoroughly search through all clothing

21   items, bedding, boxes, everything inside of a residence.

22   Cupboards, cabinets in the kitchen and bathroom.  We'll

23   open bottles, food boxes, looking for drugs and other

24   evidence.

25   Q.    And you mentioned bedding.  In this particular case in

Direct - Mohlman

1    the basement, did you search through the bed in the

2    basement?

3    A.    Yes.

4    Q.    And specifically between the box spring and the

5    mattress?

6    A.    Yes.

7            MR. PHILLIPS:   Please publish Government

8    Exhibit 85, which has been stipulated to.

9    BY MR. PHILLIPS:

10   Q.    If you would, describe to the jurors what they're

11   looking at there and where that is --

12   A.    This is, again, the basement bedroom at 1250 South

13   Monaco.   There was a simple mattress and box spring

14   elevated in that room, and in it between the mattress and

15   box spring was this Ruger revolver firearm.

16           MR. PHILLIPS:   And please publish Government

17   Exhibit No. 86.

18   BY MR. PHILLIPS:

19   Q.    And is that just more of a close-up to that firearm?

20   A.    Correct.

21           MR. PHILLIPS:   And please publish Government

22   Exhibit No. 87.

23   BY MR. PHILLIPS:

24   Q.    And what does that photograph tell you about that

25   firearm?

Direct - Mohlman

1    A.   It's depicting that it's loaded, and I actually

2    believe it had been fired.  That one round is -- you can

3    see the primer has been dented, the -- kind of silver

4    round, it appears the primer's been dented so that round

5    was probably fired.

6    Q.   And is this the round you're talking about right

7    there?

8    A.   That is.

9    Q.   And you mentioned a prescription pill bottle earlier.

10   Is that the pill bottle that you're referring to?

11   A.   That's the one.

12        MR. PHILLIPS:   I'd ask to please publish

13   Government Exhibit No. 97.

14   BY MR. PHILLIPS:

15   Q.   If you would, describe to the jurors why this

16   photograph -- or this particular phone was important to

17   you.

18   A.   I believe this phone was found -- as you're walking

19   down the basement, there was a ledge there.  And I believe

20   this phone was on the -- on the ledge.  And when we pulled

21   up the associated telephone number for the phone, this was,

22   in fact -- where it says mobile device number, this was, in

23   fact, the target telephone 13 that we were intercepting.

24   Q.   And who was the user of target telephone 13?

25   A.   Ricky Garrison and occasionally Heather Quintanilla.

793

Direct - Mohlman

1    MR. PHILLIPS:  And please publish Government

2  Exhibit No. 96.

3  BY MR. PHILLIPS:

4  Q.   And that's a birth certificate.  Who's that go to?

5  A.   Ricky Garrison.

6  Q.   Thank you.  Now, I believe that you have some actual

7  physical elements -- or physical pieces of evidence that

8  you brought here today; is that correct?

9  A.   I do.

10  Q.   If you could, could you retrieve those items or make

11  themself available to you, or do you have them up there

12  with you?

13  A.   Yes.

14  Q.   Okay.  Thank you.  And if you could, please retrieve

15  Government Exhibit No. 73.  And share that with the jury or

16  show the jury what that is and why that was important to

17  you.

18  A.   These were -- as was depicted in one of the photos,

19  these were the two bags of gel tabs that were located

20  inside the box in the basement.  When I say gel tabs,

21  they're capsules that can be filled.

22  Q.   And -- but those particular ones are empty?

23  A.   They are.

24  Q.   And if you could, please show the -- or the jurors

25  Government Exhibit 74.  Yes.

Direct - Mohlman

1    A.   74 is a partial bottle.  It contains a white powder

2    and the bottle is labeled Inositol Powder.

3    Q.   And, again, why was that important to you as an

4    investigator?

5    A.   It was important because this is a commonly known

6    cocaine drug cut.

7    Q.   And where was it -- what else was it located with when

8    you were doing the search?

9    A.   There was another bottle inside of the box of C1000

10   powder, and there were also two digital scales inside that

11   box as well.

12   Q.   And if you would retrieve Government Exhibit 75.

13           Now you mentioned that you were familiar with

14   inositol.  Are you familiar with that particular product?

15   A.   I am not.  I don't know -- I wasn't familiar with the

16   C1000 powder.

17   Q.   And how does it appear?

18   A.   It appears similar to the inositol, kind of a white

19   powder.  This one has more of a crystal consistency to it,

20   but it's similar, in appearance, at least, to inositol.

21   There again, I don't know what its legitimate use is for.

22   Q.   And if you would retrieve and explain to the jury what

23   Government Exhibit 76 is.

24   A.   This is one of the digital scales that was found

25   inside the box.  It's silver in color and it just has a

Direct - Mohlman

1    flip-open top and it's just a small scale.

2    Q.   And in your training and experience, why is that of

3    importance to you?

4    A.   Because these -- these types of scales are commonly

5    used to weigh drug amounts for distribution.

6    Q.   And --

7    A.   And --

8    Q.   What --

9    A.   Sorry.  Go ahead.

10   Q.   How much weight does those -- or are you able to tell

11   that?

12   A.   I don't know how far this one would read to.  I don't

13   know if it's multiple ounces or not.  But typically, this

14   being a smaller scale, it would obviously be used to weigh

15   smaller amounts of drugs, I would think.  I would be

16   comfortable with one ounce or less if I were weighing drugs

17   on this.

18   Q.   And Government Exhibit 77?

19   A.   Another digital scale.  This one's black.  There

20   again, flip-open top case and digital readout.  The scale's

21   a little bit larger, but similar to the other scale that

22   was seized.

23         MR. PHILLIPS:  One moment.

24   BY MR. PHILLIPS:

25   Q.   And did you have anything to -- did you request, as a

Direct - Mohlman

1   police officer, anything be done with those scales?

2   A.   Yes.  I'm probably actually getting it all over my

3   fingers.  I requested that they be examined for

4   fingerprints and also drug residue.

5   Q.   And any success in that?

6   A.   None on either -- on either case.

7   Q.   Ask you to retrieve Government Exhibit No. 78.

8   A.   78 I don't have.

9   Q.   It's probably in the book.  I'm sorry, I probably

10  threw you off.  The original would be in the book.

11            MR. PHILLIPS:  And at the same time, we would ask

12  to publish stipulated Exhibit 78.

13            THE WITNESS:  Okay.

14  BY MR. PHILLIPS:

15  Q.   If you would, describe to the jury where you found

16  that.

17  A.   Ricky Garrison had a wallet on his person when he was

18  brought outside to where I was at, and I retrieved this

19  from him.

20  Q.   Now, you -- there was a wallet found in the dresser

21  with the ID.  Was -- was this a second wallet?

22  A.   Yes.

23  Q.   Okay.  And if you would, describe to the jury why that

24  was important to you.

25  A.   Well, this is a bank account card in his possession,

797

Direct - Mohlman

1    and so I believed that to be -- to be important for the

2    investigation.  It's a, you know, checking -- a checking

3    account number and routing number, a card commonly used for

4    those -- those things.

5    Q.    And fair to say that checking account number ended in

6    8860?

7    A.    Yes.

8          MR. PHILLIPS:  Ask to please publish stipulated

9    Exhibit No. 79.

10   BY MR. PHILLIPS:

11   Q.    And that's kind of hard to read; however, are you able

12   to find where the account number, at least the account

13   number ending in, is in that exhibit?

14   A.    I can't on the screen, but I -- with the physical

15   piece of evidence here, I can read that.

16   Q.    Okay.  And if you would, maybe highlight on the screen

17   where it's located and then inform the jury what the

18   physical item reads.

19   A.    This right here says account number, and then 8860 is

20   right here.

21   Q.    And they will be able to have that real exhibit in the

22   back to look at it.

23   A.    Okay.

24   Q.    Okay.  They will.

25         MR. PHILLIPS:  In that, if you could bring it back

798

Direct - Mohlman

1    up, please.

2    BY MR. PHILLIPS:

3    Q.    Since you have the original up there that you can read

4    a bit better than the copy, if you could, inform the jury

5    as to what, if anything, that was important to you on that

6    piece of paper or on that deposit slip.

7    A.    The search warrant was on May 23d.  This receipt is

8    dated May 8th, which was fairly recent to our search

9    warrant.  It showed a cash deposit of $4,000 into checking

10   account ending in 8860, and which led to a balance of

11   $6,788.

12   Q.    Thank you.

13         MR. PHILLIPS:  And if you would, please publish

14   Government Exhibit 80.

15   BY MR. PHILLIPS:

16   Q.    And, again, do you have the original to 80 up there in

17   the book?

18   A.    Yes.

19   Q.    And even with my old eyes, this is -- you can read a

20   little bit better than you can the other.

21   A.    I can.  On the screen I can read this one.

22   Q.    And if you would point out to the jury what was of

23   importance to you on that.

24   A.    There again, the transaction date of 5-13-2014, 10

25   days prior to the execution of the search warrants, looking

Direct - Mohlman

1    at account number ending in 8860, and then, again, a cash

2    deposit, this time $500, leading to a balance in the

3    checking account of $6,646.

4    Q.   And those two slips are almost identical, other than

5    the amount of money, correct?

6    A.   Yes.  I think the one is -- is an actual deposit slip

7    and then the other one shows the balance.

8    Q.   Okay.

9         MR. PHILLIPS:  And please publish Government

10   Exhibit No. 81.

11        THE WITNESS:  Okay.

12   BY MR. PHILLIPS:

13   Q.   And, again, describe to the jurors what was important

14   about these items.

15   A.   There again, another deposit slip dated May 15th,

16   2014, and the deposit is to account number 8860, cash

17   deposit of $1,000, leading to a balance of $7,344.

18   Q.   Now, where did you find these last three items, 79,

19   80, and 81, on that particular day and search?

20   A.   They were inside of the wallet that Mr. Garrison had

21   with him.

22   Q.   Now, I kind of want to jump back to Government Exhibit

23   No. 89, if you would, please.  Now, looking at the screen

24   in Government No. 89, if you would please refresh the

25   jurors as to why that box was important to you and where it

Direct - Mohlman

1    was located.

2    A.    This box was located inside the basement closet at

3    1250 South Monaco and inside that box was the 9-millimeter

4    handgun Beretta.

5    Q.    And going back to Government Exhibit No. 109, which

6    was the conversation on May 20th of 2014 between Ricky

7    Garrison and an unknown male, do you recall that phone call

8    that was placed just a few minutes ago?

9    A.    Yes.

10   Q.    And in that phone call, do you remember it's the

11   unknown male stating, No, the black one was in -- what's it

12   called?  No, it's still in the box?

13   A.    Yes.

14   Q.    And downstairs?

15   A.    Yes.

16   Q.    Yeah -- and then the unknown male says, Yeah, yeah, I

17   took it back down there motherfucker, it's right, right,

18   where you put it in -- or put it.  I'm sorry.

19   A.    Yes.

20   Q.    Now, during of the course of your investigation

21   from -- starting in early June of 2013 but going

22   particularly from June of 2013 through June of 2014, or at

23   least up to this particular day on May 23d of 2014, you'd

24   followed Ricky Garrison a bunch?

25   A.    Yes.

801

Direct - Mohlman

1    Q.    Other members and surveillance had as well?

2    A.    Yes.

3    Q.    And during that time, did you ever see him going to a

4    regular job or to employment or anything of that nature?

5    A.    No.

6    Q.    I'd ask you to please retrieve Government Exhibit

7    No. 70.   And do you recognize that item?

8          COURTROOM DEPUTY:   Mr. Phillips, do you have that

9    as admitted?

10         MR. PHILLIPS:   It's stipulated to, 70 and 71.

11         COURTROOM DEPUTY:   I missed that.

12         THE COURT:   I don't show it either.   Do you, Deb?

13         COURTROOM DEPUTY:   I don't show it to 70.

14         THE COURT:   You started at 71 with 26 exhibits.

15         MR. PHILLIPS:   I apologize.   And it's my

16   understanding that there's a stipulation to 70 and 71 and,

17   as such we would move to admit both of those.

18         THE COURT:   71 is in.   There's a stipulation to

19   70?

20         MR. LEONARD:   There is, Your Honor.

21         THE COURT:   Given the stipulation, Exhibit 70 is

22   admitted into evidence and may be published to the jury.

23      (Government's Exhibit 70 received)

24         MR. PHILLIPS:   Thank you, Ms. Hansen.

25   BY MR. PHILLIPS:

Direct - Mohlman

1    Q.   If you would describe to the jurors what that is you

2    have right there.

3    A.   This is the Ruger revolver that was found in the

4    basement between the mattress and bed -- box spring at 1250

5    South Monaco.

6    Q.   And if you're able to, please hold it up and allow

7    them to observe it.  Thank you.

8         And if you would, please retrieve Government

9    Exhibit 71.

10   A.   Sorry, did you say 71?

11   Q.   Yeah, did I throw you off --

12   A.   No, no, I just --

13   Q.   I did, 71.  And what is that?

14   A.   This is the Beretta 9-millimeter that was located in

15   the basement closet at 1250 South Monaco.

16   Q.   If you would, please, do like you just did and allow

17   the jurors to see it.

18        MR. PHILLIPS:  And, Your Honor, if I may have one

19   moment.

20        THE COURT:  You may.

21        MR. PHILLIPS:  Actually, I guess I don't need it.

22   Thank you.  No further questions.

23        THE COURT:  All right.  Cross-examination.

24        MR. LEONARD:  Can I have one second with Mr.

25   Phillips?

Direct - Mohlman

1          May we approach, Your Honor?

2              THE COURT:   Sure.

3          (Discussion at side bar)

4              MR. LEONARD:   So I wanted to front this issue with

5      Mr. Phillips so we don't get into a problem.   I intend to

6      ask the officer if they found any drugs at the Monaco

7      apartment, and my understanding is that Mr. Phillips, on

8      redirect then would ask him if they found anything that was

9      used on that test, the residue, which was subject to that

10     motion *in limine*.

11         And my understanding is the Court previously

12     reluctantly on the motion *in limine* and the Government had

13     conceded that in the motion *in limine* so it wouldn't be

14     proper on redirect for them to even get into it.   That was

15     the point of filing the motion *in limine*.

16             THE COURT:   Okay.

17             MR. PHILLIPS:   What my understanding was is it's

18     incorrect, we didn't have any drugs to present in court

19     because what we're talking about is one of the scales that

20     was located in the home had drug residue on it, then the

21     testing of the residue used up all the drugs so we weren't

22     going to be able to present any drugs at trial.

23             THE COURT:   Okay.   And --

24             MR. LEONARD:   And I filed a specific motion *in*

25     *limine* on that and asked that it be excluded for the

Direct - Mohlman

1    reasons stated in the motion.

2         THE COURT:   That what be excluded?

3         MR. LEONARD:   Any evidence of the drug residue

4    that was used up.   And not only that, it would have to come

5    in under 702 testimony because it's a test, and 702 has

6    been excluded.

7         MR. PHILLIPS:   Your Honor, I don't believe it is

8    in the sense of asking the officer, Hey, did you find any

9    drugs there, and have the officer say, No, when, in fact,

10   the truth is drugs were found there, but they were used up

11   in the testing.

12        I mean, if he asks the officer if they found any

13   drugs, the truthful answer is yes.

14        THE COURT:   Yeah, so why do you want to ask that?

15        MR. LEONARD:   Well, there's -- I don't believe

16   there were any drugs found there.

17        THE COURT:   But the answer is there were.

18        MR. LEONARD:   But that's subject to a motion -- I

19   mean, I understand that, but the -- that's why the Court

20   has 702 rulings in place --

21        THE COURT:   Right, but if -- the motion *in limine*

22   ruling's in place, but if you -- if you open a door and go

23   down a route that it calls the whole predicate of the

24   ruling into question, then, you know, it's not like I can't

25   reconsider prior rulings.   I don't understand why you want

Direct - Mohlman

1    to ask a question that you know the truthful answer is yes,

2    there were.

3            MR. LEONARD:  And I honestly, to be fair, there

4    was -- I couldn't ask for a retest on the substance because

5    there wasn't enough.  So I don't -- I don't know, you know.

6    I would have.  I certainly considered it.  That's what you

7    consider in any kind of test.

8            THE COURT:  What if -- if everybody agrees, we

9    could do the following:  What if Mr. Leonard asks were

10   there any drugs found in the apartment other than in the

11   residue on the scale?

12           MR. PHILLIPS:  I'm fine with that.  I think

13   that -- I think he can truthfully answer that.

14           THE COURT:  And he will say no.

15           MR. PHILLIPS:  Right.  He will say no to that.

16           THE COURT:  Are you okay with that?

17           MR. LEONARD:  If that's the Court's ruling,

18   that's --

19           THE COURT:  I think that's the best way to cut

20   this cord --

21           MR. LEONARD:  That's fine.

22           THE COURT:  -- because otherwise we will be

23   chasing our tail here.  All right.  Okay.  Let's do that.

24       (End of discussion at side bar)

25           THE COURT:  All right.  Cross-examination.

Cross - Mohlman

1        MR. LEONARD:  Thank you, Your Honor.

2                    CROSS-EXAMINATION

3    BY MR. LEONARD:

4    Q.   Investigator, how are you?

5    A.   I'm good.  How are you?

6    Q.   I'm good.  Thank you.  I should say "well."  I hear my

7    English teacher.

8         You attended all the proffers, which -- I call

9    them proffers, but the interviews of all the testifying

10   codefendants you attended; isn't that correct?

11   A.   The majority, if not all.

12   Q.   All right.  And you've reviewed those interview notes

13   and you're aware of the evidence associated with those

14   interviews, correct?

15   A.   To be honest -- yeah, I wrote most of the reports.  I

16   remembered elements of them, but I haven't reviewed them

17   recently.

18   Q.   All right.  Let's just focus on -- I'm not really

19   going to get into what was contained in them so much as I

20   want to focus on the interview sessions you attended.  Did

21   you place a recording device down to record what was being

22   said?

23   A.   No.

24   Q.   Did you have a video camera going to record what was

25   being said?

Cross - Mohlman

1   A.   No.

2   Q.   We're fortunate we have a court reporter that takes

3   down everything we say.  Did you have a court reporter in

4   that interview room taking down everything that was said?

5   A.   No.

6   Q.   And my understanding is that the way that you generate

7   a report from an interview with a cooperating witness who's

8   seeking a deal is to write those notes by hand and then

9   type them up; is that correct?

10   A.   Correct.  Nor -- yeah, in a proper interview normally

11   I'm taking handwritten notes, or the agent -- because of

12   where we do them, when people are in custody there's

13   usually two agents, so one agent might take the notes

14   and -- but, yes, there's usually someone taking notes,

15   whether it's myself or my partner.

16   Q.   So the notes are taken generally the day of the

17   interview, correct?

18   A.   Correct.

19   Q.   And then usually the typed-up report isn't done until

20   a day or two later, correct?

21   A.   I try to get them done within the next day or two.  I

22   don't let them sit for very long.

23   Q.   And then the notes are destroyed?

24   A.   Yes.

25   Q.   And so the notes don't get turned over to the defense,

1    correct?

2    A.    Correct.

3    Q.    Now, you had indicated to the Assistant United States

4    Attorney that you're the case agent; that's correct?

5    A.    One of them, yes.

6    Q.    But to be fair, and I'm not trying to cast any

7    aspersions on Special Agent Gullicksrud, you're the main

8    case agent; isn't that correct?

9          THE COURT:   Take the compliment when it's given to

10   you.

11         THE WITNESS:   Yes.

12   BY MR. LEONARD:

13   Q.    All right.

14         MR. PHILLIPS:    Would you like a copy of that

15   transcript?

16         THE WITNESS:   Yes.

17         MR. LEONARD:   I think I touched on an inside joke,

18   Your Honor, and I was not aware of that.

19   BY MR. LEONARD:

20   Q.    So, all right.   You reviewed, then, almost all the

21   discovery in this case, correct?

22   A.    Correct.

23   Q.    And as you just showed, you're the person who takes

24   care of the evidence, correct?

25   A.    Yes.

Cross - Mohlman

1    Q.   And you would agree with me that there are over 48,000

2    intercepted calls in this case, correct?  Roughly?

3    A.   Yes -- roughly, yes.

4    Q.   Give or take a hundred?

5    A.   Yes.

6    Q.   You said you had three stationary pole cams; is that

7    right?

8    A.   At least three, yes.

9    Q.   There were hundreds, if not thousands, of hours of

10   recording and surveillance; isn't that correct?

11   A.   Correct.

12   Q.   And then in addition to your video surveillance, you

13   had physical surveillance, which you described in detail,

14   correct?

15   A.   Yes.

16   Q.   And you had multiple officers that you could draw upon

17   to conduct physical surveillance, right?

18   A.   Correct.

19   Q.   And I think you also indicated you have the ability to

20   reach out and contact officers in other locales, correct?

21   A.   Correct.

22   Q.   And Count 1 of the -- this is the conspiracy, runs 368

23   days; isn't that right?

24   A.   Correct.

25   Q.   Now, you talked a little bit about some of the

Cross - Mohlman

1    backpage ads and what you did with those.  I have gone

2    through the exhibits and the pictures, and there's a lot of

3    pictures here.  I didn't see a picture of Mr. Garrison and

4    Ms. Quintanilla in a vehicle together in Oklahoma.  Did

5    you?

6    A.    Not in those ads.

7    Q.    Well, not just the ads, but -- I'll get to that, thank

8    you.  I mean, there's no picture of them in a vehicle

9    together in Oklahoma, correct?

10   A.    Not that I have.

11   Q.    All right.  Certainly you would have admitted that

12   into evidence if you had it, wouldn't you?

13   A.    Most likely.

14   Q.    Now, you talked about the backpage ads, and I will

15   touch on the obvious:  I didn't see Mr. Garrison's picture

16   in those backpage ads, did you?

17   A.    Correct.

18   Q.    I'm going to ask you, this is a fairly wide

19   question -- this is to avoid me going through all the

20   counts with you, all right -- but between the periods of

21   June 2013 and up to May 22d, 2014, you didn't arrest Mr.

22   Garrison, correct?

23   A.    That's correct.

24   Q.    And no one from your investigative team arrested Mr.

25   Garrison, correct?

Cross - Mohlman

1    A.    Correct.

2    Q.    No drugs during that time period were seized from Mr.

3    Garrison; isn't that correct?

4    A.    Now -- potentially -- but none that have been

5    presented here.

6    Q.    There's none in evidence, correct?

7    A.    Correct.

8    Q.    All right.  I want to move on now to Count 48.  You --

9    the Government alleges that Count 48 occurred on May 23d,

10   2014, correct?

11   A.    I'm -- can you repeat the question, please?

12   Q.    Sure.  Did I speak too quickly?

13   A.    No.

14   Q.    The Government alleges that Count 48 occurred on May

15   23d, 2014, correct?

16   A.    Is that the -- which count is that, more specifically?

17   Q.    That's Count 48.  That's the gun charge.

18   A.    Okay.  Yes.

19   Q.    And that's the day you served the search warrant,

20   correct?

21   A.    Correct.

22   Q.    You remember that day, don't you?

23   A.    I do.

24   Q.    It was served early in the morning, correct?

25   A.    Correct.

Cross - Mohlman

1    Q.   6:00 in the morning, to be exact, right?

2    A.   Yes.

3    Q.   That's the day you arrested Mr. Garrison, correct?

4    A.   Correct.

5    Q.   And he didn't have a firearm -- I use the term "on his

6    person"; do you understand what I mean by that?

7    A.   I do.

8    Q.   All right.  Did he have a firearm on his person?

9    A.   Not that I'm aware of.

10   Q.   All right.  That would be a pretty important fact,

11   wouldn't it?

12   A.   Yes.  Yes.  But keep in mind, I wasn't the one who

13   kicks down the door or whatever.

14   Q.   Well, sure, I understand, you're the case agent, so

15   they would report back to you that important fact, wouldn't

16   they?

17   A.   That would be important to me.

18   Q.   The members of your team certainly would not keep the

19   lead case agent out of the loop on that important fact,

20   would they?

21   A.   I would hope not.

22   Q.   Right.  That would be bad protocol to say the least,

23   correct?

24   A.   I would think so, yes.

25   Q.   All right.  The Beretta that you talked about, that's

813
Cross - Mohlman

1   the 9-millimeter there, you found that in a box, correct?

2   A.   Correct.

3   Q.   And the picture shows that box outside of the closet,

4   right?

5   A.   Right.

6   Q.   And you had to move that box outside of the closet so

7   there was sufficient light to take the picture, right?

8   A.   Potentially.  I'm not the one who pulled the box out

9   of the closet, but I'm not speculating why they pulled the

10  box out; I just know that the box was inside of the

11  closet.

12  Q.   All right.  So the picture doesn't really represent

13  where the box was, right?

14  A.   I don't believe so, no.

15  Q.   The closet picture appears to have a door on it,

16  right?

17  A.   Yes, I believe it had a door.

18  Q.   So somebody had to open the door to retrieve the box,

19  correct?

20  A.   I do not know if the door was already open or someone

21  opened it.

22  Q.   You requested a -- lab reports on the -- both guns,

23  right?

24  A.   Correct.

25  Q.   You asked for fingerprints, right?

Cross - Mohlman

1    A.    Yes.

2    Q.    And DNA, correct?

3    A.    Correct.

4    Q.    There were other people living at the Monaco address,

5    correct?

6    A.    There were.

7    Q.    And the -- specifically Alexander Romero lived there,

8    correct?

9    A.    Yes.

10   Q.    And then Antonio Stevenson lived there, correct?

11   A.    Yes, I believe those were the two other parties.

12   Q.    Their items, I think you used the term "indicia," but

13   the things that would make you suggest they lived there

14   were found upstairs, correct?

15   A.    Correct.

16   Q.    The main part of the apartment?

17   A.    Yes.

18   Q.    And it would be your understanding that it was one of

19   their apartments, right?

20   A.    Yes.  Yes.

21   Q.    I mean, they're the ones who paid for it, they're the

22   ones who probably are on the lease, et cetera?

23   A.    Well, probably prior to the search warrant, yes, I had

24   believed that to be true; that it was Mr. Stevenson's and

25   Ms. Romero's apartment and that Ricky was staying there.

Cross - Mohlman

1    Q.   Okay.  That's what I'm getting -- I wasn't trying to

2    be deceitful.  It really wasn't Mr. Garrison's apartment

3    that he was renting or paying for, correct?

4    A.   I don't know what agreement they had, but, you know, I

5    don't know if there was any subleasing going on, but he was

6    staying there.

7    Q.   All right.  You -- did you seize vehicles during this

8    search warrant?

9    A.   Yes, definitely the -- well, that day I saw both

10   vehicles at the search warrant.  I saw the blue or silver

11   Porsche Cayenne, and then later on in the day at another

12   location, I saw the silver Impala.

13   Q.   I think you maybe misunderstood.  Did you "seize"

14   them?  I probably didn't --

15   A.   Oh, I thought you said "see."

16   Q.   I would get in trouble for that.  Did you seize any

17   vehicles on the day of the search warrant?

18   A.   Yes, sir, we seized the blue Porsche Cayenne.

19   Q.   All right.  And you were the one who filled out the

20   application for a search warrant, correct?

21   A.   I did.

22   Q.   Okay.  That's a -- just so the jury understands, the

23   application's a fairly lengthy document, correct?

24   A.   At times.

25   Q.   It's not a page, for instance, usually.

Cross - Mohlman

1    A.    Usually not.

2    Q.    And during that search warrant application, you

3    indicated that you observed Ms. Quintanilla driving the

4    Impala, correct?

5    A.    I don't recall that specific detail in the

6    application.  Is there an associated date or other details

7    you can give me?

8    Q.    Well, the date of the application or the date that the

9    alleged driving took place?  What are you referring to?

10   A.    The date of the alleged driving.

11   Q.    I need to retrieve the search warrant and take a look

12   at it, so let me . . .

13             MR. LEONARD:  I am not moving to admit the search

14   warrant into evidence, Your Honor, but I would like to

15   refresh the witness' recollection, or I can simply give him

16   the date.  It's -- I don't want to draw --

17             THE COURT:  Why don't you ask Mr. Phillips if he

18   will stipulate to the date and then we can . . .

19             MR. LEONARD:  All right.

20   BY MR. LEONARD:

21   Q.    So there's been a stipulation that the date was

22   May 20th, 2014.  Does that help refresh your

23   recollection?

24   A.    And the -- I mean, as far as, you know, Ms.

25   Quintanilla driving the car, it's very possible; it just

Cross - Mohlman

1    doesn't -- I can't recall it off the top of my head, you --

2    but certainly if it's in the affidavit, that's what

3    happened.

4    Q.    All right.  So you don't -- you don't doubt my

5    representation to you that that's what you wrote, you saw

6    Ms. Quintanilla driving the vehicle?

7    A.    Right.

8    Q.    And the Impala, correct?

9    A.    Sure.

10   Q.    All right.

11         THE COURT:  Just so we're clear, Mr. Leonard,

12   we're talking about the affidavit prepared by this witness

13   for a search warrant for the -- for the search of the 1250

14   South Monaco --

15         MR. LEONARD:  That's correct, Your Honor.

16         THE COURT:  -- premises?  Okay.

17   BY MR. LEONARD:

18   Q.    Now, you made some statements about not wanting to

19   blow your investigation.  Do you recall those statements?

20   A.    Yes, or burn it down.

21   Q.    Something along the lines of that.

22   A.    Right.

23   Q.    And that's -- you've represented that that -- the

24   reason that you didn't arrest Mr. Garrison earlier was that

25   you didn't want, to use your phrase, to burn down the

818

Cross - Mohlman

1   investigation, correct?

2   A.   Compromise.

3   Q.   Yeah, compromise, whatever.  In some way cause a

4   problem with it, right?

5   A.   Right.

6   Q.   Now, there had been a lot of talk -- and you talked

7   about the March 26th intercept, I guess, of a radio

8   transmission you made, correct?

9   A.   Correct.

10  Q.   At that time, would you agree -- I think you testified

11  you thought you were burned, right?

12  A.   Right.

13  Q.   So the investigation is compromised, or burned,

14  right?

15  A.   Not necessarily.  We -- we still did -- we thought

16  definitely -- definitely with Aguilar, we thought it was

17  compromised.  But we monitored -- ricky Garrison and

18  Aguilar met in person.  We don't know what was said in that

19  conversation when they met in person.  They separated.

20          We were looking for other indications, other phone

21  calls dealing with Ricky Garrison.  We were looking for

22  other phone calls of him talking about how, you know, law

23  enforcement was watching, or we were burned, or he was

24  burned, or whatever, and we didn't get those conversations.

25  Q.   All right.  So I'm trying to track your logic, because

Cross - Mohlman

1   my understanding is you don't want to arrest people because

2   if you arrest people, the folks they're associated with

3   will scamper to the winds, right?

4   A.   Potentially.

5   Q.   And you and Agent Gullicksrud go out on the 27th of

6   March, though, and actually pick up Mr. Aguilar and drive

7   him to a park, right?

8   A.   We do.

9   Q.   And you talk to him about your investigation,

10  correct?

11  A.   Correct.

12  Q.   And you -- would it be fair to say that your

13  understanding would be that Mr. Aguilar had a fairly good

14  idea that you were looking at him as a suspect for criminal

15  charges, right?

16  A.   That was our understanding.  It turns out we were

17  wrong, but that was our understanding.

18  Q.   You didn't misrepresent yourself, though, and say

19  that, you know, you're the neighborhood watch; you said you

20  were police officers, right?

21  A.   Absolutely.  I think I even said FBI agent.

22  Q.   Okay.  And you didn't arrest Mr. Aguilar that day,

23  right?

24  A.   No.

25  Q.   And Mr. Aguilar, I take it, is free to make phone

820
Cross - Mohlman

1    calls, right?

2    A.    Oh, absolutely, yes.

3    Q.    You didn't take his phones, right?

4    A.    No.  No.

5    Q.    And then we go into later March and you don't arrest

6    everybody, right?

7    A.    No.

8    Q.    And then we're into April and you don't arrest

9    everybody; isn't that right?

10   A.    Correct.

11   Q.    And we're in the first part of May and you don't

12   arrest everybody; isn't that right?

13   A.    Correct.

14   Q.    You don't get around to arresting Mr. Garrison until

15   the latter part of May, right?

16   A.    Correct.

17   Q.    And then it's into the beginning part of June that

18   most of the rest of the people are arrested, correct?

19   A.    Correct.

20            MR. LEONARD:  One second, Your Honor.

21            THE COURT:  Sure.

22            MR. LEONARD:  Thank you, Your Honor.  I have no

23   further questions.

24            THE COURT:  All right.  Redirect.

25            MR. PHILLIPS:  Thank you, Your Honor.  If we may

821

Cross - Mohlman

1    approach.

2              THE COURT:  Sure.

3         (Discussion at side bar)

4              MR. PHILLIPS:  Your Honor, it's our belief that

5    they opened the door as to -- as far as the cocaine residue

6    that was found on the scale; he asked this officer directly

7    that no drugs were found from Garrison from June of 2013

8    through May 23d of 2014.   In fact, that's exactly why we

9    approached and that's exactly why I told Mr. Leonard

10   that --

11             THE COURT:  He said through May --

12             MR. LEONARD:  I said May 22d, the day before.

13             MR. PHILLIPS:  Okay.

14             MR. McDERMOTT:  So you know, Mr. Phillips, the

15   note I passed him, you know, almost referred to that, but I

16   think your agent was referring to what was seized from the

17   codefendant, and so we are just going to leave it alone.

18             MR. LEONARD:  Yeah, I was specific --

19             THE COURT:  I specifically remember Mr. Leonard

20   asking --

21             MR. McDERMOTT:  Right.

22             THE COURT:  -- I forget the day you started with,

23   but you ended May 22d.

24             MR. LEONARD:  I did.

25             MR. McDERMOTT:  He narrowed it so it wouldn't open

822

Redirect - Mohlman

1    the door into -- thank you for correcting that.

2              THE COURT:  So does that cover it?

3              MR. PHILLIPS:  That's it.

4              MR. LEONARD:  Thank you for coming, though.

5         (End of discussion at side bar)

6                    REDIRECT EXAMINATION

7    BY MR. PHILLIPS:

8    Q.   You were asked some questions about whether you

9    recorded interviews and proffers that were given.  Why did

10   you not record those?

11   A.   That's a -- I just don't.  It's -- I usually defer to

12   the prosecuting attorney who's present during those

13   interviews.  I've never been advised that I should record

14   them.

15   Q.   And has it been your practice throughout your career

16   to not, and to take notes and write the report?

17   A.   Yes.  There are times that I've recorded interviews

18   before, but it's not a typical practice.

19   Q.   And the Metro Gang Task Force, is that an FBI lab task

20   force?

21   A.   Yes.

22   Q.   And does the FBI -- up until recently in the last,

23   approximately, a year -- have a policy about not recording

24   phone calls and recently changed that policy?

25   A.   I'm not aware of their recent changes.

823

Redirect - Mohlman

1   Q.   Okay.  And why do you not provide interview notes?

2   A.   Because the report that I write is written from my

3   notes, and it's a complete and accurate description of the

4   notes that I took.

5   Q.   And you were asked a number of questions about other

6   people that lived in the Monaco address.  Was there any

7   indication anyone other than the defendant was staying in

8   the basement between him and Ms. Quintanilla?

9   A.   No.  Ms. Quintanilla had very few items, and what she

10   did have were in the basement.  And there could have been

11   other items in the closet, I'm not sure, but the personal

12   effects, the driver's license for Mr. Garrison, the pill

13   bottle, all that was in that basement room.

14   Q.   And you were asked about Ms. Quintanilla driving the

15   Impala on May 20th of 2014, and you didn't specifically

16   remember that and maybe other officers saw that, but if

17   it's in your search warrant, it certainly is true.

18   A.   Absolutely.

19   Q.   But on May 23d of 2014, where was Ms. Quintanilla

20   found?

21   A.   She was inside of that basement room with Mr.

22   Garrison.

23   Q.   And where was the Impala found?

24   A.   The Impala was found at another address in north

25   Denver, a long ways away from Monaco.

824

Redirect - Mohlman

1    Q.    And ultimately you took this case down in June;

2    specifically June 4th of 2014; is that correct?

3    A.    That's correct.

4    Q.    And if you would, describe to the jury how large of an

5    operation that was in order to have that take-down,

6    taking -- actually we'll use the term take-down -- describe

7    to them what we mean by that.

8    A.    Basically, because our defendants, they were spread

9    across multiple jurisdictions.  We call on law enforcement

10   officers from around the metro area to assist us with a

11   take-down.  And it just so happened at that time on that

12   date we were doing two separate take-downs of major

13   investigations and, as I said, we had 20-plus defendants,

14   and the other was a fairly large case.

15        And so we bring all these law enforcement officers

16   together, we assign people locations and individuals that

17   they're responsible for arresting, and then everyone

18   there -- there's a take-down day, and at 6:00 in that

19   morning -- that morning of take-down we start knocking on

20   doors, hoping the law enforcement -- probably I would

21   estimate 80 to a hundred officers are scattered around the

22   metro and other locations attempting to arrest the people

23   on the indictments.

24   Q.    And were you successful in arresting all of your

25   potential defendants in this case?

825

1    A.    No.

2    Q.    And were some of them fugitives for quite some time?

3    A.    Quite some time.

4            MR. PHILLIPS:  If I may have one moment, Your

5    Honor.

6            THE COURT:  Yes.

7            MR. PHILLIPS:  Nothing further.  Thank you, Your

8    Honor.

9            THE COURT:  All right.  May this witness be

10   excused for the --

11           MR. PHILLIPS:  Yes.

12           THE COURT:  All right.  For the defendant?

13           MR. LEONARD:  Yes, Your Honor.

14           THE COURT:  All right.  Lead case Agent Mohlman.

15           THE WITNESS:  I apologize for my outburst, Your

16   Honor.  It just caught me funny.

17           THE COURT:  That's all right.  You may step down.

18           THE WITNESS:  Thank you.

19           THE COURT:  All right.  The Government may call

20   its next witness.

21           MR. PHILLIPS:  Your Honor, if we may have a moment

22   to confer.

23           THE COURT:  Sure.

24           MR. PHILLIPS:  Thank you, Your Honor.  The

25   Government has no further witnesses and would rest.

826

1          THE COURT:  All right.  Does the defendant have a

2     Rule 29 motion to make?

3          MR. LEONARD:  We do, Your Honor.

4          THE COURT:  All right.  Would the parties

5     stipulate to the argument on the Rule 29 motion be deferred

6     until the time that we would be renewing that motion?

7          MR. PHILLIPS:  The Government would so stipulate.

8          THE COURT:  All right.

9          MR. LEONARD:  The defense so stipulates.

10          THE COURT:  All right.  The defendant may call his

11     first witness.

12          MR. LEONARD:  Your Honor, the defense has no

13     witnesses.  The defense rests.

14          THE COURT:  The defense rests.  All right, then

15     there will be no rebuttal evidence from the Government.

16          So, ladies and gentlemen of the jury, here's where

17     we are.  We are done with the testimonial evidence portion

18     of the trial.  The lawyers and I have a lot of work for the

19     rest of the afternoon in terms of jury instructions,

20     verdict forms, there's some legal arguments on some motions

21     that are going to be made; none of which involve you.

22          So the good news for you is that you're done for

23     the day.  You're going to have a long weekend.  Let me tell

24     you what's going to happen Monday morning.

25          Monday morning we will reassemble at the -- our

1    normal time, and, really, on Monday there should not be a

2    reason we should keep you longer than 8:45 in the

3    deliberation room.

4          Pretty close to 8:45 we'll call you back out here.

5    I'll read to you all the jury instructions that you're

6    going to be using in your deliberations, and you also will

7    be given a copy in written form to consult while you're

8    deliberating.  I'll read those instructions to you because

9    the law requires me to do that.  Sometimes we find some

10    errors in it as I read it, and then I need to consult with

11    the lawyers to mark up the final set to make sure that

12    those errors are rectified before the final set in hard

13    copy is placed back in the deliberation room for you to

14    review.

15          After I'm done reading those instructions, the

16    lawyers will have the opportunity for their closing

17    arguments and then when they're done, then you -- your work

18    starts; your deliberations will begin at the conclusion of

19    the closing arguments.

20          So especially because it's a long -- it's a longer

21    weekend for you, you may be tempted a little bit more than

22    you might on a regular evening, please do not -- especially

23    we're this close to concluding the trial, do not discuss

24    this case with anyone, and don't do any independent

25    research into the facts, the law, or the persons involved

828

1    in this lawsuit.

2           So the lawyers, the parties, will stay in the

3    courtroom, but the jury is excused until 8:45 Monday

4    morning.

5           (Jury left the proceeding at 12:29 p.m.)

6           THE COURT:  So as we discussed this morning, I'm

7    going to use a good part of this lunch break with

8    Mr. Hawkins to finalize the jury instructions and verdict

9    forms and to review my notes and prepare for a ruling on a

10   Rule 29 motion.  So we'll be in recess until approximately

11   1:45, but I don't want to be held to that.  If we still

12   have more work to do back in chambers, we'll do it.

13          Mr. Hawkins will be out here in a couple of

14   minutes and will need to retrieve one thing from each of

15   you:  From Ms. Rangel, he's going to retrieve the final

16   limiting instruction with the names of the individuals

17   appended to the end; and from Mr. McDermott, he's going to

18   retrieve your proposed verdict form with respect to Count

19   1.

20          THE COURT:  All right.

21          MR. PHILLIPS:  Your Honor, if I may have one

22   moment to --

23          THE COURT:  Sure.

24          MR. PHILLIPS:  -- check my e-mail.  And I think it

25   may be helpful to the Court if I do so as far as the

829

1   Court's plans during the break and so forth.  It will be

2   worth your time.

3           THE COURT:  Okay.  All right.

4           MR. LEONARD:  And --

5           MS. RANGEL:  And -- I'm sorry.

6           MR. LEONARD:  Go ahead.

7           MS. RANGEL:  With that, I just wanted to clarify,

8   on the limiting instruction, I think for the two calls the

9   Court read, I think it's an unknown male.  I just wanted to

10  make sure that was everyone else's recollection.  That's

11  what I will be adding --

12          MR. LEONARD:  I don't have any name --

13          THE COURT:  So we don't have any name.  So then

14  what we will do is add back those two words "listed below,"

15  and actually, probably --

16          MS. RANGEL:  I could --

17          THE COURT:  I think if you took two or three

18  minutes, Mr. Leonard, you and Ms. Rangel could agree on a

19  way to retain the substance of this instruction and just

20  rephrase it to say -- because it will be pretty awkward to

21  say "the portions of the speaker's statement listed below"

22  and then listed below is "persons unknown."

23          It just seems -- I'm almost wondering if it could

24  make sense, and I could talk to Mr. Leonard about it, to

25  modify it to "unknown male speaking" in the body of the

1    instructions since it's an unknown male.

2             I will leave it to you.  And, actually, since it

3    will be a few more minutes, then you can let Ms. Hansen

4    know when you have that done and then she'll get it to

5    Mr. Hawkins.

6             MS. RANGEL:  Okay.

7             THE COURT:  I'm sure if you're not going to be

8    revising it substantively, I'll deal with whatever you come

9    up with.  So that will take care of your point.

10            MS. RANGEL:  Okay.

11            THE COURT:  How about the verdict form?

12            MR. McDERMOTT:  Your Honor, I -- what I -- what I

13   will forecast to the Court is I prepared what I referred to

14   as a bridge instruction, which essentially includes a

15   lesser-included offense with respect to Count 1, and if

16   that becomes part of the instructed packet, then I believe

17   that the objection that we had tendered to the verdict form

18   becomes moot because then the instructions would track the

19   verdict forms.

20            THE COURT:  Okay.  So what you're not asking for,

21   and maybe I misunderstood, when the two of you had argument

22   this morning, you were at -- you were telling me you were

23   going to give me what you're referring to as a bridge

24   instruction.

25            MR. McDERMOTT:  Right.

1          THE COURT:  And that -- Mr. Leonard, you were

2     talking about your belief that the actual verdict form had

3     to have the "beyond a reasonable doubt" standard included

4     within the special interrogatory portions of the Count 1

5     verdict form.

6          MR. LEONARD:  I still believe it needs to have the

7     *Alleyne* "beyond a reasonable doubt" language.  We're going

8     to submit the lesser-included --

9          THE COURT:  Well --

10         MR. LEONARD:  -- because my understanding was the

11    Court directed us to talk to the Government about getting

12    the instruction into *Alleyne*-compliant language.  That was

13    my understanding.  So we've got a lesser-included because

14    we think there's going to be a mandatory minimum

15    instruction offered by the Government.

16         THE COURT:  Well, I guess I'm being very, very

17    unclear this morning.  What I wanted from the defendant is

18    your proposed verdict form for Count 1.  All right?  So

19    obviously your proposal will include the language that you

20    believe is missing from the Government's verdict form on

21    Count 1 such that it makes it noncompliant with *Alleyne*.

22         I will also look at a bridge instruction -- a

23    bridge jury instruction, but what I want from you is

24    your -- your alternative -- or your alternate language for

25    Count 1 for the verdict form.

832

1          MR. LEONARD:  Okay.

2          THE COURT:  All right?  So do you have -- if you

3    have a flash drive or something there, I'm sure we can get

4    it -- you can give it to Ms. Hansen and we can get it

5    printed back in chambers if you don't have anything printed

6    out right now.

7          MR. LEONARD:  I don't.  It will take me just a

8    second to modify what you're talking about.

9          THE COURT:  And then if you let her know when

10   you're done with that.

11         MR. LEONARD:  I will.

12         THE COURT:  Now that your phone call or checking

13   your e-mail --

14         MR. PHILLIPS:  It did.  And, Your Honor, last

15   night and this morning and throughout the morning with

16   thought and additional research and so forth that's being

17   done last night, Ms. Rangel and I, in assessing how the

18   evidence came out in this case, and not exactly as we had

19   anticipated it would, we believe that it would be proper at

20   this time for the Government to dismiss Count 48 as we do

21   not believe that we've shown that there was active

22   deployment of the firearm as required by *Bailey* and

23   subsequent cases.

24         THE COURT:  I like the way great minds think

25   alike, because you were going to have trouble on 48.  I was

833

1    going to grant that motion because I didn't have any

2    evidence --

3              MR. LEONARD:  I wrote a lot.

4              THE COURT:  Oh, no, you --

5              MR. PHILLIPS:  And, Your Honor --

6              THE COURT:  You took away 10 minutes of argument

7    from Mr. Leonard.

8              MR. PHILLIPS:  Your Honor, we'll allow --

9              THE COURT:  I just want to say I very much respect

10   both of your integrity in conceding that point and in

11   making it -- again, if only civil litigators would try

12   cases in the same way, but thank you for that.

13              Are you making a motion to voluntarily dismiss

14   Count 48?

15              MR. PHILLIPS:  Yes, I would make that motion, Your

16   Honor.

17              THE COURT:  Okay.  I assume there's no objection.

18              MR. LEONARD:  There's no objection.

19              THE COURT:  Based on that motion, the motion's

20   granted.  Ms. Hansen, the minutes will reflect that Count

21   48 is dismissed.  All right.

22              MR. LEONARD:  Your Honor, I have a Rule 29 written

23   motion.  I can e-mail it as well once I get my phone on.

24              THE COURT:  You can hand it to Ms. Hansen; she'll

25   hand it to me.

1       MR. LEONARD:  I tendered copies to the Government.

2   There is a portion which is now completely irrelevant, but

3   I would -- there's -- there's another -- there's other

4   sections, I don't know if you want me to argue it all now

5   or --

6       THE COURT:  No, no, we're going to do the Rule 29

7   argument when we come back from -- so I have to both eat

8   and finalize jury instructions and look at my -- compare

9   and contrast my notes with Mr. Hawkins and make sure that

10  we're prepared on the Rule 29.

11      So especially now that we've gone 10 minutes

12  talking about it, I'm probably not going to get back out

13  here until 2:00.  That's an hour and 20 minutes from now.

14      So you're free, if you want to go and have lunch

15  or something, you can be comfortably gone -- once you get

16  the deliverables to Ms. Hansen for Mr. Hawkins as we have

17  been talking about, once you get those done, if you're

18  thinking of leaving the building, grab a sandwich or

19  something, you can be -- you can safely do that.  As long

20  as you're back by, say, a quarter to 2:00, that's fine, if

21  you want to go back to your offices as well.

22      We'll be in recess until approximately 2:00.

23      (Recess at 12:39 p.m.)

24                  AFTERNOON SESSION

25      (In open court outside the presence of the jury at

835

1    2:05 p.m.)

2              THE COURT:  All right.  At this time, I will

3    entertain the defendant's motion for judgment of acquittal

4    pursuant to Criminal Rule 29, and per the stipulation of

5    the parties, I'll treat this as both the original and the

6    renewed motion under that rule.  Mr. Leonard.

7              MR. LEONARD:  Thank you, Your Honor.  Your Honor,

8    I'm just going to make brief comments since you have the

9    written document before you and --

10             THE COURT:  Right.

11             MR. LEONARD:  -- probably it states it better than

12   I'll state it orally.  But our first contention is that the

13   Government failed to prove a conspiracy.  We believe that

14   the evidence is overwhelming that what the Government

15   proved was, at best, the buyer-seller relationship.  There

16   was no evidence of sales that were made on credit, there

17   was reference to an organization but no organization was

18   proved up.

19             The witnesses who appeared in court were

20   consistent that they were either selling for cash in hand

21   and/or if they were buying something, that was -- they were

22   paying cash for that.  So -- and to focus that argument

23   just right down to the nitty-gritty, we don't believe they

24   proved interdependence because there was no shared purpose

25   between the individuals that are alleged to be in the

836

1    conspiracy.

2              THE COURT:  What about the -- you know, this

3    buyer-seller notion that you raised and that you're

4    arguing, that at best what the Government proved was that

5    there were a series of buyers or sellers of controlled

6    substances with the defendant?  That's -- that doctrine is

7    a Ninth -- out of the Ninth Circuit, isn't it?

8              MR. LEONARD:  I believe it's also in the Tenth

9    Circuit.  The instruction --

10             THE COURT:  But the Tenth Circuit -- some of the

11   Tenth Circuit case law we've looked at, it's -- it is much

12   more limiting and much more critical.  Of course, using

13   that instruction of buyer-seller, it's very limited

14   circumstances, wouldn't you agree with that?

15             MR. LEONARD:  That -- I have to agree with that

16   because I believe that's what the Tenth Circuit case law

17   says, but we believe that --

18             THE COURT:  And specifically, *U.S. v. Flores*

19   says -- the Tenth Circuit said the buyer-seller doctrine is

20   designed to protect retail drug users and not dealers or

21   middlemen, which is quite a bit different from what the

22   Ninth Circuit has said.  Would you agree with that?

23             MR. LEONARD:  I do, but I believe *Ivy* more

24   incorporates the Ninth Circuit, which I cited in my brief,

25   the -- the buyer-seller component of it.  But --

 1          THE COURT:  Let me ask you -- okay, let's move

 2    beyond that.  Interdependence, what about, I'll put out an

 3    example:  The testimony of Mr. Vigil yesterday that, you

 4    know, he both -- primarily he sold cocaine to the

 5    defendant, sometimes he bought.  But he was aware through

 6    the phone calls, was he not, that Mr. -- that the

 7    defendant, your client, was in turn reselling the

 8    controlled substance that Mr. Vigil was selling to him?

 9          So, in other words, there was -- your client was

10    dependent on the supply of Mr. Vigil, just using this

11    example, in order for him to complete his sales to other

12    individuals.

13          MR. LEONARD:  Well, that's -- I think that's the

14    distinction we're trying to make.  When -- in the light

15    most favorable to the Government, when Mr. Garrison is

16    alleged to be purchasing from a supplier, it is a cash

17    transaction.  And so while the phone calls do suggest that

18    maybe Mr. Vigil knew that Mr. Garrison would do something

19    else with it, the reality is he just wanted the cash.

20          And so had Mr. Garrison left Mr. Vigil's house and

21    decided to throw the cocaine down the drain, it didn't

22    matter one bit to Mr. Vigil.  Much like when I go to the

23    liquor store and buy beer, all they want is my cash.  They

24    absolutely have -- they don't care what I do with it.

25          THE COURT:  Is that really true?  Is that -- I

838

1    mean, isn't Mr. Vigil concerned, at least to this extent,

2    that he wants his buyer, your client, to have the money to

3    continue to buy from him, and Mr. Garrison will only have

4    money to buy from him if he is successful in supplying and

5    selling the drugs as opposed to throwing them down the

6    toilet, because if he did that, then he has no money to buy

7    anything further from Mr. Vigil?

8             MR. LEONARD:  Perhaps.  I think the distinction

9    there is that it becomes a mutual agreement if there's

10   credit given and he has a shared stake in it.

11            THE COURT:  Do you have a case that says that if

12   there are cash transactions, that somehow that precludes a

13   finding of the conspiracy by a jury?  It has to be -- that

14   these drugs have to be sold on credit?

15            MR. LEONARD:  No.  I don't.  No, I don't.

16            THE COURT:  Well, yeah, such a case doesn't exist.

17   So what -- I mean, so what's your argument about -- I don't

18   understand your argument:  Well, there's no credit

19   extended.

20            MR. LEONARD:  Well, it was an example to show if

21   there's credit extended, you have more proof of some sort

22   of mutually shared benefit, common plan, scheme or goal,

23   rather than just -- I mean, not every transaction is a

24   conspiracy.

25            THE COURT:  Well, I understand.  If we go to the

1    Triangle and somebody walks up to someone who they have

2    never seen before and never sees again and does a

3    hand-to-hand transaction, I doubt the Government would

4    charge a conspiracy of that.  But here you've got recurring

5    daily, weekly, semi-weekly, transactions.  And, again, I go

6    back to the point -- sort of analogous, would be, you know,

7    the argument, you know, is it in society's interest to

8    raise the minimum wage?  Some people argue, well, it

9    is even in the interest of employers to raise the minimum

10   wage because then folks can make more money and then they

11   have the money to buy more consumer goods in society and

12   everybody benefits.  That's one side of the argument.

13          So here Mr. Vigil, while, yeah, he's not -- he's

14   not concerned to -- you know, to the detail, you know, of

15   exactly how it is that Mr. Garrison is getting the money to

16   continue to buy from him, he does have an interest in

17   Mr. Garrison having the money to continue to buy from him,

18   or he can't make any more sales to him.  So he has an

19   interest in Mr. Garrison making money and making -- and

20   making money from selling drugs, as there's no evidence

21   that he's making money, you know, going to work on 17th

22   Street any -- during the week.

23          MR. LEONARD:  Well, I understand the Court's

24   position.  And I --

25          THE COURT:  Okay.

1               MR. LEONARD:  I --

2               THE COURT:  Okay.

3               MR. LEONARD:  I don't think I can illuminate my

4    position any further.  I -- I've tried.

5               THE COURT:  Okay.

6               MR. LEONARD:  Unless the Court --

7               THE COURT:  Okay.  Go ahead.

8               MR. LEONARD:  I will move on from the conspiracy,

9    unless the Court has other questions for me on that, and

10   rely upon the arguments made in my written motion.

11              THE COURT:  The only question I have about the

12   conspiracy is the same thing I've talked about now about

13   three or four times with your co-counsel, is do you have a

14   different -- an alternative verdict form on conspiracy that

15   you want to tender to --

16              MR. LEONARD:  No.

17              THE COURT:  -- us to consider?

18              MR. LEONARD:  No, I don't.  And I need to explain

19   myself to the Court, just -- I read an earlier version of

20   what was an instruction that we had discussed with the

21   Government and simply missed the next one that had come in

22   that talked about what we had done.  That's -- I should

23   have caught that.

24              THE COURT:  Okay.

25              MR. LEONARD:  Didn't.

1          THE COURT:  So I just want to make this perfectly

2     clear in the record:  The defendant is withdrawing its

3     objection to the verdict form insofar as the verdict form

4     relates to Count 1, which the Government tendered to the

5     Court?

6          MR. LEONARD:  Yes.

7          THE COURT:  Okay.

8          MR. LEONARD:  That's right.

9          THE COURT:  Got it.  Beyond that, I have nothing

10    further, Mr. Leonard.

11         MR. LEONARD:  All right.  I need to flip here,

12    because my next section was on the firearm.

13         I will leave my argument on the telephone counts

14    as tendered in the written document because I don't think I

15    can further illuminate the Court on those, but I'm happy to

16    answer your questions if you have any.

17         THE COURT:  No, I don't.

18         MR. LEONARD:  All right.  So, lastly, we move to

19    the Man Act Violation.

20         THE COURT:  And I thought we had a stipulated

21    instruction, but now I heard we have a sort-of stipulated

22    instruction.  Now we're going to have a new instruction?

23         MR. LEONARD:  Yes.  And now we are --

24         THE COURT:  I know we're talking about your

25    motion, we're getting ahead of ourselves a little bit, but

1    instructions and the arguments that we are dealing with on

2    your motion are not completely distinct issues, right?

3    They're intertwined to some extent.

4              MR. LEONARD:   They are.   And we have a stipulated

5    instruction; the Government and the defense worked to

6    create a stipulated Man Act instruction, which is patterned

7    after the Seventh Circuit pattern instructions.   We

8    submitted that --

9              THE COURT:   There's not a Tenth Circuit pattern

10   instruction?

11             MR. LEONARD:   No, I don't know --

12             MR. PHILLIPS:   There's not.

13             THE COURT:   I guess we don't do --

14             MR. LEONARD:   I can only find the Seventh and the

15   Ninth.   And the Ninth was -- I didn't track it very well,

16   but that just may be me.

17             MR. PHILLIPS:   It was bad.

18             THE COURT:   Okay.   So we go -- we're going with

19   the Seventh, then.

20             MR. LEONARD:   So we do have a stipulated

21   instruction there.   And --

22             THE COURT:   So what's your argument as to why I

23   should not allow the Man Act Count to go to the jury?

24             MR. LEONARD:   So basically there are three

25   arguments on that.

843

1         THE COURT:  Okay.

2         MR. LEONARD:  The first is there's no proof that

3    there's the traveling in interstate commerce.  We don't

4    know how Ms. Quintanilla, who's the other person, as in the

5    jury instruction, gets in Oklahoma.  I certainly think the

6    Government contends that she was taken there, but there's

7    no proof before the jury of that.

8         THE COURT:  But isn't there circumstantial

9    evidence of that?  I mean, the -- I think there's evidence

10   from lead case Agent Mohlman -- I'm sorry --

11        MS. RANGEL:  He wasn't even here for it.

12        THE COURT:  Yeah, he's not --

13        SPECIAL AGENT GULLICKSRUD:  I'll let him know.

14        THE COURT:  -- that -- well, actually, I think

15   from both agents, that there was no -- no one saw

16   Ms. Quintanilla arriving in her separate vehicle, No. 1.

17   That there was just one vehicle with Colorado plates in the

18   parking lot in Oklahoma City.

19        And you have Mr. Garrison's receipt for the room,

20   and you have his phone number on her backpage ad.  What --

21   isn't that enough -- wouldn't that be a tall order for me

22   to conclude that no reasonable juror could, using that

23   circumstantial evidence, conclude that the Man Act had been

24   violated beyond a reasonable doubt?

25        MR. LEONARD:  Well, our argument is that yes, no

844

1    reasonable juror could because there's not -- the

2    interstate travel ties into my second argument, which is

3    transport.  They're one and the same.  There's just no

4    evidence of how she was -- arrived there and/or was she

5    transported.  She's in Oklahoma, that's -- that much we

6    know.  How --

7              THE COURT:  She's in Oklahoma in -- at the same

8    time your client is --

9              MR. LEONARD:  Correct.

10             THE COURT:  -- in a room that your client paid

11   for, advertising her services through his phone number.

12             MR. LEONARD:  That's correct, Your Honor.  That

13   is, but that -- that I agree with.

14             THE COURT:  And -- and there's no evidence --

15   surely no controverting evidence from the defendant,

16   because he put on no evidence, that she got there any other

17   way but with the defendant.

18             Obviously the point I'm making is there's no

19   direct evidence of her -- there's no film of her in Mr.

20   Garrison's car crossing state lines from Colorado to

21   Oklahoma, I grant you that, but isn't there sufficient

22   circumstantial evidence from which a reasonable juror could

23   infer that that's exactly what happened?

24             MR. LEONARD:  Well, from the defense's

25   perspective, there is not.  And, again, I find myself

845

 1   unable to properly offer any more cogent facts other than

 2   what I've argued.

 3          THE COURT:  Okay.

 4          MR. LEONARD:  But I think there is another fact,

 5   which is -- they didn't put on the evidence of prostitution

 6   and the Seventh Circuit jury instruction defines

 7   prostitution.  It means knowingly engaging in or offering

 8   to engage in a sexual act in exchange for money or other

 9   valuable consideration.

10          Now, Detective -- I know --

11          THE COURT:  How -- I'll let you finish --

12          MR. LEONARD:  Detective Rivera can only testify

13   about what he did.  He cannot testify about what

14   Ms. Quintanilla did because she didn't testify.  She -- he

15   was not allowed to testify about what she would have -- was

16   saying because that was hearsay and a *Crawford* issue --

17          THE COURT:  Right.

18          MR. LEONARD:  -- and you have to agree, and in --

19   there has to be an agreement, there has to be the two

20   people.  And we don't know what she agreed to.  We know he

21   arrested her, but an arrest is just an arrest --

22          THE COURT:  Right.

23          MR. LEONARD:  -- and it's not proof of the

24   agreement for prosecution.  And that's lacking and missing

25   and it has to be satisfied.

1          THE COURT:  Well, first of all, as you said, it

2    requires proof of an offer.  I mean, there doesn't have to

3    be evidence that the activity -- the activities were

4    consummated.  Do you agree with that?

5          MR. LEONARD:  I do agree.  I do.

6          THE COURT:  Okay.  And there was testimony from

7    Detective Rivera that he specifically asked if she would

8    engage in a particular sex act, and that he gave her $260

9    in cash.  And that when she was arrested, the $260 was in

10   her purse.

11         MR. LEONARD:  That I agree.

12         THE COURT:  So isn't it reasonable to infer that

13   she -- that there was a -- an offer and acceptance of that

14   money for the services that he asked if she would engage

15   in?

16         MR. LEONARD:  I don't think so.  I think that the

17   Government had a duty and a burden to put Ms. Quintanilla

18   on the stand and --

19         THE COURT:  To say what -- to say what?

20         MR. LEONARD:  Say what happened in the room.

21         THE COURT:  Well, do you -- are you arguing that

22   you need two people to testify to a conversation such

23   that -- or because a jury could -- is not within their

24   rights to infer through circumstantial evidence certain

25   facts, and that you have one person testifying as to his

1    part of the conversation, his questions, his act of giving

2    her money, and the location of the money in her purse,

3    suggesting that she accepted the money?  Isn't the jury

4    within its province to be able to infer that -- the

5    remainder of what occurred there?

6              MR. LEONARD:  No, I think that, in fact, that's

7    where the Rule 29 specifically comes down and insulates the

8    prejudice that comes from the Government only putting on

9    one-half of a conversation.  And what ends up by only

10   putting on one-half of the conversation, we burden-shift.

11   And now the defendant has to put on something to negate

12   Detective Rivera.  And that isn't the way the criminal

13   system works.

14             And so we know what Detective Rivera was saying,

15   but the offer, the -- I don't think he was going to go

16   through with it, so the unlawful aspect has to be coming

17   from Ms. Quintanilla.  She has to accept the offer in that

18   she has to do something other than just take the money to

19   accept it, because we don't know what she said.

20             And the Government had the ability to get her;

21   they didn't.  They could immunize her if she takes the

22   Fifth.  They didn't.  They did not argue that her

23   statements were subject to a co-conspirator statement.  I

24   think that's likely because the law's fairly against that,

25   but I think there's scenarios where you could make a

1    co-conspirator argument under this version of the Man Act.

2    And so we're left with a detective and silence, and there

3    cannot be an agreement, then, with the silence.

4            THE COURT:  I agree with you that there are

5    certain fact patterns, hypotheticals that I could think of

6    where just hearing one side of the conversation would not

7    be enough to meet a Rule 29 standard for allowing a count

8    to go to the jury.  I agree with that in the abstract.  I

9    can think of situations like that.

10           But in this case, we have not just the Detective

11   Rivera's testimony as to what he said and did in that room,

12   we have the other evidence of her backpage.com ad that

13   says, I'm just in town for a brief period of time, call

14   this number -- which is your client's number -- and, You

15   know, we can have a good time.

16           With all the other facts I think there's enough

17   there for a jury to reasonably infer what else happened in

18   that room -- or what else she may have said.  In this case,

19   I think there's enough there.

20           MR. LEONARD:  Thank you, Your Honor.  I don't have

21   anything further to argue.

22           THE COURT:  Okay.  All right.  I'll hear from the

23   Government.

24           MS. RANGEL:  I think it makes -- at least in my

25   mind, and correct me if it's different for the Court -- I

1    think it makes sense to start with the prostitution count

2    and then talk about the conspiracy, since that's where we

3    left off.

4             THE COURT:  Sure.  That's fine.

5             MS. RANGEL:  I -- I agree with what the Court has

6    said thus far in terms of the evidence in this case and the

7    analysis of the evidence in the case.  The testimony that

8    Detective Rivera put before this jury was clear, and I

9    think a reasonable juror could conclude, certainly viewing

10   the evidence in the light most favorable to the Government,

11   which is where we are now, that when Ms. Quintanilla --

12   when Detective Rivera says to her, Can I perform a very

13   specific sexual act with -- to you or with you, or however

14   it was he phrased it, and puts money on the table, which

15   she then picks up and puts in her purse, I think that a

16   reasonable juror could certainly conclude that that is

17   acceptance, that this is an agreement.  And I think that's

18   based on logic and common sense of everyday transactions

19   where you don't necessarily need words to communicate that

20   you are accepting what the other person is offering you.

21            And I think that that certainly indicates that

22   there was an agreement for it.  And he did testify that

23   prostitution is illegal in the state of Oklahoma; that he

24   placed her under arrest for the crime of prostitution, and

25   so I think that particular element has been established.

1          I think the evidence is also clear, not only just

2      on Detective Rivera's testimony, but on the testimony of

3      Investigator Mohlman, that the defendant -- a reasonable

4      juror could conclude that the defendant knowingly

5      transported Ms. Quintanilla to that location for the

6      purpose of prostitution.  Detective Rivera said that she

7      was not connected with any vehicle, including the

8      defendant's, in the parking lot, but that her backpage ads

9      clearly link him to it.  And further, Mr. Natha came in and

10     testified to that Red Roof Inn receipt, which bears the

11     defendant's name and address as having paid for the room

12     that Ms. Quintanilla was in.

13         And so I think when you look at the totality of

14     the evidence for that case, certainly in the light most

15     favorable to the Government, a reasonable juror could

16     conclude that he was guilty of that.

17         THE COURT:  Yeah.  And I think to some extent my

18     questions were taking us -- my questions of Mr. Leonard

19     were taking me a little bit afield of the actual count, the

20     Man Act Count.  It was -- I was focusing on our questions

21     and the answer, the colloquy, was evidence of what she did,

22     and did she actually engage in prostitution, but the Man

23     Act is really -- it's -- the focus is on whether the

24     defendant intended her to engage in prostitution and then

25     transported her across state lines to do so.

851

 1          So actually a lot of what I'm thinking now, a lot

 2   of that colloquy was really neither here nor there in terms

 3   of the -- of what the Man Act requires as far as the

 4   defendant is concerned.

 5          Would you agree with that?

 6          MS. RANGEL:   I would agree with that.   And if I

 7   may, as you were just kind of planting that in my head, I

 8   just want to also add a little bit more testimony that the

 9   jurors could properly consider, and that's the testimony of

10   Greg Williams.   And -- I apologize -- oh, Mr. Williams and

11   Mr. Painter, both of whom testified to this jury that

12   they'd had previous conversations with the defendant

13   regarding prostitution.

14          Specifically, Mr. Williams said that Mr. Garrison

15   indicated something to the effect of wanting to be like his

16   buddy who had someone -- a prostitute pay for his Porsche

17   Cayenne, something to the effect that he would do something

18   similar.

19          Mr. Painter indicated that he had similar

20   prostitution sort of conversations with the defendant.   And

21   so I think just to supplement my previous facts, I think a

22   reasonable juror could conclude that not only did he

23   transport her there, since he was present in the parking

24   lot paying particular attention to Detective Rivera who was

25   headed to the hotel room that the defendant had paid for,

852

1    in conjunction with those ads, but also his statements to

2    other individuals regarding his knowledge, his, perhaps,

3    motivation to engage in prostitution.

4              THE COURT:  Okay.

5              MS. RANGEL:  With regard to the conspiracy, it

6    sounds like what it really boils down to is an argument on

7    interdependence.  And I think that the evidence that's

8    before this jury and that a reasonable juror could conclude

9    based on that evidence is certainly that the individuals

10   that have testified, the evidence that has been presented

11   from these phone calls, establish that there was a link

12   amongst these defendants; and in a drug conspiracy,

13   interdependence truly is like a business.

14             And I know that Mr. Leonard said that if he went

15   to a liquor store and he purchased beer, they don't care

16   what he did with it after he left, but a business would not

17   be successful if all they cared about was one transaction.

18   Businesses work because of repeat customers.  And they work

19   because they need that repeat business, they need people

20   continuously coming in and giving them money, that then

21   they then supply the product.  And that's exactly what the

22   evidence in this case has demonstrated, not only from Mr.

23   Vigil, as the Court pointed out, but I think Mr. Aguilar's

24   testimony was also clear as to that, that he distributed

25   ounce-level amounts to this defendant, and that they

853

1    exchanged the money for it.

2          And I think, frankly, you could go all the way

3    down to Greg Williams and the fact that Greg Williams said

4    that he purchased from the defendant twice a week, and he

5    would then make approximately $100 off of what he gave to

6    his friends, and he used that hundred dollars for gas and

7    snacks and -- I think he made it pretty clear that he

8    depended on that money for himself and, in turn, depended

9    on Mr. Garrison to continue to feed his habit -- his

10   cocaine habit.

11         And so I think when you view it more in the light

12   of the business aspect of it and the need, that they've all

13   kind of established for each other; for Mr. Garrison to

14   purchase from his suppliers, and in turn for the people to

15   purchase from Mr. Garrison.  I think interdependence has

16   been established.

17         THE COURT:  Now, I mean, to go to the jury, I

18   would just need to find that there is evidence that two or

19   more individuals were engaged, correct?

20         MS. RANGEL:  That's correct.

21         THE COURT:  Because I'll tell you, in my mind, I

22   think there's -- there's a spectrum here in terms of some

23   of these witnesses as to who -- there were some folks, I

24   agree, Aguilar and Simeon Ramirez and Christopher Vigil,

25   those three were definitely in an ongoing, almost daily

854

1    business with the defendant in my view.  And there's enough

2    evidence of that to go to the jury on that.

3           Mr. Sidney Taylor, on the other hand, there wasn't

4    much there.  Mr. Williams also -- I don't think there was

5    much there in terms of that kind of interdependence of a

6    business relationship.  But I guess that's -- that's

7    neither here nor there for purposes of the motion because

8    all I need to find is that there's enough for the jury to

9    conclude that the defendant was in a conspiracy with at

10   least one other person.  Is that your view?

11          MS. RANGEL:  That is my view.  And I think what

12   might kind of sum up I think what the Court is saying in

13   terms of perhaps there's a more clear, concise

14   interdependence, if you will, with some of the witnesses

15   compared to others, perhaps, I think the Court said it's a

16   little more far-reaching.  I don't know if you said that,

17   but I'm about to say that because the Tenth Circuit has

18   said that; and, specifically, that the conduct of the

19   alleged co-conspirators, including the defendant, may be

20   diverse and far-reaching, but must be interdependent in

21   some way.

22          And I think that's exactly what we have in this

23   case.  And I will provide you with the cite.  It's *Horn*.

24   I'm just looking for something other than the short cite on

25   this.  I apologize.  I was so proud of myself and it's

855

1    fading as I can't find this.  It's 946 F.2d 738.  The

2    specific page for that quote is 740.  And that's out of the

3    Tenth Circuit in 1991.

4               THE COURT:  Okay.

5               MS. RANGEL:  And I think that's exactly what we

6    have here, is that perhaps the interdependence is more

7    obvious and perhaps a little bit more stretched out on some

8    of these witnesses, but I think the interdependence is

9    still there.

10              THE COURT:  Okay.

11              MS. RANGEL:  And I don't know if the Court has any

12   need for any further argument on the conspiracy.

13              THE COURT:  No, I don't.  Are we going to discuss

14   the communications counts next?

15              MS. RANGEL:  Oh.  Yes.  My -- I apologize.  Let me

16   find that here in his -- my understanding of the argument

17   is essentially that we -- that the evidence has not shown

18   that he knowingly used a telephone, and that knowingly used

19   a telephone acted with the intent to -- bless you --

20   commit, cause, or facilitate the commission of a drug

21   felony which, here, is the distribution of cocaine, crack

22   cocaine, and methamphetamine.  And the evidence is very

23   clearly otherwise.

24              You've -- there's been ample testimony about the

25   slang that has been used in terms of soft or hard, and that

856

 1     came through very clearly in terms of what soft meant with

 2     the powder cocaine; the hard with the crack cocaine.

 3           There's the call with Mr. Painter where the

 4     defendant is referring to the M game, and that Mr. Painter

 5     does not understand, and after they go back and forth the

 6     defendant flat-out says, The meth.

 7           And I think the very first call that the -- this

 8     jury heard, the defendant specifically refers to coke.  So

 9     some of the calls actually do contain the drugs involved in

10     this case.  The bulk of the calls certainly do talk about

11     the code, but there's been ample evidence from long-time

12     cocaine dealers, long-time cocaine users, and long-time

13     investigators familiar with the drug industry, who have

14     talked about what that code means, that a reasonable juror

15     could conclude that the defendant not only knowingly picked

16     up the phone when it rang, knowingly picked up the phone

17     and called someone, but that he did to arrange for the

18     sale -- the -- both the sale and the purchase of narcotics.

19           THE COURT:  All right.

20           MS. RANGEL:  Thank you, Your Honor.

21           THE COURT:  Okay.  Thank you.

22           Mr. Leonard, it's your motion.  I'll give you an

23     opportunity for a brief reply.

24           MR. LEONARD:  So my -- it's quite possible that my

25     written Rule 29 wasn't clear, but my understanding was that

857

1      the Government had connected the unlawful use of

2      communication facility charges to the conspiracy to

3      distribute and possess with intent to distribute, Count 1.

4      That was what they were linking it to.

5                THE COURT:  Okay.

6                MR. LEONARD:  And if that's the case, then I

7      believe that the Court and the Rule 29 -- and this is where

8      I thought the Court was going when he wanted the layout

9      which phone count went -- which phone call went to whatever

10     day or count -- I think the Court then needs to look at and

11     see which phone count would specifically go to the

12     conspiracy, and I will leave aside the suppliers because I

13     think that the Court has made its position fairly

14     well-known on that, but Mr. Painter, Mr. Williams, and --

15               THE COURT:  Taylor?

16               MR. LEONARD:  -- Mr. Taylor, excuse me -- I can

17     see him, but I couldn't come up with his name -- they're

18     end users, they're not part of the conspiracy and,

19     therefore, those phone counts, since the phone count they

20     are tying to the conspiracy I think should be dismissed.

21               THE COURT:  I think you have a point there, to

22     some extent.  I know I said before that the Rule 29s and

23     the jury instructions are intertwined in some levels, but I

24     also have an obligation to look at the different -- the

25     differences between the two, and what I'm trying to

1    accomplish with ruling on this motion.

2         So as I understand it -- and I just looked at the

3    29 again just before I came out here, even copied the

4    page -- it says, The Court on the defendant's motion must

5    enter a judgment of acquittal of any offense for which

6    evidence is insufficient to sustain the conviction.

7         Now, right now we've not decided on what the jury

8    instructions are going to be, so I'm viewing your motion as

9    going against the counts as they are in the indictment.

10   There is no such connection in -- the communications counts

11   in the indictment are not connected to the conspiracy in

12   the indictment, so for purposes of Rule 29 and the juncture

13   we are right now, whatever is the merit in your argument

14   does not go to whether there is sufficient evidence for the

15   communications counts to go to the jury.

16        I think your point is probably better taken up

17   in -- a little bit later in terms of the jury instruction,

18   because if it -- and I think when I looked at the

19   instructions, I looked at the instructions, I think you're

20   right.  In the Government's instructions they are linking

21   the communications counts to the conspiracy count, which is

22   not how it's set out in the indictment.  And -- but you see

23   the point I'm making, Mr. Leonard?

24             MR. LEONARD:  I do, Your Honor.

25             THE COURT:  Okay.  Because you're asking me --

859

1     give me a number of one of the counts -- communication

2     counts, for example.

3                MR. LEONARD:   Count 4 or 5 or --

4                THE COURT:   Okay.  Oh, I thought I had it out

5     here, but --

6                MR. LEONARD:   I believe all the communication

7     counts they linked, at least in the proposed jury

8     instruction, which we didn't object to.

9                THE COURT:   Right.  But what you're asking me to

10    do is enter judgment of acquittal on a count as asserted in

11    the grand jury's indictment and, right now, and not having

12    made a decision on jury instructions, I don't believe I can

13    do that because, as stated in the -- as stated in the

14    indictment, I think there's enough evidence for a

15    reasonable juror to convict on those counts.  All right, if

16    you're following me.

17                MR. LEONARD:   I'm following you.  Yes.

18                THE COURT:   Okay.  All right.  Okay.  I'm ready to

19    rule on the motion.

20                This matter's before me on the defendant's motion

21    and renewal motion under Federal Criminal Procedure 29(a)

22    for judgment of acquittal.  For the reasons that follow, I

23    deny the motion:

24                In considering the defendant's Rule 29(a) motion,

25    the Court is required to consider the evidence presented in

1    the light most favorable to the Government and may enter

2    judgment of acquittal only if no reasonable jury could find

3    guilt beyond a reasonable doubt.

4         In making its determination, the Court is not

5    permitted to weigh conflicting evidence or consider the

6    credibility of witnesses as that is the province solely of

7    the jury.  *United States v. White*, 673 F.2d 299, 301, Tenth

8    Circuit, 1982.  The Government bears the burden of

9    establishing each element of the crime charged beyond a

10   reasonable doubt.

11        With respect to Count 1 alleging conspiracy to

12   distribute controlled substances between June 1, 2013, and

13   June 4, 2014, in my view it has been adequately supported

14   by the testimony of and exhibits best discussed with,

15   Agents Brad Gullicksrud, Christopher -- and Josh Mohlman,

16   Christopher Vigil, Simeon Ramirez, and Francisco Aguilar.

17        With respect to Counts 4 and 5 alleging use of a

18   communications facility in the furtherance of a felony on

19   November 16th, 2013, that count has been -- is adequately

20   supported by the testimony of and exhibits discussed with

21   Agent Gullicksrud, Gregory Williams, and Roger Wehr.

22        With respect to Counts 7 and 8, alleging use of a

23   communications facility in furtherance of a felony on

24   November 22d, 2013, that -- those counts are adequately

25   supported by the testimony of and exhibits discussed with

861

 1    Agent Gullicksrud, Mr. Simeon Ramirez, and Agent Mohlman --

 2    Investigator Mohlman.

 3         Count 11, alleging use of a communications

 4    facility in furtherance of a felony on November 23d, 2013,

 5    that count is adequately supported by the testimony of and

 6    exhibits discussed with Agents Gullicksrud and Mr. Sidney

 7    Taylor.

 8         With respect to Counts 13 and 16 alleging use of a

 9    communications facility in furtherance of a felony on

10    November 29th, 2013, in my view those counts are adequately

11    supported by the testimony of and exhibits discussed with

12    Agent Gullicksrud, Mr. Christopher Vigil, and Mr. Roger

13    Wehr.

14         With respect to Count 15 alleging use of a

15    communications facility in furtherance of a felony, which

16    occurred also on November 29th, 2013, I believe that count

17    is adequately supported by the testimony of and exhibits

18    discussed with Agent -- Investigator Mohlman and Mr.

19    LeCesne.

20         With respect to Counts 22 through 26, alleging use

21    of a communications facility in the furtherance of a felony

22    on January 5th, 2014, in my view those counts are

23    adequately supported by the testimony of and exhibits

24    discussed with Agent Gullicksrud and Mr. Robert Painter.

25         With respect to Counts 30 and 31, alleging use of

862

1    a communications facility in furtherance of a felony on

2    January 9th, 2014, in my view those counts are adequately

3    supported by the testimony of and exhibits discussed with

4    Agent Gullicksrud and Mr. Francisco Aguilar.

5         With respect to Counts 39 through 44, alleging use

6    of a communications facility in furtherance of a felony on

7    January 9th, 2014, in my view those counts are adequately

8    supported by the testimony of Agents Gullicksrud and

9    Mohlman and as well as Mr. Robert Painter.

10        And, finally, with respect to Count 45, alleging

11   interstate transportation for the purpose of prostitution

12   on March 17th, 2014, in my view that count is adequately

13   supported by the testimony of and exhibits discussed with

14   Detective Alonzo Rivera, Mr. Tushar Natha, and Investigator

15   Josh Mohlman, Mr. Gregory Williams, and Mr. Robert Painter.

16        All right.  So we're going to take a recess.

17   We're going to look at your revised Man Act instruction and

18   finalize the Court's set of instructions.

19        My practice is to bring out a set, we'll give you

20   each two sets of the Court's instructions and verdict

21   forms.  I'll give you 15 minutes from the time that we

22   bring them out for you to review, collect your thoughts,

23   and what you're going to -- what kind of record you're

24   going to make.

25        I'll come out 15 minutes after you receive those

1    documents and then we'll have our charging conference.  I

2    would recommend to the Government that you give some

3    thought to the exchange I just had with Mr. Leonard with

4    respect to your jury instruction and how you've tied your

5    communications counts to the conspiracy count.

6            MR. PHILLIPS:  Absolutely, Your Honor.  I've

7    already started making some notes.

8            THE COURT:  Okay.  Very well.  We will be in

9    recess.

10          (Recess taken 2:48 p.m. to 3:44 p.m.)

11          THE COURT:  All right.  The record will reflect

12   that the parties and their counsel had 15 minutes to review

13   the Court's set of jury instructions and verdict form.  The

14   way I generally handle these matters -- these conferences,

15   these charging conferences, is to begin by reading into the

16   record a summary of what we have done with respect to the

17   various proposed instructions.  And then I'll let each side

18   have their opportunity to make their record with those

19   instructions and verdict forms.

20          So with regard to the stipulated instructions,

21   stipulated instruction 1.03, 1.04, 1.06, 1.07, 1.08, 1.10,

22   and 1.12 were all adopted.

23          With respect to one stipulated instruction 1.14,

24   that was rejected, since there was no informant testimony

25   in this case; that instruction would not be applicable.

864

1    With respect to stipulated instructions 1.15,

2    1.16, 1.18, 1.19, 1.20, 1.31, there's an instruction that

3    isn't numbered, but it's found at ECF 1207 at page 25

4    having to do with conjunctive-disjunctive.  That was

5    adopted.  So all from 1.15 through 1.31 were adopted.

6    Conjunctive-disjunctive instruction was adopted.

7    1.40, 2.06, 2.26, 2.87, were all adopted.

8    ECF 1207, at page 34, withdrawal from conspiracy,

9    that was adopted.  The rest of these don't -- some of these

10   don't have numbers, I just have to refer to the ECF

11   numbers.  ECF 1207, at page 35, possession with intent to

12   distribute less than 500 grams cocaine, that was modified.

13   ECF 1207, at page 37, possession with intent to

14   distribute less than 28 grams of cocaine base, that was

15   modified.

16   ECF 1207, at page 38, possession with intent to

17   distribute less than 28 grams of methamphetamine, that was

18   modified.

19   The substituted new Man Act instruction from the

20   parties that was stipulated to using a Seventh Circuit

21   pattern instruction, that was adopted.

22   Stipulated instruction 12 -- sorry -- stipulated

23   instruction 2.44 and 2.45 were rejected as the charge

24   applicable to those two instructions were dismissed -- or

25   was dismissed.  And so those two instructions are rejected.

1        ECF 1207, at page 43, proof of knowledge or intent
2   was adopted.
3        And the final stipulated instruction, ECF 1207 at
4   page 44, entire indictment, it's modified, and here's what
5   we're going to do.  Because the indictment is so long, it
6   will be included in the written instructions that go back
7   to the jury deliberation room, but I'm not going to read
8   the entire indictment Monday morning.  So they will have it
9   in written form, I just will save some time and not read
10  the indictment prior to the closing arguments.
11       Also from that indictment, Counts 35 and 47 will
12  be excised, or deleted from that indictment that's going to
13  go back to the jury deliberation room.  And also the
14  forfeiture allegation from the indictment will also be
15  deleted.
16       With respect to the Government's proposed disputed
17  instructions, No. 1 was adopted; No. 2 was rejected; No. 3
18  was rejected; No. 4 was rejected; No. 5 was rejected; No. 6
19  was rejected.
20       With respect to the defendant's proposed disputed
21  instruction B, buyer-seller relationship, that was
22  rejected; and C, reasonable doubt, that was rejected.
23       All right.  So are there any objections to the
24  jury's final -- to the Court's final jury instructions from
25  the Government?

1          MR. PHILLIPS:  Yes, Your Honor.

2          THE COURT:  All right.

3          MR. PHILLIPS:  I guess a matter of housekeeping:

4    Page 9, the stipulated instruction 1.10, ECF No. 1207 at

5    16.

6          THE COURT:  Okay.

7          MR. PHILLIPS:  Which is the impeachment by prior

8    inconsistencies.

9          THE COURT:  Right.

10         MR. PHILLIPS:  Myself and defense counsel have

11   talked.  We both concur and agree that the name that should

12   be in there should be Francisco Aguilar.

13         THE COURT:  Okay.  All right.  We will make a note

14   to make that change -- that addition to the page 9.  All

15   right.

16         MR. McDERMOTT:  And, I'm sorry, Your Honor, just

17   to interject, as long as we're in the singular on the

18   second page, I'm sure you all will catch it, but it should

19   probably say "he" instead of "they" and I assume -- it

20   sounds like the Court is making the changes, but if you

21   need the parties to do it --

22         THE COURT:  Are we talking about the --

23         MR. McDERMOTT:  Same one on No. 9.  As Mr.

24   Phillips was talking, I was just reading, and the second

25   sentence says:  You have also heard that before this trial

 1    they made statements --

 2              THE COURT:  Yeah.  So it's "he" and "his" instead

 3    of "their."

 4              MR. PHILLIPS:  And later "witness" as opposed to

 5    "witnesses."

 6              THE COURT:  How to believe this witness's,

 7    singular possessive.  Okay.

 8         MR. PHILLIPS:  And then I believe the last sentence

 9    should read, "You can only use this as one way of

10    evaluating his" --

11              THE COURT:  Right.

12              MR. PHILLIPS:   -- "testimony."

13              THE COURT:  Okay.  All right.

14              MR. PHILLIPS:  Instruction 2.26 at ECF No. 1207 --

15              THE COURT:  So what -- let's use pages for this

16    instruction -- instruction conference.

17              MR. PHILLIPS:  Page 21.  I believe there should be

18    a period after, in the element that says:  Second, the

19    defendant, in doing so, acted with the intent to cause or

20    facilitate the commission of a drug felony, period.

21              THE COURT:  Where are we talking?

22              MR. PHILLIPS:  I'm sorry, the second element.

23              THE COURT:  Second element.

24              MR. PHILLIPS:  And after the word "drug felony,"

25    should be a period as opposed to connecting it to the

 1    entire conspiracy.

 2              THE COURT:  To facilitate the drug  -- so the

 3    second line of the second -- of the paragraph that begins,

 4    "second"?  Second, the defendant, in doing so, acted with

 5    the intent to commit, cause, or facilitate the commission

 6    of a drug felony, period?

 7              MR. PHILLIPS:  Yes.  And the rest of that

 8    paragraph should not be there.

 9              THE COURT:  The entire rest of the paragraph you

10    are saying should be out?

11              MR. PHILLIPS:  Yes, Your Honor.

12              THE COURT:  Okay.  Why is that?

13              MR. PHILLIPS:  Because as the -- as it's charged,

14    it is charged to commission of a drug felony, not to the

15    commission of the entire conspiracy.

16              THE COURT:  Okay.  Let me hear from the defendant

17    in response to this objection.  This is what we were

18    talking about in your motion.

19              MR. LEONARD:  It is --

20              THE COURT:  Do you want to stand up?  I know

21    you're getting tired at the end of the trial.

22              MR. LEONARD:  I'm sorry.  My brain was trying to

23    engage.

24          I think they need to list the predicate felony.

25    My understanding, maybe I misunderstood, I thought they

869

1    were going to link it to the separate distribution counts,

2    but . . .

3              It is part of our -- I don't know --

4              THE COURT:  So, first, let me get it on the

5    record.  Do you agree or do you object to the Government's

6    proposed revision to the unlawful use of communication

7    facility instruction?

8              MR. LEONARD:  I don't think -- to be honest, I

9    don't think I can -- if they're saying they want to change

10   the instruction as they're the -- and they want to remove

11   the conspiracy as the predicate drug felony, I don't think

12   I can object to that.

13             I do think there does -- has to be linked to some

14   drug felony, not just sort of the nebulous drug felony.  I

15   think the jury needs to have a direction as to what -- what

16   the phone call is being attached to as the drug felony.

17             THE COURT:  So you're saying that -- well, first

18   of all, let me make clear:  You're not objecting to the

19   deletion from this paragraph of the -- that portion of the

20   paragraph that comes after the words "drug felony," namely,

21   the language having to do with the conspiracy count.

22             MR. PHILLIPS:  And, Your Honor, if I may.  This

23   may facilitate it.  If defense would like, if we would have

24   no objection to after "drug felony," say "possession or

25   possession with intent to deliver" -- or "possession or

1    possession with intent to deliver a controlled substance,"

2    period.

3             THE COURT:  Okay, but I just don't -- this is an

4    important point, so I just want to make sure the record is

5    clear.

6             The defendant does not object to the elimination

7    of the language in this paragraph of a reference to the

8    conspiracy count.

9             MR. LEONARD:  Can I have one second?

10             MR. McDERMOTT:  I'm sorry, can we have a moment,

11    please?

12             THE COURT:  Yup.  While they're looking at that,

13    Mr. Phillips, maybe you and Ms. Rangel can wordsmith some

14    additional words that you may want to propose to address

15    the second point Mr. Leonard's making.

16             MR. PHILLIPS:  Okay.

17             MR. LEONARD:  So this is the -- I'm going to be as

18    precise as I can for the record.

19             THE COURT:  Uhm-hum.

20             MR. LEONARD:  This is the defense position.  My

21    understanding is the Government is asking, after -- on

22    page 21, after "drug felony" where a comma -- to make that

23    a period and excise out beginning at "namely" and ending at

24    "substance."

25             THE COURT:  Correct.  That's the proposal from the

1    Government.  What is the defendant's position?

2              MR. LEONARD:  I do not have -- believe I have the

3    ability to object to that, since the Government is the

4    prosecution, it's their burden to carry forward what

5    they've charged.  I do, however, think that there has to be

6    something that -- instead of just drug felony in the

7    abstract, which would leave the jury to try and figure out

8    what is a drug felony under the United States Code, that

9    the Court needs to instruct and the Government needs to

10   pick a count that links to the phone charge, part 1, first;

11   and then there would be an instruction saying that for

12   instance if they choose distribution:  You're instructed

13   that distribution is a drug felony, for lack of a -- that's

14   not the most precise -- how I would say it, but that's

15   where I'm getting.  If that makes sense.

16             THE COURT:  All right.  We're making some

17   progress.  There's no objection to the elimination of

18   the -- that portion of the paragraph after the words "drug

19   felony."  Mr. Phillips, what's your response to the --

20   Mr. Leonard's proposal and how to handle his point that we

21   can't just leave it as commission of a drug felony?

22             MR. PHILLIPS:  I would then suggest -- and I would

23   agree and would suggest the following language.

24             THE COURT:  All right.

25             MR. PHILLIPS:  That after "drug felony" there will

872

1    be a semicolon, namely, comma, distribute and possess with

2    intent to distribute a controlled substance, period.

3            And then as Mr. Leonard just pointed out, at the

4    bottom where it says:  To facilitate the commission of a

5    drug felony means to make the commission of the drug felony

6    easier or aid or assist in the commission of the offense.

7    Then say, You're instructed that distribute and possess

8    with intent to distribute a controlled substance is a drug

9    felony.

10           THE COURT:  Does that satisfy your concerns,

11   Mr. Leonard?

12           MR. LEONARD:  Not, I suppose, to be difficult, I

13   would say the controlled substance needs -- they need to

14   pick cocaine, cocaine base or methamphetamine, as those are

15   the ones charged with the discrete distribution counts.

16           THE COURT:  Okay.  I think that's reasonable.  Do

17   you have a problem with that, Mr. Phillips?

18           MR. PHILLIPS:  I understand the suggestion.  What

19   I'm thinking out loud in my head is how we would create

20   this because we have different drugs for -- throughout the

21   thing, and so the counts up top, as it reads, 4, 5, 7, is

22   how to incorporate that or instruct it.

23           It seems like this instruction then would become

24   unwielding and huge, lengthy, confusing.  That's -- I'm not

25   sure exactly how I'd word it.  I mean, I don't necessarily

1    object to it.  I don't believe it's necessary, but I -- I

2    just am not thinking how we could create such an

3    instruction given the number of counts and different drugs

4    involved.

5          THE COURT:  Right.  I don't think we want to get

6    into the business of having this instruction be repeated

7    for each single count.  I think we want one instruction

8    that deals generically with all the distribution counts.

9          MR. LEONARD:  And I guess my suggestion would be

10    that they say controlled substance, comma, cocaine, comma,

11    cocaine base, comma, or methamphetamine, and just at the

12    bottom after they have instructed that it's a drug felony,

13    say Counts -- whatever counts list the cocaine, list

14    cocaine -- these list the cocaine base, and these list the

15    methamphetamine.  Sorry.

16          THE COURT:  Why do we have to do that last point?

17    I mean, isn't it evident from the other instructions what

18    they're referring to?

19          MR. LEONARD:  I suppose from -- from -- no, I

20    don't think so.  I think the instructions are rather

21    difficult for even lawyers to understand, and that if we

22    can point them directly in that instruction as they're

23    deliberating, it helps them -- helps the jury better focus.

24          THE COURT:  All right.  Let's do this in steps.

25    Okay.  Let's -- first, let's eliminate the language that

1    both sides agree should be eliminated from the paragraph,

2    all language after "drug felony."  And then drug felony,

3    the comma becomes a semicolon, and at least as far as the

4    first set or clause that Mr. Leonard -- I don't think you

5    have objection to that.

6           MR. LEONARD:  No, we're in agreement with that.

7           THE COURT:  So can you read that again, Mr.

8    Phillips, slowly, so we can jot it down here.

9           MR. PHILLIPS:  Semicolon, namely, comma,

10   distribute and possess with intent to distribute a

11   controlled substance.

12          THE COURT:  And then you wanted to end it as a

13   period, but then, Mr. Leonard, you suggested something

14   along the lines, which in this case is -- or which in this

15   case is cocaine, cocaine base, or methamphetamine.

16          MR. LEONARD:  That's correct, Your Honor.

17          THE COURT:  So is there -- I'm just now

18   remembering, we don't have an instruction that says a

19   controlled substance in this case is -- are these drugs.

20   We don't say that somewhere else?

21          MR. PHILLIPS:  I don't know, I would have to

22   check.  But just for the Court's knowledge, as Mr. Leonard

23   was suggesting the cocaine, cocaine base, and -- or either

24   methamphetamine, we were saying that would be good to add

25   as well, so we don't object to that.

875

1          THE COURT:  Okay.  So namely, distribute and

2     possess with intent to distribute a controlled substance,

3     which in this case is cocaine, cocaine base, and

4     methamphetamine.  So are we -- are we okay on both sides up

5     to this point?

6          MR. PHILLIPS:  I believe so.  Yes, Your Honor.

7          THE COURT:  All right.  Mr. Leonard?

8          MR. LEONARD:  Yeah, I'm good up to that point.

9     That's correct.

10          THE COURT:  Okay.  Now, so you -- your -- but you

11     don't want to stop there, you want to add something to the

12     last paragraph.

13          MR. LEONARD:  Correct.  I believe that there then

14     needs to be specificity as to which distribution, and

15     possess with the intent to distribute a controlled

16     substance counts refer to cocaine, or cocaine base or

17     methamphetamine.

18          THE COURT:  So just like enumerate it, Counts X

19     through Y are in reference to cocaine; Z --

20          MR. LEONARD:  Yes, Your Honor.

21          THE COURT:  And that comes at the end of this, so

22     as to -- so you don't have any problem with that last

23     sentence:  To facilitate the commission of a drug felony?

24          MR. LEONARD:  No, I think that's probably what the

25     statute pretty much says, so I --

1          THE COURT:  So then you want the remaining -- you

2     want to basically add a new section to this instruction

3     that says, "In this case, Counts X, Y, involve cocaine as a

4     controlled substance; A through D, cocaine base as a

5     controlled substance; and D through E, methamphetamine as a

6     controlled substance?

7          MR. LEONARD:  Yes, Your Honor.

8          THE COURT:  And you would be satisfied with that?

9          MR. LEONARD:  Yes, Your Honor.

10         THE COURT:  I don't think that's such a difficult

11    thing to do.

12         What do you think, Mr. Phillips?

13         MR. PHILLIPS:  If I may have one moment, Your

14    Honor.  I'll be honest, I'm not quite tracking --

15         THE COURT:  Okay.  I think what he's -- what Mr.

16    Leonard's suggesting -- correct me if you're suggesting

17    something else, Mr. Leonard -- if you'll just hear --

18    listen to what I'm saying, because I'm relaying to

19    Mr. Phillips what you said, and I just want to make sure

20    I'm doing it accurately.

21         That at the end of -- still the same instruction,

22    but maybe we could make it so it's not so cumbersome, make

23    it a different -- a separate instruction and we could say

24    something -- just a different instruction that says:  In

25    this case, Counts -- these counts involve the alleged

```
 1    distribution and possession with regard to cocaine; and

 2    with respect to these other counts, it is alleged that

 3    cocaine base was distributed and possessed.  Have it as a

 4    separate instruction.  What do you think about that?

 5         MR. LEONARD:  I don't object to that.  I just want

 6    there to be something that the jury can understand without

 7    flipping back and forth.

 8         THE COURT:  Yes.  Right.

 9         THE LAW CLERK:  Could I just throw out a different

10    potential organizing principle for this?

11         THE COURT:  Sure.

12         THE LAW CLERK:  Because all these charges are

13    based on they're connected to something that happened on

14    that same date, and so is there a way we could, instead,

15    use the date and come up with something other -- rather

16    than organizing it by the drug?  I don't have anything

17    specifically in mind yet, but I wanted to put that in the

18    mix.

19         MS. RANGEL:  I -- that's how my outline is

20    organized is by date, and the counts are grouped, which is

21    also how our exhibit list was organized, so we kind of

22    already have that in other forms that we could put in the

23    jury instructions, if that makes sense.

24         THE COURT:  Okay.  It just -- and then we could

25    finish this instruction with the changes we have agreed to
```

1    incorporate, and then we could all agree that we will have

2    an additional instruction that will come right after this

3    one that will organize by date the drugs involved.  How

4    about that?

5         MR. PHILLIPS:  I believe -- we believe that's a

6    good idea.  The only one thing about that, I believe that

7    there is one -- at least one that comes to my mind that

8    went from one day into the next.  Actually there was

9    another one, because there was another one that was very

10   late at night and then early in the morning.  But --

11        THE COURT:  But -- couldn't we say -- and then

12   there was two phone calls on the same day.  I think

13   November 29th, there was two on the same day.

14        MS. RANGEL:  Uhm-hum.

15        MR. PHILLIPS:  Right.

16        THE COURT:  But still, the organizing thread would

17   be the date, so we could just -- it could be broken down

18   first phone call on November 29th, X; second phone call Y.

19        MR. PHILLIPS:  I think that makes good

20   organization.  And is -- makes it track -- you can track it

21   for -- the jury could track that.

22        THE COURT:  Okay.  How does that sound, Mr.

23   Leonard?

24        MR. LEONARD:  The defense is fine with that.

25        THE COURT:  All right.  Why don't we do this to

1    save some time today.  I don't know about you folks, but

2    I'm really tired.  Why don't we agree to leave the charging

3    conference open until first thing -- let's do this,

4    let's -- let's -- let's -- at 8 -- let's convene at 8:30

5    and then we could just, for the sole purpose of getting on

6    the record and agreeing to this new instruction that it

7    sounds in concept that all the lawyers are in agreement on,

8    we've just got to punch it out and get -- and get final

9    agreement on the wording.

10         Does that -- and then you folks can exchange

11   e-mails over the weekend and come to an agreement on that.

12         MR. PHILLIPS:  I think that's a great idea and

13   we're open to that.

14         MR. LEONARD:  Yeah, I'm fine with that.

15         THE COURT:  Okay.  Let's do that.  So since we're

16   agreed we're going to do it just for our purposes of page

17   numbering, let's see -- so, Brian, I think what we could do

18   is just like insert a blank page after 21 and, you know,

19   just put new instruction, and then we -- once we've agreed

20   Monday morning, then we can then insert the text that the

21   lawyers have agreed to on the new -- what will be new

22   page 22, and then the remainder -- assuming there are no

23   other pagination changes, the remainder of the set will be

24   paginated from 23 to the end.

25         All right?  So let's do that.  Okay?

880

1            MR. PHILLIPS:  One other suggestion on this

2      instruction, Your Honor.  I believe we need to add, at the

3      bottom, you're instructed:  Distribute and possess with

4      intent to distribute a controlled substance.  And it's fine

5      to include cocaine, cocaine base, or methamphetamine is a

6      drug felony.

7            THE COURT:  Are you talking about what I -- the

8      language that I added?

9            MR. PHILLIPS:  No.  I think just because I believe

10     the language you're adding is going to be the new page, I'm

11     just talking about --

12           THE COURT:  No, no, no, the language that -- okay.

13     Let's get this clear.  Correct page 21, where we've agreed

14     what comes out of that second paragraph and then putting --

15     inserting a semicolon after "drug felony" and then we're

16     going to -- we're going to insert after that the following:

17     Namely, comma, distribute and possess with intent to

18     distribute a controlled substance, comma, which in this

19     case is cocaine, cocaine base, and methamphetamine.

20           I thought I got the two sides to agree to that.

21           MR. PHILLIPS:  I agree to that, Your Honor.

22           THE COURT:  Okay.

23           MR. LEONARD:  I do agree with that.  And I -- just

24     I agree with what Mr. Phillips is saying.  I think there

25     needs to be additional advisement that the possession with

1    intent is the drug felony.

2            THE COURT:  Okay.  So you want to add what and

3    where?  Where in the --

4            MR. PHILLIPS:  New paragraph --

5            THE COURT:  After the -- so there's this -- to

6    facilitate a single-sentence paragraph --

7            MR. PHILLIPS:  Right.

8            THE COURT:  -- right?  You want to add another new

9    paragraph?

10            MR. PHILLIPS:  Correct.  Either right before that

11    or right after that.  I don't think it matters.

12            THE COURT:  I'm just -- as long as we keep it all

13    in one -- since we're deleting quite a bit, we probably can

14    keep it all on 21, because, hopefully, what you will agree

15    to over the weekend will be -- can be all fitted on one

16    page.

17            So, okay, what's your new -- your new -- it's a

18    new single-sentence paragraph.

19            MR. PHILLIPS:  Correct.

20            THE COURT:  All right.  What is that?

21            MR. PHILLIPS:  You are instructed that distribute

22    and possess with intent to distribute a controlled

23    substance, comma, in this case cocaine, cocaine base, or

24    methamphetamine, is a drug felony.

25            THE COURT:  Okay.  Mr. Leonard, do you agree with

1    that?

2          MR. LEONARD:  We -- I would agree, except I would

3    ask that you omit "in this case," since it's always --

4          MR. PHILLIPS:  Oh, actually, I would agree with

5    that because -- I understand why the Court earlier had "in

6    this case" so --

7          THE COURT:  Okay.  So you agree to keep "in this

8    case" the first time, but you want it out the second time?

9          MR. LEONARD:  Correct.  Yes.

10         THE COURT:  Okay.

11         MR. PHILLIPS:  And we're fine with that, Your

12    Honor.

13         THE COURT:  So you are instructed that distribute

14    and intent to distribute a controlled substance, comma,

15    cocaine, cocaine base, and methamphetamine, is a drug

16    felony.  Are we agreed on that?  Mr. Leonard?

17         MR. LEONARD:  Yes, we are.

18         THE COURT:  Okay.  All right.  Any other

19    objections to the Court's set of jury instructions from the

20    Government?

21         MR. PHILLIPS:  Your Honor, page 26, I believe that

22    only gets given if withdrawal is a defense.  And I don't

23    think there's been evidence of that.

24         THE COURT:  So why did you stipulate to it?

25         MR. PHILLIPS:  Because we had it before -- before

1     trial.  We never know if that's going to be the defense

2     that's raised or not.

3               THE COURT:  That's true.  That's true.  Defendant

4     want to -- wish to be heard on this?

5               MR. LEONARD:  That -- I stipulated -- the defense

6     stipulated to it in the beginning just because it was a

7     pattern instruction.

8               THE COURT:  Right.

9               MR. LEONARD:  But I think it's fine to withdraw

10    the instruction.

11              THE COURT:  Okay.  The withdrawal from the

12    conspiracy instruction will be deleted from the final set

13    of instructions.

14              Any other objections to the Court's jury

15    instructions from the Government?

16              MR. PHILLIPS:  Page 27.

17              THE COURT:  Okay.

18              MR. PHILLIPS:  The fourth element.

19              THE COURT:  Okay.

20              MR. PHILLIPS:  Where it ends with:  Less than 500

21    grams --

22              THE COURT:  Right.

23              MR. PHILLIPS:  -- it should say, "500 grams of a

24    mixture or substance containing a detectable amount of

25    cocaine."

884

1          THE COURT:  Okay.  So those are -- Mr. Leonard, do

2     you agree?

3          MR. LEONARD:  I do, Your Honor.

4          THE COURT:  Okay.  So less than 500 grams of a

5     mixture or substance containing a detectable amount of

6     cocaine.

7          All right.  Any other objections?

8          MR. PHILLIPS:  Page 30.  Fourth element.  It

9     should say "mixture or substance containing a detectable

10     amount of."

11          THE COURT:  Is that what the statute says?

12          MR. PHILLIPS:  It is, Your Honor, and that's how

13     he's charged.

14          THE COURT:  Okay.  All right.  Do you agree with

15     that, Mr. Leonard?

16          MR. LEONARD:  Yeah, I believe that's how -- I

17     agree that's how the statute defines it.

18          THE COURT:  All right.  So fourth element,

19     "substance containing a detectable amount of

20     methamphetamine."  Right?  Any other objections?

21          MR. PHILLIPS:  Page 31.

22          THE COURT:  Okay.

23          MR. PHILLIPS:  Someone who has better English

24     skills than myself and Mr. Leonard, caught the fact that

25     the second element should say, "at the time of

885

 1    transportation, the defendant intended that the individual"

 2    instead of "an individual."

 3            THE COURT:  Okay.  I think that's correct.

 4            MR. LEONARD:  I agree.  I am proud that

 5    Mr. Phillips and I didn't use "a," we used "an," which is

 6    correct.

 7            THE COURT:  All right.  Any other objection?

 8            MR. PHILLIPS:  Finally, on page 36.

 9            THE COURT:  I like the word "finally."  Go ahead.

10            MR. PHILLIPS:  Where it says, "superseding

11    indictment charging statutes."  I believe we should remove

12    18 U.S.C. 922(g)(1).

13            THE COURT:  Oh, good point.

14            MR. PHILLIPS:  And 18 U.S.C. 924(c)(1)(A).

15            THE COURT:  You agree, of course, Mr. Leonard?

16            MR. LEONARD:  I do, Your Honor.

17            THE COURT:  Okay.  So that -- we do have this in

18    editable form, right?

19            THE LAW CLERK:  Yes.

20            THE COURT:  While I still have you up, Mr.

21    Phillips, does the Government have any objection to the

22    verdict form?

23            MR. PHILLIPS:  Yes, Your Honor.

24            THE COURT:  Okay.

25            MR. PHILLIPS:  We believe that in order to --

1    well, let's go to page 2, (1)(a) where it says:  "We, the

2    jury, upon our oaths unanimously find," we should insert,

3    "beyond a reasonable doubt that" --

4              THE COURT:  Then why just there?

5              MR. PHILLIPS:  What?

6              THE COURT:  Why don't we have it in Count 1?

7              MR. PHILLIPS:  Oh.  Wait.  Yeah, we should there.

8              THE COURT:  Let me ask you, I have not done -- I

9    don't think you asked for this in the Cisneros trial, but

10   if there's an instruction on what's the burden of proof,

11   why do we have to restate it in the verdict form?

12             MR. PHILLIPS:  Your Honor, I -- I didn't believe

13   that we needed to.  These -- actually, the verdict forms

14   you probably recognize came from the Cisneros trial.  Mr.

15   Leonard has suggested that he believes it's necessary.

16   We're not afraid of it in any way.  That's why we suggested

17   it, so . . .

18             THE COURT:  Well, I mean, one of your -- one of

19   your objections, I forget which one, Mr. Leonard, raised a

20   point that's one that's very important to me that I look at

21   in all my jury instructions, criminal or civil, which is

22   the repetition of terms, calling attention to certain

23   things, and maybe some things need to be called attention

24   to.

25             But usually I like to state things once in an

887

 1    instruction, if for no other reason than because we have

 2    pretty savvy jurors who are not trained in the law and they

 3    may try to read too much into something that's repeated

 4    twice; that's -- where other things are not repeated twice.

 5          I think -- let me put it this way:  I've not in

 6    a -- in a prior criminal case repeated the burden of proof

 7    with the question of -- as to every single count in the

 8    verdict form when I have an instruction that clearly lays

 9    out the burden of proof on the Government.

10          So, you know, why do you believe it has to be

11    repeated again?

12          MR. LEONARD:  And that was the issue where the

13    instruction -- yeah, I was -- was changed to include the

14    "beyond a reasonable doubt" as to the elements, so we

15    withdrew our objection as to both the verdict form and the

16    instruction.  So we don't think -- we think this verdict

17    form is fine.

18          THE COURT:  Okay.

19          MR. PHILLIPS:  And to make it easy, so do we, Your

20    Honor.

21          MR. McDERMOTT:  Your Honor, you were asking me

22    earlier and that's what I was about to explain.  There

23    was -- there was a conference between Mr. Leonard and.

24    Mr. Phillips, and then e-mails and subsequent instructions

25    were tendered, and we figured it out --

888

1          THE COURT:  Okay.

2          MR. McDERMOTT:  -- after some work and tendering

3    and some draftsmanship, so I think everything's okay.

4          THE COURT:  So you're withdrawing that objection.

5          MR. PHILLIPS:  Yes, Your Honor.  And we believe

6    they're --

7          THE COURT:  So, but while -- we might as well -- I

8    mean, this is the highlight -- we highlighted some points

9    here, and I think it applies to both, but we might as well

10   run through them with you, Mr. Phillips.

11         And maybe this was -- the highlight, "as

12   referenced in instruction No. XX," why do we need to have

13   that in there?  I think it's just cleaner without that last

14   clause.

15         MR. PHILLIPS:  I would agree, Your Honor.

16         THE COURT:  Okay.

17         MR. PHILLIPS:  I think it is clear without that.

18         THE COURT:  All right.  And then we would have to

19   keep track -- whenever you have internal citation -- or

20   references, if you change something, you always have to be

21   worrying about remaining internally consistent.

22         All right.  So question 1A, there will be a colon

23   after "cocaine" and the remainder of that question will be

24   stricken.

25         And I think we should do the same with 1B.  Do you

1    agree, Mr. Phillips?

2              MR. PHILLIPS:  I do.

3              THE COURT:  Mr. Leonard?

4              MR. LEONARD:  Yes, Your Honor.

5              THE COURT:  Okay.  After "cocaine," there will be

6    a colon and the remainder of that question will be

7    stricken.  We'll do the same with 2A, colon after "cocaine

8    base," and the remainder of that question stricken -- oh,

9    and by the way, just going back to the first page, I wanted

10   to make -- one second, Mr. McDermott, let me not lose my

11   thought.

12             MR. McDERMOTT:  Okay.  Sorry.

13             THE COURT:  We changed the -- you folks had it:

14   Please skip the following questions.  And I thought that

15   was dangerous to say "the following," you know.  Jurors may

16   not know how many -- how many questions should they skip?

17   So we stuck in there specifically the questions they should

18   skip if there's a not-guilty finding on Count 1.

19             All right.  Mr. McDermott, you were going to say?

20             MR. McDERMOTT:  We -- we discussed it.  Never

21   mind.

22             THE COURT:  Okay.  All right.

23             MR. McDERMOTT:  I'm pain resistant, so . . .

24             THE COURT:  Okay.  Question 2B, colon after

25   "cocaine base," the remainder of that question is deleted.

 1      Question 3A, colon after the word "methamphetamine."  The

 2      remainder of that question is deleted.

 3              All right.  Beyond that, does the Government have

 4      any objection -- any further objections to the verdict

 5      form?

 6              MR. PHILLIPS:  No, Your Honor.

 7              THE COURT:  Okay.  Objections from the defendant

 8      to the Court's set of jury instructions as amended now

 9      during the charging conference with our colloquy and

10      agreements?  Who's going to handle it for the defendant?

11              MR. LEONARD:  Mr. McDermott is.

12              MR. McDERMOTT:  Your Honor, I do not have any

13      grammatical changes from --

14              THE COURT:  So you just have substantive issues.

15              MR. McDERMOTT:  The ones that were already

16      tendered, we did tender the reasonable doubt instruction,

17      it is different than the Tenth pattern that was tendered by

18      the Government.

19              THE COURT:  Let me make the following statement.

20      I neglected to make it, and maybe that will take care --

21      save you some time on your objections.

22              Any instruction that the parties submitted that

23      were not included in this set have been either rejected in

24      whole or in part or revised, meaning implicitly that --

25      that the Court has ruled on your proposal and has either

1    sustained the Government's objection to it or has not

2    adopted your proposal.

3         So I don't think you need to get up again to say,

4    We submitted X instruction and you didn't include it.

5    It's -- it's a given that if it's not in this set, your

6    proposed disputed instruction was rejected.  You've made

7    your record.

8         MR. McDERMOTT:  Okay.  It sounds like I guess the

9    old days before my time when you say exception after your

10   objection was overruled, I don't need to do that; I've made

11   my record, so --

12        THE COURT:  Okay.

13        MR. McDERMOTT:  I know, it's late.

14        THE COURT:  Yeah.  You've submitted your

15   instruction, it's not included in the final set, it's

16   rejected, it's -- in my mind, it's clear for the record

17   that you've made your record on that point.

18        Apart from an instruction that was not included,

19   do you have any objection to any instruction in the Court's

20   set that you have a particular objection to?

21        MR. McDERMOTT:  No, Your Honor.

22        THE COURT:  Great.  Does the defendant have any

23   objection to the Court's verdict form as we've revised it

24   orally now with the charging conference?

25        MR. McDERMOTT:  No, Your Honor.

 1          THE COURT:  Okay.  Excellent.  Do counsel agree --
 2   I want to get on the record, do counsel agree that as I'm
 3   reading the jury instructions to the jury, that if I find
 4   that there are any amendments necessary as a result of any
 5   typographical, grammatical or syntactical -- I love that
 6   word -- errors, that I can make them as I'm reading it to
 7   the jury?
 8          For the Government?
 9          MR. PHILLIPS:  The Government would agree.
10          THE COURT:  All right.  For the defendant?
11          MR. LEONARD:  Yes, we would be pleased if you did.
12          THE COURT:  All right.  Two last things:  Length
13   of closing argument.  I'll take input from counsel as to
14   how much they'd like.
15          MR. PHILLIPS:  If I may have one moment, Your
16   Honor.
17          THE COURT:  Sure.
18          MR. PHILLIPS:  Your Honor, we'd ask for 90
19   minutes; not sure if we would use that.
20          THE COURT:  Whoa.
21          MR. PHILLIPS:  That surprised the Court.
22          THE COURT:  Yes, I don't think I've ever allowed
23   90 minutes.  How much does the defendant want?
24          MR. LEONARD:  30 minutes.
25          THE COURT:  Oh, what a difference.

1    MR. PHILLIPS:  So we would ask for 60.  Split in

2  the middle.  Look at the side's cooperation.

3    THE COURT:  I'll give you each 60 minutes.  And as

4  I said on the voir dire, that I gave you 30, but if you

5  were done at 11 minutes, sit down.  So just don't go on to

6  fill 60 minutes.

7    Mr. Leonard, you'll have up to 60 minutes.  If you

8  want to take 25, and you've said your peace, that's it.

9    MR. LEONARD:  Yeah, I cannot anticipate taking

10  longer than 30 minutes.  I just don't think it's --

11    THE COURT:  Okay.  So each side will have 60

12  minutes for closing argument.  Per my practice standards,

13  that means, Mr. Phillips, that you can hold back only 20 --

14  no more than 20 minutes for your rebuttal.

15    MR. PHILLIPS:  Understood.

16    THE COURT:  Okay.  And then to give you some

17  flexibility, you don't have to give me an answer now unless

18  you want to, we can wait until Monday morning for you to

19  tell me how much of a warning you would want for both

20  segments.  Who's going to do the closing?

21    MS. RANGEL:  We both are.

22    THE COURT:  Okay.  So we'll need to know how much

23  of a warning for both segments, and the same for you,

24  Mr. Leonard, how much of a warning you want.  You can tell

25  us on Monday morning.

1        The last thing is Ms. Hansen is going to run -- I

2   do this in every trial because it's always a good thing to

3   do.  She's going to run through her records of the exhibits

4   that have been admitted, and I want to make sure that they

5   comport with your records.  Hopefully you folks are keeping

6   them and not your paralegals that are gone because maybe

7   you let them go back to the office too soon.  Hopefully you

8   have your own records.

9        MR. PHILLIPS:  We did have a list that we have, so

10  we're prepared.

11        THE COURT:  Okay.  Is the defendant prepared?

12        MS. WENDY ANDERSON:  It's buried, Your Honor.  We

13  have to find it.

14        THE COURT:  I'll give you a moment to find it.

15        MS. WENDY ANDERSON:  We're ready, Your Honor.

16        THE COURT:  Okay.  Deb.

17        COURTROOM DEPUTY:  I'm going to go page by page.

18  So the first page, 1 through 4, admitted; page 2, 5 through

19  8, admitted; 9 through 11, admitted; 12 through 14,

20  admitted; 15 through 19, admitted; 20 through 24, admitted;

21  25 to 29, admitted; 30 through 34, admitted; 35 through 39,

22  admitted; 40 through 43, admitted; 44 through 46, admitted;

23  47 through 50, admitted; 51 through 54, admitted; 55,

24  admitted; 56, rejected; 57, 58, 59, received; 56-A

25  received -- or admitted, I'm sorry.  Same thing.

1          MR. PHILLIPS:  When you said received, was --

2          COURTROOM DEPUTY:  Yeah, let me repeat.  55

3    admitted; 56, rejected; 57, 58, 59 admitted; 56-A,

4    admitted.

5          MR. PHILLIPS:  Agreed.

6          THE COURT:  All right.  Does that comport with the

7    Government's records?

8          MR. PHILLIPS:  There's a number of exhibits still.

9    That page was a bit confusing, we're just con --

10          THE COURT:  That's right, we went into three

11    digits.

12          COURTROOM DEPUTY:  60 through 64, admitted; 65

13    through 69, admitted; 70 through 73, admitted; 74 through

14    78, admitted; 79 through 83, admitted; 84 through 87,

15    admitted; 88 through 92, admitted; 93 through 97, admitted;

16    98 through 102, admitted; 103 through 107, admitted; 108

17    through 113, admitted; 114 through 119, admitted; 120

18    through 123, admitted; 124 is a demonstrative, admitted but

19    won't go back to the jury; 125 is admitted.

20          THE COURT:  All right.  Does that comport with the

21    Government's records?

22          MR. PHILLIPS:  It does, Your Honor.

23          THE COURT:  All right.  Does it comport with the

24    defendant's records?

25          MS. WENDY ANDERSON:  I just have a question on

1    one.  May I refer to my notes, Your Honor?

2              THE COURT:  Sure.

3              MS. WENDY ANDERSON:  I had a question on 53.

4              COURTROOM DEPUTY:  Okay.

5              MS. WENDY ANDERSON:  I didn't know that it had

6    been admitted.

7              COURTROOM DEPUTY:  It was admitted on the 24th.

8    Oh, so that is today.

9              THE COURT:  53.  That was one of the backpage.com.

10             MS. WENDY ANDERSON:  I just didn't have that

11   written down.

12             MR. PHILLIPS:  So we agree.

13             THE COURT:  Okay, Ms. Anderson?

14             MS. WENDY ANDERSON:  Yes, Your Honor.

15             COURTROOM DEPUTY:  And for the defendant, I have

16   one admitted, D.

17             THE COURT:  That's not listed --

18             COURTROOM DEPUTY:  The judgment.

19             THE COURT:  Oh, Mr. --

20             MR. PHILLIPS:  Ramirez.

21             THE COURT:  -- Ramirez's judgment.  And that

22   was -- you labeled -- you got a label and --

23             COURTROOM DEPUTY:  Yes.  Is that going back to the

24   jury?

25             THE COURT:  Yes.

1                COURTROOM DEPUTY:  Okay.

2                THE COURT:  Because that was the basis that Mr.

3     Leonard can reference it in his closing if he wishes to and

4     argue from it, and it's going back to the jury.

5                MS. WENDY ANDERSON:  Your Honor, may I remove the

6     original from the courtroom and take it back and copy it to

7     put in the juror notebooks?

8                COURTROOM DEPUTY:  I made a number of copies.

9                MS. WENDY ANDERSON:  Did you make a number?

10               COURTROOM DEPUTY:  With D on it.  Yes.

11               MS. WENDY ANDERSON:  Correct.

12               THE COURT:  Okay.  And A, B, and C were not

13    offered, right?

14               COURTROOM DEPUTY:  Correct.

15               MR. PHILLIPS:  That's correct.

16               THE COURT:  Okay.  So we'll get back together at

17    8:30 on Monday morning to deal with that last instruction.

18    And then we'll finalize a set -- we will bring out a set of

19    the final, final, including this last instruction, in

20    unannotated form so that you'll have it for closing.  If

21    you want to use it on the ELMO, it will -- you'll have it

22    without the footnotes at the bottom.

23               All right.  Anything else we need to deal with

24    before we recess for today?

25               MS. RANGEL:  I was just going to suggest, if

 1    Mr. Hawkins wants to send me either just that one

 2    instruction on the phone counts or the whole thing, I can

 3    start to work on it, and we can get you back a final

 4    version, if that's acceptable to you, so that way you're

 5    not plugging in another page.  I'm happy to do that.

 6              THE COURT:  Oh.  That works for me.

 7              MS. RANGEL:  Okay.

 8              THE COURT:  But besides that, anything else for

 9    the Government that we need to deal with today?

10              MS. RANGEL:  No.  Thank you.

11              THE COURT:  All right.  Anything else from the

12    defendant that we need to deal with today?

13              MR. LEONARD:  No.  Thank you, Your Honor.

14              THE COURT:  All right.  We will be in recess until

15    8:30 Monday morning.

16         (Proceedings concluded at 4:41 p.m.)

17                              **INDEX**

18    Item                                               PAGE

19                   GOVERNMENT'S WITNESSES

20         **JOSH MOHLMAN**
           Direct Examination by Mr. Phillips         702
21         Voir Dire Examination by Mr. Leonard       728
           Direct Examination by Mr. Phillips (Cont'd)  735
22         Cross-examination by Mr. Leonard           806
           Redirect Examination by Mr. Phillips       822
23
           Argument on Rule 29 Motion                 835
24         Court's Ruling                             859

25         Charging Conference                        863

```
 1                        GOVERNMENT'S EXHIBITS

 2      EXHIBITS:        Offered    Received   Refused   Stipulated

 3      52               762        762

 4      53               764        764

 5      54               765        765

 6      58               768        768

 7      70               801        801

 8      71               757        758

 9      72               757        758

10      73               757        758

11      74               757        758

12      75               757        758

13      76               757        758

14      77               757        758

15      78               757        758

16      79               757        758

17      80               757        758

18      81               757        758

19      82               757        758

20      83               757        758

21      84               757        758

22      85               757        758

23      86               757        758

24      87               757        758

25      88               757        758
```

900

```
 1                    GOVERNMENT'S EXHIBITS

 2      EXHIBITS:         Offered    Received   Refused    Stipulated

 3      89                757        758

 4      90                757        758

 5      91                757        758

 6      92                757        758

 7      93                757        758

 8      94                757        758

 9      95                757        758

10      96                757        758

11      97                757        758

12      98                757        757

13      108               775        776

14      109               779        780

15      125               704        705

16

17                   *     *     *     *     *

18                    REPORTER'S CERTIFICATE

19          I certify that the foregoing is a correct transcript

20      from the record of proceedings in the above-entitled

21      matter.

22          Dated at Denver, Colorado, this 15th day of May, 2017.

23

24                        Mary J George

25          _                    |                      _
```