1           IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLORADO
2
    Criminal Action No. 14-cr-0231-WJM-1
3
    UNITED STATES OF AMERICA,
4
            Plaintiff,
5
    vs.
6
    RICKY GARRISON,
7
            Defendant.
8
    ------------------------------------------------------------
9
                    REPORTER'S TRANSCRIPT
10                  (Jury Trial - Day 5)
                        VOLUME VI
11  ------------------------------------------------------------

12          Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13  Judge, United States District Court for the District of

14  Colorado, commencing at 8:38 a.m., on the 27th day of

15  February, 2017, in Courtroom A801, United States

16  Courthouse, Denver, Colorado.

17
                        APPEARANCES
18
            ZACHARY H. PHILLIPS and CELESTE B. RANGEL, Assistant
19  U.S. Attorney, 1801 California Street, Suite 1600, Denver,
    Colorado 80202, appearing for the plaintiff.
20
            MILLER M. LEONARD, Miller Leonard, P.C. 14143 Denver
21  West Parkway, Suite 100, Golden, Colorado 80401 and
            SEAN M. McDERMOTT, McDermott Stuart & Ward, LLP, One
22  Sherman Place, 140 East 19th Avenue, Suite 300, Denver,
    Colorado 80203, appearing for the defendant.
23
24              MARY J. GEORGE, FCRR, CRR, RMR
            901 19th Street, Denver, Colorado 80294
25          Proceedings Reported by Mechanical Stenography
                Transcription Produced via Computer

P R O C E E D I N G S

1

2    (Call to order of the court outside the presence of

3    the jury at 8:38 a.m.)

4    THE COURT:  All right.  We're finishing up our

5    charging conference from Friday.  The record will reflect

6    that the revisions to the jury instructions and verdict

7    form that we discussed on Friday have been made, have

8    revised sets of both documents have been provided to

9    counsel.

10    So let me ask of the Government first, are there

11    any remaining objections to either of the Court's final set

12    of jury instructions or the verdict form?

13    MR. PHILLIPS:  No.  Thank you, Your Honor.

14    THE COURT:  All right.  From the defendant?

15    MR. McDERMOTT:  No, Your Honor.  Just the ones we

16    already submitted and that you've already dealt with.

17    THE COURT:  Right.  And --

18    MR. McDERMOTT:  Yes.

19    THE COURT:  -- dealt with, and you've made your

20    objections to what wasn't included.  But specifically with

21    regard to the revisions that were made from Friday,

22    you're -- the defendant is okay with those?

23    MR. McDERMOTT:  Yes, Your Honor.

24    THE COURT:  Okay.  So let me -- oh, the -- you've

25    gotten sets of the instructions without the annotations.

1          MR. PHILLIPS:  We have, Your Honor.

2          THE COURT:  Okay.  And so this is what we're going

3    to do.  Mr. Hawkins will be back in his office while I'm

4    reading the instructions, and you will recall the agreement

5    we got on the record on Friday that as I was reading it, as

6    sometimes happens, I will note grammatical or other kind of

7    errors, nonsubstantive, of course, and I will make them

8    with counsel's agreement on the record.  Mr. Hawkins will

9    make those revisions back in chambers.  And then before we

10   start closing arguments, if there are any such revisions,

11   he'll bring out those pages to counsel so that you will

12   have them in case you want to use any of them during your

13   closing arguments.

14          Which leads us to the closing arguments.  How much

15   of a warning for the opening segment of the closing

16   argument does the Government want?

17          MS. RANGEL:  I think two minutes would be great.

18          THE COURT:  Two minutes?

19          MS. RANGEL:  Yes.  Thank you.

20          THE COURT:  And how about for the rebuttal

21   portion?

22          MR. PHILLIPS:  Two minutes as well.

23          THE COURT:  All right.  How much of a warning does

24   the defendant want for its closing argument?

25          MR. LEONARD:  Two minutes, Your Honor.

1          THE COURT:  Two minutes all around makes it easy

2     for Ms. Hansen.  Let me just point out to the Government,

3     because this has come up before a couple of times, and I

4     just want to make sure everybody's clear on this:  The way

5     we split it up for the Government is you have 40 minutes

6     and 20 minutes.  If you take only 35 minutes in your

7     opening, that does not mean that you have 25 minutes in

8     rebuttal.  You always -- you never get more than 20 minutes

9     in rebuttal, just so we're clear on that.

10          MR. PHILLIPS:  And that's the way we've prepared.

11     Thank you, Your Honor.

12          THE COURT:  Okay.  Excellent.  All right.  Do you

13     know if all the jurors are here?

14          COURTROOM DEPUTY:  I do not.

15          THE COURT:  Okay.  So since we don't know that,

16     we'll take a brief recess.  Is there anything we need to

17     deal with before we bring out the jury in a few moments for

18     me to start reading instructions?

19          MR. McDERMOTT:  Your Honor, just very briefly.  We

20     already did make a Rule 29 motion.  May I step to the

21     lectern, please?

22          THE COURT:  Sure you may.

23          MR. McDERMOTT:  Just as I was reviewing the record

24     over the weekend, my intention was drawn to Count 38, and

25     that deals with the March 2d alleged transaction.  And

1    Count 38 charges that on March 2d, Mr. Garrison did

2    knowingly and intentionally distribute and possess with the

3    intent to distribute less than 500 grams of a mixture or

4    substance containing a detectable amount of cocaine.

5         When I went through the record, all of the

6    evidence that came out with respect to that transaction

7    through Mr. Painter, he actually identified that as base or

8    crack cocaine.  And so that, from our perspective, is very

9    different than what was charged.  And I believe all of the

10   evidence goes to crack cocaine rather than powder cocaine.

11        And so we would renew our motion for judgment of

12   acquittal with respect to all the counts that we previously

13   submitted, but I did want to at least focus the Court's

14   attention to Count 38.  And I will also simply apologize,

15   but as I was going through the record, it just -- it jumped

16   out at me, and I felt compelled to bring it to both

17   Mr. Phillips' attention and the Court's attention.

18        THE COURT:  Okay.  First of all, with respect to

19   you making another general renewal of your 29 motion, I

20   don't think you get to renew it twice.  I made it very

21   clear on the record that on Friday afternoon we were taking

22   argument on both the -- your motion and the renewal of your

23   motion, given the stipulation of the parties that we

24   made -- so that -- you made, so that the jury could be sent

25   home in the middle of the day.

1           With respect to Count 38, so your objection is

2   that the count in the indictment references a count of

3   distribution of cocaine and it's your -- the defendant's

4   contention that the evidence that came in with respect to

5   this count, in other words, the transaction on March 2d,

6   2014, the testimony was just -- was just -- was with regard

7   to cocaine base.

8           MR. McDERMOTT:  Correct.

9           THE COURT:  All right.  Can I hear from the

10  Government on this?

11          MR. PHILLIPS:  Thank you, Your Honor.  As the

12  Court noted, I think time for a Rule 29 has come and gone;

13  but, secondly, as far as cocaine and cocaine base are

14  concerned, the jury's heard endless testimony from numerous

15  witnesses that cocaine base is nothing more than cocaine

16  that's cooked into a hard base, freebase-type thing, where

17  the inositol, or whatever else is in there, is cooked off.

18          This is no different than had cocaine and cocaine

19  base both been sent to a lab, the result is always the

20  same, the result is it's cocaine.  It's kind of like water

21  and ice.  If you sent ice in, water, and they're both

22  H2O --

23          THE COURT:  The formula is the same.

24          MR. PHILLIPS:  The formula is the same.  The only

25  difference between this and, say, meth when it's charged,

1    you can't look at meth and say, Okay, that's, you know,

2    98 percent pure.  And that's why there's a charging

3    document, as this Court has seen numerous times, where it's

4    50 grams or more of actual methamphetamine, or 500 grams or

5    more of a mixture or substance.

6            As such, this is simply, you know, a police

7    officer or somebody, a witness can look at cocaine base and

8    say that's base compared to powder, but it's -- it's H2O,

9    it's water, it's ice, it's cocaine.

10           THE COURT:  All right.  Okay.  Thank you.

11           Mr. McDermott, do you have any case law to cite,

12   since you had the weekend to be thinking about this, and

13   you're just springing it on all the rest of us, do you have

14   any case law to support your motion that -- the distinction

15   that you're making in terms of the form of the controlled

16   substance is a grounds for entry of a judgment of

17   acquittal?

18           MR. McDERMOTT:  Your Honor, I -- frankly, I

19   noticed it -- I had gone through the entire record and then

20   visited my client two times over the weekend, and after

21   my -- during my second visit --

22           THE COURT:  You don't have to tell me what you did

23   over the weekend --

24           MR. McDERMOTT:  I understand.  It came to my --

25           THE COURT:  Don't talk over -- after all this

1    time, Mr. McDermott, please, don't talk over me.

2            Do you have a case to cite to me that the --

3    what -- the distinction that you have raised that the

4    controlled substance was in a form different than what was

5    charged in the indictment is grounds for entry of a

6    judgment of acquittal?

7            MR. McDERMOTT:  And where I was going, Your Honor,

8    is I began research regarding variance, and it came to my

9    attention late yesterday, and I have not concluded that

10   research.  So right now I do not have a case.  I did go

11   back and I looked at Rule 29.  I believe there's a

12   provision that permits us to make a motion after a jury's

13   verdict within 14 days.  And I don't want to prolong

14   things, but I did at least look at that and began the

15   research, but, frankly, I didn't want to -- short answer is

16   no, but that's taking you through the process and what

17   occurred over the weekend.  So that's where I am right now.

18           Part of my concern is, is I know the properties

19   are the same, but under the law, if Mr. Garrison was found

20   guilty of the base, the way the testimony has come out,

21   instead of powder cocaine, I believe it would trigger a

22   mandatory minimum, and that is what really jumped out at

23   me.  And when we were discussing this last night, that was

24   my major concern.

25           THE COURT:  All right.  But if the -- the way the

1    verdict form reads, it doesn't read -- well, let me make

2    sure.

3            The way the verdict form reads is:  Does -- do

4    you, the jury, find the defendant, Garrison, on Count 38,

5    not guilty or guilty?  So I agree with you that there may

6    be some sentencing disparity depending on which form of the

7    controlled substance it may be, but wouldn't the way the

8    evidence came out and how the verdict form was written,

9    wouldn't it be to your client's benefit?

10           MR. McDERMOTT:  For Count 38, yes.  I am somewhat

11   concerned that if they do find him guilty of that, though,

12   then it will relate to their verdict with respect to

13   Count 1.  And if he's found guilty of that amount of base

14   cocaine as it pertains to Count 1, then we have a problem.

15           THE COURT:  Well, okay, but, again, the verdict

16   form is going to reflect that they're finding him guilty of

17   distributing cocaine.  All right?

18           MR. McDERMOTT:  Correct.

19           THE COURT:  So where does -- Mr. Phillips, do you

20   have, off the top of your head, a list of which counts --

21   which of the distribution counts goes as to which substance

22   and which form of the substance?

23           MR. PHILLIPS:  Not off the top of my head, but I

24   can say that Count 1's been charged that way since the very

25   beginning.  They --

1          THE COURT:  All right.  And there are -- all

2     right.  And, Mr. McDermott, you're not contesting that 38

3     is the only transaction as to which there was cocaine base,

4     are you?

5          MR. McDERMOTT:  No, I'm not.

6          THE COURT:  All right.  So --

7          MR. McDERMOTT:  It's one that was not charged as

8     cocaine base, and then the evidence did come out that it

9     was cocaine base instead of powder cocaine.

10          THE COURT:  And, again, doesn't that inure to your

11     client's benefit?  That's one less cocaine base count that

12     he could be found guilty of.  Because if he's found guilty,

13     he's found guilty of distributing powder cocaine.  My

14     recollection on the sentencing guideline amendments is that

15     there's still a disparity; it went from 100 to 1 to 10 to

16     1, right?

17          MR. McDERMOTT:  Correct.  And the reason I don't

18     see it as a benefit is that after I caught that in the

19     record, I went through the *Jencks* material and I saw that

20     Mr. Painter, in his discussion with the Government, had

21     said that it was powder cocaine; he did not say it was

22     crack cocaine.  I believe that's why the Government charged

23     the March 2d incident the way that they did, and charged it

24     as powder instead of base cocaine.

25          And I frankly think Mr. Painter misspoke during

1   his direct examination, and it continued through his

2   direct, and he was not impeached with it.

3          And it was, frankly, just -- I think -- as Mr.

4   Phillips is talking about the similarities between powder

5   and crack cocaine, I think all the people participating in

6   this trial have kind of gotten used to that as well and,

7   frankly, it was missed, and I missed it until yesterday

8   evening when --

9          THE COURT:  Okay.  But there are other counts --

10          MR. McDERMOTT:  There are.

11          THE COURT:  -- distribution counts in which the

12   controlled-substance transaction has to do with cocaine

13   base as opposed to cocaine, correct?

14          MR. McDERMOTT:  Yes, Your Honor.

15          THE COURT:  All right.  Okay.  Well, I'm going to

16   deny the defendant's renewed motion under Rule 29 with

17   respect to Count 38 for the following reasons:  No. 1,

18   counsel cited no case law to support the argument that he's

19   taking; No. 2, as we've discussed on the record, it appears

20   to me that the mistake is a mistake that inures to the

21   defendant's benefit in the sense that if the jury returns a

22   guilty verdict on Count 38, that's a -- that's a count that

23   is referenced -- or is tied to the distribution of cocaine,

24   powder cocaine as opposed to cocaine base; and, thirdly, I

25   deny it because if there is an error here, it's an error

1     that will benefit the defendant in that the sentencing on

2     Count 38 would be less severe in the form in which it's

3     going to the jury than otherwise.

4          So your motion's denied.  Anything else that --

5     from the defendant's perspective that we need to raise

6     before we bring in the jury?

7          MR. McDERMOTT:  Not before the jury.  Thank you,

8     Your Honor.

9          THE COURT:  All right.  We will be in recess for a

10    few moments.

11         (Recess taken 8:53 a.m.)

12         (In the presence of the jury at 9:04 a.m.)

13         THE COURT:  Welcome back, ladies and gentlemen of

14    the jury.  I trust you had a good weekend.  And welcome

15    back to day five of our jury trial.

16         So at this point I'm going to read to you the

17    final set of jury instructions that will govern your

18    deliberations during the course of this trial.  And after

19    that, we will have the closing arguments of the -- of the

20    lawyers.

21         All right.  Members of the jury, in any jury

22    trial, there are, in effect, two judges; I am one of the

23    judges and you are the other.  I am the judge of the law

24    and you are the judges of the facts.  I presided over the

25    trial and decided what evidence was proper for your

1    consideration.  It is also my duty at the end of the trial

2    to explain to you the rules of law that you must follow and

3    apply in arriving at your verdict.

4         In explaining the rules of law that you must

5    follow, first, I will give you some general instructions

6    which apply in every criminal case; for example,

7    instructions about the burden of proof and insights that

8    might help you to judge the believability of witnesses.

9    Then I will give you some specific rules of law that apply

10   to this particular case.  And, finally, I will explain the

11   procedures you should follow in your deliberations, and the

12   possible verdicts you may return.

13        These instructions will be given to you for your

14   use in the jury room so you need not take copious notes at

15   this time.  If you want to, go ahead.  Oh, and also there

16   will be one set of instructions for each of the 12 of you

17   that will be deliberating.

18        You, as jurors, are the judges of the facts, but

19   in determining what actually happened, that is, in reaching

20   your decision as to the facts, it is your sworn duty to

21   follow all the rules of law as I explain them to you.

22        You have no right to disregard or give special

23   attention to any one instruction, or to question the wisdom

24   or correctness of any rule that I may state to you.  You

25   must not substitute or follow your own notion or opinion as

1   to what the law is or what the law ought to be.  It is your

2   duty to apply the law as I explain it to you, regardless of

3   the consequences.

4         However, you should not read into these

5   instructions or anything else that I have said or done, any

6   suggestion as to what your verdict should be, because that

7   is entirely up to you.

8         It is also your duty to base your verdict solely

9   upon the evidence, without prejudice or sympathy.  That was

10  the promise you made and the oath that you took.

11        The Government has the burden of proving the

12  defendant guilty beyond a reasonable doubt.  The law does

13  not require a defendant to prove his innocence or produce

14  any evidence at all.  The Government has the burden of

15  proving the defendant guilty beyond a reasonable doubt, and

16  if it fails to do so, you must find the defendant not

17  guilty.

18        Proof beyond a reasonable doubt is proof that

19  leaves you firmly convinced of the defendant's guilt.

20  There are few things in this world that we know with

21  absolute certainty, and in criminal cases the law does not

22  require proof that overcomes every possible doubt.  It is

23  only required that the Government's proof exclude any

24  reasonable doubt concerning the defendant's guilt.

25        A reasonable doubt is a doubt based on reason and

1    common sense after careful and impartial consideration of

2    all the evidence in the case.  If, based on your

3    consideration of the evidence, you are firmly convinced

4    that the defendant is guilty of the crime charged, you must

5    find him guilty.  If, on the other hand, you think there is

6    a real possibility that he is not guilty, you must give him

7    the benefit of the doubt and find him not guilty.

8         You must make your decision based solely on the

9    evidence that you saw and heard here in court.  Do not let

10   rumors, suspicions, or anything else that you might have

11   seen or heard outside this court -- this court influence

12   your decision in any way.

13        The evidence in this case includes only what the

14   witnesses said while they were testifying under oath, the

15   exhibits that I allowed into evidence, and the stipulations

16   the lawyers or parties agreed to.

17        Nothing else is evidence.  The lawyers' statements

18   and arguments are not evidence.  Their questions and

19   objections are not evidence.  If a lawyer asks a question

20   of a witness which contains an assertion of fact,

21   therefore, you may not consider the assertions by the

22   lawyer as any evidence of that fact.  Only the witness's

23   answers are evidence.  My legal rulings are not evidence

24   and my comments and questions are not evidence.  Anything

25   you may have seen or heard outside the courtroom is not

 1      evidence and must be entirely disregarded.

 2              During the trial, I did not let you hear the

 3      answers to some of the questions that the lawyers asked.    I

 4      also ruled that you would not see some of the exhibits that

 5      the lawyers or parties wanted you to see.    And sometimes I

 6      ordered you to disregard things that you saw or heard or I

 7      struck things from the record.    You must completely ignore

 8      all these things.    Do not even think about them.    Do not

 9      speculate about what a witness might have said or what an

10      exhibit might have shown.    These things are not evidence,

11      and you're bound by your oath not to let them influence

12      your decision in any way.

13              There are, generally speaking, two types of

14      evidence from which a jury may properly determine the facts

15      of the case.    One is direct evidence, such as the testimony

16      of an eyewitness.    The other is indirect or circumstantial

17      evidence, that is, the proof of a chain of facts which

18      point to the existence or nonexistence of certain other

19      facts.

20              As a general rule, the law makes no distinction

21      between direct and circumstantial evidence.    The law simply

22      requires that you find the facts in accord with all of the

23      evidence in the case, both direct and circumstantial.

24              While you must consider only the evidence in this

25      case, you are permitted to draw reasonable inferences from

1    the testimony and exhibits, inferences you feel are

2    justified in light of common experience.  An inference is a

3    conclusion that reason and common sense may lead you to

4    draw from facts which have been proved.

5          By permitting such reasonable inferences, you may

6    make the deductions and reach conclusions that reason and

7    common sense lead you to draw from the facts which have

8    been established by the testimony and evidence in this

9    case.

10         I remind you that it is your job to decide whether

11   the Government has proved the guilt of the defendant beyond

12   a reasonable doubt.  In doing so, you must consider all the

13   evidence.  This does not mean, however, that you must

14   accept all of the evidence as true or accurate.  You are

15   the sole judges of the credibility or believability of each

16   witness and the weight to be given to that witness'

17   testimony.

18         An important part of your job will be making

19   judgments about the testimony of the witnesses who

20   testified in this case.  You should think about the

21   testimony of each witness you heard -- you have heard and

22   decide whether you believe all or any part of what each

23   witness had to say and how important that testimony was.

24   In making that decision, I will suggest that you ask

25   yourself a few questions:

1            Did the witness impress you as honest?

2            Did the witness have any particular reason not to

3   tell the truth?

4            Did the witness have a personal interest in the

5   outcome of the case?

6            Did the witness have any relationship with either

7   the Government or the defense?

8            Did the witness seem to have a good memory?

9            Did the witness clearly see or hear the things

10  about which he or she testified?

11           Did the witness have the opportunity and ability

12  to understand the questions clearly and answer them

13  directly?

14           Did the witness' testimony differ from the

15  testimony of other witnesses?

16           When weighing the conflicting testimony, you

17  should consider whether discrepancy has to do with a

18  material fact or with an unimportant detail.  And you

19  should keep in mind that innocent misrecollection, like the

20  failure of recollection, is not uncommon.

21           The defendant did not testify, and I remind you

22  that you cannot consider his decision not to testify as

23  evidence of guilt.  I want you to clearly understand that

24  the Constitution of the United States grants to a defendant

25  the right to remain silent.  That means the right not to

1    testify or call any witnesses.  That is a constitutional

2    right in this country, it is very carefully guarded, and

3    you should understand that no presumption of guilt may be

4    raised and no inference of any kind may be drawn from the

5    fact that a defendant does not take the witness stand and

6    testify or call any witnesses.

7            In reaching a conclusion on a particular point, or

8    ultimately in reaching a verdict in this case, do not make

9    any decision simply because there were more witnesses on

10   one side than on the other.

11           You have heard the testimony of Francisco Aguilar.

12   You have also heard that, before this trial, he made

13   statements that may be different from his testimony here in

14   court.  The earlier statements were brought to your

15   attention only to decide how believable this witness'

16   testimony was in this trial.  You cannot use these

17   statements as proof of anything else.  You can only use

18   them as one way of evaluating Mr. Aguilar's testimony here

19   in court.

20           The testimony of a witness may be discredited or

21   impeached by showing that the witness previously had been

22   convicted of a felony; that is, a crime punishable by

23   imprisonment for a term of years.  A prior conviction does

24   not mean that a witness is not qualified to testify, but is

25   merely one circumstance that you may consider in

1    determining the credibility of the witness.  You may decide

2    how much weight to give any prior felony conviction that

3    was used to impeach a witness.

4            The Government called, as some of their

5    witnesses -- ah -- as some of its witnesses, alleged

6    accomplices who were named as a co-def -- as codefendants

7    in the indictment.  The Government has entered into a plea

8    agreement with the codefendants, providing for the

9    dismissal of some charges and a recommendation of a lesser

10   sentence than the codefendants would otherwise likely

11   receive.  Plea bargaining is lawful and proper, and the

12   rules of this Court expressly provide for it.

13           An alleged accomplice, including one who has

14   entered into a plea agreement with the Government, is not

15   prohibited from testifying.  On the contrary, the testimony

16   of an alleged accomplice may, by itself, support a guilty

17   verdict.  You should receive this type of testimony with

18   caution and weigh it with great care.  You should never

19   convict a defendant upon the unsupported testimony of an

20   alleged accomplice unless you believe that testimony beyond

21   a reasonable doubt.

22           The fact that an accomplice has entered a guilty

23   plea to the offense charged is not evidence of the guilt of

24   any other person.

25           The testimony of an admitted drug user -- drug

921

1    abuser must be examined and weighed by the jury with

2    greater caution than the testimony of a witness who does

3    not abuse drugs.

4            Gregory Williams, Sidney Taylor, Robert Painter,

5    and Christopher Vigil may each be considered an abuser of

6    drugs.  You must determine whether the testimony of those

7    witnesses have been affected by the use of drugs or the

8    need for drugs.

9            So we're going to change that to, "testimony of

10   those witnesses have been."

11           Counsel, do you agree with that change?

12           MR. PHILLIPS:  Yes, Your Honor.

13           MR. LEONARD:  Yes, Your Honor.

14           THE COURT:  All right.  You will note that the

15   indictment charges that the crime was committed on or about

16   certain dates.  The Government must prove beyond a

17   reasonable doubt that the defendant committed the crime

18   reasonably near those dates.

19           You are here to decide whether the Government has

20   proved beyond a reasonable doubt that the defendant is

21   guilty of the crime charged.  The defendant is not on trial

22   for any act, conduct, or crime not charged in the

23   indictment.  It is not up to you to decide whether anyone

24   else who is not on trial in this case should be prosecuted

25   for the crime charged.  The fact that another person who

1    also may be guilty -- the fact that another person also may

2    be guilty is no defense to a criminal charge.  The question

3    of the possible guilt of others should not enter your

4    thinking as to -- well, let me start that sentence again.

5           The question of the possible guilt of others

6    should not enter your thinking as you decide whether this

7    defendant has been proved guilty of the crime charged.

8           If you find the defendant guilty, it will be my

9    duty to decide what the punishment will be.  You should not

10   discuss or consider the possible punishment in any way

11   while deciding your verdict.

12          The law recognizes two kinds of possession:

13   actual possession and constructive possession.  A person

14   who knowingly has direct physical control over an object or

15   thing at a given time is then in actual possession of it.

16          A person who, although not in actual possession,

17   knowingly has the power at a given time to exercise

18   dominion or control over an object, either directly or

19   through another person or persons, is then in constructive

20   possession of it.

21          More than one person can be in possession of an

22   object if each knows of its presence and has the power to

23   control it.

24          A defendant has joint possession of an object when

25   two or more persons share actual or constructive possession

1    of it.  However, merely being present with others who have

2    possession of the object does not constitute possession.

3              Some counts of the indictment may accuse a

4    defendant of violating the same statute in more than one

5    way.  In other words, the indictment may allege that the

6    statute in question was violated by various acts which are

7    in the indictment joined by the conjunctive "and" while the

8    statute and the elements of the offense are stated in the

9    disjunctive using the word "or."

10             In these circumstances, it is sufficient for a

11   finding of guilt if the evidence established beyond a

12   reasonable doubt the violation of the statute by any one of

13   the acts charged.  In order for you to return a guilty

14   verdict, however, all 12 of you must agree that the same

15   act has been proven.

16             During this trial, you have heard some sound

17   recordings of certain conversations.  These conversations

18   were legally -- were legally recorded.  They are a proper

19   form of evidence and may be considered by you as you would

20   any other evidence.  You were also given transcripts of

21   those recorded conversations.  Keep in mind that the

22   transcripts are not evidence.  They were given to you only

23   as a guide to help you follow what was being said.  The

24   recordings, themselves, are the evidence.

25             If you noticed any differences between what you

1    heard on the recordings and what you read in the

2    transcripts, you must rely on what you heard and not on

3    what you read.

4         If you could not hear or understand certain parts

5    of the recordings, you must ignore the transcript as far as

6    those parts are concerned.

7         Certain statements have been admitted to you to

8    give context to statements made by the defendant.  The

9    purpose of the unknown male statements in the Government's

10   Exhibits 108 and 109 is to help explain the defendant's

11   statements.  The statements of the unknown male speaker are

12   not evidence of proof of any facts; thus, you may not

13   consider the portions of the unknown male speaker's

14   statements in the Government's Exhibits 108 and 109 as

15   proof of the matter asserted.  However, you may consider

16   the defendant's statements as proof of the matter asserted.

17        Some counts of the indictment are also charged --

18   some counts of the indictment also charge a violation of

19   Title 18 of the United States Code Section 2 which provides

20   that, quote, Whoever commits an offense against the United

21   States, or aids, abets, counsels, commands, induces, or

22   procures its commission, is punishable as a principal.

23        This law makes it a crime to intentionally help

24   someone else commit a crime.  To find the defendant guilty

25   of this crime, you must be convinced that the Government

1    has proved each of the following beyond a reasonable doubt.

2              And then this is for the count of aiding and

3    abetting.

4              First, someone else committed the charged crime;

5    and

6              Second, the defendant intentionally associated

7    himself in some way with the crime, and intentionally

8    participated in it as he would in something he wished to

9    bring about.  This means that the Government must prove

10   that the defendant consciously shared the other person's

11   knowledge of the underlying criminal act and intended to

12   help him.

13             The defendant need not perform the underlying

14   criminal act, be present when it is performed, or be aware

15   of the details of its commission to be guilty of aiding and

16   abetting.  But a general suspicion that an unlawful act may

17   occur or that something criminal is happening is not

18   enough.  Mere presence at the scene of a crime and the

19   knowledge that a crime is being committed are also not

20   sufficient to establish aiding and abetting.

21             The defendant, Ricky Garrison, is charged in

22   Counts 4, 5, 7, 8, 11, 13, 15, 16, 22, 23, 24, 25, 26, 30,

23   31, 39, 40, 41, 42, 43, and 44, with a violation of Title

24   21 of the United States Code Section 843(b).  This law

25   makes it a crime to use a communication facility to commit

1    or facilitate the commission of a felony drug offense.   To

2    find the defendant guilty of this crime, you must be

3    convinced that the Government has proved each of the

4    following beyond a reasonable doubt:

5              First, the defendant knowingly used a telephone;

6              Second, the defendant, in doing so, acted with the

7    intent to commit, cause, or facilitate the commission of a

8    drug felony, namely, distribution and possession with

9    intent to distribute a controlled substance; and

10             Third, the defendant so used the telephone on or

11   about the same date as the drug felony.

12             To "facilitate the commission of a drug felony"

13   means to make the commission of the drug felony easier or

14   aid or assist in the commission of the offense.

15             You are instructed that distribution and

16   possession with intent to distribute a controlled

17   substance, namely, cocaine, cocaine base, or

18   methamphetamine, is a drug felony.

19             The defendant is charged in Count 1 with a

20   violation of Title 21 of the United States Code

21   Section 846.   This law makes it a crime for anyone to

22   conspire with someone else to violate federal laws

23   pertaining to controlled substance.

24             In this case, the defendant is charged with

25   conspiracy to distribute and possess with the intent to

1    distribute one or more of the following controlled

2    substances; 1 -- No. 1, more than 500 grams but less than 5

3    kilograms of a mixture or substance containing a detectable

4    amount of cocaine, a Schedule II controlled substance.

5         No. 2, more than 28 grams but less than 280 grams

6    of a mixture or substance which contains cocaine base.

7         No. 3, less than 50 grams of a mixture or

8    substance containing a detectable amount of

9    methamphetamine, its salts, isomers, and salts of its

10   isomers, a Schedule II controlled substance.

11        To find the defendant guilty of this crime, you

12   must be convinced that the Government has proved each of

13   the following beyond a reasonable doubt:

14        First, two or more persons agreed to violate the

15   Federal drug laws;

16        Second, the defendant knew the essential objective

17   of the conspiracy;

18        Third, the defendant knowingly and voluntarily

19   involved himself in the conspiracy;

20        Fourth, the amount of the controlled substance

21   was, No. 1, more than 500 grams but less than 5 kilograms

22   of a mixture or substance containing a detectable amount of

23   cocaine, a Schedule II controlled substance.

24        No. 2, more than 28 grams but less than 280 grams

25   of a mixture or substance which contains cocaine base.

1        Three, less than 50 grams or more of a mixture or

2    substance containing a detectable amount of

3    methamphetamine; and

4        Fifth, there was an interdependence among the

5    members of the conspiracy; that is, the members in some way

6    or manner intended to act together for their shared mutual

7    benefit within the scope of the conspiracy charged.

8        A conspiracy is an agreement between two or more

9    persons to accomplish an unlawful purpose.  It is a kind of

10   partnership in criminal purpose -- in criminal purposes in

11   which each member becomes the agent or partner of every

12   other member.

13       Once a person becomes a member of a conspiracy, he

14   is held legally responsible for the acts of the other

15   members done in furtherance of the conspiracy, even though

16   he was not present or aware that the acts were being

17   committed.  Mere similarity of conduct among various

18   persons, and the fact that they may have associated with

19   each other, and may have assembled together and discussed

20   common aims and interests, does not necessarily establish

21   proof of the existence of a conspiracy.

22       The evidence in the case need not show that the

23   members entered into any express or formal agreement.  Nor

24   is it necessary that the evidence show that the members

25   stated between themselves what their object or purpose was

1    to be, or the details thereof, or the means by which the

2    object or purpose was to be accomplished.

3         In order to establish proof that a conspiracy

4    existed, the evidence must show beyond a reasonable doubt

5    that the members in some way or manner, or through some

6    contrivance, expressly or impliedly came to a mutual

7    understanding to try to accomplish a common and unlawful

8    plan.

9         The evidence in the case need not establish that

10   all the means or methods set forth in the indictment were

11   agreed upon to carry out the alleged conspiracy, nor that

12   all means or methods which were agreed upon were actually

13   used or put into operation.  Nor that all of the persons

14   charged to have been members of the alleged conspiracy were

15   members.  Rather, the evidence in the case must establish

16   beyond a reasonable doubt that the alleged conspiracy was

17   knowingly formed, and that one or more of the means or

18   methods described in the indictment were agreed upon to be

19   used in an effort to effect or accomplish some object or

20   purpose of the conspiracy, as charged in the indictment;

21   and that two or more persons, including the defendant, were

22   knowingly members of the conspiracy.

23        If you conclude that the evidence beyond a

24   reasonable doubt -- if you conclude from the evidence

25   beyond a reasonable doubt that a conspiracy as charged did

1    exist, then you must next determine whether the defendant

2    was a member of that conspiracy; that is, whether the

3    defendant participated in the conspiracy with knowledge of

4    its unlawful purposes and in furtherance of its unlawful

5    objectives.

6              In determining whether the defendant was a member

7    of the conspiracy, the jury must consider only his acts and

8    statements.  The defendant cannot be bound by acts or

9    declarations of other participants until it is established

10   that a conspiracy existed and that he was one of its

11   members.

12             To be a member of the conspiracy, the defendant

13   need not know all of the other members or all of the

14   details of the conspiracy, nor the means by which the

15   objects were to be accomplished.  Each member of the

16   conspiracy may perform separate and distinct acts.  It is

17   necessary, however, that for the defendant to be a member

18   of the conspiracy, the Government must prove beyond a

19   reasonable doubt that he was aware of the common purpose

20   and was a willing participant with the intent to advance

21   the purposes of the conspiracy.

22             In other words, while a defendant need not

23   participate in all the acts or statements of the other

24   members of the conspiracy to be bound by them, the acts or

25   statements must be interdependent so that each member of

1    the conspiracy depends upon the acts and statements of the

2    other conspirators to make the conspiracy succeed.

3        The extent of a defendant's participation in the

4    conspiracy is not relevant to whether he is guilty or not

5    guilty.  A defendant may be convicted as a conspirator even

6    though he plays a minor part in the conspiracy.  His

7    financial stake, if any, in the venture is a factor that

8    may be considered in determining whether conspiracy existed

9    and whether the defendant was a member of it.

10        The defendant is charged in Counts 2, 6, 10, 12,

11   14, 17, 18, 19, 28, 29, 32, 33, 34, 36, 37, 38, and 46 with

12   a violation of Title 21 of the United States Code Section

13   841(a)(1).  This law makes it a crime to possess a

14   controlled substance with the intent to distribute it.

15        To find the defendant guilty of this crime, you

16   must be convinced that the Government has proved each of

17   the following beyond a reasonable doubt:

18        First, the defendant knowingly or intentionally

19   possessed a controlled substance as charged;

20        Second, the substance was, in fact, cocaine;

21        Third, the defendant possessed the substance with

22   the intent to distribute it;

23        And, fourth, the amount of the controlled

24   substance possessed by the defendant was less than 500

25   grams of a mixture or substance containing a detectable

1    amount of cocaine.

2           With respects to Counts 6, 12, 14, 17, and 29,

3    specifically, you must also be convinced that the

4    Government has proved a fifth fact beyond a reasonable

5    doubt, namely, that the defendant possessed the controlled

6    substance within 1,000 feet of the real property of a

7    public school.

8           Cocaine is a controlled substance within the

9    meaning of the law.  To, quote, possess with intent to

10   distribute means to possess with intent to deliver or

11   transfer possession of the controlled substance to another

12   person with or without any financial interest in the

13   transaction.

14          The defendant is also charged in Counts 3, 9, 20,

15   and 27 with a violation of Title 21 of the United States

16   Codes Section 841(a)(1).  To find the defendant guilty of

17   these counts, you must be convinced that the Government has

18   proved each of the following beyond a reasonable doubt:

19          First, the defendant knowingly or intentionally

20   possessed a controlled substance as charged;

21          Second, the substance was, in fact, cocaine base;

22          Third, the defendant possessed the substance with

23   the intent to distribute it;

24          And, fourth, the amount of the controlled

25   substance possessed by the defendant was less than 28 grams

1    of a mixture or substance containing cocaine base.

2              Cocaine base is a controlled substance within the

3    meaning of the law.  To possess with intent to distribute

4    means to possess with intent to deliver or transfer

5    possession of a controlled substance to another person,

6    with or without any financial interest in the transaction.

7              The defendant is also charged in Count 21 with a

8    violation of Title 21 of the United States Code Section

9    841(a)(1).

10             To find the defendant guilty of -- I think that

11   should be "this count" instead of "discount."

12             Counsel agree?

13             MR. PHILLIPS:  Agreed.

14             MR. LEONARD:  Yes, Your Honor.

15             THE COURT:  All right.  I'll start the sentence

16   again.

17             To find the defendant guilty of this count, you

18   must be convinced that the Government has proved each of

19   the following beyond a reasonable doubt:

20             First, the defendant knowingly or intentionally

21   possessed a controlled substance as charged;

22             Second, the substance was, in fact,

23   methamphetamine;

24             Third, the defendant possessed the substance with

25   the intent to distribute it;

1        Fourth, the amount of the controlled substance

2   possessed by the defendant was less than 28 grams of a

3   mixture or substance containing a detectable amount of

4   methamphetamine;

5        And, fifth, the defendant possessed the controlled

6   substance within 1,000 feet of the real property of a

7   public school.

8        Methamphetamine is a controlled substance within

9   the meaning of the law.

10       To "possess with intent to distribute" means to

11  possess with intent to deliver or transfer possession of a

12  controlled substance to another person with or without any

13  financial interest in the transaction.

14       Count 45 of the indictment charges the defendant

15  with transportation for prostitution in violation of Title

16  18 of the United States Code Sectio 2421.  In order for you

17  to find the defendant guilty of this charge, the Government

18  must prove both of the following elements beyond a

19  reasonable doubt:

20       First, the defendant knowingly transported an

21  individual in interstate commerce; and

22       Second, at the time of the transportation, the

23  defendant intended that the individual would engage in

24  prostitution for which an individual could have been

25  charged with a criminal offense.

1          If you find from your consideration of all the

2     evidence that the Government has proved each of these

3     elements beyond a reasonable doubt, then you should find

4     the defendant guilty.

5          If, on the other hand, you find from your

6     consideration of all the evidence that the Government has

7     failed to prove any one of these elements beyond a

8     reasonable doubt as to this charge, then you should find

9     the defendant not guilty of this charge.

10         Prostitution means knowingly engaging in or

11    offering to engage in a sexual act in exchange for money or

12    other valuable consideration.

13         The intent of a person or the knowledge that a

14    person possesses at any given time may not ordinarily be

15    proved directly because there is no way of directly

16    scrutinizing the workings of the human mind.   In

17    determining the issue of what a person knew or what a

18    person intended at a particular time, you may consider any

19    statements made or acts done by that person and all other

20    facts and circumstances received in evidence which may aid

21    in your determination of that person's knowledge or intent.

22         You may infer, but you are certainly not required

23    to infer, that a person intends the natural and probable

24    consequences of acts knowingly done or knowingly omitted.

25    It is entirely up to you, however, to decide what facts to

1    find from the evidence received during this trial.

2         All right.  That concludes the part of my

3    instructions explaining the law that applies in this case.

4    Now let me finish up by explaining some of the things about

5    your deliberations in the jury room and your possible

6    verdicts.  Later this morning, a bailiff will escort you to

7    the jury deliberation room and provide each of you with a

8    copy of the instructions that I have just read.  Any

9    exhibits admitted into evidence will also be placed in the

10   jury room for your review.

11        When you go to the jury room, you should first

12   select a foreperson who will help to guide your

13   deliberations and will speak for you here in the courtroom.

14        The second thing you should do is review these

15   instructions.  Not only will your deliberations be more

16   productive if you understand the legal principles upon

17   which your verdict must be based, but for your verdict to

18   be valid, you must follow the instructions throughout your

19   deliberations.

20        Remember, you are the judges of the facts, but you

21   are bound by your oath to follow the law stated in these

22   instructions.

23        To reach a verdict, whether it is guilty or not

24   guilty, all of you must agree.  Your verdict must be

25   unanimous.  Your deliberations will be secret.  You will

 1   never have to explain your verdict to anyone.

 2         You must consult with one another and deliberate

 3   in an effort to reach agreement if you can do so.   Each of

 4   you must decide the case for yourself, but only after an

 5   impartial consideration of the evidence with your fellow

 6   jurors.   During your deliberations, do not hesitate to

 7   re-examine your own opinions and change your mind if you

 8   are convinced that you are wrong, but do not give up your

 9   honest beliefs solely because of the opinion of your fellow

10   jurors or for the mere purpose of returning a verdict.

11         Remember at all times you are the judges, the

12   judges of the facts; you must decide whether the Government

13   has proved the defendant guilty beyond a reasonable doubt.

14         The Court has prepared a verdict form for your

15   convenience.   And it reads as follows:

16         In criminal case No. 14 cr 231 WJM, United States

17   of America, plaintiff, versus defendant No. 1, Ricky

18   Garrison.   Verdict form.

19         Count 1:   We, the jury, upon our oaths unanimously

20   find the defendant, Ricky Garrison, as to conspiracy to

21   distribute and possess with the intent to distribute a

22   mixture and substance containing a detectable amount of

23   cocaine, cocaine base, or methamphetamine:   Guilty or --

24   not guilty or guilty.   And a line next to those words "not

25   guilty or guilty."

 1          Special verdict as to Count 1.  If you find the

 2     defendant not guilty of conspiracy to distribute and

 3     possess with the intent to distribute a mixture and

 4     substance containing a detectable amount of cocaine,

 5     cocaine base, or methamphetamine, please skip questions 1A

 6     through 3A and proceed to the next count.

 7          If you find the defendant guilty of conspiracy to

 8     distribute and possess with the intent to distribute a

 9     mixture or substance containing a detectable amount of

10     cocaine, cocaine base or methamphetamine, please proceed to

11     the following questions:

12          Question No. 1A:  We, the jury, upon our oaths

13     unanimously find that the defendant, Ricky Garrison, as to

14     conspiracy to distribute and possess with intent to

15     distribute at least 500 grams but less than 5 kilograms of

16     a mixture or substance containing a detectable amount of

17     cocaine:  Not guilty or guilty.

18          If your answer to question No. 1A is "guilty,"

19     please skip to question No. 1B.  If your answer to question

20     1A is "guilty," please skip question 1B and proceed to

21     Question 2.

22          If your answer to question No. 1A is "not guilty,"

23     please answer the following question:

24          Question 1B:  We, the jury, upon our oaths

25     unanimously find the defendant, Ricky Garrison, as to

1    conspiracy to distribute and possess with intent to

2    distribute a quantity less than 500 grams of a mixture or

3    substance containing a detectable amount of cocaine:  Not

4    guilty or guilty.

5         Question 2A:  We, the jury, upon our oaths

6    unanimously find the defendant, Ricky Garrison, as to

7    conspiracy to distribute and possess with intent to

8    distribute more than 28 grams but less than 280 grams of a

9    mixture or substance containing a detectable amount of

10   cocaine base:  Guilty -- not guilty or guilty.

11        If your answer to Question No. 2A is "guilty,"

12   please skip Question 2B and proceed to Question 3.

13        If your answer to 2A is "not guilty," please

14   answer the following question:

15        2B:  We, the jury, upon our oaths unanimously find

16   the defendant, Ricky Garrison, as to conspiracy to

17   distribute and possess with intent to distribute less than

18   28 grams of a mixture or substance containing a detectable

19   amount of cocaine base:  Not guilty or guilty.

20        Question 3A:  We, the jury, upon our oaths

21   unanimously find the defendant, Ricky Garrison, as to

22   conspiracy to distribute and possess with intent to

23   distribute less than -- less than 50 grams of a mixture or

24   substance containing a detectable amount of

25   methamphetamine:  Not guilty or guilty.

1          Can counsel approach.

2              (Discussion at side bar)

3          THE COURT:  Okay.  I am noticing that in the

4     verdict form -- and this may be entirely intentional, but

5     we do not have a 3D.  Is that our intent?

6          MR. PHILLIPS:  It is our intent, Your Honor,

7     because that's the lowest amount, so there's --

8          THE COURT:  That's --

9          MR. PHILLIPS:  Yeah.

10         THE COURT:  That's as far as the statute goes.

11         MR. PHILLIPS:  Yup.  That's true.

12         THE COURT:  Counsel for the defendant agree?

13         MR. LEONARD:  Yeah, I stumbled over that last

14    night, too, and had had a heart attack, frankly.

15         MR. McDERMOTT:  We had a conversation --

16         THE COURT:  You didn't have to have a heart attack

17    because you know we -- so it to doesn't -- the statute

18    doesn't go in -- 50 grams --

19         MR. PHILLIPS:  That's correct.

20         THE COURT:  Okay.  Thank you.

21             (End of discussion at side bar)

22         THE COURT:  Count 2:  We, the jury, upon our oaths

23    unanimously find the defendant, Ricky Garrison, in Count 2:

24    Not guilty or guilty.

25         Count 3:  We, the jury, upon our oaths unanimously

1   find the defendant, Ricky Garrison, in Count 3:  Not guilty

2   or guilty.

3          Would counsel stipulate that I can just summarize

4   for the jury that the remainder of the verdict is exactly

5   the same for the remaining counts?

6          MR. PHILLIPS:  Yes, please, Your Honor.

7          THE COURT:  Okay.

8          MR. LEONARD:  Yes, Your Honor.  Thank you.

9          THE COURT:  All right.  So for the remaining

10  counts, Count 4 through Count 46, the verdict is exactly

11  the same:  We, the jury, upon our oaths unanimously find

12  the defendant, Ricky Garrison, in Count X:  Not guilty or

13  guilty.  So I won't spend 10 minutes reading that.

14         All right.  Then at the conclusion of the verdict

15  form, there is a space for the foreperson to sign the

16  verdict form and date the form and indicate the time.

17         After you have deliberated and consulted with each

18  other, the foreperson will write the unanimous answer of

19  the jury in response to each question on the verdict form.

20  At the conclusion of your deliberations, the foreperson

21  should date and sign the verdict form.

22         Only one copy of the verdict form will be provided

23  to you.  If you make an error on the form, please tell the

24  bailiff.  The bailiff will destroy the erroneous form and a

25  blank form will be provided.

1          If you want to communicate with me at any time

2     during your deliberations, please write down your message

3     or question and give it to the bailiff who will bring it to

4     my attention.  There will be a form in the room for you to

5     write that out.  And that form, I think, calls for the

6     foreperson's signature.

7          I will respond as promptly as possible either in

8     writing or by having you return to the courtroom as that --

9     so that I can address you orally.

10         Counsel agree it should be "so" instead of "as"?

11         MR. PHILLIPS:  Yes, Your Honor.

12         MR. LEONARD:  We do, Your Honor.

13         THE COURT:  All right.  I'll read that sentence

14    again.  I will respond as promptly as possible either in

15    writing or by having you return to the courtroom so that I

16    can address you orally.

17         I caution you, however, that with any message or

18    question you may send, that you should not tell me any

19    details of your deliberations or indicate how many of you

20    are voting in any particular way on any particular issue.

21         Let me remind you that nothing that I have said in

22    these instructions, nor anything that I've said or done

23    during the trial, was meant to suggest to you what I think

24    your decision should be.  That is your exclusive

25    responsibility.

1            And let me note that because of the -- of its

2    length, I will not read the indictment to you at this time,

3    but the indictment will be included at the end of the

4    written instructions that I've just read to you.  So all of

5    you will have a copy of that indictment.

6            All right.  So now is the time for the closing

7    arguments of the parties.  Let me explain one thing to you.

8    Because the Government has the burden of proof, the law

9    provides that the Government can split up the time for its

10   closing argument.

11           Both sides -- now we do everything as fair as we

12   can.  Both sides will get exactly the same amount of time,

13   so don't think that one side is getting more time for their

14   closing than the other.  They will get the -- exactly the

15   same time, but because the Government has the burden of

16   proof in this case, the law allows the Government to

17   reserve some portion of that exact same amount of time to

18   use in rebuttal.  So you will hear from the Government

19   twice in the closing argument.  You will only hear from the

20   defendant once.  All right?

21           And also I remind you that these arguments are not

22   evidence and you should not consider them as such.

23           All right.  Close -- oh, and then let me say one

24   more thing.  We will hear from the Government in its

25   opening segment of the closing argument, and then we'll

944

1    take a 10-minute break, and then we'll hear the defendant's

2    closing argument, and then the Government's rebuttal

3    closing argument, and then the case will be yours.

4              All right.   Closing argument for the Government.

5              MS. RANGEL:   Good morning.   Thank you very much

6    for your time, both last week and this week.   It's very

7    much appreciated.   Last week you heard a lot of evidence

8    about how the defendant, Ricky Garrison, uses people as a

9    means to an end.   Today I'm going to take the time that I

10   have with you to review those means.

11             We're going to start with the conspiracy charge in

12   this case, which is Count 1.   And that is the conspiracy to

13   distribute and possess with the intent to distribute either

14   cocaine, cocaine base, or methamphetamine.   As we work

15   through the evidence, though, consider all of the evidence

16   that you have pertaining to substantive counts of

17   distribution, the substantive phone counts that you hear,

18   all of that is to be considered for that conspiracy charge.

19             The conspiracy ran from June 2013 to June 2014 and

20   it encompasses all of the evidence that you have heard

21   between those dates.

22             We're going to work through the evidence

23   chronologically.   That's how the charges are grouped

24   together, and so we'll talk about the substantive charges.

25   And by "substantive" I mean the drug distribution charges

1    and the phone counts that go with them.

2            So we're going to start right now with the charge

3    of conspiracy.  And as you just heard, there are five

4    elements to that charge.  We've proven all five of those

5    elements to you beyond a reasonable doubt.  As we go

6    through those elements one by one, I'll remind you of the

7    evidence that pertains to those particular elements.

8            The first element that we have had to prove to

9    you -- that we have proven to you, is agreement.  And when

10   we talk about agreement for conspiracy, it's two or more

11   people are agreeing to violate the federal drug laws.  This

12   agreement does not need to be explicitly made.

13   Prosecutions would rarely be able to be brought before the

14   jury if the law required us to show an explicit agreement,

15   a contract, two people shaking hands, saying, Yes, we are

16   going to violate the federal drug laws.  That's not what

17   the law requires us to do.

18           Rather, when we talk about an agreement, look at

19   what the parties are doing.  Look at what they are saying,

20   look at how they respond to what is said to them, and look

21   at what actions they take.  That's how you can infer

22   agreement.  And here, the agreement that we are talking

23   about is the agreement to buy and sell narcotics, and that

24   is obviously in violation of federal law.

25           So let's talk about the evidence that you have

946

 1    before you that at least two people made that agreement.

 2    You have phone calls from Ricky Garrison, the defendant, to

 3    Christopher Vigil; you have calls from Ricky Garrison to

 4    Francisco Aguilar; and you have calls from Ricky Garrison

 5    to Simon Ramirez.  And all of those calls are where he asks

 6    of them about their ability to supply him with cocaine.

 7            You heard testimony that he would then either meet

 8    up with them or they would come to him, and that they -- at

 9    that point in time when they met up, they would sell

10    cocaine to him.

11            You have phone calls where the defendant discusses

12    selling Robert Painter methamphetamine, and the testimony

13    shows that they later met up and Robert Painter did, in

14    fact, purchase methamphetamine from the defendant.

15            You also have phone calls from Greg Williams and

16    Sidney Taylor, where they call the defendant and

17    essentially place a cocaine and a crack cocaine order from

18    him.  They then meet up, and they exchange cash to the

19    defendant in exchange for those drugs.  All of that

20    demonstrates agreement.  They discussed on these phone

21    calls amounts and prices, whether those phone calls are

22    with the source of supply or the customer, and then those

23    deals occur.

24            That is agreement to buy and sell drugs, to buy

25    and sell cocaine, crack cocaine, and methamphetamine.

1          Furthermore, you heard ample testimony that 1

2     ounce of cocaine is not personal use.  And so when Simon

3     Ramirez, Francisco Aguilar, when they sold the defendant 1

4     ounce, 2 ounces, 9 ounces of cocaine, that is an agreement

5     to distribute cocaine because that amount is not for

6     personal use, that is indicative of distribution.  And the

7     evidence has made clear to you that that is exactly what

8     the defendant then did with that.

9          You have further proof of an agreement to

10    distribute, and specifically in Exhibit 61.  Exhibit 61

11    pertains to a transaction that the defendant had with

12    Francisco Aguilar on March 25th.  And that is, in

13    particular, a text that the defendant sent to Francisco

14    Aguilar where he says, You got your magic cut or do I need

15    to bring mine?

16         And Francisco Aguilar explained to you that when

17    he said "magic cut" the defendant was referring to

18    inositol, which is a cutting agent for cocaine.  And you

19    heard explained to you that a cutting agent, when mixed

20    into cocaine, produces a larger amount of cocaine.  A

21    larger amount of cocaine results in more cocaine to be

22    sold, which, in turn, results in a greater profit.

23         That is clear evidence of agreement to distribute

24    cocaine between Francisco Aguilar and the defendant.

25         The second element of conspiracy is knowledge.

1    Because there is clear agreement from at least two people

2    to buy and sell drugs, the next question that you have to

3    resolve is if the defendant knew the essential objective of

4    the conspiracy, to buy and sell drugs for a profit.  The

5    unequivocal answer to that question is yes.  The defendant

6    knew that he was buying and selling drugs; he knew that

7    others were buying and selling drugs; and that he and

8    others were profiting from buying and selling drugs.

9          The defendant had no legitimate job; he had no

10   legitimate source of income.  The money he made came from

11   drug distribution.  When he exchanged cash for drugs from

12   Christopher Vigil, from Francisco Aguilar, and Simon

13   Ramirez, he knew that they were doing the same thing as

14   him.  There is no evidence before you that anyone was

15   dealing drugs out of charity.  Everyone was doing it to

16   make money.

17         The calls before you make ample references to

18   this, as well as hustling, and people needing to get to

19   work.  We've proven the element of knowledge to you beyond

20   a reasonable doubt.

21         The next element is membership.  And we have also

22   proven that to you beyond a reasonable doubt.  There's

23   absolutely no question the defendant knowingly and

24   voluntarily involved himself in this conspiracy.  Some of

25   the individuals who testified last week told you that they

1    did have some form of a friendship with the defendant, but

2    the bulk of their relationship with the defendant revolved

3    around buying and selling drugs.

4         When the defendant would dial his phone, when he

5    would text on his phone, or when he would answer phone

6    calls to then discuss drugs, that is knowing and

7    voluntarily done.

8         When he traveled to Greg Williams' Arvada

9    apartment, the Taco Bell to meet Sidney Taylor, Christopher

10   Vigil's garage, or Francisco Aguilar's apartment, or when

11   he opened the door to his home for James Tillmon, Travis

12   Edwards, Francisco Aguilar, or others, he was doing so

13   knowingly and voluntarily so that he could buy and sell

14   drugs.

15        The next element of conspiracy is the drug

16   amounts.  And hopefully you can read that slide okay.  I

17   have to warn you, there's going to be some wordy slides, so

18   bear with me.  You're not receiving any of the transcripts

19   of the calls, so there's going to be a fair amount of

20   information on some of these slides for you.  This will be

21   the first of many.

22        So when we talk about the drug amounts -- and this

23   element of the conspiracy is that there was the

24   distribution and the possession with intent to distribute

25   certain amounts.  So when we talk about cocaine, this first

1    one is powder cocaine.   More than 500 grams but less than 5

2    kilograms of a mixture or substance containing a detectable

3    amount of cocaine.

4         Break down those amounts for you:   Francisco

5    Aguilar testified about very specific times that he dealt

6    with the defendant.   He estimated in total, during June

7    2013 and June 2014, that he had sold the defendant anywhere

8    from 20 to 23 ounces.   That's 28 grams per ounce, so that's

9    anywhere from 560 to 644 grams.

10        Simon Ramirez told you that he sold the defendant

11   9 ounces total, 252 grams.

12        Christopher Vigil indicated that he sold the

13   defendant 2 ounces on November 29th, 56 grams.

14        Greg Williams told you about two specific

15   purchases he made from the defendant, one on November 16th

16   for 9 grams of powder.   He told you that he purchased 7 to

17   9 grams of powder from the defendant during this time

18   period once or twice a week.

19        Robert Painter told you that four to five times a

20   month he would buy 1.7 grams, or a teener, from the

21   defendant, anywhere up to an eight-ball, which is 3.5

22   grams.   And sometimes he would buy 7 grams from the

23   defendant, which is a quarter ounce.

24        Sidney Taylor told you that he was buying cocaine

25   from the defendant one to three times a week, which is also

1    a teener, 1.75 grams.

2          So the total weight from the testimony that you

3    heard last week on the low end is 867.75 grams all the way

4    up to 968.75 grams, well above that 500-gram minimum

5    threshold.

6          When we talk about the cocaine base, the crack

7    cocaine testimony that you heard, did we prove to you

8    beyond a reasonable doubt that it was more than 28 grams,

9    but less than 280 grams?  We did.

10          The testimony from Greg Williams was that on

11    November 16th, he purchased 1.75 grams and on November

12    29th, he purchased 1.75 grams.

13          Robert Painter told you that he purchased that

14    onion that he talked to the defendant about on that phone

15    call on March 2d, which was 1 ounce, or 28 grams.

16          Sidney Taylor told you that he was purchasing 1.75

17    grams one to three times a week from the defendant.  The

18    total on the low end is 33.25 grams, above 28 grams as the

19    minimum threshold.

20          What about methamphetamine?  You heard phone calls

21    and testimony pertaining to this.  This solely deals with

22    Robert Painter, and Robert Painter told you on January 5th,

23    2014, he purchased a quarter ounce, or 7 grams, of

24    methamphetamine from the defendant.  That's certainly less

25    than 50 grams of a mixture or substance containing a

1    detectable amount of methamphetamine.

2              We've proven the minimum drug weights to you and,

3    frankly, well above the minimum amounts.

4              So the final amount -- oh, and I apologize.  The

5    final element of conspiracy is interdependence.  Think of

6    interdependence like a business.  Drugs come from the

7    source of supply to the distributor, who then pushes those

8    drugs out onto the street.  What you have before you is

9    Government's Exhibit 124, which demonstrates how this

10   happens.

11             Just like a business, a drug conspiracy is

12   dependent on customers purchasing the product and returning

13   to purchase product.  Francisco Aguilar, Simon Ramirez, and

14   Christopher Vigil, all at the top of Government's Exhibit

15   124, were dependent on the defendant purchasing cocaine

16   from them, and they wanted him to distribute that cocaine

17   so he would have money and return to them to continue to

18   purchase cocaine.

19             A clear example of this involves the January 5th

20   sale of methamphetamine from the defendant to Robert

21   Painter.  On that date, the defendant called Christopher

22   Martinez, who's on the left of your screen right now on

23   Government's Exhibit 124.  He called Christopher Martinez

24   to obtain that methamphetamine and then he turned around

25   and sold it to Robert Painter.  Greg Williams, Sidney

1    Taylor, and Robert Painter were all dependent on the

2    defendant being able to purchase cocaine and

3    methamphetamine so that he could, in turn, turn around,

4    sell them the cocaine, make crack cocaine to sell to them,

5    and sell methamphetamine to Robert Painter, and that he

6    could continue to sell to them.

7        It does not matter whether or not these

8    individuals knew each other.  They were interdependent with

9    each other in that they depended on the actions and

10   statements of each other, whether it's the source of supply

11   or the distributor, to continue to buy and sell drugs.  And

12   in so depending, they all benefited from that purchase and

13   sale of the drugs.  They all -- they were all working

14   together for that same common goal:  the purchase and sale

15   of the drugs.

16       The drugs came from the sources of supply to the

17   defendant and out to them.  They, in turn, gave the

18   defendant money for that, who used that money to purchase

19   those drugs.  Now we're going to talk about the individual

20   drug transactions and the phone calls associated with all

21   of them.

22       As you heard, the defendant is charged not only

23   with the possession with the intent to distribute, but with

24   aiding and abetting the same.  And consider that when we

25   talk about the calls and who was involved in this.  Most of

954

 1    the transactions involved the defendant directly

 2    distributing those drugs, but some of them have him

 3    intentionally associating himself with individuals such as

 4    Travis Edwards, Christopher Martinez, and that evidence

 5    shows that he clearly aided and abetted those transactions

 6    in that he intentionally participated in the purchase of

 7    those drugs, in the sale of those drugs, and purposely

 8    brought about that result.

 9         We're going to start with November 16th, 2013.

10    And this covers Counts 2 through 5.  This involves a

11    possession of powder cocaine with the intent to distribute

12    it.  That powder cocaine was less than 500 grams of a

13    mixture or substance containing a detectable amount of

14    cocaine.  It also involves the possession of cocaine base

15    with the intent to distribute that cocaine base -- cocaine

16    base being crack cocaine -- and that that amount of cocaine

17    base was less than 28 grams of a mixture or substance

18    containing cocaine base.

19         There are also two telephone counts associated

20    with this; those are Counts 4 and 5.  And specifically the

21    drug felony involved is the distribution, the possession

22    with the intent to distribute the cocaine and the crack

23    cocaine.  And this is the deal with Greg Williams.

24         So Count 4, Exhibit 1, Greg Williams called the

25    defendant.  And in that call, he explained to the defendant

1   that he was too tired to drive to the defendant's location.

2   The defendant offered to come to him and asked where he

3   lived, which Greg Williams told him 52nd and Wadsworth.

4          The defendant then asked, What am I bringing?

5          Now, you know that he was not referring to

6   groceries, to baked goods, to tools, to dinner.  You know

7   that because of how Greg Williams responds.  Greg Williams

8   responds by saying, The nine and the teener.

9   Nine-and-one-half.

10          The defendant responded to that by saying, Nine

11   soft?  And then teener hard?

12          Williams confirmed this.

13          And when Mr. Williams came in and testified to

14   you.  He told you that what he was asking for was 9 grams

15   of powder, 1.75 grams of crack.

16          In this call, they discussed the defendant's

17   recent purchase of a Porsche Cayenne.  He calls it a

18   Porsche truck.  And as you know, that would certainly come

19   up time and time again in this investigation.

20          In case you had any doubt as to what the defendant

21   was offering to bring to Mr. Williams, he explicitly says

22   that he will get food before he comes over, that his girl

23   wants to eat, and they will probably get food on the way

24   over.  That's his word, describing food.  It's unambiguous

25   what they are talking about and what the defendant is

1    bringing over to Mr. Williams.

2          Count 5, Exhibit 2, is a text message from Greg

3    Williams sending the defendant his address, which was that

4    52nd and Wadsworth location by the Home Depot.  And Mr.

5    Williams told you that on that date, he purchased 9 grams

6    of powder cocaine, which is charged in Count 2, and 1.75

7    grams of crack, which is cocaine base charged in Count 3,

8    and that he paid the defendant $450 for that.

9          He further told you that he used some of the

10   drugs, that he did get high from those drugs, indicating

11   that they had a detectable amount of cocaine in them, and

12   that he also gave some of those drugs to his friends.

13         He told you that he would do this and that he

14   would profit $100 for every quarter ounce that he gave to

15   his friends.  He said that he had three friends that he

16   would do this with.

17         Detective Wehr also testified to this transaction

18   and to sitting in that parking lot and observing the

19   defendant's vehicle there.  He indicated to you that the

20   defendant's vehicle was parked in Greg Williams' parking

21   lot at the time of this transaction, and that he saw an

22   individual, that he could not identify, go to the passenger

23   side of the defendant's vehicle and appear to get in.  And

24   that he was only there for a short period of time.

25         You know that the call and that text message above

1    pertain to the distribution of cocaine and crack cocaine on

2    that date because of the language they use and because of

3    the subsequent actions that Detective Wehr observed, which

4    corroborate what Greg Williams told you happened.

5    The defendant was not offering to drive from his

6    home in Aurora to Greg Williams' apartment in Arvada solely

7    because they were friends.  He was not offering to come

8    over there and meet up with him briefly to shake hands or

9    to give him a hug.  He came over there to give him drugs

10   and to receive cash money for those drugs.

11   The next count is November 22d, 2013, which

12   relates to Count 6 through 8.  And this is possession of

13   powder cocaine with the intent to distribute it.  And this

14   transaction occurred at the defendant's home.  So it's also

15   charged within 1,000 feet of the real property of a public

16   school.

17   There are two phone counts associated with this

18   transaction and those are Counts 7 and 8.  And this is a

19   call -- two calls, rather, that the defendant had with

20   Simon Ramirez.  So Count 7 pertains to Exhibit 3.  And that

21   is the call where Simon Ramirez asks the defendant if he's

22   good, could he use one or two?  He has two of the singles

23   left.

24   The defendant indicates, Yeah, I could.

25   Ramirez explained to him that he had done an order

1   yesterday, but they had a couple left, and he wanted to

2   check with him.  The defendant asked Simon Ramirez, So,

3   what, 2?

4           Ramirez indicated, Yup.

5           To which the defendant said, Okay, you drop them

6   off to me later.

7           Ramirez agrees to this.  They then discuss timing

8   of this.  And Ramirez told you at the end of this call that

9   he believed that the defendant was asking for 1 to 2

10  ounces.

11          Count 8 pertains to Exhibit 4, which is the call

12  from Simon Ramirez to the defendant where Simon Ramirez is

13  at the defendant's home and the defendant is not, and the

14  defendant tells him that he's at least an hour away, he's

15  getting a massage.

16          He tells Simon Ramirez, Why don't you try and open

17  up that Impala right quick and see if it's open.  Open up

18  the car right quick and see if it's open.

19          Simon Ramirez indicates, Uh-huh.  If it is, just

20  do it right there or what?

21          The defendant tells him to pop the trunk, put it

22  in the trunk, and lock it up.  And as soon as I leave here,

23  I'll go get the money and come straight to you.

24          What are they talking about here?  Use your

25  everyday life experience, your reason and your common

1    sense.  What is Simon Ramirez bringing over after talking

2    about 1 or 2 singles from an order the day before that the

3    defendant would want him to put in the trunk of the vehicle

4    and he would meet up with him later?

5         In case that's not clear enough, the defendant

6    asks Simon Ramirez, It's all clean, right?  It ain't all

7    shaky and shit, is it?  And Simon Ramirez assures him, Na,

8    na.  Simon Ramirez also tells him, It's one.  The defendant

9    asks, It's just one?

10        And Simon Ramirez confirms that.

11        The defendant says, Then I'll be straight to you.

12   I probably got like 700 on me right now.

13        Simon Ramirez explained to you that he had had

14   brought over 1 ounce of cocaine and that he understood the

15   defendant to say that he had $700 on him and would bring

16   him that when they met up.

17        Later in this call, still staying on Exhibit 4,

18   they discuss where Simon Ramirez will be.  And, remember,

19   that's the call where the defendant indicated he didn't

20   want to drive as far out as Simon Ramirez lived because

21   Simon Ramirez lived further west than the defendant.  But

22   ultimately, he agrees that he will do that.

23        And Simon Ramirez tells the defendant that the car

24   is locked.  The defendant then tells him to go in back in

25   the garage, to open up the fence, to put it in the garage.

1    I don't know, it's a box with DVDs in it.

2           And then there's that step-by-step where the

3    defendant is instructing him, There's a side door on the

4    garage, and telling Simon Ramirez how to get into the

5    garage using that side door.

6           Simon Ramirez finally says, Just right here, bro,

7    in the white, where all the cleaning shit is, white towel,

8    where all the cleaning supplies are in the box.

9           The defendant says, Got you.  Appreciate it.

10          Simon Ramirez told you that he went in the

11   defendant's garage and that he left 1 ounce of powder

12   cocaine in that garage, and that later they met up at a

13   Benihana's where the defendant got into Simon Ramirez's

14   vehicle and paid him $1,000 in cash for that 1 ounce of

15   powder cocaine.

16          Now, you heard testimony from Investigator Mohlman

17   that the distance between the defendant's house and the

18   Aurora West College Preparatory Academy was anywhere from

19   738.2 feet and 862.6 feet, depending where on the school

20   you measured, whether it was the corner or one of the doors

21   to the school.  But either measurement is well within that

22   1,000 feet of the school.

23          Investigator Mohlman also showed you Exhibits 5

24   through 7, which were the CCTV video and the screenshots

25   showing the defendant's house, showing Simon Ramirez's

961

1    vehicle pull up to the defendant's house, and showing Simon

2    Ramirez by the defendant's car, and then walking around to

3    the side of his garage.

4         The next count is November 23d, 2013, and this

5    pertains to Counts 9 through 11.  And here, we are talking

6    about both powder cocaine and cocaine base, crack cocaine.

7    And there's also one phone count, and the one phone count

8    is Count 11, the cocaine base is Count 9, and the powder

9    cocaine is Count 10.

10        And on this date, Sidney Taylor called the

11   defendant, and that's reflected in the call at Exhibit 8.

12   And the defendant asked him, You one of Mikey's people?

13        What did Simon Ramirez tell you about the way

14   he -- in which he met the defendant?  He told you that he

15   had been purchasing cocaine from a man named Michael Key,

16   and that Michael Key introduced him to the defendant to buy

17   cocaine from him.

18        And so when the defendant asked him, Are you one

19   of Mikey's people, Sidney Taylor understood that to mean

20   the defendant was verifying that that was how Sidney Taylor

21   had gotten the defendant's number.

22        The defendant told Sidney Taylor to come over

23   here, by, like, Colfax and Havana by that Taco Bell.

24   Sidney Taylor told you that he would meet up to buy drugs

25   from the defendant at a Taco Bell.  The defendant talks to

1   Taylor -- Sidney Taylor about the price.

2           He says, I don't know what really you all did last

3   time, but I told him it was 3, so it's 3, though.

4           Hearing that, Sidney Taylor asks for half and

5   half.

6           The defendant said, Yeah, you talking -- you

7   taking about half?  Taylor said, Just do me one six, a

8   16th, you know, 16-year-old soft and then 16-year-old hard,

9   just do it like that.  The defendant responds, Okay, a

10  ball?

11          Sidney Taylor says, Yes, just split it half and

12  half for me.

13          Sidney Taylor explained to you that he wanted half

14  the drugs for half the price, so that when he met up with

15  the defendant, he paid him $150 for an eight-ball, which he

16  explained was 1/16th ounce crack, 1/16th ounce powder, 3.5

17  grams.

18          You know that those drugs contained a detectable

19  amount of cocaine because Sidney Taylor that -- told you

20  that he used them and that he got high.

21          Moving on to November 29th, 2013, which is Counts

22  12 through 16.  On this date, we're once again talking

23  about powder cocaine at the defendant's house, so less than

24  500 grams within 1,000 feet of the real property of a

25  public school.  There are three phone counts associated

1      with both of those deals.   Those are Counts 13, 15, and 16.

2                Exhibit 98 starts with Robert Painter calling the

3      defendant at 1:19 p.m.   And Painter indicates that he's

4      nearby, and asks if he can stop by.   The defendant says, I

5      ain't no good.   Waiting on my Mexican partner.   If he ain't

6      got -- if he ain't get me -- with me by 3:00, then I'm just

7      going to go through somebody else.   What you need, though?

8                Painter indicates, Damn, by 3, huh?   I'm behind --

9      yeah, you don't even know what I mean.

10                The defendant indicates that he'll call him back.

11     Robert Painter told you that in this call, Robert Painter

12     wanted cocaine from the defendant.

13                After the defendant got off the phone with Robert

14     Painter, he called one of his sources of supply, Simon

15     Ramirez, at 1:21 p.m., and that's Exhibit 99.

16                The defendant says, What he say?

17                Simon Ramirez says that he's working on it.   What

18     are you gonna need?

19                The defendant says, I don't even know.   He doesn't

20     have money?   I'll just do like 4 quick.   Let me know

21     something by 3 because it's you now, but if it ain't

22     nothing by 3, I got to go do something.

23                Simon Ramirez indicates, All right, I'll let you

24     know.

25                And what did he tell you?   He told you that he

1    never got with the defendant that day; that he never sold

2    him any cocaine on that day.

3           So shortly before 3:00 p.m., having not heard from

4    Simon Ramirez, the defendant calls Christopher Vigil.   And

5    this is Count 3, and it's reflected in the call at

6    Exhibit 9.

7           And the defendant says, I need 2.   I'm -- I'm on

8    my way down there.   And Christopher Vigil indicates that he

9    was running to the bank at that time.   The defendant called

10   Robert Painter at 4:56 p.m., which is Exhibit 100.   And he

11   asks him if he still wants to come get that.

12          Robert Painter says, Of course I do -- of course,

13   man, you know.

14          The defendant says, I'm just making sure, I'm

15   fixing to go get it right now.   I'm just making sure.   I'll

16   be ready in a minute, it ain't gonna be that long.

17          Greg Williams calls the defendant approximately 16

18   minutes after this call at 5:10 p.m., and that's reflected

19   in Exhibit 101.   And Greg Williams, when -- on the phone

20   when the defendant asks him, What are you gonna need?   You

21   gonna need soft or hard?

22          Greg Williams tells him, My normal.

23          The defendant asks, How much soft?

24          And Greg Williams asks for a quay.   Greg Williams

25   explained to you that a quay was a quarter ounce, which is

1    7 grams.

2         The defendant says, All right, I'll have it ready

3    for you in a second.  I'm going to go meet him right now as

4    we speak.  Be ready because I'm gonna cook this shit up so

5    be ready, all right?

6         Christopher Vigil told you that on this date,

7    November 29th, he sold the defendant 2 ounces, which is 56

8    grams of powder cocaine, for $1100 an ounce.  Investigator

9    Mohlman told you that Christopher Vigil's address was 518

10   feet away from Wyatt Edison Charter Academy.

11        Still later that day, after the transaction with

12   Christopher Vigil, the defendant called James Tillmon at

13   6:46 p.m., and this is Count 15, Exhibit 10.

14        And Tillmon asked, You got more of that shit now?

15   The defendant said, That stuff I normally fuck with?  Uh, I

16   just did it.

17        Two minutes later the defendant is back on the

18   phone with his source of supply, Christopher Vigil, at 6:48

19   p.m., and that's Exhibit 11 and this is Count 16.

20        The defendant says, You got one more down there?

21        And Christopher Vigil says, Yeah.

22        The defendant says that he has someone waiting on

23   it so he'll probably be on his way.  Can you weigh it and

24   tell me how much it is and text it to me?

25        Vigil says, It's a good little amount, too.  I

1   just checked it up.

2           Hearing that, the defendant says, It's all good

3   then, it's more.   It's probably around 7, huh?

4           And Vigil responds, Yeah, it's about there.

5           Christopher Vigil told you that the defendant

6   drove that Porsche Cayenne to his house and parked by his

7   garage door in the alley.   Exhibit 12 is a GPS ping of the

8   defendant's phone at the same time on the same date,

9   indicating that the defendant was near Christopher Vigil's

10  residence.

11          Furthermore, Exhibit 103 is the text message from

12  Christopher Vigil to the defendant telling him that he was

13  in his garage, so park in the back.   Exhibit 104 is a call

14  from the defendant to Christopher Vigil saying that he

15  can't see Vigil.   Christopher Vigil tells him he's sitting

16  in the garage and he will open up the door.   He confirms

17  that the defendant needs to be in the alley and to just

18  park by the open garage door.

19          Detective Wehr also told you that at this time, he

20  was parked in the street with a clear view of Christopher

21  Vigil's garage door.   He saw that garage door open, he saw

22  that distinctive Porsche Cayenne, being driven by the

23  defendant, park by the garage door.   And at the time he

24  didn't recognize Christopher Vigil, he didn't have a

25  positive identification of him, but that he saw the two

1    meet talk for a brief period of time, go into the garage

2    for a minute or two, and come back out.  And that they

3    talked again at the car, at which point in time Detective

4    Wehr was able to positively identify Christopher Vigil as

5    the person interacting with the defendant, and that the

6    defendant then drove away.

7           Christopher Vigil told you that he could not

8    remember the exact amount of cocaine that he sold to the

9    defendant on November 29th, but he told you that in the

10   entire time he dealt with the defendant, the smallest

11   amount he sold him was 1 ounce and the largest amount he

12   sold him was 2 ounces.

13          For purposes of Count 14, which is the second

14   count of distribution on that day -- or possession with

15   intent to distribute on that day, both 1 ounce and 2

16   ounces, both of them are less than 500 grams of a mixture

17   or substance containing a detectable amount of cocaine.

18          And you know that Christopher Vigil sold to the

19   defendant on that date for many reasons:  One is the

20   substance of their communications; the other is the fact

21   that they met up.  The defendant drove from his home to go

22   meet with Christopher Vigil, talk to him for a period of

23   time, went into his garage for a short amount of time, and

24   left.  That's indicative of the fact that they, in fact,

25   had had that drug transaction that Christopher Vigil, in

1    fact, sold to the defendant.

2         It's not worth the defendant's time to go over to

3    Christopher Vigil's house for nothing.

4         Furthermore, James Tillmon, the person who had

5    called the defendant looking for drugs, once that deal --

6    the second deal with Christopher Vigil was done, James

7    Tillmon was over at the defendant's house, and Exhibit 10

8    shows that on that CCTV.  It shows those distinctive

9    taillights of James Tillmon's vehicle parking in front of

10   the defendant's home after he had returned from the second

11   time being over at Christopher Vigil's house that day.

12        Moving forward to December 7th, 2013, which is

13   reflected in Count 17, on this date, the defendant

14   possessed with the intent to distribute powder cocaine,

15   less than 500 grams within 1,000 feet of the school.  And

16   this is reflected in Exhibit 14, which is a call between

17   Francisco Aguilar and the defendant.

18        The defendant indicates that he could still use

19   like 2, and Francisco Aguilar told you that the defendant

20   wanted 2 ounces of cocaine on that date.

21        Exhibit 15 is a text message from the defendant,

22   which he told you indicated that the drugs were ready, but

23   that he had been busy.

24        Exhibit 16 is the text from Aguilar to the

25   defendant on 12-7, All gravy, which indicates that he has

1    the drugs and he's ready to sell them.

2         Exhibit 17 and 18 then are confirmation that

3    Aguilar was on his way to the defendant -- excuse me -- and

4    Francisco Aguilar told you that on that date, he sold the

5    defendant 2 ounces of cocaine at his house, which is within

6    1,000 feet of a school, and that he charged the defendant

7    $900 per ounce.

8         December 10th, Counts 18 and 19 are a deal with

9    Sidney Taylor where he indicated to you that he would buy

10   up to an eight-ball at a time from the defendant, 3.5

11   grams, 1/16th powder cocaine, 1/16th crack cocaine.

12        December 11th, which is Count 20, is a similar

13   charge.  And this one reflects that it was up to 3.5 grams.

14   He told you that this was the most that he would buy from

15   the defendant three to four times a week, and this reflects

16   a crack cocaine deal, less than 28 grams.

17        January 5th, 2014, is the deal -- the

18   methamphetamine deal with Robert Painter that we talked

19   about earlier.  And that starts with a call with Robert

20   Painter at 11:38 p.m., which is reflected in Exhibit 19.

21   And the defendant talks to Robert Painter about the M game.

22   Robert Painter does not understand what the defendant is

23   talking about and repeatedly asks him, The M game?  Until

24   the defendant finally says, On the meth.  My people just

25   started getting like pounds.

1          Robert Painter indicates to him that he would like

2     to purchase methamphetamine, but when told the price, when

3     he asks what the ticket is, he can't afford it.  And so he

4     places a smaller order, that he told you a bizel was a

5     ball, 3.5 grams, and a quad was a quarter ounce, 7 grams.

6     He couldn't afford $1,100, but he could afford less.  So he

7     did not purchase the full ounce at that time.

8          After speaking with Robert Painter, the defendant

9     called Christopher Martinez, who supplied him with

10    methamphetamine.  And Christopher Martinez indicates that

11    he will be there in a short amount of time.

12         After this conversation with Christopher Martinez,

13    the defendant texted with him and called him about the

14    timing of it.  He then communicates again with Robert

15    Painter in Exhibit 24.  And they are confirming Robert

16    Painter is asking if he's got it.  And at that point in

17    time he told you the plan was that they were just going to

18    wait until the next day.

19         But then the defendant called Robert Painter back,

20    which is Count 24, Exhibit 25.  And he indicated that he

21    could get it.  And Robert Painter told him that he was on

22    his way.  And the defendant confirms that the amount of

23    methamphetamine he wanted was a quarter, as in a quarter

24    ounce.

25         The defendant then called Christopher Martinez,

1    reflected in Exhibit 26, and Christopher Martinez told the

2    defendant he would be there in 30 minutes.  The defendant

3    told, then, Robert Painter that they were looking at about

4    20, 30, maybe 40, 45.

5            The defendant then called Robert Painter, which is

6    reflected in Exhibit 28.  He said 10 minutes, you gonna be

7    here.

8            COURTROOM DEPUTY:  Ms. Rangel, you have two

9    minutes.

10           MS. RANGEL:  Thank you.

11           And Robert Painter indicated that he would be

12   there in maybe 10 minutes, but asks the defendant if he

13   would cover the methamphetamine at that time.  And he

14   repeatedly told him, Cover it, cover it, I'll be there in

15   15.

16           The defendant called Robert Painter and said he

17   was ready, which Robert Painter told you meant that he had

18   the methamphetamine.

19           Robert Painter then called the defendant

20   indicating, I'm at the door.  He told you that on that

21   date, he purchased a quarter ounce of methamphetamine,

22   which is 7 grams, from the defendant at the defendant's

23   home, within 1,000 feet of a school.  He told you that he

24   used that methamphetamine and that he got high off of it,

25   which means that it contained a detectable amount of

1    methamphetamine.

2            We have another deal with Sidney Taylor reflected

3    in Counts 27 and 28 for January 6th, again a 16th ounce

4    crack cocaine and a 16th ounce powder cocaine.

5            January 9th, 2014, is Counts 29 through 31.  And

6    this is another deal of powder cocaine at the defendant's

7    home within 1,000 feet of a school.  And these are repeated

8    phone calls back and forth with one of his sources of

9    supply, Francisco Aguilar.  And they are coordinating when

10   Francisco Aguilar can get there and Francisco Aguilar

11   repeatedly assures him as to the quality of the cocaine;

12   that it was soft, that it had broken when he had opened it

13   up.

14           Francisco Aguilar told you that he ultimately met

15   up with the defendant and on this date he sold the

16   defendant 9 ounces of powder cocaine at the defendant's

17   home, and that is 252 grams of cocaine, within 1,000 feet

18   of a school.

19           January 28th, Count 32, are calls between James

20   Tillmon and Greg Last Name Unknown.  And this is where Greg

21   Last Name Unknown indicates to James Tillmon that he wanted

22   2.

23           Tillmon goes over, per surveillance, to the

24   defendant's house and arrives for a short period of time,

25   and that's that CCTV footage that you saw in Exhibit 42

1    that reflects James Tillmon leaving the defendant's home

2    and getting into the vehicle.

3         THE COURT:  Ms. Rangel, I'm going to need you to

4    wrap it up.

5         MS. RANGEL:  Okay.

6         Subsequent calls indicated that there was a drug

7    deal that occurred between James Tillmon and Greg Last Name

8    Unknown.

9         You have another substantive count with Sidney

10   Taylor on February 26th, which is reflected in Counts 33

11   and 34.  Another count with Sidney Taylor on February 28th.

12   You have a substantive count on March 1st between Francisco

13   Aguilar and the defendant for 109 grams.

14        On March 2d, you have another substantive count of

15   distribution between the defendant and Robert Painter,

16   where the defendant uses another source of supply, Travis

17   Edwards.

18        March 17th is the prostitution count.  And you

19   heard ample testimony from Detective Rivera regarding that,

20   about how he observed the defendant in the parking lot, he

21   met up with Heather Quintanilla in the hotel room, he gave

22   her $260 for an hour of her time.  He asked her if he could

23   have sex with her from behind, after which she took the

24   money and he placed her under arrest for prostitution.

25        He found condoms, the money, and the hotel receipt

1    in her purse.  The hotel had been rented by the defendant.

2         Finally, you have the transaction between

3    Francisco Aguilar and the defendant on March 26th, and

4    the search warrant evidence from May 23d, 2014.  The search

5    warrant evidence from May 23d, 2014, confirms everything

6    that the calls have been indicating, in that there was drug

7    paraphernalia, there were scales, there was the cutting

8    agent, inositol, and there was evidence that the defendant

9    had thousands of dollars, besides having no legitimate

10   employment.

11        There were no drugs there, but there was certainly

12   indication that drugs had been there.  You've heard all of

13   the evidence that shows the defendant used people as a

14   means to an end for him.  He sold drugs.  You have before

15   you almost a year-long conspiracy with multiple drug

16   transactions, with multiple individuals.

17        He also was someone who would prostitute a woman

18   to make money for him.  He would sell you anything that he

19   could, as long as you would pay him; whether it was

20   cocaine, crack cocaine, methamphetamine, or the human body.

21        Because he used people as a means to an end, and

22   now that you know what he was doing, today is your

23   opportunity.  You are now the means to the end of his

24   criminal ways.  Consider all of the evidence that you have

25   before you and find him guilty as charged.  Thank you.

1          THE COURT:   Thank you, Ms. Rangel.   You exceeded

2     your time by three minutes.   I'm going to deduct three

3     minutes from the Government's rebuttal, so the Government

4     will have 17 minutes in rebuttal and you will get a warning

5     at a minute 15.

6          All right.   We're going to take a

7     briefer-than-normal morning break.   We will be in recess

8     for 10 minutes.

9          (Recess at 10:37 a.m. to 10:50 a.m.)

10          THE COURT:   Closing argument for the defendant.

11     Mr. Leonard.

12          MR. LEONARD:   Thank you, Your Honor.

13          There's a beauty in a trial.   It isn't the kind of

14     beauty that we see in a painting or a song, but it is a

15     beauty that speaks to all of our desire for liberty.   And

16     no matter how divided the media says we've become, I

17     guarantee there's one thing that everyone in this courtroom

18     agrees upon:   We all have the essential fundamental right

19     to liberty to be free.   It's why Lincoln said that we are a

20     nation conceived in liberty.   And I know of no other nation

21     that offers to its citizens what we offer to our citizens,

22     each and every one.   And that is, if your liberty is going

23     to be taken forcibly by the Government, they must prove

24     your guilt as to each and every element of the charge

25     alleged beyond a reasonable doubt.

1          It is an essential right that each and every one

2    of us has.  And, in particular, it is the right that my

3    client, Mr. Ricky Garrison, has.

4          And we have spent much of our time directly

5    looking at that witness box and listening to that

6    testimony, but soon everything that you are going to be

7    considering is about Mr. Garrison and will impact him, and

8    your decision -- not the Judge's, not the Government's --

9    is what counts.

10          When we started this case, I stood up in opening and

11    I made what really were promises to you.  I told you there

12    would be no drugs introduced into evidence in this case,

13    and there were not.  And if I could leave this lectern and

14    walk over to the rail of the jury there, I would lay before

15    you all the drugs that were introduced as evidence in this

16    case.  There were none.  It would be a very easy task for

17    me.

18          But not only weren't there any drugs introduced

19    from Mr. Garrison or the testifying codefendants, there

20    were no drugs from the other people that the Government say

21    were involved in the conspiracy.  I told you there was no

22    agreement, and you heard the testimony from the

23    codefendants who testified about their deals, there was no

24    agreement.  Even with their deal, they wouldn't go so far

25    as to say there was an agreement.

1           I told you that there was no common purpose, and

2   there was no common purpose.  And I'll get into that in

3   further detail, but you got to see the people who the

4   Government alleges there was a common purpose, this

5   interdependence.  And none of them articulated it because

6   there wasn't one.

7           I told you that there's no way to accurately

8   measure the amount of drugs that the Government says is

9   involved in the conspiracy.  And as the Court read to you

10  in the instruction, these are very specific imprecise

11  amounts, but we have no drugs so we can't have a weight.

12          The Government asks you to rely upon phone calls

13  and the codefendant's testimony.  And they are not

14  reliable.  And you've seen that.  And I'm going to get into

15  further detail about that, but you know that now.  That was

16  a promise made and it was a promise kept.

17          I told you that the alleged conspiracy covers some

18  368 days beginning in June of 2013 and ending in June of

19  2014.  And in this conspiracy that the Government claims

20  that is supposed to last 12 months and three days, only 15

21  days have independent charges.  Why is that?  Because there

22  wasn't a conspiracy.  There wasn't a common purpose.

23          The Government has gone to great lengths to show

24  the detail of their investigation.  And I told you in

25  opening that there would be over 40,000 phone calls.  And

1    on direct exam -- or cross-examination, Agent Mohlman

2    testified that there were over 48,000 known calls.  That's

3    roughly 4,000 phone calls for each month of the alleged

4    conspiracy and yet although they intercept 48,000 phone

5    calls of what they claim to be a vast conspiracy, how many

6    were introduced into evidence?  I believe 63, give or take.

7    And I am not a math expert, but I guarantee that that is

8    less than 1 percent.  It is less than one-half of 1

9    percent.  It is an infinitesimally small number of phone

10   calls in what they say was a vast conspiracy.

11          Now, let's turn to the evidence of the 368 days

12   that were charged in that conspiracy.  There are no charges

13   brought in June, July, August, September, or October.

14          Move to 2014.  There are no substantive charges

15   brought in April, May, or June.

16          Now, this is Exhibit 124.  I want to bring this up

17   just to start to mark off the people that you didn't hear

18   from.  And I think this is important because if you look at

19   the indictment, which you will have in your instruction

20   packet, Count 1 charges a number of people that you never

21   heard from, and not even really talked about.

22          Travis Edwards, he did not walk in the courtroom

23   to testify.  The sole evidence on Mr. Edwards is a phone

24   call.  And as we have established, the phone calls are

25   hardly reliable.

1        Christopher Martinez.  We did not hear from

2    Christopher Martinez, or Melvin Turner, or Louis Ramirez,

3    or Sean Beardsley.  We didn't hear from James Tillmon.  We

4    didn't hear from Archie Pool.  We didn't hear from Dante'

5    Fisher.  You didn't just not hear from them, nobody brought

6    in any evidence that they say was seized from these folks

7    who are supposed to be involved in this vast conspiracy

8    that goes on for 368 days.

9        If there was something, they would have brought it

10    to you because that's their job.  And they know their job.

11        I want to talk now about the six codefendants who

12    did testify.  All of them have one thing in common; not a

13    single one of them came to talk to you out of the goodness

14    of their heart.  Every single one of them came to you with

15    a deal.  And not just a little bit of a deal, a substantial

16    deal.  Time and again, we hear of time served or a

17    reduction in sentence where they're going to ask for

18    probation.  Time and again, we hear that these people

19    refuse to talk to law enforcement unless their lawyer's

20    with them getting them the deal.  They all have the same

21    count.

22        But I think we can divide these six people fairly

23    into two distinct groups:  people who are using and

24    addicted to drugs, and people who the Government alleges

25    are selling.

1       Now, one of the people who the Government alleges

2  is selling is also addicted to drugs and I'm going to talk

3  about each of these people independently.

4       Mr. Vigil.  Who's Mr. Vigil?  Mr. Vigil, the

5  Government alleges, is selling drugs.  He tells you the

6  reason he's selling them is because he's a drug addict.

7  Mr. Vigil has a substantial drug problem.  That much is

8  abundantly clear, it's not disputed.  Nobody disagrees with

9  that.  Mr. Vigil is so in the grips of his addiction that

10  he's on pretrial release and he's lying to his pretrial

11  release officer in violation of court order; he's using

12  cocaine.  And he's lying about it and he's concocting

13  reasons why he's dropping dirty instead of owning the

14  truth.

15       Why is that?  Because addicts really have one

16  thing in common, all of them:  they're liars.  And that

17  doesn't mean they're a horrible, awful person, but it's

18  just the reality, because the one thing that an addict

19  wakes up with thinking about, caring about, and wanting

20  more than anything else, is the drug.  Or the alcohol.

21  That's all they are.  That's all they are.

22       Mr. Ramirez.  Government alleges that Mr. Ramirez

23  is selling drugs, that he's selling drugs to my client.

24  And when he's on direct examination he's answering the

25  questions.  Why?  Because he wants his deal.  He knows what

1      he has to do to get his deal.  He better answer the

2      Government's questions.  He even talks about how he came

3      into the country after being deported.

4           Now, when I get up and start to ask him those very

5      same questions, along those same lines, what does he do?

6      He takes the Fifth and he stops answering questions.  Why

7      is that?  I don't have a deal to give.  Nothing.  I don't

8      have it.  I can't give him anything.

9           But he's not just lying about coming into the

10     country, he's lying about something else that's really

11     important.  This judge gave him a very clear order:  If you

12     come back in, one, you can't do it illegally; but

13     nonetheless, you need to report.  And he won't answer that

14     question, because he didn't do it.  He doesn't do it.

15     Because, unfortunately, he doesn't even have a deal with

16     the judge.  So he's not worried about satisfying the judge;

17     he's just worried about satisfying the Government.

18          Now there's Mr. Aguilar, the last of the so-called

19     dealers.  Now, Mr. Aguilar is impeached on the stand, and

20     you have that in your instructions.  His amounts are all

21     over the place.  He -- the guy cannot keep his story

22     straight.  He does have basically this thing in common with

23     every time he speaks to the Government:  his amounts are

24     going to change.  And if he came back in for the sixth time

25     and talked, the amount would change.  And that's important.

1          Now we have Mr. Painter.  What does Mr. Painter

2     do?  He wakes up doing drugs.  He goes to bed thinking

3     about drugs.  If you listen to his phone calls, if there

4     was ever something that was somewhat hard and pathetic to

5     listen to, it's listening to Mr. Painter's voice, because

6     that is a person who is in the grips and throes of serious

7     addiction.  You can hardly understand what he's saying.

8     And if that addiction had gotten so far that he's mumbling

9     and slurring his words, can you trust his memory?  I don't

10    think so.  And, frankly, I don't think it's unreasonable to

11    even make that request of you.

12          And then there's Mr. Williams, the last of the

13    people who I call the users or addicts.  Mr. Williams is

14    obviously not the same person in this courtroom who was

15    involved, the Government alleges, during the period of 2013

16    to 2014.  Mr. Williams is a man who tells you

17    straightforward without any reservation, I was scared of

18    spending the rest of my life in prison, that I would die in

19    prison.

20          That's a motivating factor for Mr. Williams, and

21    he tells you that.  And you should consider that when you

22    consider the weight of his testimony and whether or not Mr.

23    Williams has a reason, a good reason, to want to satisfy

24    the Government, who are the only people who can give that

25    deal.

1          But Mr. Williams tells you something else, and,

2     again, it's somewhat difficult, if not very difficult, to

3     listen to.  He's using cocaine and drinking.  And -- every

4     night, I believe is what he said.  And he describes why he

5     uses the cocaine.  And this is truly -- I think it's

6     heart-breaking.  He uses the cocaine so he can drink more,

7     so he doesn't feel the drunk.  That is an experienced

8     addict.  That is not somebody who's just dabbling a little

9     bit in their abuse.  It has taken over.

10          And the Government wants you to trust him.  They

11     want you to trust him on amounts and his recollection.  But

12     he's in the grips and throes of his addiction.  And it

13     taints everything that he says, just like every other user,

14     just like when you throw oil into water and then try to

15     take an object out of it, the oil gets all over that object

16     no matter what you do.

17          Now, what did these folks also all say about their

18     dealings with Mr. Garrison?  They were either the buyer and

19     he was the seller or he was the seller and he was -- they

20     were the buyer.  And they were clear they didn't have an

21     agreement.  And it's important to talk about what it means

22     to have an agreement.

23          First of all, they're telling you they didn't have

24     an agreement, but what do they mean by that?  And the jury

25     instruction will shed some light, I think, and help you.

1    Mere similarity of conduct among various persons and the

2    fact that they may have associated with each other and may

3    have assembled together and discussed common names and

4    interests does not necessarily establish proof of the

5    existence of a conspiracy.

6         Bingo.  That's what they were saying, folks.

7    That's what they were saying.  In my view, there's

8    something else.  Not one of them pled guilty to conspiracy.

9    You know why?  They weren't involved in a conspiracy.

10        Each of them testified as to their independent

11    reasons for doing what the Government says they did.  And

12    simply put, in the language of the jury instructions -- and

13    I ask you to follow those instructions, to follow the

14    instructions given you by the Court, and determine that

15    there's no mutual, common purpose.

16        These folks weren't interdependent, they were

17    independent.  And it's something that is very important and

18    crucial.

19        So one of the things I noticed was the Government

20    and the agents would talk about this organization.  And I

21    kept sitting there thinking to myself, what organization?

22    I don't know what organization they're talking about.  And

23    the thing about -- just because these people all may know

24    each other, and actually I don't even think that's what the

25    evidence showed, but just because Mr. Garrison knows all

1    these people, it certainly doesn't mean that they're acting

2    as a unit.  Just because they allegedly did business

3    together, doesn't mean there was a common purpose.

4           I think you need to focus on what the alleged

5    business arrangement is.  And one of the things that really

6    became apparent when each of these people testified was

7    there wasn't an ounce of trust between any of them.  None

8    of them.  They didn't trust each other.  And that's crucial

9    because that's why they had everybody pay cash.  You know,

10   to have some sort of common interest or a mutual purpose,

11   there has to be a modicum of trust, just a little bit.  But

12   there wasn't any there.  There wasn't.  They all wanted

13   cash, they wanted it then and there to -- so that they

14   could go pursue their independent purpose.  They weren't

15   going to wait on somebody else to go take care of other

16   business before they got their money.  That wasn't what was

17   going on.  And they testified to that.  Nobody sold on

18   credit.  And that's pretty crucial.

19          Now, let's talk about these individuals in some

20   more detail.  We have Mr. Vigil.  Mr. Vigil is arrested in

21   January of 2014.  Now, according to the Government, he's

22   not detained -- and this is according to Mr. Vigil, too --

23   he's free to go, and they don't arrest him on this matter

24   until June of 2014.  Now, the Government's telling you that

25   Mr. Vigil has a common interest, a mutual agreement with

1    Mr. Garrison to support the conspiracy.  And we know the

2    Government is up on -- as they say, they're up on the

3    phones, they're on the wire.

4            What didn't you hear after the January 9th arrest

5    from Mr. Vigil?  You didn't hear him making phone calls to

6    Mr. Garrison saying, Hey, I just got nailed so somebody's

7    on to us, so we need to just cool it way down.  And he

8    didn't say that.  He didn't say that because he didn't

9    care.  And he didn't care because there's no common

10   interest and purpose.  Mr. Vigil's about Mr. Vigil.  He was

11   going to take care of his independent discrete needs, not

12   Mr. Garrison.

13           But if there's a common purpose, you bet your life

14   there will be those phone calls.  Because if you are

15   relying on Mr. Garrison, and he needed Mr. Garrison not to

16   get caught, and he wouldn't want to get caught again doing

17   what they allege he was doing, Mr. Garrison.

18           Well, let's talk about Mr. Aguilar.  Mr. Aguilar

19   gets picked up, but not arrested, on March 27th of 2014.

20   These two nice agents take him for a ride in the park.  And

21   I would imagine it was one of the worst park experiences

22   that Mr. Aguilar has ever had in his life.  And they

23   confront him.  And I'm going to get back to that, but they

24   let him go.  And I questioned the Government about -- and

25   their agents about, What steps did you take to stop Mr.

1   Aguilar from getting on the phone and making phone calls,

2   from alerting these people he's supposed to be in business

3   with, he's supposed to have a common purpose with.

4        Nothing.  Right?  Mr. Aguilar's free.  He's free

5   as can be.  He's walking around, doing whatever he wants to

6   do until he gets picked up in June.  And they're up on the

7   phones and what don't you hear?  You don't hear Mr. Aguilar

8   making a phone call to Mr. Garrison saying, Oh, buddy, look

9   out, I got picked up, you know, the day after the alleged

10  deal, and so we need to stop it, we need to cool it because

11  I don't want to get picked up again.  I don't want to get

12  picked up again and I don't want you to get picked up.

13       He doesn't make that phone call, because he

14  doesn't care.  He doesn't care because there's no common

15  purpose.  He's got his own independent purpose and it has

16  nothing to do with Mr. Garrison.

17       Now we have Mr. Ramirez.  Mr. Ramirez's testimony,

18  and the testimony from the agents, is that Mr. Ramirez

19  starts out making deals with Mr. Garrison and he's joined

20  with his brother-in-law, Mr. Aguilar.  But then according

21  to the Government's theory of the case, Mr. -- I think Mr.

22  Aguilar says this, too -- they cut Mr. Ramirez out.

23  Remember that?  They cut him out.

24       Now, the Government alleges there's a common

25  purpose, there's a conspiracy.  And they're up on the

1    phones and they're able to listen, and there's not one

2    phone call that's brought into evidence, because it doesn't

3    exist, of Mr. Ramirez complaining to Mr. Garrison about why

4    he's not ordering any of this alleged product from him

5    anymore.  And if he needs the business and they're supposed

6    to have this common purpose, you know what, in just the

7    plain English, he'd be pissed, wouldn't he?  He'd be angry.

8    He's cut out.

9           And you don't do that with a business partner.

10   But they weren't business partners and they had no common

11   purpose, and he doesn't care.  He doesn't care, because his

12   own needs had already been met.  He got cash in hand the

13   day the alleged deal went down.  That's what happened.

14   There was no common purpose.

15          And the users.  You don't hear any phone calls

16   from them saying, I really need it.  You, told me you'd get

17   it.  We had this agreement.  But why can't you get it to

18   me?

19          You don't hear that.  Their common purpose is

20   getting high; feeding the addiction.

21          And if there was this conspiracy, as I referenced

22   back and alluded to earlier, why are all the alleged deals

23   between November and March in this 368-day period of time?

24   That, too, is pretty good evidence that even under the

25   Government's theory, it wasn't a conspiracy.

1          Now, I want to turn to the specific amounts that

2     the Government has to prove.  You've heard the judge read

3     you the instruction; you'll have your own instructions that

4     you take back and look at.  There are no weights we have.

5     We have no laboratory tests.  So the way that you're

6     supposed to determine amounts is based off of cooperating

7     codefendant testimony who had deals and phone calls.

8          And one of the things that caught me -- my

9     attention in the Government's closing argument was

10    Exhibit 3.  And the Exhibit 3 is where Aguilar and Mr.

11    Garrison are talking, and supposedly Mr. Garrison is

12    ordering 2 ounces.  That's what they say the phone call

13    means.

14         But the testimony, and what they say the actual

15    evidence is, is only 1 ounce that's delivered.  And that's

16    just 1 ounce of the fact that the phone calls, they're not

17    accurate.

18         So there's no single gram of drugs seized, there's

19    no exhibit, in this case, of cocaine, cocaine base, or

20    methamphetamine; there's nothing tangible, not only from

21    Mr. Garrison and the cooperating testifying codefendants,

22    but all the other people that are supposed to be part of

23    this conspiracy.

24         Now they've gone to great excuses, the Government.

25    In fact, it seemed to really kind of bother them when I

1    suggested, Why didn't you arrest these people?

2              Well, it takes time and it takes effort.

3              And undoubtedly, it does.  But, you know what,

4    it's their job.  It's what you and me and everyone in this

5    courtroom pays them to do.  And it is a hard job.  And hard

6    jobs demand performance and results.

7              So we started with no drugs.  That's what I told

8    you.  We end with no drugs.  And this is supposed to be a

9    drug case.

10             Now, there's multiple incentives here, all the

11   phone -- the people who testified have an incentive; a

12   tremendous incentive.  And in the history of mankind, there

13   is one thing that is one of the best motivators that we

14   have come up with, and perhaps it speaks to our brutality,

15   but it's fear.  You put fear into somebody, especially the

16   fear of taking their life or their liberty from them, and

17   you can get them to say many, many things.

18             In fact, I'll wager you can make somebody scared

19   enough that they'll say just about whatever you want them

20   to say.  That's human nature.  And each and every one of us

21   knows that deep in our hearts.  None of us will be proud of

22   it, but, boy, the humanity in all of us is hard to

23   override.

24             And so the Government puts great pressure, turns

25   the screw on the deal.  You want your deal, you need to

1    testify as to what we think happened.

2         And the Government kept something from you, too.

3    They interview all these testifying codefendants.  We're in

4    2017.  We have all sorts of technology that allows us to

5    record events.  We can record audio, we can record visual,

6    we can record both audio and visual.  We have court

7    reporters who can take down everything you say.

8         But the Government doesn't do that.  They don't

9    let you see the interviews as they happened.  They don't

10   let you see the tone of these people's voices or see what

11   kind of pressure they were putting on them.  Instead, you

12   have to rely on handwritten notes that are destroyed and

13   then typed into a report.

14        That makes me think of something in the 19th

15   century, not 21st century.  Why?  Why can't you hear those?

16   Well, I think because you would have heard and seen these

17   people trying to tell their story and the pressure that

18   they were receiving.

19        Now, the Government says that the alleged drugs

20   had to be cocaine or cocaine base or methamphetamine

21   because that's what the codefendants say it was and that's

22   what the phone calls were.  And let's just test that theory

23   on a reasonable person.  Our good agents walk up and in

24   their hand is a cup and they say, Look, I got tea in this

25   cup.  And to use the language of this case, I have a bizall

1    of tea.  And the reasonable person's first learning what a

2    bizall is.  But he gets past that and he says, Where's this

3    tea from?

4            Well, it's from Sidney Taylor.  Mr. Taylor assures

5    me that it's tea.  It really is tea.

6            And then the agent goes on to describe everything

7    you've seen about Mr. Taylor and heard and witnessed with

8    your own eyes.  And he says, drink it.  I assure you, it's

9    tea beyond a reasonable doubt.

10           And the person hesitates and the agent says, Hold

11   on, hold on, one second.  If I'm wrong, you'll lose five to

12   20 years of your life.

13           No reasonable person would drink that tea.  And

14   you know what, Mr. Garrison deserves that very same level

15   of concern.  And you can go through each and every one of

16   the testifying codefendants and run that analogy.

17           I want to talk a little bit more about the

18   amounts.  You'll be instructed that you have to find these

19   amounts beyond a reasonable doubt in order to find a

20   conspiracy.  As I've said, the Government's having you rely

21   upon the phone calls and the in-person testimony.

22           Let's just take a second and think about what

23   these people were testifying.  Erase the fact that it's

24   four out of six were drug users in the throes of addiction

25   and erase the fact that all six of them were under a deal.

1    We're talking about 2013 and 2014.   Three or four years

2    ago.   I sometimes can't remember what I had for dinner.

3            What do we all just forget that happened the day

4    before, or an hour before?   And sometimes it's important

5    things.   How many times have one of us called our wife from

6    the grocery store, saying, Now what am I supposed to get?

7    We don't remember and the conversation happened one hour

8    before.   And we were supposed to be paying close attention

9    and we can't remember.

10           And the Government says, Look, now, three or four

11   years ago, you should trust these people.   Trust them now.

12   Take a man's liberty perhaps five to 20 years.

13           Now the phone calls I said aren't reliable.

14   You've listened to them and you've seen the differences

15   that occur in those phone calls.   And you can't really

16   verify independently what's said on the phone calls because

17   the Government, well, they go to great lengths and pains to

18   explain why they didn't arrest anybody.   Never swoops in

19   and arrests people when they say a deal is going down at a

20   certain point, March 2d.   For goodness sakes, they can't

21   come in and make an arrest.

22           Oh, no, we want to see if we can get everything.

23   We want this to just go on and on.

24           You know what, nobody gets to -- they just

25   determined it can go on forever and you have to say, Sorry,

1  he didn't arrest them because that's why we wanted to get
2  everybody.
3          No, they should have arrested somebody.  They
4  should have.  And they had ample opportunity.  And they had
5  CCTV cameras and they had phone calls and they had GPS.
6  They can do all that which has to take a lot of man-hours,
7  but they can't work up to making the arrest.  So you're
8  left to determine weights off of people's memories.
9          But there's something about these people's
10  memories, too.  They talk to you about cutting agents and
11  we know now what a cutting agent is.  It's a nonillegal
12  substance that's used to add volume to the alleged illegal
13  substance.  And you would have thought the Government would
14  have gone into greet detail to find out how much cutting
15  agent these people are supposed to be adding to every gram
16  or ounce of the alleged product, but they don't do that.
17  Because they don't care, because they want the highest
18  number.
19          You saw on their chart there, they take the
20  highest number.  Aguilar says stretch 1 or 2 to 9, and now
21  we talk about a 9-ounce deal, or a 4-ounce deal.  But if
22  he's saying I take 1 or 2 and turn it into 9, the
23  Government owes it to you, and they owe it to my client, to
24  try to figure out, Hey, Mr. Aguilar, on these days you're
25  saying you're doing these deals, how much cutting agent are

1   you adding to this alleged 4 ounces here and the 4 ounces

2   there and the 2 ounces there?  Or Mr. Ramirez, Mr. Vigil.

3         But they don't do it.  And you know these guys are

4   saying, I want to make as much money as possible because

5   that's the goal I have in mind.  I had to ask them about

6   it.  I had to bring it out.  Well, I don't think that's

7   just and I don't think it's right.  I sure don't think it

8   adds up to proof beyond a reasonable doubt as to the

9   weights.  And you need to hold them to that.  That's their

10  burden.  That's what they said they'd prove.

11        We know there's a lot of cutting agent.  Sidney

12  Taylor, who was a very interesting individual, he even

13  says, There's kind of poor quality bad stuff, probably too

14  much cut, I think were his exact words.

15        Now, let's talk about Mr. Ramirez.  Can you trust

16  what he says about an ounce?  He gets time served, so he

17  has a wonderful deal.  He testifies that when he is picked

18  up, he's not going to talk.

19        He tells me on cross, You know, I'm not talking, I

20  don't have anything in place.  Now he's back in trouble

21  again.  He's picked up -- he said, I'm facing a new charge.

22  Guess what?  Guess what happens?  He doesn't talk.  You

23  know why he doesn't want to talk?  He doesn't have a deal

24  in place.  No deal, no talk.  That's how it works for Mr.

25  Ramirez.  You cannot trust somebody who only talks to you

1    with a deal.  You know that.

2           If you use the words the Government likes, that's

3    just plain old common sense, and I would ask you to use it.

4           Mr. Vigil doesn't talk either until he has a deal.

5    He had opportunity to, but he won't do it.  But there's

6    something else about Mr. Vigil.  He's got this deal, he

7    hasn't been sentenced.  He's out of custody.  He's on

8    pretrial release and supervision.  He's told by the Court,

9    you know, during pretrial release and supervision, you

10   can't use cocaine.  You can't do that anyway, but it's a

11   condition you give to somebody.

12          What's Mr. Vigil doing?  He's using cocaine.  And

13   he doesn't own it.  He doesn't just say right away, Yeah,

14   you know, I'm just having a real hard time with my

15   addiction and I've got this problem and so can you work

16   with me?

17          That's not what he says.  He starts accusing his

18   pretrial officer -- this is brought out in cross -- of the

19   test being wrong or there's some reason that he's dropping

20   dirty for cocaine.  And it's not that he went out and

21   bought it.  Did you catch this?  He got it in some car.

22          Come on.  He's an addict.  And what he cares about

23   is cocaine and what he cares about is his addiction.

24   That's what drives him.  He also cares very, very, very

25   much about his deal.  And I thought this was a fascinating

997

1    exchange.   The prosecutor, Would you do anything you

2    possibly could to get out of prison or release?   Mr. Vigil,

3    before the prosecutor can finish his question, chimes in,

4    Yes, I would.   The prosecutor has to go back and finish up

5    what he was going to say before Mr. Vigil interrupts him

6    and says, Will you lie on the stand?   And now Mr. Vigil,

7    Oh, well, no, I wouldn't do that.   I wouldn't do that.

8            That man wants his deal.   He wants his deal.   And

9    he's getting his deal.   And evidently he can lie to his

10   pretrial officer and not have any consequences.   That's

11   what he said, I haven't been charged with it.

12           They want you to believe him.   I don't think that

13   person's believable.   I don't think a reasonable person

14   would believe it.   But Vigil also admits to using cutting

15   agents.

16           So aside from his testimony, just his testimony

17   alone, by that cutting agent use, you know that any amount

18   that he is telling you about is suspect, because Mr. Vigil

19   has shown to you:   Whose interest is the primary one?   His

20   own.

21           So he's going to be putting as much cutting agent

22   that he can into whatever he is selling in order to do

23   what?   Maximize his profit.   Why does he want to maximize

24   his profit?   Because he wants to buy more drugs.

25           Francisco Aguilar.   Well, Francisco Aguilar sure

1    got a good deal.  And he didn't testify without a deal.  He

2    got one that -- he would tell less than the truth and he

3    still got it.  Mr. Aguilar gets picked up for his ride in

4    the park on March 27th, and during that ride in the park,

5    he's pretty specific about a lot of things:  price, what

6    happened the day before.  And he also tells the officers

7    that the total amount that he sold was 1.  1 ounce.

8         The officers do not believe him and he makes it

9    apparent to him that they don't believe him.  Mr. Aguilar's

10   not a dumb man, though.  He learned something from that

11   interview.  He learns you need to tell the Government what

12   they want to hear so he goes in with his deal on

13   March 27th, 2014.  This is the deal he's supposed to tell

14   the truth, remember?  And if he doesn't, he can be

15   prosecuted.

16        And what's he tell is the total amount that he

17   sold?  4 1/2 to 5 ounces.  That's different than 1.  And

18   then he gets brought in again in February, right before

19   trial.  And now the total amount isn't 1, and it's not 4

20   1/2, or 5, it's 22 to 23.  We're now really going up the

21   slope.  We're exponentially growing in amounts.

22        But then he gets on the stand, raises his right

23   hand, swears to tell the truth, and now it's, oh, 20.

24        I think this is clear, Mr. Aguilar has no idea the

25   amount that he allegedly sold.  And if he doesn't know, you

1   can't trust him and you can't rely upon it.  He's just not

2   believable.  Let me put it this way.  Can you trust Mr.

3   Aguilar's word on the weights and the alleged conspiracy

4   with a man's liberty?  I don't think that's reasonable.

5           There's something else, though.  This is just -- I

6   don't even know how to put it.  I suppose curious.  Now the

7   Government admits that what Mr. Aguilar said about selling

8   4 grams, remember that, that's what he tells the agents at

9   first on March 27th.  It wasn't 4 of them, he didn't mean 4

10  ounces, it meant 4 grams.  And the agents just -- they go

11  at him.  No, they don't believe that.  That's what Mr.

12  Aguilar said, They didn't believe me.  Even though he tells

13  the price, and even though this is one day after the

14  alleged event, and even though the agents, themselves,

15  testified, We weren't sure the deal took place.

16          So they go from thinking that they're not sure

17  that the deal took place to being so certain that they're

18  jamming it on the guy that it can't be 4 grams, to the

19  point that in his plea agreement, he agrees under oath that

20  it's 4 ounces only to get back up in front of you -- and,

21  by the way, the same judge, who testified under oath in his

22  plea agreement -- in his plea hearing and says, Oh, wait,

23  it wasn't 4 ounces, it was 4 grams.

24          But they filed no documents to even inform the

25  Court of this.  Oops.  It was just a mistake is basically

1   what they're saying.  A mistake made under oath and the

2   oath is supposed to mean something.  It's supposed to

3   ensure accuracy.  It's supposed to ensure that you're

4   getting the truth.  The truth that you can rely upon.  And

5   you know Mr. Aguilar has shown to you and to the Court his

6   oath doesn't mean anything.

7          That March 27th interview, I talked about this,

8   it's one day after the event.  It's one day after the

9   event.  And Mr. Aguilar's pressed and he holds to it in

10  that that it was 4 grams instead of 4 ounces.  And it was

11  $120.  And he tries to tell the agents what happened and

12  they wouldn't believe it.

13         And Mr. Aguilar did learn something really

14  valuable.  One ounce wasn't good enough.  He learned that 4

15  1/2 to 5 ounces wasn't good enough.  We get to 20, 22, 23,

16  and now we're in the ballpark.

17         Why is that important?  Because without Mr.

18  Aguilar's weight, even if you accept the other people's,

19  the values and weights as true, which I think you certainly

20  should not, I think this is ample evidence, without Mr.

21  Aguilar, you can't get over that 500-gram level.

22         Think about that.  I think that's really

23  important.  Now, I want to talk a little bit about the

24  distribution phone counts.  And I'm not going to redo the

25  evidence, but I want to point out that each and every

1   distribution count requires you to find that the substance

2   was, in fact -- that's in your jury instruction -- either

3   cocaine, cocaine base, or methamphetamine.

4        You have no laboratory tests to prove to you that,

5   in fact, it was any of those substances.  You must rely

6   upon codefendant testimony or phone calls, which have been

7   proved to be unreliable, and certainly are not reliable as

8   proof beyond a reasonable doubt.

9        But also consider the other things here:  When Mr.

10  Garrison's arrested, what is there?  No drug.  None.  None.

11  Not a gram.  Not in the house.  Not in the cars.  Not on

12  him.  Not on the woman.

13       And Agent Gullicksrud did a real good who job of

14  describes how thorough they are in their search.  They

15  don't just walk around a house and kind of casually look at

16  it.  No, they search the place, they look in the nooks and

17  crannies.  I think they even look in the cereal boxes.

18  They are looking to see where the stuff might be, and they

19  don't find any.  And there's no drugs from any of the

20  codefendants.  None of the codefendants who testified, and

21  none of them who they say are codefendants who didn't

22  testify, none.

23       Now, I do think I need to draw your attention to

24  why some of these people's, in particular, Mr. Painter's

25  testimony, is just obviously wrong.

1002

1    On Count 38, the Government charges and alleges

2    that Mr. Garrison, with the intent to distribute less than

3    500 grams of a mixture or substance containing a detectable

4    amount of cocaine, that's what they're saying, there's

5    distribution of cocaine and there's an aiding and abetting

6    on there.  Mr. Painter's asked on direct what it was and he

7    says, it was not cocaine, it was crack.  He contradicts

8    even the Government's own charge.  Because he doesn't

9    remember.  He doesn't remember.  His memory is just that

10   impaired.

11   And if Mr. Painter can't even get in line with

12   what the Government has charged, how can you trust what he

13   said?  How can you trust my client's liberty, his life,

14   with that kind of testimony?

15   So let's switch from drug counts to the

16   transportation count, the transportation for prostitution.

17   And here the Government charges Mr. Garrison took a person

18   to Oklahoma for their purpose of having her commit

19   prostitution.

20   And let's think about what's missing here.  The

21   Government went to great details to tell you how

22   sophisticated they are in tapping everybody's phones.  Mr.

23   Garrison's in particular.  They put on a representative

24   from T-Mobile to talk about how you can GPS ping these

25   phones so we know exactly where they are.

1       And even though they're tapping Mr. Garrison's

2    phone calls from at least November all of the way to the

3    end of the alleged conspiracy, we don't hear any phone

4    calls about him wanting to take a person to Oklahoma for

5    prostitution.

6       You know, in fact you don't hear a phone call at

7    all about him wanting to take anybody anywhere for

8    prostitution.

9       The codefendants talk a little bit about it.  They

10   use the term pimping.  They don't ever really describe what

11   that means, though.  And what they certainly don't describe

12   is that it means that he's going to take somebody,

13   transport them, to commit this act of prostitution.

14      So they're listening, they're recording, and there

15   are no phone calls.  Why not?  Because it wasn't Mr.

16   Garrison's purpose.  We know they have electronic

17   surveillance.  They have the ability to put up -- actually

18   it's pretty good, CCTV, I mean, I saw that and wondered how

19   many times I have walked by and not noticed, and they can

20   focus in on people's license plates.  They can do in-person

21   surveillance.  Simply put, the Government can follow you

22   around and they can do a pretty good job of it, and they're

23   pretty good about not being seen, but we don't have a

24   picture of Mr. Garrison and Ms. Quintanilla in a car ever,

25   not once.  But in particular, not in Oklahoma.  Not in

1   Kansas.   Not in Ohio.

2          And I submit to you, folks, that the reason is

3   because they don't have one because they weren't.   And we

4   know from Detective Rivera that they had been told in

5   advance to be looking for all of this.   And Detective

6   Rivera struck me as a guy who knows how to do his job,

7   didn't he?   He -- he seemed really good at it.   Heck, he

8   was -- he got the undercover thing down.

9          I don't think, really in a million years, you

10   would think that Detective Rivera was a cop.   Would you?   I

11   didn't.

12          Now what does Detective Rivera say?   Because his

13   testimony is really illuminating.   First of all, who does

14   he speak with?   A woman.   Mr. Garrison is not a woman.

15   That is plain as day.   He doesn't speak to that woman once.

16   He talks about the multiple phone calls he has with this

17   woman.   Multiple.   She's arranging this deal that they say

18   happened with the detective.   She's handling her business.

19          When he shows up, he verifies that the person

20   whose voice he's listening to on the phone is the same

21   person that he is seeing in Room 226, and it also is the

22   same person in the backpage ads which have pictures of that

23   woman, Ms. Quintanilla.   They don't have any pictures of

24   Mr. Garrison.   They point out that it's Mr. Garrison's

25   phone number, but, again, there's no phone calls that are

1    taped on it, and tapped that they play for you.

2         Now, when Detective Rivera is speaking to Ms.

3    Quintanilla with this woman about the meeting that they are

4    trying to set up in Room 226 -- I think you caught this and

5    this is important -- what's he say she tells him about?

6    Look for a red Chevy SS truck.  She is very specific about

7    the truck.  It's not just there's a red truck down there,

8    park near it.  She's talking about this red Chevy SS truck,

9    because it's hers.  Otherwise, you'd say just come to Room

10   226.

11        Now here's another problem we have on the defense:

12   We don't collect the evidence.  They don't even bother to

13   take a picture of this red Chevy SS truck.  Why not?  Well,

14   they're too busy trying to get the picture of Mr. -- what

15   they say is Mr. Garrison's grainy Porsche.  It's a grainy

16   picture.  I mean, I -- that's an important piece of

17   evidence.  And I can't go back in time and re-create that.

18        Detective Rivera also talks about why Mr. Garrison

19   might be in the parking lot.  And during his testimony, he

20   gave this opinion, and he said a lot of times in these kind

21   of investigations, We know that the girls -- they're

22   working, as well, as prostitutes or escorts and have

23   somebody with them as security or somebody who's in charge

24   of whatever business they're conducting to collect the

25   money or just as protection.

1   And he goes on to say, Knowing this kind of

2   information, we usually look for somebody acting as a

3   lookout or as a security, or something to that effect.

4   Well, first of all, let's just start with who Ms.

5   Quintanilla is.  She's an adult.  She's an adult woman.

6   She's not a minor.  She has a driver's license.  They

7   recovered that.  She handles the transaction.  She does the

8   talking.  And, according to the Detective Rivera, she is

9   the only person in the room.  She's handling her own

10   business.  And there's absolutely no evidence before you

11   that Mr. Garrison was handling her business.

12   So under Detective Rivera's theory -- and he's the

13   Government's witness -- he's there for security.  But,

14   nonetheless, there's no evidence whatsoever that Mr.

15   Garrison transported her.  Even more, in interstate

16   commerce.  There just was no evidence put on that.

17   We know also that prostitution means knowingly

18   engaging in or offering to engage in a sexual act in

19   exchange for money or other valuable consideration.  We

20   don't really even know what Ms. Quintanilla agreed to.  We

21   know what Detective Rivera said she agreed to.  We know

22   what he said she was charged with.

23   We didn't hear from her.  We don't know what she

24   said.  You frankly don't know if she just intended to rip

25   the guy off hoping that, well, what could he do?  You can't

1007

1    go to the cops about something like that, right?  And that

2    the guy would be scared and walk away.  We just don't know

3    because we didn't hear from Ms. Quintanilla.

4         Our liberty is something that none of us can put a

5    price tag on.  All of us are the sons and daughters of the

6    people who established this country.  Who thought it so

7    important to talk about liberty that they wrote in the

8    Declaration of Independence that all of us are endowed with

9    life, liberty and the pursuit of happiness.

10        And our liberty is so important that we do not let

11   the Government take a person's liberty away from them, the

12   right to live and be free, unless they have proved that

13   person's guilt on each and every element beyond a

14   reasonable doubt.

15        And I am confident, ladies and gentlemen of the

16   jury, that they did not do that.  And as I told you in

17   opening, I am asking that you find Mr. Garrison not guilty

18   on each and every count because he has not been proven

19   guilty beyond a reasonable doubt.

20        Your Honor, thank you very much for your time.

21   Members of the Government, counsel, Mr. Garrison.

22        THE COURT:  All right.

23        MR. PHILLIPS:  Thank you, Your Honor.

24        THE COURT:  Sure.  Mr. Phillips, the Government

25   has 17 minutes in rebuttal.

1    MR. PHILLIPS:  How much spaghetti has been thrown

2    at the wall behind you?  Can I get anything to stick?

3    Ladies and gentlemen, Ricky Garrison's guilty.

4    But what is the defense telling you?  Oh, wait, if you

5    think it's not real drugs, those weren't real drugs.  Those

6    weren't real drugs.  This wasn't even drugs.

7    All right, if you believe that.  It wasn't pure

8    cocaine.  It wasn't pure cocaine.  You don't know how much

9    was mixed in there.  Oh, wait, the mixture or substance

10    contained cocaine.  So it was too much mixture.

11    If it's not too much cut, then don't believe the

12    amounts.

13    Oh, God, there's something else you're going to

14    believe.  And if it's not the amounts you don't believe,

15    then don't believe the witnesses.  Oh, we throw some more

16    spaghetti, because I know they're going to find that.  I'll

17    even go so far as saying those witnesses didn't tell you

18    what pimping was.

19    Ladies and gentlemen, I will not offend your

20    common sense that you know what pimping is.

21    They don't have a picture of them in the Cayenne

22    together.  Just grasping; flailing; knowing that the

23    Government has proven this beyond a reasonable doubt.

24    Is there any doubt in your mind defense counsel

25    got up and said those weren't real drugs?  Any doubt in

1    your mind those were real drugs?  Would people keep going

2    back paying thousands of dollars for something that wasn't

3    cocaine?  Let me give you a grand.  Oh, it wasn't cocaine,

4    but let me give you another grand.  Oh, it wasn't cocaine.

5    Let me give you another grand.  Oh, it wasn't cocaine.

6         Well, if you don't believe that, it wasn't a

7    conspiracy.  It wasn't a conspiracy.  They didn't have a

8    common plan or scheme.  Oh, yeah they did.  The

9    Government's 124.  There was a common plan and scheme.  And

10   what was it?  It was cocaine; drugs.  Drugs in and drugs

11   out.  More expensive down here.  Make some money here.

12   Make some money up here.  Yeah.  It was clear.

13        I give you Walmart.  You were Sidney Taylor, you

14   were Latoya Winbush.  You're Greg Williams.  You need food.

15   You go to Walmart.  You buy your milk, you buy your Fritos,

16   you check out.  What was Walmart doing?  They were giving

17   you what you wanted, right?  They were making some money

18   off that milk.

19        Did you need to take a measuring device with you

20   to Walmart and measure that gallon of milk or did you know

21   it was a gallon of milk?  Well, in this business, what does

22   Ricky Garrison take?  He takes scales.  He's got scales.

23   They were there with him.  So he was careful.

24        What else do you do?  Did Walmart say to you, Hey,

25   our goal is to give you milk and we've gone out to, or --

1   or give you chips, and we have gone out to Frito Lay and we

2   have gone out to distributors and that's our common plan

3   and scheme.  No, you know what it is.

4        What else does Walmart do?  What do they do if

5   they can't get milk from distributor 1?  They've got to get

6   milk, right?  So they go to distributor 2.  If you're in

7   the logistics business, what is your job?  Your job is to

8   get Frito Lay there.  Your job is to get the milk there, or

9   whatever.  You're the trucking company, you're part of the

10  conspiracy, that upper part, that part that we care about,

11  the important part.

12       If your trucking company's not getting it going,

13  somebody else's trucking company will.  If Ricky Garrison

14  can't get it by 3:00, he's going to go somewhere else.  I'm

15  checking on my Mexican source now.  It was an absolute

16  common plan and scheme.

17       Let me attack credibility of the witnesses,

18  because maybe that's what they'll believe.  Oh, it's

19  cocaine.  Oh, it's amounts.  But let me attack the

20  credibility of the witnesses.  What did these witnesses do?

21  What was the only thing these witnesses did?  They

22  supported the defendant's own words.  The defendant's own

23  phone calls.  The very first phone call you had, when this

24  trial started, and Ricky Garrison was talking at length

25  with Bhatia Fox about the drug world, what did he tell you?

1   The discussion zips for 1100.  How he could make money off

2   those zips, cooking it up.  The money he made off different

3   amounts, he talked at length about it.

4        Garrison says, What I been doing lately?  I been

5   taking 1 1/2 and turning it into 2.

6        When you first heard that, did you know what it

7   was?  Did you know what he meant?  You do now.  I bet you

8   could listen to that phone call now and tell your friends,

9   Yeah, this is a guy taking an ounce and a half and making

10  it 2.  But what does that ounce and a half or what does

11  that 2 mean -- or contain?  It contains cocaine.  He talks

12  about zips and onions.

13       Last Tuesday did you know what a zip was?  How

14  about an onion?  How about a teenager?  A nager?  An

15  eight-ball?  A teener.  You do now, because it's the

16  defendant's own words.  He has told you himself, ladies and

17  gentlemen:  I'm guilty.

18       MR. LEONARD:  Your Honor, I object.  That -- may

19  we approach?

20       THE COURT:  All right.  This time won't count

21  against the Government.

22       (Discussion at side bar)

23       MR. LEONARD:  Your Honor, the Government said that

24  "he has told you," referring to my client.  He has violated

25  my client's Fifth Amendment constitutional right to remain

1012

1   silent and the jury instructions therein.  I would ask for

2   a mistrial.

3         MR. PHILLIPS:  Your Honor, this jury has not heard

4   that he's actually said those words.  I was simply

5   referring to the amounts and the conversations and the use

6   of those words as circumstantial evidence to prove his

7   guilt.  And the defendant certainly has given his share of

8   the evidence without testifying.  But the telephone calls

9   that were intercepted, the jurors heard that indicate his

10  guilt.

11        THE COURT:  Well, Mr. Leonard, don't you think

12  it's -- it is obvious to the jury that Mr. Phillips didn't

13  mean that your client literally said it, but that his

14  actions and his words, his admissions, the equivalent, or

15  in effect, says, I'm guilty?  Don't you think that's how a

16  reasonable juror would take the argument?

17        MR. LEONARD:  With all due respect, I do not, Your

18  Honor.

19        THE COURT:  Well, I disagree with you.  I don't

20  think any reasonable juror would take the words that Mr.

21  Phillips has said and conclude that Mr. Phillips is arguing

22  that the defendant has literally said -- literally, that,

23  I'm guilty.  But that he has, through his actions and

24  words, demonstrated that he's guilty.  So your motion for a

25  mistrial is denied.

1013

1    (End of discussion at side bar)

2    THE COURT:  All right.  Mr. Phillips, you may

3    resume your closing.

4    MR. PHILLIPS:  Thank you.  What else did he tell

5    you very early on in that very first phone call?  He told

6    you that, You remember Charlie, he an old ass like junky

7    nigga, you know what I'm saying?  But he, he ain't smoking

8    right now because he is on probation.  So he been getting

9    money.  And that's the one I was saying got a Cadillac and

10   a Ford Taurus and he got all kind of new shit over there.

11   That's the business.  A Cayenne.  Travel around.

12   Thousands of dollars deposited in your account in cash,

13   with no job.  That's the business.  What else did he tell

14   you about Charlie?  Quote, Charlie done got killed over

15   there, man.  That's the business.  It's a dangerous

16   business.

17   Counsel made many discussions about amounts.  You

18   heard Ms. Rangel telling you the amounts and actually,

19   quite frankly, you heard from the witness stand as well as

20   the phone calls what the amounts were.  What's a zip?

21   What's an onion?  What about Ricky's own texts, March 3d,

22   2014, when he texts Travis Edwards?  Thousand, right?

23   Do you buy a gram for $1,000, or do you buy an

24   ounce for $1,000?  This is a man that uses people for his

25   own means.  It was a zip.  It was an onion.  It was an

1 ounce.

2       And remember what Travis Edwards said during that

3 phone call?  Shit, you charge me 11, there you go with that

4 bullshit.

5       Even his close associates he will do everything he

6 can to make money off them.

7       The 9-ounce deal with Christopher Vigil, the phone

8 call where Ricky Garrison says, Well, hold on, let me count

9 something up and I'll call you back.  Ladies and gentlemen,

10 if it was grams, and you're counting up $1,000, you count

11 that up pretty quick, even in 20s.  What about $9,000?

12 Now, that takes several minutes.

13       You've heard call after call and witness after

14 witness being supported by those calls.

15       Defense counsel asked, Who didn't you hear from?

16 Who didn't you hear from?  Well, how many people do you

17 want to hear from?  How many people need to get charged?

18 What did Ricky Garrison tell Latoya Winbush in her phone

19 call?  Stop being lazy, man, get off your ass and go get

20 contacts.  Tell your mama to go to work, too, shit.

21       That was the same phone call where he said, This

22 coke, it's fine.

23       Latoya Winbush, she has the right to plead guilty,

24 she has the right to go to trial.  There are many

25 noncharged people below Ricky Garrison, as you've heard.

1   They have the right to testify or not.  These people up

2   here, Christopher Martinez, you didn't hear from him.  Just

3   like Ricky Garrison, he has the right to a trial, or he has

4   the right to plead guilty and not cooperate.  That's

5   another reason people might not testify.  Fear; not

6   surprising.  People you've heard from came in and did the

7   best they could to recollect.  There are times many years

8   ago that you have a hard time recollecting.  How much milk

9   did you have last year?  Well, I buy about a gallon a week.

10   Okay.  Weren't you on vacation for a week?  That's right.

11   I was on vacation for a week so I didn't have milk that

12   week.  Thank you for reminding me.

13          What about Thanksgiving?  Did you have family into

14   town, or a family reunion during the summer?  That's right,

15   I did.  Thank you for reminding me.

16          That's exactly what the phone calls do.  How much

17   was that deal worth?  He talks -- he attacks these people

18   down here.  They're addicted; you can't believe them;

19   they're just addicts.  That's the defendant's voice you can

20   believe.  It's the phone calls you can believe.  They

21   didn't know what was going on.  And who feeds that

22   addiction?  What must Latoya Winbush's mother be like?

23   Addicted.

24          He says what about -- these people could have

25   forgot.  It was four years ago.  They must have forgot.

 1   Well, if I played you a phone call -- if I asked you what

 2   you had for dinner four years ago, no way, right?  What if

 3   I played you a phone call where you were calling your

 4   significant other and said, That was the most delicious

 5   pork chops last night.  Where did you get that recipe?

 6          Any doubt in your mind what that was, the meal the

 7   day before?  That's exactly what these witnesses are doing.

 8   They are simply propping up the defendant's own words.

 9          It's interesting, he attacks the deals.  People

10   got great deals.  Well, this judge could have sentenced

11   anybody he wanted to up to 20 years.  A very good,

12   experienced judge did what he thought was proper.

13          And he attacks Ramirez specifically, Boy what a

14   deal he got.  Yeah, what did he get?  He got deported,

15   that's what he got.  He got the proper sentence this judge

16   thought he should get and then got deported.

17          Did he come back?  Yeah.  What would have happened

18   if we said, No, keep him here?  Oh, look at the deal he

19   got.  They kept him in the United States.  It's spaghetti

20   at the wall.  What can I possibly get to stick?  Nope, he

21   got exactly what you heard.

22          Can't believe Aguilar because Aguilar said

23   different amounts.  What did Aguilar really do?  He hid

24   from it early on when he first met with these officers, and

25   he hid from it when he talked to them the first time in the

1   proffer.  He said, No, those are grams.  Those are grams.

2           No, they weren't grams because it was -- or it was

3   time to count money.  It wasn't grams because I got 700

4   now.  Let me get some more and I'll meet you.

5           Those aren't grams; those are ounces.

6           And what did Aguilar do, finally, right before

7   trial?  He pled guilty.  And he and his attorney signed the

8   plea agreement and he swore in front of this judge he was

9   telling the truth.  But what do you know about Aguilar?

10  You know that he sold so much cocaine to this defendant

11  that it was hard to remember every deal.  And what did he

12  do when we sat down with him and reminded him that was the

13  night that somebody intercepted his calls?  He said, Oh, I

14  told the judge something that now I know isn't true.  So

15  I'm going to come in here and tell the truth.  That's what

16  I got to do.

17          And who brought that out?  We did.  We had him

18  look at his plea agreement.

19          There was an attack that all of these people, this

20  was just a hand-to-hand.  There was no trust or anything.

21  No?  You know that Painter got meth from Ricky Garrison

22  where Ricky Garrison paid for it the first time.  You heard

23  that phone call.  Not a lot of people trusted Ricky

24  Garrison.  This conspiracy:  Some people are testifying,

25  some aren't.  And that's for your . . .

1       The reason why they're not here.

2       Use of women, just like other people.  What does

3  Ricky Garrison do when he needs clips for his gun?  When he

4  talks to Simeon Ramirez?  I need clips because they

5  wouldn't let me send this shit to Colorado.  In the state

6  of Colorado they won't let you extend the clips so I be --

7  when I get extended clips, I send them to my bitch in

8  Wyoming.  Just another woman who's just another bitch for

9  Ricky Garrison.

10       Latoya Winbush, same thing.  This shit is hot.

11  You and your momma get out there and start making contacts.

12       And Heather Quintanilla, they don't have a picture

13  of him in the car with her.  Spaghetti at the wall.  Oh,

14  the car's in the parking lot with Ricky Garrison sitting in

15  it.

16       Well, maybe she was just going to rip him off.

17  Spaghetti at the wall.  That's what he does.  He throws

18  spaghetti at the wall.  Look for the red Chevy SS truck --

19       COURTROOM DEPUTY:  Mr. Phillips, you have two

20  minutes.

21       MR. PHILLIPS:  Thank you.

22       Look for the red Chevy SS truck parked there

23  specifically so that my pimp can watch, so he can pay

24  attention.

25       Where did those exhibits go from there?  Ohio, he

1    was there.  Heather Quintanilla.  And then later another

2    trip, Oklahoma.  They get arrested -- or not "they."  He --

3    she gets arrested.  What happens just a couple of days

4    after?  The means to the end.  He has her stopping in

5    Wichita with him, advertising more to make him more money,

6    this woman who's just been arrested.  Why wouldn't she

7    appear and testify?  She has the right.  She doesn't need

8    to.  She has the right to have her case tried in front of a

9    court like he's expressed.  Maybe love.  And like so many

10   other, maybe fear.

11        Ladies and gentlemen, you've heard all of this

12   evidence and it started with the defendant's words as a

13   means to an end.  As Ms. Rangel told you, he uses people

14   for a means to an end.  Well, today you put an end to this

15   man and this particular conspiracy.  But there's many more

16   floating off that chart now as others have testified and

17   shared.  Find this man guilty.

18        Thank you.

19        THE COURT:  Thank you, Mr. Phillips.

20        Well, members of the jury, you will remember a

21   week ago today I informed you that only 12 of you were

22   going to be able to deliberate the verdict.  And we sat 13

23   of you, an alternate, so just in case one of you got ill,

24   or for some other reason couldn't conclude your

25   deliberations, we had that alternate.  But under the law

1     the alternate cannot participate in the deliberations and

2     will have to be excused at this time.  And I told you that

3     a week ago, it's just to prepare yourself for this event.

4            So, Mr. Pompeo, you are the alternate and you will

5     not be participating in the deliberations.  I know I speak

6     on behalf of the parties and the lawyers and everyone in

7     the courthouse to sincerely thank you for the week that you

8     have given us out of your life to hear the testimony and to

9     be part of our criminal justice system.

10           A couple of things I need to tell you that are

11    very important before you leave the building.  Please do

12    not discuss the case with the other members of the jury.

13    Of course, you can say goodbye and all that.  But also

14    don't speak with anyone outside the other 12 or anyone else

15    about this case until you get a call from Ms. Hansen.

16           She's going to get your mobile phone number or

17    whatever is your preferred mode of contact because, believe

18    it or not, it has happened in one of my criminal trials,

19    where one of the jurors, one of the 12, became ill, could

20    not conclude the deliberations, and we had to call the

21    alternate and he came back and completed the deliberations.

22           So until you get a call from her, you can't talk

23    about it at all with anyone else.  All right?

24           THE JUROR:  Uhm-hum.

25           THE COURT:  All right.  So now, finally, the

1   remaining 12 of you, you get to start your deliberations.

2          A couple of things on that:  You can only

3   deliberate the substance of this case when the 12 of you

4   are together.  If one of you goes to the restroom or walks

5   out in the hall for some reason, or you just take a break,

6   you have to stop your deliberation.  Only when all 12 of

7   you are in the room deliberating at the same time.

8          You can now finally take your notes with you to

9   look at while you're doing your deliberations.

10          To ensure that your deliberations are private, a

11  court security officer will serve as a bailiff and he will

12  be present outside the jury room to ensure that it --

13  you're not interrupted or disrupted by anyone.  And he will

14  also be collecting your cell phones while you're

15  deliberating.

16          And that's how we get you to give us a verdict.

17  You give us a verdict, we give you back your phones.

18          When you get back to the -- and it has been

19  interesting to me, there's a clear age spectrum in terms of

20  how much this puts people into a panic.  Folks under about

21  25, I've noticed, will go into a panic when they know that

22  they can't have their phones for a few hours, but you'll

23  survive; you will make it to the end.

24          When you go back to the deliberation room, you

25  will see 12 sets of instructions, one for each of you.  The

1    lawyers are going to stick around here for a few more

2    minutes to go through with Ms. Hansen the exhibit notebooks

3    to make sure that the exhibit notebooks contain only those

4    exhibits and pages of each exhibit that are admitted into

5    evidence that would be going back to the deliberation room.

6    The firearms are exhibits that have been admitted into

7    evidence.

8         And we haven't talked about this, counsel, but

9    it's my practice that the firearms do not go back into the

10   deliberation room.

11        If you for some reason, collectively, the 12 of

12   you believe you want to see the firearms, they will be out

13   here in the courthouse.  One of the case agents will be

14   notified that you want -- you'll let us know via a note,

15   we'll arrange for one of the two case agents to be in the

16   courtroom.  They won't be on top of you, they will be back

17   in the courtroom, just watching, making sure that

18   everything goes all right.  And you can come out and

19   inspect the -- inspect the firearms out here.

20        At least for today -- I know you have been told

21   all your life it doesn't exist, but at least for today

22   there is such a thing as a free lunch.  You are all going

23   to get lunch provided by the court to facilitate your

24   deliberations and that you don't have to take a break and

25   you can start your deliberations and continue through.

1    All right.  Will the court security officer please

2  come forward, or officers.

3    COURTROOM DEPUTY:  Your Honor, before I give the

4  oath, can I give Mr. Pompeo, so he can leave, his

5  certificate?  And I don't swear him in.

6    THE COURT:  Okay.  Sure.

7    THE JUROR:  What should I do with my notes?

8    COURTROOM DEPUTY:  Give them to me.

9    THE COURT:  Give them to Ms. Hansen.  She'll shred

10  them.  Actually, she won't shred them yet until she calls

11  you.  You'll want your notes.  And you can wait in the

12  deliberation room for the rest of the folks to come in if

13  you want to say goodbye.

14    The rest of you please keep seated because we have

15  to -- the security officers need to take an oath.

16    (Security officers sworn in)

17    THE COURT:  All right, ladies and gentlemen of the

18  jury, you can now follow the court security officers back

19  to the jury deliberation room.

20    (Jury left the proceedings at 12:16 p.m.)

21    THE COURT:  All right, counsel, please give Ms.

22  Hansen your cell phone numbers so that you can be contacted

23  when and if we get a question and, of course, when we get a

24  verdict.

25    If we don't have a verdict by 5:00 today, we will

1024

1  excuse the jurors for the evening and we will have them all

2  come back, and we will bring them back into the courtroom

3  at 8:45 in the morning.  I want all lawyers to be here by

4  8:30.  We'll bring them out for a minute to put on the

5  record that all 12 are present and accounted for and

6  they'll go back and resume their deliberations.

7       So as I -- you heard me mention to the jury,

8  please stick around so that you go physically through the

9  binders with Ms. Hansen and make sure only those exhibits

10 and those pages of the exhibits that were admitted into

11 evidence actually go back to the deliberation room.

12      I want to say to the lawyers, it was a pleasure

13 doing this trial with the four of you, and I think that all

14 four of you did an excellent job.  It's obvious that you

15 both -- all four of you feel very strongly about your case

16 and your clients, and I commend you for your -- for your

17 work.

18      All right.  We will be in recess until there's a

19 question from the jury or we have a verdict.

20      (Recess at 12:17 p.m.)

21                    AFTERNOON SESSION

22      (In open court outside the presence of the jury at

23 1:40 p.m.)

24      THE COURT:  The record will reflect that counsel

25 for the Government, and counsel for the defendant, as well

1025

1    as the defendant, are present in the courtroom.

2            A few moments ago I received probably the easiest

3    questions that I have received from a jury in my six years

4    on the bench.  Two questions.  We now know our foreperson,

5    it's Mr. Durdy.

6            First question from the jury:  What is the

7    computer in the room for?

8            So I propose that I respond:  Listen to the

9    recorded telephone calls.  Date and time.  Is that

10   satisfactory?

11           MR. PHILLIPS:  And the CCTV, but yes, I agree,

12   Your Honor.

13           THE COURT:  Oh, the CCTV.  Okay.  All right.  The

14   defendant?

15           MR. LEONARD:  Yes, Your Honor.  That's

16   satisfactory.

17           THE COURT:  Okay.  So give me a moment to write

18   that.

19           All right.  The second question from the jury:

20   Can we get a copy of Exhibit 124?  My recollection is 124

21   is the demonstrative exhibit; is that correct?

22           MR. PHILLIPS:  That is correct, Your Honor.

23           THE COURT:  Okay.  So I think the answer to this

24   question is:  Because it is a demonstrative exhibit, that

25   was not admitted into evidence.  So no.  Can't -- the

 1   answer -- can we get it?  No, because it was a

 2   demonstrative exhibit that was not admitted into evidence.

 3          MR. PHILLIPS:  Correct.

 4          The COURT:  Does everybody agree?

 5          MR. PHILLIPS:  Yeah.

 6          THE COURT:  Defendant?

 7          MR. LEONARD:  We agree, Your Honor.  Thank you.

 8          THE COURT:  Okay.  All right.  All right.  I'll

 9   give these to Ms. Hansen, who will provide it to the jury.

10          All right.  We will be in recess again until we

11   have another question or a verdict from the jury.

12       (Recess at 1:44 p.m.)

13       (In open court outside the presence of the jury at

14   4:10 p.m.)

15          THE COURT:  All right.  We have another question

16   from the jury.  Note to the Court:  We, the jury, have a

17   question, dated today at 3:38, signed by the foreperson --

18   oh, the record will reflect that counsel for the Government

19   is present in the courtroom, counsel for the defendant, as

20   well as the defendant.

21          Question from the jury:  What is the definition of

22   "detectable"?  So let me tell how I usually handle these

23   things.  I'm going to give you a few minutes, take a

24   recess.  If you folks have come up with a stipulation, a

25   stipulated answer to the question, I will give it to the

1    jury.  If you can't, I will give them my normal -- my

2    default answer, which is:  Sorry, we can't answer your

3    question.  I'll refer you back to the jury instructions and

4    ask you to do the best job you can applying the

5    instructions to the facts of this case.  So --

6            MR. LEONARD:  Your Honor, this might save us some

7    time, but that's the defense's request, that -- the Court's

8    standard instruction.

9            THE COURT:  Okay.  So you're not willing to

10   consider a stip --

11           MR. LEONARD:  No, it's certainly not to be

12   discourteous to the other side; and I don't mean it and

13   hope it's not taken in that way.

14           THE COURT:  Okay.  That's fine.  Then that's what

15   I will do.  So --

16           MR. PHILLIPS:  And, Your Honor.

17           THE COURT:  Yeah.

18           MR. PHILLIPS:  We would simply ask the Court to

19   give the Oxford dictionary, or a dictionary definition of

20   "detectable."  I believe that's proper for the Court.

21   Clearly the jury is asking for some guidance from the

22   Court.  Detectable is not defined in definition -- or in

23   the Tenth Circuit jury instructions in any way.

24           However, I believe that the Court can give a

25   definition from an outside source so that they aren't

 1    searching for it.  But we would ask the Court to give, and

 2    we have an Oxford dictionary definition, which is a readily

 3    acceptable resource.  And we would ask that the Court give:

 4    Able to be perceived or noticed.  Discernible.

 5              THE COURT:  What about that, Mr. Leonard?

 6              MR. LEONARD:  Your Honor, I certainly appreciate

 7    where the Government's coming from, but it was not defined

 8    for the jury prior to them getting the case; it was not

 9    subject to closing argument.  We were not able to shape our

10    argument around that.  Frankly, I suppose it's a learning

11    experience that it -- I -- from the defense's perspective,

12    it needed to be defined prior to and not after, so we don't

13    believe it's proper for the Court now to give any further

14    instructions than those that have been given and have been

15    so, really tirelessly, pored over by the parties to make

16    sure that they were in good working order.

17              THE COURT:  All right.  Okay.  I agree with the

18    defendant.  In an absence of a stipulated response, I'm

19    going to give the jury the following response:

20              The Court cannot answer your question.  You are

21    directed to refer to the jury instructions and apply them

22    as best you can to the facts of this case.

23              All right.  We'll be in recess until we have

24    another question from the jury or a verdict.

25              (Recess 4:15 p.m.)

1029

1       (Proceedings concluded at 4:15 p.m.)

2

3                              **INDEX**

4       Item                                        PAGE

5       CHARGING CONFERENCE (Cont'd)                902

6       READING OF JURY INSTRUCTIONS TO THE JURY    912

7                       CLOSING ARGUMENTS

8       By Ms. Rangel                               944
        By Mr. Leonard                              975
9       By Mr. Phillips                             1008

10      QUESTIONS FROM THE JURY                     1025
        QUESTION FROM THE JURY                      1026

11

12                 *      *      *      *      *

13                    REPORTER'S CERTIFICATE

14

15      I certify that the foregoing is a correct transcript

16      from the record of proceedings in the above-entitled

17      matter.

18      Dated at Denver, Colorado, this 16th day of May, 2017.

19

20

21                                   _Mary J. George_

22

23

24

25