# Attachment A

ORIGINAL

FILED IN OPEN COURT
U.S.D.C. - Atlanta

APR 2 8 2016

JAMES N. HATTEN, Clerk

By: ⟨signature⟩   Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

    *v.*

SHAUNTAY CRAIG, aka "Shake," or
    "Shakey,"or "Shake G," or "Big
    Bro";
ALONZO WALTON,  aka "Spike;
MANGWIRO SADIKI-YISRAEL, aka
    "Iz,"or "Izzy";
KEVIN CLAYTON, aka "KK";
DONALD GLASS, aka "Smurf," or
    "Dred";
LEWIS MOBELY, aka "OG";
VERTUIES WALL, aka "Vert";
ADRIAN JACKSON, aka "Blackjack";
TERRANCE SUMMERS, aka "T-Man"
MARKELL WHITE, aka "Kell,"or
    "Markell Taylor";
RONALD MCMORRIS, aka "Detroit
Red," or "Detroit," or "Red";
PERRY GREEN, aka "Lucky";
DERECK TAYLOR, aka "D";
ALVIS O'NEAL, aka "Ebby";
JEREMIAH COVINGTON, aka "Tre B";
ANTONIO AHMAD, aka "Izzy";
ERIC MANNEY, aka "E";
QUIANA FRANKLIN, aka "KiKi";
FREDERICK JOHNSON, aka "Popino";
CHARLES WINGATE,  aka "Carlos," or
    "Los";
VANCITO GUMBS;
THOMAS PASBY, aka "Ayo";
DENISE CARTER, aka "Loyal";
CARLTON KING, JR.;
KELVIN SNEED;

Criminal Indictment

No.  1:16-CR-145

UNDER SEAL

ARRIE FREENEY;
MYRICK STEVENS, aka "Breadwinner";
CURTIS THOMAS;
YOHORI EPPS;
MICHAEL DRUMMOND, aka "Savage";
LADERRIS DICKERSON
JAMES TRAVIS RILEY; AND
NICHOLAS EVANS;

THE GRAND JURY CHARGES THAT:

## COUNT ONE

### Background

At all times relevant to this Indictment:

1.      The Gangster Disciples is a violent gang which began in the Chicago,

Illinois area.  In the 1970's, the leaders of two different Chicago-based gangs, the

Black Disciples and the Supreme Gangsters, aligned their respective groups and

created the Gangster Disciples.   Once united, the Gangster Disciples recruited

heavily in Chicago, within Illinois jails and prisons, and throughout the United

States.   The Gangster Disciples are active in criminal activity in approximately 24

states.

2.      The Gangster Disciples employ a highly structured organization.

Members are organized into geographic groups; each called a "count" or a

"deck."   Members in good standing are considered to be "on count" or "plugged

in."   A meeting of a particular count may be referred to as a "round" or a "nine."

During these meetings, dues may be collected, gang membership and business discussed, gang literature distributed, and criminal activity discussed and planned.

3.      The Gangster Disciples maintain a hierarchical structure on the belief that the enterprise will be ready to step in and run the United States should its government fail.  Gangster Disciples often use titles for positions within the gang.  The term "Chairman" is reserved for the national leader, L.H., who is currently incarcerated, but who still communicates with gang leadership.  Other than the Chairman, Gangster Disciples "Board Members" are the highest ranking members.  Board Members maintain regular contact with state and regional leaders — the "Governor-of-Governors," "Governors" and "Assistant Governors" of the states where the Gangster Disciples are active.

4.      The responsibilities of a Gangster Disciples "Governor-of-Governors" and "Governor" include, but are not limited to, setting membership recruitment goals; communicating with national leadership, including through telephone conference calls to a national call-in number; enforcing gang codes and rules; collecting and disbursing of dues and funds; and approving certain forms of criminal activity to be carried out by gang members and associates.  As the highest ranking Gangster Disciple within a state, a Governor is aware of and coordinates much of the criminal activity occurring within that state.  This

3

information is then passed up to the Governor-of Governors, who coordinates gang activity within several states.

5.      A state's "Assistant Governor" for the Gangster Disciples is responsible to the governor for collecting dues from the various counts, ensuring that anyone claiming membership is in fact "plugged in" and "on count," and recruiting new members into the gang.

6.      Each state has a "Chief Enforcer," who is responsible for enforcing the gang's codes, rules and regulations.  The State Chief Enforcer is responsible for seeing that punishment, including "Kill on Sight" ("KOS") orders and "greenlights" which authorize physical punishment, is effectuated for Gangster Disciples members who violate gang rules.   The Chief Enforcer is also responsible for ensuring that people who claim to be members of the Gangster Disciples are in fact members in good standing.  Each count also has a Chief Enforcer who is responsible for enforcing gang rules within that count.

      a.      Chief Enforcers command "enforcement teams" and "clean-up crews" comprised of Gangster Disciples members for the purpose of administering discipline, including assaults and killings. Members who serve on enforcer teams and clean-up crews are sometimes referred to as "UFOs" and "Ninjas."

b.      Some counts specially named their enforcement teams. "HATE

Committee" and "BLACC Team" are specially named enforcement

teams of the Gangster Disciples.

7.      The "Chief of Security" or "COS" for each state primarily protects the gang

and its leadership from outside threats by providing protection to the Governor

and responding to requests for protection when law enforcement and rival gangs

are exerting pressure on the gang.  Each count also has a Chief of Security who is

responsible for providing security for that count and providing security for

visiting Gangster Disciple leadership.

8.      A "Regent" or "Region" is a Gangster Disciple leader responsible for

several counts within a state.

9.      The leader of an individual count is referred to as the "First Coordinator"

or "First C."

10.     The "Treasurer" is responsible for assisting a governor in collecting dues

and funds from the counts and transmitting the funds to the Treasurer at the

national level.

11.     The "Literature Coordinator" of a count is responsible for maintaining

gang "literature," such as contact lists, meeting minutes, membership

applications and other documents.  Literature Coordinators also conduct

literature classes to teach newer members about the gang and its codes, rules, regulations and terminology.

12.     All of the above positions are collectively referred to as "Positions of Authority" or "POAs." All other members are referred to as "Outstanding Members,' or "OSMs," or, simply, members.

13.     As a whole, male Gangster Disciples members are referred to as "Brothers of the Struggle " ("BOS"). The "Sisters of the Struggle" ("SOS") are female members of the Gangster Disciples. As a group, the SOS are a subset of the Gangster Disciples that has a separate, but comparable, structure and that ultimately reports to the same Governor and Board Members as do male Gangster Disciples.

### The Enterprise

14.     At all times relevant to this Count of this Indictment, there existed in the Northern District of Georgia, and elsewhere, an organization, namely, the Gangster Disciples. The Gangster Disciples, including its leaders, members and associates, constituted an enterprise, as defined by Title 18, United States Code, Section 1961(4); that is, a group of individuals associated-in-fact, which engaged in and the activities of which affected interstate and foreign commerce. The enterprise constituted an ongoing organization whose members functioned as a

continuing unit for a common purpose of achieving the objectives of the enterprise.

## Purposes of the Enterprise

15.     The purposes of the enterprise included, but were not limited to, the following:

a.      Enriching the leaders, members, and associates of the enterprise through, among other things, drug trafficking, robbery, carjacking, extortion, wire fraud, credit card fraud, insurance fraud, and bank fraud.

b.      Preserving and protecting the power, territory, operations, and proceeds of the enterprise through the use of threats, intimidation, and violence, including, but not limited to, murder, attempted murder, assault with a dangerous weapon, obstruction of justice, and other acts of violence.

c.      Promoting and enhancing the enterprise and its members' and associates' activities through, among other things, conference calls, "networking" activities, celebrations of founder L.H's birthday, BOS weekends, the annual Gangsters Ball and other gatherings that allowed members to, among other things, find other members willing to engage in criminal activity and plan that criminal activity, devise ways to hide criminal activity from law enforcement and discuss ways in which members could enrich themselves and the enterprise through various criminal schemes.

d.      Keeping victims and witnesses to crime in fear of the enterprise and in fear of its leaders, members, and associates through threats of violence and actual violence, including murder, attempted murder, assault and intimidation.

e.      Providing gang members safe houses in which to hide and protection to avoid apprehension by police.

f.      Providing financial aid and assistance to gang members charged with or incarcerated for gang-related activities.

## The Racketeering Conspiracy

16.      Beginning on a date unknown, but starting no later than the year 2009, to no earlier than the return of this Indictment, in the Northern District of Georgia and elsewhere, the defendants,

SHAUNTAY CRAIG, aka "Shake," or "Shakey,"or "Shake G," or "Big Bro";

ALONZO WALTON,  aka "Spike;

MANGWIRO SADIKI-YISRAEL, aka  "Iz,"or "Izzy";

KEVIN CLAYTON, aka "KK";

DONALD GLASS, aka "Smurf," or "Dred";

LEWIS MOBELY, aka "OG";

VERTUIES WALL, aka "Vert";

ADRIAN JACKSON, aka "Blackjack";

TERRANCE SUMMERS, aka "T-Man"

MARKELL WHITE, aka "Kell,"or "Markell Taylor";

8

RONALD MCMORRIS, aka "Detroit Red," or "Detroit," or "Red";

PERRY GREEN, aka "Lucky";

DERECK TAYLOR, aka "D";

ALVIS O'NEAL, aka "Ebby";

JEREMIAH COVINGTON, aka "Tre B";

ANTONIO AHMAD, aka "Izzy";

ERIC MANNEY, aka "E";

QUIANA FRANKLIN, aka "KiKi"; FREDERICK JOHNSON, aka

"Popino";

CHARLES WINGATE,  aka "Carlos," or "Los";

VANCITO GUMBS;

THOMAS PASBY, aka "Ayo";

DENISE CARTER, aka "Loyal";

CARLTON KING, JR.;

KELVIN SNEED;

ARRIE FREENEY;

MYRICK STEVENS, aka "Breadwinner";

CURTIS THOMAS;

YOHORI EPPS; and

MICHAEL DRUMMOND, aka "Savage,"

each a member and associate of the Gangster Disciples, and others not named in

this Indictment, did knowingly, willfully and unlawfully combine, conspire,

confederate, and agree with one another to violate Title 18, United States Code,

Section1962(c); that is, did agree to conduct and participate directly and

indirectly in the conduct of the affairs of said enterprise through a pattern of

racketeering activity, as defined by Title 18, United States Code, Sections 1961(1)

and (5), which consisted of multiple threats and acts involving:

     a.     murder, in violation of Official Code of Georgia, Sections 16-5-1; 16-4-1 and 16-4-8;

     b.     robbery, in violation of Official Code of Georgia, Sections 16-8-40; 16-4-1; and 16-4-8;

     c.     extortion, in violation of Official Code of Georgia, Sections 16-8-16; 16-4-1; and 16-4-8;

     d.     arson, in violation of Official Code of Georgia, Sections 16-7-60; 16-7-61; and 16-4-8; and

multiple offenses involving

     e.     drug trafficking, in violation of Title 21, United States Code, Sections 841(a)(1), 841(b)(1)(A) and 846; and

multiple acts indictable under

     f.     Title 18, United States Code, Section 1343 (wire fraud);

     g.     Title 18, United States Code, Section 1344 (financial institution fraud);

h.     Title 18, United States Code, Section 1029 (fraud and related activity in connection with access devices);

i.     Title 18, United States Code, Section 2422 (inducing and enticing individuals to travel interstate to engage in prostitution); and

j.     Title 18, United States Code, Sections 1512 and Section 1513 (obstruction of justice).

17.    It was part of the conspiracy that each defendant agreed that a conspirator would commit at least two acts of racketeering in the conduct of the affairs of the enterprise.

## Roles of the Defendants

18.    The defendants held the following roles as members and associates of the Gangster Disciples:

a.     SHAUNTAY CRAIG, aka "Shake," "Shakey," "Shake G," and "Big Bro" held the rank of "Board Member";

b.     ALONZO WALTON, aka "Spike G," held at different relevant times the positions of Governor of Georgia and Governor of Governors, the latter position controlling Georgia, Florida, Texas, Indiana, and South Carolina;

c.     MANGWIRO SADIKI-YISRAEL, aka "Iz,"and "Izzy," held at different relevant times the positions of First Coordinator of the Marietta Count, Assistant Governor of Georgia, and Governor of Georgia;

11

d.    KEVIN CLAYTON, aka "KK," held the rank of Chief Enforcer for

the State of Georgia and was a founding member of HATE Committee, an

"enforcer and clean-up crew" of the Gangster Disciples;

e.    DONALD GLASS, aka "Smurf" or "Dred," was a founding member

and later leader of HATE Committee, an enforcer and clean-up crew of a

Gangster Disciples count. GLASS also served as First Coordinator of the Eastside

Count of the Gangster Disciples;

f.    LEWIS MOBELY, aka "OG," was a founding member of HATE

Committee, an enforcer and clean-up crew of the Gangster Disciples;

g.    VERTUIES WALL, aka "Vert," was a leader of the BLACC Team

enforcement team for the Macon count and was the First Coordinator for the

Macon count;

h.    ADRIAN JACKSON, aka "Blackjack," was a Governor of Governors

for the Western States, including California, and subsequently the National

Treasurer;

i.    TERRANCE SUMMERS, aka "T-Man," held at different relevant

times the positions of Governor of Alabama and Governor of Governors for

Georgia, Alabama, South Carolina and Florida;

j.    MARKELL WHITE, aka "Kell" and "Markell Taylor," was a Region

for multiple Gangster Disciples' counts in the Macon, Georgia area;

12

k.      RONALD McMORRIS, aka "Detroit Red," "Detroit," and "Red,"

was a member of HATE Committee, an enforcer and clean-up crew of the

Gangster Disciples, and was later First Coordinator of the Atlanta count and

subsequently the First Coordinator of the Marietta count;

l.      PERRY GREEN, aka "Lucky," was a member of the Gangster

Disciples and served on HATE Committee, an enforcer and clean-up crew of the

Gangster Disciples;

m.      ALVIS O'NEAL, aka "Ebby," was a senior member of and money

launderer for the Gangster Disciples;

n.      JEREMIAH COVINGTON, aka "Tre B," was First Coordinator of the

Valdosta count and a Region for the southeast Georgia area;

o.      ANTONIO AHMAD, aka "Izzy," was the Chief of Security for the

State of Georgia;

p.      QUIANA FRANKLIN, aka "KiKi," was a Sister of the Struggle in

Birmingham, Alabama and also served as Treasurer for the State of Alabama;

q.      FREDERICK JOHNSON, aka "Popino," was the Chief Enforcer for

the Northside count;

r.      CHARLES WINGATE, aka "Carlos," aka "Los," was Assistant Chief

of Security for the Covington count;

13

s.      VANCITO GUMBS was a member of the Gangster Disciples while at

the same time serving as a police officer with the DeKalb County Police

Department; and

t.      DERECK TAYLOR; ERIC MANNEY, aka "E"; MICHAEL

DRUMMOND, aka "Savage; THOMAS PASBY, aka "Ayo"; DENISE CARTER,

aka "Loyal"; CARLTON KING, JR.; KELVIN SNEED; ARRIE FREENEY;

MYRICK STEVENS, aka "Breadwinner"; CURTIS THOMAS; and YOHORI EPPS

were members of the Gangster Disciples.

## Manner and Means of the Conspiracy

19.    The manner and means by which the members and associates conducted

and participated in the affairs of the Gangster Disciples criminal enterprise to

achieve its purposes included, but were not limited to, the following:

a.      The members and associates of the enterprise attended regular

meetings where criminal activity was discussed, financial proceeds from criminal

activity were collected, disciplinary beatings of fellow Gangster Disciples

members were discussed and decided, and an oath of allegiance to the gang and

its leadership was pledged.

b.      To enforce discipline and the rules of the enterprise, members and

associates of the enterprise engaged in a system of "violations," in which the

defendants and others committed, and aided and abetted in the commission of,

14

murder, attempted murder, conspiracy to murder, physical assault and threats, and the imposition of fines for those members and associates of the enterprise who violated rules, questioned authority, were suspected of cooperating with law enforcement, or otherwise posed any real or perceived threat to the leaders, members, or purposes of the enterprise.

      c.    To generate income, defendants agreed to distribute and attempted to distribute more than 500 grams of a mixture and substance containing methamphetamine, more than 1 kilogram of a mixture and substance containing heroin, and more than 5 kilograms of a mixture and substance containing cocaine; robbery; carjacking; extortion; arson; check and bank fraud; wire fraud; insurance fraud; credit card fraud; prostitution and other illegal activities.

      d.    To increase the coffers of the different Gangster Disciples counts, the enterprise would provide seed or "investment" money to Gangster Disciples groups to allow the counts to grow that money by, among other things, buying and reselling drugs at a profit.

      e.    Gangster Disciples members would teach other members and associates how to commit certain crimes, including insurance fraud, wire fraud and bank fraud.

f.      Older Gangster Disciples members introduced younger members, including juveniles, to the criminal nature of the enterprise by ordering them to commit crimes, including murder, robbery, and drug trafficking.

g.      Gangster Disciples members acquired, stored, borrowed, transferred, carried and used firearms and other weapons to engage in attacks and armed conflict with others.

h.      Members and associates of the enterprise used gang-related terminology, codes, symbols, phrases, clothing and hand gestures to demonstrate affiliation with the gang, and, at times, required recruits to complete a written application for membership.

i.      To perpetuate the enterprise and to maintain and extend its power, members and associates of the enterprise committed and conspired to commit acts including murder, that is, causing the death of another human being unlawfully and with malice aforethought or causing the death of another human being, irrespective of malice, in the commission of a felony; attempted murder, that is, performing any act that constitutes a substantial step toward the commission of murder; intimidation; extortion, and assault against individuals who posed a threat to the enterprise or jeopardized its operations, including rival gang members, Gangster Disciples members who were believed not to be

following gang rules, and other individuals, including witnesses to the enterprise's illegal activities.

 j. To maintain the enterprise's strict hierarchy and adherence to gang rules and the chain of command, members who refused to follow rules and those believed to be operating without proper authority were severely punished, including by death.

 k. Members and associates of the enterprise hid, misrepresented, concealed, and caused to be hidden, misrepresented, and concealed, the objectives of acts done in furtherance of the "enterprise," and used coded language and other means of communication to avoid detection and apprehension by law enforcement authorities.

### Overt Acts

In furtherance of the conspiracy, and to effect the object and purposes thereof, the defendants and others not named as defendants herein committed various overt acts, including, but not limited to, the following:

 1. Beginning on or about October 6, 2009, and continuing through at least on or about March 15, 2010, defendant MANGWIRO SADIKI-YISRAEL caused at least four fraudulent transactions to occur that resulted in excess of $26,013 being deposited into at least one account controlled by SADIKI-YISRAEL.

2.      In or about 2010, defendants KEVIN CLAYTON, DONALD GLASS,

LEWIS MOBELY, and others founded HATE Committee as an enforcement and

clean-up crew, and defendant ALONZO WALTON, as governor of Georgia,

"stamped" and approved HATE Committee's existence and role.

3.      Beginning on or about November 1, 2010, and continuing through at

least on or about November 4, 2010, defendant MANGWIRO SADIKI-YISRAEL

and Gangster Disciples member J.S. caused at least four fraudulent transactions

to occur that resulted in excess of $26,304 being deposited into at least one

account controlled by J.S.

4.      On or about July 2, 2011, Gangster Disciples members Dereck Lee

Kemp, Harvey Hogans and Alphonso Watkins attempted to rob victim Derek

George Gray, Jr. during a drug deal, and when the attempted robbery went

wrong, Gray was shot and killed, after which Kemp, Hogan, and Watkins

dumped Gray's body from the car in which the shooting took place and then

burned the car.

5.      Beginning in or about May 2012, and continuing through in or about

August 2013, defendant JEREMIAH COVINGTON distributed drugs, including

heroin, with and for defendant SHAUNTAY CRAIG.

6.      In or about May 2012, Gangster Disciples member Christopher

Calhoun hid out in a Gangster Disciples' "safe house" in Atlanta controlled by

defendant ALONZO WALTON and other Gangster Disciples leadership to avoid arrest on a federal warrant issued by the Southern District of Mississippi.

7.      On or about May 25, 2012, Gangster Disciples member T.B., aka "Most Wanted," who was wanted by police for armed robbery, hid out in a Gangster Disciples "safe house" controlled by defendant ALONZO WALTON and other Gangster Disciples leadership and which contained Gangster Disciples "literature," four handguns, 2 shotguns, 1 assault rifle, over 450 rounds of ammunition, and 1 bullet proof vest.

8.      On or about June 14, 2012, defendant ERIC MANNEY possessed and distributed heroin.

9.      On or about June 27, 2012, defendant ERIC MANNEY possessed and distributed heroin.

10.     On or about July 12, 2012, defendant ERIC MANNEY possessed and distributed heroin.

11.     On or about October 26, 2012, defendant VERTUIES WALL and other Gangster Disciples members shot and injured W.R.

12.     Beginning in or about November 2012, defendants SHAUNTAY CRAIG, ALONZO WALTON, KEVIN CLAYTON and DONALD GLASS, and other Gangster Disciples members threatened rapper R.R. with physical harm

unless rapper R.R. paid the Gangster Disciples for the use of the gang's name and symbols.

13.    On or about December 7, 2012, defendant PERRY GREEN and fellow Gangster Disciples member Q.H. robbed an individual at gunpoint.

14.    On or about January 18, 2013, Gangster Disciples member Juante Kelly, aka "Osiris," shot Gangster Disciples recruit T.S. because T.S. refused to take part in a Gangster Disciples- led "community clean-up."

15.    On or about February 16, 2013, defendants LEWIS MOBELY, SHAUNTAY CRAIG, KEVIN CLAYTON, and DONALD GLASS and others were filming a music video featuring the Gangster Disciples in front of a neighborhood convenience store when 17-year-old J.H. walked in front of the camera wearing a red shirt and taunted the Gangster Disciples.

16.    On or about February 16, 2013, defendant LEWIS MOBELY shot J.H. in the chest because MOBELY believed that J.H. had insulted the Gangster Disciples.

17.    Beginning on or about February 19, 2013, and continuing through at least on or about March 18, 2013, defendants RONALD  McMORRIS and MANGWIRO SADIKI-YISRAEL caused at least five fraudulent transactions to occur that resulted in excess of $10,200 being deposited into at least one account controlled by McMORRIS.

18.     On or about February 22, 2013, defendant LEWIS MOBELY possessed a 12-guage shotgun, ammunition, and cocaine.

19.     On or about March 20, 2013, defendant ERIC MANNEY possessed cocaine, marijuana, heroin, a loaded Ruger 9mm handgun with a laser site, a second loaded Ruger 9 mm handgun, a Remington rifle with a laser site, an RPM/Maadi Co. rifle with an extended clip, a loaded High Point 9 mm handgun, a loaded Taurus .40 caliber handgun, and associated ammunition in a house where Gangster Disciples meetings were held.

20.     On or about April 30, 2013, defendant LEWIS MOBELY admitted that he shot J.H. "because of the board," referring to the Gangster Disciples Board Members.

21.     Beginning on or about June 20, 2013 and continuing through at least on or about August 15, 2013, defendants MYRICK STEVENS and MANGWIRO SADIKI-YISRAEL caused at least three fraudulent transactions to occur that resulted in excess of $34,100 being deposited into at least one account controlled by STEVENS.

22.     Beginning on or about July 24, 2013 and continuing through at least on or about September 6, 2013, defendants DENISE CARTER and MANGWIRO SADIKI-YISRAEL caused at least eleven fraudulent transactions to occur that

resulted in excess of $32,341 being deposited into at least one account controlled by CARTER.

23.     Beginning on or about August 5, 2013, and continuing through at least on or about September 5, 2013, defendants THOMAS PASBY and MANGWIRO SADIKI-YISRAEL caused at least twenty-six fraudulent transactions to occur that resulted in excess of $83,918 being deposited into at least one account controlled by PASBY.

24.     On or about August 15, 2013, Gangster Disciples member Charles Deandre Roman shot and injured J.R., a rival Bloods member.

25.     Beginning on or about August 19, 2013, and continuing through at least on or about September 25, 2013, defendants ARRIE FREENEY, ALONZO WALTON, and MANGWIRO SADIKI-YISRAEL caused at least six fraudulent transactions to occur that resulted in excess of $20,307 being deposited into at least one account controlled by FREENEY.

26.     On or about August 23, 2013, defendant RONALD McMORRIS possessed multiple pounds of marijuana that belonged to defendant SHAUNTAY CRAIG and an assault rifle that McMORRIS obtained from defendant ALONZO WALTON.

27.     On or about August 23, 2013, defendant RONALD McMORRIS

owed $11,000 to the Gangster Disciples "Nation" for the drugs that belonged to

defendant SHAUNTAY CRAIG that police had seized.

28.     On or about September 12, 2013, defendants JEREMIAH

COVINGTON and MANGWIRO SADIKI-YISRAEL caused at least one

fraudulent transaction to occur that resulted in excess of $19,900 being deposited

into at least one account controlled by COVINGTON.

29.     Beginning on or about September 16, 2013, and continuing through

at least on or about January 29, 2014, defendants CARLTON KING, JR. and

MANGWIRO SADIKI-YISRAEL caused at least fifteen fraudulent transactions to

occur that resulted in excess of $43,394 to be deposited into at least one account

controlled by KING.

30.     Beginning on or about September 19, 2013, and continuing through

at least on or about October 8, 2013, defendants YOHORI EPPS and

MANGWIRO SADIKI-YISRAEL caused at least eight fraudulent transactions to

occur that resulted in excess of $26,304 being deposited into at least one account

controlled by EPPS.

31.     Beginning on or about October 4, 2013, and continuing through at

least on or about October 21, 2013, defendants KELVIN SNEED and

MANGWIRO SADIKI-YISRAEL caused at least six fraudulent transactions to

occur that resulted in excess of $24,417 being deposited into at least one account controlled by SNEED.

32.     Beginning on or about October 18, 2013, and continuing through at least on or about February 4, 2014, defendants CURTIS THOMAS and MANGWIRO SADIKI-YISRAEL caused at least thirty-eight fraudulent transactions to occur that resulted in excess of $108,536 being deposited into at least one account controlled by THOMAS.

33.     In or about December 2013, defendant ALONZO WALTON and co-conspirator M.F. falsely claimed that M.F.'s vehicle was stolen for purposes of fraudulently collecting insurance money.

34.     In or about December 2013, after helping M.F. make a false insurance claim on her vehicle, defendant ALONZO WALTON firebombed the car to destroy it and later told defendant SHAUNTAY CRAIG and others that he was teaching the insurance fraud scheme to Georgia-based Gangster Disciples as a way for the gang to make money.

35.     On or about December 2, 2013, the Gangsters Disciple Governor of Texas, D.T., aka "Spook," called defendant ALZONO WALTON to report that a Sister of the Struggle, R.G., and 11 other Gangster Disciples members had been arrested for possessing and distributing crack cocaine and that D.T. was concerned that R.G. might be cooperating with police.

36. On or about December 3, 2013, defendant LEWIS MOBELY ordered defendant RONALD McMORRIS to "whack" J.H., the victim that MOBELY shot on or about February 16, 2013, because J.H. testified in federal court.

37. On or about December 15, 2013, defendant ALONZO WALTON sent HATE Committee members to a club to confront rival Crips gang members.

38. Beginning on a date unknown, but no later than December 2, 2013, and continuing until on or about December 17, 2013, defendant LEWIS MOBELY possessed a contraband cellphone while in federal custody that MOBELY used to contact fellow Gangster Disciples members to discuss gang business.

39. On or about December 20, 2013, defendants SHAUNTAY CRAIG, TERRANCE SUMMERS, and QUIANA FRANKLIN ran a "stash house" in which firearms and illegal drugs, including cocaine and marijuana, were stored.

40. On or about December 25, 2013, defendants SHAUNTAY CRAIG, ALONZO WALTON, MANGWIRO SADIKI-YISRAEL, and ANTONIO AHMAD, and others secreted defendant QUIANA FRANKLIN from law enforcement after a stash house she ran was raided by police.

41. In or about January 2014, defendant ALONZO WALTON recruited individuals to take part in the credit card and bank fraud scheme controlled by defendant MANGWIRO SADIKI-YISRAEL.

42.     On or about January 14, 2014, defendant LEWIS MOBELY assaulted two correctional officers by throwing a chemical solution in their faces and eyes.

43.     On or about January 18, 2014, defendant ALONZO WALTON granted permission to Gangster Disciples members to kill "Prince Old Timer" because "Prince Old Timer" was causing dissent within the Gangster Disciples.

44.     On or about February 1, 2014, defendants RONALD McMORRIS and ANTONIO AHMAD possessed and distributed cocaine.

45.     On or about February 27, 2014, defendant ALONZO WALTON and other Gangster Disciples members drove to Columbus, Georgia to retrieve defendant ANTONIO AHMAD after AHMAD had been shot in a gunfight.

46.     On or about February 28, 2014, Gangster Disciples member C.L.L. possessed cocaine, Alprazolam, marijuana, a Rossi revolver, a Smith & Wesson .40 caliber semi-automatic handgun, ammunition, and gang "literature."

47.     On or about March 20, 2014, defendants ALONZO WALTON and ANTONIO AHMAD, Laderris Dickerson (who is not a defendant in this Count), and others carjacked victim M.F. and stole her vehicle and approximately $14,000 at gunpoint, part of which was used to pay off a drug debt that AHMAD owed to defendant SHAUNTAY CRAIG.

48.     On or about March 22, 2014, Gangster Disciples member James Hightower shot and killed rival Bloods gang member Anthony Bowers and shot and injured rival Bloods member D.C.

49.     On or about May 5, 2014, defendants ANTONIO AHMAD and ALZONO WALTON, along with other Gangster Disciples members, possessed two firearms in a vehicle while on the way to attend a state-wide meeting for Gangster Disciples members who held a "position of authority" within the gang.

50.     On or about May 10, 2014, Gangster Disciples leaders approved a "greenlight" on rival Bloods gang members in Atlanta in retaliation for the killing of James Hightower's son, that shooting having been done in retaliation for Hightower shooting and killing one Bloods member and injuring another on March 22, 2014.

51.     On or about June 6, 2014, defendant KEVIN CLAYTON asked defendant MANGWIRO SADIKI-YISRAEL for a contact to help smuggle marijuana into a prison.

52.     On or about June 29, 2014, defendant MARKELL WHITE offered to help Gangster Disciples member J.C. pick up shell casings to hinder a police investigation of a shooting that J.C. had committed.

53.     On or about July 3, 2014, defendant MARKELL WHITE and Gangster Disciples member J.C. agreed to buy multiple kilograms of cocaine at

$25,000 per kilogram, on which they believed they could make $10,000 profit per

kilogram.

54.     On or about July 8, 2014, defendants SHAUNTAY CRAIG and

ADRIAN JACKSON discussed supplying a new drug customer who would be

buying multiple kilograms of cocaine every month.

55.     On or about July 10, 2014, defendant ADRIAN JACKSON and

Gangster Disciples member C.H. , aka "Six Face," who was then the Gangster

Disciples governor of South Carolina, discussed plans to expand the Gangster

Disciples into Salt Lake City, Washington, D.C., Philadelphia, New Orleans,

Wisconsin, and Kansas, and JACKSON reminded C.H. that defendant

TERRANCE SUMMERS already had a "guy" in Salt Lake City.

56.     On or about July 10, 2014, defendant MARKELL WHITE asked that

armed Gangster Disciples members be provided to him because WHITE planned

to enter rival gang territory to defraud video gaming machines.

57.     On or about July 12, 2014, defendant MARKELL WHITE asked that

armed Gangster Disciples members be provided to him because WHITE planned

to enter rival gang territory to defraud video gaming machines.

58.     On or about July 26, 2014, defendants SHAUNTAY CRAIG and

ADRIAN JACKSON negotiated pricing for kilograms of cocaine.

59.     On or about July 28, 2014, defendants SHAUNTAY CRAIG and

TERRANCE SUMMERS traveled to Memphis, Tennessee to pick up

approximately 27 pounds of marijuana.

60.     On or about September 10, 2014, defendant JEREMIAH

COVINGTON and two other Gangster Disciples members traveled with two

firearms from Valdosta to Atlanta to protect a heroin transaction.

61.     On or about September 14, 2014, defendant CHARLES WINGATE

obtained heroin from defendant SHAUNTAY CRAIG.

62.     On or about September 16, 2014, defendant FREDRICK JOHNSON

possessed and distributed cocaine.

63.     On or about September 19, 2014, defendant RONALD McMORRIS

possessed and distributed MDMA, commonly referred to as "Molly."

64.     On or about September 19, 2014, defendant RONALD McMORRIS

deposited $2700 into at least one bank account controlled by defendant

MANGWIRO SADIKI-YISRAEL.

65.     On or about October 8, 2014, defendant CHARLES WINGATE

ordered heroin from defendant SHAUNTAY CRAIG for resale.

66.     On or about October 10, 2014, defendant FREDRICK JOHNSON

possessed and distributed cocaine.

67.     On or about October 11, 2014, defendants SHAUNTAY CRAIG,
TERRANCE SUMMERS, and MARKELL WHITE possessed and distributed the
controlled substance Roxycodone.

68.     On or about October 24, 2014, defendant TERRANCE SUMMERS
reported to defendant SHAUNTAY CRAIG that he had approximately 8 ounces
of heroin remaining for sale.

69.     On or about November 3, 2014, defendant SHAUNTAY CRAIG and
other Gangster Disciples members discussed their "Ladies of Distinguished
Nature" prostitution service for Gangster Disciples members to use during
Gangster Disciples events.

70.     On or about November 11, 2014, defendant FREDRICK JOHNSON
possessed and distributed cocaine.

71.     On November 13, 2014, Gangster Disciples member T.D.J, aka
"Real," agreed to buy for resale 40 ounces of heroin and multiple pounds of mid-
grade marijuana from defendant SHAUNTAY CRAIG.

72.     On or about November 17, 2014, defendant FREDRICK JOHNSON
possessed and distributed cocaine.

73.     On or about December 1, 2014, Gangster Disciples members from
throughout Georgia were at Club Déjà Vu in Atlanta celebrating the birth date of

Gangster Disciples founder and Chairman, when gunfire erupted, wounding two security guards.

74.     On or about December 9, 2014, Gangster Disciples member T.C. possessed and distributed heroin.

75.     On or about December 12, 2014, defendants VERTUIES WALL and DERECK TAYLOR and other Gangster Disciples members met outside Wings Café, a nightclub known to be frequented by rival Crips gang members.

76.     Prior to entering Wings Café on December 12, 2014, defendant DERECK TAYLOR, who provided security for defendant VERTUIES WALL, retrieved a firearm from defendant WALL.

77.     Defendants VERTUIES WALL and DERECK TAYLOR, along with other Gangster Disciples members, then entered Wings Café, and provoked an altercation with Crips gang members seconds after entering by throwing a cigar, a bottle, and a chair at the Crips gang members.

78.     Immediately after Crips gang members threw a bottle at the Gangster Disciples members in return, Gangster Disciples member M.P. shot and killed Crips gang member Corey Hollingshed, after which more gunfire was exchanged, resulting in the deaths of George Henley and Dereck Jackson and the injury of M.P., J.F., and N.T.

79.     On or about December 13, 2014, defendant VERTUIES WALL told

Gangster Disciples member D.T. to arrange for a false police report to be made

stating that WALL's .357 handgun had been stolen before the December 12, 2014,

shooting at Wings Cafe, when, in fact, WALL possessed that firearm during the

shooting.

80.     On or about January 22, 2015, defendants RONALD McMORRIS and

FREDRICK JOHNSON possessed and distributed cocaine and Xanax.

81.     On or about February 13, 2015, defendant RONALD McMORRIS

possessed and distributed Xanax.

82.     On or about February 20, 2015, defendant RONALD McMORRIS

possessed and distributed Xanax and cocaine.

83.     On or about February 25, 2015, Gangster Disciples and HATE

Committee member E.O., aka "Eddie," possessed two rifles, two bullet proof

vests, and over 140 rounds of ammunition.

84.     On or about March 1, 2105, defendant DERECKTRAYLOR and

another Gangster Disciples member shot at individuals in a vehicle after getting

into an altercation with them at a nightclub.

85.     On or about April 3, 2015, defendant RONALD McMORRIS

possessed a firearm and ammunition.

86.     On or about April 14, 2015, Gangster Disciples members C.F., T.D., and C.C. shot and killed Anthony Kennedy after a "KOS," meaning "Kill on Sight," order was issued.

87.     On or about June 6, 2015, defendant RONALD McMORRIS possessed and distributed cocaine.

88.     On or about June 11, 2015, defendant MARKELL WHITE intentionally burned down his house from which he sold drugs and then submitted a false insurance claim to defraud the insurance company.

89.     On or about June 11, 2015, defendant SHAUNTAY CRAIG told Gangster Disciples members in Memphis, Tennessee that they need to contribute more money to the "box" (the term used for monies previously collected from Gangster Disciples members) because of their drug sales.

90.     On or about June 24, 2015, defendant RONALD McMORRIS and Gangster Disciples member "Yo" possessed and distributed heroin.

91.     On or about June 29, 2015, defendant SHAUNTAY CRAIG possessed a firearm that he displayed during a drug negotiation.

92.     On or about June 30, 2015, Gangster Disciples and HATE Committee member Q.H. got into a verbal fight with a rival Bloods gang member after Q.H. sat on the rival gang member's car.

93.     On or about June 30, 2015, Gangster Disciples and HATE Committee member Q.H. and other Gangster Disciples members traded gunfire with rival Bloods gang members, including the gang member whose car Q.H. sat on.

94.     On or about July 1, 2015, defendant DONALD GLASS chided Gangster Disciples and HATE Committee member Q.H. for not reacting more strongly when Q.H. and a rival Bloods gang member got into a fight and GLASS urged Q.H. to remedy his poor prior performance by finding and shooting a rival Bloods gang member.

95.     On or about July 1, 2015, defendant PERRY GREEN handed a firearm to Gangster Disciples and HATE Committee member Q.H. could shoot DeMarco Franklin, who GREEN and Q.H. believed was a rival Bloods gang member.

96.     On or about July 1, 2015, Gangster Disciples and HATE Committee member Q.H. shot and killed victim DeMarco Franklin upon the urging of defendant DONALD GLASS and in the belief that Franklin was a rival Bloods gang member.

97.     On or about July 3, 2015, defendant DONALD GLASS, along with Gangster Disciples and HATE Committee members J.B.; D.L.P., aka "Island"; K.F., aka "Jersey"; R.G., aka "Dric"; A.C., aka "Phat," and others, planned to rob a drug dealer they knew as "Zay," who sold drugs from a room at the Stone

Mountain Inn, but when they got to the hotel, they delayed the robbery because of police activity in the area.

98.    Later that same day, Gangster Disciples members J.B.; D.L.P., aka "Island"; K.F, aka "Jersey;. and R.G., aka "Dric," and others returned to the Stone Mountain Inn to commit the robbery, and in doing so shot and killed Edward Chadmon and shot and injured I.M.

99.    During the attempted robbery on July 3, 2015, at the Stone Mountain Inn, Gangster Disciples and HATE Committee member R.G., aka "Dric" was shot in the head by the robbery victims, after which Gangster Disciples member S.L. convened a meeting at which defendant DONALD GLASS and Gangster Disciples member S.L. ordered using money in the "box" to obtain additional firearms and further called for Gangster Disciples members to retaliate against the shooting of R.G.

100.    After this, defendant DONALD GLASS and other Gangster Disciples members obtained additional firearms, extended magazines, ammunition and bullet proof vests, some of which were stored at GLASS's house.

101.    In or about July 2015, after the shooting of Gangster Disciples member R.G., defendant DONALD GLASS put Gangster Disciples members in

the Central Avenue area of Stone Mountain "on hold" because they were not sufficiently "plugged in."

102.   On or about July 16, 2015, defendant SHAUNTAY CRAIG possessed and distributed 200 Oxycodone pills.

103.   On or about July 23, 2015, defendant KEVIN CLAYTON ordered Gangster Disciples members to assault a Bloods gang member, R.T.

104.   On or about July 29, 2015, defendant DONALD GLASS commended Gangster Disciples member Joseph Broxton, aka "Joe," and others for stealing a BMW.

105.   On or about July 30, 2015, defendant DONALD GLASS provided firearms to Gangster Disciples and HATE Committee member Q.H. and others and instructed them to attack Gangster Disciples members in the Central Avenue area of DeKalb who were not following the rules.

106.   On or about July 30, 2015, Gangster Disciples and HATE Committee members Q.H.; J.B.; D.L. P., aka "Island"; and K.F., aka "Jersey," shot and injured F.C. at the victim's Central Avenue residence.

107.   In a separate incident on or about July 30, 2015, Gangster Disciples and HATE Committee members Q.H., J.B.; D.L. P., aka "Island"; and K.F., aka "Jersey"; shot and killed Rocqwell Nelson and shot and injured J.T. at a Central Avenue residence.

108.   On or about August 3, 2015, defendant DONALD GLASS and "Gator," another Gangster Disciples member, shot and killed Gangster Disciples member Robert Dixon because GLASS suspected that Dixon was cooperating with police and because Dixon was not sufficiently "plugged in."

109.   On or about August 6, 2015, defendants SHAUNTAY CRAIG and ALVIS O'NEAL, and Gangster Disciples member Nicholas Evans (who is not a defendant in this Count) mailed approximately four pounds of methamphetamine through the U.S. Mail, with at least one pound of methamphetamine going to James Travis Riley (who is not a defendant in this Count), the Gangster Disciples Governor for Kansas.

110.   On or about August 8, 2015, Gangster Disciples members R.G, aka "Dric," and A.C., aka "Phat," traveled to North Carolina with a Rossi .357 handgun, a Ruger 9 mm handgun and a Smith and Wesson .38 caliber handgun.

111.   On or about August 12, 2015, defendants SHAUNTAY CRAIG and TERRANCE SUMMERS sold one-half kilogram of heroin for $40,000.

112.   On or about August 18, 2015, defendants SHAUNTAY CRAIG and TERRANCE SUMMERS possessed and distributed 103 grams of heroin and CRAIG informed the buyer that he should call SUMMERS for all future heroin buys.

113.   On or about August 19, 2015, defendant DONALD GLASS possessed in his residence rubber gloves, a mask, a folding knife, 1 AKM assault rifle with a "banana clip" magazine with 23 rounds of ammunition, one WASR-10 assault rifle with a "banana clip" magazine with 31 rounds of ammunition, 3 loaded handguns, an extended magazine for 9mm ammunition, and approximately 195 rounds of live ammunition.

114.   On or about August 21, 2015, defendant KEVIN CLAYTON complained that instead of defendant DONALD GLASS trying to make a name for himself, GLASS should have been using the HATE Committee members for "robbing dope boys" and "hitting major licks."

115.   On or about August 21, 2015, defendant KEVIN CLAYTON, in talking about the shootings done by HATE Committee members, bragged that it was CLAYTON who "brought them shooters to the table."

116.   On or about August 25, 2015, defendant VANCITO GUMBS, who was then a DeKalb County Police Officer, admitted that he had killed people as a "hitman" for the Gangster Disciples.

117.   In or about fall of 2015, defendant VANCITO GUMBS, while a police officer, traveled with defendant KEVIN CLAYTON to "take care of GD business."

118.   On or about September 2, 2015, defendants SHAUNTAY CRAIG and TERRANCE SUMMERS and another Gangster Disciples member possessed and distributed heroin.

119.   On or about September 18, 2015, defendant ADRIAN JACKSON met with incarcerated Gangster Disciples founder.

120.   On or about September 19, 2015, defendant KEVIN CLAYTON told defendant VANCITO GUMBS that defendant DONALD GLASS was CLAYTON'S "right hand guy," and HATE Committee was the "clean-up crew" within the Gangster Disciples' "structure."

121.   On or about September, 28, 2015, defendant RONALD McMORRIS possessed a firearm.

122.   In or about September and October 2015, defendant KEVIN CLAYTON bragged that the Gangster Disciples had infiltrated police departments and the parole office.

123.   On or about October 1, 2015, defendant KEVIN CLAYTON asked defendant VANCITO GUMBS, who was then a DeKalb County Police Officer, to find out what police were investigating on Flat Shoals road and GUMBS later reported to CLAYTON that it was a shooting.

124.   On or about October 3, 2015, defendant VANCITO GUMBS, who was then a DeKalb County Police Officer, called defendant KEVIN CLAYTON

and warned CLAYTON to stay away from a sports bar that police were currently raiding and which CLAYTON frequented.

125.    On or about October 3, 2015, defendant KEVIN CLAYTON asked defendant VANCITO GUMBS, who was then a DeKalb County police officer, to bring CLAYTON a gun.

126.    On or about October 29, 2015, defendant RONALD McMORRIS possessed and distributed cocaine.

127.    On or about November 22, 2015, defendant QUIANA FRANKLIN told defendant TERRANCE SUMMERS to shut down their "stash house" because she was afraid that police were investigating them.

128.    On or about January 9, 2016, defendant SHAUNTAY CRAIG ordered Gangster Disciples members to retaliate against individuals who robbed and shot Gangster Disciples member B.S.L. who was "working" for CRAIG in Roanoke, Alabama.

129.    Thereafter, on or about January 10, 2016, a Gangster Disciples member shot into retirement housing, where he believed the person who shot B.S.L. was visiting.

130.    At all times relevant to this indictment, defendant MICHAEL DRUMMOND provided names and account information to defendant MANGWIRO SADIKI-YISRAEL to use in fraudulent transactions.

131. Throughout the dates alleged in this indictment, defendants SHAUNTAY CRAIG and ADRIAN JACKSON communicated regularly with incarcerated Gangster Disciples Board Members.

## Notice of Enhanced Sentencing

136. The following defendants joined and remained in the RICO conspiracy charged in Count One knowing and agreeing that members of the enterprise engaged in acts involving murder, in violation of Official Code of Georgia 16-5-1:

> SHAUNTAY CRAIG, aka "Shake," or "Shakey,"or "Shake G," or "Big Bro";
>
> ALONZO WALTON, aka "Spike;
>
> MANGWIRO SADIKI-YISRAEL, aka "Iz,"or "Izzy";
>
> KEVIN CLAYTON, aka "KK";
>
> DONALD GLASS, aka "Smurf," aka "Dred";
>
> LEWIS MOBELY, aka "OG";
>
> VERTUIES WALL, aka "Vert";
>
> ADRIAN JACKSON, aka "Blackjack";
>
> MARKELL WHITE, aka "Kell," aka "Markell Taylor";
>
> TERRANCE SUMMERS, aka "T-Man";

41

ANTONIO AHMAD, aka "Izzy";

PERRY GREEN, aka "Lucky"; and

DERECK TAYLOR, aka "D"

137.     The following defendants joined and remained in the RICO
conspiracy charged in Count One knowing and agreeing that members of the
enterprise manufactured, distributed, and possessed with the intent to distribute
controlled substances including more than 500 grams of a mixture and substance
containing a detectable amount of methamphetamine, a Schedule II controlled
substance; more than one kilogram of a mixture and substance containing a
detectable amount of heroin, a Schedule I controlled substance; and more than
five kilograms of a mixture and substance containing a detectable amount of
cocaine, a Schedule II controlled substance; any of which constitutes a violation
of Title 21, United States Code, Section 841, Section 841(b)(1)(A), and Section 846:

SHAUNTAY CRAIG, aka "Shake," or "Shakey,"or "Shake G," or
"Big Bro";

ALONZO WALTON,  aka "Spike;

MANGWIRO SADIKI-YISRAEL, aka  "Iz,"or "Izzy";

KEVIN CLAYTON, aka "KK";

DONALD GLASS, aka "Smurf," aka "Dred";

LEWIS MOBELY, aka "OG";

ADRIAN JACKSON, aka "Blackjack";

MARKELL WHITE, aka "Kell," aka "Markell Taylor";

RONALD MCMORRIS, aka "Detroit Red," or "Detroit," or "Red";

TERRANCE SUMMERS, aka "T-Man";

ALVIS O'NEAL, aka "Ebby";

JEREMIAH COVINGTON, aka "Tre B";

ANTONIO AHMAD, aka "Izzy";

QUIANA FRANKLIN, aka "KiKi";

FREDERICK JOHNSON, aka "Popino";

CHARLES WINGATE,  aka "Carlos," aka "Los";  and

ERIC MANNEY, aka "E";

All in violation of Title 18, United States Code, Sections 1962(d) and 1963(a).

<u>Count Two</u>

1.     At all times relevant to this Indictment, the Gangster Disciples, as more

fully described in Paragraphs 1 – 15 of Count One of this Indictment, which are

realleged and incorporated by reference herein, including its leaders, members

and associates, constituted an enterprise as defined in Title 18, United States

Code, Section 1959(b)(2), that is, a group of individuals associated in fact that

was engaged in, and the activities of which affected, interstate and foreign

commerce.  The enterprise constituted an ongoing organization whose members

functioned as a continuing unit for a common purpose of achieving the

objectives of the enterprise.

2.      At all times relevant to this Indictment, the above-described enterprise, the

Gangster Disciples, through its members and associates, engaged in racketeering

activity as defined in Title 18, United States Code, Section 1959(b)(1) and Section

1961(1), to include acts involving murder, robbery, extortion, and arson, all  in

violation of the laws of the State of Georgia; multiple offenses involving Title 21,

United States Code, Section 841 and 846; and acts indictable under Title 18,

United States Codes, Sections 1029, 1343, 1344, 1512, 1513, and 2422.

3.      On or about February 16, 2013, in the Northern District of Georgia, the

defendant LEWIS MOBELY did knowingly and unlawfully attempt to murder

J.H., in violation of Official Code of Georgia, Section 15-5-1(a) (murder) and

Section 16-4-1 (attempt), for the purpose of maintaining and increasing position

in the Gangster Disciples, an enterprise engaged in racketeering activity.

All in violation of Title 18, United States Code, Section 1959(a)(5).

## Count Three

On or about February 16, 2013, in the Northern District of Georgia, the

defendant LEWIS MOBELY did knowingly use and carry a firearm during and in

relation to a crime of violence, as alleged in Count Two of this Indictment, in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii).

## Count Four

On or about February 22, 2013, in the Northern District of Georgia, the defendant, LEWIS MOBELY, did knowingly and intentionally possess with intent to distribute a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance, all in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

## Count Five

On or about February 22, 2013, in the Northern District of Georgia, the defendant, LEWIS MOBELY, did knowingly possess a firearm in furtherance of a drug trafficking crime, as alleged in Count Four of this Indictment, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

## Count Six

On or about March 20, 2014, in the Northern District of Georgia, the defendants ALONZO WALTON, ANTONIO AHMAD, and LADERRIS DICKERSON, aided and abetted by one another and by others known and unknown to the grand jury, with the intent to cause death and serious bodily harm, did take a motor vehicle that had been transported, shipped and received in interstate commerce, that is, a 2013 Chevrolet Sonic, from the person and

45

presence of M.F., by force, violence and intimidation, in violation of Title 18, United States Code, Section 2119 and Section 2.

Count Seven

On or about March 20, 2014, in the Northern District of Georgia, the defendants ALONZO WALTON and LADERRIS DICKERSON, aided and abetted by one another, did knowingly use and carry a firearm during and in relation to a crime of violence, as alleged in Count Six of this Indictment, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) and Section 2.

Count Eight

1.      Paragraphs 1 and 2 of Count Two of this Indictment are realleged and incorporated by reference as though fully set forth herein.

2.      On or about August 3, 2015, in the Northern District of Georgia, defendant DONALD GLASS and a Gangster Disciples member known as "Gator," aided and abetted by one another and by others known and unknown to the Grand Jury, did knowingly and unlawfully murder victim Robert Dixon, aka Rampage, in violation of Official Code of Georgia, Section 16-5-1, for the purpose of maintaining and increasing position in the Gangster Disciples, an enterprise engaged in racketeering activity.

All in violation of Title 18, United States Code, Section 1959(a)(1) and Section 2.

Count Nine

1.     On or about August 3, 2015, in the Northern District of Georgia, defendant

DONALD GLASS and another Gangster Disciples member known as "Gator,"

aided and abetted by one another and by others known and unknown to the

Grand Jury, did knowingly use and carry a firearm during and in relation to a

crime of violence, that is the murder of Robert Dixon, aka Rampage, as alleged in

Count Eight of this Indictment, such killing being a murder defined in Title 18,

United States Code, Section 1111.

2.     In the course of this violation of Title 18, United States Code, Section

924(c), as alleged in paragraph one of this Count, the defendants caused the

death of a person; that is, Robert Dixon, through the use of said firearm.

All in violation of Title 18, United States Code, Section 924(c)(1)(A)(iii),

Section 924(j)(1), and Section 2.

Count Ten

On or about August 19, 2015, in the Northern District of Georgia, the

defendant, DONALD GLASS, knowingly possessed with the intent to distribute

a mixture and substance containing a detectable amount of marijuana, a

Schedule I controlled substance, and a mixture and substance containing a

detectable amount of methamphetamine, a Schedule II controlled substance, all

47

in violation of Title 21, United States Code, Section 841(a)(1) and Section

841(b)(1)(C).

## Count Eleven

On or about August 19, 2015, in the Northern District of Georgia, the

defendant, DONALD GLASS, knowingly possessed a firearm in furtherance of a

drug trafficking crime, as alleged in Count Ten of this Indictment, in violation of

Title 18, United States Code, Section 924(c)(1)(A)(i).

## Count Twelve

On or about August 6, 2015, in the Northern District of Georgia and

elsewhere, defendants SHAUNTAY CRAIG, ALVIS O'NEAL, JEREMIAH

COVINGTON, NICHOLAS EVANS, and JAMES TRAVIS RILEY, did willfully

combine, conspire, confederate, agree, and have a tacit understanding with one

another and with persons known and unknown to the Grand Jury, to violate

Title 21, United States Code, Section 841(a)(1); that is, to knowingly and

intentionally possess with intent to distribute more than 500 grams of a mixture

and substance containing a detectable amount of methamphetamine, all in

violation of Title 21, United States Code, Section 846; Section 841(a)(1); and

Section 841(b)(1)(A).

# FORFEITURE PROVISIONS

Upon conviction of the offense in violation of Title 18, United States Code, Section 1962 alleged in Count One of this Indictment, the defendants, SHAUNTAY CRAIG, aks "Shake," Or "Shakey,"Or "Shake G," Or "Big Bro," Or Dred"; ALONZO WALTON, aka "Spike"; MANGWIRO SADIKI-YISRAEL, aka "Iz,"or "Izzy,"; KEVIN CLAYTON, aka "KK,"; DONALD GLASS, aka "Smurf,"; LEWIS MOBELY, aka "OG,"; VERTUIES WALL, aka "Vert,"; RONALD MCMORRIS, aka "Detroit Red," or "Detroit," or "Red,"; TERRANCE SUMMERS, aka "T-Man,"; MARKELL WHITE, aka "Kell," aka "Markell Taylor,"; ALVIS O'NEAL, aka "Ebby,";ADRIAN JACKSON, aka "Blackjack,"; JEREMIAH COVINGTON, aka "Tre B,"; ANTONIO AHMAD, aka "Izzy,"; QUIANA FRANKLIN, aka "KiKi,"; FREDERICK JOHNSON, aka "Popino,"; CHARLES WINGATE,  aka "Carlos," aka "Los,"; VANCITO GUMBS; PERRY GREEN, aka "Lucky,"; ERIC MANNEY, aka "E"; YOHORI EPPS; CARLTON KING, JR.;KELVIN SNEED; ARRIE FREENEY; DENISE CARTER, aka "Loyal"; MYRICK STEVENS, aka "Breadwinner"; THOMAS PASBY, aka "Ayo"; CURTIS THOMAS; and MICHAEL DRUMMOND, aka "Savage," shall forfeit to the United States pursuant to Title 18, United States Code, Section 1963:

(a)    any interest acquired or maintained in violation of Section 1962;

(b)    any interest in, security of, claim against, or property or contractual right of any kind affording a source of influence over, any enterprise which the defendants established, operated, controlled, conducted, or participated in the conduct of, in violation of Section 1962; and

(c)   any property constituting, or derived from, any proceeds obtained, directly or indirectly, from racketeering activity in violation of section 1962, including, but not limited to, the following:

(a)   MONEY JUDGMENT:   A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable.

(b)   FIREARMS:

    (1)   Glock 26 9mm handgun, serial number BWZ987US;

    (2)   Colt Junior handgun, serial number 7677CC;

    (3)   Beretta BU9 Nano handgun, serial number NU053873;

    (4)   Glock 21 .45 caliber semi-automatic pistol, serial number LEN857;

    (5)   Romarm/Cugir semi-automatic rifle, serial number WASR-10 /1-68192-04;

    (6)   Glock 30 .45 caliber handgun, serial number TRD093;

    (7)   Ruger P95 9mm handgun, serial number 316-93351;

    (8)   Rossi 461 .357 caliber revolver, serial number ZL445811;

    (9)   AKM Semi-Automatic rifle, serial number CM01078;

    (10)  Smith & Wesson 12 Airweight .38 caliber handgun, serial number C435869;

    (11)  Diamondback DB89 9mm handgun, serial number YB55328;

(12)   Tapco USA 7.62 caliber handgun, serial number 1982S-AP1598;

(13)   Smith & Wesson SW40VE .40 caliber handgun, serial number RBN5001;

(14)   Taurus R352 .38 caliber handgun, serial number RG71045;

(15)   Glock 21 .45 caliber semi-automatic pistol, serial number KNR651;

(16)   DPMS Panther Arms rifle, serial number FH217876;

(17)   Davis Industries .380 caliber handgun, serial number AP294597;

(18)   Intratec .380 caliber handgun, serial number DO30224;

(19)   Glock 19 9mm handgun, serial number LEF226;

(20)   Beretta 92FS 9mm handgun, serial number BER408813Z;

(21)   Glock .357 caliber handgun, serial number PED454;

(22)   One bolt action rifle, serial number 2400073;

(23)   Taurus .38 caliber revolver, serial number ET454910;

(24)   Beretta 9mm handgun, serial number E659917;

(25)   Grendel .380 caliber handgun, serial number 07510;

(26)   Lorcin 9mm handgun, serial number L048041;

(27)   Taurus 9mm handgun, serial number T077729;

(28)   Sig Sauer 9mm handgun, serial number UU633832;

(29)   Smith & Wesson .38 caliber handgun, serial number 1182299;

(30)   North American .22 caliber firearm, serial number G49552;

(31)   Mossberg 12 gauge shotgun, serial number P385938;

(32)   GD 12 gauge shotgun, serial number 9600710;

(33)   Norcinco 7.62 caliber handgun, serial number 1615497;

(34)   Maverick 12 gauge shotgun, serial number MV08090S; and

(35)   Assorted ammunition.

Upon conviction of one or more of the offenses alleged in Counts Three, Five, Seven, Nine, and Eleven of this Indictment, the defendants, LEWIS MOBELY, ALONZO WALTON, LADERRIS DICKERSON, VERTUIES WALL, and DONALD GLASS, shall forfeit to the United States pursuant to Title 18, United States Code, Section 924(d) and Title 28, United States Code, Section 2461(c), any firearm and ammunition used in the commission of said violation.

Upon conviction of one or more of the offenses alleged in Counts Four and Ten of this Indictment, the defendants, LEWIS MOBELY and DONALD GLASS, shall forfeit to the United States pursuant to Title 21, United States Code, Section 853, any property constituting, or derived from, proceeds obtained, directly or indirectly, as a result of said violations and any property used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of said violations, including, but not limited to, the following:

(a)   MONEY JUDGMENT:   A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable.

52

(b)    FIREARMS:

(1)    Glock 19 9mm handgun, serial number LEF226;

(2)    Beretta 92FS 9mm handgun, serial number BER408813Z;

(3)    Maverick 12 gauge shotgun, serial number MV08090S;

(4)    Glock 26 9mm handgun, serial number BWZ987US;

(5)    Colt Junior handgun, serial number 7677CC;

(6)    Beretta BU9 Nano handgun, serial number NU053873;

(7)    Glock 21 .45 caliber semi-automatic pistol, serial number LEN857;

(8)    Romarm/Cugir semi-automatic rifle, serial number WASR-10 /1-68192-04;

(9)    Glock 30 .45 caliber handgun, serial number TRD093;

(10)    Ruger P95 9mm handgun, serial number 316-93351;

(11)    Rossi 461 .357 caliber revolver, serial number ZL445811;

(12)    Smith & Wesson 12 Airweight .38 caliber handgun, serial number C435869; and

(13)    Assorted ammunition.

Upon conviction of the offense alleged in Count Six of this Indictment, the defendants, ALONZO WALTON, ANTONIO AHMAD, and LADERRIS DICKERSON, shall forfeit to the United States pursuant to Title 18, United States Code, Section 982(a)(5), any property, real or personal, which represents or is traceable to the gross proceeds obtained, directly or indirectly, as the result of said violations, including, but not limited to, the following:

(a)    MONEY JUDGMENT:    A sum of money in United States currency representing the amount of proceeds obtained as a result of each offense, or conspiracy to commit such offense, for which the defendant is convicted.  If more than one defendant is convicted of an offense, the defendants so convicted are jointly and severally liable.

If, as a result of any act or omission of the defendants, any property subject to forfeiture:

(a)    cannot be located upon the exercise of due diligence;

(b)    has been transferred or sold to, or deposited with, a third person;

(c)    has been placed beyond the jurisdiction of the Court;

(d)    has been substantially diminished in value; or

(e)    has been commingled with other property which cannot be subdivided without difficulty;

the United States intends, pursuant to Title 18, United States Code, Section 1963(m) and Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b), and Title 28, United States Code, Section 2461(c) , to seek forfeiture of any other property of the defendants up to the value of the forfeitable property or seek a money judgment against said defendants for any amount that would constitute the proceeds of such violation.

A ___*TRUE*___ BILL

_____
FOREPERSON

JOHN A. HORN
*United States Attorney*


KIM S. DAMMERS
*Assistant United States Attorney*
Georgia Bar No. 425317


HANS B. MILLER
*Trial Attorney*
Florida Bar No. 12607


RYAN K. BUCHANAN
*Assistant United States Attorney*
Georgia Bar No.  623388


600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181