1

```
 1                  IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLORADO
 2
     Criminal Action No. 14-cr-0231-WJM-1
 3
     UNITED STATES OF AMERICA,
 4
         Plaintiff,
 5
     vs.
 6
     RICKY GARRISON,
 7
         Defendant.
 8
     -----------------------------------------------------------
 9
                         REPORTER'S TRANSCRIPT
10                       (Sentencing Hearing)

11   -----------------------------------------------------------

12        Proceedings before the HONORABLE WILLIAM J. MARTINEZ,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 8:49 a.m., on the 2d day of

15   February, 2018, in Courtroom A801, United States

16   Courthouse, Denver, Colorado.

17
                             APPEARANCES
18
          ZACHARY H. PHILLIPS and CELESTE B. RANGEL, Assistant
19   U.S. Attorneys, 1801 California Street, Suite 1600, Denver,
     Colorado 80202, appearing for the plaintiff.
20
          MILLER M. LEONARD, Miller Leonard, P.C., 14143 Denver
21   West Parkway, Suite 100, Golden, Colorado 80401 and
          SEAN M. McDERMOTT, McDermott, Stuart & Ward, LLP, One
22   Sherman Place, 140 East 19th Avenue, Suite 300, Denver,
     Colorado 80203, appearing for the defendant.
23
                     MARY J. GEORGE, FCRR, CRR, RMR
24             901 19th Street, Denver, Colorado 80294
               Proceedings Reported by Mechanical Stenography
25               Transcription Produced via Computer
```

P R O C E E D I N G S

(Call to order of the court at 8:49 a.m.)

THE COURT:  All right.  We're on the record in criminal case No. 14 cr 231, defendant No. 1, United States of America versus Ricky Garrison.  And I'll take appearances of counsel.

MR. PHILLIPS:  Good morning, Your Honor.  Zachary Phillips and Celeste Rangel on behalf of the Government.

THE COURT:  Good morning.

MR. LEONARD:  Good morning, Your Honor.  Miller Leonard and Sean McDermott appearing on behalf of Mr. Ricky Garrison, who appears in person and in custody.

THE COURT:  All right.  Good morning to the three of you.  Probation officer please identify himself for the record.

PROBATION OFFICER:  Gary Kruck.  Good morning, Your Honor.

THE COURT:  Good morning, Mr. Kruck.  Welcome.

All right.  At this time, Mr. Garrison, I'm going to have you rise and Ms. Hansen's going to administer an oath to you.

COURTROOM DEPUTY:  Please raise your right hand.

(Defendant sworn in)

THE COURT:  All right.  The record reflects that 11 months ago today, on March 2d, 2017, a jury returned a

1    verdict convicting Mr. Garrison on the following 20 counts

2    of the superseding indictment.  With respect to Count 1,

3    conspiracy to distribute with possession to -- with intent

4    to distribute one or more of the following controlled

5    substances:  More than 50 grams or less than 5 kilograms of

6    a mixture or substance containing a detectable amount of

7    cocaine; more than 28 grams but less than 280 grams of a

8    mixture or substance containing a detectable amount of

9    cocaine base; and less than 50 grams of a mixture or

10   substance containing a detectable amount of

11   methamphetamine, all in violation of 21 United States Code

12   Section 841(a)(1), (b)(1)(C), and 846.

13        I'll note for the record, however, that with

14   respect to Count 1, the jury did not find quantities of

15   drugs which triggered the mandatory minimum sentence under

16   the statute.

17        The jury also convicted of the -- the defendant of

18   the following counts, all of which asserted a use of a

19   communication device, telephone, in furtherance of a drug

20   trafficking felony in violation of 21 United States Code

21   Section 843(b) and (d).  And those are Counts 4, 5, 7, 8,

22   11, 13, 15, 16, 22, 23, 24, 25, 26, 30, 31, 39, 40, 41, and

23   42.

24        The jury acquitted Mr. Garrison of the remaining

25   counts the grand jury returned against him in the

1    superseding indictment.

2            We're here this morning for the sentencing of the

3    defendant.  Counsel, can you briefly summarize your

4    respective sentencing recommendations.  Let's hear from the

5    Government.

6            MR. PHILLIPS:  Your Honor, the Government believes

7    the defendant is a category 34 with Criminal History

8    Category of V, and as such, is looking at 235 to 293

9    sentencing guideline.  The Government would be asking for

10   240 months, and we will be asking that regardless where the

11   Court comes down.

12           THE COURT:  So the Government is seeking the

13   statutory maximum on Count 1?

14           MR. PHILLIPS:  That's correct.

15           THE COURT:  And then the telephone counts, the

16   sentences, what are you seeking with respect to those?

17           MR. PHILLIPS:  Your Honor, with those, we would

18   respectfully request the four years, but I believe that

19   those would have to run concurrent with the 20 years.

20           THE COURT:  All right.  And on supervised release?

21           MR. PHILLIPS:  We would ask for at least five

22   years, although, quite frankly, for this defendant I

23   believe that lifetime supervision would be appropriate.

24           THE COURT:  Is that --

25           MR. PHILLIPS:  Actually, let me double-check, Your

1    Honor.

2            THE COURT:  Is that permissible under the statute?

3    Let's see here.

4            MR. PHILLIPS:  I believe it's three years.  I

5    apologize, Your Honor.  We would ask for the three years.

6            THE COURT:  Okay.  So according to the sentencing

7    recommendation from Mr. Kruck, the statutory maximum

8    supervised release on Count 1 is actually -- it is three

9    years to life, and the statutory maximum for the telephone

10   counts are one year.  The guideline on supervised release

11   for Count 1 is one to three years and one year for the

12   telephone counts.  So --

13           MR. PHILLIPS:  Your Honor, I believe, again,

14   appropriately, at the minimum, I think five years, which

15   is -- the Court could do, but I do believe that given this

16   defendant and his history, that a lifetime supervision

17   would be the best thing for the safety of the community.

18           THE COURT:  All right.  So the Government

19   disagrees with the probation officer's recommendation of

20   three years on Count 1?

21           MR. PHILLIPS:  I do have to disagree with Mr.

22   Kruck.

23           THE COURT:  All right.  Great.  I'll take the

24   sentencing recommendation of the defendant.

25           MR. LEONARD:  Thank you, Your Honor.  The

6

1    defendant's requesting time served.  We have indicated in

2    our sentencing statement, as well as our objections to the

3    presentence report, that we believe that Mr. Garrison falls

4    into Criminal History Category III, offense level 20.  He

5    comes out to 41 to 51 months under our guideline

6    calculations.

7            As to any supervised release, we would ask for a

8    minimum term of supervised release.  We believe that that

9    satisfies the sentencing statutory analysis that the Court

10   has to conduct.

11           THE COURT:  So your position, Category III --

12   Criminal History Category III, that's after application of

13   a departure.  It's not your position that that's where he

14   comes before the Court as a Category III.

15           MR. LEONARD:  Correct.  We believe he comes before

16   the Court as a Category IV, but we believe that's an

17   overrepresented criminal history --

18           THE COURT:  Okay.

19           MR. LEONARD:  -- and would ask, both under the

20   guidelines and under 3553(a), that he be found having a

21   different Criminal History Category of III.

22           THE COURT:  All right.  And you're aware that the

23   probation officer determined his history to be a V?

24           MR. LEONARD:  We are, yes.

25           THE COURT:  Okay.  All right.  So let's turn first

1    to the Government's objections.  The Government filed three

2    objections.  The first one was the -- was an objection to

3    paragraph 64 of the report objecting to the probation

4    officer's failure to recommend a sentencing enhancement for

5    possession of a dangerous weapon.

6         Does the Government wish to add anything to its

7    written submission on objection No. 1?

8         MR. PHILLIPS:  Your Honor, I don't believe so.  We

9    state in there our position regarding the recovery of the

10   two guns during the search, as well as numerous phone calls

11   this Court heard, as well as testimony, and also would

12   remind the Court of the *United States v. Putra*, P-u-t-r-a,

13   at 117 Supreme Court 633, which is a very similar case

14   where in fact the defendant, although not convicted of gun

15   charges, the Court can find the two-point enhancement.

16        THE COURT:  All right.  Does the defendant wish to

17   be heard any further on the Government's objection No. 1?

18        MR. LEONARD:  Your Honor, first we would note that

19   the Court found, pursuant to our Rule 29 motion, that there

20   was a variant as to the conspiracy charged and to what was

21   found.

22        I would also note that the Government did not

23   establish temporal proximity between the weapon and any

24   drug trafficking activity.  We cited *United States v.*

25   *Zavalza-Rodriguez*, 379 F.3d 1182, at page 1185, Tenth

1    Circuit, 2004.

2            THE COURT:  All right.  With respect to

3    Government's objection No. 1 regarding the sentencing

4    enhancement for possession of a dangerous weapon, I agree

5    with the defendant that is -- for several reasons that the

6    sentencing enhancement should not apply.

7            First of all, his fingerprints were never found on

8    any of the firearms; there was no DNA evidence linking him

9    to those firearms.  The firearms were not found in

10   locations -- were found in locations that were not obvious

11   and there were no proof that Mr. Garrison had ever even

12   handled the seized weapons.

13           There's no evidence that the two -- the two

14   weapons were owned by Mr. Garrison and there's evidence

15   that they were found, in fact, in an apartment which the

16   defendant did not own and did not rent.  Finally, I find

17   that the Government has failed to show any -- as Mr.

18   Leonard has just pointed out, any temporal proximity

19   between the weapon and the drug trafficking activity of

20   which the defendant was convicted at trial.

21           So for those reasons, I am going to overrule the

22   Government's objection No. 1.

23           Turning to Government's objection No. 2, with

24   respect to the same paragraph of the report, the probation

25   officer's recommendation that there not be a sentencing

1    enhancement for maintaining the premises for a drug

2    trafficking or distribution purposes.  Does the Government

3    have any further argument on this objection?

4         MR. PHILLIPS:  Your Honor, I believe that's also

5    laid out in the Government's motion.  Clearly this

6    defendant used his residence as a place to both receive

7    cocaine and then cook the cocaine into crack cocaine.  The

8    Court heard that testimony at trial, as well as observed on

9    CCTV the drug trafficking company going from the residence

10   which was clearly used as a drug premise.

11        THE COURT:  Okay.  Further argument from the

12   defendant on this objection.

13        MR. LEONARD:  Your Honor, the focus and force of

14   our argument goes to whether or not the Government proved

15   primary use as to incidental use.  And the Court will

16   recall Mr. Garrison was acquitted of all of the substantive

17   distribution counts.

18        THE COURT:  Right.

19        MR. LEONARD:  The conspiracy charges, which he was

20   convicted of, covered a large range of months, and even if

21   you accept in the light most favorable to the Government

22   the evidence, the overwhelming use of the home, even under

23   the Government's evidence, was licit as opposed to illicit,

24   and for those reasons we would ask you to overrule the

25   objection.

1          THE COURT:  Can you cite me any case law that

2     takes some kind of proportionality test so if the licit

3     activities are 72 percent and the illicit are 28 percent,

4     that the sentencing enhancement doesn't apply, or anything

5     along those lines?

6          MR. LEONARD:  We cited the *United States v.*

7     *Johnson* case, Sixth Circuit case, which talks about primary

8     or principal use as opposed to incidental or collateral

9     use.  The *Johnson* case is 737 F.3d 444 at page 447, it's

10    2013 Sixth Circuit case.  I'm not aware of a mathematic

11    formula that any circuit court has broken down.

12          THE COURT:  Or any district court.

13          MR. LEONARD:  I'm not aware of any, Your Honor,

14    no.

15          THE COURT:  But incidental, what is -- tell me

16    what your interpretation of the cases that have construed

17    incidental such that the use or the maintaining of the

18    premises for these illicit purposes are so dimittimus such

19    that they are nothing more than incidental and, therefore,

20    in fairness, the enhancement should not apply.

21          MR. LEONARD:  Well, my assessment of the cases,

22    along with the comment note 17 of 2D1.1, is that the Court

23    needs to focus on the frequency that the premise was used

24    by a defendant for manufacturing and distributing a

25    controlled substance and how frequently the premise was

1    used by the defendant for a lawful purpose.

2          And so I think, as I read the case law, there is

3    no formula that we mathematically break down.  It is a

4    judgment call that the Court has to make in balancing what

5    is the more lawful use of the home versus what is the

6    unlawful use.  And in this case, I think that the evidence

7    was clear that the lawful use of the home far outweighed

8    the unlawful use.

9          THE COURT:  But isn't that almost always going to

10   be the case?  I mean, you'd have to be a heck of a criminal

11   to be committing crimes, you know, 16 hours a day, you

12   know, or eight hours a day.  It just -- life doesn't unfold

13   in that way.  There's crimes that are committed using -- in

14   this instance using a residence, but I don't see how, in

15   terms of the proportionality or weighing of percentage use

16   or the measurement of how its used, could be approaching

17   anything like a 50-50 measurement.

18          I think the way I read the cases is it's not so

19   much that -- that the use of the premises for lawful

20   reasons was primary, it's that the use for, in this case,

21   the distribution and maintenance of drug distribution

22   activities was more than just a incidental or one-off kind

23   of event.  And I don't see how else you can interpret these

24   cases, because I don't read them to be even suggesting that

25   if there is significant lawful activity going on, like

1    sleeping and watching TV and cooking meals, that somehow

2    that absolves the defendant of the enhancement that would

3    otherwise apply for nonincidental use of the premises for

4    criminal activity.

5            MR. LEONARD:  Well, I suppose this is one of those

6    cases where two lawyers are given the same fact pattern and

7    they see it in a different way.

8            THE COURT:  Well, your -- you're a lawyer and I'm

9    a judge.

10           MR. LEONARD:  That's correct.  Obviously in the

11   end your decision will carry more weight than mine, but

12   when I look at what the evidence was that was presented,

13   the Government never seized drugs, for instance, out of

14   this home.

15           The jury rejected the substantive counts that

16   would have occurred allegedly at the home.  The conspiracy

17   was not tied --

18           THE COURT:  Not necessarily.

19           MR. LEONARD:  -- just the home.

20           THE COURT:  Not -- I mean, why would the

21   distribution be limited to the premises?

22           MR. LEONARD:  Well, it wasn't, according to the

23   Government's theory, but the counts where the Government's

24   theory was that the distribution occurred directly from the

25   home were flat rejected by the jury.

1          THE COURT:  All right, I'll grant you that.  But

2     what about all the testimony from the codefendants of the

3     comings and goings from the premises and the dropping off

4     and purchasing and the closed circuit TV video, the

5     photographs that were introduced at trial, the testimony of

6     the agents that were surveilling the premises?  I mean,

7     clearly I can't ignore all that evidence.

8          MR. LEONARD:  Well, we -- the defense believes

9     that the codefendants' testimonies is unreliable and can't

10    be relied upon.  As for the Government agents, I heard

11    their testimony as well and none of them ever saw fit to

12    arrest anyone when they thought a drug deal was going down.

13    And, in fact, their evidence, when they go and talk to some

14    of these people to try to back up and buttress the phone

15    calls and the video that they have, the amounts change, the

16    amounts differ.

17          In fact, they represent to the Court at one point

18    that a 4-ounce sale is a 4-ounce sale and then it's a

19    4-gram sale.  I don't think any of it's believable.  I

20    think that's why the jury disregarded it and found the

21    defendant not guilty on all of the substantive distribution

22    counts.

23          THE COURT:  Okay.  Thank you.

24          Does the Government wish to be heard on this

25    objection?

1          MR. PHILLIPS:  Your Honor, just for the record, we

2    note that the Government did cite a number of cases in

3    document 1350 on page No. 8, which we believe establishes

4    that even where a full-time residence is used as a stash

5    house, where there's substantial drug trafficking, the

6    Court could find, in fact, the defendant used it as a stash

7    house.

8          In addition, we cited *United States v. Roybal* at

9    188 F.Supp 3d 1163, it's out of District of New Mexico in

10   2016, quoting *Miller*, which was in the previous cite, where

11   Congress has intended to deter manufacturing and

12   distribution of illegal drugs in crack houses where

13   children are being raised.  In fact, the Court heard

14   testimony, in fact, during a period of time where Mr.

15   Garrison was at that residence, his girlfriend, or common

16   law wife at the time, also had a child there.

17         In addition, addressing defense counsel's concerns

18   about the jury finding the defendant not guilty of the

19   substantive counts, in fact what the Court has here, which

20   is by a preponderance of the evidence not beyond a

21   reasonable doubt, they did find him guilty beyond a

22   reasonable doubt of the conspiracy, and the preponderance

23   of the evidence clearly establishes he was using his

24   residence as a stash house.

25         THE COURT:  Okay.  Thank you.  All right.  I agree

1   with the Government that at trial numerous witnesses

2   testified that they regularly either dropped off or

3   received illegal narcotics from the defendant at his

4   residence on East 13th Avenue in Aurora, Colorado.

5           This testimony was confirmed through the use of

6   still pictures, closed circuit TV video, as well as agent

7   testimony that confirmed that drug transactions regularly

8   took place at the defendant's residence throughout the

9   course of the conspiracy.

10          So the Government's objection to the lack of a

11   sentencing enhancement on account of the defendant

12   maintaining a premise for the purpose of manufacturing or

13   distributing a controlled substance is sustained.  As a

14   consequence, a two-level increase in the total offense

15   level is appropriate.

16          Quickly dealing with objection No. 3 from the

17   Government on paragraph 101 with respect to whether the

18   defendant has a great relationship with Ms. Christy Pearce,

19   the mother of his six-year-old daughter, that objection's

20   overruled.  The Government has failed to introduce, in my

21   view, any evidence that the defendant's actions required

22   law enforcement to protect Ms. Pearce or her home in

23   Michigan.

24          All right.  Let's turn to the objections to -- or

25   by the defendant.  There were 33 objections filed by the

1    defendant.  Mr. Leonard, Mr. McDermott, you should know

2    that is a record for any case I've ever sentenced a

3    defendant on.

4         We don't have time this morning to hear additional

5    argument on every single one of these 33 objections and I

6    suspect we don't have additional argument on all of them.

7    So what I'm going to ask you to do is use your discretion

8    and only ask me to hear additional argument on the more

9    important or critical objections.  The other ones I will

10   just go ahead and rule on without further argument.

11        And I'm going to -- so what I thought would make

12   the most sense is I'm going to take these in chunks, or

13   packages of five.  So, for example, we'll start with

14   objections 1 through 5, and then I'll ask counsel if they

15   have any objection to 1 through 5, and then we'll proceed

16   in that fashion through all 33.  All right.

17        Mr. Leonard, does the defendant have any

18   additional arguments on any of its objections 1 through 5?

19        MR. LEONARD:  Your Honor, I believe I've laid it

20   out as best I can.

21        THE COURT:  Okay.  Does the Government wish to be

22   heard on objections 1 through 5?

23        MR. PHILLIPS:  No.  Thank you, Your Honor.

24        THE COURT:  All right.  So objection No. 1

25   regarding the statement that -- in the report that Mr.

1    Garrison was found guilty of Count 1 as charged, I'm going

2    to sustain the objection to the extent the Government

3    concedes that the jury did not find that the conspiracy

4    encompassed an amount of drugs requiring a mandatory

5    minimum sentence; however, Mr. Garrison was found guilty of

6    Count 1, not of some lesser-included offense, so the

7    objection is otherwise overruled.

8         With respect to objection No. 2 and the statement

9    that Mr. Garrison on page 2 of the report was arrested on

10   May 28th, 2014, I'm going to sustain that objection.  The

11   record does reveal that Mr. Garrison was arrested on May

12   23d, 2014, and immediately taken into custody.

13        With regard to objection No. 3 as it pertains to

14   paragraph 1 of the report, again, the statement that Mr.

15   Garrison was found guilty of Count 1 as charged is -- that

16   objection's sustained in part and overruled in part for the

17   same reasons that I discussed with respect to objection No.

18   1.

19        With respect to objection No. 4 regarding various

20   statements in paragraphs 5 through 58 of the report

21   regarding Mr. Garrison's guilt and the scope of the

22   conspiracy, I am going to overrule this objection for the

23   reasons that it is grossly overbroad, incredibly vague, and

24   does not come close to having the specificity necessary for

25   me, to allow me to make a considered, informed and

1   factually based ruling.

2        With respect to objection No. 5 regarding

3   paragraph 7, the reference in the report that codefendant

4   Christopher Martinez was Mr. Garrison's main source of

5   supply for methamphetamine and that codefendants Travis

6   Edwards and James Tillmon were sources of cocaine for the

7   defendant, with respect to codefendant Christopher

8   Martinez, the objection is sustained.

9        Our review of the record shows no evidence that

10  this codefendant was, in fact, Mr. Garrison's main source

11  of supply for methamphetamine.  With respect to

12  codefendants Edwards and Tillmon, the objection is

13  overruled.  In my view, there is sufficient evidence in the

14  record to support the statement in the report that Messrs

15  Edwards and Tillmon had dealings with and were sources of

16  cocaine for Mr. Garrison.

17        All right.  Any further argument from the

18  defendant on objections 6 through 10?

19        MR. LEONARD:  No.  Thank you, Your Honor.

20        THE COURT:  All right.  Does the Government wish

21  to be heard on defendant's objections 6 -- wish to be heard

22  further on the defendant's objections 6 through 10?

23        MR. PHILLIPS:  No.  Thank you, Your Honor.

24        THE COURT:  All right.  All right, let me take up

25  objection No. 6 pertaining to statements in the report

1   found at paragraphs 12, 13, and 14 regarding codefendants

2   James Tillmon's, Christopher Martinez's and Gregory

3   Williams' drug distribution actions as they relate to this

4   defendant.  The objection is overruled.  In my view,

5   there's sufficient evidence in the record to support the

6   statements of the probation officer in paragraphs 12

7   through 14 of the report.

8           I agree with the Government that the defendant is

9   just simply wrong to argue that at sentencing I'm limited

10  solely to the evidence and facts presented at trial and

11  found by the jury beyond a reasonable doubt.  In my view,

12  again, I agree with the Government, the case law is crystal

13  clear that I can consider and take judicial notice of the

14  complete record in the defendant's case and consider those

15  factors in light of the preponderance of the evidence

16  standard and which is what I'm doing here with respect to

17  objection No. 6.

18          With respect to objection No. 7 regarding

19  paragraph 16 of the report and statements in that paragraph

20  pertaining to codefendant Sidney Taylor's receipt of drugs

21  from Mr. Garrison, that objection's overruled.  In my view,

22  there's sufficient evidence in the record to support these

23  statements in the report, especially given, again, that I'm

24  not limited to the evidence presented at trial.

25          Turning to objection No. 8 regarding paragraph 36

1       of the report, and specifically to the statement in

2       paragraph 36 that says, quote, Garrison typically

3       distributed powder cocaine and methamphetamine primarily to

4       defendant James Tillmon and also distributed cocaine to

5       codefendants Gregory Williams, Sidney Taylor, Latoya

6       Wimbush, and Robert Painter.  Tillmon, in turn, distributed

7       methamphetamine to Painter.  There's evidence that Garrison

8       was also distributing marijuana in Michigan, end quote.

9              I'm going to sustain and overrule this objection

10      in part.  So I'm going to sustain the reference in the

11      paragraph to what the defendant's typical practice is.

12      There's no evidence in the report to support that specific

13      characterization, in my view.  It's overruled with respect

14      to the reference to Mr. Garrison's distribution to Mr.

15      Williams, Taylor, Ms. Wimbush, and Mr. Painter.  In my

16      view, there's sufficient evidence in the record to support

17      these statements in paragraph 36 of the report.

18             The objection's sustained with respect to the

19      statement as to whether Mr. Tillmon distributed

20      methamphetamine to Mr. Painter, and sustained, as well,

21      with regard to the statements pertaining to Mr. Garrison's

22      alleged plain distribution in Michigan.  And as to these

23      statements, in my view there's not sufficient evidence in

24      the record to support them.

25             With respect to objection No. 9 regarding

1    paragraph 35 of the report having to do with the summary of

2    the investigation, this objection's overruled.  I agree

3    with the Government that the information contained in

4    paragraph 35 of the report summarizing the investigation in

5    this case is true and accurate.

6            With respect to objection No. 10 regarding

7    paragraph 37 of the report, with respect to claims about

8    the amounts Mr. Garrison purchased every so many days or so

9    many weeks and that Mr. Garrison was a Gangster Disciple

10   member who was involved in prostitution, guns, and

11   robberies and that his main source of supply may have been

12   in Mexico.  With respect to the portion of that referenced

13   statement that pertains to Mr. Garrison's membership in the

14   Gangster Disciple's gang, I am going to overrule that

15   objection.  In my view, there's sufficient evidence in the

16   record to support that statement.  And, again, I'm not

17   limited to the evidence presented at trial.

18           With respect to all the remaining statements in

19   paragraph 37, however, I am sustaining the objection.  I

20   agree with the defendant that there's not sufficient

21   evidence in the record to support these additional

22   assertions.  And I will note with respect to the statement

23   involving prostitution, that the jury did acquit the

24   defendant of the Man Act count.

25           All right.  Does the defendant have any additional

1     argument with respect to objections 11 through 15?

2              MR. LEONARD:  No.  Thank you, Your Honor.

3              THE COURT:  All right.  Does the Government wish

4     to be heard on objections 11 through 15?

5              MR. PHILLIPS:  No.  Thank you, Your Honor.

6              THE COURT:  Okay.  Objection No. 11 regarding

7     paragraph 39, Mr. Tillmon's history of purchases and sales,

8     I'm going to sustain the objection, for lack of sufficient

9     supporting evidence, the statements pertaining to Mr.

10    Tillmon's methamphetamine sales to Mr. Painter, as well as

11    to what Mr. Tillmon's alleged typical practice was; in all

12    other respects, however, this objection is overruled.

13             With respect to objection No. 12 regarding

14    paragraph 40 pertaining to Christopher Martinez's history

15    of purchases and sales, I'm going to sustain the objection

16    for lack of sufficient supporting evidence, that's

17    regarding the statements pertaining to Mr. Martinez's

18    alleged typical frequency of acquiring and reselling

19    methamphetamine; however, in all other respects, that

20    objection is overruled.

21             With respect to objection 13 regarding the

22    statements in paragraph 41 of the report pertaining to

23    codefendant Francisco Aguilar's history of purchases and

24    sales, I'm going to sustain that portion of the objection

25    with -- which makes reference to Mr. Aguilar's alleged

1    weekly practice of supplying certain amounts of cocaine to

2    Mr. Garrison, for lack of sufficient supporting evidence.

3    In all other respects, however, this objection's overruled.

4         With respect to objection 14 regarding paragraph

5    43 of the report, Chris -- codefendant Christopher Vigil's

6    history of purchases and sales, I am going to overrule this

7    objection as moot.  The defendant does not object to the

8    factual content of this paragraph but only that it fails to

9    note that while firearms were found at codefendant

10   Christopher Vigil's residence, that he did not receive a

11   sentencing enhancement as a result.

12        Given that I have overruled the Government's

13   objection No. 1, which similarly sought to increase Mr.

14   Garrison's offense level based on possession of a firearm,

15   so this defendant will likewise not receive any sentencing

16   enhancement based on any alleged possession of any firearm.

17   And so, in my view, this objection is moot and overruled as

18   such.

19        With respect to objection 15 regarding paragraph

20   44 of the report in codefendant Travis Edwards' history of

21   purchase and sales, I'm going to sustain for lack of

22   sufficient supporting evidence the generic accusation that

23   Mr. Edwards purchased powder cocaine from the defendant.

24   In all other respects, this objection is overruled.

25        I have to compliment defense counsel, nothing --

1    you're incredibly thorough.

2            Okay.  Objections 16 through 20, does the

3    defendant wish to be heard any further on these objections?

4            MR. LEONARD:  One second, Your Honor.

5            THE COURT:  Sure.

6            MR. LEONARD:  I only wish to be heard as to

7    paragraph 19.

8            THE COURT:  All right.  Let's turn to that.  Okay.

9    Just for the record, objection 19 is an objection in

10   paragraph -- an objection to paragraph 58 of the report

11   given that there's no reduction in the offense level for

12   alleged acceptance of responsibility in the report.

13           Go ahead, Mr. Leonard.

14           MR. LEONARD:  Your Honor, the position of the

15   defendant, as stated both in our response, but also orally,

16   is that when the Government broadly overcharges, the

17   defendant is left in a horrific position of either going to

18   trial or admitting to facts which were not found at trial,

19   which legally the Court said didn't -- weren't approved, as

20   there was a variant.

21           And also this is a case where I think the abuse of

22   mandatory minimums is present.  The mandatory minimum in

23   this case as charged is used as a lever.  We see it with

24   the codefendants who testify, who then their testimony is

25   all over the board from what they say in the beginning to

1    what they say at trial.  And Mr. Garrison, as the Court's

2    aware, he didn't want to cooperate, he didn't want to sit

3    down with the Government, and so his position is to either

4    accept the mandatory minimum charge or go to trial.

5         And we believe he's been vindicated by his trial

6    in what the jury found and that he should get acceptance of

7    responsibility because he had no other choice.

8         THE COURT:  Well, let me say this -- first, let me

9    ask the Government, does the Government wish to be heard on

10   this objection?

11        MR. PHILLIPS:  Your Honor, we did brief this, but

12   as the Court has noted as it's gone through paragraph after

13   paragraph after paragraph the defendant objected to,

14   there's nothing in the record that shows he's taking any

15   sort of responsibility at all in this case.  As such, in

16   the case law as well as the footnote that we noted in our

17   response in 1360, paragraph 19, in fact this should be

18   overruled.

19        THE COURT:  All right.  Well, let me address your

20   comments directly, Mr. Leonard.  At least with respect to

21   the assertion that prosecuting offices in this country on

22   the federal and state level, some of them are overcharging,

23   as you put it, defendants and causing them or forcing them

24   to a position where, as a practical matter, they have no

25   option but to plead guilty, that's been the source of a lot

1    of articles in the literature, a lot of criminal law

2    professors at the nation's law schools have written

3    extensively on this, and I think reasonable people can

4    differ on that issue.  And I think there's evidence,

5    especially in some jurisdictions, that what you described

6    does, in fact, go on and go on very frequently.  I question

7    how frequently that happens in this district, happily.

8    However, I've never seen a case that says that one way to

9    resolve that dilemma is by, in my view, artificially

10   ascribing acceptance of responsibility to the defendant as

11   a means to address that dilemma.

12         Whatever -- I think what the -- however unlikely

13   it may be that this would ever happen, the solution to what

14   you're talking about is -- has to come from the prosecuting

15   and charging offices in this country in terms of

16   reassessment and reexamination of their charging practices.

17   I don't believe that the relief, the cure, for this

18   dilemma, at least from a defendant's perspective, comes in

19   the form of giving the defendant a reduction in the offense

20   level for acceptance of responsibility similar to what was

21   given to the codefendants who pled guilty, because, in

22   fact, I would be granting a reduction based on a factually

23   untrue assertion.

24         Putting aside the dilemma that you well-described,

25   it is just simply not true that Mr. Garrison has accepted

1    responsibility in this case.  So I can't -- I can't, in my

2    view, discharge my duties of this office and give the

3    defendant a two-level reduction -- three-level reduction in

4    the offense level for -- or predicated and premised on a

5    falsehood.  And I'm not going to do that.

6         So I'm going to overrule objection No. 19.  Mr.

7    Garrison cites no support for his contention under Section

8    3E1.1, application note 2, that it -- that that application

9    note applies when the Government purportedly overcharges a

10   case and supposedly gives the defendant no option but to go

11   to trial.

12        Do you have any other objection to any of the

13   other objections in this group of five?

14        MR. LEONARD:  No.  Thank you, Your Honor.

15        THE COURT:  All right.  Does the Government wish

16   to be heard on any of the other objections in this grouping

17   of five?

18        MR. PHILLIPS:  No.  Thank you, Your Honor.

19        THE COURT:  All right.  Let's go back to objection

20   16 regarding paragraph 46, Archie Poole's history of

21   purchases and sales.  I'm going to sustain for lack of

22   sufficient supporting evidence the statement, quote,

23   additional transactions related to methamphetamine and

24   cocaine, in which he, Mr. Poole, was not charged, end

25   quote.  In all other respects, the objection is overruled.

1          With respect to objection 17 regarding paragraph

2    47 and Louis Ramirez's history of purchases and sales, this

3    objection's overruled.  In my view, there's sufficient

4    evidence in the record to support these statements in

5    paragraph 47, again, given that I'm not limited to the

6    evidence presented at trial.

7          With respect to objection 18 to paragraphs 48 and

8    49 regarding codefendants Melvin Turner's and Shawn

9    Beardsley's history of purchases and sales, I'm going to

10   sustain for lack of sufficient supporting evidence the

11   statement -- the specific statement that codefendant

12   Beardslee cooked methamphetamine in his residence.  Other

13   than that and in all other respects, the objection is

14   overruled.

15         I've already ruled on objection 19.

16         With respect to objection 20 regarding

17   paragraph 60, the quotation of Count 1 of the superseding

18   indictment, I'm going to overrule this objection.  I agree

19   with the probation officer that the language in

20   paragraph 60 is simply a verbatim quotation from the

21   superseding indictment and it does not state nor can it be,

22   in my view, reasonably read to imply that the defendant was

23   convicted of distributing a quantity of controlled

24   substances requiring the imposition of a mandatory minimum

25   sentence.

1          Elsewhere, I note for the record, the report makes

2     it perfectly and abundantly clear that the defendant's

3     conviction on Count 1 did not trigger a mandatory minimum

4     sentence.

5          All right.  Does the defendant have any additional

6     argument in objections 21 through 25?

7          MR. LEONARD:  only as to 21, Your Honor.

8          THE COURT:  Go ahead.

9          MR. LEONARD:  Your Honor, the defendant, even if

10    using the preponderance of the evidence standard as

11    mandated by the guideline, would assert that there is no

12    way to have sufficient evidence that comes to a base level

13    offense of 30.  Specifically we would point to the fact

14    that as the presentence report indicates, the Court heard

15    the evidence and you heard the cooperating codefendants

16    testify.  Their amount of drugs was never consistent.

17         If there's anything they were consistent about was

18    that they cannot come up with a number that they actually

19    would agree upon, even among themselves.  What's troubling

20    is that Mr. Aguilar pled guilty before this Court in a

21    signed document which he indicated was true and accurate

22    wherein he misrepresented substantially an amount that was

23    transacted.  He -- he said in that document that it was 4

24    ounces.  Then he changes his testimony to be 4 grams.  The

25    amounts just can't be verified.  It doesn't matter if we're

1    looking at beyond a reasonable doubt or if we're using a

2    preponderance of evidence standard.

3         Using -- taking the evidence as a whole in the

4    light most favorable to the Government, all I think that

5    one can conclude is that there were drugs transacted.  As

6    to the amounts, trying to reach a specificity, I think it's

7    impossible.

8         THE COURT:  Well, before you sit down, let's

9    recognize something that the guidelines prescribe offense

10   levels based upon on a range of quantity of drugs based on

11   marijuana equivalency, so first of all, it's not the case

12   that, for example, it necessarily causes a change in the

13   sentencing guideline if we just eliminate and ignore Mr.

14   Aguilar's testimony because it still could come within a

15   range, and it's a broad range.  And what I'm looking at

16   is -- and based on what the Government submitted in its

17   sentencing statement and its marijuana equivalency

18   calculations, that what I have to be satisfied is that

19   there is evidence that came in at trial on a beyond a

20   reasonable doubt standard of sufficient -- of a sufficient

21   total amount of drugs to get us to the base -- I shouldn't

22   use that word -- the minimum threshold to trigger, in this

23   case, the recommended offense level of 30.

24        In my view, the Government in its sentencing

25   statement did an excellent job of putting that together,

1   collecting the information, collecting the evidence, doing

2   the mathematical calculations on the equivalency and

3   showing how the -- even at the low end of the range of the

4   testified quantity amounts that were in the base level 30

5   guideline range.  I did not see from the defendant a

6   comparable and contrasting calculation of what the

7   defendant believes should be, other than the statement that

8   I should believe none of the codefendant's testimony, they

9   all had reason and incentive to lie based on their

10   cooperation agreements.  And so, therefore, in effect the

11   defendant's argument is there is zero evidence of any

12   quantity of drugs.  And that -- I'm just simply not going

13   to accept that.

14          Had the defendant parsed it out a little more

15   reasonably, in other words as -- if you had, in response to

16   the Government's sentencing statement -- and, again,

17   there's no specific response to the Government's

18   calculations and quantity analysis in terms of the

19   equivalency, other than to say I should accept none of

20   it -- if you, for example, had shown me, well, if we

21   exclude Mr. Aguilar and -- and I can see there is some

22   troubling aspects to his testimony -- if we pull his

23   numbers out, then that necessarily gets us to a lower

24   offense level.  But that was not done and I'm not going to

25   do that work for the defendant, and there's just simply no

1    controverting evidence or calculations and argument to

2    rebut the Government's sentencing statement calculation.

3            MR. LEONARD:  Your Honor, the defense's position

4    was that the highest level that could be reasonably

5    ascertained either under a reasonable doubt standard or a

6    preponderance of the evidence is the highest level that the

7    jury came to, which was Level 22.  And the reason that Mr.

8    McDermott and I didn't sit down and do a comparable

9    analysis was simply because I am unable to pick out between

10   any of the testifying and cooperating codefendants what is

11   truthful and what isn't.

12           THE COURT:  Well, see, that's -- that's, I think,

13   the problem with defendant's approach on this point,

14   because I don't believe that all defendants -- all these

15   defendants were created equal in terms of their veracity on

16   the stand.  And I think there was -- there were some that I

17   found very credible, and there was no controverting

18   evidence.  And -- and I think that it's just wrong, based

19   on the evidence at trial, to lump them all together to --

20   either I accept -- I accept all of their testimony or

21   reject all of their testimony.  And that, I don't believe,

22   is warranted based on how the evidence came in at the

23   trial.

24           MR. LEONARD:  It's one of those things we

25   respectfully disagree, Your Honor.

1          THE COURT:  Okay.  The Government wish to be heard

2     on objection 21?  And, actually, just for the record, 21 --

3     we're dealing with 21, Mr. Leonard, and 22 together because

4     they both -- 21 and 22 are your objections to the base

5     level of 30 recommended by the probation officer.

6          MR. LEONARD:  Correct, Your Honor.

7          THE COURT:  Okay.  So does the Government wish to

8     be heard further on the objections 21 and 22?

9          MR. PHILLIPS:  Nothing further than as to say the

10    Government likes it when the Court steals the Government's

11    thunder and refers back to document 11 and the calculations

12    in there giving the Court at the base level and at the

13    highest level.

14         THE COURT:  Yeah.  Okay.  I think you folks did a

15    good job on that.

16         All right.  Given my ruling on the Government's

17    objection No. 2, in which I have increased the defendant's

18    offense level to 32, these two objections are necessarily

19    overruled because surely if the offense level is 32,

20    they're not -- it's not 22, both for the reasons I stated

21    in my sustaining the Government's objection No. 2, as well

22    as the colloquy I just had with counsel with respect to the

23    evidence -- the argument and the calculations and analysis

24    that the Government has done with respect to the testimony

25    at trial that supports a minimum finding of the amount of

1    the drugs attributable to this defendant sufficient to

2    trigger a base offense level of 30 and then enhanced to 32.

3         All right.  Turning to objection 23 regarding the

4    statement in paragraph 73 of the report with respect to Mr.

5    Garrison's 2003 conviction, as to whether his 2003

6    conviction was a felony, I'm going to overrule this

7    objection as the grounds for this ruling and as the -- and

8    as the grounds for this ruling I adopt the reasons stated

9    in the Government's and the probation officer's responses

10   to this objection.

11        With respect to objection 24 regarding statements

12   in paragraph 4 of the report that the defendant's 2006

13   conviction was for drug use, again, I'm going to overrule

14   this objection and, as grounds for this ruling, I'm

15   adopting the reasons stated in the Government's and the

16   probation officer's responses to this objection.

17        With respect to objection 25 regarding paragraphs

18   74 and 76 of the report, pertaining, again, to Mr.

19   Garrison's purported 2006 conviction for a drug abuse

20   offense and his 2008 conviction for damage to private

21   property, I am going, again, to overrule this objection

22   as -- and as the grounds for the ruling, I'm going to adopt

23   the reasons stated in the Government's and the probation

24   officer's responses to this objection.

25        All right.  Does the defendant have any additional

1    argument on objections 26 through 30?

2              MR. LEONARD:  No, Your Honor.

3              THE COURT:  All right.  Does the Government wish

4    to be heard on objections 26 through 30?

5              MR. PHILLIPS:  No.  Thank you, Your Honor.

6              THE COURT:  All right.  With regard to objection

7    26 regarding paragraph 76 of the report, as it pertains to

8    Mr. Garrison's 2008 conviction for damage to private

9    property, I'm going to overrule this objection and, as

10   grounds for this ruling, I adopt the reasons stated in the

11   Government's and probation officer's responses to this

12   objection.

13             With respect to objection 27 regarding paragraph

14   80 of the report pertaining to Mr. Garrison's 2009

15   conviction for public indecency, I am going to overrule

16   this objection and, as grounds for the ruling, I am

17   adopting the reasons stated in the Government's and the

18   probation officer's responses to this objection.

19             With respect to objection 28 regarding paragraph

20   87 of the report that the defendant was on probation for a

21   DWAI conviction when he was arrested on the 23d of May of

22   2014, I'm going to again overrule this objection and, as

23   the grounds for the ruling, I adopt the reasons stated in

24   the Government's and probation officer's responses to this

25   objection.

1            With respect to objection 29 regarding paragraphs

2    90 and 92 of the report wherein the probation officer has

3    assessed a subtotal criminal history points of IX and a

4    total criminal history points of XI to the defendant, given

5    my prior rulings overruling the defendant's objections as

6    to the assessment of the individual criminal history

7    points, this objection to the summation of the total -- the

8    subtotal and the total criminal history points is

9    necessarily overruled.

10           With respect to objection 30 claiming that Mr.

11   Garrison deserves a downward departure of his Criminal

12   History Category under guideline Section 4A1.3(b), I'll

13   just ask you again, Mr. Leonard, do you wish to be heard

14   any further on this?

15           MR. LEONARD:  No.  Thank you, Your Honor.

16           THE COURT:  All right.  So just so I understand

17   your argument, because I don't know that you -- well, is it

18   your position that there should be a downward departure

19   from 5 to 3 because a -- that Category V overrepresents the

20   seriousness of your client's criminal history?

21           MR. LEONARD:  That is my argument, Your Honor.

22           THE COURT:  All right.  Is it also in conjunction

23   with an argument that the total criminal history points

24   and, therefore, the Criminal History Category, should be

25   lower because some of the individual assessed points for

1    the convictions I just went through, the 2003, 2006, 2008,

2    2009 convictions, that there's something infirm or legally

3    objectionable about those convictions?

4           In other words, are you challenging any of the

5    individual criminal history points that totaled 11 which

6    got us to the Criminal History Category of V?

7           MR. LEONARD:  We certainly challenge the -- I

8    believe it's the -- the incident of exposing one's self, or

9    I can't remember the exact --

10          THE COURT:  Public indecency.

11          MR. LEONARD:  Public indecency.  That was handled

12   all through the mail; he didn't have counsel.  So we just

13   don't think it's ripe for points to be assessed.

14          THE COURT:  Okay.  Again, I'm just asking for

15   clarification.  Is it -- is that also your argument as to

16   why there should be a downward departure in the Criminal

17   History Category?

18          MR. LEONARD:  Yes, Your Honor.

19          THE COURT:  Okay.  Does the Government wish to be

20   heard on whether -- on the appropriateness of a downward

21   departure in the Criminal History Category?

22          MR. PHILLIPS:  If I may get one moment, Your

23   Honor.

24          THE COURT:  Sure.

25          MR. PHILLIPS:  Your Honor, we believe that the

1    probation department correctly calculated the defendant's

2    criminal history.  Underrepresentation is when there's like

3    a speeding charge that gets counted for some reason or

4    something of that nature.  Here what we have is a defendant

5    who's convicted of a weapons charge.  The public indecency

6    charge actually notes that he was represented by counsel,

7    according to the probation department's report.  He's also

8    got reckless operation -- I'm sorry, damage to property.

9    Those sort of things are exactly what the criminal history

10   calculations are for, and this Court has done a very

11   thorough, complete job of going through each one of those

12   and properly assessing the points and, in fact, he comes

13   out in the middle of category history -- criminal history

14   No. V, with a score of 11, and we believe as such he is a

15   criminal history V.

16           THE COURT:  Okay.  I am going to overrule

17   objection No. 30 and deny a -- what I would construe as a

18   motion under Section 4A1.3(b)(4)(A), downward departure of

19   the Criminal History Category.  I'm overruling the

20   objection and denying the construed motion because, in my

21   view, the defendant has failed to discharge his burden of

22   convincing me of the appropriateness of a downward

23   departure in this case from a Criminal History Category of

24   V to III.

25           From my prior rulings it should be clear that in

1    my view all of the 11 total criminal history points

2    assessed against the defendant were proper and warranted

3    given the facts and circumstances of the defendant's prior

4    criminal history.

5         In addition, in my view Mr. Garrison does not come

6    close to establishing that a Criminal History Category of V

7    substantially overrepresents the actual seriousness of his

8    criminal history.

9         All right.  Any further -- our last group, 31

10   through 33, any further argument from the defendant?

11        MR. LEONARD:  Only on 32, Your Honor.

12        THE COURT:  Go ahead.

13        MR. LEONARD:  Your Honor, the objection to --

14   found at paragraph 32, which appears on our 4, is to the

15   characterization of Mr. Garrison as a gang member, as well

16   as that characterization anywhere else within the

17   presentence report.

18        This is a matter we litigated some discovery on

19   this, whether or not they had any evidence that Mr.

20   Garrison was a member of the Gangsters Disciples.  The

21   evidence in the discovery, especially in the applications

22   for the Title 3 wiretap, says he's a suspected member.

23   There's a police report in discovery where it said that he

24   had a falling out with the Gangster Disciples, and then the

25   Government --

1           THE COURT:  Well, doesn't that -- doesn't that

2     show -- well, implicit in that statement, if there's a

3     falling out, there was membership at some time.

4           MR. LEONARD:  No, actually I don't think that's

5     the case.  And that's what we're trying to get at, is:  Was

6     he a member that gets kicked out or is he somebody who

7     knows the Gangster Disciples, people who are actually part

8     of the Gangster Disciples, and then there's a falling out?

9           But one of the things that the Government attempts

10    to use to bolster the Gangster Disciples' argument, and

11    that my client is part of the Gangster Disciples, is an

12    indictment out of the Northern District of Georgia.  And

13    that indictment specifically lays out the structure of the

14    Gangster Disciples.  It's pretty interesting.  Talks about

15    ranks, how people get into the gang.  Nothing like that was

16    ever produced either in discovery, in the presentence

17    report, or at trial concerning my client.  None of it.

18          So they allege that there's a gang called the

19    Gangsters Disciples that is a well-founded organization

20    that has a structure, that evidently is known both within

21    the gang and to law enforcement.  It's known such to law

22    enforcement that they can detail who people are within this

23    gang and yet they can't tell me who Mr. Garrison is as part

24    of this gang.  Is he a governor, is he somebody who is in

25    the process of being affiliated?  Is he in the process of

1    being initiated?

2              This -- none of that was provided.  It doesn't

3    exist because he's not a member of the gang.

4              THE COURT:  All right.  Mr. Phillips, can you,

5    just for the record, summarize for me what the Government

6    believes is the evidence it has that Mr. Garrison was at

7    least at some point in time a member of the Gangster

8    Disciples?

9              MR. PHILLIPS:  Your Honor, during the course of

10   this investigation -- well, let me start with it's always

11   hard to establish whether a person is a gang member or not

12   given the fact that it's not like being part of the bar

13   association.  You can't go to the Colorado Supreme Court

14   and pull up 31251 and say Zachary Phillips is a part of

15   the -- is admitted to the Colorado bar.

16             However, during the entire course of this

17   investigation, the Court has the wiretaps, the

18   investigative reports, the pretrial sentence report and the

19   evidence at trial, the 403 evidence at trial, that, in

20   fact, this defendant is a member of the Gangster Disciples.

21   Whether he had a falling out, that is purely based on phone

22   intercepts where they -- during the course of the

23   intercepts and investigation, there were text messages

24   calling for a meeting for everyone in the Gangster

25   Disciples to go to a particular meeting, and Mr. Garrison's

42

1    part of that string of text messages and the fact of being

2    called to the meeting.

3         Then during the course of the intercepts there's

4    also additional intercepts where he expresses, over the

5    phone, that, you know, They don't want me doing my own

6    thing so I'm going to do my own thing and they just have to

7    deal with it.

8         And, in fact, we do know that the indictment of

9    the Gangster Disciples in Atlanta involve particular people

10   from Colorado who, when they went to Atlanta and the

11   Alabama area to help bolster and, quite frankly, got higher

12   ranks in the Gangster Disciples, that were directly

13   involved prior to the actual charging document in our

14   case --

15        THE COURT:  These are unindicted individuals?

16        MR. PHILLIPS:  These are indicted individuals that

17   are now -- unindicted in our case because they had left

18   during the course -- right about the time we started

19   intercepts.  Not -- they hadn't left when we started the

20   investigation, but when we started the intercepts.

21        THE COURT:  Okay.  I was going to ask you what the

22   connection is with the -- with this defendant and the

23   indictment in the Northern District of Georgia.

24        MR. PHILLIPS:  It is a very close connection.  In

25   fact, that Atlanta has worked closely with Aurora in their

1    homicide investigation, as well as FBI here in our initial

2    case.  Our investigation and this particular investigation

3    assisted them greatly in getting their investigation going.

4    I can tell the Court it is so close that, in fact, there's

5    investigators and prosecutors from the state of Georgia

6    that have been here prior to interview people, and will be

7    here in the future to interview people as there is a direct

8    connection between the Gangster Disciples' investigation

9    there and the Gangster Disciple investigation we had here.

10              THE COURT:  Was any of this evidence with respect

11   to Mr. Garrison's connection to these individuals that are

12   not defendants in this case but that you are telling me are

13   members of this gang, was any of that disclosed to the

14   defendant in discovery?

15              MR. PHILLIPS:  It is part of the initial

16   investigation as well as in the background of the Title 3

17   intercepts and the basis for the need for the intercepts.

18              THE COURT:  Okay.

19              MR. LEONARD:  Your Honor, if I may briefly --

20              THE COURT:  Sure.  Go ahead.

21              MR. LEONARD:  So this is one of the issues that we

22   talked to the Government about.  What evidence do you have

23   to support the fact that he's actually a Gangster

24   Disciples?  Not a suspected member, which is what the law

25   enforcement agent puts in the Title 3 affidavit, sworn

1     under oath.

2              When they go for the wiretap affidavit and when

3     they surveil the alleged meeting of the Gangster Disciples,

4     one of the things they say is they have a high-up member of

5     the Gangster Disciples working for them, talking to them.

6     Nothing -- there's no inference, though, that a

7     confidential human source says Mr. Ricky Garrison is a

8     member of the Gangster Disciples.  It's supposition.

9     There's no evidence.  It doesn't rise to the level of the

10    preponderance of the evidence.  We've not been provided

11    anything to substantiate it.  His name doesn't appear in

12    the indictment out of the Northern District of Georgia.

13    We've sought the information.

14             So if somebody knows somebody who's part of a

15    gang, it doesn't make them part of a gang.  If somebody is

16    seen out with somebody who's part of a gang, it still

17    doesn't make them a part of a gang.  And even if you do

18    business with a gang member, it doesn't mean you're part of

19    a gang.  There's nothing to substantiate he's part of the

20    Gangster Disciples.  We've asked for it, we can't get it.

21             THE COURT:  I don't think it's a fair statement to

22    say there's nothing to substantiate.  Let's begin:  What

23    about the text messages that Mr. Phillips is referencing?

24    I mean, I agree that because someone talks to a member,

25    texts or has a phone call with a member of a gang doesn't

1    necessarily mean they're a member of a gang, but if they're

2    conversing with this individual in the context of engaging

3    in criminal activity that the gang is known to be engaged

4    in, isn't it a reasonable inference to draw from that that

5    there's -- that this gang is not going to be having

6    outsiders involved in the planning and commission of these

7    criminal acts?

8            MR. LEONARD:  Actually, I think that is the

9    reasonable inference, but it's that the gang doesn't want

10   anybody else involved in the activity that they're involved

11   in.  This is their territory.  And so if somebody else

12   who's not involved in the gang is engaged in this activity

13   that they don't like because it is impeding upon their

14   ability to control that area, that's how I view that

15   evidence.

16           THE COURT:  But what about the text messages with

17   respect to this meeting of the gang members?  I mean, do

18   you believe it's a fair and more reasonable inference to

19   draw from those communications that Mr. Garrison was on the

20   outside and the gang members were concerned about him

21   encroaching on their activities?

22           MR. LEONARD:  That's exactly the inference I draw.

23   Yeah.

24           THE COURT:  Or the reverse?

25           MR. LEONARD:  No, I draw it -- the inference that

1    Mr. Garrison's on the outside and that the meeting is not

2    about him being part of the gang, it's about him being told

3    to not affiliate with any of that activity, that's what

4    I -- that's what I draw from it.  And we asked, then, is

5    there anything else that supports gang membership?  And

6    what I hear from the Government is, We've got a lot of

7    information, but I haven't provided it.

8            THE COURT:  Mr. Phillips, I'll give you an

9    opportunity for a final retort.

10           MR. PHILLIPS:  Your Honor, it's a disagreement as

11   to -- well, in that particular point as far as the texts as

12   to why that would be, why a gang would include you on a

13   text to come to the gang meeting isn't, You're on the outs.

14   It's, No, come on in.

15           Now, if, in fact, you're wanting to make more

16   money and not pay as many dues, then the gang gets a little

17   upset.  But the Court has the wiretaps.  To say suspected

18   gang member is, in fact -- how do you define gang member?

19   Again, I go back to:  You can't go to the Supreme Court and

20   say you're a gang member.  You have to just go off of all

21   of the evidence presented and the wiretap affidavits, the

22   testimony at trial, everything indicates and shows that

23   this defendant was, in fact, a member of the Gangsters

24   Disciples and remains a member of the Gangster Disciples.

25           THE COURT:  All right.  This ended up being a

1    little bit closer call than I thought initially at first

2    blush, but I'm going to side with the Government on this

3    issue.  I think on a preponderance of the evidence standard

4    that there is sufficient evidence in the record, in

5    addition to the evidence that came in at trial, to

6    establish if not that Mr. Garrison is -- remains currently

7    a member of the Gangster Disciples, but that at some point

8    he was -- even if he did disaffiliate himself from that

9    organization at a later date -- but that he was a gang

10   member at some point in time during the period of the

11   conspiracy charged.  So objection 32 is overruled.

12           With respect to objection 31 regarding paragraph

13   130 of the report, that objection objects to the probation

14   officer's calculation of the offense level of 30 and

15   Criminal History Category of V.  For the same reasons that

16   I stated previously in overruling the defendant's

17   objections to similar contentions, I'm overruling the

18   defendant's objections to a total offense level of 30 and a

19   Criminal History Category of V.

20           Finally, objection No. 33 regarding the special

21   conditions of supervised release recommended by the

22   probation officer, I specifically find that the special

23   conditions recommended to me by the probation officer do

24   not constitute a greater deprivation of liberty than

25   reasonably necessary to accomplish the goals of sentencing.

1    It is for this reason that the defendant's final objection

2    is overruled.

3          So wrapping that all up, giving my -- given my

4    rulings on the parties' objections, I find that the total

5    offense level in this case is 32 and that the defendant's

6    Criminal History Category is V.  This yields an advisory

7    guideline sentencing range on the counts of conviction of

8    188 to 235 months, the period of supervised release for

9    Count 1 is one to three years under the guidelines, and the

10   period of supervised release under the guidelines for the

11   remaining counts of conviction is one year.  With regard to

12   a fine, according to the report the fine range under the

13   guidelines for these counts is 17,500 to $1 million, along

14   with a mandatory special assessment of $2,000.

15         All right.  Subject to the parties' objections to

16   my rulings on their respective objections, do counsel agree

17   the Court has correctly calculated the guideline sentencing

18   range in this case?

19         MR. PHILLIPS:  Yes, Your Honor.

20         MR. LEONARD:  Subject to the objections --

21         THE COURT:  Yes, of course.

22         MR. LEONARD:  Yes, Your Honor.

23         THE COURT:  Okay.  All right.  We are next going

24   to take up the defendant's motion to strike certain

25   information contained in the Government's response to the

1    defendant's motion for nonguideline sentence, ECF 1371.

2            I'll hear additional argument on this motion.  Mr.

3    Leonard.

4            MR. LEONARD:  I covered the gang issue.  Does the

5    Court wish me to address that any further?

6            THE COURT:  No.

7            MR. LEONARD:  So as to the Adams County homicide,

8    I'm not sure if it's relevant in making a determination,

9    No. 1; but, No. 2, Mr. Garrison's never been charged and

10   we've only been provided as the defense some 50 some odd

11   pages of reports, which is an overview of the

12   investigation.  The overview certainly, to me, suggests

13   that there are other suspects as well.  The main suspect

14   from what I view would be the person who lives down --

15           THE COURT:  The neighbor?

16           MR. LEONARD:  The neighbor, his name is Malcolm,

17   who, according to the police reports, the victim makes a

18   excited utterance prior to being shot saying, Hey, Babe,

19   it's Malcolm, as she opens the door and then she's

20   proceeded to be shot a number of times and then

21   subsequently dies.

22           THE COURT:  And for the record, this victim is a

23   confidential informant.  That's your understanding.

24           MR. LEONARD:  That's my understanding.

25           THE COURT:  Okay.

1          MR. LEONARD:  However, there were other

2     individuals also who she was a confidential informant of.

3     But, frankly, Your Honor, this is the -- at some point, you

4     know, the Government in Adams County, if they're going to

5     charge Mr. Garrison, why haven't they?  And they haven't

6     charged him because they don't have the evidence.  They

7     don't have the evidence because he didn't do it.

8          And it puts us in the position of, as the defense,

9     of trying to prove, you know, almost a negative.  How do I

10    prove it when I don't have access to the entire file?  I

11    can't litigate what I don't know.  And so I view the

12    Government's allegation that he is a suspect is nothing

13    more than an attempt, really, to smear my client before the

14    Court, to disparage him in hopes of getting a higher

15    sentence, but then I haven't been provided anything to

16    defend him with.

17         So he's a suspect?  I take their word for it that

18    he's a suspect.  Adams County has him as a suspect.  And I

19    note that he hasn't been charged, and I note that he gave

20    DNA, and that he participated with the investigation.  So

21    at some point he's a suspect because an officer says he is,

22    that's great, I don't think it goes to his sentence, I

23    don't think it's relevant.  I think it's nothing more than

24    an attempt to, as I say, smear him before the Court.

25         THE COURT:  When you say he participated in the

1    investigation, was he interviewed?

2              MR. LEONARD:  He was.

3              THE COURT:  Okay.

4              MR. LEONARD:  And he provided DNA willingly.  They

5    didn't have to go get a court order for it.  He gave it to

6    them.

7              THE COURT:  All right.  And this is a -- maybe I

8    should ask Mr. Phillips, this remains, to your

9    understanding, a live case being investigated by an Aurora

10   homicide detective?

11             MR. PHILLIPS:  Your Honor, the Aurora murder does

12   include investigation by the Aurora homicide detective,

13   Tom -- and I'm drawing a blank on his last name.  It's also

14   being investigated by the FBI out of Atlanta as part of

15   that investigation down there as well.

16             THE COURT:  Okay.  So how do you respond to Mr.

17   Leonard's point that in effect here we're asking the

18   defendant to prove a negative?

19             MR. PHILLIPS:  Your Honor, that is difficult in

20   the sense that there is a sense that we are asking the

21   defense to prove a negative.  At the same time, what

22   defense is trying to get the Government to do -- and as I

23   noted in the Government's response for the defendant's

24   motion for release pending sentencing in document No. 1413,

25   and I understand that was heard in front of one of the

1    magistrate judges and not yourself, but I do know it's part

2    of the record in this case, we're in the difficult position

3    of there's ongoing investigation; there -- officers are

4    confident as to what happened.  But as the Court is well

5    aware, for an arrest, it's probable cause.  Prior to an

6    arrest, we always ask law enforcement to have evidence

7    beyond a reasonable doubt.

8         At this point, you know, officers are very

9    confident in the probable cause yet have yet to develop the

10   point where they would be comfortable going in front of a

11   jury beyond a reasonable doubt.  That investigation does --

12   is ongoing and, as I noted in our filing, there are

13   numerous witnesses who have had interactions with Mr.

14   Garrison regarding the murder and which has assisted the

15   investigation, but has not yet led to the beyond a

16   reasonable doubt.

17        This is a very difficult thing for both sides in

18   the sense that, you know, we don't want to produce all of

19   the evidence and especially those witnesses that will be

20   eventually testifying against Mr. Garrison because what his

21   history showed:  History has showed that witnesses against

22   Mr. Garrison can wind up dead.  I can tell the Court that

23   it is ongoing and that he and others are participated -- or

24   at least it's the investigators both here and in Georgia

25   believe that he and others participated in this particular

1    murder to assist Mr. Garrison to continue in his drug

2    trade, but we have had limited ability to share that with

3    defense and the Court.  And I understand the Court is

4    having to rely on what it has in front of it as far as this

5    entire case file including the wire intercepts and that

6    evidence.

7              THE COURT:  Now, you will agree -- well, you

8    conceded as much in your filing that you didn't give the

9    defendant all the information you have, and for obvious

10   reasons, and you've just articulated some of them because

11   of the sensitive nature of some of the information with

12   respect to an ongoing, live investigation.  But will you

13   agree with me that that puts the defendant at an even

14   more -- understanding your difficulties and the fine line

15   you have to walk, that also puts the defendant in a

16   difficult position because they don't have all of the

17   information that you have and with which they -- he might

18   be able to at least in some fashion rebut some of this

19   information?

20             MR. PHILLIPS:  And that was a decision we had to

21   make given the fact that this particular murder

22   investigation is ongoing and has not been charged by this

23   date.  And, yes, I would concede that, in fact, that is a

24   difficult position for defense counsel, however, it's a

25   necessary one for the fact that the Government has to keep

1    some of that information -- well, quite frankly, Aurora

2    could have easily looked at us and said, No way, I'm not

3    giving you anything, and -- but, in fact, voluntarily gave

4    a summary of their base investigation into the

5    investigation to us to supply to defense counsel.

6            THE COURT:  Okay.  One second.

7            MR. LEONARD:  Your Honor, may I make a brief

8    record, Your Honor?

9            THE COURT:  Actually, I was going to ask you some

10   additional questions and then I'll let you --

11           MR. LEONARD:  I apologize.

12           THE COURT:  I always let everybody make their

13   record they want to make.  One thing neither of you have --

14   has -- I knew there was something that was missing in this

15   discussion, in this colloquy, which is really at the bottom

16   what a lot of your -- the Government's arguments with

17   respect to this issue goes back to the belief of the

18   codefendants that Mr. Garrison was involved with the murder

19   and that, therefore, the resultant fear that they had --

20   they have of Mr. Garrison and their fear in terms of

21   cooperation, and that's one of the reasons you -- the

22   Government has argued makes the codefendants -- one of the

23   reasons, you have other arguments, not at all similar to

24   the defendant because they have this sort of inchoate fear,

25   but nonetheless they still testified.  And Mr. Garrison

1    doesn't have that.  He's not operating under that kind of

2    fear.

3              Do you see the difficulty, though, for me in terms

4    of, let's say we're looking at this from a hearsay

5    analysis, I don't even really have -- and even though

6    hearsay is admissible in a sentencing hearing, it needs to

7    be hearsay that has some indicia of reliability, and even

8    though the Rules of Evidence don't strictly apply, but one

9    of the difficulties here that I see from the defendant's

10   perspective is that we don't even really have hearsay

11   statements, we have beliefs and fears, sentiments, ideas,

12   in people's heads.  And doesn't that make that even more

13   difficult for a defendant to attempt to keep out what

14   someone fears?

15             I could have fear of the spaghetti monster,

16   completely irrational.  But because somebody has a fear

17   doesn't mean it's predicated or premised on any reality.

18   So I guess I can't formulate that into a question, but I

19   think that that is another aspect here that we haven't

20   talked about so far in this colloquy, which is, at bottom,

21   your argument on both the dissimilarity of the defendants

22   and on this motion, the responsive motion is that while --

23   the codefendant's belief that he was responsible for the

24   murder.  Do you wish to make any statement on that?

25             MR. PHILLIPS:  I realize there's not a question in

 1     there but maybe I could better articulate the Government's

 2     position.  As the Court is well aware, in the vast

 3     majority, if not all, drug investigations that are like

 4     this, the drug trade is a dangerous trade.  There is always

 5     fear because there is money, there's cooperators,

 6     there's -- as the Court is well aware we have to seal

 7     certain items, certain filings.  We don't produce certain

 8     evidence until a particular point because of the fear in

 9     the drug trade.

10          Our point is that is prevalent in every case.

11     Then you add in the fact that the Gangster Disciples are

12     part of this and then also the additional idea that all of

13     these codefendants are aware of the fact that Ricky

14     Garrison is suspected of the actual murder of a informant.

15     That's just one more additional step of fear that those

16     individuals in fact rose above in order to testify and/or

17     cooperate.  And that's the Government's layering, for lack

18     of a better term, of the fear factor.

19          THE COURT:  Okay.  Mr. Leonard, I'll let you make

20     your additional statement.

21          MR. LEONARD:  Thank you, Your Honor.  So the

22     murder is brought up, is a fear that is particularized in

23     that the codefendants who testify are particularly scared

24     because of knowledge -- alleged knowledge of an Adams

25     County murder.  But there's no documentation of that.  They

1    didn't testify to it.  So at some point the Sixth Amendment

2    and due process kicks in.  And I have to have, as defense

3    counsel -- that my client has a right to test whatever

4    evidence they're trying to use to rise to a level of

5    preponderance of the evidence to tell the Court that this

6    is a reason that the Court should give a higher sentence.

7             It doesn't exist.  None of these codefendants

8    testified that they were afraid of Mr. Garrison because of

9    an Adams County murder.  None of the codefendants stated to

10   the presentence report officer, who had access to the

11   Government's file, at least as I read it, because he met

12   with them, that they were afraid because of Mr. Garrison.

13   I don't know where the information comes from.

14            It exists in sort of space that I don't have an

15   ability to say, well, if that information does exist, how

16   did they get it?  Did they get it after the fact because

17   they were told during a meeting in a proffer session?  Or

18   was it something that they originate -- I don't know.  I

19   don't know where this allegation even comes from, so I

20   can't test it.  I can't --

21            THE COURT:  The allegation that the codefendants

22   are fearful of your client?

23            MR. LEONARD:  Yes.  Because of -- and I think

24   specifically we're talking about the Adams County murder --

25   because of this Adams County murder.  It doesn't exist.

1           And the Government has asserted also -- and I want

2     to make sure that my record's clear on this -- that the

3     Court only has to have a minimal indicia of reliability.

4     And I'm aware of the case law on that.  And just so the

5     record's clear, I don't think the minimal indicia of

6     reliability standard is constitutional.  I think it

7     violates my client's right to due process and his Sixth

8     Amendment right to have an adversarial testing of the

9     evidence.

10          THE COURT:  And there's some cases percolating

11    through the system on that issue, aren't there, right now?

12          MR. LEONARD:  There are.

13          THE COURT:  Whether the Sixth Amendment allows for

14    hearsay to be used in sentencing.  All right.  Thank you.

15          MR. LEONARD:  Thank you.

16          MR. PHILLIPS:  If I may, and I know --

17          THE COURT:  Yes.

18          MR. PHILLIPS:  Not anything particular --

19          THE COURT:  Sure.

20          MR. PHILLIPS:  Of course there's no testimony

21    about it, Your Honor.  We'd be trying this case again if,

22    in fact, the Government elicited testimony about the Adams

23    County murder.  That was something specifically we quite

24    frankly agreed to not elicit during any witness testimony

25    because it would have been so prejudicial to the defendant,

1    and the Court would have immediately made a good ruling and

2    said we did wrong and defense -- I think we even litigated

3    this -- I'm not positive we litigated it or we may have

4    agreed on that beforehand because that was not evidence

5    brought out in trial.

6            THE COURT:  Thank you.

7            MR. LEONARD:  I need to make one more record, Your

8    Honor.  The CI was never disclosed.  So there's allegation

9    that the CI was known to Mr. Garrison.  We don't have

10   evidence of that.

11           THE COURT:  Okay.  All right.  I'm prepared to

12   rule on the motion to strike.  The defendant's motion

13   ultimately traces back to his motion for a variant

14   sentence, ECF 1362, which we'll get to later in the

15   hearing.  In that motion the defendant argues that the

16   Section 3553(a)(6) factors regarding unwarranted

17   disparities in sentencing should lead to a lower sentence

18   for him since he is allegedly similarly situated to his

19   codefendants who pled guilty.

20           The Government responded Garrison is not similarly

21   situated for two principle reasons:  As I stated in my

22   colloquy with Mr. Phillips, first the Government claims

23   that the other codefendants' fear of Mr. Garrison because

24   they believe he ordered or was somehow involved in the

25   murder of a confidential informant in Adams County.  I

1    note, however, that despite this professed fear, these

2    codefendants, nonetheless, agreed to cooperate with the

3    Government against Mr. Garrison including test- -- some of

4    them testifying at trial.

5            Secondly, the Government notes that it gave the

6    defendant an opportunity to cooperate, specifically to

7    furnish information potentially helpful to a prosecution of

8    members of the Gangster Disciples street gang in Georgia.

9    But the Government contends Mr. Garrison refused to assist

10   law enforcement, unlike his codefendants.  Thus the

11   Government says Mr. Garrison is not similarly situated to

12   his codefendants.

13           This response prompted Mr. Garrison to file his

14   motion to strike requesting that all claims or insinuations

15   related to the Adams County murder be stricken as entirely

16   unsupported and that all references to the Gangster

17   Disciples be excluded under Rule of Evidence 410 because

18   they involve plea negotiations.

19           With respect to the information relating to the

20   Adams County murder, I agree with the defendant that these

21   references should be stricken.  I understand the

22   Government's position that Mr. Garrison's codefendants

23   believe or suspect that he was involved in this murder, and

24   I also understand that I can consider hearsay in the

25   sentencing context.  But in this case, it is hard to even

1    identify precisely what hearsay statements I'm being asked

2    to consider.

3         Through briefing, the Government simply reports

4    what all the codefendants apparently believe.  There's no

5    out-of-court statement for me to examine.  Moreover, Mr.

6    Garrison has never been charged in connection with the

7    murder, and for these reasons this portion of the

8    defendant's motion to strike is granted, and I will not

9    consider Mr. Garrison's codefendants' alleged fear of him

10   on account of the Adams County murder.

11        As to the potential for cooperation in the

12   Gangster Disciples prosecution, there's enough evidence in

13   the record to sustain the underlying allegation --

14   accusation that Mr. Garrison was, or at least at some time

15   had been, a member of the Gangster Disciples.  This is

16   ultimately immaterial in my view, however, because the

17   Government raises it only as an example of a specific

18   opportunity to cooperate that it offered the defendant and

19   that he refused.

20        The information provided to me on this point

21   simply emphasizes that he's different than the other

22   codefendants because he did not cooperate.  As far as I'm

23   aware, there is no significance between general

24   noncooperation and specific noncooperation.  So the context

25   of his noncooperation really, in my view, is irrelevant.

1      For this reason, the defendant's motion to strike

2   is also granted as to the Government's statements regarding

3   the defendant's opportunity to cooperate against the

4   Gangster Disciples.  Nonetheless, this has little effect on

5   my evaluation of Mr. Garrison's motion for variant sentence

6   because I agree with the Government that Mr. Garrison was,

7   in fact, not a cooperator in contrast to his defendants.

8      So for all these reasons, the defendant's motion

9   to strike is granted.  All right.  We're going to take a

10   10-minute recess.

11      (Recess 10:20 a.m. to 10:35 a.m.)

12      THE COURT:  All right.  At this time I'm going to

13   take up the defendant's motion for a nonguideline sentence,

14   ECF 1362.

15      Mr. Leonard, do you have any additional argument?

16      MR. LEONARD:  I have a brief, compared to my

17   writing argument.

18      THE COURT:  Okay.

19      MR. LEONARD:  The force and thrust of the

20   defense's argument comes to where the Court, in a

21   nonguideline sentence, should determine the amount of drugs

22   transacted in trying to fashion an appropriate sentence, as

23   well as the disparate potential sentences that can arise if

24   Mr. Garrison is given a guideline sentence as opposed to

25   the codefendants, who I think just as -- in the summary

63

1    sense received very lenient sentences comparative to what

2    the guideline sentence calculates for Mr. Garrison.

3         The Tenth Circuit pattern jury instruction 1.14

4    tells jurors that they have to examine and weigh informant

5    testify with greater care than the testimony of an ordinary

6    witness, and that they should determine whether the

7    informant testify has been affected by self-interest,

8    agreement he has with the Government, by his own interest

9    in the outcome of the case, or prejudice against the

10   defendant.  And this caution is echoed by members of the

11   judiciary.

12        In fact, Ninth Circuit Senior Judge Steven Trott

13   who, himself, was a former Assistant United States Attorney

14   and Assistant Attorney General in charge of the criminal

15   division before taking the bench, has written:  Criminals

16   are likely to say and do almost anything to get what they

17   want, especially when what they want is to get out of

18   trouble with the law.  Jurors suspect their motives from

19   the moment they hear about them in a case and they

20   frequently disregard their testimony altogether as highly

21   untrustworthy and unreliable, openly expressing disgust

22   with the prosecution for making such deals with, quote,

23   unquote, scum.

24        That's in Words of Warning for Prosecutors Using

25   Criminals as Witnesses, 47 Hastings Law Journal 1381, at

64

1    page 1383 and 1385, 1996.

2           The jury returned a verdict that I understand the

3    law is different as to its standard in terms of whether or

4    not it's reasonable doubt and preponderance of the

5    evidence, but the jury's verdict was clear:  They did not

6    believe the Government's case.  They didn't believe the

7    Government's case as it amounts to the weight of alleged

8    drugs transacted, rejecting the mandatory minimum sentence,

9    rejecting it with specific special interrogatory jury

10   instructions.

11          They had more than ample opportunity in their 3

12   1/2 days of deliberation to consider all the evidence.  And

13   they came back and told all the participants, We don't

14   believe the Government; we don't believe their theory of

15   the case.  They also acquitted on all of the substantive

16   distribution charges.

17          And as an officer of the Court, I have to admit to

18   the Court that you have every ability under the current law

19   to disregard what the jury said and come to your own

20   conclusion based on the preponderance of the evidence

21   standard, but I think it's fair to attribute a lot of

22   weight to what the jury did; a lot of weight to what

23   ordinary citizens did in making a determination.  And --

24          THE COURT:  Why would I be disregarding the jury

25   if I were to sentence your client to a guideline sentence?

1          MR. LEONARD:  Because the jury disregard -- said

2     to the Government, We don't believe the amounts that were

3     transacted.  They never came to a specific amount.

4          And I understand and concede this is a different

5     legal standard than what the Court applies.  But,

6     nonetheless, the jury did hear all the evidence and 12

7     people in collaboration determined that they really

8     couldn't come to an amount other than zero to just below

9     the mandatory minimum.

10         And I think that that should be given weight

11    because it is a reflection of the credibility of the

12    Government's witnesses who were put on the stand to come to

13    that weight, which the Government relied on in their

14    closing, which was a very good closing.

15         They specifically went through what amounts were

16    testified to, and how, then, the jury should reach a

17    conclusion that above the mandatory minimum of drugs had

18    been reached.  I think that's powerful.  And I also think

19    that the Court -- you know all the sentences that have been

20    handed out because you handed them out.  There is a great

21    difference between the guideline calculation that Mr.

22    Garrison has received and the sentence that other

23    individuals have received.

24         The basis for that difference is cooperation,

25    that's what the Government said.  And so the Court should

1    afford great deference to the cooperation given.  I don't

2    think the cooperation, in all honesty, was good.  And if

3    you take just one person who -- to compare, Steven Vigil --

4    or Christopher Vigil, an East Side Oldie member, known gang

5    member, gun in his house, distributing drugs, his, quote,

6    unquote, cooperation amounted to numerous pretrial service

7    violations for drug use.

8            And then on the stand, not to my question, to the

9    Government's question, he says what is known about

10   cooperators:  I will say anything to keep myself out of

11   prison.  And he receives a sentence of 16 months.  And his

12   criminal history, I believe, was a four.

13           So if you weigh his cooperation, I don't think his

14   cooperation was good.  In fact, I think his cooperation was

15   seen by the jury as worthless.  In my closing, I referenced

16   the fact that Mr. Vigil was unworthy of consideration and

17   unworthy of belief.  And he's similar to the other

18   codefendants who testified in a way that's unbelievable.

19           I've addressed earlier the issue of overcharging.

20   It was manifestly evident in this case where the mandatory

21   minimum was rejected by the jury.  One gun count was

22   dismissed prior to going to trial and the other gun count,

23   the 924(c), which in itself is a mandatory minimum

24   consecutive count, can't make it past a Rule 29.

25           So we went to trial and we vindicated many of the

1    positions that we had been presented -- presenting to the

2    Government, that we did not agree on the amount of drugs

3    that were allegedly transacted, we didn't think that the

4    conspiracy in fact was adequately charged; it was

5    overcharging the scope, which the Court agreed with.  And

6    that we disagreed with the gun charges.

7            It can't go without notice, too, that my client

8    has been in custody from the beginning of this case until

9    today.  In that custodial situation is far -- no custodial

10   situation is good, but the custodial situations that he

11   finds himself in are even less than a normal BOP facility.

12   He's been at the GEO facility in Aurora and now he's at the

13   FDC facility in Englewood.

14           Mr. Garrison is a changed person.  The roughly

15   four years -- I think it's a little less than four years --

16   of time that he has spent in custody has allowed him to

17   reflect on who he is as a person, who he was as a person,

18   and who he wants to be as a person.

19           Having your life regulated in that kind of

20   environment makes you choose to be either a person who is

21   going to change and want to change and takes steps to

22   change, or a person who blames others and who thinks of

23   nothing other than trying to find ways out of that

24   situation by causing problems or being difficult.

25           When you carry a case this long, you tend to get

1    to know a person in a way that you don't if you only carry

2    a case for one or two or three months.  And I'm struck by

3    conversations I've had with Mr. Garrison.  I'm struck by

4    the fact that when I see him yesterday before we go to

5    court, he's a calm person and he's talking to me about who

6    he wants to be when he gets out and how he wants to be a

7    father and how he realizes that he needs to be a father.

8    And how he's just learned his own father has Parkinson's,

9    and that has been held and kept from him while he's in

10   custody, and his mother has lupus.  And seeing his change

11   in attitude and his change in his desire for who he wants

12   to be.  And he talks about family and the reality of what

13   family is.  And also he talks about why he might be sitting

14   in this facility.

15          He also talks to me about respect.  And he doesn't

16   have anger, and he -- we talked about respect and what it's

17   like to respect people.  And I respect my client and I like

18   my client.  And Mr. Garrison talks about his respect for,

19   quote, everyone involved in this process.  That's a change.

20   And that is something that occurred during the 43, 44

21   months that he's been in custody awaiting this sentencing

22   hearing.

23          And the Court is not bound by the guidelines.  The

24   Court can consider all the factors in 3553 in determining

25   and fashioning the appropriate sentence.  In this case, we

1    believe that an appropriate sentence is time served, or as

2    we indicated in the variant motion, the high end of 60

3    months.  It appropriately respects the process, the amount

4    of time that Mr. Garrison has spent in custody is

5    sufficient to keep the public aware of the fact that

6    violating the law is serious, it is sufficient to keep him

7    from reoffending.

8         Mr. Garrison's well aware of the force, might, and

9    power the United States Government can bring upon an

10   individual.  He's aware of the power of the judiciary

11   system to punish, and that has all sunk in with him.

12        So we believe that the variant sentence requested

13   is appropriate and we would respectfully request time

14   served or a high end of 60 months.

15        THE COURT:  All right.  Thank you.

16        MR. LEONARD:  Thank you.

17        THE COURT:  I'll hear from the Government in

18   opposition.

19        MR. PHILLIPS:  Your Honor, the Government's

20   response, we focused greatly on the codefendants in this

21   particular case and, in fact, the codefendants in this

22   particular case are very differently situated than the

23   defendant, and the fact that they cooperated.  The

24   guidelines are developed in such a way as to make sure that

25   people are treated the same not only on this particular

1    case, but all cases.  And, in fact, the guidelines are

2    appropriate in this case.

3         The defendant -- quite frankly, the Government --

4    defense counsel talked about the amount of drugs in this

5    case.  The Government has agreed with probation and the

6    Court that the "at least as much as" amount of drugs, we

7    could have pounded our fist and said, "Well, as much as.

8    That just would have been hard for me to keep a straight

9    face in front of the Court.

10        I think it's best for the Court to view this

11   defendant in the "at least" amount of drugs.  And, in fact,

12   the jury found the defendant guilty of the conspiracy.  One

13   of the things that struck us during the course of

14   deliberations was the jury's question about what's the

15   definition of a detectable amount?  For the proper reasons,

16   I think the Court never gave them a definition at the time,

17   and who knows how they determined detectable amount in all

18   those specific instances; however, they did make it clear

19   this defendant was involved in a conspiracy.

20        The Government has proven, and the Court has

21   evidence, it's already been established, that, in fact, his

22   criminal history is a 32 -- his offense level is a 32 and

23   his criminal history is a V.  He should be treated as

24   people that are in a criminal history 32 and -- or an

25   offense level 32 and a criminal history V.

1          As such we think the motion for a variant sentence

2     should be denied as it's not just the people in this case

3     but in all cases that the defendant is compared to, and

4     that's why we have the guidelines.  In fact, those 3553, as

5     we put in our motion, cut against the defendant, but we're

6     not going to be asking -- ultimately I did tell the Court

7     we're going to ask for 240.  We're not.  We're going to ask

8     the Court to do a guideline sentence.  We are going to ask

9     for a high point in that guideline sentence, but we think

10    that is why we have that here and that's specifically what

11    the Court should be doing with Mr. Garrison and that is

12    what justice will be in this case.

13         THE COURT:  What is your specific sentencing

14    request at this point?

15         MR. PHILLIPS:  We are going to ask for the 235

16    months, which is part of the guideline sentence.

17         THE COURT:  All right.  I have one question for

18    you.  I looked over all the codefendants' sentences, their

19    Criminal History Categories, their crimes that they pled

20    to.  Putting aside everything else, the closest one I could

21    come to in terms of being similarly situated -- not that he

22    is, but at least more similar than the others, is James

23    Tillmon, defendant No. 2, because he pled guilty to Count 1

24    and he is a Criminal History Category VI.  And based on the

25    agreements of the parties and other factors, I sentenced

1    him to 40 months.

2            So can you speak to, in addition to everything

3    else we've talked about that differentiates this defendant

4    from all the others, given lack of cooperation and other

5    matters, what else should I hang my hat on to -- if I were

6    to adopt a 235 -- just round it out to 240 for purposes of

7    multiplication, six times higher than Mr. Tillmon who pled

8    guilty to the same count and had a higher criminal history

9    category?

10           MR. PHILLIPS:  Well, I think there's a number of

11   factors in there.  One would be the amount of narcotics

12   that Mr. Tillmon could be found responsible for.  They were

13   considerably less than what ultimately the defendant is

14   being held responsible for.

15           Two is the fact that Mr. Tillmon did -- although

16   he did not testify at trial, he did provide cooperation

17   and, in fact, also gets three points for his acceptance of

18   responsibility in cooperating.  All of that takes him down

19   considerably before the Court is then asked to take into

20   consideration that cooperation.  That -- those numbers, as

21   the Court is well aware, go down quickly as a person

22   cooperates, as a person takes responsibility, as a person

23   gets all of those bonuses, for lack of a better term, or

24   considerations, in the guidelines.  That's specifically why

25   we have those in the guidelines.  And he starts out at a

1       lower level and then, in fact, gets acceptance, which as

2       the Court has already said the defendant hasn't done, and

3       also meeting with the Government and those things.

4               THE COURT:  All right.  So if I could summarize

5       what I think you're saying is the most critical distinction

6       is that the quantity of controlled substances for which

7       he's being held -- or was held accountable is so

8       dramatically less than what this defendant was found guilty

9       of that his offense level begins substantially lower than

10      where we have Mr. Garrison at 32.

11              MR. PHILLIPS:  Right.  And, in fact, looking at

12      Mr. Tillmon -- and I'm going off of docket No. 1367, the

13      probation report -- he had 31.5 grams of cocaine that he's

14      held responsible for.  Mr. Garrison has 1.2 kilograms of

15      cocaine.  That's without calculating in the cocaine base as

16      well as the methamphetamine.  There's a great disparity.

17              MR. LEONARD:  Your Honor, if I may.

18              THE COURT:  Hold on.  You'll have your chance.

19              MR. PHILLIPS:  And that is only what Mr. Garrison

20      purchased.  He again distributed an additional 370 grams of

21      cocaine and 225 grams of cocaine base, meaning Mr.

22      Garrison, as opposed to Mr. Tillmon.

23              THE COURT:  Do you have it handy where -- what Mr.

24      Tillmon's base offense level was based on his quantity?

25      Where he started at before the --

1          MR. PHILLIPS:  Your Honor, I do not have it

2    particularly handy.  But I could figure it out if the Court

3    would like to take -- give me a few minutes.

4          THE COURT:  Yeah.  Why don't you try to figure it

5    out and then I'll hear what Mr. Leonard has to say.

6          MR. LEONARD:  Well, what I was first going to say

7    is that the prosecution referenced a document that I don't

8    have possession of and I would ask for that to be produced.

9          THE COURT:  What are you talking about?

10          MR. LEONARD:  He referenced document 13 --

11          MR. PHILLIPS:  It's the PSI.

12          MR. LEONARD:  Nonetheless, he referenced the PSI.

13    In this case or Tillmon's case?

14          MR. PHILLIPS:  This case.

15          MR. LEONARD:  The other thing I think I need is

16    Mr. Tillmon's calculation.  Part of the issue I have in

17    trying to understand disparity is that there's a large

18    section of evidence that's kept from me by rule.  And I

19    don't know, for instance, all the aspects of the agreement

20    that occurred between Mr. Tillmon and the Government.

21          Did they agree, for instance, on a certain amount

22    of drugs that was to limit relevant conduct?  I don't know.

23    And I think he also referenced that he cooperated, and that

24    was unknown to me.

25          THE COURT:  Because he didn't testify?

 1              MR. LEONARD:  Correct.

 2              THE COURT:  All right.

 3              MR. LEONARD:  But I don't know what his *Jencks*

 4     material is or anything else.  And, you know, the -- in

 5     general -- and I'm summarizing because there's such a

 6     volume of evidence here -- the amount of drugs that get

 7     attributed to some of these people who've pled guilty and

 8     get sentenced is different than what I believe could be

 9     calculated under a relevant conduct standard if there's not

10     some sort of limitation based on the fact that some of

11     these people pled guilty to a conspiracy, which opens up

12     the door to a lot of relevant conduct.

13              THE COURT:  Well, first of all, I want to make it

14     clear, you do have -- you do have the presentence report

15     for your client.

16              MR. LEONARD:  I do.  And so, I mean, Tillmon --

17     I'm referencing the document 1367, paragraph 39, Tillmon

18     typically purchased 1 to 2 ounces of methamphetamine weekly

19     from codefendant Garrison when Tillmon was in Colorado.

20     Well, again, I don't know how often is he supposed to be in

21     Colorado.  That's a decent amount of meth.  It doesn't tell

22     me what the purity level of the meth is.  Is it actual or

23     is it some difference?  So I don't know.

24              THE COURT:  All right.  I think the record is

25     clear, however, that the quantities that Mr. Tillmon was

1    charged with and that he pled guilty to as relevant conduct

2    is a fraction of what I determined is involved with a Level

3    22 total offense level for your client.

4            I'm wondering if you have an answer for me, Mr.

5    Phillips, in terms of --

6            MR. PHILLIPS:  We're getting very close, but if I

7    just may address, that's exactly why we think the variant

8    sentence should be denied.  In fact, the guidelines are to

9    hold people that are similarly situated accountable.  Mr.

10   Tillmon is not similar to Mr. Garrison in many, many ways.

11   And --

12           THE COURT:  Mr. Kruck -- I think Mr. Kruck can

13   help us here.

14           PROBATION OFFICER:  Yes, Your Honor.  Mr.

15   Tillmon's base offense level -- or total offense level is

16   17 and his criminal history was VI.

17           THE COURT:  Okay.  All right.  That's a

18   significant disparity.  All right.  Thank you.

19           Anything else you'd like to say in support of your

20   motion, Mr. Leonard?

21           MR. PHILLIPS:  No, thank you.

22           THE COURT:  I thought you were done and I was

23   turning to a reply from --

24           MR. PHILLIPS:  You were talking to me as I was

25   talking to --

1        THE COURT:  Okay.

2        MR. LEONARD:  If I could have a moment, I'm

3   looking at some documents with Mr. Tillmon.  I wasn't

4   expecting the Tillmon question.

5        THE COURT:  My question was answered, which was,

6   according to Officer Kruck, that he had a total offense

7   level of 17, which is 15 levels below your client's total

8   offense level.

9        MR. LEONARD:  Yes, Your Honor.  My -- I don't know

10  how Officer Kruck arrived at that level, though.

11       THE COURT:  Well, but he's just telling you what

12  is in -- may not be available to you, but is in the record

13  as to what I sentenced Mr. Tillmon based on a total offense

14  level of 17 and then from which, you know, acceptance of

15  responsibility was -- is that accurate, acceptance of

16  responsibility, Mr. Kruck?

17       PROBATION OFFICER:  Yes, Your Honor.

18       THE COURT:  Okay.  And so that -- so we started at

19  a different universe in terms of the guideline range than

20  your client.

21       All right.  Last opportunity.  Any additional

22  argument on your motion, Mr. Leonard?

23       MR. LEONARD:  One second.  No, Your Honor.

24       THE COURT:  All right.  Okay.  Before I rule on

25  the defendant's motion, I'm going to review some of his

 1    history and characteristics under 3553(a).  The record

 2    establishes that Mr. Garrison is 34 years old, he is a

 3    citizen of the United States.  He was born in Michigan to

 4    Ronald Rhodes and Vanessa Garrison, who were never married

 5    to each other.  Defendant's father resides in Flint,

 6    Michigan, and is retired from General Motors, and the

 7    defendant's mother also resides in Flint, although she's

 8    also had -- and while she was previously employed with

 9    General Motors, she's now disabled.  The defendant was the

10    couple's only child.

11         Mr. Garrison was raised by his mother and maternal

12    grandparents in a working class neighborhood of Flint, and

13    had very limited interaction with his father growing up.

14    He has a large and close family on his mother's side and he

15    reported a good childhood, was involved in sports as a

16    student and was never subjected to any maltreatment or

17    abuse as a child or youth.

18         The defendant graduated from Flint Southwestern

19    Academy where he participated in several sports.  He moved

20    to Columbus, Ohio, to attend DeVry University to study

21    business management.  He attended DeVry for less than an

22    academic year and returned to Flint after his mother became

23    ill.  He then completed a 10-week program at Ross Medical

24    Center where he earned a medical assistant certificate.

25         In 2007, Mr. Garrison moved to Aurora, Colorado,

1    where he lived until the time of his arrest in May of 2014.

2              As an adult, he has lived primarily with family

3    and friends.  He has never owned residential property and

4    has never traveled outside the United States.

5              From the time he was 14, the defendant has used

6    marijuana and, prior to his arrest in this case, he had

7    done so on a daily basis since 2008.  He admits to being --

8    to using cocaine for about seven years beginning when he

9    was 22, but he claims that he did so only approximately one

10   time a year.  Between 2007 and 2010, the defendant used

11   ecstasy and for a six- to seven-month period, he used that

12   drug on a daily basis, according to what he informed the

13   probation officer.

14             The defendant has never been legally married.

15   Between 2012 and 2014, he was residing with his then

16   girlfriend, Shanna Waterson in Aurora.  According to the

17   defendant, the relationship terminated in 2015 due in part

18   to his incarceration in this case.  No children were born

19   to this relationship.

20             Between 2007 and 2012, the defendant was in a

21   relationship with Christy Pearce, who we've mentioned

22   before.  Ms. Pearce presently resides in Flint.  The

23   relationship apparently terminated when Ms. Pearce left

24   Colorado to return to Michigan.  The defendant and Ms.

25   Pearce have one child together, Ava Garrison, age 6.  The

1    child lives with her mother in Michigan.  According to Mr.

2    Garrison, he continues to have a great relationship with

3    Ms. Pearce and that he provided financially for his

4    daughter up until the time he was incarcerated.

5          The defendant also has a son, Isaiah, age 6.  The

6    boy and his mother, April Kubis, reside in Arizona.

7    According to Mr. Garrison, he was involved in a short-term

8    relationship with Ms. Kubis, and he currently has no

9    contact with his son and does not pay child support for

10   him.

11         The defendant informed the probation officer that

12   he began a relationship with Heather Quintanilla while

13   incarcerated and he continues to have regular contact with

14   Ms. Quintanilla.  The couple have known each other for a

15   long period of time and no children have been born to this

16   relationship.

17         With regard to gainful employment, the report

18   indicates that the defendant's been unemployed since 2006.

19   Prior to 2006, he was employed at a small factory in Ohio

20   for approximately two weeks.  Prior to that, for about six

21   months, he was employed as a medical assistant to one

22   Dr. Patrick Chang in Grandblanc, Michigan.

23         With regard to the defendant's criminal history,

24   according to the PSIR, he has one felony juvenile criminal

25   adjudication and, given my ruling on the defendant's

1    objections, I have concurred with the probation officer

2    that Mr. Garrison should be assessed 11 criminal history

3    points, and he's before me having suffered two prior adult

4    felony convictions.

5         Turning to the nature and circumstances of the

6    offense, pursuant to the Court's General Order 2002-3 the

7    Government filed a sentencing statement setting forth the

8    facts of this case it believed were presented at trial, as

9    did the defendant -- and the defendant filed a response to

10   that sentencing statement and as is provided for in the

11   General Order.

12        As all counsel, the parties, and I were present at

13   the entire trial and heard all the evidence, I believe

14   little purpose would be served here today by a detailed

15   recitation of the nature and circumstances of the offense

16   and I will, instead, incorporate herein by reference the

17   parties' respective sentencing statements to the extent

18   they are not factually inconsistent with my findings in

19   this hearing as they relate to the parties' respective

20   objections and to their respective sentencing-related

21   motions.

22        All right.  As of today, the defendant has served

23   1,356 days, or approximately 45 months and one week in

24   pretrial detention.

25        Mr. Kruck, do you wish to make any statement at

1   this time on behalf of the probation office?

2           PROBATION OFFICER:  I've nothing to add, Your

3   Honor.  Thank you.

4           THE COURT:  All right.  Thank you, sir.  All

5   right.  Mr. Leonard, will you take the lectern with your

6   client, please.

7           MR. LEONARD:  Yes, Your Honor.  And I -- may I add

8   one thing for the record?  Document 580 is James Tillmon's

9   plea.  It was a Rule 11(c)(1)(A) plea agreement and

10  stipulation of facts.  So to the my best of my knowledge,

11  then, the Government and defense counsel in Mr. Tillmon's

12  case agreed upon relevant conduct and foreclosed, then, the

13  possibility of a greater finding of relevant conduct.

14          THE COURT:  All right.  Mr. Garrison, do you wish

15  to make any statement to the Court on your own behalf

16  before I announce your sentence?

17          THE DEFENDANT:  Yes, sir.

18          THE COURT:  Go ahead.

19          THE DEFENDANT:  First of all, I would like to

20  thank Mr. Miller and Mr. McDermott for representing me.

21          Sir, in this time span, I take full responsibility

22  for everything in my life that I've been leading up and to

23  this point.  It's been aggressive, combative, and

24  destructive and I know it.  I've been ignorant.  Everything

25  I've done, I've never completed anything.  I've went to

1    school, dropped out of school.  Started again, dropped out

2    again.

3         I've been just running amuck, not really -- not

4    really caring or paying attention or taking the time to

5    really just discipline myself.  In this time span, this

6    four years incarcerated, I came in ignorant, I couldn't

7    even understand what I was reading.  In this time span,

8    sir, I've grown to understanding and I'm more conscious now

9    to where I'm able to pay attention more to -- to detail.  I

10   feel like I'm more disciplined.  I feel like I'm more

11   patient.  I've humbled myself.

12        I've seen so much in this four years.  It's just

13   made me regret the way I've been living, and which I know

14   that my family is hurt.  I mean, as you see I have no one

15   here for me right now.  My mother is in Michigan, my

16   father's in Michigan, my grandfather has died in this time

17   span, my auntie has died, my cousin died from a heroin

18   overdose.  So I've been kind of out here fighting on my

19   own, dealing with this incarceration.

20        But they're still supporting me in this time span.

21   They've sent me a lot of literature and they've helped me

22   as much as they can, so I appreciate it and --

23        THE COURT:  And they sent -- I received a lot of

24   letters from your extended family on your mother's side and

25   they were very interesting and informative.

1          THE DEFENDANT:  Yeah.  And I just hope that I

2    haven't let them down.  I know my grandfather, he was my

3    dad, and, you know, I wasn't even there to bury him.  So,

4    you know, I just -- if you can, sir, I would like to --

5    actually, if I do get a lot of time, can you have me

6    transferred to Michigan so I can at least see my mother and

7    my kids?

8          THE COURT:  Well, if the Government doesn't object

9    and if that's the request of your client -- of your --

10   sorry, of your attorney, then that's a recommendation I can

11   make to the Bureau of Prisons, but I don't control where

12   they assign inmates, so -- but I can make that

13   recommendation.

14         THE DEFENDANT:  Yes, sir.  Thank you.  My -- in

15   Michigan, if anywhere east, anywhere close, because my

16   mother, she's disabled, so she's not going to be driving

17   too far.

18         THE COURT:  Well, and because this has taken time

19   in other sentencing hearings, I believe Michigan has more

20   than one federal district, so do you know -- so you'd want

21   to be close to Flint?

22         THE DEFENDANT:  Yes, sir.

23         THE COURT:  All right.  Mr. Kruck, while we're

24   going through the rest of this, could you figure out what

25   district Flint is in so I can -- we can put that in the --

1 or is Michigan one district?  Am I wrong?

2    PROBATION OFFICER:  I believe it's one district,

3 Your Honor, but I'll double-check.

4    THE COURT:  Okay.  That will make it easy.

5    THE DEFENDANT:  Outside of that, sir, like I said,

6 I'm going to fight to be my best.  Whatever you impose I'm

7 still going to fight to be my best.  I take full

8 responsibility.  I just want to get through it and try to

9 educate myself and get home and do better, be a better

10 father, son, husband, whatever I can be.  Thank you.

11    THE COURT:  All right.  I'm prepared to rule on

12 the defendant's motion.  In my view, the following

13 mitigating and aggravating factors are relevant under

14 3553(a) for the proper consideration of the defendant's

15 motion.

16    With respect to factors in mitigation, I'm taking

17 into account some of the results at trial which, in my

18 view, lessened to some degree the defendant's overall

19 culpability in this case.  The jury found the defendant not

20 guilty of all substantive distribution charges, as Mr.

21 Leonard has pointed out.  They also found him not guilty on

22 the alleged Man Act violation.  At the Rule 29 hearing, the

23 Government dismissed its 922(c) count that had been added

24 by way of a superseding indictment.  And also related to

25 that, prior to trial the Government dismissed the 922(g)

1    firearm count filed against the defendant.

2         I agree with the Government that in the strict

3    sense, Mr. Garrison is not similarly situated with his

4    codefendants for at least the following two reasons:

5         All of the other codefendants in this case have

6    cooperated with law enforcement and the Government, and the

7    defendant has chosen not to cooperate.  Also all of the

8    other codefendants in this case have accepted

9    responsibility for their crimes while this defendant has

10   not.  Nonetheless, I also agree with the defendant that

11   justice and Section 3553(a) preclude extreme and undue

12   disproportionality between the sentences I impose even on

13   defendants who are not, strictly speaking, similarly

14   situated.

15        With this in mind, I note that the codefendant who

16   comes closest to accountability with Mr. Garrison in terms

17   of crime of conviction and criminal history category is

18   defendant No. 2, James Tillmon.  Mr. Tillmon was also

19   convicted of Count 1 and he had a Criminal History Category

20   of C -- of VI, which is higher than defendant's Criminal

21   History Category of V.  I sentenced Mr. Tillmon to a

22   custodial sentence of 40 months to run consecutive to the

23   state court sentence he was currently serving.

24        But I also take into account, given the colloquy I

25   just had with the Government counsel, that notwithstanding

1    that Mr. Tillmon also pled guilty to the same count as this

2    defendant, his relevant conduct included amounts of

3    controlled substance that were a small fraction of that the

4    defendant stands convicted of distributing.  And for that

5    reason, the amount by which this factor enters into the

6    3553(a) analysis in my mind is limited and tempered by that

7    distinction.

8         With respect to factors in aggravation, clearly

9    the most serious aggravating factor for Mr. Garrison is the

10   crimes of which he's been convicted:  Count 1, conspiracy

11   to possess and possession with intent to distribute

12   cocaine, cocaine base, and methamphetamine.  Additionally

13   the jury found the defendant guilty of 19 counts of using a

14   communication device during the commission of a felony drug

15   offense.

16        The evidence at trial established that during the

17   course of the conspiracy, the defendant was receiving

18   multi-ounce quantities of cocaine and methamphetamine from

19   multiple sources.  The defendant would receive the cocaine

20   and redistribute it in either powder or base form in

21   exchange for money.  The defendant would also redistribute

22   the methamphetamine in exchange for money.

23        For purposes of sentencing guideline calculation,

24   as well as an aggravating factor under 3553(a), I find that

25   the evidence at trial established that Mr. Garrison was

1   involved in the purchase of at least 1.232 -- 1.232

2   kilograms of cocaine, and that he redistributed that amount

3   in the form of both powder and base cocaine.  Also in this

4   regard, I find that the evidence at trial established that

5   the defendant produced and then redistributed at least 225

6   grams of cocaine.

7        For purposes of relevant conduct under guideline

8   Section 1B1.3(a)(1)(B), I find that the total drug quantity

9   for which this defendant is accountable is at least 373.957

10  kilograms of marijuana on a converted basis.

11       Also in aggravation is the defendant's serious and

12  extensive prior criminal history.  He has a prior felony --

13  he has prior felony convictions for resisting slash

14  assaulting slash obstructing an arrest by a police officer;

15  of possession of a firearm by a previous offender; a felony

16  conviction for attempted carrying of a concealed weapon.

17  In addition, the defendant has convictions for drug abuse,

18  damage to property, public indecency, driving while ability

19  impaired.  And, finally, I note that Mr. Garrison has a

20  history of failing to comply with the conditions of

21  community supervision.

22       Balancing these strongly competing factors, I find

23  that the sentencing statutory purpose are best served by

24  granting in part the defendant's motion.  I intend to

25  sentence the defendant to a period of imprisonment of 156

1    months on Count 1 and 48 months on each of the remaining

2    counts of conviction, all sentences to be served

3    concurrently with each other.

4         Upon release from custody, I intend to order the

5    defendant be placed on a period of supervision of three

6    years on Count 1 and one year on all remaining counts of

7    conviction.  All such periods of supervision to be served

8    concurrently with each other.

9         Given the defendant's lack of financial means, I

10   intend to waive payment of any fine other than the special

11   assessment of $2,000.

12        Before I impose sentence, I'll give counsel a

13   final opportunity to make any additional record they

14   believe appropriate.

15        MR. PHILLIPS:  Nothing.  Thank you, Your Honor.

16        THE COURT:  All right.  Thank you.  For the

17   defendant.

18        MR. LEONARD:  Nothing.  Thank you, Your Honor.

19        THE COURT:  All right.  I find that a guideline

20   sentence in this case would be greater than necessary to

21   accomplish the goals of sentencing and I will instead

22   impose a sentence below the guideline range.  In addition,

23   I find that the sentence I will impose in this case

24   reflects the seriousness of the offense, affords adequate

25   deterrence to future criminal conduct, and will protect the

1    public from further crimes of this defendant.

2            Accordingly pursuant to the Sentencing Reform Act

3    of 1984, it is the judgment of this Court that the

4    defendant, Ricky Garrison, be committed to the custody of

5    the Bureau of Prisons to be imprisoned for a term of 156

6    months on Count 1 and 48 months on each of Counts 4, 5, 7,

7    8, 11, 13, 15, 16, 22, 23, 24, 25, 26, 30, 31, 39, 40, 41,

8    and 42, all such sentences to be served concurrently with

9    each other.

10           In serving these terms of incarceration, the Court

11   recommends to the director of the Bureau of Prisons that it

12   give -- that he or she -- I don't know what the gender of

13   the director is -- give defendant full credit for his

14   creditable time served in pretrial detention.

15           Mr. Kruck, have we figured out the Michigan --

16           PROBATION OFFICER:  It is two districts, Your

17   Honor, Eastern and Western.  We believe Flint is in the

18   Eastern District of Michigan.

19           THE COURT:  Okay.  Is there any objection from the

20   Government for recommendation?

21           MR. PHILLIPS:  No, Your Honor.

22           THE COURT:  All right.  The Court also recommends

23   that the defendant be incarcerated at a facility

24   appropriate to his security designation located within the

25   Eastern District of Michigan.

1    Upon release from imprisonment, the defendant

2    shall be placed on supervised release for a period of three

3    years on Count 1, and one year on all other counts of

4    conviction, all such periods of supervised release to be

5    served concurrently.

6    Within 72 hours of release from the custody of the

7    Bureau of Prisons, the defendant shall report in person to

8    the probation office in the district to which he is

9    released.

10    While on supervised release, the defendant shall

11    not commit another federal, state or local crime, shall not

12    possess a firearm as defined in 18 United States Code

13    Section 921, and shall comply with the standard conditions

14    that have been adopted by this Court in District of

15    Colorado General Order 2016-1.

16    The defendant shall not unlawfully possess and he

17    shall refrain from unlawfully using a controlled substance.

18    The defendant shall submit to one drug test within 15 days

19    of release on supervised release and two periodic tests

20    thereafter.  The defendant shall cooperate in the

21    collection of DNA as directed by the probation officer.

22    The Court finds that the following special

23    conditions of supervision are reasonably related to the

24    factors enumerated in Sections 3553(a) and 3583(d) and they

25    do not constitute a greater deprivation of liberty than

1    reasonably necessary to accomplish the goals of sentencing:

2         Special condition No. 1:  The defendant shall

3    participate in and successfully complete a program of

4    testing and/or treatment for substance abuse as approved by

5    the probation officer until such time as the defendant's

6    released from the program by the probation officer.

7         The defendant shall abstain from the use of

8    alcohol or other intoxicants during the course of treatment

9    and shall pay the cost of treatment as directed by the

10   probation officer.

11        No. 2:  With regard to the probation officer's

12   recommendation that I subject the defendant and his home

13   and effects to a search without the protections of the

14   Fourth Amendment, I find that such a search condition is

15   warranted under the facts of this case and, as a

16   consequence, I'm ordering that the defendant -- that the

17   defendant's use of computers and internet access devices

18   shall be limited to those the defendant requests to use and

19   which the probation officer authorizes.

20        The defendant shall submit his person, property,

21   house, residence, papers, office, computer, and other

22   electronic communication or data storage devices or media

23   and effects to a search conducted by a United States

24   probation officer.  Failure to submit to search may be

25   grounds for revocation of supervised release.

1           The defendant shall warn any other occupants of

2      the premises that those premises may be subject to searches

3      pursuant to this condition.  An officer may conduct the

4      search pursuant to this condition only when reasonable

5      suspicion exists that the defendant has violated a

6      condition of supervision and that the areas to be searched

7      contain evidence of this violation.  Any search must be

8      conducted at a reasonable time and a reasonable manner.

9           No. 3:  The defendant shall not associate with or

10     have contact with any gang members and he shall not

11     participate in any gang activity to include the displaying

12     of any gang paraphernalia.

13          Lastly, No. 4:  The defendant shall participate in

14     a cognitive behavioral treatment program as directed by the

15     probation officer until such time as the defendant is

16     released from the program by the probation officer.  The

17     defendant shall pay the cost of treatment as directed by

18     the probation officer.

19          The defendant shall pay a special assessment of

20     $2,000 which shall be due and payable immediately.  The

21     Court finds that the defendant does not have the ability to

22     pay a fine so the Court will waive the payment of any fine

23     in this case apart from the special assessment.

24          Now, Mr. Garrison, you have the right to appeal

25     both your conviction and the sentence that I've just

1    imposed.  If you wish to file such an appeal, a notice of

2    appeal must be filed with the Clerk of the Court within 14

3    days after entry of judgment or the right to appeal will be

4    lost.

5         If you're unable to afford an attorney for an

6    appeal, the Court will appoint one to represent you.  If

7    you're unable to afford the fees for filing an appeal, you

8    may file a request with the Court that such fees be waived.

9         Okay.  Anything further from the Government at

10   this time?

11        MR. PHILLIPS:  No.  Thank you.

12        THE COURT:  All right.

13        MR. PHILLIPS:  Not this morning, Your Honor.

14        THE COURT:  All right.  Yes.  Anything further

15   from the defendant?

16        MR. LEONARD:  Thank you for the hearing, Your

17   Honor.  It's been a pleasure to represent Mr. Garrison.

18        THE COURT:  Thank you for that.  Let me just

19   say -- I believe I said this at the end of the trial --

20   both sides, both sets of counsel did an extraordinary job

21   in this case; very hard-fought case.

22        Mr. Garrison, you received an excellent defense

23   and your lawyers did an excellent job on your behalf,

24   otherwise you would not have gotten what you got this

25   morning.  Just let me say that for the record.

1          Anything further from the probation officer?

2          PROBATION OFFICER:  No, Your Honor.  Thank you.

3          THE COURT:  All right.  Defendant is remanded to

4     the custody of the United States Marshals.  Thank you, that

5     will be all.

6          (Proceedings concluded at 11:21 a.m.)

7

8                    *     *     *     *     *

9                     REPORTER'S CERTIFICATE

10

11        I certify that the foregoing is a correct transcript

12    from the record of proceedings in the above-entitled

13    matter.

14        Dated at Denver, Colorado, this 20th day of March,

15    2018.

16

17

18

19

20    _                                              _

21             MARY J. GEORGE, FCRR, CRR, RMR

22

23

24

25