IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

**FILED**
UNITED STATES DISTRICT COURT
DENVER, COLORADO

OCT 31 2019

JEFFREY P. COLWELL
CLERK

RICKY GARRISON,
      Petitioner,

v.

UNITED STATES OF AMERICA,
      Respondent.

)
)
)
)
)

Civil Case No:
Criminal Case No: 14-Cr-231-WJM

## MOTION UNDER 28 U.S.C. §2255 TO VACATE, SET ASIDE, OR CORRECT AN ILLEGAL SENTENCE OR CONVICTION BY A PERSON IN FEDERAL CUSTODY.

### BACKGROUND

On March 2, 2017, Petitioner, Ricky Garrison, after a jury trial, was convicted of one Count of Conspiracy To Distribute and Possess With The Intent To Distribute A Mixture And Substance Containing A Detectable Amount Of Cocaine, Cocaine Base, Or Methamphetamine in violation of §§ 21 U.S.C. 841(a)(1), and (b)(1)(c), and 846. Defendant was also convicted of nineteen Counts of Using A Communication Device, In Furtherance Of A Drug Trafficking Felony Count's:4-5,7-8,11,13, 15-16, 22-26, 30-31, and 39-42, in violation of 21 U.S.C. § 843(b) and (d).

At sentencing on February 2, 2018, the District Court found that the advisory sentencing range was offense Level 32, with a Criminal History Category V, resulting in a range of imprisonment of 188 to 235 months. The courts granted defense's request for a below range sentence, and senteced defendant to 156 months imprisonment, concurrent to all charges.

Petitioner appealed from the above convictions to the United States Court Of Appeals For The Tenth Circuit. The Appeal was docketed as 18-1053. The following grounds were raised: (1) The District Court Abused Its Discretion When It Refused To Allow Defense to File A Motion to Suppress Evidence, (2) Insufficient Evidence To Prove Conspiracy, and (3) Ineffective Assistance Of Counsel For Failing To Ask For Buyer Seller Jury Instruction. The Court Denied the Appeal on January 23, 2019, and there was no Petition for Writ of Certiorari to the United States Supreme Court.

---

Note: Tr. used in this motion referneces "Trial Transcript" And S.F is referncing "Statement of facts."

Issue I.

COUNSEL WAS INEFFECTIVE FOR FAILING TO
TIMELY SUBMIT A MOTION PURSUANT TO
FRANKS V. DELAWARE 438 U.S. 154 98 S.Ct. (1978)

Facts: Federal law requires the government to obtain a court order before intercept-
ing wire or other electronic communications. 18 U.S.C. §2518 (3). An appropriate
court may authorize the intercept if it determines, among other things, that the
wiretap is necessary that is, normal investigative procedures have failed or are likely
to fail. § 2518(3)(c). Thus, an application for a wiretap order must include "a full
and complete statement as to whether or not other investigative procedures have been
tried and failed or why they reasonably appear to be unlikely to succeed if tried
or to be too dangerous." § 2518(1)(c). If the government fails to comply with the
statutory requirement, the evidence obtained through the wiretap must be suppressed.
§2515, United States v. Faulkner, 439 F.3d 1221,1223 (10th Cir 2006).

A "Franks argument" seeks to suppress evidence obtained as a result of a search
warrant or wiretap authorization under Franks v. Delaware, 438 U.S. 154 98 S.Ct. 2674
(1978). Under Franks, a criminal defendant may challenge a facially sufficient affidavit
for a wiretap authorization on the ground that investigators knowingly, intentionally
or recklessly included false information in the affidavit or omitted material infor-
mation from it. See United States v. Green, 173 F.3d 822, 828 (10th Cir 1999)(citing
Franks). "If a wiretap affidavit omits material information that would vitiate either
the necessity or the probable cause requirements had it been included the resulting
evidence must be suppressed."

Counsel believed that the government in this case was utilizing traditional in-
vestigative techniques that were working, as, the government had a source on the
inside and law enforcement hid this fact when they completed their affidavit's for
for authorization... Thus, counsel, Leonard Miller reasonably determined, that there
was no necessity for the wiretap's, making the wiretaps illegally obtained, thus
he sought to file a motion to suppress the evidence from the wiretaps.

The court set a deadline for May 6, 2016, for all suppression issues. Counsel
however would not file the Franks motion until 8 weeks after the deadline. United
States v. Garrison, 2019 U.S. App. Lexis 2107; Fed. Appx 8 (Jan. 23, 2019 10th
Cir )... Counsel's reason for not filing the Franks motion timely was that:

> The defense had a good faith belief who CHS-1 was but that it was
> never confirmed. Without the government confirming the identity of
> CHS-1 a "Franks" motion could not be filed, as speculation even in
> "good faith" as to CHS-1 identity would not suffice to meet the le-
> gal standard...Id; See also Doc. # 1051.

2

To prevail on a motion to suppress under *Franks*, the defendant must establish by a preponderance of the evidence that the government intentionally or recklessly included false statements or omitted material information from the affidavit and, further, that when these failings are corrected the affidavit was insufficient to support the warrant or authorization. *See Franks*, 438 U.S. at 155-56. The Supreme Court contemplated that an evidentiary hearing is necessary for a defendant to make this showing. *See id.; United States v. Yeje-Cabrera*, 430 F.3d 1, 8 (1st Cir. 2005) (observing with respect to a motion to suppress wiretap evidence that "[a] *Franks* hearing . . . is the proper route for addressing" the concern that "government omitted material information that would have prevented a finding of necessity"). But such government affidavits are presumed to be valid, so to receive a *Franks* hearing and an opportunity to present these challenges a defendant must first make "a substantial preliminary showing" that he or she can meet this standard. *Franks*, 438 U.S. at 155-56; *see id.* at 171-72. This preliminary showing must include an offer of proof, and the defendant must provide supporting affidavits or satisfactorily explain their absence. *Id.* at 171; *United States v. Herrera*, 782 F.3d 571, 573 (10th Cir. 2015).

Here, counsel's untimely proffered *Franks* motion, contained the prerequisites to obtain a Franks Hearing. See R. Vol III at 217-284 thats referenced and incorporated herein; See Also Attached Exhibit "A," laying out with specificity how the government knowingly, intentionally or recklessly omitted material information that misled the judge who issued the wiretap warrant. The informant, Leslie Leyba had an undisclosed girlfriend/boyfriend relationship with the target for the first wiretap. Ms. Leyba was also involved in drug transactions, they shared the same cars, she had access to the targets cell phone, banking information. They lived at the same address. She was contacting law enforcement about individuals, the target Mr. Ramirez associates was coming onto contact with police, affirming or providing their identity's. Id The proffered motion also identifies, how had the Court been informed of the true relationship between CHS-1 (Leslie Leyba) and Mr. Ramirez, it would have obliterated the "necessity" requirement. Id. The motion also came with an offer of proof with supporting affidavit. See Att. Exh. "B." Thus, counsel made the requisite showing to obtain a hearing on the suppression issue. **Franks**, 438 U.S. at 171; **Garrison**, supra at 8 (Garrison did not request a Franks hearing...even though he made a Franks based argument.)

Further, counsel found the case to be srikingly similar to United States v. Simpson, 813 F.2d 1462, 1471 (9th Cir 1987), where the district court found that the affidavit was "artfully drafted with intent to mislead the reviewing judge." and if the full detail about the informants penetration into the defendants activities were known to the judge, a reasonable district judge would have denied the application because "necessity" had not been shown. See Exh "A". Thus, counsel should be held to be ineffective for failing to timely submit the above Franks motion.

## STANDARD OF REVIEW

The law is clear, counsel's failure to file a suppression motion can be constitutional ineffective assistance of counsel. See e.g., Kimmelman v. Morrison,

477 U.S. 365, 385-87 (1986). Counsel's ignorance, inattention or lack of diligence in his investigation about a point of law that is fundamental to his case , is a quintessential example of unreasonable performance. Hinton v. Alabama, 571 U.S. 263, 134 S.CT. 1081, 1089 (2014).

To prevail on the ineffective assistance claim, requires showing that the Fourth Amendment claim is meritorious and "that there is a reasonable probability that the verdict would have been different absent the excludable evidence in order to demonstrate actula prejudice." Kimmelman, 477, at 375.

## Defeceint  Performance

Petitioner contends  that counsel failure to know the fundamental requirement's to file a Franks  motion, fail below an objective standard of reasonableness. See Garrison, supra at 9 ( Counsel cites no authority in support of the proposition, when he knew the identity of CHS-1, he could not bring a "Franks" motion without the governments confirmation of CHS-1 identity).

The motion to suppress was also meritorious, as argued in the "Franks Motion" Exh. "A," the government in this case, took measures in the drafting of the Affidavit to mislead, when they knew that they had an informant on the inside, who was the girlfriend of the target that was actively involved in the operations of the alleged drug deals. The government failure to inform the judge of that fact resembles that of United v. Simpson, 813 f.2d 1462, 1471 (9th Cir 1987). Counsel failure to submit the Franks motion timely was unreasonable under professional norms. Hinton, 571 U.S. at 274.

## Prejudice.

In opening arguments the government informed the jury that it will be intorducing evidence of phone calls and text messages detailing purchases and sales of drugs. Tr. 156. The governments first witness was Agent Bradley Gullicksrud. Tr. 166. He immediately testify to the purpose of the wiretaps. Tr. 170. Thus, he identify they now have the ability to know about drug deals prior to the transaction, therefore they  can watch as the deals occured. Tr. 176. He can identify sources, customers and other coconspirators. Tr. 176, 193. He identified recorded conversations and text messages between Mr. Garrison and co-defendants Robert Painter, Christopher Martinez, Gregory Williams, Simeon Ramirez, Christopher Vigil, Sidney Taylor and Francisco Aguilar. Tr. 195-214. All of these were reported drug transactions. Id.

The government then introduced those co-defendants to match those alleged transactions.

Co-defendant Gregory Williams, identified hearing his voice on tape, therefore agreed to cooperate. Tr. 297. William's would testify against the Petitioner, that he was purchasing cocaine from the Petitioner. Tr. 302-04.

Co-defendant Sidney Taylor testified against the Petitioner identifying alleged drug transaction through the recorded wiretaps. **Tr. 349-52.**

Codefendant Robert Painter testified against the Petitioner identify alleged drug transactions through the wiretaps. **Tr. 383-90**

Co-defendant Simeon Ramirez testified against the Petitioner identifying alleged drug transactions through the wiretap. **Tr.440-50.**

Co-defendant Francisco Aguilar testified againdt the Petitioner identifying alleged drug transactions through the wiretap. **Tr. 511-14, 516-22.**

Co-defendant Christopher Vigil testified against the Petitioner identifying alleged drug transactions through the wiretap. **Tr. 661-66.** Further, the government focused on what the investigation revealed after the wiretaps were authorized. **Tr. 172, 615**

Thus, the heart of the governments case, from its investigation to the evidence it submitted at trial, was based upon these unconstitutionally obtained wiretaps. The governments closing arguments is replete with talking about the evidence obtain because of the wiretaps. **Tr.945-46, 951-52, 56, 957-59, 961,963-65...** Thus, the wiretap evidence was critical for the government and the exclusion would have made the governments opening arguments and closing arguments unattainable... The government witnesses, credibility was rejected by the jury, when the government failed to introduce any evidence of actual drug buy's, thus, acquitting the Petitioner of all distribution counts. Similarily, with out those recorded phone calls, its likely the jury would have acquitted Petitioner of the phone facilitation counts and conspiracy, because the jury was unwillingly to convict the Petitioner on the words of unbelievable co-defendants.

But for counsel's ineffective assistance, the outcome if the proceedings would have been different.

Petitioner respectfully ask the court to vacate his conviction and sentence on the conspiracy count and all phone counts and be given immediate release.

Issue II.

## Petitioner Received Ineffective Assistance of Counsel During Plea Negotiations.

Facts: During pretrial stages, Counsel James Castle, informed the Petitioner that he believes that the government had committed an illegal wiretap. Counsel informed that the government had an informant amongst the conspirators, but failed to inform the Court of that fact before issuing the wiretap. See Att. Exb. "C" Counsel stated he was moving to suppress evidence obtained as a result of that illegal wiretap. Id.

Counsel also informed Petitioner a time later that the government was looking to accept a non-cooperation plea deal. Petitioner told counsel that if they offered a number that he could work with he would plead guilty. Eventually through negotiations Petitioner told counsel he would take 60 months. See Att. Exb. "D" . Counsel presenting this information to the government, the government countered with 70 months. Id. A time limit to accept the offer was eyed at filing additional charges of a 924(c) violation. Id.

[1] Petitioner told counsel he wanted some time to consider the offer, but, to weigh his options, Petitioner wanted to know the status of his motion to suppress the wiretaps. See Att. Exb C . Counsel appeared to become irritated, and told Petitioner he needs to give him an answer "now," because he has a trip to Africa coming up. Id. Petitioner told counsel he was not, not going weigh his options based on him wanting to see Africa. Notably, February 1st, was the deadline to have all motions filed with the Court. Within 72hrs of Counsel telling Petitioner of the governments offer, Petitioner attempted to call counsel to accept the plea offer. Id. Counsel did not take his calls. Instead, Counsel comes to see Petitioner approximately a day later, with an order from the Court removing counsel from the case. Id. Thus the Petitioner agreement to accept the 70 months was not presented to the government.

Petitioner proceeded to trial. After being found guilty of the Conspiracy Count and Phone Facilitation Count, the Court sentenced the Petitioner to 156 months. The Court in reaching that decision, in addressing the variant sentence motion, the Court identified that Petitioner's unwillingness to cooperate has little effect on the Courts evaluation. See Sentencing Hearing at 62. (S. Hr. hereinafter). The Court examined the closest similar situated codefendant to the Petitioner, James Tillmon, with a criminal history of VI. In contrast to the Petitioner's V, and there, Mr. Tillmon received 40 months for his sentence. S. Hr. 71,72. Francisco Aguilar also plead guilty in this case, who the government presented evidence that he was a supplier to the Petitioner, and he received 37 months. The Court further believed it could not accept a reduction based on acceptance of responsibility because there was no evidence he did in fact was accepting responsibility. S. Hr. 24-27 . Thus, counsel should

be held to be ineffective for costing Petitioner the opportunity to a favorable plea.

## STANDARD OF REVIEW

Under **Strickland v. Washington,** 466 U.S. 668 (1984) the Court should look to ABA's standards in determining whether a Counsel behaved reasonably "under prevailing professional norms," **Strickland,** 466 U.S. at 688. "Prevailing norms of practice as reflected in American Bar Association Standards and the like, e.g., ABA Standard for Criminal Justice 4|1.1 to 4-8.6 (2d ed. 1980) (The defense functions, are guides to determining what is reasonable.' Id.

Under the ABA standards, counsel has an affirmative duty to move to suppress evidence obtained in violation of his clients contsitutional rights:

> For each matter, defense counsel should consider what procedural and investigative steps to take and motions to file, and not simply follow rote procedures learned from prior matters. Defense counsel should not be deterred from sensible actions merely because counsel has not previously seen a tactic used, or because such actions might incur criticism or disfavor... Arm Bar Ass'n, ABA standards for Criminal

Justice for the Defense Function, Standard 4-3.7(f) (4th ed. 2015).

A motion to suppress prejudiced evidence clearly falls within the range of "sensible actions ABA expects defense attorneys to perform for their clients. In **United States v. Christy,** 2018 U.S. Dist. Lexis 9220 No. Cr. 10-1534 Jb (Jan. 19 2018), In addressing whether a defendant is making an informed decision to accept a guilty plea, it noted, that it does not upset the criminal justice process, for a defendant to make motions, e.g. motion to suppress evidence, long before trial where a defendant can achieve a pre trial evidence ruling: Citing Crist v. Bretz, 437 U.S. 28, 49-50 (1978) (Defendant may, and sometimes must move for various rulings on the indictment and the admissibility of evidence before trial. These motions, in practical terms, may decide the case.)

In analyzing prejudice at he plea negotiation stage, the Court "focuses on whether counsel's constitutionally ineffective performance affected the outcome of the plea process. **Hill v. Lockhart,** 474

Ultimately in the context of pleas, a defendant must show the outcome of the plea process would have been different with competent advice. **Lafler v. Cooper,** 556 U.S. 156, 163 (2012). To do so, a defendant must prove two factors (1) a reasonable probability they would have accepted the earlier plea offer had tehy been afforded effective assistance of counsel; and (2) " a reasonable probability that the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise the discretion.

**Counsel's Defecient Performance**

      According to the standard's of the ABA supra, Petitioner had a legitimate concern in wanting to know about the developement of the motion to suppress. This was directly related, for the Petitioner in making an informed decision on whether to accept the 70 months plea deal. Unreasonably, counsel lacked the advice on how to proceed because counsel lack of diligence in preparing the motion. Further, counsel advising to accept the plea in part on wanting to take a trip to Africa fell below objective norms, because that advice had nothing to do with the strength of the suppression issue. Nor any facts or laws of his case, e.g., the government did not reouire an immediate answer, See Exb D  and counsel did not leave to go to Africa within the few days Petitioner did take unguidedly to call counsel to accept the plea deal. With the Petitioner telling counsel he wanted some time to think about it, counsel had abandoned the case at an unreasonable time, thus, before the Court had removed counsel from the case, Counsel had already removed himself from the case, not accepting the Petitioner calls. Thus, Petitioner willingness to accept the plea for 70 months, was not presented to the government. Thus, counsel defecient performance affected the outcome of the plea process. **Hill** at  59.

**Prejudice**

      Counsel defecient performance certainly prejudiced the Petitioner. Petitioner was sentenced to 156 months when he was willing to accept the plea for 70 months. Here he recieved 86 months more than he would have.

      The government would not have cancelled the offer. Within the few days the Petitioner took to accept the offer, the government had not filed the 924(c) offense, nor were there any developments in the case.

      The Court was also likely to accept the plea deal. The plea deal doubled the other 15 co-defendants sentence in this case. And as the Court pointed out, his lack of cooperation has little consideration in what sentence the defendant receives. Thus, but for Counsels defeceint performance, the outcome would have been different.

**Lafler**

      Petitioner reouest that his sentnece be set aside and be given the benefit of the 70 months, or any relief necessary to accomplish the 70 months desired outcome.

---

[1] It's being noted that it was co-counsel Mitchell Baker that bought the plea- deal and stated he needed to know, so that he could go to Africa.

Issue III          APPELLATE COUNSEL WAS CONSTITUIONALLY
                   DEFICIENT FOR FAILING TO PERSUE A CLEAR
                   OBJECTIVE OF PREVENTING THE COURT FROM
                   USING PREPONDERANCE OF THE EVIDENCE TO
                   DETERMINE THE DRUG WEIGHT.

Facts:  Petitioner was charged with conspiring to distribute and possess with intent to distribute, one or more of the following controlled substances (1) more than 500 grams but less than 5 Kilograms of cocaine. (2) more than 28 grams but less than 280 grams of cocaine base (3) less than 50 grams of methamphetamines. All in violation of Title 21 U.S.C. § 841(a)(1), 21 U.S.C. §841 (b)(1)(B)(ii) and 846.

Prior to trial and at the rest of the governments case, there are discussions and agreeances, that all drug amounts have to be specific elements, that have to be found beyond a reasonable doubt, to attribute a drug finding amount to the Petitioner. Tr. 751, 755-56, 830-31, 840.

Counsel, was limiting the liability that his client could face, from the holdings of United States v. Watts, 519 U.S. 148, 157 (1997) (Per Curiam) (Explaining that judicial fact finding of acquiited conduct is permissable because a jury cannot be said to have "necessarily rejected" **any facts** when it returns a **general verdict of not guilty**). Thus, Counsel obtaining "special verdict form" for lesser drug amounts Tr. 928-930 was dispositive to other court's in determining how to calculate a sentence. See United States v. Pimentel-Lopez, 828 F.3d 1173, 1176 (9th Cir 2015) ( "Where the jury made affirmative finding, under the highest standard of prrof known to our law, that the amount of meth attributable to defendant is less than 50 grams, the district court cannot attribute more than that amount to defendant without contradicting the jury on a fact it found as a result of its deliberations; District judges have many powers, but contradicting juries as to finding of facts they have been asked to make is not among them, to do so would be a clear violation of Petitioner's Sixth Amendment rights."); United States v. Saunders, 826 F.3d 363, 372 (7th Cir 2015) (Because we believe the (jury form) cannot properly read as a factual finding that less than 1,000 grams were involved, the sentencing court was permitted to finda higher drug quantity by preponderance of the evidence.)

These rulings appear to be in accord with Supreme Court precedents, about matters that are put before the jury, fall exclusively within the province of the jury. Crane v. Kentucky, 476 U.S. 683 688 (1986)( As the Court noted in Jackson v. Denno, 378 US 368 (1964), because question of credibility, whether of a witness or of a confession, are for the jury,  the requirement that the court make a pretrial voluntariness de-

termination does not undercut the defendant's traditional prerogative to challenge the confession's reliability during the course of the trial; " it has expressly assumed that evidence about the manner in which a confession was secured will often be germane to its probative weight, a matter that is exclusively for the jury to assess.") Thus, were a court to prevent a defendant from showing the circumstances in which a confession was obtained, it would violate his rights under the Due Process Clause, to a fair trial. Crane, 476 US at 690; Strickland v. Washington, 466 U.S 668, 684-85 (1984) ( the constitution guarantess a fair trial through the due process clause, but it defines the basic elements of fair trial largely through several provisions of the Sixth Amendment.)

Clearly in this case, the prosecution sought to prove that the Petitioner was involved and did conspire to possess and distribute more than 500 grams of cocaine and more than 28 grams of cocaine base. Tr. 950-51. The prosecution's efforts however, came exclusively through confessions of witnesses: Gregory Williams, Christopher Vigil, Sidney Taylor, Robert Painter, Simeon Ramirez, and Francisco Aguilar. Id.

In contrast, the defense, clearly told the jury, that the making of those confessions, are not reliable. Tr. 162. Their Confessions is based on their incentives to get deals, Id as a result, their testimony changes up alot, and gets worse for the defendant, as they want to make sure their deal get accepted as this defendant nears trial. Tr 162-63... Because this becomes a question of credibility and the manner in which these confessions were secured, their testimony falls exclusively for the jury to assess. Crane, 476 U.S. 688.

## Confession of Witnesses

Francisco Aguilar: Mr Aguilar confirmed that everytime the prosecution reinterviewed him, the drug amounts increased that he allegedly sold to the Petitioner. Tr. 544. On January 9th, he testified for the prosecution he sold the Petitioner 9 ounces of cocaine. Tr. 519-20. On cross examination however, he admitted that he did not sale the Petitioner 9 ounces. Tr. 539-40. He admitted that he changed the drug amounts of a 4 gram sale to a 4 oz. sale based on the conditions that the prosecution would not accept testimony that it was a 4 gram sale. Tr. 532-34. At the Sentencing Hearing ( S. Hr. hereinafter), that Court stated that there was troubling aspect about Aguilar testimony, and could see excluding the numbers from the equation. S. Hr. 31.

Simeon Ramirez: Mr. Ramirez had an agreement to come in an testify. Tr. 433, 483, 485. The first time he had ever met or knew of the Petitioner, is when he came to Mr. Ramirez auto repair shop in the summer of 2013. Tr. 434 On that day, Petitioner allegedly put a $1000 down on a car that cost $2500. Tr. 436. Approximately a week later, the car is payed off. Tr. 437. .. Ramirez testimony however,

is that he sold Petitioner 4 oz of cocaine two months prior to him purchasing the car. Tr. 439. Then two weeks later he allegedly sold another 4 oz's Tr. 440. It was never explained how was this possible, when he did not even know the Petitioner until he met him at his shop. Tr. 434. The jury likely rejected this 8 oz sale. Ramirez stated his next sale was a few months down the line in November. Tr. 440. On November 22nd, Ramirez interpreting a wiretap, states he sold Petitioner 1oz of cocaine. Tr. 442. If believed , the jury heard least conflicting that he sold the Petitioner 28 grams of cocaine. Id.

Christopher Vigil: Mr. Vigil testified that his relationship to the Petitioner was that the is a supplier of cocaine. Tr. 660, 671. No evidence however was introduced of any alleged drug transactions between June, 2013 thru November 28th, 2013. On November 29th, Vigil testified he sold Petitioner 2oz's of cocaine. Tr. 662, 663, 950. This was a total of 56 grams of cocaine. Id.

Gregory Williams: Mr. Williams, testified that the circumstances and condition's he was under when he provided his confessions, was that he was concerned about dying in prison behind this conviction. Tr. 330. The government during closing arguments did not identify Mr. williams as a co-conspirator, in contrast with Vigil, Aguilar, and Ramirez. Tr. 946, 948, 952... Despite the government bolstering during opening arguments how Petitioner's movements was being recorded, those cell phone taps failed to corroborate Williams confessions that he purchased 7-9 grams of cocaine and 1.7g of cocaine base once to twice a week. Tr. 303-04, 310, 315, 319, 321. Had it been believed it would have resulted in a finding of no more than 16 grams of cocaine and 3.5 grams of cocaine base from the two alleged recorded drug transactions. Id.

Robert Painter: Mr. painter testified that he gave a proffer statement that he purchased cocaine from Petitioner 4-5 times a month. Tr. 382-83. But, his initial response when asked in trial, was twice a month. Id. After the government reminded him of his proffer statement and that he has to tell the truth, he stated 5 times a month, maybe. Id.... recorded conversations between Painter and Petitioner failed to corroborate Painter's assertions, as in a 90 day periode, it showed possibly three alleged transactions. Tr. 389, 391, 395-96. Further, Painter switched numerous of times of the type of alleged drugs  he was attempting to purchase on the March 2nd  transaction. Tr. 382, 395, 397, 405. The jury acquitted Petitioner of this alleged conduct. Had it been credible, it would have been a finding of no more than 3.5 grams of cocaine. Tr. 386 and 7 grams of meth. Tr. 391.

Sidney Taylor:  The jury witnessed tha Taylor did not even meet the Petitioner until November 23rd, 2013. Tr. 352  And only dealt with him until February, 2014, Id, and this was when he could not get drugs from others he ws dealing with. Id; Tr. 364.  The jury acquitted defendant ofthis conduct. The phone recording's if believed showed approximately two alleged drug transactions for 1.6 grams of cocaine and 1.6 grams of cocaine base. Tr. 351 -54.

The Supreme Court, did not limit the exclusive providence of the jury to the credibility of witnesses, it allowed, " any part of the prosecutions case to be shown to be unworthy of belief. Crane, 476 U.S. at 688-89. See Also United States v. Cronic, 466 U.S. 648, 656 (1984) ( .the defendant has the basic right to have the prosecution case encounter and "survive the crucible of meaningful adversarial testing")

**Subterfuge by the Prosecution:**  The jury witnessed the prosecution on multiple occasions, strive to mislead them... In the testimony of Simeon Ramirez, the alleged sale for 4 oz'z before he ever met the Petitioner, Tr. 434-439, despite expressed confusion about that testimony, the prosecution did not seek to find out how was that possible, instead, the prosecution sought to narrate that'alleged sale to happen within the time frame of the indictments. Id at 439.

With the testimony of Francisco Aguilar, the jury witnessed the prosecution actually solicit false testimony, that Aguilar believed at the time of his plea agreement he had sold the Petitioner 4 oz's instead of 4 grams. Tr. 527  Thus, defense counsel brought out evidence that Aguilar repeatedly told the prosecution it was nothing but a 4 gram sale , in which the prosecution would not accept. Tr. 534. Further, to attempt to rebut the credibility problem of Aguilar, the prosecution presented evidence that Aguilar as a drug dealer, would not keep records of his illicit dealings, because of the dangers of law enforcement come knocking. Tr. 545... Counsel makes the connection during closing arguments, that the prosecution, in 2017, with allthe technology to record these witnesses interviews, they dont do that, because they dont want you to see the pressure these co-defendants were receiving in telling their story. Tr.  990-91. Further counsel vigorously attacked the credibility of the drug amounts. Tr. 977, 980-84, 989-90, 994.

**The Jury Agreed with the defense.** Crediting the less conflicting testimony:

        Simeon Ramirez    ..... 28 grams of cocaine.
        Francisco Aguilar .... ---
        Robert Painter    ..... 3.5 grams of cocaine 7 grams of meth
        Gregory Williams  .... 16 grams of cocaine and 3.5 grams of cocaine base
        Sidney Taylor    ...... 1.6 grams of cocaine and 1.6 grams of cocaine base
        Christopher Vigil .... 56 grams of cocaine

Totaling 105.1 grams of cocaine, 5.1 grams of cocaine base, and 7 grams of meth, thus, the jury found that the Petitioner was involved in a conspiracy with less than 500 grams of cocaine, less than 28 grams of cocaine base, and less than 50 grams of meth that could be attributed to him.

On the marijuana equivalancy chart this amount to:

105.1 grams of cocaine · 200g of marijuana = 21.020 Kilograms of Marijuana.
5.1g of cocaine base · 3,5715 of marijuana = 18.212 "           "
7g of Meth · 2000g of marijuana          = 14    "           "
                                          ----------
                                          53.232 Kg of marijuana.

52.232 kg of marijuana has an offense level of 18.

## Sentencing

Counsel filed extensive objection's by motion as well as orally to the sentencing memorandum arguing amongst many things: how the prosecution is overcharging in attempt to force defendants to either cooperate, accept the mandatory minimum charge, or go to trial. S. Hr. 24,25. Counsel specifically identified that the prosecution case "did not survive an adversarial process," the jury rejected the prosecution's over charged amounts returning the verdict as it did, the jury found the government case not credible. Thus, counsel argued that the Court was limited to the findings by the jury, resulting in an offense level of no more than 22. Further counsel objected that the preponderance of the evidence standard is unconstitutional. S. Hr. 24, 25, 29, 30-32, 62-65.

The Court overruled counsel's objection's. S.Hr. 19, 32. In doing so, the Court acknowledged that there are some cases coming thru the system finding that the "minimum indicia of reliability standard," is a violation of the Sixth Amendment. S.Hr. 58. Further, acknowledging, that acts of the government overcharging, has been the subject of extensive debates. S. Hr. 25, 26, but has not seen a case on how to rightfully resolve the dilemma. Id... The court nonetheless in rejecting counsel's arguments, admonished counsel for not preparing a drug amount chart to rebut the governments chart. S Hr. 30-31. Thus, the Court states, had counsel had done so, he could see there being a lower offense level, but he's not going to do the job for counsel. Id.

The Court weighing on the credibility of the witnesses, adopted the government's unchallenged drug calculation chart. S. Hr. 30-33. Finding the relevant conduct of which the Petitioner is accountable for was at least 373.957 kg of marijuana on a converted marijuana basis. S.Hr. 88. That amount corresponds with the submitted goverment chart showing 1.232 Kg of cocaine, 31.8 g of cocaine base, and 7g of meth. See Att. Exh "E". The Court determined erroneously that this amount result in offense level of 30 and found that the overall offense level was 32, but departed below the

the guidelines to sentence Petitioner to 156 months. S.Hr. 48,88. Thus, the Court should find appellate counsel ineffective for not challenging the Court's finding on appeal.

### Standard of Review

To prove that appellate counsel was ineffective under Strickland, 466 U.S. 668 (1984), a defendant must show (1) constitutional performance of his appellate counsel was objectively unreasonable and (2) resulting prejudice, by demonstrating that but for counsel's unproffessional error, the result of appeal... would have been different. United states v. Turrentine, 638 F. Appx. 704, 705 (10th Cir 2016) (quoting Cargle v. Mullen, 317 F.3d. 1196, 1202 (10th Cir 2003). The strength of the omitted issue guides the Court's assessmanet of the ineffectiveness claim. If the omitted issue is plainly meritorious that it would have been unreasonable to winnow it out even from an otherwise strong appeal, its omission may directly establish defecient performance. " In every case, Strickland requires that counsel identify the objective most important to the defendant's case and do the research necessary to decide whether and how to pursue those objectives." United States v. Ervin, 198 F. Supp. 3d 1169, 1173 (D. Mont. 2016) .

Counsel's Defecient Performance.

In this instant case, Petitioner contends that appellate counsel's performance fell below objective standard of reasonableness, whether because of lack of diligence, lack of attention, or simple ignorance of the law, counsel failed to digest the record in preperation of the Appeal, and raise that because the jury made an unamious finding that the drug amounts was **less than 500g of cocaine and less than 28g of cocaine base**, the Court was not permitted to recalculate the credibility of those witnesses to reach a higher drug amount.  See Pimental-Lopez, 828 F.3d at 1176 supra (holding: "The district court cannot attribute more than that amount to defendant without contradicting the jury on a fact it found as a result of its deliberations.")  This holding is also supported by the Supreme Court decision in Watts stating:

> "[A]n acquittal is not a findings of any fact. An acquittal can only be an acknowledgement that the government failed to prove an essential element of the offense beyond a reasonable doubt **Without specific findings, no one can logically or realistically draw any factula finding inferences...**"

Thus, contrary tothe court of appeals' assertion Brady, the <u>jury cannot be said to have "necessarily rejected" any facts when it returns a GENERAL VERDICT OF NOT GUILTY.</u>

For these reasons, "an acquittal in a criminal case does not preclude the government from relitigating an issue when it is presented in a subsequent action governed by a lower standard of proof." United States v. Watts, 519 U.S. at 155-56.

Because this case is **not** utilizing a general verdict **but** a verdict form with specific findings. And because the drug amounts came exclusively from the making of witnesses confessions, in which the Supreme Court has determined that the credibility of those confessions falls exclusively in the province of the jury. Crane, 476 U.S. at 688, Then one can logically or realistically draw a factual finding, from the unsupported and conflicting testimonies concerning the drug weights See S.F., and from the governments apparent subterfuge to inflate the drug weights See S.F., that the jury did return a unamious verdict for drug amounts for less than 500g and 28g of cocaine and cocaine base. Watts at 155. Thus, appellate counsel performance was defecient for not raising this issue.

Further, counsel's performance was defecient because the Court clearly identified that it was possible to get a lower offense level on the drugs, had counsel presented a comparable drug chart... Within that same breath the Court specifically identified that it could see excluding Francisco's testimony fromthe equation, but as the Court adopted the governments drug chart, it accepted the drug amounts of Franciso. See S.F. Exh "E". Because it can be shown that the Petitioner is only accountable for 52.232kg of marijuana that would have offense level of 18, coupled with the Court identifying it could have gotten to a lower level, it shows that the district court findings was in the realm of speculations and had counsel brought that to the Appellates Courts attention it would have been reversed. See United States v. Dahda, 852 F.3d 1282, 1294-95 (10th Cir 2017) (reversing sentence where the governments reliance on additional evidence would not take the district court's finding's outside the realm of speculation.

Because counsel di not argue in accords with **Pimental-Lopez** and **Dahda** on appeal, counsel performance fell below the standard of reasonableness.

Prejudice

Counsel defecient performance prejudice the Petitioner. Because 52.232kg of marijuana is a level 18, Petitioner was not looking at no more than 78 months in contrast with the 300 plus kg that was assigned to him. The Court entertained the sentencing disparity between Petitioner and other defendants, and the Court showed that it was driven by the drug weights to impose the 156 months, doubling the high end of 63-78 months, that a level 20 would represent. Thus, Petitioner request that the Court find his counsel ineffective and reverse his sentence and sentence him according to a Level 20.

Issue IV                 APPELLATE COUNSEL WAS INEFFECTIVE FOR FAILING
                            TO CHALLENGE ERRONEOUS GUIDELINE SENTENCE

Facts:      The District Court determined that the Petitioner was responsible for
373.957 Kg of marijuana on a converted basis. S.Hr.88. The Court determined that this
has an offense level of 30 and provided an additional 2 point enhancement for maintain-
ing a drug house. S. Hr. 48, 88.

According to §2D1.1, 373kg of marijuana represents a level 24. See 2D1.1 Level
24 at least 100kg but less than 400kg of marihuana/ converted drug weight. With the
additional 2 point enhancement, this would have put him at a level 26. With a criminal
history of V, it shows that he was facing 110-137 months. Based on a Level 32 however,
put him at 188-235 months. This was the starting point of the Court's assessment of
Petitioner's sentence, in which the Court departed below the guidelines and sentence
him to 156 months.

Later observing that the Court miscalculated the offense level, Petitioner notified
appellate counsel that 373.957 kg with the two point enhancement should have put him
at an offense level of 26 not 32. See Att Exh F. Counsel ignored this obvious miscalculation.
Petitioner then attempted to assert the error pro se to the Appellate Court. The Court
would not accept the pro se motion. See Att Exh G. Thus, counsel was ineffective for not
raising the miscalculation on direct appeal.
Counsel's Deficient Performance.

In King, he argued that his counsel was ineffective, because he failed to identify
a favorable reading of the U.S.S.G. 4B1.1, that his resisting arrest did not qualify
him for an sentence enhancement. King v. United States, F.3d 844, 851 (8th Cir 2010).
He presented his argument pro se on direct appeal, but because he was represented by
counsel, the Appellate Court did not entertain his argument. Id at 853. In granting
him a COA however, the Appellate Court sua sponte, recognized that his appellate counsel
was ineffective for not picking up on the favorable argument. Id. That Court determined
that King was prejudiced because had counsel presented the issue on direct appeal, the
Court would have reached the merits of the argument. Id at 854 And because he was sentenced
to many years beyond the correct guideline range, the issue met the plain error standard,
thus, reversing his sentence.

Just as in King, Petitioner not only told appellate counsel about the miscalculated
sentence, he presented a pro se argument to the Appellate Court. EXh F,G. Because U.S.S.G.
2D1.1 gave a favorable reading of Level 24 and with the enhancement would have put him
at a Level 26, this Court should find that like King, Petitioner's appellate counsel
cost him the opportunity to present a favorable argument on direct appeal, rendering

16

his performance defecient.

## Prejudice

But for counsel's defecient performance, the appellate court would have reached the merits of his argument's. And, because not only did the Court start with a wrong guideline point, Petitioner was sentenced to years beyond the guideline range had it been corrected. **King** at 854; See Also Molina-Martinez v. United States , 136 S.Ct. 1338, 1343 (2016) ("When a defendant is sentenced under an incorrect Guideline range-- whether or not the defendant's ultimate sentence falls within the correct range, the error itself can and most often will be sufficient to show a reasonable probability of a different outcome absent the error.") Id at 1345. Here Petitioner was facing 110-137 months but it was erroneous calculated at 188-235 months, in which the Court sentenced to 156 months 19 months above the high end of the correct guideline level. Thus the Court should vacate this sentence finding counsel to be constitutionally ineffective.

## Request For Evidentiary Hearing

Petitioner reqeust this Court to grant him an evidentiary hearing. Petitioner points out that the same **Franks** motion that counsel submitted untimely, is being re-submitted in this current motion. Thus, the Court should grant this request, as it appears from the 10th Cir Opinion in **Garrison**, that this Court found it arguable that the motion satisfied the requisite for a **Franks Hearing**. See United States v. Garrison, 2019 U.S. App. Lexis 2107_ Fed. Appx. 8 *2 (10th Cir 2019) ( "The district Court observed ...'they also seem to know many details about CHS-1 that could arguably support a claim that the government was not sufficiently forthcoming to the judge that issued the wire-tap'").

Further, when a movants allegations, if accepted as true, would entitle him to relief, a district court generally may not make a "finding on controverted issues of fact without a hearing" Machibroda v. United States, 368 U.S. 487, 493-94 (1962), cited by United States v. Chavero, 630 Fed. Appx. 866, 868 (10th Cir 2015) (identifying that conflicting affidavits require an evidentiary hearing). Because Petitioner is claiming that counsel wanted him to take a plea based on him counsel wanting to go to Africa during the midst of plea negotiations, and because PEtitioner was telling Counsel's to challenge the miscalculation's of his sentence in which that was failed to be done, if taken as true, then those allegations would support an ineffective assistance claim. Therefore Petitioner request that this Court schedule for an evidentiary hearing.

The Petitioner prays that this Court grant him all the relief he has requested or any relief that the Court believes Petitioner is entitled to.

Respectfully Submitted BY

Ricky Garrison, pro se.

CERTIFICATE OF SERVICE

I declare under the penalty of prejury that the foregoing is true and correct and that this motion Under 28 U.S.C. § 2255 was placed in the prison mailing system on ___October 29, 2019___
(month, date, year)


Executed on ___October 29, 2019___ date.        /s/ Ricky Garrison

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

RICKY GARRISON,
 Petitioner,

v.

UNITED STATES OF AMERICA,
 Respondent.

Civil No:
Criminal Case No: 14-Cr-231-WJW

_____/


EXHIBITS IN SUPPORT OF § 2255 MOTION

## INDEX

TABLE OF CONTENTS         RELATED TO    Pg(S)

Exh "A" Motion to suppress wiretap . . . . . . . . . .  3,4

Exh "B" Proffer Statement in support of motion to
        suppress wiretap.      . . . . . . . . . .  3

Exh "C" Sworn Affidavit in support of § 2255 motion. . .  6,

Exh "D" Email communication's between counsel and
        Government to reach a plea deal . . . . . . . .  6,8

Exh "E" Government's drug chart that the Court adopted. .  13

Exh "F" Email communications between Mr. Garrison and his
        Appellate Counsel identify the miscalculation in
        the sentence that he wanted counsel to raise. . .  16

Exh "G" Motion sent to the Appellate Court raising issues
        pro-se, that the court rejected to hear.. . . . .  16

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No. 14-cr-00231-WJM

UNITED STATES OF AMERICA,
                Plaintiff,

v.

#1 RICKY GARRISON,
                Defendant.

---

## DEFENDANT'S MOTION TO SUPPRESS WIRETAP EVIDENCE PURSUANT TO THE HOLDINGS IN *FRANKS v. DELAWARE*

---

COMES NOW Defendant, by and through counsel, and hereby files the following Motion to Suppress Wiretap Evidence pursuant to the holdings in *Franks v. Delaware* 438 U.S. 154 (1978). In support of this request, the defendant states the following:

### Legal Authority

1. A defendant who wishes a reviewing court to consider evidence outside what the issuing court considered must bring a *Franks* challenge, named for *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant may be entitled to a preliminary evidentiary hearing to challenge the truthfulness of statements in an affidavit sworn out in support of a warrant. *Id.* at 155–56. *Franks* applies to wiretap warrants, *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999), and can be used to challenge both the constitutional requirement of probable cause and the

1

Exh. "A"

stricter statutory requirements found in Title III, *United States v. Merton*, 274 F. Supp. 2d 1156, 1166 (D. Colo. 2003). To obtain a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155–56; see also *United States v. Owens*, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit."). *Franks* similarly applies to material omissions. *Merton*, 274 F. Supp. 2d at 1166.

A defendant's allegations must do more than just suggest a problem with the warrant, instead, the allegations "must be accompanied by an offer of proof...Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks*, 438 U.S. at 171, *see also United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

As this motion will focus on intentional, knowing, or reckless omissions, a court presented with such a set of facts, must add in the omitted facts and assess the affidavit(s) in that light. *Stewart v. Donges*, 915 F.2d 572, 582-83 (10th Cir. 1990). The Court must "ask whether a warrant would have issued in a but-for world where the attesting officer faithfully represented the facts. If so, the contested misstatement or omission can be dismissed as immaterial. If not, a Fourth Amendment violation has occurred and the question turns to remedy." *United States v. Herrera*, 782 F.3d 571, 575 (10th Cir. 2015).

2.  Defendant, in filing this Motion to Suppress Wiretap Evidence, pursuant to the holdings in *Franks*, is asserting the following violations:

A. The Government made numerous material omissions as to the identity of CHS-1 (who is admitted as being Leslie Leyba).   These material omissions include:

(1).  CHS-1's relationship with Francisco Ramirez;

(2).  CHS-1's name;

(3).  CHS-1's living arrangement (address) with Francisco Ramirez;

(4)  CHS-1's extensive ties to Mr. Ramirez, including driving the same vehicle.

B. The Government intentionally misled, by omission, the Court as to the identity of CHS-1 in order to create necessity.   While this argument is interrelated to the argument in ¶ A, above, it is a separate issue, as will be seen later.

C. The Government materially omitted information concerning the involvement of CHS-5 in the investigation.

3.  The violations alleged in ¶ 2 fall into the following legal categories:

A.  The material omissions as to CHS-1, if included, would have resulted in a finding that "necessity" had not been met;

B.  The intentional misleading, by omission, as to the identity of CHS-1, if not undertaken by the Government, would have resulted in a finding that

"necessity" has not been met;

C.  The material omissions as to CHS-5, when combined with the other omissions, if included, would have resulted in a finding that "necessity" had not been met.

4. The *Franks* legal analysis to a wiretap motion is similar to the *Franks* approach to a search warrant.  One significant difference is the impact of the omissions or misstatements upon the government's application; in a wiretap motion, a *Franks* error may jeopardize not only probable cause, but also necessity for the wiretap. *See e.g. United States v. Ippolito*, 774 F.2d 1482, 1485 (9th Cir. 1985). Accordingly, the *Franks* errors asserted by defendant are such that "necessity" would not have been found, absent their omission.

5.  The arguments in this Motion apply to all of the wiretaps in this case:  TT1 – TT13.  The *Franks* errors continue to each and every wiretap Order issued, with TT1 as the starting point; the Franks errors in TT1 taint the later wiretaps as those wiretaps relied upon the proceeds of TT1, not to mention that the later wiretaps continue to include the material omissions and misrepresentations that led to TT1. Importantly, if an original wiretap was improvidently granted, the government cannot use the fruits of that wiretap to obtain authorization for alter interceptions. *See, e.g., United States v. Giordano,* 416 U.S. 505, 529-30 (1974).

**The Government materially omitted information concerning the relationship between CHS-1 and Francisco Ramirez**

4

6. Throughout the investigation the Government indicated that they had a confidential human source (CHS-1) who was able to provide the Government with information concerning Francisco Ramirez, the subject of TT1.

7. CHS-1 was not identified, by name, in TT1, nor any subsequent wiretap application. CHS-1, it turns out, was Leslie Leyba. Ms. Leyba was Mr. Ramirez' girlfriend/former spouse. The Government admitted that Ms. Leyba was CHS-1 in Doc. #1004, pg. 21.

8. The Government, in fact, took great pains to hide this relationship from the Court and it was not until the Government's Response to defendant's Motion to Suppress Wiretap Evidence (Doc. #1004, pg. 21) that the Government admitted that CHS-1 was Ms. Leyba. Oddly, the Government failed to apprise the Court of the true nature of the relationship between CHS-1 and Mr. Ramirez. Instead of advising the Court that the two were girlfriend/boyfriend and/or former spouses, the Government referred to their relationship as a "close social relationship with Francisco Ramirez..." Doc. #1004, pg. 21.

9. The Government never mentioned that CHS-1, Leslie Leyba, lived at the same address as Francisco Ramirez: 2120 Sable Blvd. On October 25, 2013, Mr. Ramirez received a call on TT1 from an unknown individual. This call indicated that the unknown person was stopped by the police. CHS-1 assisted the agents in identifying the individual using the phone. INV000579. Included in this report is a

message from CHS-1 asking the agent(s) if someone had been contacted by police near Mr. Ramirez' residence o f2120 Sable Boulevard. *Id.* The next day, Mr. Ramirez made an outgoing telephone call on TARGET TELEPHONE ONE to LESLIE LEYBA at (720) 530-7367 subscribed to Leslie Leyba, 2120 Sable Boulevard, Aurora, Colorado. INV 000580 (emphasis added).

10. CSH-1 (Leslie Leyba) is listed as the emergency contact for Francisco Ramirez in a May 15, 2013 arrest/booking report.  INV 000126.  Following this report, on May 16, 2013, an Impounded Vehicle Report indicates that the car that Mr. Ramirez was stopped driving, on May 15, 2013 is owned by a Betty Leyba.  INV 000128.  This information was not supplied to the issuing Court(s).

11. Mr. Ramirez also admits to having ties to Ms. Leyba.  He stated, during an intercepted call, that he had deposited his entire check into her account.  INV 000660.  He indicated that he did this in order to cash the check. *Id.*  He also indicated that he would pull the cash out the next day. *Id.*  This information was not supplied to the issuing Court(s).

12. The ties between CHS-1 (Ms. Leyba) and Mr. Ramirez, listed in paragraphs 6 -11, were omitted from the wiretap applications in that the Government never even summarized the relationship between CHS-1 and Mr. Ramirez, rather, they omitted the information, even in summarized fashion, thus making it appear that CHS-1 and Mr. Ramirez, while associated, were not close, intimate, boyfriend/girlfriend, living together, driving the same vehicles, and financially interrelated.

6

**The Government's assertion that traditional investigative means were not working is obliterated once the Court is made aware of the relationship between CHS-1 (Leslie Leyba) and Mr. Ramirez and the Government's omissions regarding the relationship**

13. The Government asserted that a wiretap of Francisco Ramirez was necessary, because:

> As the facts set forth above demonstrate, and for the reasons set forth below, your affiant believes that these traditional investigative techniques have been tried and have either: (1) failed completely; (2) have had limited success but have failed to achieve the full objectives of this investigation as delineated in paragraph 7 supra; (3) reasonably appear to be unlikely to succeed if tried; or (4) are too dangerous to employ.

WT000055, ¶ 88.

The Government then goes on to assert the basis for their conclusion that traditional investigative methods will not work. The defense will address each of the conclusions submitted.

14. The Government concluded as following concerning physical surveillance:

> Physical surveillance:  your affiant believes the interception of wire and electronic communications to and from TARGET TELEPHONE ONE is necessary to identify all of Francisco RAMIREZ' source(s) of cocaine, narcotics customers, other possible co-conspirators, storage facilities and importation times and locations.

*Id.* at ¶ 108.

The Government, having omitted the relationship between CHS-1 and Mr. Ramirez, failed to inform the issuing Court(s) that CHS-1 was, in fact, able to provide all such information since she lived in same home with Mr. Ramirez, had access to his phone, vehicles, and was able to provide the Government with up-to-date and accurate information concerning Mr. Ramirez.  In reality, the

Government had fully penetrated Mr. Ramirez' alleged organization.

15.  The Government asserted that U.S. Postal Service mail check(s) were not providing valuable information or they might compromise the investigation.  The Government stated the following:

> On September 24, 2013, MGTF investigators requested postal information for multiple addresses associated with this investigation including: 2120 Sable Boulevard, Aurora, Colorado, 80011, the residence of Francisco RAMIREZ; 10340 East 13th Avenue, Aurora, Colorado, 80010, the residence of Ricky GARRISON; and 701 Tucson Street, Aurora, Colorado, 80011; the residence of Jesus MOLINA-VILLARREAL. Investigators learned that 2120 Sable Boulevard, Aurora, Colorado, has received mail addressed to known family associates of his. However, investigators have not received information from any of the mail cover requests that identifies a named target and interceptee of this investigation as a result of the postal checks.

> Your affiant believes continued use of postal checks will be of little use to this investigation and may actually be detrimental. Named target and interceptees of this investigation have demonstrated an active effort to avoid using their real names on public record documents; specifically phone contracts and vehicle registration records. Your affiant has learned that the targets of this investigation use false names and addresses to register phones and vehicles to thwart efforts of law enforcement attempting to identify them. There is no reason to believe that the targets of this investigation would not take similar precautions with regard to their residences.

> Additionally, MGTF investigators are aware of two documented instances of mail cover requests being disclosed to the targets of an investigation. Such a disclosure would adversely affect the investigative efforts being utilized in this investigation and would jeopardize the safety of cooperators and investigators. Your affiant believes there are more effective methods of identifying targets related to this investigation and does not believe mail covers will further the objectives of this investigation.

*Id.* at ¶ 109-111.

Here, the Government not only omitted that CHS-1 lived at 2120 Sable Blvd, they

also omitted that CHS-1 (Leslie Leyba) had full access to the mail at 2120 Sable Blvd.

16.    The Government addresses the use of CCTV surveillance cameras by asserting that:

> However, cameras alone will not allow investigators to determine the full scope of the drug trafficking organization to include: identifying co-conspirators, methods of transportation, pooling of money and dates and times associated with drug shipments. For example, without the advance notice provided by the interception of wire and electronic communications investigators will be able to view subjects arriving at Francisco RAMIREZ' residence but will be unable to take additional steps prior to co-conspirator meetings to conduct physical surveillance of subjects leaving the location and potentially identify storage facilities or other co-conspirators.

*Id.* at 114.

Again, there is no mention of the fact that CHS-1 is Leslie Leyba, Mr. Ramirez' girlfriend/ex-spouse, who lives in the same home with him, 2120 Sable Blvd. This omission denied the Court the full context of the penetration of Mr. Ramirez' alleged organization and deprived the Court of valuable information from which to test the conclusions as to the inability of CCTV surveillance to be used, in combination with CHS-1, to achieve their goals.

17.    The Government addressed the use of GPS tracking of vehicles.    The Government attested that "[o]n September 12, 2013, the Honorable Judge Mix, United States Magistrate Judge for the District of Colorado, authorized a tracking warrant, case number 13-SW-05723- KLM, for Francisco RAMIREZ' gold Chevrolet Malibu sedan (622-HJO)." WT000068, ¶ 68.    Here, the Government omitted that CHS-1 also drove the Malibu and further omitted any of the

9

associations between CHS-1 (Ms. Leyba) and Mr. Ramirez. In the application (for 13-SW-05723-KLM), in fact, the Government asserted that the "TARGET VEHICLE is almost exclusively used by RAMIREZ and his girlfriend Leslie LEYBA." TKR 000183. Curiously, within this very application, the Government identifies Mr. Ramirez' girlfriend as Ms. Leyba and also refers to CHS-1 without identifying to the Court that CHS-1 and Ms. Leyba are one in the same.

18. The Government addressed the execution of search warrant and other court orders. The Government begins their analysis of with the use of pen registers to capture information on Mr. Ramirez' phone(s). Two pen register applications were approved by the Honorable Judge Mix: 13-SW-05718-KLM and 13-SW-05735-KMT. WT000071-72, ¶ 124-125. In neither of these applications does the Government give the Court any information concerning the relationship between CHS-1 and Mr. Ramirez. Further, the Government asserted that "[i]nvestigators learned that Francisco RAMIREZ changed his phone number before reactivating the 720-628-0597 phone number. Id. at ¶ 124. The Government did not inform the Court that this information was provided by Ms. Leyba. INV000472. Rather, the Government advised that CHS-1 had provided this information. WT000045, ¶ 70. Again, the failure to supply the omitted information concerning CHS-1 denied the Court the ability to assess the success of traditional investigative means, which in this instance were GPS phone tracking.

19. The Government also addressed their ability to conduct a low-key entry into the buildings associated with Mr. Ramirez. They asserted "that it would be extremely difficult to conduct a low key entry into the multiple

10

residences/businesses associated with this group without alerting the targets to police observation." WT000072, ¶ 127. The Government concluded, "it would be difficult to select a time to execute the warrants and not be observed by other neighbors, thus eliminating the possibility of utilizing a surreptitious search warrant with delayed notice." *Id.* Omitted, once again, were the facts concerning CHS-1: she lived at the same home as Mr. Ramirez, she had access to the home, she was cooperating with the Government and giving them information. Thus, the Government's omissions, if included, negate their conclusion(s).

20. The Government next turned to CHS-1 and CHS-1's extensive penetration of Mr. Ramirez' activities. Paragraphs 130 – 133 layout the information the Government has received from CHS-1. The Government concludes that "[a]lthough CHS-1 continues to provide information of use to this investigation, your affiant does not believe CHS-1 is capable of providing assistance that will enable investigators to achieve the overall goals of this investigation." WT000075, ¶ 133. The Government, however, omitted the identity of CHS-1, her ties to Mr. Ramirez, her residence, her access to his vehicles, and in general, the nature and extent of their relationship.

**The Government intentionally misled, by omission, the Court as to the identity, and the relationship between CHS-1 and Mr. Ramirez, in order to create necessity**

21. The Government never informed the Court of the identity of CHS-1, nor did

the Government inform the Court of the extensive ties/relationship that CHS-1 and Mr. Ramirez shared. This omission was intentional as the Government knew the identity of CHS-1 (Leslie Leyba) and they knew of the relationship between Mr. Ramirez and Ms. Leyba, including, among other ties, her residence being the same as Mr. Ramirez', as well as her sharing a vehicle with him.

22. The intentionality of the omission is best observed by looking at the application for a GPS tracking device presented to the Honorable Judge Mix. The Government attested that "[o]n September 12, 2013, the Honorable Judge Mix, United States Magistrate Judge for the District of Colorado, authorized a tracking warrant, case number 13-SW-05723- KLM, for Francisco RAMRIREZ' gold Chevrolet Malibu sedan (622-HJO)." WT000068, ¶ 68. Here, the Government omitted that CHS-1 also drove the Malibu and further omitted any of the associations between CHS-1 (Ms. Leyba) and Mr. Ramirez. In the application (for 13-SW-05723-KLM), in fact, the Government asserted that the "TARGET VEHICLE is almost exclusively used by RAMIREZ and his girlfriend Leslie LEYBA." TKR 000183. Thus, the Government's omission of the identifiers for CHS-1 in the wiretap applications was the continuation of a pattern of behavior designed to omit the relationship of CHS-1 and Mr. Ramirez in order to create the perception that necessity existed.[1]

---

[1] This pattern of activity continues. The Government, in Doc. #1004, while identifying CHS-1 as Ms. Leyba, failed to outline her extensive ties to Mr. Ramirez. Instead, the Government characterized their relationship as a "close social relationship with Francisco Ramirez..." Doc. #1004, pg. 21

23.    In the wiretap applications, the Government did mention Ms. Leyba.
WT000320, 321, 926, 186, 320.  When Ms. Leyba is mentioned, her relationship
with Mr. Ramirez is not explained.  In fact, when Ms. Leyba's name appears in the
same sentence with Mr. Ramirez, the Government made no effort to apprise the
Court of their relationship, instead, the Government merely stated, "[i]nvestigators
are unsure if the Hispanic male was involved with the drug transaction or if he was
simply an associate of Francisco RAMIREZ or Leslie Leyba."  WT000320.

### The Government materially omitted information concerning the involvement of CHS-5 in the investigation

24. The Government undertook to explain to the Court their use of confidential
human sources.  They did this in paragraphs 130 – 142.  The Government does
not mention CHS-5 in these paragraphs.  The Government, thus, omitted the
information concerning CHS-5.  CHS-5, however, was known to the Government
and being used in this investigation prior to the application for TT1.

25. The activity of CHS-5 was extensive.  CHS-5 was being used to identify Drug
Courier #1.  INV000518.  CHS-5 was being used to contact Mr. Molina-Villarreal.
*Id.*; INV000522[2].  CHS-5 was fitted with an electronic recording device to record

---

[2] Doc. #522 references an October 7, 2013 drug purchase that CHS-5 made with
Mr. Molina-Villarreal.  It appears that CHS-5 was, thus, identified on October 7,
2013 by the Government during a drug bust.  The arrested individual, Alvin
Valdez, asks to speak to Investigator Gullucksrud who indicates there will not be
a filing at this time.  INV000503-504.

his meeting with Mr. Molina-Villarreal. INV000530. CHS-5 was also allowing his

phone to be reviewed by the investigators. *Id*. CHS-5 was being used to conduct

controlled drug purchases with Mr. Molina-Villarreal. INV000532. In fact, one

controlled purchase occurred on October 22, 2103, one day prior to the TT1

application. INV000548. All of this information was omitted.

### The *Franks* errors asserted by defendant are such that "necessity" would not have been found, absent their omission

25. The fact pattern of this case is strikingly similar to *United States v. Simpson*,

813 F.2d 1462 ( 9th Cir. 1987). In *Simpson:*

> Following an evidentiary hearing, Judge Hatter found that the affidavit submitted by agent Robert Ross ("Ross Affidavit") to satisfy the statutory requirement that wiretapping be authorized only when necessary was "**artfully drafted with the intent to mislead the reviewing judge**." Findings of Fact and Conclusions of Law Suppressing Wiretap Evidence ("Wiretap Findings"), at 5. The affidavit stressed the need for wiretapping to identify all of the members of Simpson's suspected narcotics enterprise. In it Ross claimed that adequate evidence could not be obtained through other investigative avenues because Simpson and his co-conspirators had "insulated themselves and their high echelon accomplices from all but a small circle of associates" such that "[u]ndercover agents, confidential informants, and witnesses cannot penetrate the organization to the highest levels because of insulation tactics utilized." *Ross Affidavit*, at 47. With respect to the FBI's plan to set Simpson up for a drug bust, the affidavit claimed that "there is no reason to believe that such a purchase would identify the source and storage place for the heroin, nor the identities of other conspirators." *Id*. at 50.

*Id. at* 1471 (emphasis added).

The court, in *Simpson*, was not convinced. The court, focusing on the depth of

14

their informant's penetration of the enterprise, through traditional means, negated

the "necessity" prong.

> The government's assertion that traditional law enforcement methods could not discover the identity of all members of the alleged drug ring assumes that Miller had no potential to win Simpson's confidence enough to learn the details of the drug enterprise. In fact, however, Judge Hatter found that Miller had become "deeply involved" with the enterprise. *Wiretap Findings, at 4.* Miller had obviously established a close friendship with Simpson, had been present on several occasions while Simpson conducted business with other members of the alleged drug ring, *Ross Affidavit,* at 27-33, and had become trusted enough to be permitted to identify potential drug purchasers for Simpson. In *Ippolito,* we rejected the government's claim that wiretapping was needed to discover the identities of unknown cohorts when in fact an informant "was both willing to testify and had great potential for uncovering the entirety of the conspiracy under investigation." 774 F.2d at 1486-87. Following *Ippolito,* we conclude that if the full details about Miller's penetration into Simpson's activities were known to the issuing judge, "a reasonable district court judge could have denied the application because necessity for the wiretap order had not been shown." *Ippolito,* 774 F.2d at 1487.

*Id.,* citing *United States v. Ippolito,* 774 F.2d 1482, 1487 (9th Cir.1985).

25. Thus, the *Simpson* court, faced with a similar fact pattern as in this case, determined that traditional investigative techniques were working. Defendant urges this Court to, likewise, find that traditional investigative techniques were working and that there was no "necessity" for the wiretaps.

WHEREFORE, for the reasons stated herein, defendant prays the Court find in favor of his motion.

DATED at Denver, Colorado this _____th day of July 2016.

Respectfully submitted,

/s/Miller Leonard
14143 Denver West Pkwy.,
Suite 100
Golden, CO 80403
(720) 613-8783 Phone
(303) 907-9516 Phone - Cell
(720) 613-8782 Fax
Attorney for Defendant
CO Reg. # 41029
miller@themillerleonardlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July _____, 2016, I electronically filed the foregoing
Motion and that a copy was delivered to all parties allowed to receive this motion
by the District of Colorado's ECF filing system.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Criminal Action No. 14-cr-00231-WJM

UNITED STATES OF AMERICA,
                Plaintiff,

v.

#1 RICKY GARRISON,
                Defendant.

---

## DEFENDANT'S PROFFER PURSUANT TO THE HOLDINGS IN *FRANKS v. DELAWARE*

---

COMES NOW Defendant, by and through counsel, and hereby files the following Proffer to his Motion to Suppress Wiretap Evidence pursuant to the holdings in *Franks v. Delaware* 438 U.S. 154 (1978). In support of this request, the defendant states the following:

### Legal Authority

1. A defendant who wishes a reviewing court to consider evidence outside what the issuing court considered must bring a *Franks* challenge, named for *Franks v. Delaware*, 438 U.S. 154 (1978). *Franks* held that a defendant may be entitled to a preliminary evidentiary hearing to challenge the truthfulness of statements in an affidavit sworn out in support of a warrant. *Id.* at 155–56. *Franks* applies to wiretap warrants, *United States v. Green*, 175 F.3d 822, 828 (10th Cir. 1999), and can be used to challenge both the constitutional requirement of probable

1

Exh. "B"

R

cause and the stricter statutory requirements found in Title III, *United States v. Merton*, 274 F. Supp. 2d 1156, 1166 (D. Colo. 2003). To obtain a *Franks* hearing, the defendant must make "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit." *Franks*, 438 U.S. at 155–56; see also *United States v. Owens*, 882 F.2d 1493, 1499 (10th Cir. 1989) ("It is not enough to show . . . that an affiant's negligence or innocent mistake resulted in false statements in the affidavit."). *Franks* similarly applies to material omissions. *Merton*, 274 F. Supp. 2d at 1166.

A defendant's allegations must do more than just suggest a problem with the warrant, instead, the allegations "must be accompanied by an offer of proof...Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained." *Franks*, 438 U.S. at 171, see also *United States v. Kennedy*, 131 F.3d 1371, 1376 (10th Cir. 1997).

As defendant is offering evidence that in the form of Investigative Reports, Wiretap Reports, and admissions made in court filings, the defense is proceeding with an offer of proof as to the information that supports the allegations.

As a preliminary matter, all of the evidence defendant is offering was either produced by the Government in discovery, or is contained in filings made by the Government in this case.

2

The following information supports the claims made in defendant's motions:

1. CHS-1 is Leslie Leyba: this information was admitted, and is contained, in Doc. #1004, filed by the Government. The Government admits that CHS-1 is Ms. Leyba on page 21 of Doc. #1004. Given the admission of the Government as to the identity of Ms. Leyba, the defense asserts that this issue is not subject to evidentiary contest, however, out of an abundance of caution, defendant submits that the Government would admit that CHS-1 is Ms. Leyba, and further, if necessary, the defense would be able to call witnesses to establish this fact, namely the affiant of TT1.

2. Leslie Leyba resided at 2120 Sable Blvd. She resided with Fransisco Ramirez. This information is supplied in INV000579 to INV000585. INV000579 to INV000585 were provided to the defendant by the Government in discovery. The defense has no reason to believe that the Government, who supplied this information to the defense, objects to the contents of the documents, namely the address of Ms. Leyba. However, the defense offers that INV000579 to INV000585 were prepared by Investigator J. Mohlman on 10-26-2013. The reports contain the address of Ms. Leyba.

3. Ms. Leyba and Mr. Ramirez were boyfriend/girlfriend and they reside at 2120 Sable Blvd. Also, Ms. Leyba was the driver of the gold Chevrolet Malibu, along with Mr. Ramirez. CHS-1 and Ms. Leyba are referenced in the same document without identifying CHS-1 and Ms. Leyba as being the same person. This information was supplied in TKR000182-183.

TKR000182-183 is a court filed document: 13-SW-05723-KLM. The document is subject to the Court taking judicial notice; TKR 000183 is contained in TKR000177-187. The document was signed by the Honorable Judge Mix; it was attested to by Investigator Gullicksrud, and reviewd by AUSA Phillips. However, if the information proffered is contested, the defense would call Investigator Gullicksrud to the stand where he would affirm the contents of the filing, and specifically, the address of Mr. Ramirez and Ms. Leyba, as well as their relationship status.

4. Mr. Ramirez listed Ms. Leyba as his emergency contact in a May 15, 2013 arrest/booking report. This information is contained in INV000126. INV000126 is an Aurora Police Department Arrest/Booking Report. It was filled out by Officer Schol. The document was provided in discovery to the defense by the Government and, as a result, the defense does not believe that the Government would contest the information supplied in the document. It the Government would so contest, the defense could either submit this record as a business record, or the defense could call the officer as a witness to the stand to authenticate the document. Further, Mr. Ramirez can testify that he listed Ms. Leyba as his emergency contact.

5. INV000128 is a Impound Vehicle Report from the Aurora Police Department. It was supplied to the defense by the Government in discovery. This document indicates that Ms. Betty Leyba owned the vehicle Mr. Ramirez was driving, it further indicates that Mr. Ramirez lived

4

at 2120 Sable Blvd.   The document was provided in discovery to the defense by the Government and, as a result, the defense does not believe that the Government would contest the information supplied in the document.  It the Government would so contest, the defense could either submit this record as a business record, or the defense could call the officer as a witness to the stand to authenticate the document.

6. INV000660 is the beginning of a document series.  Within this document series, on INV000662, Mr. Ramirez indicates that he is depositing his entire check into Ms. Leyba's bank account.  He also indicates that he will pull this money out the next day.   The document was provided in discovery to the defense by the Government and, as a result, the defense does not believe that the Government would contest the information supplied in the document.   It the Government would so contest, the defense could either submit this record as a business record, or the defense could call the officer as a witness to the stand to authenticate the document.  The document was prepared by Investigator Mohlman.

7. Documents referenced with a prefix WT are documents supplied by the Government in discovery.  These documents are the filings and Order for wiretaps TT1 – TT13.  These documents are all subject to judicial notice, however, the defense has no reason to believe that the Government contests any of the contents of these documents.

8. INV000503, 504518, )522, 530, 532, 548 all relate to CHS-5 and his involvement with the \investigation.  These documents were provided in

discovery to the defense by the Government and, as a result, the defense does not believe that the Government would contest the information supplied in the document.   It the Government would so contest, the defense could either submit the documents as a business record(s), or the defense could call the officer who wrote the reports as a witness to the stand to authenticate the documents.

DATED at Denver, Colorado this _____th day of July 2016.

Respectfully submitted,

/s/Miller Leonard
14143 Denver West Pkwy.,
Suite 100
Golden, CO 80403
(720) 613-8783 Phone
(303) 907-9516 Phone - Cell
(720) 613-8782 Fax
Attorney for Defendant
CO Reg. # 41029
milller@themillerleonardlawfirm.com

## CERTIFICATE OF SERVICE

I hereby certify that on July _____, 2016, I electronically filed the foregoing Motion and that a copy was delivered to all parties allowed to receive this motion by the District of Colorado's ECF filing system.

6

## SWORN AFFIDAVIT

The Petitioner, Ricky Garrison declare under the penalty of perjury that I have knowledge of the foregoing facts and can attest to the foregoing in Court as they are true and correct to the best of my knowledge.

1) James Castle, told me that he believed the government had committed an illegal wire tap and that he was moving to file a suppression motion to all evidence obtained as a result of the wire taps.

2) I informed James Castle that I was willing to take a plea if they offered the right numbers. This statement came after counsel informed me that the government was looking to offer me a deal.

3) I told counsel Mitchell Baker I would take 60 months on a plea deal. When Counsel told me they offered 70 months and in his belief did not think they would go any lower, I told counsel I wanted some time to think about taking the 70 months. But, I wanted counsel to tell me the status of my motion to suppress.

4) I believed that if the motion to suppress had a chance to succeed, it could have brought in the 60 months or better deal.

5) After a few days of contemplating the offer, I called counsel to take the 70 month deal. Counsel would not take my call and or unavailable to take my call.

6) Counsel Mitchell Baker also informed me that because he wanted to take a trip to Africa, he needed an answer from me then at that moment if I was willing to take the 70 months the government was offering.

7) I informed appellate counsel that I believed that the court had miscalculated my sentence , that I should be at a Level 26 instead of Level 32 and asked to present that issue on direct appeal.

8) I informed Appellate Counsel that I wanted him to raise that my Sixth Amendment rights were violated to a trial because the jury found that I was only responsible for less than 500g of cocaine and less than 28g of cociane base.

/s/ Ricky Garrison   10/29/19
Ricky Garrison        Date

Exh "C"



Mackenzie Morris <paralegallos@gmail.com>

---

## Fwd: Mr. Garrison

---

**James Castle** <jcastlelaw@gmail.com>                          Fri, Jan 29, 2016 at 4:02 PM
To: "<paralegallos@gmail.com>" <paralegallos@gmail.com>

please print

--------- Forwarded message ---------
From: **Mitchell Baker** <mitchbaker@estreet.com>
Date: Fri, Jan 29, 2016 at 12:41 PM
Subject: Mr. Garrison
To: "Phillips, Zachary (USACO)" <Zachary.Phillips@usdoj.gov>
Cc: Jim Castle <jcastlelaw@gmail.com>

Mr. Phillips, as we have discussed throughout the week, I went to see Mr. Garrison this morning regarding the offer of 70 months. Mr. Garrison has reconsidered his position with respect to accepting that offer in light of his belief that he is really not looking at much more time based upon the quantities of drugs involved and the gun related issues. He feels that the government is unfairly targeting him as a significant drug dealer and punishing him for things he did not do. He advised me that he would accept an offer of 60 months with the RDAP recommendation and assured me that he would not seek a lower sentence or try to negotiate further if the 60 month sentence is agreed to. Please let us know your position as soon as possible.

Mitch Baker

1543 Champa Street, Suite 400

Denver, CO 80202

Tel 303.592.7353

--
James Castle
Castle & Castle, P.C.
1544 Race Street
Denver, CO 80206
(303) 675-0500
email: jcastlelaw@gmail.com

Exh. "D"



Mackenzie Morris <paralegallos@gmail.com>

## Fwd: Mr. Garrison

**James Castle** <jcastlelaw@gmail.com>
To: "<paralegallos@gmail.com>" <paralegallos@gmail.com>

Fri, Jan 29, 2016 at 4:02 PM

please print

---------- Forwarded message ----------
From: **Phillips, Zachary (USACO)** <Zachary.Phillips@usdoj.gov>
Date: Fri, Jan 29, 2016 at 2:07 PM
Subject: RE: Mr. Garrison
To: Mitchell Baker <mitchbaker@estreet.com>
Cc: Jim Castle <jcastlelaw@gmail.com>


Mr. Baker (and Mr. Castle),


Thank you for taking the time to go see your client. I know you have an obligation to communicate your client's wishes and I appreciate you doing such. However, as you know, it was an extreme concession that ultimately I chose to offer the 70 months. Quite frankly, I and others involved in this case were very set on nothing lower than 78 months. It was only through your (and Mr. Castle's) work and professionalism that I was willing to meet you in the middle and agree on a 70 month sentence.


I know we have discussed this, but to be clear, I want to reiterate my position. As charged (although this will change prior to trial) I am confident in my case against your client and believe at the minimum I can get a conviction that guarantees a 60 month sentence and a guideline sentence of at least 110 - 137 months. I would find it surprising if Judge Martinez sentences your client to anything below a guideline sentence and I believe it is likely that he sentences your client at or near the top end of the guidelines.


Does your client wish to consider the 70 month offer? Please let me know. I can allow him a short time to consider it; however, it is time that we either settle this case or proceed on a trial track. As you know, I am prepared to present evidence to the Grand Jury to add the gun charge during the commission of a drug offense. I would like to do that with the next Grand Jury which is upcoming.


Thank you for your hard work on this case.


Zachary Phillips

Deputy Chief, OCDETF

United States Attorney's Office

District of Colorado

Exh." D"'

of cocaine base (based on three times a week purchase) during the months of October and November 2013.

17.   "Latoya Wimbush was a cocaine customer of Ricky Garrison. In her plea agreement, Ms. Wimbush stipulated to 1.75 grams of cocaine and 1.75 grams of cocaine base as relevant conduct.

18.   "Robert Painter - Robert Painter purchased cocaine, cocaine base as well as methamphetamine from the defendant during the course of the conspiracy. At trial, Robert Painter testified he purchased cocaine from the defendant 4 -5 times a month and he would purchase between 1.75 grams or 3.5 grams and sometimes as much as 7 grams. Additionally, Robert Painter specifically testified the largest purchase he had with the defendant was 28 grams of cocaine base from the defendant on one occasion. Further, Robert Painter testified that on January 5, 2014 he purchased 7 grams of methamphetamine from the defendant. For purposes of relevant conduct pursuant to USSG § 1B1.3(a)(1)(B) the total drug quantity for which the defendant is accountable is at least 91 grams of cocaine (based on 1.75 grams per purchase) or as much as 364 grams of cocaine (based on 7 grams per purchase). Additionally, for purposes of relevant conduct pursuant to USSG § 1B1.3(a)(1)(B) the total drug quantity for which the defendant is accountable is 28 grams of cocaine base and 7 grams of methamphetamine.

## "SUMMARY OF USSG § 1B1.3(a)(1)(B) ACCOUNTABILITY

| Sources | At least | As much as |
|---|---|---|
| Simeon Ramirez | 252 g cocaine | 252 g cocaine |
| Francisco Aguilar | 560 g cocaine | 644 g cocaine |
| Christopher Vigil | 420 g cocaine | 840 g cocaine |
| Travis Edwards | 28.3 g base | 28.3 g base |
| James Tillmon | 3.5 g base | 3.5 g base |
| Christopher Martinez | 7 g methamphetamine | 7 g methamphetamine |
| **Totals** | 1.232 kilograms cocaine<br>31.8 g base<br>7 g methamphetamine | 1.736 kilograms cocaine<br>31.8 g base<br>7 g methamphetamine |

| Customers | At least | As much as |
|---|---|---|
| Greg Williams | 264 g cocaine<br>182 g base | 728 g cocaine<br>364 g base |
| Sidney Taylor | 14 g cocaine<br>14 g base | 42 g cocaine<br>42 g base |
| LaToya Wimbush | 1.75 g cocaine<br>1.75 g base | 1.75 g cocaine<br>1.75 g base |
| Robert Painter | 91 g cocaine<br>28 g base<br>7 g methamphetamine | 364 g cocaine<br>28 g base<br>7 g methamphetamine |
| **Totals** | 370.75 g cocaine<br>225.75 g base<br>7 g methamphetamine | 1.135 kilograms cocaine<br>435.75 g base<br>7 g methamphetamine |

- 8 -

Exh. "E"

**"Drug Quantity Conversion**

19.     **"Purchases from sources:**

At least:

1,232 g of cocaine x 200 g marijuana = 246.400 kilograms

31.8 g base x 3,571 g marijuana = 113.557 kilograms

7 g methamphetamine x 2 KG marijuana = 14 kilograms

Total:          373.957 kilograms

As much as:

1,736 g cocaine x 200 g marijuana = 347.200 kilograms

31.8 g base x 3,571 g marijuana = 113.557 kilograms

7 g methamphetamine x 2 kilo marijuana = 14 kilograms

Total:          474.757 kilograms

**Redistributed:**

At least:

370.75 g cocaine x 200 g marijuana = 74.150 kilograms

225.75 g base x 3,571 g marijuana = 806,153.25 kilograms

7 g methamphetamine x 2 kilo marijuana = 14 kilograms

Total:          806,241.14 kilograms

As much as:

1,135 g cocaine x 200 g marijuana = 227 kilograms

435.75 g base x 3,571 g marijuana = 1,556,063.25 kilograms

7 g methamphetamine x 2 kilo marijuana = 14 kilograms

Total:          1,556,304.25 kilograms

20.     "The evidence at trial clearly established that the defendant was involved in the purchase of at least 1.232 kilograms of cocaine. It is then clear that he redistributed that amount in both cocaine and cocaine base. The evidence at trial clearly establishes the defendant produced and then redistributed at least 225 grams of cocaine base and as much as 435 grams of cocaine base. For purposes of relevant conduct pursuant to U.S.S.G. § 1B1.3(a)(1)(B), the total drug quantity for which the defendant is accountable

- 9 -

TRULINCS 40459013 - GARRISON, RICKY - Unit: PEK-A-A

---------------------------------------------------------------------------------------

FROM: Truskoski, Ryan
TO: 40459013
SUBJECT: RE: Issues to raise on appeal:
DATE: 05/22/2018 07:21:09 AM

Got it. Thanks.

RICKY GARRISON on 5/21/2018 7:37:25 PM wrote
May 21, 2018

1.  Wiretap issue (Denial of Franks hearing)

2.  Conspiracy count 1

3.  Relevant conduct finding attributed to me was 373.957 kilograms marijuana.  The judge attributed base offense level 30+2 point enhancement.  373.957 kilograms marijuana pg 88 sentencing transcripts is a base offense level of 24.  So plus the 2 point enhancement would make my offense level 26.  Base offense level 30 is 1000-3000 kilograms of marijuana.  That's way above the accountability.

4.  Special verdict interrogatory:  Alleyne

5.  Two point enhancement

6.  Criminal history.

These are just a few things i see i know you know more than me so I'm sure i probably have more issues than that.  I'm mailing something to you tomorrow sir.  Then I'll probably have something else for you before Friday i wish you would allow me to speak to you about my issues it would make me feel a little better to have a better read from you Mr. Truskoski.

Thank you,
Ricky Garrison

Exh.  "F"

# UNITED STATES COURT OF APPEALS
## TENTH CIRCUIT
### Office of the Clerk
Byron White United States Courthouse
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

Chris Wolpert
Chief Deputy Clerk

June 25, 2018

Ricky Garrison (#40459-013)
FCI Pekin
P.O. Box 5000
Pekin, IL 61555

     RE:   Case No. 18-1053, *United States v. Garrison*

Dear Mr. Garrison:

We received from you a document captioned *Motion to File a Pro Se Supplemental Brief Raising Meritorious Issues Counsel Failed to Raise*. Please be advised that, because Mr. Truskoski is currently representing you in this appeal, all communications to the court regarding your appeal must come from him. The court will neither accept nor take any action regarding any filing or correspondence it receives directly from you. *See, e.g.*, 10th Cir. R. 46.5(A).

We urge you to communicate with Mr. Truskoski directly on issues related to your appeal but, by copy of this letter, advise him of your motion.

          Very truly yours,

          *Elisabeth A. Shumaker*

          ELISABETH A. SHUMAKER, Clerk

EAS/lal
cc:   Ryan T. Truskoski

Exh. "G"

IN THE UNITED STATES COURT OF APPEALS
FOR THE TENTH CIRCUIT

UNITED STATES OF AMERICA,

                    Plaintiff-Appellee,          Appeal No.: 18-1053

v.                                               ON APPEAL FROM THE UNITED STATES
                                                 DISTRICT COURT FOR THE DISTRICT
                                                 OF COLORADO
RICKY GARRISON,                                  (The Hon. William J. Martinez)

                    Defendant-Appellant.
_____/

MOTION TO FILE A PRO SE SUPPLEMENTAL BRIEF
RAISING MERITORIOUS ISSUES COUNSEL FAILED TO RAISE

NOW COMES Ricky Garrison, proceeding Pro Se in the above
captioned-matter.  The Appellant invokes the legal doctrine as
prescirbed under Haines v. Kerner, 404 U.S. 519, 520-21 (1972),
in the instant proceedings.  And the viable and meritorious reasons
that follows, the Appellant implores the Court, in the interest of
justice and in accord with Due Process of law, to grant leave to
file the instant Pro Se Supplemental Brief.

The U.S. Supreme Court just ruled on two cases that are
applicable to the issues being raised herein; issues that clearly
runs afoul of Rosales-Mireles, ___ U.S. ___ (No. 16-9463)(U.S. June
18, 2018); Chavez-Mela v. United States, ___ U.S. ___, (No. 17-
5619)(U.S. June 18, 2018) and Molina-Martinez v. United States,
133 S.Ct. 1338, 1347 (2013); see also U.S. v. Archuleta, 865 F.3d
1280, 1291 (10th Cir. 2017)(quoting Molina-Martinez, 133 S.Ct. at
1346-47).

                                                 Exh. "G"

### A. Erroneous Guideline Range/Error In Sentencing Calcuation, In Violation Of Due Process

This issue was initially raised in the district court and is therefore preserved for this Court's review under Fed.R.Crim. Proc. 52(a).

In the case at bar, the legislative Guideline for the violation of 21 U.S.C. § 841(a)(1) is U.S.S.G. § 2D1.1 (as several different types of controlled substances were involved in the instant case). The application of U.S.S.G. § 2D1.1 (note 8(B)) directs the district court's ussage of the Drug Equivalency Table to determine the marijuana equivalence of all drugs. See Exhibit - A, [docket entry 1428 at pg. 88]. Pursuant to U.S.S.G. § 1B1.3(a)(1)(B) as to relevant conduct the Appellant was held accountable for 373.957 kilograms of marijuana on a converted basis

The plain error committed by the district court was attributing an erroneous Base Offense Level of 30 in its calculation regarding the Appellant at his sentencing hearing on February 2, 2018. Under U.S.S.G. § 2D1.1 in order for a Base Offense Level of 30 to constitutionally apply, the amount must be at a minimum 1,000 Kg but not exceeding 3,000Kg's of marijuana.

The appropriate Base Offense Level for the 373.957 kilograms of marijuana attributed by the district court shuld have been a Base Offense level 24 (at least 100 kg, not exceeding 400kg's).

There is no question that the aforementioned runs afoul of the rule of law articulated in Molina-Martiez, 133 S.Ct. at 1347;

-2-

<u>Rosales-Mireles</u> & <u>Chavez-Mela</u>, <u>supra</u>.

The Appellant did in fact render an objection to the amonut
of drugs alleged in the PSR. See Exhibit - **B**, [docket entry 1352, **pg 6**
at **📷.** 21-22]. Being convicted under the charge of conspiracy,
there was a wide range from the minimum amount of 373.957 to the
maximum amount of 1,556,304.25 kilograms of marijuana(converted).
That being the summary of U.S.S.G. § 1B1.3(a)(1)(B) accountability
relevant conduct of the PSR completed by the Probation Department.
The Base Offense level should have been 24 for the drug amount,
plus 2-points for the enhancement, thus yielding a Base Offense
Level of 26, rather than the erroneous prescribed BOL of 32,
and a corresponding Guideline range of 110-137. And for the
record, it is the amount of drugs attributed by the distirct
court during a sentencing hearing and NOT the drug amount alleged
in the PRS. See Fed.R.Crim.P. 32 and 35(c), which reads in
pertinent part:

> "As used in this rule, "sentencing" means the
> oral announcement of the sentence." (emphasis added).

Accordingly, clearly "the drug amount of 373.975 kg's"
attributed by the district court during the February 2, 2018
sentencing hearing is a part of the sentence and therefore must
control in accord with Fed.R.Crim.Proc. 32, 35(c) and The Fifth
Amendment Due Process Clause of the U.S. Constitution.

**WHEREFORE**, for the good cause shown above and in accord with

-3-

Supreme Court precedent (Molina-Martinez, 133 S.Ct. at 1346-47;

Chavez-Mela & Rosales-Mireles, supra), and due process of law, the

Appellant respectfully requests the Court to render an order

vacating and remanding the Appellant's sentence to the district

court for a full re-sentening hearing.

CERTIFICATE OF SERVICE

I hereby certify that a true and complete copy of the fore-

going Motion seeking leave of the Court to file a Pro Se supplemental

motion and Motion seeking to have Appellant's sentence vacated

has been placed in U.S. First Class Mail, this day of June 21,

2018, with the postage prepaid to the parties below:


U.S. Attorney's Office
1225 - 17th Street
Suite 700
Denver, CO 80202

Ricky Garrison 40459-013
FCI Pekin
P.O. Box 5000
Pekin, IL 61555

-4-

Legal Mail



◇40459-013◇
Reg.
404
Fed—
P.C—
Pekin, IL 61555
United States

7018 0360 0001 3444 4746

CERTIFIED MAIL

◇40459-013◇
Us District Court
#A105
901 19TH ST
Denver, CO 80294
United States

RECEIVED
OCT 2 8 2019
FCI PEKIN
MAIL ROOM

Mail Room
Federal Correctional Institution
P. O. Box 7000
Pekin, IL 61555-7000

The enclosed letter was processed through
special mailing procedures for forwarding
to you. The letter has neither been opened
nor inspected. If the writer raises a
question or problem over which this facility
has jurisdiction, you may wish to return the
material for further information or clarification.
If the writer encloses correspondence for
forwarding to another addressee, please return
the enclosure to the above address.

7018 0360 0001 3444 4476